# EXHIBIT A

## DARK CIRCUIT LABS, INC.

## SHAREHOLDERS AGREEMENT

This SHAREHOLDERS AGREEMENT, dated as of _Nov 3rd___, 2021, ("Effective Date"), by and among DARK CIRCUIT LABS, INC., with a principal address located at 1900 Reston Metro Plaza, Floors 5-6, Reston, VA 20190 and (the "Company") and each of the Shareholders listed on Schedule 1 attached hereto (each, a "Shareholder", and collectively, the "Shareholders").

## W I T N E S S E T H :

WHEREAS, as of the Effective Date, each of the Shareholders owns the number of shares of Common Stock, respectively, specified with respect to such individual on Schedule 1 attached hereto, and such shares, as of the Effective Date, represent the percentage ownership of all of the Capital Stock of the Company on a fully diluted basis as specified with respect to such individual on Schedule 1;

WHEREAS, the parties hereto desire to set forth their mutual agreements and understandings with respect to, among other things, certain of their respective rights, duties and obligations and certain transactions and arrangements in respect of the Company, the Capital Stock of the Company and related matters; and

WHEREAS, the parties hereto desire to ensure the continuity of the business of the Company and that all Shareholders remain actively engaged in the business of the Company.

NOW, THEREFORE, the parties hereto, intending legally to be bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Defined Terms and Interpretation.    (a) Each capitalized term found in this Agreement that is not specifically defined in this Section 1.1 shall have the definition ascribed to it in the particular Section of this Agreement where such term is found. As used in this Agreement, the following terms shall have the following meanings:

"Affiliate": of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Agreement": this Shareholders Agreement, together with all Schedules and Exhibits hereto, as the same may be amended, supplemented or modified in accordance with the terms hereof from time to time.

"Bankruptcy" shall mean, with respect to any Person, the occurrence of any of the following events: (a) the filing by such Person of a petition in bankruptcy or for relief under applicable bankruptcy laws; (b) the filing against such Person of any such petition (unless such

#4570734v5

petition is dismissed within ninety (90) days from the date of filing thereof); (c) entry against such Person of an order for relief under applicable bankruptcy laws; (d) written admission by such Person of its inability to pay its debts as they mature, or an assignment by such Person for the benefit of creditors; or (e) appointment of a trustee, conservator or receiver for the property or affairs of such Person.

"Buyout Event" shall mean the occurrence of an Involuntary Transfer or the removal of a Director For Cause (as defined in Section 2.5).

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company, any and all equivalent ownership interests in a Person (other than a corporation) and any and all rights, warrants or options to purchase any of the foregoing.

"Common Stock": shares of the Company's common stock, par value $0.0001.

"Company": Dark Circuit Labs, Inc., a Delaware corporation.

"Control": (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Effective Date": the date of this Agreement first written above.

"Founders" shall collectively mean Chase Bertke, Ronald Pelkey, Jr. and Eric Missimer, and each individually, a "Founder".

"Governmental Authority": any nation or government, any state or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or any other regulatory authority.

"Incompetence" means, with respect to any Director or Shareholder, that such person is unable to manage their affairs and that a guardian, trustee or other Person is appointed to manage the affairs of such Director or Shareholder.

"Involuntary Transfer" shall mean any Transfer, proceeding or action by or in which a Shareholder shall be deprived or divested of any right, title or interest in or to any of its shares of Capital Stock, including, without limitation, any seizure under levy of attachment or execution, any transfer in connection with Bankruptcy or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, any transfer to a state or to a public offers or agency pursuant to any statute pertaining to escheat or abandoned property, any transfer pursuant to a property settlement, judgment or final decree of a court incident to a divorce, dissolution of marriage or separation, or the involuntary dissolution of any Shareholder which is an entity.

"Nayara": shall mean Nayara One LLC, a Virginia limited liability company.

2

"Person": any individual, company, corporation, partnership, limited liability company, trust, division, Governmental Authority or other entity.

"Retire" and "Retirement" means a voluntary retirement from performing services for the Company as an employee or consultant or otherwise

"Requirement of Law": as to any Person, the articles or certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, statute, treaty, rule or regulation, order or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property, or to which such Person or any of its property is subject.

"Securities Act": The Securities Act of 1933, as amended.

"Shareholder": each of those shareholders of the Company listed on Schedule 1 attached hereto and each other Person that becomes a party to this Agreement from time to time pursuant to Section 3.1(b) hereof.

"Shareholders": collectively, all of the Shareholders of the Company.

"Transfer": with respect to any Capital Stock, (a) any sale, assignment or transfer of such Capital Stock or any right or interest therein; (b) any pledge or hypothecation of such Capital Stock or any interest therein; (c) any grant, sale or other transfer of securities convertible or exchangeable into or exercisable for or other options, warrants or rights to acquire such Capital Stock or any interest therein; and (d) any other direct or indirect transfer of such Capital Stock or any interest therein.

(b)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement unless otherwise specified.

(c)     The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

## ARTICLE II
## VOTING AGREEMENT, AND RELATED MATTERS

2.1     Number of Directors. The Board of Directors of the Company shall consist of not less than four individuals (each, a "Director"). For so long as Nayara is a shareholder of the Company, Nayara shall have the right to designate one (1) Director to the Board of Directors (the "Nayara Director"). The initial Nayara Director shall be Larry Littleton The remaining members of the Board of Directors shall consist of the three (3) Founders (the "Founding Directors").

2.2     Founders Designees to the Board of Directors. The Founders hereby agree to vote their Shares of Common Stock at any regular or special meeting of the Shareholders called for the purpose of filling positions on the Board of Directors of the Company, or in any written consent executed in lieu of such a meeting of Shareholders, and shall otherwise take all actions

3

necessary, to ensure the election of all of the Founders to Board of Directors, subject to the provisions of Sections 2.5 and 2.6 below.

2.3     Nayara Designee to the Board of Directors. At all times during which Nayara is a Shareholder, Nayara shall be permitted to designate one (1) member of the Board of Directors (the "Nayara Director"). In the event that the Nayara Director is removed in accordance with Section 2.5 below or is unable or unwilling to serve, then only Nayara shall have the right to appoint a replacement Nayara Director.

2.4     Director Votes. For all actions and decisions coming before the Board of Directors, each Founder serving as a director shall have ten (10) votes and any director who is not a Founder, including any director who replaces a Founder director, and the Nayara director, shall have one (1) vote (collectively, "Director Votes" and individually, a "Director Vote"). For any matter coming before the Board of Directors at a duly called meeting of the Board of Directors, the affirmative vote of a majority of the Director Votes shall be required to approve such matter; provided however, that at any time where less than all of the Founders are members of the Board of Directors, the affirmative vote of a majority of Director Votes to be cast by Founders then serving on Board will be required to approve any matter. The consent of all Directors shall be required for all action of the Board of Directors taken by written consent.

2.5     Removal of Directors. Directors holding a majority of the Director Votes may remove a Director from the Board of Directors (i) For Cause, as defined below or (ii) if such Director (or the party who has the right to designate such Director) no longer holds any shares of Capital Stock of the Company; provided that a Director shall be deemed to hold shares of Capital Stock transferred for estate planning purposes. For purposes of this Agreement "For Cause" shall mean, with respect to any Director, (i) such Director's dishonesty, incompetence, willful misconduct, gross negligence, or breach of fiduciary duty, (ii) any conviction of, or the entering of a plea of guilty or nolo contendere to, a crime that constitutes a felony, or any willful or material violation by such Director of any federal, state or foreign securities laws, (iii) any conviction of any other criminal act or act of material dishonesty, disloyalty or misconduct by such Director that has a material adverse effect on the property, operations, business or reputation of the Company or (iv) the material breach by such Director of any written covenant or agreement with the Company not to disclose any confidential information or not to compete or interfere with the Company.

2.6     Filing of Vacancies. In the event of (i) the death or Incompetence of a Founding Director, then the heir, guardian, trustee or other Person appointed to manage the affairs of such Founding Director shall have the right to appoint a replacement Director, provided that such replacement Director shall not have ten (10) Director Votes, but shall have one (1) Director Vote. In the event that any Founding Director is otherwise unwilling to serve as a Director, or is removed as a Director in accordance with Section 2.5 above, then the remaining Founders acting unanimously  may  appoint a replacement Director, provided that such replacement Director shall not have ten (10) Director Votes (as described below, but shall have one (1) Director Vote. A vacancy of Nayara Director shall be filled by the Nayara only.

#4570734v5

ARTICLE III

SPECIAL PROVISIONS RELATING TO DILUTION, SERVICE PROVIDER
SHARES AND PREEMPTIVE RIGHTS

3.1     Special Provisions Relating to Dilution and Service Provider Shares.

In the event that the Board of Directors elects to issue additional shares of Common Stock to employees, consultants and contractors of the Company in exchange for services to be provided to the Company (collectively, the "Service Providers" and such shares of Common Stock issued to Service Providers are hereafter referred to as "Service Provider Shares"), with respect to the issuance of the first [290,323] Service Provider Shares to Service Providers the number of shares of Common Stock of the Company issued to Nayara shall be appropriately adjusted, such that dilutive effect of the issuance of the first [290,323] Service Provider Shares to Service Providers shall be borne solely by the Founders on a pro rata basis (i.e. the percentage ownership of Nayara shall not be reduced as a result of such issuances of additional Common Stock until such time as [290,323] Service Provider Shares have been issued to Service Providers. After the issuance of such [290,323] Shares, the percentage ownership of the Shareholders with respect to the issuance of any additional shares of Common Stock shall be diluted appropriately and proportionately on a pro-rata basis.

3.2     Preemptive Rights.

(a)     If the Company proposes at any time to issue shares of Capital Stock (other than to Service Providers as contemplated in Section 3.1(b)), the Company shall provide written notice to Nayara (the "Section 3.2 Notice"), setting forth in reasonable detail the number of shares of Capital Stock to be issued, the per-share and aggregate consideration to be paid by each purchaser, and the other terms and conditions upon which such shares of Capital Stock are being sold. Nayara shall have the right, for a period of ten (10) business days after delivery of the Section 3.2 Notice to agree by written notice to the Company (an "Acceptance Notice") to purchase from the Company the number of shares of Capital Stock that would cause Nayara to own, after the issuance of the shares of Capital Stock set forth in the Section 3.2 Notice, the same percentage of all issued and outstanding shares of Capital Stock that the Nayara owned as of the time the Section 3.2 Notice was given. The shares of Capital Stock purchased under this Section 3.2 shall be the on the same terms and conditions for sale as are set forth in such Section 3.2 Notice. Nayara's election to purchase shares of Capital Stock hereunder shall be binding and irrevocable. The failure of Nayara to deliver an Acceptance Notice shall constitute a waiver of its rights under Section 3.2 with respect to the purchase of shares of Capital Stock offered at such time but shall not affect its rights with respect to any future issuances or sales of shares of Capital Stock.

(b)     At the closing of the sale or issuance of the shares of Capital Stock as set forth in the Section 3.2 Notice, the Company shall transfer to Nayara, and Nayara shall purchase, the number of shares of Capital Stock that Nayara is obligated to purchase, for the purchase price and on the terms and conditions provided for in Section 3.2.

#4570734v5

ARTICLE IV
AGREEMENTS RELATING TO THE CAPITAL
STOCK OF THE COMPANY AND OTHER MATTERS

Section 4.1    Transfers of Capital Stock.

(a)    No Shareholder other than Nayara shall, without the prior approval of the Board of Directors (which approval shall not be unreasonably withheld), directly or indirectly, Transfer any Capital Stock of the Company (or any interest therein or irrevocable proxy with respect thereto), now or hereafter at any time owned by such Shareholder. To the extent such Shareholder obtains such prior approval of the Board of Directors, such Transfer shall be subject to adherence with the terms and provisions of this Agreement, including, but not limited to the terms of this Article IV.

(b)    Any Transfer of Capital Stock of the Company by any Shareholder (or Transferee, as defined) shall not relieve the transferor of its obligations hereunder and, assuming such Transfer is done in compliance with the terms of this Agreement, shall only be valid if the Person to whom such Capital Stock is Transferred (a "Transferee") prior to the Transfer, agrees in writing in an agreement reasonably acceptable to the Company to be bound by the terms of this Agreement (if not already a party to this Agreement) immediately prior to such Transfer; provided, however, if a Transfer of Capital Stock involves the Transfer of all outstanding shares of Capital Stock by all of the Shareholders, then the Transferee need not be party to this Agreement and this Agreement shall be automatically terminated upon consummation of such Transfer. Any such Transferee that agrees to be bound by the terms of this Agreement as provided in this paragraph (b) shall be deemed, upon execution and delivery of such agreement to be so bound, to be a Shareholder hereunder. Each such Transferee that agrees to be bound by the terms of this Agreement shall be entitled to all of the rights under this Agreement to which the transferor was entitled immediately prior to such Transfer. Any purported Transfer without obtaining the agreement by the Transferee to be bound by the terms of this Agreement reasonably acceptable to the Company (except in the case of the Transfer of all outstanding shares of Capital Stock) shall be deemed void and of no further effect and shall be governed by the provisions of paragraph (c) below.

(c)    In the event a Transfer of any Capital Stock of the Company has taken place or remains in place in violation of the provisions of this Article III or any other provision of this Agreement, such Transfer shall be void and of no effect, and no dividend of any kind whatsoever nor any distribution pursuant to liquidation or otherwise shall be paid by the Company to the Transferee in respect of such Capital Stock (all such dividends and distributions being deemed waived), and any voting rights of such Capital Stock on any matter whatsoever shall remain vested in the transferor. The Company shall not be required to record on its stock transfer ledger or its stock register or other records any Transfer made in violation of this Agreement.

#4570734v5

4.2    Legends on Stock.  Each certificate evidencing shares of Capital Stock of the Company held by any Shareholder or any Transferee of a Shareholder shall bear the following legend on the face thereof:

"THIS CERTIFICATE IS ISSUED SUBJECT TO THE PROVISIONS OF A SHAREHOLDERS AGREEMENT DATED AS OF _____, 2021 AND NEITHER THIS CERTIFICATE NOR THE SHARES REPRESENTED BY IT ARE ASSIGNABLE OR OTHERWISE TRANSFERABLE, EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SAID AGREEMENT, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, OR ANY OTHER STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAW OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE."

Any certificate issued at any time in exchange or substitution for any certificate bearing such legend (except a new certificate issued upon completion of a public distribution under a registration statement of the Capital Stock represented thereby) shall also bear such legend unless, in the opinion of counsel for the holder of such Capital Stock (which counsel shall be reasonably satisfactory to the Company), the Capital Stock represented thereby is not, at such time, required by law to bear such legend. The Company agrees that it will not Transfer on its books any certificate for its Capital Stock in violation of the provisions of this Agreement or any applicable laws.

4.3    Right of First Refusal.

(a)    If a Shareholder  receives a bona fide third party offer to purchase all or part of his shares of Capital Stock (a "Third-Party Offer"), such  Shareholder (a "Selling Shareholder") may sell such shares of Capital Stock subject to the provisions of this Section 4.3:

(i)    If a Selling Shareholder receives a Third-Party Offer, the Selling Shareholder must first offer to sell the shares of Capital Stock that are the subject of a Third-Party Offer (the "Offered Interest") to the other Shareholders (the "Non-Selling Shareholders"), as follows:

(1)    Such offer for sale (the "Offer") shall be in writing and addressed by the Selling Shareholder to the Non-Selling Shareholder(s) at their addresses listed in this Agreement (or to such other address that they shall designate in writing to the Company). Such Offer shall formally notify the Non-Selling Shareholder(s) of the material terms and conditions of the Third-Party Offer, including, but not limited to, the identity of the third party purchaser, the price to be paid for the Offered Interest to be acquired and the proposed closing

date. The Selling Shareholder shall represent and warrant in such Offer that the Third-Party Offer is a bona fide offer and that the Selling Shareholder is willing to sell the Offered Interest to the Non-Selling Shareholder(s) free and clear of all liens and encumbrances. If the sale involves more than fifty percent (50%) of the shares of Capital Stock in the Company, and if the Selling Shareholder intends to exercise the Drag Along Right set forth in Section 4.5, such Selling Shareholder shall affirmatively indicate in the Offer its intent to exercise the Drag Along Right and that the prospective purchaser has been notified of this intention and is ready willing and able to purchase such additional shares of Capital Stock.

(2)     The Non-Selling Shareholder(s) each shall have, for a period of thirty (30) days after receipt of the Offer (the "Expiration Date"), the right, but not the obligation, on a pro-rata basis or such other basis as agreed in writing in writing among the Non-Selling Shareholders, to acquire from the Selling Shareholder all and not less than all of the Offered Interest (the "Right of First Refusal") on the same terms and conditions set forth in the Offer. In order to exercise the Right of First Refusal, a Non-Selling Shareholder must provide written notice to the Selling Shareholder and the Company ("Exercise Notice") of his decision to exercise the Right of First Refusal prior to the Expiration Date. If a Non-Selling Shareholder does not exercise their Right of First Refusal to purchase their pro-rata portion of the Offered Interest, the other Non-Selling Shareholder(s) must either elect to purchase, on such basis as they may agree among themselves, that portion of the Offered Interest that the other Non-Selling Shareholder(s) did not elect to purchase or forego their own Right of First Refusal.

(3)     The closing of each sale and purchase pursuant to the exercise of the Right of First Refusal shall be held at the offices of the Company on the fifteenth (15th) Business Day following the date the Selling Shareholder receives the Exercise Notice from a Non-Selling Shareholder.

(ii)     If the Right of First Refusal has not been exercised on or prior to the Expiration Date, then the Selling Shareholder shall have the right, beginning five (5) Business Days thereafter and for a period of ninety (90) days after such Expiration Date, to sell to the Offered Interest to the bona fide third party purchaser that made the Third Party Offer on the same terms and conditions as set forth in the Offer. Any proposed Transfer on terms and conditions more favorable to the third party purchaser than those described in the Offer, as well as any proposed Transfer of shares of Capital Stock more than ninety (90) days after the Expiration Date, shall again be subject to compliance with the requirements of this Section 4.3.

4.4     Tag-Along Rights of Shareholders.

(a)     If, at any time, Selling Shareholder(s) holding fifty percent (50%) or more of the shares of Capital Stock deliver an Offer pursuant to Section 4.3, and the Non-Selling Shareholders wish to participate in such sale (the "Tag-Along Right"), and do not wish to exercise their Right of First Refusal, the Non-Selling Shareholders may notify the Selling Shareholders by written notice (the "Tag-Along Notice"), on or before the fifteenth (15th) day following the Expiration Date of the Right of First Refusal ("Tag-Along Period"), that such Non-Selling Shareholders desire to sell to the bona fide third party purchaser identified in the Offer all or part of their shares of Capital Stock in the Company ("Tag-Along Shareholder") on the same terms and conditions under which the Selling Shareholders' shares of Capital Stock are to be

purchased. The Tag-Along Notice shall specify the portion of the shares of Capital Stock that such Tag-Along Shareholder desires to sell. The offer of each Tag-along Shareholder set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-along Shareholder shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this Section 7.4. Each Tag-Along Shareholder shall have the right to sell in a sale subject to this Section 7.4 the shares of Capital Stock equal to the product obtained by multiplying (x) the shares of Capital Stock held by the Tag-Along Shareholder by (y) a fraction (A) the numerator of which is equal to shares of Capital Stock the Selling Shareholders proposes to sell or Transfer to the bona fide third-party purchaser and (B) denominator of which is equal to all of the shares of Capital Stock then owned by such Selling Shareholders.

(b)     The Selling Shareholders shall use their commercially reasonable efforts to include in the proposed sale to the bona fide third-party purchaser all of the shares of Capital Stock that the Tag-Along Shareholders have requested to have included pursuant to the applicable Tag-Along Notices, it being understood that the bona fide third-party purchaser shall not be required to purchase shares of Capital Stock in excess of the number set forth in the Offer. In the event the bona fide third-party purchaser elects to purchase less than all of the shares of Capital Stock sought to be sold by the Tag-Along Shareholders, the number of shares of Capital Stock to be sold to the third party purchaser by the Selling Shareholders and each Tag-Along Shareholder shall be reduced so that each such Shareholder is entitled to sell its pro-rata portion of the shares of Capital Stock the bona fide third-party purchaser elects to purchase (which in no event may be less than the number of shares of Capital Stock set forth in the Offer).

(c)     Each Shareholder who does not deliver a Tag-Along Notice in compliance with clause (a) above shall be deemed to have waived all of such Shareholder's rights to participate in such sale, and the Selling Shareholders shall (subject to the rights of any participating Tag-Along Shareholder) thereafter be free to sell to the bona fide third party purchaser its shares of Capital Stock at a price that is no greater than the price set forth in the Offer and on other same terms and conditions which are not materially more favorable to the Selling Shareholders than those set forth in the Offer, without any further obligation to the non-accepting Shareholders.

(d)     Each Tag-Along Shareholder shall take all actions as may be reasonably necessary to consummate the Tag-Along sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholders.

(e)     The Selling Shareholders shall have ninety (90) business days following the expiration of the Tag-Along Period in which to sell the shares of Capital Stock described in the Offer, on terms not more favorable to the Selling Shareholders than those set forth in the Offer (which such ninety (90) business day period may be extended for a reasonable time not to exceed one hundred twenty (120) business days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Shareholders have not completed such sale, the Selling Shareholders may not then effect a sale of shares of Capital Stock subject to this Section 7.4 without again fully complying with the provisions of this Section 4.4.

#4570734v5

(f)     This Section 4.4 shall not apply to: (i) sales to any employee of the Company, except for any Founder who is an employee; or (ii) sales in a distribution to the public (whether pursuant to a registered public offering, Rule 144 or otherwise).

4.5     Drag-Along Rights.

(a)     In the event Selling Shareholder(s) holding more than fifty percent 50%) of the shares of Capital Stock in the Company desire, collectively, to Transfer all of their shares of Capital Stock, subject to the expiration of, or election not to exercise, the Non-Selling Shareholder(s)' Right of First Refusal, such Selling Shareholder(s) shall have the right to require the Non-Selling Shareholder(s) to sell (the "Drag-Along Right") to the bona fide third party purchaser identified in the Offer all of the Shares of Capital Stock owned by each Non-Selling Shareholder. Any shares of Capital Stock purchased pursuant to this Section 7.5 shall be paid for at the same price to be paid to the Selling Shareholder(s) for their shares of Capital Stock and upon the same terms and conditions under which the Selling Shareholder(s)' Shares of Capital Stock are to be purchased. The Selling Shareholder(s) may exercise the Drag Along right by affirmatively indicating they are exercising such Drag-Along Right in the Offer.

(b)     Each Non-Selling Shareholder shall take all actions as may be reasonably necessary to consummate the Drag-Along sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholders.

(c)     The Selling Shareholder(s) shall have ninety (90) Business Days following the date of the Offer in which to sell the Shares of Capital Stock described in the Offer, on terms not more favorable to the Selling Shareholder(s) than those set forth in the Offer (which such ninety (90) Business Day period may be extended for a reasonable time not to exceed one hundred twenty (120) Business Days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Shareholder(s) have not completed such sale, the Selling Shareholder(s) may not then effect a sale of shares of Capital Stock subject to this Section 7.5 without again fully complying with the provisions of this Section 4.5.

4.6     Buyout Events.

(a)     In the event a Buyout Event occurs with respect to a Founder (a "Terminated Shareholder"), the Company shall have the right, but not the obligation, to purchase all or any portion of the Terminated Shareholder's shares of Capital Stock (the "Buyout Right") in accordance with the terms of this Section 4.6.

(b)     The Company shall have the option, for a period of one hundred eighty (180) days following a Buyout Event (the "Buyout Period") to purchase all or any portion of the Terminated Shareholder's shares of Capital Stock. The right of the Non-Terminated Shareholder to purchase the Terminated Shareholder's shares of Capital Stock shall be exercisable by the delivery of a written notice (the "Buyout Exercise Notice") by the Company to the Terminated Shareholder, prior to the expiration of the Buyout Period, stating what amount of the Terminated Shareholder's shares of Capital Stock that the Company has elected to purchase. Such purchase

10

shall be completed in accordance with the closing procedures set forth in Section 4.7 herein. The Buyout Exercise Notice shall be binding on the Terminated Shareholder upon delivery by the Company.

4.7    Terms for Purchase of Buyout Interest. The following terms of purchase shall apply to the purchase of a Terminated Shareholder's Shares of Capital Stock:

(a)    Purchase Price. The purchase price for a Terminated Shareholder's shares of Capital Stock shall be the Fair Market Value of the Terminated Shareholder's shares of Capital Stock ("Purchase Price").

(b)    Closing. The closing of the purchase of the Terminated Shareholder's Shares of Capital Stock pursuant to Section 4.6 hereof shall take place at the office of the Company on a date (the "Closing Date") and at a time designated by the Company. On the Closing Date, the Terminated Shareholder shall deliver the certificate(s) evidencing the Terminated Shareholder's shares of Capital Stock being sold along with a duly executed stock power and the Company shall deliver by certified or bank cashier's check or wire transfer to an account designated in writing by the Terminated Shareholder, an amount not less than twenty (20%) percent of the Purchase Price. The balance of the Purchase Price, with interest at a rate of five (5%) percent per annum shall be paid in five (5) equal installments each due to the Terminated Shareholder on the anniversary of the Closing Date and shall be evidenced by the delivery of a promissory note (a "Promissory Note") by the Company to the Terminated Shareholder. Notwithstanding the foregoing, the Company shall have the right, but not the obligation, to pay the entire Purchase Price on the Closing Date or the remaining balance of the Purchase Price to the Terminated Shareholder at any time without penalty.

(c)    Spousal Consent. Simultaneously with the execution of this Agreement by the Shareholders, each Shareholder shall deliver to the Company, a fully executed Spousal Consent, in the form attached hereto as Exhibit B.

4.8    Further Assurances. A Terminated Shareholder shall execute and deliver such additional documents and instruments and perform such additional acts as the Company may request to effectuate or carry out and perform all the terms, provisions and conditions of Sections 4.6 and 4.7 hereof and the transactions contemplated thereby, to effectively transfer, assign and deliver the Terminated Shareholder's Shares of Capital Stock to the Company.

4.9    Remedies. It is specifically understood and agreed that any breach of the provisions of Sections 4.6, 4.7 or 4.8 hereof by a Terminated Shareholder will result in irreparable injury to the Company, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other remedies that the Company may have, the Company may enforce its respective rights by actions for specific performance in federal or state court in the Commonwealth of Virginia. In the event that the Company is required to enforce its rights under Sections 4.6, 4.7 or 4.8 hereof, the Terminated Shareholder shall reimburse the Company for all of the Company's costs and expenses, including attorneys' fees and

11

disbursements, incurred by the Company in enforcing the provisions of Section 4.6, 4.7 or 4.8 hereof.

4.10     Special Provisions Relating to Death, Incompetence, Retirement or Termination of Employment of any Founder. In the event of the death, Incompetence, Retirement, or termination of employment with the Company of a Founder for any reason other than Cause (as defined in Section 2.5), such Founder shall be permitted to maintain their shares of Capital Stock, or Transfer their shares of Capital Stock to such Founder's immediate family, or a trust or other entity Controlled by or for the benefit of such Founder and/or such Founder's immediate family. In the event of the death, Incompetence, Retirement or termination of employment with the Company of a Founder for any reason other than Cause, such Founder (in the case of termination of employment for any reason other than Cause), or such Founder's successor, heir, or guardian, as applicable, shall appoint a replacement Director to the Board of Directors as set forth in Section 2.6, and such replacement Director shall have one (1) Director Vote.

4.11     Transfers for Estate Planning Purposes. Notwithstanding the prohibition against Transfers set forth in this Article IV, a Founder may Transfer their shares of Capital Stock, for estate planning purposes to said Founder's immediate family, or a trust, corporation, limited liability company or partnership Controlled by or for the benefit of such Founder or such Founder's immediate family, without requiring compliance with Section 4.3. In addition, in the event of such a Transfer, the Shareholders shall not have the rights set forth in Section 4.4..

ARTICLE V
REPRESENTATIONS AND WARRANTIES

5.1     Representations and Warranties of the Shareholders. Each of the Shareholders severally represents and warrants to, the other Shareholders and the Company that:

(a)     Authority. Such Shareholder has all requisite power to enter into this Agreement and to be bound by the terms hereof. This Agreement has been duly executed and delivered by such Shareholder, has been effectively authorized by all necessary action on the part of such Shareholder and constitutes such Shareholder's legal, valid and binding obligation, enforceable against such Shareholder in accordance with its terms, except as enforceability may be subject to the application of general equitable principles and to bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally.

(b)     Agreements Not in Breach of Other Instruments. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of the terms hereof will not result in a breach of any of the terms or provisions of, or constitute a default under, or conflict with (x) any agreement, indenture or other instrument to which such Shareholder is a party or by which such Shareholder is bound, (y) any judgment, decree, order or award of any court, governmental body, Governmental Authority or arbitrator by which such Shareholder is bound or (z) any Requirement of Law applicable to such Shareholder.

#4570734v5

(c)     Regulatory Approvals. There are no consents, approvals, authorizations or other requirements prescribed by any applicable Requirement of Law that must be obtained by such Shareholder or satisfied by such Shareholder in connection with its execution, delivery and performance of this Agreement.

(d)     No Legal Bar. There is no suit, action or proceeding pending or, to such Shareholder's knowledge, threatened against such Shareholder that questions the validity of this Agreement, any of the transactions contemplated hereby or any action which has been taken by such Shareholder in connection herewith or in connection with any of the transactions contemplated hereby or that seeks to enjoin the consummation thereof.

## ARTICLE VI
## ADDITIONAL COVENANTS AND AGREEMENTS

6.1     Books and Accounts. The Company shall keep, or shall cause to be kept, full, accurate and true books and accounts of the Company's business, in which each Company transaction shall be fully and accurately entered. The Board of Directors shall have the authority to designate and retain a firm of independent certified public accounts to assist in the maintenance and preparation of such books, records and reports as the Board of Directors deems desirable or as is required under any Requirement of Law.

6.2     Information Rights. The Company shall provide reasonable access or copies for review to each Shareholder of the following: (i) annual audited or reviewed financial statements, including a balance sheet as of the end of such fiscal year, and a statement of cash flows for such year within one hundred twenty (120) days of the close of each fiscal year of the Company, (ii) unaudited quarterly financial statements within thirty (30) days of the end of each fiscal quarter of the Company, and (iii) any other information reasonably requested by the Shareholder from time to time. Nayara shall have the right to visit and inspect the Company's properties, examine its books of account and records and discuss the Company's affairs, finances and accounts with the officers of the Company, at reasonable times and on reasonable advance notice to the Company.

6.3     Non-Compete: No Shareholder shall, during the time such Shareholder is a Shareholder or employee of the Company, and for a period of one (1) year following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, without the prior written consent of the Company, directly or indirectly, and whether as principal, agent, officer, director, partner, employee, consultant, broker, dealer or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, or be engaged, have an interest in or take part in, or render services to any person, firm, corporation or other business organization (other than the Company) engaged in a business which is competitive with all or part of the business of the Company.

6.4     Confidential Information. Each Shareholder agrees that he, she or it will utilize Confidential Information (as defined below) solely for the purpose of the business of the Company and will make no other use of Confidential Information. In furtherance of the foregoing, no Shareholder shall directly or indirectly divulge, communicate, use to the detriment

13

of the Company or for the benefit of any other person or entity or misuse in any way, any Confidential Information, including, but not limited to, personal information, forms, know-how, client lists, technical data, business plans and industry analyses. For the purposes of this Agreement, "Confidential Information" means that information which is confidential and proprietary to the Company (including, but not limited to, trade secrets) and which derives (or may derive) economic value to the Company by not being generally known to others, or which the Company is otherwise under an agreement of confidentiality with an unaffiliated third party. Each Shareholder agrees that he or it will maintain and preserve the confidentiality and secrecy of such Confidential Information. In the event that a Shareholder shall receive a request to disclose all or any part of the Confidential Information under the terms of a subpoena or order issued by a court of competent jurisdiction, such Shareholder agrees, to the extent legally permissible to (i) promptly notify the Company of the existence, terms and circumstances surrounding such a request, (ii) consult with the Company on the advisability of taking legally available steps to resist or narrow such request, and (iii) if disclosure of such information is required, exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information and to reasonably cooperate with the Company in any such effort by the Company, at Company's sole cost and expense.

6.5     Non-Solicitation. For so long as a Shareholder is a Shareholder or employee of the Company and for a period of twenty four (24) months following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, such Shareholder shall not, without the written permission of the Company or any Affiliate, directly or indirectly (i) solicit, employ or retain, or have or cause any other person or entity to solicit, employee or retain, any other Shareholder or other person who is employed by the Company or (ii) solicit the business of or provide services or products to any client (or prospective client) of the Company at any time while such Shareholder was an employee or Shareholder of the Company.

6.6     Non-Disparagement. No Shareholder shall, directly or indirectly, individually or in concert with others, knowingly engage in any conduct or make any statement that is reasonably likely to have the effect of undermining or disparaging the reputation of the Company or any Affiliate of the Company, or the good will of the Company or any Affiliate of the Company, products, or business opportunities, or that is reasonably likely to have the effect of undermining or disparaging the reputation of any officer, director or employee, past or present, of the Company or any of its Affiliates. This Section does not in any way restrict or impede any Shareholder from exercising protected rights, including rights under the National Labor Relations Act (NLRA) or the federal securities laws, including the Dodd-Frank Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency.

6.7     Termination of Prior Shareholders' Agreements. Each of the Shareholders and the Company agree that all Shareholders' agreements among or between such parties or any of them in relation to the Company and/or its Capital Stock are hereby terminated and superseded and replaced by this Agreement.

## ARTICLE VII
## EFFECTIVE DATE; TERM; TERMINATION

7.1     Effective Date. This Agreement shall become effective on the Effective Date.

7.2     Term. The obligations of each party hereunder shall remain binding upon such party until such time as:

(a)     this Agreement has terminated pursuant to Section 7.3 hereof; or

(b)     such party has Transferred all of its Capital Stock in the Company in accordance with the terms of this Agreement and the by-laws of the Company and is in compliance with its obligations under this Agreement;

provided that Sections 6.3-6.6 shall survive any termination of this Agreement.

7.3     Termination. Except as otherwise expressly provided herein, this Agreement shall terminate and all rights and obligations hereunder shall cease, upon the first to occur of any of the following events:

(a)     the voluntary dissolution of the Company; or

(b)     the written agreement of each of the parties hereto to such termination; or

(c)     the effective date of an initial public offering of shares of the Company's Capital Stock.

## ARTICLE VIII
## MISCELLANEOUS

8.1     Entire Agreement. This Agreement, together with the other agreements, instruments and documents expressly referred to herein, constitute the entire agreement of the parties with respect to the transactions contemplated hereby and supersede all prior agreements and understandings with respect thereto, whether written or oral.

8.2     No Waiver; Amendment; Modifications in Writing. No failure or delay by a party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to any party at law or in equity or otherwise. No waiver of or consent to any departure by a party from any provision of this Agreement shall be effective unless signed in writing by the parties entitled to the benefit thereof. No amendment, modification or termination of any provision of this Agreement shall be effective unless signed in writing by all parties. Any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure from the terms of any provision of this Agreement, shall be effective only in the specific instance and for the specific purpose for which made or given. Notwithstanding anything to the contrary contained in this Agreement, the

15

Board of Directors of the Company is hereby authorized to amend Schedule 1 to this Agreement to reflect any changes to Schedule 1 made in accordance with the terms of this Agreement including, (i) the addition or deletion of Shareholders, (ii) changes in the number and/or type of shares held by Shareholders, (iii) changes in percentage ownership and (iv) changes of address of a Shareholder made at the request of such Shareholder in writing.

8.3    Notices. All notices, demands and requests which may be or is required to be given under this Agreement shall be in writing and , shall be deemed to have been duly given, (i) when sent by reputable overnight carrier, (ii) when received, if personally delivered, or (iii) when sent by United States registered or certified mail, return receipt requested, postage prepared. Any such notices shall be addressed as follows:

> If to the Company:    Dark Circuit Labs, Inc.
> 1900 Reston Metro Plaza
> Floors 5-6,
> Reston, VA 20190

> If to the Shareholder: At the respective addresses set forth in Schedule 1.

Any party hereto may change the address or addresses to which notice is to be sent by giving written notice to the other parties in the manner provided for herein.

8.4    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.

8.5    Binding Effect; Assignment. The rights and obligations of the parties under this Agreement may not be assigned or otherwise transferred to any other Person, except (i) with the prior written consent of the other parties hereto and (ii) in connection with a Transfer of Capital Stock of the Company by a Shareholder made in compliance with all of the provisions of this Agreement. Except as expressly provided in this Agreement, this Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors, permitted assigns, heirs and personal representatives. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and personal representatives.

8.6    Governing Law. This Agreement shall be deemed to be a contract made under and shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference to the principles of conflict of laws.

8.7    Consent to Jurisdiction and Service of Process Any suit, action or proceeding arising out of or relating to this Agreement may be instituted in any Federal court or any state court of the Commonwealth of Virginia situated in Fairfax County, and each party agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding

#4570734v5

is improper or that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each party further irrevocably submits to the jurisdiction of such court in any such suit, action or proceeding. Any and all service of process and any other notice in any such suit, action or proceeding shall be effective against any party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage fully prepaid, mailed to such party as herein provided. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

8.8     Further Assurances. Each of the parties hereto shall execute and deliver such documents, instruments and agreements and take such further actions as may be reasonably required or desirable to carry out the provisions of this Agreement, and each of the parties hereto shall cooperate with each other in connection with the foregoing.

8.9     Specific Performance. The parties hereto acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that money damages would not provide an adequate remedy. It is accordingly agreed that each of the parties hereto shall be entitled to an injunction and other equitable remedies to prevent breaches or threatened breaches by the other parties hereto of this Agreement, and to enforce specifically the terms and provisions hereof or thereof in any court of the United States or any state thereof having jurisdiction, this being in addition to any other remedy to which the parties may be entitled at law or in equity.

8.10    Severability of Provisions. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

8.11    Headings. The Article and Section headings used or contained in this Agreement are for convenience of reference only and shall not affect the construction of this Agreement.

8.12    Costs and Expenses. The respective parties hereto shall pay all costs and expenses that each respectively incurs with respect to the negotiation, execution and delivery of this Agreement and the Related Documents.

8.13    Nature of Agreements. The covenants and agreements of the parties in this Agreement are several and not joint covenants and agreements, unless otherwise expressly specified herein.

8.14    Gender. Whenever the context so requires, any references to the singular pronoun shall include the plural and vice-versa, and references to the masculine gender shall include the feminine gender and vice-versa, and references to neuter gender shall include the masculine or feminine gender, whichever is applicable.

8.15    No Presumption From Drafting. This Agreement has been negotiated at arm's length between persons knowledgeable in the matters set forth within this Agreement.

17

Accordingly, given that all parties have had the opportunity to draft, review, engage legal counsel, and/or edit the language of this Agreement, no presumption for or against any party arising out of the drafting all or any part of this Agreement will be applied in any action relating to, connected with or involving this Agreement.

[SIGNATURE PAGE TO FOLLOW IMMEDIATELY]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement or caused this Agreement to be duly executed by their respective officers or representatives thereunto duly authorized as of the day and year first written above.

DARK CIRCUIT LABS, INC., a Delaware corporation

By: _____
    Name: Chase Bertke
    Title: Chief Executive Officer

SHAREHOLDERS:

_____
Chase Bertke

_____
Eric Missimer

_____
Ronald Pelkey, Jr.

Nayara One, LLC, a _____
limited liability company

By: _____
    Name: Larry Littleton
    Title: Managing Director

19

| Name of Shareholder | No. of Shares of Common Stock Owned | Percentage Ownership of all of the Company's Outstanding Capital Stock |
| --- | --- | --- |
| Chase Bertke | 325,000 | 32.5% |
| Ronald Pelkey, Jr. | 325,000 | 32.5% |
| Eric Missimer | 325,000 | 32.5% |
| Nayara One, LLC | 25,000 | 2.5% |
| Total | 1,000,000 | 100% |