# EXHIBIT C

# CONFIDENTIALITY NON-COMPETITION AND PROTECTABLE RIGHTS AGREEMENT

This Confidentiality and Protectable Interest Agreement (the "**Agreement**") is entered into this July 30, 2022, between Dark Circuit Labs, Inc., a Delaware corporation (which together with its subsidiaries, affiliates, assigns and/or successors is "**the Company**" or the "**Company**") and Michael Frank (the "**Employee**"). The purpose of this Agreement is to set forth certain reasonable restrictions related to active and prospective clients and referral sources of The Company as well as the Company's Confidential Information and Trade Secrets. **This agreement contains a limited "non-compete."**

**WHEREAS**, the Company's business ("**Company Business**") is the development of cyber security products, software and services, or other lines of business that the Company enters (or has taken concrete steps to enter into in the near future) during the term of your association with the Company for third parties who utilize the Company's offerings ("**Clients**"), which Clients do business with, or seek to utilize the services of the Company and/or its employees.

**WHEREAS**, Company Business also includes the use of and interaction with referral sources of business from business and individuals who refer prospective or actual clients ("**Referral Sources**").

**WHEREAS**, the Company has expended substantial time, effort and financial resources on marketing, entertaining and servicing Clients, so as to develop and maintain those relationships, its brand, name and reputation in the marketplace. In doing so, the Company has generated and enjoys the expectation of continued patronage ("**Goodwill**") from those Clients with whom it has done business and from prospective Clients with whom it is actively working to obtain new business and those individuals which refer business to the Company ("**Referral Sources**") the loss of which will cause the Company irreparable harm. A "**Prospective Client**" or Referral Source shall mean one with whom the Company is or was working with to obtain new business at the relevant time period in question.

**WHEREAS**, the Company has expended substantial time, effort and financial resources on identifying and developing business relationships with, negotiating terms for product and software development with, and working with third-party service providers of components and software for the Company's products and services ("**Service Providers**"), so as to develop and maintain those relationships and to have its proprietary products and services created. In doing so, the Company has generated and enjoys the expectation of a continued working relationship with those Service Providers with whom it has done business and from prospective Service Providers with whom it is actively working to establish new business relationships ("**Goodwill**") the loss of which will cause the Company irreparable harm. A "**Prospective Service Provider**" shall mean one with whom the Company is or was working with to establish a business relationship at the relevant time period in question.

**WHEREAS**, the Company has expended substantial time, effort and financial resources in identifying, recruiting, hiring and retaining employees, the loss of whom will cause the Company irreparable harm.

**WHEREAS**, the Company has also acquired, maintains, and protects information that is not known publicly or readily available in the marketplace relating to Company Business including Clients, Service Providers and Referral Sources and which it regards as "**Confidential Information**," and/or as "**Trade Secrets**", as such terms are defined below, and Employee will have access to such Confidential Information and Trade Secrets of the Company in his or her or their role with the Employer.

Now, in view of these considerations and the mutual obligations contained in this Agreement, the Parties further agree as follows:

**1.     Consideration.** The Company may offer employment and/or receipt of an equity award or option to purchase equity to the Employee subject to the terms and conditions in an offer letter between the Company and Employee and other agreement governing the grant of equity or options to purchase equity. In the event of an inconsistency, the terms of this Agreement shall govern. Employee's employment shall be at all times at-will, subject to the notice provisions herein. Employee acknowledges that any offer of employment is conditioned upon Employee entering into this Agreement and shall constitute sufficient and valid consideration to Employee for purposes of Employee entering into this Agreement.

**2.     Faithful and Diligent Performance; No Conflicts of Interest.** Employee agrees to devote Employee's full business time and attention to the performance of duties for the Company and to perform Employee's duties for the Company faithfully and diligently, to act at all times while employed by the Company with undivided loyalty, and to refrain from engaging in any conduct while employed by the Company that involves a conflict of interest between employee's personal or financial interests and the Company's business interests, including obtain other employment or independent contractor work while employed by the Company unless Employee first fully discloses such conflict of interest to the Company and receives consent from the Company's Chief Executive Officer, President or Chief Operating Officer (the Company's "**Contact Persons**") to engage in such conduct.

**3.     Confidentiality and Use of Confidential Information and Trade Secrets.**

   **(a)     Confidential Information and Trade Secrets.** The Employee and the Company agree that for the purposes of this Agreement, and in addition to any meaning that it may have under the common law, the term "**Confidential Information**" shall mean information belonging to or possessed by the Company, whether or not reduced to writing (or in a form from which such information can be obtained, translated or derived into reasonably usable form), that derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including without limitation, financial information, reports, and forecasts; improvements and other intellectual property owned by or relating to the Company; the buying practices of Clients or prospective Clients; the disclosures from or to Service Providers or prospective Service Providers; pricing offered to Clients or; pricing offered from Service Providers; the Company's production, advertising, marketing and growth strategies, methods and research; the prices/rates/terms at which the Company obtains or has obtained, or sells or has sold its products or services; the Company's sales, costs and sales methods; and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) that have been discussed or considered by

the management of the Company; the Company's business systems and methodologies employed by the creation, delivery, maintenance and improvement of the Company's product and services. Confidential Information also includes the confidential information of others, such as Clients and Service Providers with which Employee or the Company has a business relationship. Confidential Information shall also include any information that Employee is required to keep confidential pursuant to any ethical obligation or state or federal law, rule or regulation. Notwithstanding the foregoing, Confidential Information does not include documents in the public domain unless due to breach of Employee's duties under the Agreement. Confidential Information, such as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, inventions, product drawings, designs and photographs, prototypes, methods, business systems, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known are referred to as "**Trade Secrets**".

(b) **Use of Information During Employment.** While employed by the Company, Employee shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company. Employee shall adhere to all rules and policies of the Company relating to maintaining and safeguarding Confidential Information from public disclosure or use by an individual or business, including those that compete for Company Business.

(c) **Information if no Longer Employed.** All documents, records, data, information and physical property, whether or not amounting to or containing Confidential Information or Trade Secrets, which are furnished to Employee by the Company or are produced by Employee in connection with Employee's employment will be and remain the sole property of the Company. Employee is required to return to the Company all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Company. In the event Employee shall no longer be employed by the Company, Employee shall not use or otherwise distribute or disseminate Confidential Information or Trade Secrets on his/her/their behalf or that of a third person. Upon the end of the employment relationship between the Employee and the Company, Employee shall immediately gather and return to the Company all Confidential Information and Trade Secrets in his/her/their possession or control. At the Company's request, Employee shall delete all Confidential Information and Trade Secrets stored electronically which he/she/they maintains or has access to, including those residing in email accounts or on computers or portable electronic devices and shall remove from Employee's electronic storage, email or networking sites (such as LinkedIn) any Confidential Information or Trade Secrets by deleting such contacts from such websites and not re-engineering same. It is the express intent of the Parties that if no longer employed by the Company, the Employee shall not use or have access to Confidential Information or Trade Secrets relating to Clients, Prospective Clients, Service Providers, Prospective Service Providers, and Referral Sources including those for which Employee had a pre-existing relationship that existed prior to employment by Company (or its subsidiaries, affiliates or predecessors) it being expressly understood and agreed that the goodwill in such relationships has been transferred and sold to the Company.

**(d)** **Defend Trade Secret Act Notice.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a Trade Secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and is (i) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the Trade Secret to the attorney of the individual and use the Trade Secret information in the court proceeding, if the individual (iii) files any document containing the Trade Secret under seal; and (iv) does not disclose the Trade Secret, except pursuant to court order.

**4.** **No Diversion of Client, Prospective Client, Service Provider, Prospective Service Providers, and Referral Source Relationships.**

**(a)** During the course of Employee's employment, Employee shall not, directly or indirectly: (i) solicit, accept an offer to do business with, service or divert any Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources and/or Company Business for Employee's personal benefit or that of a third-party or to the Company's detriment or (ii) consistent with Employee's duty of loyalty, work for another business which competes with the Company for Company Business including, without limitation, running, owning, managing, operating, controlling, being employed by, providing consulting services to, being a manager, officer, director or employee of, participating in, lending Employee's name to, investing in, or being connected in any manner with the management, ownership, operation, or control of any business, venture or activity that performs competitive services with the Company.

**(b)** In recognition of the Company's interest in protecting its Goodwill interest in Clients, Prospective Clients, Service Providers, Prospective Service Providers and Referral Source relationships, Employee agrees that for a period of twelve (12) months after he/she is no longer employed, Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

**5.** **Non-Solicitation of Company Employees.** Employee recognizes the desire of the Company to preserve its Goodwill, its Confidential Information and Trade Secrets through the continued services of its employees. While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was

employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

**6.** **Calculation of Time in Sections 4, 5 & 9.** In the event of a breach of the Employee's obligations in paragraphs 4, 5 or 9, the duration for which such breach is continuing shall be excluded from the period during which such obligations shall apply and such time period shall be extended thereby.

**7.** **Representations & Acknowledgments.**

**(a)** **Representations.** Employee represents to the Company that:

(i) there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent, impair, restrict or make unlawful the execution of this Agreement or performance hereunder;

(ii) Employee does not possess any confidential information or trade secrets of a former employer or other thirty-party; and

(iii) in the course of employment with the Company, Employee will take no action to violate or infringe upon the intellectual property, confidentiality or ownership rights of any third-party.

**(b)** **Acknowledgements.** Employee acknowledges that:

(i) Employee shall fill a role for Company which will allow Employee to create, maintain and foster unique and extraordinary close and trusting relationships with Clients, Prospective Clients, Service Providers, Prospective Service Providers, and/or Referral Sources or is expected to utilize the Company's Confidential Information and Trade Secrets in performing the duties required by Employee's position;

(ii) Employee expressly waives any defense to the enforcement of paragraph 4 of this agreement that Employee had a pre-existing relationship with any Client, Service Provider or Referral Source;

(iii) Employee is not and will not be unduly burdened by the provisions and enforcement of this Agreement;

(iv) the covenants set forth in Sections 4 and 5 are reasonable in all respects (including geography, scope and duration) and necessary for the protection of the legitimate protectable interests of the Company, including its Goodwill and are not overreaching; and

(v) Employee has been given sufficient time to review and consider the terms of this Agreement and has been afforded the opportunity to consult with an attorney. By signing this Agreement, Employee has done so knowingly and voluntarily and without duress or coercion.

**8.     Remedies for Breach.**

(a)     In the event of any actual or threatened breach of any of the covenants contained in this Agreement, the Company shall be entitled to seek an injunction (temporary, preliminary and/or permanent) to enforce this Agreement, without the requirement of posting a bond or other form of collateral, and may also pursue any other available remedies available to it in law and/or equity.

(b)     Should the Company be a Prevailing Party in any litigation to enforce the terms of this Agreement, Employee shall be responsible for and pay the reasonable costs, fees and expenses of Company's attorneys associated with such litigation, including appeals. The Company shall be a "**Prevailing Party**" if it obtains temporary, preliminary and/or permanent injunctive relief, or is awarded monetary damages for such breach or threatened breach.

**9.     Ownership of Inventions**.

(a)     **Inventions Retained and Licensed**. Employee has attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the date of this Agreement: (i) Employee made or created, and/or (ii) are owned solely or jointly by Employee or belonging to Employee jointly with others or in which Employee has an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively, "**Prior Inventions**"); or, if no such list is attached, Employee represents that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, Employee hereby forever waive any and all rights or claims of ownership to such Inventions. Employee understands that Employee listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of Employee's ownership of such Inventions.

(b)     **Use or Incorporation of Inventions**. If in the course of Employee's employment or working with the Company, Employee uses or incorporates into any of the Company's products, services, processes or machines any Invention not covered by Section 9(d) of this Agreement in which Employee has an interest, Employee will promptly so inform the Company in writing. Whether or not Employee gives such notice, Employee hereby irrevocably grants to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c)     **Inventions** "**Inventions**" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable including, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon, and to differentiate, for purposes of the disclosure in Exhibit A are personal to the Employee and do not involve the Company. "**Company Inventions**" means any

and all Inventions that Employee may solely or jointly author, discover, develop, conceive, or reduce to practice during the Employee's employment or working with the Company on or related to Company matters within the scope of Employee's employment.

(d) **Assignment of Company Inventions**. Employee hereby assigns to the Company, or the Company's designee, and agrees to promptly make full written disclosure to the Company of and to hold in trust for the sole right and benefit of the Company, all of Employee's right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. Employee hereby waives and irrevocably quitclaims to the Company or the Company's designee any and all claims, of any nature whatsoever, that now have or may hereafter have for infringement of any and all Company Inventions. Employee further acknowledges that all Company Inventions that are made by Employee (solely or jointly with others) within the scope of and during the period of the Employee's employment or working with the Company are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by Employee's salary and benefits and any other consideration. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, Employee hereby waives and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If Employee has any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, Employee hereby unconditionally and irrevocably grants to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e) **Maintenance of Records**. Employee agrees to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Employee's employment or working with the Company. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. Employee agrees not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. Employee agrees to deliver all such records (including any copies thereof) to the Company at the time of termination of the employee's employment as provided for in this Agreement.

(f) **Intellectual Property Rights**. Employee agrees to assist the Company, or its designee in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments

which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Employee further agrees that Employee's obligation to execute or cause to be executed, when it is in Employee's power to do so, any such instrument or papers shall continue during and at all times after the end of the Employee's employment and until the expiration of the last such intellectual property right to expire in any country of the world. Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact, to act for and in Employee's behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by Employee's subsequent incapacity.

10. **[Limited Non-Compete Relating Solely to the Compliance with Option Grant**. In the event the Employee terminates Employee's employment with the Company, as a condition precedent for receiving the benefits of any grant of equity or option to purchase equity, Employee shall not, for a period of twelve (12) months after the end of employment work for a Company located within a thirty (30) mile radius of the Company's office address located at 1900 Reston Metro Plaza, Suite 600, Reston VA, 20191, that competes with the Company for Company Business.]

11. **Limited Enforcement by The Company; Partial Invalidity.** The Company shall have the option and right to enforce any provision in this Agreement to a partial, lesser and/or more limited extent than this Agreement provides, upon written notice to Employee. If any provision of this Agreement is declared to be void, invalid, or illegal, the parties request that such provision be partially enforced and modified by the court to most closely reflect the intent of the parties, to the fullest extent permitted by law. If any provision of this Agreement is declared to be unreasonable or excessively broad by a court, the parties request, to the fullest extent permitted by law, that the court interpret such provision in such a manner so as to provide the greatest degree of protection for the Company.

12. **Governing Law and Consent to Jurisdiction**. This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Virginia without regard to principles involving the conflict of laws. Any dispute or controversy other than those involving the need for a temporary restraining order or a preliminary injunction arising out of or relating to this agreement and/or an Employee's employment that could otherwise be resolved by a court shall be resolved through arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association, in which neither class actions nor collective actions will be permitted. The Employer shall pay any such filing fee if necessary to ensure that the AAA hears these disputes. Judgment upon the award may be entered in any court having jurisdiction. Both you and The Company give up any right to resolve a controversy through any other means, except for claims for injunctive relief relating to this Agreement and/or Employee's employment such as requests for temporary restraining orders, and preliminary and/or permanent injunctions which shall first be heard in the state and federal courts located in the State of Virginia. Employee and the Company hereby consent to the jurisdiction and venue of such courts and irrevocably waive the necessity of

personal service of process and consent to service of process by overnight mail (UPS or FEDEX next day delivery).

***Neither Employee nor the Company will be able to sue in court in connection with monetary claims related to this agreement.*** This inability to sue in court includes, for example, claims based on federal statutes such as Title VII of the Civil Rights Act of 1964 and the Fair Labor Standards Act and claims based on statutes, common law causes of action and concerning compensation. If there is more than one such dispute between Employee and Company, all such disputes may be heard in a single arbitration proceeding. Disputes pertaining to different employees of Company will be heard in separate arbitration proceedings. Any arbitration shall be resolved under the Delaware Rapid Arbitration Act Each party shall bear its own costs and fees in any legal dispute between them except in accordance with paragraph 8(b) of this Agreement or any statutory rights that Employee may have. Notwithstanding any language to the contrary in this agreement, the parties hereby agree that the award rendered by that arbitrator may be appealed pursuant to the AAA's Optional Appellate Arbitration Rules ("Appellate Rules"); that the award rendered by the arbitrator(s) shall, at a minimum, be a reasoned award; and that the award shall not be considered final until after the time for filing the notice of appeal pursuant to the Appellate Rules has expired. Appeals must be initiated within thirty (30) days of receipt of an Underlying Award, as defined by Rule A-3 of the Appellate Rules, by filing a Notice of Appeal with any AAA office. Following the appeal process the decision rendered by the appeal tribunal may be entered in any court having jurisdiction thereof.

**13.** **Miscellaneous.**

**(a)** This Agreement may be only amended by written agreement of the parties hereto, and no person, other than the Parties shall have any rights under or interest in this Agreement or the subject matter hereof.

**(b)** No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion. No waiver shall be effective unless set forth in writing and signed by the party granting such waiver.

**(c)** Employee expressly acknowledges and agrees to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. This Agreement will inure to the benefit of the Company, its successors, and its assigns. Employee acknowledges and agrees that the Company may assign this Agreement to any of its subsidiaries, affiliates, or successors, at any time and without Employee's further approval or consent. Employee further acknowledges and agrees that the Company may be merged or consolidated with another entity, and that such entity shall automatically succeed to the rights, powers, and obligations that the Company has under this Agreement, without Employee's further approval or consent. Finally, Employee acknowledges and agrees that Employee's obligations under this Agreement are personal and that Employee may not assign this Agreement.

**(d)** The headings or captions used in this Agreement are inserted only for the purpose of convenience and reference, and in no way define the scope or intent of any provision or part hereof.

**(e)** The unnumbered paragraphs on page 1, and paragraphs 2 through 13 shall survive both the termination of this Agreement and the end of the employment relationship between the Employee and the Company.

**(f)** The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. In the event of any such prohibition or unenforceability, a court of appropriate jurisdiction is authorized to partially enforce, amend and/or sever any such provision to the minimum extent necessary to make such provision neither prohibited nor unenforceable.

**(g)** This Agreement, together with any other agreement referenced herein (such as any Offer Letter or Employment Agreement), constitutes the entire agreement between the Parties with respect to subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings and negotiations, both written and oral, between the Parties.

**(h)** Employee understands that nothing in this Agreement is intended to restrict Employee's rights to discuss wages and working conditions with co-workers, if any, or in any way limit Employee's right to engage in concerted activity under the National Labor Relations Act, if any.

[SIGNATURE PAGE FOLLOWS]

BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND ALL OF ITS PROVISIONS AND THAT I AGREE TO BE FULLY BOUND BY THE SAME.

EMPLOYEE:

By: *Michael Frank*
Name:

Address:

904 Elden St

Herndon, VA 20170

Email:   m.afrank@yahoo.com

DARK CIRCUIT LABS, INC.

By: *Ronald C Pelkey*
Name: Ronald Pelkey
Title:  President and Chief Operating Officer