**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIGINIA**
**Alexandria Division**

**DARK CIRCUIT LABS, INC.,**

　　　**Plaintiff,**

**v.**                                                    **Case No.:    1:23-cv-00326**

**BLACK SAILS SECURITY LLC,**
**JOHN CARPENTER,**
**ERIC MISSIMER,**
**MICHAEL FRANK,**
and **KEITH HADDOCK**

　　　**Defendants.**

## DEFENDANTS JOHN CARPENTER AND BLACK SAILS SECURITY, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT

The Court should dismiss Plaintiff Dark Circuit Labs, Inc.'s ("Plaintiff" or "Dark Circuit") Complaint against defendant Black Sails Security, LLC ("BSS") and John Carpenter ("Carpenter") pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). Because DCL agreed, in its Confidentiality Non-Competition and Protectable Rights Agreement ("Agreement") with Carpenter, that it would submit all monetary claims related to the Agreement or Carpenter's employment to arbitration, the Court lacks subject matter jurisdiction over such claims against Carpenter and BSS. 1ˢᵗ Am. Compl. ("FAC") (Dkt. No. 11), Ex. B ¶ 12. In all of its claims, including those for injunctive relief, DCL has failed to state a claim upon which relief can be granted.

## I.    BACKGROUND

Carpenter was employed by DCL,[1] an offensive cyber security company that performs services in support of the United States' operational missions and cyber arsenal, from December 15, 2021, until March 6, 2023. FAC ¶¶ 5-9. On December 20, 2021, Carpenter and DCL entered into the Agreement, which contains restrictive covenants and an arbitration provision, as discussed in detail below. FAC, Ex. B ¶¶ 3-5, 12.

Carpenter formed BSS, a single-member Virginia limited liability company, on December 2, 2022. FAC ¶¶ 37, 88. Carpenter is its managing member. FAC ¶ 88. DCL alleges it learned of this through its client, Lockheed Martin Corp. ("LMCO"), on January 25, 2023, when defendant Keith Haddock ("Haddock"), who is an LMCO Project Manager, notified DCL that Carpenter had founded BSS, intended to compete with DCL, and solicited Haddock for a subcontract with LMCO. FAC ¶¶ 67-68. According to DCL, a few days later, Carpenter and defendant Eric Missimer ("Missimer") told DCL that they intended to terminate their DCL employment and divert work from DCL's subcontract with LMCO to BSS, and that they had solicited one other DCL employee to join them. FAC ¶¶ 82-83. DCL sent Carpenter a cease-and-desist letter on January 27, 2023, and then conducted an internal investigation into Carpenter's and Missimer's actions. FAC ¶ 75. DCL alleges that Carpenter told another employee, defendant Michael Frank ("Frank"), that he would be offered employment with BSS, FAC ¶¶ 79-81, and referred to Missimer as his employee or potential employee. FAC ¶ 125.

According to DCL, Haddock told DCL on February 9, 2023, that if Carpenter and Missimer resigned their DCL employment, LMCO would terminate DCL from the contract. FAC ¶¶ 129,

---

[1] Carpenter and BSS do not admit any of the facts alleged in the Complaint but recite them here in accordance with the legal standard for evaluating motions to dismiss.

133. DCL alleges that in the same call Haddock "specifically mentioned a material term that had been proposed by DCL in settlement discussions" with Carpenter. FAC ¶ 130. At DCL's urging, Carpenter and Missimer elected to not resign at that time. FAC ¶¶ 134-35. DCL alleges, based solely on Haddock's alleged knowledge of the settlement discussions and his threat to terminate DCL if Carpenter and Missimer resigned, that: "Defendants continued to communicate with Haddock or others at LMCO regarding confidential and proprietary information, DCL's internal business affairs, and solicitation of DCL employees to work for BSS or other entities on behalf of LMCO, all while they purported to be engaging in good faith settlement negotiations with DCL." FAC ¶ 136.

On March 3, 2023, Carpenter submitted his letter of resignation to DCL, with an effective date of April 3, 2023. FAC ¶ 150. DCL terminated Carpenter's employment the following business day, on March 6, 2023. FAC ¶ 156. DCL alleges "on information and belief" that Carpenter resigned because LMCO intends not to issue further work to DCL and that Defendants and Haddock "agreed to this course of action to ensure DCL would be phased out in order to divert DCL's business interests under the IDIQ Contract to BSS." FAC ¶ 152. DCL does not offer any facts to support this allegation.

Without any support at all, DCL alleges "[o]n information and belief, Missimer granted Carpenter and BSS unauthorized access to DCL's company property in his possess." FAC ¶ 140.

Finally, DCL alleges that after January 25, 2023, LMCO changed DCL's payment terms from 14 days to 45 days and issued DCL a purchase order on March 6, 2023, for less than the usual amount of its purchase orders. FAC ¶¶ 193-94, 197-200. DCL blames these developments on all Defendants. FAC ¶ 203.

Based on these allegations, DCL pleads the following claims:

1. Misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, *et seq*., against all Defendants.
2. Misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336, *et seq*., against all Defendants.
3. Violation of Virginia's Uniform Computer Information Transactions Act, Va. Code §§ 59.1-501.1, *et seq*., against all Defendants.
4. Misappropriation of trade secrets under Virginia common law, against all Defendants.
5. Breach of contract, against Carpenter, Missimer, and Frank.
6. Breach of fiduciary duty and duty of loyalty, against Carpenter, Missimer, and Frank.
7. Aiding and abetting a breach of contract and/or fiduciary duty and duty of loyalty, against all Defendants.
8. Common law unfair competition, against all Defendants.
9. Tortious interference with prospective economic advantage, against all Defendants.
10. Tortious interference with contractual relations, against all Defendants.
11. Civil conspiracy, against all Defendants.
12. Preliminary and permanent injunction, against all Defendants.
13. Accounting, against all Defendants.

FAC ¶¶ 211-352. DCL seeks preliminary and permanent injunctions, as well as "compensatory, consequential, liquidated, exemplary and punitive damages … together with interest, attorneys' fees, costs and disbursements, and … other and further relief …." FAC at pp. 65-66.

## II.    ARGUMENT

### A.    LEGAL STANDARD

Rule 12(b)(1) permits a court to dismiss a claim for lack of subject matter jurisdiction. *Crews v. S & S Serv. Ctr. Inc.*, 848 F. Supp. 2d 595, 597 (E.D. Va. 2012) (citing Fed. R. Civ. P. 12(b)(1)). The burden of proving subject matter jurisdiction lies with the plaintiff. *Id.* A defendant may contest subject matter jurisdiction by arguing that, even if all facts alleged in the complaint are presumed true, "the complaint fails to allege facts upon which subject matter jurisdiction may be based." *Id.* (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995)).

Rule 12(b)(6) provides for dismissal of a cause of action based upon the plaintiff's "failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive such a

motion, "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Mezu v. Morgan State Univ.*, 367 Fed. Appx. 385, 388 (4th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.* The plaintiff must allege facts that, "when accepted as true," demonstrate it is entitled to relief; it must show the "plausibility of entitlement to relief." *Id.* (citations omitted). A complaint must include more than labels or conclusions. "[A] formulaic recitation of the elements of a cause of action" is not sufficient. *Tysinger v. Motor Co., Inc. v. Chrysler Grp., LLC*, No. 3:10CV554, 2011 WL 63866, at *2 (E.D. Va. Jan. 7, 2011) (citations omitted).

### B.     THE COURT LACKS SUBJECT MATTER JURISDICTION OVER DCL'S MONETARY CLAIMS AGAINST CARPENTER AND BSS BECAUSE OF THE AGREEMENT'S ARBITRATION CLAUSE.

DCL's claims against Carpenter and BSS for monetary damages should be dismissed for lack of subject matter jurisdiction because DCL agreed that it would not bring such claims in court: "***Neither Employee nor the Company will be able to sue in court in connection with monetary claims related to this agreement.***" Ex. B ¶ 12 (emphasis in original). The Agreement requires that other than claims for injunctive relief, "[a]ny dispute or controversy … arising out of or relating to [the Agreement] and/or Employee's employment … shall be resolved through arbitration … ." *Id.* Even if there were any question about arbitrability, the Court would lack jurisdiction to decide it because DCL stipulated to the American Arbitration Association's ("AAA") Employment Rules, under which the arbitrator has exclusive authority to decide arbitrability. *Id.* This argument holds true not only for DCL's claims against Carpenter, but also for its claims against BSS.

### 1.    DCL Is Barred from Bringing Monetary Claims against Carpenter in this Court.

A "district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to [Federal Rule of Civil Procedure] 12(b)(1) when the parties' dispute is subject to binding arbitration." *Gilbert v. Donahoe*, 751 F.3d 303, 306 (5th Cir.), *cert. denied*, 135 S. Ct. 251 (2014). The law and public policy in favor of enforcing arbitration agreements is firmly established. The Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* ("FAA"), reflects a "liberal federal policy favoring arbitration agreements" as a means of settling disputes. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *see also Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) ("The FAA makes arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"). "[D]ue regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989). *See also Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2425 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). The Virginia Uniform Arbitration Act, Va. Code § 8.01-581, *et seq.*, is in accord with the FAA. Va. Code Ann. § 8.01-581.01 ("On application of a party showing an agreement [to arbitrate,] . . . the court shall order the parties to proceed with arbitration . . . ."); *Mission Residential, LLC v. Triple Net Props., LLC*, 275 Va. 157, 161 (2008). In the Fourth Circuit, courts will compel arbitration if there is (1) a dispute between the parties; (2) a written agreement with an arbitration clause covering the dispute; (3) a relationship to interstate commerce in the transaction that is the subject of the agreement; and (4) the failure, neglect, or refusal of one party to arbitrate the dispute. *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99,102 (4th Cir.1991)). All

four factors are present here: the parties have a dispute as described in the First Amended Complaint; the Agreement covers all DCL's claims for monetary relief; the transactions at issue in the Agreement (Carpenter's employment and post-employment activities) are related to interstate commerce; and DCL, by filing this suit, has refused to arbitrate.

The Court therefore should dismiss for lack of subject matter jurisdiction all monetary claims against Carpenter pursuant to the Agreement's arbitration clause.

### 2.    DCL Is Required to Arbitrate its Claims against BSS Also.

The Agreement's arbitration clause, Ex. B ¶ 12, applies with equal force to DCL's claims against BSS, notwithstanding that it is not a signatory to the Agreement. It is "[w]ell established" in the Fourth Circuit that "a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir. 2000); *see also Meridian Imaging Sols., Inc. v. OMNI Bus. Sols. LLC*, 250 F. Supp. 3d 13, 23 (E.D. Va. 2017). This is particularly true when the plaintiff, a signatory to the agreement containing an arbitration clause, relies on that agreement in its claims against a nonsignatory. *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006) (citing *Int'l Paper Co.*, 206 F.3d at 418). The plaintiff is then equitably estopped from arguing that the nonsignatory cannot compel arbitration. *Id.* "When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate." *Id.* (internal citations omitted). *See also Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005).

In the instant matter, DCL's claims against BSS refer to and arise out of the Agreement. DCL asserts trade secrets claims against BSS based on the Agreement's non-disclosure clause

(Counts 1, 2, and 4); that BSS aided and abetting a breach of the Agreement (Count 7); and that BSS tortiously interfered with the Agreement (Count 10). These claims explicitly arise out of the Agreement. As it relies on the Agreement in its claims against BSS, DCL cannot avoid the application of the Agreement's arbitration clause. "[I]t is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Am. Bankers Ins. Grp., Inc.*, 453 F.3d at 627 (internal citations omitted). Moreover, Carpenter, as the sole member and managing member of BSS, was its agent. FAC ¶ 88. All of DCL's allegations against BSS are based on alleged actions undertaken by and through Carpenter. BSS is thus bound to the Agreement's arbitration provision, and DCL cannot escape its application to DCL's claims against BSS. The Court should dismiss DCL's monetary claims against BSS.

### 3. Even If There Were Any Question Regarding Arbitrability, That Question Should Be Decided by An Arbitrator, Not This Court.

In the Agreement, DCL agreed to the AAA Employment Arbitration Rules. Ex. B ¶ 12. The AAA Employment Arbitration Rules empower the arbitrator to "rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Employment Arbitration Rule 6(a) (https://adr.org/sites/default/files/EmploymentRules-Web.pdf).[2] The FAA requires enforcement of an agreement to delegate issues of arbitrability, *i.e.*, the "threshold issues concerning the arbitration agreement," to the arbitrator. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). "'[Q]uestions of arbitrability' … include questions regarding the existence of a legally

---

[2] The Agreement also references the Delaware Rapid Arbitration Act ("DRAA"), which provides for the enforcement of arbitration agreements and requires the submission of arbitrability issues to the arbitrator. 80 Del. Laws § 5803(b)(2), (5)(a). The DRAA, however, only applies if the arbitration agreement is governed by Delaware law. *Id.* at § 5803(a)(4). As the Agreement in this case is governed by Virginia law, the DRAA is inapplicable. *See* Ex. B ¶ 12.

binding and valid arbitration agreement, as well as questions regarding the scope of a concededly binding arbitration agreement." *Id.* at 78. The Supreme Court has "recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id*. Where the parties have delegated arbitrability to the arbitrator, the court should compel arbitration on issues relating to arbitrability along with the underlying dispute. *Id*.

Here, because the Agreement invokes the AAA Employment Arbitration Rules, the Court should decline to decide any challenge to the scope of the Agreement's arbitration clause. Any such questions must be decided by an arbitrator.

### C.    DCL HAS FAILED TO STATE A CLAIM AGAINST CARPENTER OR BSS UPON WHICH RELIEF CAN BE GRANTED.

DCL has failed to allege sufficient facts in support of any of its claims, including those seeking injunctive relief. As the United States Supreme Court set forth in *Twombly* and *Iqbal*, conclusory allegations are insufficient; rather, the plaintiff must allege facts that make it plausible that it can prevail. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal* , 556 U.S. 662, 678 (2009). DCL's Complaint is wholly devoid of actual factual allegations against DCL. Each of DCL's claims is based entirely on conclusory allegations, many pled "upon information and belief" and based on unfounded assumptions. The Court should dismiss DCL's injunctive and other claims under Rule 12(b)(6).

#### 1.   DCL Has Not Alleged that Carpenter or BSS Took or Disclosed Any Trade Secrets as Required for its Claims under Counts 1 and 2.

DCL's claims against Carpenter and BSS for misappropriation of trade secrets under the Defend Trades Secrets Act ("DTSA") (Count 1) and the Virginia Uniform Trade Secrets Act

("VUTSA") (Count 2) fail because DCL has not identified any trade secrets or pled any facts suggesting that Carpenter or BSS misappropriated them.

"[T]he applicable standards under the DTSA and ... the VUTSA are nearly identical." *OROS, Inc. v. Dajani*, No. 1:19-cv-351, 2019 WL 2361047, at *2 (E.D. Va. June 4, 2019). Misappropriation of trade secrets under either law requires that "(1) the information in question must constitute a trade secret, and (2) that trade secret must have been misappropriated." *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004). The DTSA defines "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information," provided that the owner "has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). The VUTSA's definition of trade secrets is similar. Va. Code § 59.1-336. In light of these broad definitions, "'just about anything can constitute a trade secret under the right set of facts,' so long as the information (i) has independent economic value by virtue of its being a secret and (ii) is subject to reasonable efforts to maintain that secrecy." *Dajani*, 2019 WL 2361047, at *3 (quoting *Business Objects*, 331 F. Supp. at 416). Additionally, the DTSA requires that trade secrets be "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

Misappropriation under either the DTSA or VUTSA requires that the defendant either acquire the trade secret by improper means or disclose the trade secret without consent. *See* 18 U.S.C. § 1839(5) (DTSA definition of misappropriation); Va. Code § 59.1-336 (VUTSA definition of misappropriation). The plaintiff must show: "(1) that the defendant acquired, disclosed, or used

a trade secret … through improper means (namely, without express or implied consent); and (2) that the defendant knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff." *Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 780 (E.D. Va. 2012). *See, e.g., MicroStrategy, Inc. v. Business Objects, S.A.*, 331 F.Supp.2d at 425 (ruling that a claim of misappropriation could not survive where the plaintiff could show that defendant's agent possessed a trade secret but could not show that the agent disclosed the trade secret to the defendant). Acquisition of a trade secret by proper means, without disclosing or using it improperly, is not a violation of either law.

Under both the DTSA and the VUTSA, the plaintiff must allege sufficient facts to make plausible a claim that there is an actual trade secret at issue and that the defendant misappropriated it. Simply asserting that trade secrets exist without identifying what the defendant took is not enough, nor is speculation that the defendant could have disclosed or used a trade secret. Plaintiff "carries the burden to describe the subject matter of its alleged trade secrets in sufficient detail to establish each element of a trade secret." *Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*, No. 5:18-cv-00039, 2019 WL 1756293, at *4 (W.D. Va. Apr. 19, 2019). The requirement to "identify, with particularity, each trade secret" is important: the factfinder must be able "to distinguish that which is legitimately a trade secret from other information that is simply confidential but not a trade secret, or is publicly available information." *Id.* Courts routinely dismiss trade secrets claims when the plaintiff fails to plead specific details about the alleged trade secret. *See, e.g., E.W., LLC v. Rahman*, 873 F. Supp. 2d 721 (E.D. Va. 2012) (dismissing a VUTSA claim because the complaint "fails to allege what trade secrets Defendants allegedly misappropriated. Instead, the Complaint contains conclusory allegations that [defendant]

possessed knowledge of [plaintiff's] customers and business information, but is devoid of factual allegations to support this assertion"); *All Business Solutions, Inc. v. NationsLine, Inc.*, 629 F. Supp. 2d 553, 558-59 (W.D. Va. 2009) (dismissing a VUTSA claim because the complaint relied "on the single, conclusory assertion that [defendant] 'sought … to appropriate and disclose the names of [plaintiff's] customers, along with other … trade secrets and confidential information.'"); *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 407 (2012) (affirming dismissal of a VUTSA claim because the complaint failed to "identify what trade secrets [defendant] misappropriated; instead, it simply references a laundry list of items that [plaintiff] considers to be 'Confidential Information.'").

Likewise, misappropriation requires factual allegations that "the defendant acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent)." *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 855 (E.D. Va. 2018). When the defendant allegedly acquired the trade secrets by proper means, the complaint must allege that the defendant disclosed or used the trade secret improperly. "[M]ere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets, even when considered in conjunction with solicitation of former clients." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) (dismissing a DTSA claim because the complaint "makes plain that rather than acquiring the alleged trade secrets by improper means, [defendant] acquired them through the normal course of his employment.").

Here, DCL fails to identify the alleged trade secrets Carpenter or BSS took. In both Count 1 (DTSA) and Count 2 (VUTSA), DCL rattles off the following list of items that constitute "DCL Trade Secrets": "business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, business data compilations, programs,

diagrams, drawings, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer lists." FAC ¶¶ 216, 235. DCL does not allege, however, that Carpenter or BSS took any such items. Instead, DCL uses vague, conclusory allegations, such as "Defendants intentionally misappropriated and/or conspired to misappropriate trade secrets from DCL to their own economic benefit," FAC ¶ 233, and "it cannot reasonably be disputed that Carpenter and Missimer separately and with the other Defendants stole, or otherwise removed without authorization and through improper means, confidential and proprietary corporate documents from DCL," FAC ¶ 240 (Count 2). These vague allegations are plainly insufficient. It is entirely unclear what any of the Defendants, and in particular Carpenter and BSS, "stole" or what these "improper means" were. FAC ¶ 240.

DCL leaps to the conclusion, without any hint of a factual foundation, that "[t]here exists a substantial likelihood of 'inevitable disclosure' of DCL Trade Secrets if Missimer, Carpenter or Frank are allowed to work at a competitor company." FAC ¶ 222. Virginia, however, does not recognize the "inevitable disclosure" doctrine on which DCL relies. *See MeadWestvaco Corp. v. Bates*, 91 Va. Cir. 509, No. CL 13-1589, 2013 WL 12183821, at \*9 (Chesterfield County Aug. 1, 2013) (discussing lack of Virginia law on inevitable disclosure doctrine and questioning whether it is recognized by Virginia law); *Gov't Tech. Servs., Inc. v. IntelliSys Tech. Corp.*, 51 Va. Cir. 55, No. 160265, 1999 WL 1499548 (Fairfax County Oct. 20, 1999) ("Virginia does not recognize the inevitable disclosure doctrine."). DCL cites to *Atlantic Diving Supply, Inc. v. Basnight*, Case No. 2:22cv298, 2022 WL 5568083 (E.D. Va. Sept. 21, 2022), in support of its inevitable disclosure theory, but that case was decided under Delaware law, *id*. at \*12, whereas the Agreement in this case is governed by Virginia law.

The closest the First Amended Complaint comes to suggesting what trade secrets Carpenter allegedly misappropriated is (1) an accusation that Carpenter disclosed to Haddock the terms that Carpenter and DCL discussed in their failed settlement negotiations,[3] FAC ¶¶ 130, 132, 154, and (2) an accusation that Carpenter, while still DCL's vice president, downloaded a DCL business development document, FAC ¶¶ 180-81. There is no suggestion as to what BSS may have misappropriated. Settlement negotiations are not trade secrets; they do not meet the statutory definition of such under either the DTSA or VUTSA, as DCL does not allege, nor could it, that it derived independent economic value from keeping the negotiations secret or that it took reasonable efforts to maintain the secrecy. *See generally* Va. Code § 59.1-336 (defining "trade secret" under the VUTSA); 18 U.S.C. § 1839(3) (defining "trade secret" under the DTSA). DCL has not alleged that Carpenter, as the company's vice president, was not authorized to download the business development document, nor has it alleged any facts suggesting that he retained that document after his termination, disclosed it to anyone, or even removed it from the DCL laptop. *See also Indus. Packaging Supplies, Inc. v. Channell*, No. 18-CV-00165 2018 WL 2560993, at *2 (N.D. Ill. 2018) (holding that allegations that the defendants, former employees with access to trade secrets, left for a competitor offering the same services to the same clientele are "not enough to justify [the plaintiff's] otherwise unsupported suspicions that the defendants used or disclosed" trade secrets). The most DCL can muster is pure, unfounded speculation.

Counts 1 and 2 therefore should be dismissed.

---

[3] Carpenter denies this allegation.

2. **Count 3, Violation of Virginia's Uniform Computer Information Transactions Act ("VUCITA"), Va. Code §§ 59.1-501.1, et seq., Fails.**

The VUCITA has no application to this case. That law was "designed to protect individuals involved in computer information transactions, such as agreements to create, transfer, modify, or lease computer information." *Smith v. Interactive Fin. Mktg. Grp., L.L.C.*, 79 Va. Cir. 158 (2009)). The VUCITA governs contracts for computer information transactions, setting forth rules for formation, terms, and the construction of such contracts, remedies for the breach of such contracts, and related issues. *See* Va. Code Title 59.1, Ch. 43, *passim*. The VUCITA expressly states that it "does not apply to a contract of employment of an individual, other than an individual hired as an independent contractor....". *See* Va. Code Ann. § 59.1–501.3(d)(5); *see also Griffin v. Compass Grp. USA, Inc.*, No. 3:16-CV-917-JAG, 2017 WL 2829619, at *n. 2 (E.D. Va. June 30, 2017). None of the allegations in the First Amended Complaint have any relation to the VUCITA. The allegations in Count 3, like the rest of the Complaint, are vague and conclusory and therefore insufficient to state a claim upon which relief can be granted. The Court should dismiss Count 3.

3. **Count 4, Common Law Misappropriation of Trade Secrets, Should Be Dismissed Because There Is No Such Cause of Action Under Virginia Law.**

The VUTSA supplanted the Virginia common law cause of action misappropriation of trade secrets. *Babcock & Wilcox Co. v. Areva NP, Inc*., 292 Va. 165, 205 n.51 (2016) ("the VUTSA expressly states that it 'displaces … other law of this Commonwealth providing civil remedies for misappropriation of a trade secret.'") (citing Va. Code § 58.1-341(A)). The cases DCL cites in support of this claim—*MicroStrategy Inc. v. Li*, 268 Va. 249 (2004) and *Dionne v. Se. Foam Converting & Packaging, Inc.*, 240 Va. 297 (1990)—were both decided under the VUTSA without mention of a common law cause of action. As there is no common law trade secrets claim under Virginia law, the Court should dismiss Count 4.

### 4. Because the Agreement Is Unenforceable, DCL Cannot State Claims Against Carpenter or BSS Based on Breach of Contract (Count 5), Aiding and Abetting Breach of Contract (Count 7), or Tortious Interference with Contractual Relations (Count 10).

Counts 5, 7, and 10 against Carpenter and BSS are all based, in whole or in part, on the Agreement. In Count 5, DCL pleads that Carpenter breached his "employment agreement"[4] by misappropriating trade secrets, soliciting DCL's employees and customers, and working for BSS while still employed by DCL. In Count 7, DCL claims that all Defendants "have knowledge of the contractual, statutory, and common law duties owed by Carpenter, Missimer, and Frank to DCL yet Defendants encouraged and assisted them in committing breaches of same." FAC ¶ 294. Count 10 claims that all Defendants tortiously interfered with "contractual relationships with Carpenter, Missimer, and various other third-party customers or clients." FAC ¶ 327. By itself, DCL's failure to identify the "employment agreement" at issue in Count 5 or the contractual duties and relations at issue in Counts 7 and 10 is grounds to dismiss those claims under Rule 12(b)(6). Assuming that DCL is referring to the Agreement, it is unenforceable. All claims based on it should be dismissed.

DCL alleges that Carpenter violated the Agreement's Restrictive Covenants based on an email that defendant Michael Frank sent to defendant Keith Haddock on February 23, 2023, stating: "I talk to John & Eric pretty much daily about what's going on at DCL" and "it seems at this point that the writing is on the wall that we (current employees) (and possibly all) of us need to make a transition in the near future, and that ***BSS will not be setting sail anytime this year***." FAC ¶ 141. DCL alleges that Frank then went on comment that he had a contact at PLEX with whom he wanted Haddock to talk. *Id*. From this email, DCL leaps to the confounding conclusion that "Defendants were actively working behind the scenes during settlement negotiations to

---

[4] DCL does not identify the "employment agreement" and there is no document with that title attached to the First Amended Complaint.

unlawfully divert DCL's interests under the IDIQ contract as well as shift DCL employees to 'PLEX'," and that "Defendants have not halted their plans to launch BSS, but instead have simply delayed them and intend to cause further damage to DCL by as early as next year." FAC ¶ 142.

These are the only factual allegations that DCL submits to show that Carpenter has breached the Agreement. Not only are these allegations conclusory and speculative, but Frank's email also demonstrates that as early as February 23, 2023, he had given up on BSS, correctly concluding it was not going to happen, and was looking elsewhere for employment—without any assistance from Carpenter. DCL's suspicions about Frank's email are wholly insufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. DCL thus has failed to allege facts plausibly showing that it has been or will be affected by Carpenter and BSS's anodyne discussions with Frank. As such, DCL's Counts 5, 7, and 10 must fail.

Further, to the extent Counts 5, 7, and 10 are based on the Agreement's restrictive covenants, they should be dismissed because the restrictive covenants are unenforceable under Virginia law. Restrictive covenants are disfavored restraints on trade. *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 270 Va. 246, 249, 618 S.E.2d 340 (2005). Virginia applies the same test to nonsolicitation clauses as to noncompetition clauses. *See Foti v. Cook*, 220 Va. 800, 805, 263 S.E.2d 430, 433 (1980); *Lasership Inc. v. Watson*, 79 Va. Cir. 205 (Fairfax Co. 2009). A non-solicitation agreement will only be enforced if the contract: 1) is narrowly drawn to protect the employer's legitimate business interest; 2) is not unduly burdensome on the employee's ability to earn a living; and 3) is not against public policy. *Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 493, 561 S.E.2d 694 (2002). Whether the restrictive covenant is enforceable is a question of law. *Omniplex*, 270 Va. at 249, 618 S.E.2d 340. Each non-compete agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses

and employees involved. *Id*. at 249, 618 S.E.2d 340. In assessing the reasonableness of restrictions, Virginia law focuses "on the duration of the restraint, the geographic scope of the restraint, and the functional scope and extent of the activity being restricted," as well as "whether the restrictive covenant prohibits the employee from employment with a company that ***actually*** competes with the employer." *Lasership Inc. v. Watson*, 79 Va. Cir. 205, 2009 WL 7388870, at *4 (Fairfax 2009) (citations omitted) (emphasis in original). If a restrictive covenant, "considered in the context of the other language used in the contract, is capable of more than one reasonable construction, it is ambiguous, and [courts] will adopt that construction ***most favorable to the employee***." *Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 289, 414 S.E.2d 599, 601 (1992) (emphasis added); *see also Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1521 (W.D. Va. 1995).

A restrictive covenant is unenforceable *in toto* under Virginia law if it is "functionally overbroad"—i.e., if the range of proscribed activities is "greater than necessary" to protect the employer's legitimate business interest—or if it is ambiguous in scope. *Nortec Comm'n, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 231 (E.D. Va. 2008); *see Cantol, Inc. v. McDaniel*, 2006 WL 1213992 at *4 (E.D. Va. 2006) (quoting *Motion Control Sys., Inc. v. East*, 546 S.E.2d 424, 425 (2001)). An employer may not "try to limit the in terrorem effect of an ambiguous non-compete clause by interpreting it narrowly." *Lanmark Tech., Inc. v. Canales*, 454 F.Supp.2d 524, 529 (E.D.Va.2006). This is because such a clause may deter an employee from "competing even when she has a right to do so, or it may deter a competitor from hiring the employee." Estlund, *Between Rights and Contract*, 155 U. Pa. L. Rev. 379, 406 (2006). A former employee and prospective employers cannot be left guessing what is and is not prohibited. *Lanmark*, 454 F. Supp. 2d at 529. Finally, an employer cannot ask a court to fix an overly broad restrictive covenant; Virginia law requires courts to "take the non-compete provision as written; there is no authority for courts to

'blue pencil' or otherwise rewrite the contract to eliminate any illegal overbreadth." *Lanmark*, 454 F. Supp. 2d at 529.

Section 4 of the Agreement purports to restrict Carpenter, during employment, from soliciting, accepting an offer to do business with, servicing or diverting any "Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources, and/or Company business" for his own interests or that of a third-party or to the Company's detriment, and also from working for another company that competes with DCL for "Company Business." Ex. B at ¶ 4(a). For twelve months post-employment, the Agreement purports to impose the following restriction on Carpenter:

> Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

Ex. B ¶ 4(b). "Company Business" is defined as "the development of cyber security products, software and services, or other lines of business that [DCL] enters (or has taken concrete steps to enter into in the near future) during the term of your association with [DCL] for third parties who utilize [DCL's] offerings ("Clients"), which Clients do business with, or seek to utilize the services of the Company and/or its employees." Ex. B at 1. "Referral Sources" are defined as businesses and individuals that refer business to DCL. *Id*. Prospective Clients and Prospective Referral Sources are those with whom DCL is or was working with to obtain new business at the relevant time period in question. *Id*. "Service Providers" are third-party service providers of components and software for DCL's products and services.

This non-solicitation clause is overly broad in a number of ways:

- It has no geographic scope.

- As Carpenter was employed with DCL for only 16 months, FAC ¶ 25, he would have no way of knowing who were all DCL's Clients, Prospective Clients, Service Providers, Prospective Service Providers, or Referral Sources during the 24 months preceding his termination. DCL has no protectable business interest in restricting Carpenter from work with entities with whom he never had any contact on behalf of DCL and about whom he gained no information from DCL.

- It prohibits Carpenter from "business of the same type or related to the Company Business"—a broad swath of business that would include the development of cyber security products, software and services, or other lines of business DCL enters or takes step to enter, as well as business that is "of the same type or related to" such business, regardless of whether Carpenter ever worked in such business lines for DCL. Any number of computer-related business lines could be "of the same type or related to" DCL's business— other types of cyber work, other types of security work, the development of other types of software, the sale of hardware used in such work, or anything else "related to" DCL's business. DCL has no protectable business interest in restricting Carpenter from business lines that it does not have or that Carpenter never worked in for DCL, and Carpenter is left to guess what those unidentified business lines might be.

- It prohibits Carpenter from providing "services of the same type or related to the Company Business," regardless of whether Carpenter ever provided a particular service while working for DCL. DCL has no protectable business interest in restricting Carpenter from performing services for another entity that he never performed for DCL.

"The Supreme Court of Virginia has never upheld a restrictive covenant, which was ancillary to an employer-employee relationship, when the restrictive covenant could be applied to a geographic area in which the employee performed no function for the employer." *Contol, Inc. v. McDaniel,* 2006 WL 1213992 at \*4 (E.D. Va. 2006); *see also TradeStaff & Co. v. Nogiec*, 77 Va. Cir. 77 (Va. Cir. 2008). Such a limitless restrictive covenant, which may follow a former employee from place to place, is "akin to an amoeba. By having a life wholly unto itself, this covenant may grow more oppressive without restriction day by day, week by week, month by month, or year by year" and thus is invalid. *Specialty Mktg. v. Lawrence*, 80 Va. Cir. 214, 217 (Hanover Co. 2010) (quoting *Lawrence v. Business Com. Va.*, 53 Va. Cir. 102, 103 (Henrico Co. 2000)).

The non-compete provisions of the employment agreement are also overly broad in functional scope. These provisions violate the "janitor rule" by purporting to prohibit direct or indirect competition in any capacity. Under Virginia's "janitor rule," non-competes that "restrict the former employee's performance of functions for his new employer [are upheld] only to the extent that the proscribed functions are the same functions as were performed for the former employer." *Lanmark Tech., Inc. v. Canales*, 454 F.Supp.2d 524, 528 (E.D.Va.2006) (*quoting Cantol, Inc. v. McDaniel*, 2006 WL 1213992 at \*4 (E.D. Va. 2006).

The instant non-compete provision is similar to that at issue in *ManTech Int'l Corp. v. Analex Corp.*, 75 Va. Cir. 354 (Fairfax Co. 2008), where the court found that verbiage applying to "predominantly similar" businesses was impermissibly "ambiguous and vague," reaching "not only direct competition but also businesses merely in the same field which are not competitors." *Id*. Likewise, in *Motion Control Sys. v. East*, 262 Va. 33, 38, 546 S.E.2d 424 (2001), the Virginia Supreme Court found a prohibition on working for "any business similar to the type of business conducted by" the employer to be unenforceable because the restricted activities "could include a

wide range of enterprises unrelated" to employer's business. *Motion Control*, 262 Va. at 37–38, 546 S.E.2d at 426.

Equally overbroad is the Agreement's non-solicitation of employees provision, which states:

> While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

Ex. B ¶ 5. This provision would bar Carpenter from soliciting former DCL employees for any purpose, regardless of when or how they separated employment from DCL and regardless of the purpose of the solicitation. It would prevent Carpenter from soliciting a former DCL employee, even if he was employed at a different time than Carpenter, for working for a business in a completely unrelated field. For example, it would be a violation for Carpenter to tell an individual who worked for DCL prior to Carpenter about a job opening at a grocery store. DCL has no protectable business interest in banning such conduct. The court in *Strategic Enter. Sols., Inc. v. Ikuma*, 77 Va. Cir. 179 (Fairfax 2008), struck down exactly such a non-solicitation of employees clause:

> By way of example of how wide this provision reaches, assume that Employee A started employment with SE Solutions on June 1, 2008, was fired for cause on September 1, 2008, and opened up a pizza parlor on September 15, 2008. Employee B retired from SE Solutions on May 1, 2008. Even though Employees A and B never worked at SE Solutions at the same time, and had never even met, Employee A could not hire Employee B to work at the pizza parlor without violating Paragraph 14. Clearly this clause is overly broad; it does not limit employees from

competing directly with the former employer or through employment with a direct competitor. Paragraph 14 is unenforceable as a matter of law.

*Strategic Enter. Sols., Inc. v. Ikuma*, 77 Va. Cir. 179, *4 (Fairfax Co. 2008).

The overly broad and ambiguous nature of the restrictive covenants in the Agreement requires the dismissal of Counts 5, 7, and 10 against Carpenter and BSS. *Lasership Inc. v. Watson*, 79 Va. Cir. 205 (Fairfax Co. 2009) ("Because the noncompetition, nonsolicitation, and confidentiality clauses are unenforceable as a matter of law, all claims arising from those clauses must be dismissed.").

### 5.  Count 6, Breach of Fiduciary Duty and Duty of Loyalty, Fails.

DCL's breach of fiduciary duty against Carpenter fails as a matter of law. A breach of fiduciary duty requires (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages resulting from that breach. *All. Tech. Grp., LLC v. Achieve 1, LLC,* 2013 WL 143500 at *4 (E.D. Va. 2013). "An employee, including an employee at-will, owes a fiduciary duty of loyalty to his employer during his employment." *Williams v. Dominion Tech. Partners, LLC,* 576 S.E.2d 752, 757 (Va. 2003).

This count, like the rest of the First Amended Complaint, is based on merely conclusory allegations. DCL has not sufficiently alleged what interests were harmed or what actions Carpenter has taken that supposedly injured those interests. DCL attempts to allege a breach of fiduciary duty through Carpenter's alleged use of DCL's unidentified "confidential information," but as discussed *supra* it has not alleged sufficient facts to suggest that Carpenter misappropriated any of DCL's confidential information or trade secrets. DCL attaches significance to Carpenter's formation of BSS prior to his termination, FAC ¶¶ 37, 67-68, 75, 82-83, 88, but it is black letter law that forming a company or making preliminary plans to compete is not actionable. *Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.*, 260 Va. 35, 42, 530 S.E.2d 668, 672 (2000). Prior to

23

resigning from employment, employees are entitled to make arrangements to resign, including plans to compete with their employer. *Id.* This right is based on a policy of free competition. *Id.*

Accordingly, the Court should dismiss DCL's breach of fiduciary duty claim.

### 6. Count 8, Common Law Unfair Competition, Fails.

Virginia has "a narrow, sharply defined common law definition of unfair competition." *Phoenix Renovation Corp. v. Rodriguez*, 403 F. Supp. 2d 510, 517 (E.D. Va. 2005) (citing *Monoflo Int'l, Inc. v. Sahm*, 726 F. Supp. 121 (E.D. Va. 1989)). "The essential element of unfair trading is deception, by means of which goods of one dealer are palmed off as those of another, whereby the buyer is deceived, and the seller receives the profit which, but for such deception, he would not have received." *Id.* There is no allegation in the First Amended Complaint that Carpenter or BSS sold anything, let alone deceived anyone about what they sold or otherwise engaged in any "deception, by means of which goods of one dealer are palmed off as those of another." *Benjamin T. Crump Co. v. J.L. Lindsay, Inc.,* 130 Va. 144, 160, 107 S.E. 679, 684 (1921) (cited with approval in *Rosso & Mastracco, Inc. v. Giant Food Shopping Ctr.,* 200 Va. 159, 104 S.E.2d 776, 781 (1958)). This claim should be dismissed.

### 7. DCL's Tortious Interference with a Prospective Economic Advantage Claim, Count 9, is Fatally Deficient.

To state a plausible claim for tortious interference with contractual relations or prospective economic advantage, a plaintiff must plausibly allege (a) a specific, existing contractual relationship or business expectancy, and (b) that the defendant knew of that relationship or expectancy and intentionally interfered with it. *Sunsport Inc. v. Barclay Leisure Ltd.*, 984 F. Supp. 418, 423 (E.D. Va. 1997) (citation omitted); *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015). DCL does not allege a specific, existing business expectancy in Count 9, nor does it allege that Carpenter or BSS knew of that expectance and took advantage of it. DCL's allegations are

"too general to support a tortious interference claim" under Virginia law. *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 710 (E.D. Va. 2003).

Even if it had identified a business expectancy at issue, DCL failed to allege facts sufficient to show that the business opportunity was reasonably certain. The mere possibility of future economic benefit is not sufficient to support a claim of tortious interference; instead, the business expectancy must be reasonably certain of being achieved. *Williams v. Reynolds*, No. 4:06CV00020, 2006 WL 3198968, at *6 (W.D. Va. 2006). DCL simply alludes to the existence of "potential customers or clients." FAC ¶ 314. This is wholly insufficient. *See, e.g.*, *Brainware, Inc. v. Mahan*, No. 1:11cv470, 2011 WL 3734456, at *8 (E.D. Va. 2011) (dismissing a tortious interference with business relationship claim that identified a "prospective client" because "[s]uch bare allegations do not provide a sufficient basis to conclude that Defendant interfered with a 'reasonably certain' venture.").

DCL's tortious interference with a prospective economic advantage claim should be dismissed.

### 8. DCL's Tortious Interference with a Contractual Relationship, Count 10, is Fatally Deficient.

A claim for tortious interference with a contract requires a valid contractual relationship. *Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985). DCL fails to identify, beyond generalizations, any specific contract with which Carpenter and BSS allegedly interfered. Beyond the mere identification of "contractual relationships with…other third-party customers or clients," Plaintiff relies on generalized business expectancies that are purely speculative in nature. FAC ¶ 327. This failure to identify a specific contact with which Defendants allegedly interfered is fatal to the claim of tortious interference. *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F. Supp. 2d 385, 390-91 (E.D. Va. 2002). To the extent Count 10 may be

premised on the Agreement, or Frank's identical agreement with DCL, the claim fails because, as discussed *supra*, the Agreement is unenforceable.

Moreover, where, as here, the plaintiff alleges interference with an at-will contract, the defendant must have used "improper means or methods" to interfere with the contract. *Duggin v. Adams*, 234 Va. 221, 226–27, 360 S.E.2d 832, 836 (1987). The only "improper means" that DCL alleges are the alleged misappropriation of DCL's trade secrets and breach of fiduciary duties. As discussed *supra*, those claims are insufficiently pled. DCL cannot rely on them to satisfy the improper means element of its tortious interference claim.

Count 10 should be dismissed.

### 9.  DCL's Civil Conspiracy Claim (Count 11) Fails.

Under Virginia common law, a conspiracy is (1) the combination of two or more persons, (2) to accomplish some criminal or unlawful purpose not in itself criminal or unlawful, (3) by criminal and unlawful means. *Com. Business Sys., Inc. v. Bell South Servs.*, 249 Va. 39, 48, 453 S.E.2d 261, 267 (1995). Conclusory language will not suffice in pleading a conspiracy. *Govt. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004). Plaintiff must at least "allege that the defendants combined together to effect a 'preconceived plan and unity of design and purpose, for common design is the essence of the conspiracy." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F.Supp.2d 483, 499 (E.D. Va. 2003).

DCL fails to state a conspiracy claim because it does not allege a conspiracy with particularity. A plaintiff must plead conspiracy with particularity, and mere conclusory allegations are insufficient. *See, e.g., TradeStaff & Co. v. Nogiec*, 77 Va. Cir. 77, 85 (2008) ("conspiracy claims must be pleaded with particularity and with more than mere conclusory language."); *Bay Tobacco, LLC v. Bell Quality Tobacco Prod., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003)

(plaintiff failed sufficiently to allege conspiracy where plaintiff failed to plead "the requisite concert of action and unity of purpose in more than 'mere conclusory language'"); *Lewis v. Gupta*, 54 F. Supp. 2d 611, 618 (E.D. Va. 1999) ("'[M]ere conclusory language' is insufficient to state a cause of action for civil conspiracy under Virginia law"); *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797, 802 (1985) (dismissing claim because conspiracy inferences were not "fairly and justly drawn from the facts alleged"). DCL's conclusory and general allegations of conspiracy are insufficient to withstand a motion to dismiss. *Johnson v. Kaugars*, 14 Va. Cir. 172, 176 (City of Richmond 1988) ("[I]t is not enough merely to state that a conspiracy took place."). Virginia law requires Plaintiff to allege "some details of time and place and the alleged effect of the conspiracy." *Id. See, e.g., Connor v. Real Title Corp.*, 165 F.2d 291, 294 (4th Cir.1947) (concluding that conclusory allegations of "vicious conspiracy and collaboration" between three named defendants were insufficient).

The First Amended Complaint is completely devoid of facts suggesting a conspiracy. DCL merely alleges, in conclusory fashion, that "Defendants committed overt acts in furtherance of an intentional common scheme, as described in this Complaint." FAC ¶ 338. It does not identify the overt acts or the common scheme. DCL even acknowledges its failure to provide specific allegations by basing this claim "[o]n information and belief." FAC ¶ 92. These conclusory allegations are woefully insufficient to meet the heightened pleading standard of a conspiracy claim.

**10. The First Amended Complaint Should Be Dismissed with Prejudice.**

The First Amended Complaint is DCL's second attempt to plead its case. Its failure to state a claim in this second attempt demonstrates the futility of further amendments. The Court therefore should dismiss the case with prejudice.

**CONCLUSION**

The Court should dismiss this case in its entirety with prejudice.

Done: April 14, 2023

Respectfully submitted,

BLACK SAILS SECURITY, LLC and
JOHN CARPENTER

   */s/Anne G. Bibeau*
Anne G. Bibeau (VSB 41488)
WOODS ROGERS VANDEVENTER BLACK PLC
101 W. Main Street, Suite 500
Norfolk, VA 23510
Telephone: 757-446-8600
Facsimile: 757-446-8670
Anne.Bibeau@WRVBlaw.com

Pietro Sanitate (VSB 89538)
WOODS ROGERS VANDEVENTER BLACK PLC
Riverfront Plaza, West Tower
901 East Byrd Street, Suite 1550
Richmond, VA 23219
Telephone: 804-343-2059
Facsimile: 804-343-5021
Pietro.Sanitate@WRVBlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 14th day of April 2023, I caused a true and accurate copy of the foregoing Memorandum in Support of Motion to Dismiss Complaint to be served on counsel of record via the CM/ECF system and via first-class mail to:

Michael Frank
904 Elden Street
Herndon, VA 20170


/s/Anne G. Bibeau