IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| Dark Circuit Labs, Inc.,<br><br>      Plaintiff,<br><br>  v.<br><br>Black Sails Security LLC, et al.,<br><br>      Defendants. | Civil Action No. 1:23-cv-000326 |

**AFFIDAVIT OF KEITH HADDOCK IN SUPPORT OF MY OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, <u>PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY</u>**

Keith Haddock, being duly sworn, deposes and says:

1. I am over the age of eighteen (18) years, and I am fully competent to make this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are all true and correct to the best of my knowledge.

2. I am a Program Manager at Lockheed Martin Corporation ("Lockheed Martin" or the "Company") and have served in this role for the last five and a half years.

3. Lockheed Martin is a company headquartered in Bethesda, Maryland that focuses on supporting American aerospace, arms, defense, information security, and technology industries, especially those support the United States government. Lockheed Martin specializes in research, design, development, manufacture, integration and sustainment of advanced technology systems, products and services.

4. Because the Company is committed to devising innovative solutions, Lockheed Martin routinely collaborates and works with subcontractors who have specialized expertise in the subject matter of particular programs for which Lockheed Martin is contracted to perform.

5. When engaged by a customer, including the U.S. Government, for a particular program, Lockheed Martin generally serves as the prime contractor and partners with subcontractors who have the specialized skills and capabilities to satisfy the needs of the program.

6. Again, due to the specialization of each program, Lockheed Martin goes through a critical vetting process in identifying the right candidates to staff a program. Specialized programs may only have a handful of core team members, recruited from Lockheed Martin's subcontractors, because the technical expertise required is so unique and the talent pool is relatively small, as even DCL admits.

7. In delivering on the needs of a program, we commonly refer to the "mission" of the program, which the Company aims to satisfy through the work of its employees, its subcontractors, and Lockheed Martin's management thereof.

8. Given the scope of these missions, especially as issued by the U.S. Government, they can be time-sensitive and highly confidential. This means that losing just one member of the team can severely impact the progress and satisfaction of the mission.

9. It is not uncommon from time-to-time for employees of a subcontractor to move to another employer but stay on the same program with Lockheed Martin. Generally, these moves do not cause concern for the customer and rarely raise any risk.

**Engagement with Dark Circuit Labs**

10. In or around March 2021, Lockheed Martin first entered into a subcontract (the "Subcontract", also known as the "Task Order") with the Plaintiff Dark Circuit Labs, Inc. ("DCL"). Since then, the Subcontract has been modified at least nine times to account for funding changes.

11. The Subcontract pertains to a program that is highly confidential and has significant national security importance (the "Program").

12. The Subcontract was entered into under the authority of a U.S. Government Prime Contract, entered into between Lockheed Martin and the U.S. Government (the "IDIQ Contract"). The IDIQ Contract provided important and time-sensitive capabilities to the U.S. Government.

13. Pursuant to the Subcontract, DCL agreed to furnish the necessary qualified personnel and services for completion of the contractual effort, subject to the continuing approval of Lockheed Martin.

14. Per the Subcontract, Lockheed Martin reserved the unilateral right to change its staffing requirements and to direct DCL to remove, transfer and/or replace any DCL personnel who are not meeting the requirements of the position.

15. After the initial contract period of one year, the Subcontract contained optional extension terms, each one year in duration. The first option period, which Lockheed Martin exercised, covers the period of 8/4/2022 – 8/3/2023.

16. The Subcontract sets forth how DCL will be incrementally funded by Lockheed Martin in accordance with a pre-determined cost and expense table. This means DCL is paid as Lockheed Martin is funded by the Customer. The current incremental payment covers the work of DCL through April 30, 2023.

17. Under the Subcontract, DCL has an obligation to notify Lockheed Martin when its expenditures reach 85% of the incremental funding and to provide the Company with a future projection for funding.

18. The Subcontract provides that all proper invoices shall be paid Net 45 Days from

approval by Lockheed Martin.

19. Per the Subcontract, I am the Program Manager and the "LM Space Technical Representative." In this role, I work directly with both the Customer and the subcontractors for the Program.

20. With this Program, I am responsible for identifying and managing the requisite talent to service the Program. I send the hired developers to the customer site and on an ongoing basis, discuss with them morale, qualifications, and any personality issues that may arise during the course of the Program.

21. Since 2021, John Carpenter, Eric Missimer, and Michael Frank were each employees of DCL who worked on the Program. As Program Manager, I interacted with them and the other developers on the Program regularly.

### Dark Circuit Labs Experiences Employment Changes

22. In or around December 2022, Mr. Carpenter called to tell me he was experiencing "bait and switch" issues with DCL. In that same week, Mr. Missimer specifically told me DCL was telling him he needed to go work on another program. I told them both they could stay on the Program if they could work it out with DCL. It is important to Lockheed Martin that our developers stay on Programs once assigned to ensure the continuity of the mission is not interrupted.

23. In late January 2023, Mr. Carpenter called me to inform me for the first time that he was planning to start a new company, Black Sales Security LLC ("BSS"), to serve as another subcontractor for Lockheed Martin.

24. Shortly thereafter, in or around January 23, 2023, Ronald Pelkey (DCL's

President and Chief Operating Office) called me[1] to say he understood that Mr. Carpenter and Mr. Missimer were planning to leave DCL and start a new company, BSS. Because of their plans, Mr. Pelkey said he needed to let both of them go.

25. I pleaded with Mr. Pelkey not to terminate either employee because both are integral to the Program and their termination would negatively impact the Program. This is especially true because Messrs. Carpenter and Missimer are the only developers on the Program working on a particular aspect of significant importance.

26. In an effort to help DCL retain Messrs. Carpenter and Missimer and not disrupt the Program, between January and February 2023, I sent several emails to Mr. Pelkey and Chase Bertke (DCL's Chief Executive Officer) to see if there was a way for them to keep both developers employed and staffed on the Program.

27. Because DCL refused to consider keeping Carpenter and Missimer employed, I was forced to tell the Customer that there was an issue with the staff of developers on the Program.

### Dark Circuit Labs' Conduct Threatens the Mission

28. In February 2023, Messrs. Carpenter and Missimer called me to tell me they could not come into work and could no longer speak with me. They alluded to the receipt of a cease and desist letter from DCL.

29. I immediately called Messrs. Pelkey and Bertke to inquire whether they were aware of the letter and let them know that it had created a problem. Messrs. Pelkey and Bertke assured me that the letter should not raise alarms and that Messrs. Carpenter and Missimer were

---

[1] Mr. Pelkey's affidavit claims that I called him on January 23. This is not true; Mr. Pelkey reached out to me to inform me of DCL's plans to potentially terminate Messrs. Carpenter and Missimer.

misinterpreting it.

30. I called Messrs. Carpenter and Missimer back and said they could go to work per my conversation with Messrs. Pelkey and Bertke, but they said they were too scared to come in to work given the strong threats in the letter.

31. The issues with the letter impacted Lockheed Martin's trust in DCL as a viable supplier of qualified talent.

32. Fortunately, Messrs. Carpenter and Missimer returned to work the following Monday and Tuesday but informed me that they continued to receive persistent threats from DCL and were close to quitting.

33. On February 9, 2023, I called Mr. Bertke to let him know I had received another call from Messrs. Carpenter and Missimer and this time, I was told they planned to quit that evening. Generally, when a developer contacts me to express issues with their employer, it is my responsibility to notify the employer to see if they can come to a resolution. In encouraging a resolution, it is my intent to keep the developer employed on the Program to avoid any disruptions.

34. On February 24, 2023, Mr. Frank emailed me to note he had been speaking with Messrs. Carpenter and Missimer daily and that he was contemplating a move to another subcontractor, PLEX.

35. I did not email Mr. Frank back.

36. On March 6, 2023, DCL terminated Messrs. Carpenter and Missimer.

37. On March 15, 2023, Mr. Pelkey notified me by email that Mr. Frank resigned from DCL.

## Efforts to Save the Mission

38. After learning of Messrs. Carpenter and Missimer's terminations, I advised Messrs. Carpenter and Missimer that they could continue to service the Program as their work was much-needed, if they could find a new employer. There is no contractual prohibition on Lockheed Martin permitting former DCL employees to come back to the Program through a new employer.

39. I am not aware of any details of the alleged negotiations between Messrs. Carpenter and Missimer that led to their termination, only that those conversations and the receipt of a letter caused them to hesitate coming to work on multiple occasions preceding their termination. Messrs. Carpenter and Missimer were very clear that they did not want to provide unnecessary details and were nervous about DCL accusing them of further misconduct.

40. On or about March 8, 2023, I visited the Program site in my capacity as the Program Manager. During my visit, I spoke with the remaining team of DCL personnel on the Program, Chris Weiland, Paul Jalufka, Delfino Liban, and David Eisen (the "Remaining DCL Employees"), as well as Mr. Frank. My purpose in reaching out to these individuals was to determine their interest in staying on the Program, particularly given the negative impacts that had already occurred given DCL's threats to Messrs. Carpenter and Missimer (described below).

41. Provided the current situation with DCL, there is no guarantee that Lockheed Martin will entertain its option to renew another year. Nor was there ever any guarantee of continued work. The purpose of the option years is to permit Lockheed Martin to determine if its subcontractors are continuing to perform up to Lockheed Martin's demands and to give Lockheed Martin the right to not extend the relationship when those needs are not met. In the event Lockheed Martin opted not to extend the Subcontract another year, Lockheed Martin

would not be able to work with the Remaining DCL Employees, unless they worked for a different subcontractor.

42. I *never* informed the Remaining DCL Employees that I could introduce them to DCL competitors. The Remaining DCL Employees were already aware of other subcontractors on the Program, including through our phone contact list and monthly team meetings.

43. During these conversations, Mr. Frank informed me he was also looking to leave DCL.

44. As noted above, it is not uncommon for developers to move around to different subcontractors while employed on the same Program. In fact, five of the eight DCL employees on the Program had worked for another subcontractor, on the Program, before joining DCL.

45. On or about March 11, 2023, again, in my capacity as the Program Manager, I spoke with Mr. Liban to determine whether there were any morale issues with the team and asked him to speak with me if any DCL developers were beginning to look to leave the Program due to rumors about the DCL and Lockheed Martin relationship. Mr. Liban was familiar with this type of situation because we had a similar situation in 2021, during which Lockheed Martin ceased its relationship with Mr. Liban's then-employer, but he stayed on the Program by transitioning to DCL.

46. My goal in speaking with Mr. Liban was not to influence him to move; rather, I was concerned about Lockheed Martin's ability to satisfy the Customer and fulfill the mission, given the negative impacts that we had already suffered through DCL's conduct vis-à-vis Messrs. Carpenter and Missimer.

47. It was my responsibility as the Prime Contractor to apprise the Remaining DCL Employees of the option to stay on the Program because I did not expect that DCL would inform

them of the same. Failing to do so could compromise the Program.

48. Ultimately, it is of no import to either me or Lockheed Martin which subcontractor these developers work for—again, my only goal is ensure success of the Program. Thus, I never had any intention of encouraging the Remaining DCL Employees to leave DCL; I simply wanted them to know that if they did so, their work would remain critical to the Program and there may be an opportunity for them to continue on.

49. Additionally, it is my responsibility to apprise the Customer of any issues affecting the Program. Since January, given the employment issues with Messrs. Carpenter and Missimer, I notified the Customer that Lockheed Martin was considering other subcontractor options provided DCL's staffing issues.

50. At this time, Lockheed Martin has neither terminated the current Subcontract with DCL, nor elected to exercise its option to renew. Whether Lockheed Martin will exercise its option to continue working with DCL is not my decision.

51. Carpenter, Frank and Missimer have each since joined another subcontractor, PLEX, and remain employed on the Program.

### DCL's Negative Impact on the Program

52. Nothing about the situation with DCL's handling of its employees on the Program is normal or consistent with what I've experienced during my nearly 20 years working at Lockheed Martin.

53. Typically, if we lose one developer on a program it does not affect the whole mission. While we typically staff at least two developers per an end-user to minimize the risk if one has to leave the program, due to limited qualified personnel, that staffing solution is not always available. Due to limited resources, Lockheed Martin was unable to provide this back-up

staffing model for the Program.

54. On average, when a developer departs a program and is replaced, it takes at least two weeks for a new developer to get up-to-speed on the program. After that point, it takes approximately six months for a developer to become integrated into a program because they may approach it differently, to gain trust with the Customer, and more. As a result, regardless of how long a developer may have been working on a particular product, if a new developer comes in to pick up the program, the product would still typically suffer a substantial delay before being finished.

55. In this case, Carpenter, Frank, and Missimer were and continue to be individually important to the success of the customer mission.

56. They had built a significant one-on-one relationship with the end-user, with whom they spoke daily about the product and adjusted accordingly. Critical trust between them and the Customer had developed over the last year. In fact, the Customer had been reluctant to hire any third-parties, but Carpenter and Missimer had proved themselves worthy and capable of handling the work. When the work increased in volume, the Customer relied on Carpenter and Missimer to bring on Frank as a new partner to support the mission in late 2022.

57. Carpenter and Missimer were going to deliver their latest product to the Customer in the week DCL terminated their employment. They were terminated without two-weeks notice, and therefore without any communication or transition with the Customer. The Customer was upset that DCL did not allow for a smooth transition and had refused to listen to me to work on an amicable resolution to keep Carpenter and Missimer staffed on the Program.

58. As a result of their termination, the capability was not delivered, and the Customer also could not salvage the work because it was time-sensitive.

59. Because of the Customer's inability to use the latest capability developed by Carpenter and Missimer, the program suffered a negative mission impact.

60. There were no developers available to replace Carpenter and Missimer after DCL terminated them. Even if there had been, there was no way to mitigate the damage caused by their termination because it takes a developer at least two weeks to be able to get up-to-speed.

61. In addition to losing the product development, which as stated above caused a negative mission impact, the Customer lost over $200,000 worth of labor between Carpenter and Missimer's contributions. That is, their work over the past several months, was all for naught, having been cut short by DCL's termination.

62. Currently, the Customer is unilateral working on an Impact Statement for the Program, to document the negative effects of DCL's employment decisions.

63. In the event Carpenter, Missimer, Frank, or any of the Remaining DCL Employees (should they make an independent decision to leave DCL) is enjoined from working on the Program, it would significantly impact a matter of national security. If they are not permitted to work on the Program for an extended period of time it would be a tremendous problem for Lockheed Martin to support the mission and hit the intended target from the Program. The need for this talent pool and the import of their contributions to the mission cannot be overstated.

64. Like our Customer, Lockheed Martin was equally negatively impacted by DCL's employment terminations because of the mission risk created when DCL left positions open without adequate notice. The Customer approached Lockheed Martin to specifically address the problem presented by Carpenter and Missimer's terminations. This entire situation, which can best be characterized as unnecessary drama, is impacting this mission and damaging our

relationship with the Customer.

### Lack of Trade Secret Access

65. To my knowledge, at no time during the course of DCL's engagement with Lockheed Martin did I ever come into the possession of any trade secrets of DCL. My conversations with DCL employees were strictly about their retention on the Program.

66. DCL suggests that I learned confidential proposed settlement terms from the other defendants in this action. That is not true. I was aware that DCL and Messrs. Carpenter and Missimer were continuing to discuss their disagreements, but I never learned any specifics from Messrs. Carpenter and Missimer (or any of the Remaining DCL Employees). In fact, during one phone call with Mr. Pelkey, *he* divulged a proposed monetary term that DCL was demanding the other defendants pay. I repeated it back to him. I am not sure if this is what DCL refers to in its motion, but again, that proposed term was disclosed to me only by Mr. Pelkey.

67. I understand DCL has made other allegations that its former employees and my co-defendants have misappropriated trade secrets. To begin with, I do not understand what, specifically, DCL is referring to. Additionally, as noted above, I have never received (let alone used or disclosed) any of DCL's purported trade secrets.

68. For example, I understand that DCL has claimed that Mr. Missimer has retained certain DCL equipment. I have had no involvement in this alleged conduct, nor was I even aware of it prior to reading the allegation in the Amended Complaint.

69. Similarly, while I understand DCL has alleged that my co-defendants misappropriated a so-called "Business Plan," I have no idea what this document is or what information it contains. I have never received it, and necessarily could not have used or disclosed any confidential information contained in that document.

70. Finally, I understand DCL claims that my co-defendants have misappropriated a customer list, and alleges that their "solicitation" of me is evidence of such misappropriation. To my knowledge, this is untrue. My co-defendants did not "solicit" me, nor would they need to use any confidential information to do so—I am in regular contact with the DCL employees working on the Program, and they had my contact information through legitimate means. Who from the Program is employed by DCL is not DCL's private information.

71. Even assuming my co-defendants misappropriated DCL's information (which I have no reason to believe), I had absolutely no involvement in any such conduct. Nor do DCL's allegations that I was involved in the misappropriation make sense. I work for Lockheed Martin, not another subcontractor that competes with DCL. Neither I, nor Lockheed Martin, have any use for a purported customer list or DCL's "Business Plan." There is no financial incentive or other motivation for me to receive, use, or disclose DCL's confidential or trade secret information.

### Other Considerations

72. Shortly after my conversations with the Remaining DCL Employees in March 2023, I was instructed not to communicate the IDIQ Contract details with the DCL developers directly and that I should only do so through Messrs. Bertke and Pelkey, to which I have obliged.

73. I have not encouraged any DCL employee to leave DCL. It has always been my practice to advise personnel to work with their current employer should any issues arise. It is of no consequence to me who a developer is employed by, as long as the mission of the Program is satisfied. In the event a developer communicates with me an intent to leave his or her current employer, I always speak with the employer, as I did with DCL in the cases of Messrs. Carpenter

and Missimer, so that they have an opportunity to come to an agreement before any changes are made.

74. There are no rate discrepancies across subcontractors or any financial incentives that would motivate me or Lockheed Martin to work with one subcontractor over another.

75. I have zero financial or equity interest in BSS and have no substantive knowledge as to the status of the entity beyond what I have stated in this Affidavit. I am not receiving any form of a benefit from BSS.

76. At no time during my conversations with Messrs. Carpenter, Frank, and Missimer and the Remaining DCL Employees have I disparaged DCL.

77. I have not exercised any influence over the fate of DCL's relationship with Lockheed Martin as it is not my independent decision on whether Lockheed Martin elects to extend its Subcontract term with DCL. I have been transparent and truthful with both the Customer and Lockheed Martin as to issues that have arisen over the course of DCL's performance on the Subcontract, including the terminations of Messrs. Carpenter and Missimer. Any purported changes in DCL's funding for the Program is consistent with the terms of the Subcontract, which adjust based on forward-looking expenditures. Moreover, any such changes had nothing to do with this dispute, and in fact I had no involvement in any such changes.

78. My primary goal as a Program Manager is to serve the mission and ensure the work of the subcontractors supports the same. When instances like those that arose with DCL's employees occur, it is my responsibility to work toward a resolution with the subcontractor and its employees to ensure the continuity of the mission.

- 15 -

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2023

_____
Keith Haddock