**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIGINIA
Alexandria Division**

**DARK CIRCUIT LABS, INC.,**

    **Plaintiff,**

v.                                                                                      Case No.:      1:23-cv-00326

**BLACK SAILS SECURITY LLC,
JOHN CARPENTER,
ERIC MISSIMER,
MICHAEL FRANK,**
and **KEITH HADDOCK**

    **Defendants.**

**DEFENDANTS JOHN CARPENTER AND BLACK SAILS SECURITY, LLC'S
MEMORANDUM IN OPPOSITION
TO MOTION FOR TEMPORARY RESTRAINING ORDER**

The Court should deny plaintiff Dark Circuit Labs, Inc.'s ("DCL") Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery ("TRO Motion") (Dkt. 20) because DCL has failed to produce any evidence that defendant John Carpenter ("Carpenter") or defendant Black Sails Security, LLC ("BSS") have or disclosed any DCL trade secrets or other confidential information, that Carpenter is violating his Confidentiality Non-Competition and Protectable Rights Agreement ("Agreement"), or that there is any risk of irreparable harm to DCL. DCL's speculation and conjecture is insufficient to justify the extraordinary relief it seeks. DCL has failed to satisfy the requirements for a TRO or expedited discovery.

    **I.**    **FACTS**

Carpenter was employed by DCL from December 15, 2021, until March 6, 2023. First Amended Complaint ("FAC") ¶¶ 5-9. Prior to working at DCL, he was employed by IC1 Solutions, a federal contractor that had a contract with Lockheed Martin Corporation ("LMCO") to perform

services on a specific task order on an indefinite delivery indefinite quantity ("IDIQ") contract with the U.S. Government. Declaration of John Carpenter ("Carpenter Decl.") (attached hereto) ¶ 2. While working for IC1 Solutions, Carpenter worked closely with defendant Keith Haddock, the LMCO Project Manager who was his supervisor on the worksite. *Id*. ¶ 4. Carpenter's employment with IC1 Solutions ended in late 2021 when its LMCO contract ended. *Id*. ¶ 5. On December 15, 2021, DCL hired Carpenter as a Senior Computer Network Operations Developer to work on the exact same task order and IDIQ contract for LMCO as he had for IC1 Solutions. *Id*. ¶ 9. Although the task order and IDIQ contract names had changed, the work was the same. *Id*. ¶¶ 9-10. Carpenter continued to work closely with Haddock and even sat in the same chair at the same desk as he had while employed by IC1 Solutions. *Id*. Shortly after his DCL employment began, on December 20, 2021, Carpenter executed the Agreement, which incorporated by reference DCL's Offer Letter. *Id*. ¶¶ 7-8. The Agreement is attached to the TRO Motion as Exhibit D.

Carpenter, concerned with numerous issues he observed with DCL's senior leadership, decided in late 2022 to leave DCL and form his own business to continue performing offensive cyber security tools and development in support of the U.S. Government's mission. *Id*. ¶ 12. To that end, he formed a Virginia limited liability company called "Black Sails Security LLC" ("BSS") on December 2, 2022, and asked Haddock how BSS could apply for its own subcontract with LMCO to perform cyber security tools and development. *Id*. ¶¶ 13-14.

On Friday, January 27, 2023, DCL gave Carpenter a letter notifying him that his employment was suspended. *Id*. ¶ 15; Pl.'s TRO Mot., Ex. F. DCL subsequently reversed course and directed Carpenter to continue working. Carpenter Decl. ¶ 16. Thereafter, DCL and Carpenter negotiated, through counsel, for a deal under which BSS would acquire DCL's subcontract with LMCO and Carpenter and defendant Eric Missimer would continue that work through BSS. *Id*. ¶

17. Carpenter and Missimer discussed with DCL the possibility that two other DCL employees, Delfino Liban and defendant Michael Frank, would follow the DCL work to BSS. *Id*. Carpenter never disclosed the terms of these settlement discussions to Haddock. *Id*. ¶ 19. Carpenter did not offer employment to Liban or Frank as such plans were dependent on a deal with DCL. *Id*. ¶ 18.

DCL's terms for this deal, however, involved BSS paying DCL an unreasonable amount of money, far in excess of the anticipated revenue the subcontract would generate. *Id*. ¶ 17. As the negotiations foundered, on February 9, 2023, Carpenter informed Haddock that he was going to resign his employment with DCL. *Id*. ¶ 20. That evening, DCL President Ronald Pelkey emailed Carpenter and Missimer that he feared their resignation would damage DCL. *Id*. ¶ 21. At Pelkey's urging, Carpenter did not resign at that time, and continued to attempt to reach a deal with DCL whereby it would transfer its LMCO subcontract to BSS. *Id*. ¶ 23. In anticipation of this deal, Carpenter began the application process for BSS to become an LMCO subcontractor. *Id*. ¶ 23.

Carpenter's negotiations with DCL ultimately failed. On March 3, 2023, through counsel, Carpenter informed DCL of his rejection of their offer and that he intended to dissolve BSS and seek employment elsewhere. *Id*. ¶ 24. On Friday, March 3, 2023, in accordance with the terms of his offer letter, Carpenter submitted his 30 days' notice of resignation to DCL. *Id*. ¶ 25. DCL terminated his employment on the next business day, Monday, March 6, 2023. *Id*. ¶ 26. That same day, Carpenter informed LMCO that BSS would not complete the application to perform work with LMCO. *Id*. ¶ 27. Carpenter has dissolved BSS. *Id*. ¶ 29.

During his DCL employment, Carpenter participated in biweekly business development meetings with Pelkey and other members of the DCL senior leadership team ("SLT"). *Id*. ¶ 37. Before each meeting, the SLT would circulate an agenda, containing bullet points for discussion, without any detail or specifics. *Id*. ¶ 38. Carpenter did not use any "Business Dev Agenda" for

3

any purpose other than pursuit of DCL's business interests as directed by DCL. *Id.* ¶ 40. Specifically, Carpenter did not use any DCL "Business Dev Agenda" or other DCL document or information in forming BSS or planning for it. *Id.* ¶ 41.

While employed by DCL, Carpenter used a DCL laptop to access DCL's computer servers and data. *Id.* ¶ 33. He never accessed DCL's computer servers or data any other way, nor did he ever export any DCL data except as expressly authorized and directed by DCL. *Id.* ¶ 33. Carpenter returned this laptop to DCL upon his termination. *Id.* ¶ 34. He did not retain any DCL documents, data, or notes of any sort. *Id.* ¶ 35. At no point did he ever disclose or use any DCL confidential information or trade secrets for any purpose other than as expressly directed by DCL. *Id.* ¶ 36.

## II. ARGUMENT

Temporary restraining orders and preliminary injunctions are "extraordinary" remedies, "'involving the exercise of [a] very far-reaching power to be granted only sparingly and in limited circumstances'". *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021) (quoting *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017)). They are evaluated under an exacting standard. *Id.* The movant bears the burden of "clearly establish[ing] entitlement to the relief sought." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The movant must make a clear showing that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The failure to show any one of the relevant factors mandates denial of the preliminary injunction … ." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016). Even if the movant satisfies all the elements, the court retains discretion whether to issue a TRO, as TROs "are not to be granted

automatically." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). The Fourth Circuit has cautioned that such discretion should be "sparingly exercised." *Id.*

### A. DCL Will Fail on the Merits.

As demonstrated in Carpenter and BSS's pending Motion to Dismiss, the First Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) and (6). See Carpenter and BSS's Mot. to Dismiss (ECF Nos. 35-36), *passim*. DCL cannot maintain an action against Carpenter or BSS for monetary damages, as it waived such right in the Agreement, where it agreed that all monetary claims would be submitted to arbitration. *Id.* Its claims for injunctive relief should be dismissed because DCL failed to allege sufficient facts to create a plausible claim for relief upon which can be granted. *Id.* In its TRO Motion, DCL reveals why it failed to plead sufficient facts in its First Amended Complaint: there are not any.

DCL's TRO Motion focuses on only two groups of DCL's claims: (1) misappropriation of trade secrets (Counts 1 through 4) and (2) breach of the restrictive covenants in the Agreement (Counts 5, 7, and 10). There is no evidence in support of any of these claims.

### 1. DCL Has Not Shown that Carpenter or BSS Misappropriated Trade Secrets.

DCL fails to identify the alleged trade secrets Carpenter or BSS took. In Counts 1 through 4, DCL rattles off a list of items that constitute trade secrets—"business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, business data compilations, programs, diagrams, drawings, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer list"—but stops short of alleging that Carpenter or BSS actually misappropriated any such items. *See* FAC ¶¶ 216, 235. Instead, DCL uses vague, conclusory allegations, such as "Defendants intentionally misappropriated and/or conspired to misappropriate trade secrets from DCL to their own economic

5

benefit," FAC ¶ 233, and "it cannot reasonably be disputed that Carpenter and Missimer separately and with the other Defendants stole, or otherwise removed without authorization and through improper means, confidential and proprietary corporate documents from DCL," FAC ¶ 240. These vague allegations are plainly insufficient. It is entirely unclear what any of the Defendants, and in particular Carpenter and BSS, "stole" or what these allegedly "improper means" were. FAC ¶ 240.

DCL leaps to the conclusion, without any hint of a factual foundation, that "[t]here exists a substantial likelihood of 'inevitable disclosure' of DCL Trade Secrets if Missimer, Carpenter or Frank are allowed to work at a competitor company." FAC ¶ 222. Virginia, however, does not recognize the "inevitable disclosure" doctrine on which DCL relies. *See MeadWestvaco Corp. v. Bates*, 91 Va. Cir. 509, No. CL 13-1589, 2013 WL 12183821, at *9 (Chesterfield Co. Aug. 1, 2013) (discussing lack of Virginia law on inevitable disclosure doctrine and questioning whether it is recognized by Virginia law); *Gov't Tech. Servs., Inc. v. IntelliSys Tech. Corp.*, 51 Va. Cir. 55, No. 160265, 1999 WL 1499548 (Fairfax Co. Oct. 20, 1999) ("Virginia does not recognize the inevitable disclosure doctrine."). DCL cites to *Atlantic Diving Supply, Inc. v. Basnight*, No. 2:22cv298, 2022 WL 5568083 (E.D. Va. Sept. 21, 2022), as supporting its inevitable disclosure theory, but that case was decided under Delaware law, *id.* at *12, whereas Virginia law applies here. Ex. D ¶ 12.

DCL's only attempt in either the FAC or TRO Motion to identify the trade secrets Carpenter allegedly misappropriated is (1) an accusation that Carpenter disclosed to Haddock the terms that Carpenter and DCL discussed in their failed settlement negotiations, FAC ¶¶ 130, 132, 154, and (2) an accusation that Carpenter, while employed as DCL's Vice President, downloaded

6

a DCL document titled "Business Dev Agenda."[1] TRO Mot., Ex. R; FAC ¶¶ 180-81. There is no suggestion as to what BSS may have misappropriated.

Settlement negotiations are not trade secrets; they do not meet the statutory definition of such under either the DTSA or VUTSA, as DCL does not allege, nor could it, that it derived independent economic value from keeping the negotiations secret or that it took reasonable efforts to maintain the secrecy. *See generally* Va. Code § 59.1-336 (defining "trade secret" under the VUTSA); 18 U.S.C. § 1839(3) (defining "trade secret" under the DTSA). Regardless, Carpenter never disclosed the settlement negotiations to Haddock or anyone else. Carpenter Decl. ¶ 19. And certainly, as the negotiations collapsed, there is no basis for enjoining Carpenter from disclosing the terms now.

Regarding the business development agenda, DCL's only evidence on this point is that in November 2022—***four months*** before DCL fired him—Carpenter accessed the file and downloaded it. TRO Mot. 20. DCL does not suggest that Carpenter lacked authorization to access this file. *Id*. 19-20; FAC ¶¶ 180-85. Indeed, DCL alleges that Carpenter was a vice president of the company at that time. FAC ¶ 57. DCL alleges, without offering any proof, only that "while Carpenter frequently viewed or edited other documents on DCL's corporate networks, the [business development agenda] was the only document he ever downloaded." FAC ¶ 184. DCL speculates, "on information and belief," that Carpenter downloaded it "to utilize DCL's trade secrets for Defendants' competitive venture, BSS, which was incorporated approximately two weeks after he downloaded the [business development agenda] for a second time." Pl.'s TRO Mot. 20. This speculation is false.

---

[1] In the FAC, DCL refers to the document as its "business development plans and strategies," FAC ¶ 180, but the TRO Motion reveals that it was only a meeting agenda. TRO Motion, Ex. R.

7

Carpenter does not have the business development agenda and did not take it with him when he was fired. Carpenter Decl. ¶¶ 39-43. He never disclosed it to anyone or used it for any purpose other than DCL's business. *Id*. While employed, he downloaded the document for legitimate reasons: to prepare for a DCL business development meeting. *Id*. ¶¶ 37-42. During his DCL employment, he participated in biweekly business development meetings, held every other Thursday, with DCL's SLT. *Id*. ¶ 37. The meeting agenda was circulated the evening before each meeting and generally contained bullet points for discussion, without much detail or specifics. *Id*. ¶¶ 37-38. DCL's evidence shows that Carpenter accessed the "Business Dev Agenda" at issue on Wednesday, November 9, 2022, at 8:58 p.m. and Thursday, November 10 at 6:00 a.m.—shortly before a Thursday business development meeting. Pl.'s TRO Mot., Ex. R. Carpenter believes that he may have accessed this particular agenda again on November 15 because it may have related to a prospective customer that DCL had scheduled to meet. Carpenter Decl. ¶ 39. Carpenter did not use the "Business Dev Agenda" for any purpose other than pursuit of DCL's business interests as directed by DCL. *Id*. ¶ 40.

DCL glosses over the fact that Carpenter viewed and downloaded this business development agenda on a DCL laptop, which he returned to DCL immediately upon his termination. *Id*. **He never exported or printed the file.** *Id*. He did not retain a copy of it or any notes regarding it. *Id*. ¶ 35. He did not use or reference it in forming BSS, nor would it have been of any use to him for that purpose—he formed BSS to do business with LMCO, whereas DCL's business development agendas discussed *prospective* customers. *Id*. ¶ 41.

DCL also argues in its TRO Motion that Carpenter used "DCL's trade secrets to solicit clients, such as LMCO, in an effort to induce them to move their business away from DCL." Pl.'s TRO Mot. 19. Carpenter, however, never solicited any DCL client, other than by beginning the

8

application process to become an LMCO subcontractor in the context of negotiations with DCL for BSS to acquire DCL's LMCO subcontract. Carpenter Decl. ¶ 23. He did not use any DCL trade secrets in those inchoate plans. *Id*. ¶ 41. Once those negotiations collapsed—***more than a month ago***—Carpenter terminated his incomplete LMCO application, jettisoned his plans, and dissolved BSS. *Id*. ¶¶ 27-32.

Carpenter and BSS never misappropriated any DCL trade secrets and are not in a position to do so now. A TRO is unwarranted.

### 2. DCL Cannot Prevail on its Claims Related to the Agreement's Restrictive Covenants.

DCL has no evidence that Carpenter has violated the Agreement's restrictive covenants. It offers only wild speculation to support of Counts 5, 7, and 10. Moreover, because the Agreement's restrictive covenants are overly broad, they are unenforceable under Virginia law. DCL cannot show a likelihood of success on its breach of contract and related claims.

DCL bases its argument that Carpenter violated the Agreement's Restrictive Covenants on an email that defendant Michael Frank sent to defendant Keith Haddock on February 23, 2023, stating: "I talk to John & Eric pretty much daily about what's going on at DCL" and "it seems at this point that the writing is on the wall that we (current employees) (and possibly all) of us need to make a transition in the near future, and that ***BSS will not be setting sail anytime this year***." Pl.'s TRO Mot. 13 (emphasis added). Frank went on comment that he had a contact at PLEX with whom he wanted Haddock to talk. *Id*. From this email, DCL leaps to the confounding conclusion that "Defendants were actively working behind the scenes during settlement negotiations to unlawfully divert DCL's interests under the IDIQ contract as well as shift DCL employees to 'PLEX'," and that "Defendants have not halted their plans to launch BSS, but instead have simply delayed them and intend to cause further damage to DCL by as early as next year." *Id*. 14.

9

This wild speculation is not evidence, and it is the only thing DCL submits to show that Carpenter breached the Agreement. DCL's speculation makes no sense. Frank's email demonstrates that as early as February 23, 2023, he had given up on BSS, correctly concluding it was not going to happen, and was looking elsewhere for employment—without any assistance from Carpenter. Frank was turning to his own contact with PLEX for possible employment. Carpenter never offered him employment with BSS. Carpenter Decl. ¶ 18. Carpenter never discussed with PLEX the possibility of it hiring other DCL employees or taking any work from DCL. *Id*. ¶¶ 47-48. He did not even discuss his own prospects of employment with PLEX until after DCL fired him on March 6, 2023. *Id*. ¶ 46. Carpenter is not in a position at PLEX to do any competitive harm to DCL: he has no ownership interest, management role, or involvement in business development. *Id*. ¶ 45. A TRO is therefore inappropriate because DCL, lacking any evidence of a breach, has not demonstrated a likelihood of success on this claim.

Moreover, the Agreement's restrictive covenants are overly broad and therefore unenforceable under Virginia law. Restrictive covenants are disfavored restraints on trade. *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 270 Va. 246, 249, 618 S.E.2d 340 (2005). Virginia law allows enforcement only if the restriction: 1) is narrowly drawn to protect the employer's legitimate business interest; 2) is not unduly burdensome on the employee's ability to earn a living; and 3) is not against public policy. *Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 493, 561 S.E.2d 694 (2002). In assessing the reasonableness of restrictions, courts focus "on the duration of the restraint, the geographic scope of the restraint, and the functional scope and extent of the activity being restricted," as well as "whether the restrictive covenant prohibits the employee from employment with a company that actually competes with the employer." *Lasership Inc. v. Watson*, 79 Va. Cir. 205 (Fairfax Co. 2009) (citations omitted). If a provision of a restrictive

10

covenant, "considered in the context of the other language used in the contract, is capable of more than one reasonable construction, it is ambiguous, and [courts] will adopt that construction ***most favorable to the employee***." *Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 289, 414 S.E.2d 599, 601 (1992) (emphasis added); *see also Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1521 (W.D. Va. 1995) ("The mere act of subjecting the employee to the uncertainty of an ambiguous provision offends public policy.").

A restrictive covenant is unenforceable *in toto* if it is "functionally overbroad"— if the range of proscribed activities is "greater than necessary" to protect the employer's legitimate business interest—or ambiguous. *Nortec Comm'n, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 231 (E.D. Va. 2008); *see Cantol, Inc. v. McDaniel*, 2006 WL 1213992 at *4 (E.D. Va. 2006) (quoting *Motion Control Sys., Inc. v. East*, 546 S.E.2d 424, 425 (2001)). A former employee and prospective employers cannot be left guessing what is and is not prohibited. *Lanmark*, 454 F. Supp. 2d at 529.

Section 4 of the Agreement purports to impose the following restriction on Carpenter for twelve months post-employment:

> Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

Ex. D ¶ 4(b). "Company Business" is defined as "the development of cyber security products, software and services, or other lines of business that [DCL] enters (or has taken concrete steps to enter into in the near future) during the term of your association with [DCL] for third parties who utilize [DCL's] offerings ("Clients"), which Clients do business with, or seek to utilize the services

11

of the Company and/or its employees." *Id.* at 1. "Referral Sources" are defined as businesses and individuals that refer business to DCL. *Id*. Prospective Clients and Prospective Referral Sources are those with whom DCL is or was working with to obtain new business at the relevant time period in question. *Id*. "Service Providers" are third-party service providers of components and software for DCL's products and services. This clause is overly broad in a number of ways:

- It has no geographic scope.

- As Carpenter was employed with DCL for only 16 months, FAC ¶ 25, he would have no way of knowing who were all DCL's Clients, Prospective Clients, Service Providers, Prospective Service Providers, or Referral Sources during the 24 months preceding his termination. DCL has no protectable business interest in restricting Carpenter from work with entities with whom he never had any contact on behalf of DCL and about whom he gained no information from DCL.

- It prohibits Carpenter from working in DCL's current business lines and business lines it has taken steps to enter, regardless of whether Carpenter ever worked in such business lines for DCL. DCL has no protectable business interest in restricting Carpenter from work in business lines that he never worked in for DCL.

- It even prohibits Carpenter from work business lines that are "*related to*" DCL's current and planned business lines. Any number of business lines could be "related to" DCL's business—other types of cyber work and computer programming, other types of security work, the development of other types of software, the sale of hardware used in such work, or anything else "related to" DCL's business. DCL has no protectable business interest in restricting Carpenter from business lines that it does not even have, and Carpenter is left to guess what those unidentified business lines might be.

12

- It prohibits Carpenter from providing "services of the same type or related to the Company Business," regardless of whether Carpenter ever provided a particular service while working for DCL. DCL has no protectable business interest in restricting Carpenter from performing services for another entity that he never performed for DCL.

This restriction is overly broad. "The Supreme Court of Virginia has never upheld a restrictive covenant, which was ancillary to an employer-employee relationship, when the restrictive covenant could be applied to a geographic area in which the employee performed no function for the employer." *Contol, Inc. v. McDaniel,* 2006 WL 1213992 at *4 (E.D. Va. 2006); *see also TradeStaff & Co. v. Nogiec*, 77 Va. Cir. 77 (Va. Cir. 2008) ("non-compete agreements are enforceable when limited to the area formerly serviced by the former employee, or within a set mile radius of the area formerly serviced by the former employee."). The restriction is also overly broad in functional scope. Non-compete covenants that "restrict the former employee's performance of functions for his new employer [are upheld] only to the extent that the proscribed functions are the same functions as were performed for the former employer." *Lanmark Tech., Inc. v. Canales*, 454 F. Supp.2d 524, 528 (E.D. Va. 2006) (*quoting Cantol, Inc. v. McDaniel*, 2006 WL 1213992, at *4 (E.D. Va. 2006)). Here, the Agreement purports to prevent Carpenter from a broad swath of work, without regard to whether he ever worked in a similar role or even the same line of business for DCL. *See ManTech Int'l Corp. v. Analex Corp.*, 75 Va. Cir. 354 (2008) (rejecting a noncompete that prohibited work in "predominantly similar" business as impermissibly broad and ambiguous).

The Virginia Supreme Court, in *Motion Control Systems, Inc. v. East*, found that a similar restrictive covenant was unenforceable. There, the court held that a noncompete provision was invalid to the extent it prevented an employee from being employed by "any business similar to

13

the type of business conducted by the [employer]". *Motion Control Sys., Inc. v. East*, 546 S.E.2d 424, 426 (2001). The provision further defined "similar business" as "any business that designs, manufactures, sells or distributes motors, motor drives or motor controls." *Id*. The Court held that the restrictive covenant was overly broad because it restricted employment activities that "could include a wide range of enterprises unrelated to the business of the [employer]." *Id*.

The Agreement's covenant against soliciting DCL employees is equally defective. It provides that:

> While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

Ex. D ¶ 5. This overly broad provision would bar Carpenter from soliciting or hiring a former DCL employee in any capacity for any type of business. For example, he could not hire a former employee to work at a car wash. DCL has no protectable business interest in preventing its former employees from working in noncompetitive roles. *See Strategic Enter. Sols., Inc. v. Ikuma*, 77 Va. Cir. 179 (Fairfax Co. 2008) (rejecting an overly broad non-solicitation of employees clause).

The overly broad and ambiguous nature of the restrictive covenants in the Agreement renders them unenforceable and requires the dismissal of Counts 5, 7, and 10 against Carpenter and BSS. *Lasership Inc. v. Watson*, 79 Va. Cir. 205 (2009) ("Because the noncompetition, nonsolicitation, and confidentiality clauses are unenforceable as a matter of law, all claims arising

from those clauses must be dismissed."). Due to the unenforceability of the restrictive covenants, DCL is unlikely to prevail on the merits of those claims. A TRO is therefore improper.

### B. DCL Will Not Suffer Irreparable Harm without a TRO.

DCL has not carried its burden of showing a likelihood of irreparable harm in the absence of a TRO. As discussed above, it has not shown that Carpenter or BSS took any trade secrets or that Carpenter breached the Agreement. The most it can show is that prior to January 27, 2023, Carpenter made plans to perform work for LMCO under his new business, BSS. After that date, he negotiated with DCL to acquire its LMCO work. When those negotiations collapsed, Carpenter abandoned his plans and walked away, moving on to other employment and dissolving BSS. If DCL suffered any harm—which it has not shown and which Carpenter and BSS deny—such harm was in the past, prior to January 27, 2023. Injunctive relief would not remedy it.

"Past harm, without more, cannot form the basis for injunctive relief." *Dyer v. Maryland State Bd. of Educ.*, 187 F. Supp. 3d 599, 609 (D. Md. 2016), *aff'd*, 685 F. App'x 261 (4th Cir. 2017). *See also Action NC v. Strach*, 216 F. Supp. 3d 597, 644 (M.D.N.C. 2016) ("Thus, past harms suffered by [plaintiffs] … cannot be prevented at this point through the issuance of an injunction"); *Moore v. Verizon Commc'ns, Inc.*, No. 1:22-CV-51 (RDA/IDD), 2022 WL 16963245, at *11 (E.D. Va. Nov. 15, 2022) ("If Plaintiff were to prevail on the merits, that harm could 'be remedied by money damages at the time of judgment[,]' rendering a preliminary injunction unnecessary.") (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)).

Moreover, neither Carpenter nor BSS are in a position to do any harm to DCL now. Carpenter is a non-managerial employee with another business; he has no role in business development and has never suggested to his new employer that it take employees or business from DCL. Carpenter Decl. ¶ 45. BSS never had any contracts, operations, employees, or revenues. *Id*.

15

¶ 31. It never took any work from DCL and cannot do so now, as it is dissolved. *Id*. ¶ 29. Neither Carpenter nor BSS have any DCL trade secrets. *Id*. ¶ 43.

Without evidence of irreparable harm, the TRO Motion should be denied.

### C. The Other TRO Factors Also Weigh in Carpenter's and BSS's Favor.

The scope of the injunction TRO DCL seeks is far broader than the Agreement and would restrict Carpenter from working in his current employment for PLEX for two years, notwithstanding that such work is not competitive to DCL and does no harm to it. DCL seeks a TRO that would expand the scope of the restrictive covenants, to prohibit work permitted by the Agreement and for two years, instead of the one year provided by the restrictive covenants. DCL wrote the Agreement itself; it should not be permitted to broaden its already overbroad scope. The balance of equities weigh against the requested TRO. It is not in the public interest to prevent Carpenter from earning a living.

### D. Expedited Discovery is Unwarranted.

DCL has not demonstrated any basis for departing from the normal discovery procedures. It has not shown any risk of evidence being destroyed. There is no urgency here. The "rocket docket" moves fast enough. Courts grant expedited discovery only when "unusual circumstances exist." *ForceX, Inc. v. Tech. Fusion, LLC*, No. 4:11CV88, 2011 WL 2560110, at *4 (E.D. Va. June 27, 2011) (internal citations and quotations omitted). Courts apply a formulation of the preliminary injunction test, with an emphasis on the elements of a strong showing of merits and irreparable harm, when analyzing whether to grant expedited discovery. *Id*. at *6. DCL has failed to show *any* unusual circumstances such that expedited discovery would be warranted. As discussed *supra*, DCL is unlikely to prevail on the merits and has failed to show irreparable harm. As such, expedited discovery is not warranted.

### III. Conclusion

DCL has failed to meet its burden under any of the factors required for a TRO. The Court should deny DCL's TRO Motion and deny it expedited discovery.

Filed: April 17, 2023

>Respectfully submitted,
>
>BLACK SAILS SECURITY, LLC and
>JOHN CARPENTER
>
>  /s/Anne G. Bibeau
>Anne G. Bibeau (VSB 41488)
>WOODS ROGERS VANDEVENTER BLACK PLC
>101 W. Main Street, Suite 500
>Norfolk, VA 23510
>Telephone: 757-446-8600
>Facsimile: 757-446-8670
>Anne.Bibeau@WRVBlaw.com
>
>Pietro Sanitate (VSB 89538)
>WOODS ROGERS VANDEVENTER BLACK PLC
>Riverfront Plaza, West Tower
>901 East Byrd Street, Suite 1550
>Richmond, VA 23219
>Telephone: 804-343-2059
>Facsimile: 804-343-5021
>Pietro.Sanitate@WRVBlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that, on the 17th day of April 2023, I caused a true and accurate copy of the foregoing to be served on counsel of record via the CM/ECF system and via email to:

>Roya Vasseghi, Esq.
>Vasseghi Budd Law
>9663-A Main Street
>Fairfax, VA 22031
>Roya@vasseghibuddlaw.com
>Counsel for Michael Frank
>
>  /s/Anne G. Bibeau

4891-0805-1804

17