UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

**DARK CIRCUIT LABS, INC.,**

    Plaintiff,

v.    Case No.:    1:23-cv-00326

**BLACK SAILS SECURITY LLC,
JOHN CARPENTER,
ERIC MISSIMER,
MICHAEL FRANK,**
and **KEITH HADDOCK**

    Defendants.

### DECLARATION OF JOHN CARPENTER
### IN OPPOSITION TO PLAINTIFF'S MOTION FOR TRO

Pursuant to 26 U.S.C. § 1746, I, John Carpenter, declare as follows:

1. I was employed by plaintiff Dark Circuit Labs, Inc. ("DCL") from December 14, 2021, until DCL terminated my employment on March 6, 2023.

### Employment with IC1 Solutions

2. Prior to working for DCL, I was employed by IC1 Solutions, a federal contractor that had a contract with Lockheed Martin Corporation ("LMCO") to perform services on a task order known as "UncleLeo" under an indefinite delivery indefinite quantity ("IDIQ") contract with the U.S. Government known as "Cartwright".

3. My work for IC1 Solutions involved offensive cyber security tools and development. This work is classified as Top Secret.

4. While working for IC1 Solutions, I worked closely with LMCO Project Manager Keith Haddock, who was my supervisor on the worksite and my primary point of contact for my work assignments. I also worked closely with U.S. Government employees.

5. IC1 Solutions' contract with LMCO and my employment with IC1 Solutions ended in late 2021.

**Employment with DCL**

6. I was hired by DCL on December 15, 2021, as a Senior Computer Network Operations Developer.

7. I executed a Confidentiality Non-Competition and Protectable Rights Agreement ("Agreement") with DCL dated December 20, 2021. A copy of this document is attached as Exhibit B to the First Amended Complaint and Exhibit D to DCL's Motion for TRO.

8. The Agreement incorporated by reference my Offer Letter from DCL, which is attached to DCL's initial Complaint as Exhibit B. In the Offer Letter, which DCL and I executed on December 15, 2021, DCL promised to grant me 2,500 shares of DCL's common stock. DCL never granted me any shares of stock, however.

9. DCL continued the same work for LMCO that had been performed by IC1 Solutions. Like IC1 Solutions, DCL was a subcontractor to LMCO on its prime contract with the U.S. Government to perform certain offensive cyber security work. Although the work was the same, the names of the contract vehicles changed after IC1 Solutions left: the task order was renamed "UngratefulChild" and the IDIQ contract was renamed "Bazinga." Again, this work is Top Secret.

10. My work for DCL was the same as I had performed for IC1 Solutions: I even sat at the same desk and chair. Just as with IC1 Solutions, I continued to work closely with Haddock, as my

site supervisor and primary point of contact for my work assignments. I continued to work closely with the same U.S. Government employees I had worked with while an employee of IC1 Solutions.

11. DCL authorized and directed me to approve timesheets, and I did so as part of my DCL duties. I executed this duty in good faith using my best efforts. I am not aware of any mistakes in the timesheets I approved. No one ever brought any mistakes to my attention.

12. In late 2022, I became concerned with numerous problems I had observed with DCL's senior leadership. I decided that I would leave DCL and form my own business to continue performing offensive cyber security tools and development in support of the U.S. Government's mission.

13. On December 2, 2022, I formed a Virginia limited liability company named Black Sails Security LLC ("BSS"), by registering it with the Virginia State Corporation Commission. I was the sole member and the managing member of BSS.

14. In late 2022, I talked with Haddock about how BSS could apply for a subcontract with LMCO to perform offensive cyber security tools and development.

15. On Friday, January 27, 2023, DCL gave me the letter attached to DCL's TRO Motion as Exhibit F notifying me that my employment was suspended. The letter was internally inconsistent, stating on page 2 that I was placed "on an administrative leave without pay effective immediately" during which I would have no access to company property or resources or contact with DCL employees or customers, but at the same time indicating that I was "to preserve the continuity of services for the mission as it relates to Ungrateful Child." From this letter it was unclear whether I was to continue working.

16. I had been scheduled to work the following day, Saturday January 28, in support of a critical, high priority project. After Haddock contacted DCL to demand that it allow me to continue working, DCL relented and informed me that I was to continue work.

17. Thereafter, I engaged, through counsel, with DCL in settlement negotiations. DCL proposed to defendant Eric Missimer and me on February 6, 2023, that BSS acquire DCL's subcontract with LMCO and that Missimer and I continue the work through BSS. We discussed with DCL the possibility that two other DCL employees, Delfino Liban and defendant Michael Frank, would follow the work to BSS. DCL's terms for this deal, however, involved BSS paying DCL an unreasonable amount of money, far in excess of the anticipated revenue the subcontract would generate.

18. I did not offer employment to either Liban or Frank. I did not have any employment to offer them, as my plan for BSS to acquire DCL's LMCO subcontract was dependent on reaching a deal with DCL. I never discussed the matter at all with Liban. Frank approached me and asked if he could work for BSS. I told him that I could not offer him employment because nothing was definite; all I could do was ask DCL if Frank could follow the work to BSS.

19. I never disclosed the terms of these settlement discussions to Haddock or anyone else other than my legal counsel and my girlfriend. I also discussed the settlement negotiations with Missimer, whom DCL had included in its settlement proposal.

20. As my relationship with DCL was strained and settlement negotiations were not progressing, I told Haddock on or about February 9, 2023, that I planned to quit my DCL employment.

21. Later that same evening, on February 9, 2023, DCL's President, Ronald Pelkey emailed Missimer and me that Haddock had told him we planned to resign, and Pelkey feared our resignation would damage DCL. At his request, I did not resign at that time.

22. Also on February 9, 2023, Haddock sent me an email, attached hereto as **Exhibit 1**, listing DCL actions that had damaged DCL's relationship with LMCO.

23. Thereafter, I continued to attempt in good faith to reach a deal with DCL whereby it would transfer its LMCO subcontract to BSS. In anticipation of such a deal, I began the application process for BSS to become an LMCO subcontractor.

24. After several rounds of negotiations with no real movement by DCL, I notified DCL through legal counsel on March 3, 2023, that I rejected DCL's offer and intended to dissolve BSS and seek employment elsewhere.

25. On the evening of Friday, March 3, 2023, I gave DCL my 30 days' notice of resignation, as required by the offer letter I signed with DCL.

26. DCL terminated my employment the next business day, on Monday, March 6, 2023.

**Dissolution of BSS**

27. On March 6, 2023, I notified LMCO that BSS would not complete the application to perform work with LMCO.

28. Although prior to March 2023 I had discussed with Missimer and Haddock the possibility of BSS becoming an LMCO subcontractor and Missimer and I performing work through BSS, those plans were never definite and never implemented. Missimer was undecided on whether he was interested in those plans, and the plans were dependent on reaching a deal with DCL. I began but never completed LMCO's application for BSS to become a subcontractor. When the negotiations with DCL collapsed, I jettisoned those plans.

29. I instructed Legal Zoom on March 11, 2023, to dissolve BSS. Legal Zoom registered the dissolution with the Virginia State Corporation, which has marked BSS as inactive as of April 8, 2023.

30. BSS never pursued work with any entity other than LMCO.

31. BSS never had any contracts, operations, employees, or revenue.

32. Neither BSS nor I ever offered employment, or said we would offer employment, to Michael Frank or anyone else.

### DCL's Trade Secrets

33. At the beginning of my DCL employment, DCL issued me a DCL laptop for use in accessing DCL's computer servers and data. I never accessed DCL's computer servers or data any other way. I never exported any DCL data except as expressly authorized and directed by DCL.

34. Upon termination of employment, I left DCL empty handed. I immediately returned all DCL property to DCL, including its laptop computer.

35. I did not retain any DCL documents or data of any sort, or any notes regarding any DCL documents or data of any sort, when my DCL employment terminated.

36. I never disclosed or used any DCL confidential information or trade secrets for any purpose other than as expressly directed by DCL.

37. During my DCL employment, I participated in biweekly business development meetings with Pelkey and other members of DCL's senior leadership team ("SLT"). These meetings were held every other Thursday. Typically, Pelkey or another member of DCL's SLT would send the team, including me, an agenda for the business development the evening before the meeting and I would review the agenda prior to and during the meeting. At times, if asked, I would offer feedback on the agenda.

38. The business development agendas were typically a Word document containing bullet points for discussion, without much detail or specifics.

39. Exhibit R to DCL's Motion shows that I accessed a file titled "Business Dev Agenda" on Wednesday November 9, 2022 at 8:58 p.m., Thursday November 10 at 6:00 a.m., and Tuesday November 15 at 7:44 p.m. I do not recall the specifics of this meeting agenda but based on the dates I believe that a topic for discussion at our November 10 business development meeting was a prospective customer (*i.e.*, not LMCO) I had identified. My recollection is that we decided at the November 10 meeting to schedule a meeting with that prospective customer, and I believe that I reviewed the document again on November 15 for that purpose. Ultimately DCL decided not to pursue that prospective customer.

40. I did not use the "Business Dev Agenda" for any purpose other than pursuit of DCL's business interests as directed by DCL. I viewed it only on DCL's laptop. I never exported or printed the file. I did not retain a copy of it after my DCL employment ended.

41. I did not use or reference the "Business Dev Agenda" in forming BSS, nor would it have been of any use to me for that purpose due to the fact that I formed BSS to do business with LMCO, whereas DCL's business development agendas discussed prospective business.

42. I do not recall why I downloaded the "Business Dev Agenda" to the DCL laptop on November 10 and 15 rather than view it without downloading, but it was not unusual for me to download documents. I recall downloading other documents to DCL's laptop at other times.

43. I never took any action or encouraged, aided, or abetted anyone else to take any action to deprive DCL of access to its computer servers or other data or property.

## Current Status

44. On March 14, 2023, I accepted an offer of employment from PLEX Solutions, LLC ("PLEX") and began work there on March 29, 2023.

45. I am an employee and have no ownership interest in or managerial role with PLEX. I am not involved in business development for PLEX.

46. I did not have any discussions with PLEX about going to work for it until after DCL fired me.

47. I never discussed with PLEX the possibility of it hiring any other former DCL employees.

48. I never suggested to PLEX or discussed with PLEX the possibility of it taking any work from DCL.

49. PLEX has expressly directed me to not use or disclose any prior employer's confidential information or trade secrets in my employment with PLEX.

50. I have not shared any DCL confidential information or trade secrets with PLEX.

51. I have abandoned plans to start my own business at this time. I am not soliciting any business or any DCL employee for any purpose.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April __14__, 2023.

*John Carpenter*
JOHN CARPENTER

4881-1675-6060,

---------- Forwarded message ---------
From: **Haddock, Keith** <keith.haddock@lmco.com>
Date: Thu, Feb 9, 2023 at 9:31 PM
Subject: Dark Circuit Relationship with LM
To: John Carpenter <blacksailsseccontracts@gmail.com>
Cc: Bowen, Amber L <amber.l.bowen@lmco.com>

Hi John

I wanted to state that your performance on UngratefulChild has been outstanding and that the customer values you as an onsite trusted partner and a leader on the team.  Your technical achievements on contract made Dark Circuit a trusted partner with LM and with the Customer.  You are a go to asset for the customer on site when it comes to difficult technical challenges and for process improvement/mentoring.   Because of this, you made Dark Circuit a must have partner for LM and a key discriminator for us on UngratefulChild going into the 2026 recompete.

Unfortunately, the actions by other leadership in Dark Circuit have started to degrade that relationship with both LM and the customer.  These actions included:

- Ron Pelkey moving to VAIL with less than a year on contract
- Paul Jalufka alluding to the fact that his position on UngratefulChild (starting 15 February via Dark Circuit) is only temporary until a spot is available on VAIL.
- Anthony Squire leaving the onsite team after less than a year on contract and then significantly underperforming while on site with LM ATL in Arlington
- Attempts by Dark Circuit leadership to pull developer(s) off a key offsite project that you and Eric shaped

Again, you have done everything you can to strengthen the relationship between LM & Customer and Dark Circuit Labs so it saddens me to see the reputation degrade to a dangerously low level due to the actions of other partners in the company.

EXHIBIT 1

Thanks again for your time!

Keith

EXHIBIT 1