UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**DARK CIRCUIT LABS, INC.**,

Plaintiff,

vs.

**BLACK SAILS SECURITY LLC**, **JOHN CARPENTER**, **ERIC MISSIMER, MICHAEL FRANK,** and **KEITH HADDOCK**,

Defendants.

Civil Action No.: 1:23-cv-00326-LMB-LRV

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER, <u>PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY</u>**

<u>**PRELIMINARY STATEMENT**</u>[1]

From what is known without the benefit of discovery, as early as November 2022, Defendant John Carpenter ("Carpenter") twice downloaded Plaintiff Dark Circuit Labs, Inc.'s ("Plaintiff" or "DCL") business plan at a time when there was no legitimate need to use the plan. He had never downloaded any other company documents previously. In December 2022, DCL temporarily relieved Defendant Eric Missimer ("Missimer") as Treasurer and worked to realign Carpenter's responsibilities because both Missimer and Carpenter were depriving DCL of critical information regarding staffing plans, additional work opportunities, marketing efforts, employee recruitment and retention, and DCL's work for Lockheed Martin Corporation ("LMCO").

---

[1] Unless otherwise noted, the factual statements referenced herein refer to the factual statements and the Exhibits annexed to the Declaration of Steven J. Weber, Esq. ("Weber Declaration" or "Weber Decl.") (ECF No. 20-2), Affidavit of Ronald Pelkey ("Pelkey Affidavit" or "Pelkey Aff.") (ECF No. 20-1), and Reply Affidavit of Ronald Pelkey ("Pelkey Reply Affidavit" or "Pelkey Reply Aff."), all submitted in support of DCL's motion.

Meanwhile, Missimer surreptitiously continued to work with Carpenter as if Carpenter was an owner of DCL, to the exclusion of the other owners, officers, and board members. In December 2022, Defendant Black Sails Security LLC ("BSS") was formed for the admitted purpose of diverting DCL work to BSS.

From November 2022 onward, Missimer, Carpenter and Defendant Keith Haddock ("Haddock") engaged in a campaign to disparage DCL and to threaten DCL employees with unemployment unless they joined BSS. In late January 2023, Haddock and Missimer disclosed their plan to DCL who suspended Missimer and Carpenter except with respect to functions necessary to continue to serve LMCO. Haddock, concerned that Missimer and Carpenter would be terminated before their diversion scheme was completed, threatened to terminate DCL's contract if Carpenter and Missimer were permitted to resign. Defendants then utilized the "conflict" which they manufactured as fuel to further disparage DCL with respect to its relationships with LMCO and its employees, including Defendant Michael Frank ("Frank" and together with BSS, Carpenter, Missimer, and Haddock, collectively, "Defendants"). Missimer, as the Chief Technology Officer who possessed the company server, disconnected DCL's VPN, and failed to return the server depriving DCL of its corporate electronic data, including busines records, coding tools, and work product. As a result of Defendants' conduct, DCL has suffered harm, including loss of work, loss of employees, loss of access to all electronic data including business records and proprietary work tools, and a diversion of DCL's work to its direct competitor, PLEX, utilizing DCL's trade secret information.

It is evident from Defendants' myriad admissions in their oppositions that Carpenter, Missimer, Frank, and Haddock were all discussing with each other the internal workings of DCL's business operations, including but not limited to DCL's client and employee relationships and

business strategies. Instead of using such information for the betterment of DCL, Defendants used their intimate knowledge of DCL's trade secrets for their own benefit, which is against the law. Defendants admit, in one way or another, to the crux of DCL's allegations in the First Amended Verified Complaint ("FAVC"). To wit, Defendants admit that BSS was formed to compete directly with DCL and that they stole DCL's trade secrets with the objective of having DCL replaced by BSS on DCL's contract with LMCO.

Because Defendants are unable to assert any plausible argument against the overwhelming and indisputable factual record against them, in opposing DCL's request for immediate relief, they attempt to take the Court down a winding road of baseless and convoluted legal theories. Although they finger-point and contradict each other at every turn, they do not deny that they engaged in this conduct, in fact, they rely upon their admissions to DCL's allegations to make a twisted and tortured argument that, although they engaged in the misconduct DCL has alleged, they have now changed course and thus should not be held accountable for the harm caused to DCL to date. Defendants' incredible factual assertions are rebutted in great detail in the Pelkey Reply Affidavit.

This Court should give no quarter to Defendants' blatant gamesmanship and distractionist maneuvers to avoid the ramifications of their unlawful conduct. In their moving papers, DCL established that Defendants should be enjoined on an emergency and preliminary basis. Defendants failed to rebut that DCL has a likelihood of success on the merits for each of its claims to warrant injunctive relief, including but not limited to its breach of contract claims against Carpenter, Missimer, and Frank, and the aiding and abetting of such breaches by BSS and Haddock, and that Defendants misappropriated DCL's trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831-39. Nor did Defendants rebut that DCL faces irreparable harm and that an injunction would serve the public interest or that the balanced equities

favor DCL. Defendants' oppositions all fail to address the salient issues before this Court. Defendants utterly fail to defend their alleged conduct or explain how the Court could ever reach a conclusion that they should not be enjoined from continuing to engage in their competitive activities in pursuit of destroying DCL's trade secrets and legitimate business interests.

Based on their errant tactics, Defendants urge this Court to take the drastic role of permitting them to continue forward with their competitive activities in total derogation of their contractual, statutory, and common law obligations to DCL. Allowing Defendants to remain unencumbered by an Order of the Court will only embolden Defendants to continue to breach their restrictive covenants and cause further harm to DCL than has already been incurred to date. Defendants must be stopped now before DCL loses its clients and even more employees. Defendants should be temporarily and preliminarily enjoined and DCL should be granted expedited discovery to determine the full extent of Defendants' conceded wrongdoing.

## LEGAL ARGUMENT

**I.    DEFENDANTS WHOLLY FAIL TO REBUT THAT DCL HAS A LIKELIHOOD OF SUCCESS ON THE MERITS.**

**A.    Defendants Admit They Misappropriated DCL's Trade Secrets.**

DCL has submitted ample documentary evidence for the Court to enter a Temporary Restraining Order ("TRO") under the DTSA to prevent any actual or threatened misappropriation of a trade secret. *See* 18 U.S.C. § 1836(b)(3)(A)(i). Instead of rebutting such evidence, Defendants repeatedly admit to their conduct, instead attempting to convince the Court that the information they stole is not protectable under the DTSA. Similar to contentions by the other Defendants, Frank argues that DCL "has not shown source code, or anything at all, to identify its supposed trade secret(s)." (Frank Br. at 8). DCL is not required, for purposes of a TRO and preliminary injunction under the DTSA, to identify a "secret sauce" type recipe, such as source code or a specific product,

that Defendants are incorrectly intimating is required in order for the DTSA to have teeth. *See Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853-54 (E.D. Va. 2018) (finding that the plaintiff "sufficiently ple[d] that it derived independent economic value from the documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic investment—the disclosure of which could create an unfair competitive advantage.").

Without a doubt, DCL sufficiently pleads Defendants, singularly and in concert with one another, misappropriated its trade secrets under the "DTSA's *broad definition* of trade secrets." *Id.* at 853 (emphasis added). Each of the Defendants have their own arguments as to why their conduct did not involve alleged trade secret misappropriation, but their contentions are all contradictory and unavailing. For example, Carpenter admits that he downloaded DCL's Business Plan. (Carpenter Decl., ¶ 33). There is no record of meetings on the dates that Carpenter downloaded the Business Plan and out of all of the documents that Carpenter viewed or accessed through this same document sharing program, the Business Plan was the only document he ever downloaded. (Ex. R; Pelkey Reply Aff., ¶ 25). Carpenter downloaded it twice, a mere two weeks before he incorporated BSS. (Ex. R; Pelkey Reply Aff., ¶ 25). A reasonable inference can be drawn that Carpenter was misappropriating DCL's trade secrets for purposes of BSS from this course of unusual conduct and timing. (*Id.*). It is indisputable that DCL's Business Plan, as alleged in the FVAC, constitutes trade secret information under the DTSA's broad definition because DCL "derive[s] independent economic value from the documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic investment—the disclosure of which could create an unfair competitive advantage." *Space Systems*, 306 F. Supp. 3d at 853-54.

Additionally, Missimer also makes several statements regarding his undue delay in returning DCL's company property and apparently seeks to blame his delay on requesting a list of property on DCL. (Missimer Aff., ¶¶ 21-22). First, despite being demanded to return company property on January 27, 2023, Missimer did not respond to DCL's demands for its property's return and his counsel did not address request a list until three weeks later. Given Missimer's position as DCL's Chief Technology Officer and system administrator, as alleged in the FAVC, DCL's position was that he should have been aware of any and all equipment that was used in hosting, storing, transmitting data, or running on the DCL network, and as a current employee and DLC shareholder and that DCL expected his assistance in identifying any equipment that was associated with these purposes. (Ex. B, ¶ 22; Pelkey Reply Aff., ¶ 30).

Missimer claims that when he was terminated he "was in transit to Virginia" and that this made it "impossible for [him] to get the requested equipment back to DCL." (Missimer Aff., ¶ ¶ 23-24, 26-27). These statements show that Missimer admits that he had not returned company property as late as March 6, 2023, his termination date, and that he does not deny that he disconnected the VPN, thus depriving DCL of its corporate network. Missimer could have and should have returned DCL's company property immediately upon DCL's demand on January 27, 2023 when he was placed on administrative leave, but he failed to do so. (Pelkey Reply Aff., ¶ 31). He continued to fail to do so all the way until March 16, 2023, six days after DCL filed the instant action, which shows that if DCL had not taken action to recover its property by filing in court, that it may never have had its property returned. (*Id.*). Missimer's unreasonable withholding of DCL's company property after its repeated demands for its return constitutes misappropriation under the DTSA which is broadly defined as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [ ] disclosure

or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5). Once Missimer had been demanded to return the company property, which contained DCL's confidential and proprietary information, he no longer had authorization to have custody of the trade secrets and thus his continued holding of the property constitutes misappropriation under the broad terms of the statute.

With regard to Haddock's misappropriation, Carpenter states that he "told Haddock on or about February 9, 2023, that [he] planned to quit [his] DCL employment." (Carpenter Decl., ¶ 20). This date is an important date because it was only approximately one week into negotiations which were being conducted via the parties' respective counsel. (Pelkey Reply Aff., ¶ 16). It is also the same date that Ronald Pelkey ("Pelkey"), the Chief Operating Officer of DCL, had a phone call with Missimer about trying to keep negotiations moving forward. (*Id.*). Additionally, the evening of February 9, 2023, Haddock admits that he left DCL a voicemail that Carpenter and Missimer were quitting and DCL would be terminated the following day. (Haddock Aff., ¶ 33). When viewed in conjunction with each other, there is no other conclusion to reach but that Carpenter and Missimer were in constant communication with Haddock and each other at this time regarding DCL's confidential and proprietary information, further evidencing their conspiracy against DCL and wrongful use of DCL's trade secrets. (Pelkey Reply Aff., ¶ 16).

Carpenter also attaches to his Declaration an email, dated February 9, 2023, the same date as referenced above, from Haddock to Carpenter, a then-current employee and Vice President of DCL. (ECF No. 41-1; Ex. B, ¶ 57). However, Haddock's email was not sent to Carpenter's DCL email address. (Pelkey Reply Aff., ¶ 17). It was instead sent to an email address "blacksailsseccontracts@gmail.com," which DCL interprets as an email address that was created for BSS to secure contracts. (*Id.*). For Haddock to have sent this email to Carpenter's Gmail

address, Carpenter would have needed to provide it to Haddock in some manner prior to that date. (*Id.*). Even if there were no other evidence that Carpenter was soliciting LMCO to divert DCL's business to BSS, this email alone shows that Defendants must be enjoined. (*Id.*). This email further shows the necessity for expedited discovery as DCL should be entitled to full and fair review of all other emails that Defendants sent to or from the "blacksailsseccontracts@gmail.com" address or any other email accounts that were created for purposes of competing with DCL in order to investigate the full extent of Defendants' wrongdoing. (*Id.*).

As it relates to the contents of the February 9, 2023 email, Carpenter appears to take the position that Haddock's statements regarding DCL exonerate Missimer, Frank, and himself from breaching his restrictive covenant agreements or that perhaps DCL's relationship with LMCO was tarnished prior to Defendants' activities related to BSS. (*Id.* at ¶ 18). DCL's FAVC details accolades that Haddock had bestowed upon DCL up until the end of 2022, including discussions regarding purchasing DCL, which is the same exact time that BSS was incorporated. (Ex. B, ¶¶ 36-39). Disturbingly, and in keeping with DCL's allegations in the FAVC regarding Defendants' conspiracy against DCL through the use of its trade secrets, the February 9, 2023 emails shows that Haddock sent confidential performance information to Carpenter, not as a DCL employee, but in Carpenter's capacity as an owner of BSS, a direct competitor. DCL had never received any negative progress updates or poor performance reviews from Haddock or any others at LMCO. (*Id.* at ¶ 18). The February 9, 2023 email is clear and unequivocal documentary evidence that BSS, Carpenter, and Haddock were working together to withhold information that caused damage to DCL by trying to remove DCL from its subcontract to steal DCL's employees.

Haddock further states that "[t]here is no financial incentive or other motivation for me to receive, use, or disclose DCL's confidential or trade secret information." (Haddock Aff., ¶ 71).

This statement is directly contradicted by Haddock's prior conduct because Haddock made repeated comments and remarks about not only purchasing DCL but copying its company model to use for LMCO's benefit. (Pelkey Reply Aff., ¶ 61). At one point, Haddock stated that such a model would allow LMCO to increase its profit from 6% to 10% based on the fact that an identical company like DCL was a subsidiary to LMCO. Haddock had ample motivation to seek DCL's proprietary information and did so in concert with the other Defendants. (*Id.*). Haddock states that "[a]t no time" did he "disparage[] DCL." (Haddock Aff., ¶ 76). However, DCL employees stated to me directly that Haddock mentioned "issues with leadership" several times which is a statement that obviously sowed discord among DCL's employees with whom Pelkey spoke. (Pelkey Reply Aff., ¶ 62; *see* Pelkey Aff., ECF No. 20-1).

Haddock further states that he did not "learn[] confidential proposed settlement terms from the other [D]efendants" and that it was me who disclosed a "proposed monetary term" and that Haddock merely "repeated it back" to me. (Haddock Aff., ¶ 66). Pelkey did not state anything about a financial figure on the call, and moreover, DCL did not allege in its FAVC that Haddock mentioned a financial figure, but merely a "material term" related to settlement. (Pelkey Reply Aff., ¶ 60; Ex. B, ¶ 130). The fact that Haddock characterizes it as a "monetary figure" shows that he is acutely aware of the information that he learned from Carpenter and/or Missimer. (*Id.*). This is yet another reason that DCL requires expedited discovery because emails and phone records will be able to shed light on when, how often, and on what basis these individuals were conspiring and misappropriating DCL's confidential information during this time. (*Id.*).

Finally, as it relates to Frank's misappropriation, Frank states that, "[i]n the middle of February 2023, I knew that the relationship between DCL, Missimer, Carpenter and LMCO were at a low point." (Frank Aff., ¶ 29). Frank was an employee of DCL, but not in senior management,

and thus was never privy to DCL's management information. (Pelkey Reply Aff., ¶ 44). The only way that Frank could have learned of such information was through the other Defendants, such as Carpenter, Missimer, and/or Haddock, in violation of the confidences of settlement exchanges that were taking place during this time and in violation of Carpenter and Missimer's covenants not to disparage DCL. (*Id.*). DCL has asserted in its FAVC and in DCL's moving papers for the instant Motion that it was Carpenter, Missimer, and/or Haddock who worked together to disparage and induce employees to leave their employment with DCL. (*Id.*). For Frank, their efforts succeeded because Frank abruptly resigned on March 14, 2023. (*Id.*; Ex. J).

Moreover, Frank states that, "[o]n February 23, I reached out to Haddock via email to try to understand and gain an understanding of what I should do given my situation," and explains that his "statement on February 2[4] of helping Carpenter and Missimer 'work through this' was merely to convey that I was a good friend, teammate and wished nothing but the best for all of us." (Frank Aff., ¶¶ 30, 31, 33). By his statements, Frank appears to assert that his email to Haddock was sent for innocuous purposes. (Pelkey Reply Aff., ¶ 44). However, DCL's internal investigation revealed that Frank deleted his email to Haddock prior to his abrupt resignation. (Ex. U). Frank took affirmative steps to backtrack and delete an email from his "Sent" folder which is an out of the ordinary action. (Pelkey Reply Aff., ¶ 44). No other emails that Frank sent were deleted by Frank which shows that he intended to destroy the email he sent to Haddock to prevent DCL from discovering it. (Ex. U; Pelkey Reply Aff., ¶ 44).

Moreover, Frank was never authorized by DCL as an employee to "work through this" with BSS, Carpenter, and Missimer, and/or Haddock. (Pelkey Reply Aff., ¶ 45). It was DCL's understanding that all settlement discussions regarding BSS were confidential. (*Id.*). Frank was interviewed as part of DCL's internal investigation which commenced immediately upon Haddock

and Missimer's January 25 and 26, 2023 disclosures related to BSS. (*Id.*). Frank's interview could have and should have been the extent of Frank's involvement in this case. (*Id.*). However, Frank's February 24, 2023 email to Haddock shows, by his own words, that he was assisting Carpenter and Missimer with their plans related to BSS beginning sometime in 2022. (*Id.*; Exs. N, S). Additionally, there is no other cognizable reason that Frank would state to Haddock that BSS would not be "setting sail anytime this year" if he did not have plans to go work for BSS, whether in the past, at that time, or in the future. (*Id.*; Exs. N, S).

When all of the above facts, and those alleged in the FAVC and in DCL's moving papers, are taken in conjunction, it unmistakably clear that all Carpenter, Missimer, and Frank were regular in communication with each other discussing and sharing intimate knowledge of DCL's innerworkings, including the painstaking process by which DCL recruits and trains its employees and DCL's business plans and strategies, and enmeshed DCL's largest client in these conversations by way of Haddock for the sole purpose of usurping DCL's work, which each and every Defendant admits without reservation. DCL's two key individuals on the IDIQ Contract, Missimer as a shareholder and Carpenter as an officer, knew everything about DCL, and it is beyond obvious from the facts that they used DCL's trade secret information to attempt to divert this work to BSS and pilfer DCL's employees, including Frank, who then began conspiring with them after Carpenter and Missimer disclosed DCL's trade secret information to him as well. All three of these individuals were duty bound to solely use this information to benefit DCL but they instead used knowledge of DCL's trade secrets to open a competing enterprise. Defendants then changed tact, purportedly dropping their admitted and concerted plans to have BSS steal DCL's contract, and used DCL's trade secrets to secure positions for Carpenter, Missimer, and Frank at a direct competitor, PLEX, on the same LMCO program. (Haddock Aff., ¶ 51).

With regard to Carpenter, Missimer, and Frank's new employer, Defendants assert that the inevitable disclosure doctrine does not apply in Virginia. While the fact that a former employee assumed a similar position at a competitor does not, without more, make it "inevitable that he will use or disclose . . . trade secret information," the court in *MeadWestvaco Corp. v. Bates*, 91 Va. Cir. 509 (Chesterfield Cir. Ct. 2013), identified six factors that should be considered before applying the inevitable disclosure doctrine: (1) whether the former employer possesses a "trade secret"; (2) the employee's position at his former employer; (3) whether the employee possesses an "extensive and intimate knowledge" of his former employer's trade secrets; (4) the degree to which the employee's former employer and new employer are in competition; (5) whether the employee can effectively perform the duties of his new position without disclosing, using, or relying on his former employer's trade secrets; (6) whether there are other circumstances that indicate the employee or his new employer are unable or unwilling to safeguard the former employer's trade secrets. *Id.* at 524 (citing *Nucor Corp. v. Bell*, No. 2:06cv2072, 2008 WL 9894350, at *60-61 (D.S.C. Mar. 14, 2008)). In applying these factors, the circuit court in *MeadWestvaco* court granted an injunction. *See id.* As a result, Virginia state trial courts clearly do recognize and apply the inevitable disclosure doctrine, despite Defendants' protests to the contrary. DCL has shown that it meets all of the above six factors to warrant a TRO.

**B.**    **Defendants Concede that Breaches of the Restrictive Covenants Occurred.**

There is no question that Defendants admit that they breached, or aided and abetted in the breach, of the restrictive covenant provisions at issue. (Carpenter Decl., ¶ 11; Missimer Aff., ¶¶ 21-22; Haddock Aff., ¶ 23; Frank Aff., ¶¶ 23, 30-31, 33). Defendants instead focus their oppositions on the enforceability of such restrictive covenants to attempt to defeat DCL's narrowly tailored relief in its Order to Show Cause.[2] Defendants each argue that the restrictive covenants are an unnecessary restraint on trade and because Virginia disfavors "blue penciling," DCL's restrictive covenants are unenforceable and thus DCL is not likely to succeed on the merits of its breach of contract or aiding and abetting of breach of contract claims so as to prevent the issuance of a TRO and preliminary injunction. Additionally, Missimer specifically argues that Virginia law, as opposed to Delaware law, should apply to the Shareholders Agreement. (Missimer Br. at 6). However, as much as he would like to evade this fact, Missimer is not a rank-and-file employee. Missimer is a DCL shareholder, (Ex. B, ¶¶ 3, 13), and as an owner and co-founder of the company, he expressly agreed to be governed by Delaware law when he agreed and helped to incorporate DCL in that state.[3] *Run Them Sweet, LLC, v. CPA Global Limited*, 224 F. Supp. 3d 462, 466 (2016) ("[N]o word or clause in a contract will be treated meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract."); *Settlement Funding, LLC v. Von Neumann-Lillie*, 274 Va. 76, 645 S.E.2d 436 (2007) (holding that

---

[2]  DCL's full request for emergency and preliminary injunctive relief is outlined in its Order to Show Cause. (ECF No. 21).

[3]  Missimer states that "DCL has no ties to the state of Delaware." (Missimer Aff., ¶ 10). This statement is false because DCL is incorporated in Delaware and adheres to filing and reporting requirements of the state as a Delaware corporation. (Pelkey Reply Aff., ¶ 29). The Shareholders Agreement, which Missimer executed, also designates Delaware law as governing law, further evidencing the corporation's ties to the state. (Ex. C; Pelkey Reply Aff., ¶ 29).

a Virginia trial court erred in refusing to apply Utah law in construction of loan agreement when contract clearly indicated its application).

Defendants each similarly argue that "[b]ecause such restrictive covenants are disfavored restraints on trade, the employer bears the burden of proof and any ambiguities in the contract will be construed in favor of the employee." *Omniplex World Services Corp. v. U.S. Investigations Services, Inc.*, 270 Va. 246, 249, 618 S.E.2d 340 (2005). However, Defendants fail to acknowledge the remainder of the Supreme Court of Virginia's holding in *Omniplex* that "[e]ach non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Id.* (quoting *Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 493, 561 S.E.2d 694, 695 (2002)). The Court continues that "[t]hese standards have been developed over the years to strike a balance between an employee's right to secure gainful employment and the employer's legitimate interest in protection from competition by a former employee based on the employee's ability to use information or other elements associated with the employee's former employment." *Id.* at 249.

Here, when evaluating each restrictive covenant at issue on its own merits, the Court should find that the provisions, although broad, are enforceable due to the unique circumstances at issue because of the nature of DCL's business model and Defendants' egregious and demonstrated competitive conduct to date. Namely, DCL is a provider of highly specialized services for which there is a limited pool of government-cleared talent. (Pelkey Aff., ¶ 14). This fact makes DCL's employees its most valuable asset in which it invests tremendous efforts and resources to recruit, train, and retain. Put simply, Defendants used their insider knowledge regarding DCL to try to steal DCL's most valuable asset by repeatedly threatening DCL's employees that they would no longer be employed by DCL because DCL was losing its LMCO subcontract and they "needed to

find a new home." (Pelkey Aff., ¶ 25). There is likely not a more blatant need for a broad non-competition and non-solicitation provision such as the ones at issue to be enforced when "balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Omniplex*, 618 S.E.2d at 249.

The case of *Nortec Communications, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226 (E.D. Va. 2008) is also cited in opposition to DCL's motion. In *Nortec*, the employer was in the business of information technologies consulting and brought an action against its former employee, a consultant, alleging breach of non-competition and non-solicitation clauses contained within his employment contract. *Id.* at 228-29. The employee claimed, similarly that his restrictive covenants were overly broad and thus unenforceable. *Id.* at 231-32. However, the *Nortec* court found that "[i]t is not unreasonable to conclude that [the former employer] has a legitimate interest in limiting the potential harm they would suffer through the loss of business that could result were former employees permitted to leave their employ and take the business sensitive knowledge and contacts acquired through their employment with [the former employer] and use that information to compete with [the former employer] for their clients' business." *Id.* Furthermore, in *Lanmark Tech., Inc. v. Canales*, which is also cited in opposition and in *Nortec*, the court found that "[w]ith respect to employment with a direct competitor, non-compete clauses that 'restrict the former employee's performance of functions for his new employer [are upheld] only to the extent that the proscribed functions are the same functions as were performed for the former employer.'" 454 F.Supp.2d 524, 528 (E.D. Va. 2006) (quoting *Cantol, Inc. v. McDaniel*, No. 2:06cv86, 2006 WL 1213992 at *4 (E.D. Va. Apr. 28, 2006)). The circumstances that are described by the courts above are exactly what has occurred here and DCL has sufficiently and repeatedly alleged facts sufficient to demonstrate that it has a likelihood of succeed on the merits with respect to enforceability.

Additionally, despite DCL addressing this issue head-on in its moving papers, Defendants all eagerly rush to point out that there is no geographic scope in the restrictive covenants in a wholly misguided attempt to destroy their enforceability. Defendants critically omit that "[t]he considerations of function, geographic scope, and duration are not separate and distinct issues: a single consideration that is unreasonable may be reasonable as construed in light of the other two." *Cantol, Inc. v. McDaniel*, No. 2:06CV86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006). Thus, as long as the function and duration are reasonably construed, the fact that there is no geographic scope does not necessarily render a restrictive covenant unenforceable. In this regard, when the purpose of a restrictive covenant is to safeguard customer and other business relationships or workforce stability, the need for a geographic limitation depends on the portability of the employer's clientele and workforce. *See Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011) (holding that "[a]lthough the lack of a geographical limitation favors defendant, it is outweighed by the nature of the businesses at issue, [the former employer]'s *legitimate interest in protecting itself from direct competition by a former employee in a niche market*, and the limitations within the Agreement, particularly the one-year duration of the non-compete and non-solicitation provisions. For these reasons, the non-compete provision is *not invalid*.") (emphasis added).

In this case, DCL is not a local real estate agency or construction firm where a geographic restriction would be reasonably required to protect an employer's legitimate business interests, nor does DCL sell products and services to a locally finite customer base. To reiterate, and as the court found in *Cantol* and *Brainware*, there is no geographic restriction that could have been reasonably imposed to protect DCL's "legitimate interest in protecting itself from direct competition by a former employee[s, Carpenter, Missimer, and Frank,] in a niche market" of offensive cybersecurity

contracting in support of the U.S. Government's national security missions. *Brainware*, 808 F. Supp. 2d at 827. (Ex. B, ¶¶ 1, 83, 215). Similar to the *Brainware* court's finding, the restrictive covenants at issue should not be struck down because they are reasonable in function and duration.

In light of Defendants' oppositions, what DCL does know now with one hundred percent certainty given the admissions Defendants, is that "Carpenter, Frank, and Missimer have each since joined another subcontractor, PLEX, and remain employed on the [p]rogram." (Haddock Aff., ¶ 51). Unequivocally, Carpenter, Frank, and Missimer are all in violation of their contractual, statutory, and common law obligations to DCL because they are performing exactly the same work for DCL's client, LMCO, on the exact same contract. There could not be a clearer case for when highly compensated employees, one of which is an owner of the company, should be subject to the restrictive covenants to which Carpenter, Missimer, and Frank all freely and voluntarily agreed. If the Court enters the TRO as requested, Carpenter, Missimer, and Frank will be able to work as developers and engineers as long as they are not working with DCL's clients, like LMCO. As such, the restrictive covenants at issue are reasonable and are enforceable under Virginia and Delaware law. Although DCL only needs to show likely success on a single claim to merit a TRO and preliminary injunction, DCL is likely to succeed on its breach of contract claim in addition to its trade secrets misappropriation claim sufficient to justify a TRO and preliminary injunction.

## C. <u>Defendants Failed to Rebut that DCL Will Succeed on the Merits of Its Remaining Claims</u>.

For purposes of a TRO and preliminary injunction, DCL is solely required to show a likelihood of success of merits on just one of its claims against Defendants to warrant an injunction. *See Steves and Sons, Inc. v. JELD-WEN, Inc.*, 612 F.Supp.3d 563, 583 n.13 (E.D. Va. 2020). Despite Defendants' contentions to the contrary, DCL has a high likelihood of success on its remaining claims and can show a likelihood of success so as to warrant an injunction on the basis

of any of them. Specifically, Carpenter, Missimer, and Haddock do not address any claims beyond the trade secrets misappropriation and breach of contract claims and thus presumably concede all remaining claims for purposes of emergency and preliminary relief, except for Haddock who solely raises an issue related to DCL's aiding and abetting breach of fiduciary duty claim. Frank is the only Defendant to address all other counts in defense of DCL's motion. (Frank Br. at 13, 21-25). For purposes of concision as DCL is addressing hundreds of pages briefs and affidavits filed by Defendants and is limited in pages to respond, DCL focuses on its claims that Defendants tortiously interfered with DCL's contracts and business expectancy, breached their fiduciary duty and/or duty of loyalty to DCL, and conspired to commit their wrongful actions. DCL has a high likelihood of success on each of these claims, as well as the related claims.

### 1. <u>Tortious interference with prospective economic advantage and tortious interference with contractual relations.</u>

To succeed on a claim for tortious interference with contract or prospective economic advantage, DCL must show (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit," (2) that Defendants had "knowledge of the relationship or expectancy," (3) "that it was reasonably certain that absent intentional misconduct, [DCL] would have continued in the relationship or realized the expectancy," and (4) "that [DCL] suffered damages from the interference." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir. 2021) (quoting *Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (applying Virginia law)).

Here, DCL can prove the existence of its business relationship with LMCO and its employees working under the IDIQ Contract. (Ex. B, ¶ 33). There can also be no reasonable dispute that all Defendants had knowledge of these business relationships because Haddock works for LMCO which contracts with DCL and Carpenter, Missimer, and Frank all worked specifically

under the IDIQ Contract with LMCO. (Ex. B, ¶¶ 67, 71). Without Carpenter, Missmer, and Frank intentionally engaging in misconduct by way of engaging in competitive activities against DCL while they were still employed, and in the case of Missimer, while still an owner of the company, and without Haddock's use of DCL's confidential information conveyed to him by Carpenter and Missimer to strongarm DCL into handing over its LMCO subcontract to BSS, DCL's subcontract with LMCO would not be at risk and its employees would not be scared about losing their jobs. (Pelkey Aff., ¶¶ 41-42). Finally, there can be no reasonable dispute that DCL has been damaged by Defendants interference because it was forced to expend significant time and financial resources to stop Defendants in their tracks from any further interference once their plans regarding BSS were disclosed to DCL.

Haddock asserts that these claims will fail "because one cannot interfere with an invalid agreement, and as set forth in the other Defendants' oppositions, DCL is unlikely to demonstrate the restrictive covenants agreements are enforceable." (Frank Br. at 20). However, as explained in detail above, the restrictive covenant provisions are enforceable, which is fatal to Haddock's specious argument. Haddock further contends that "DCL has not alleged that Haddock engaged in any 'intentional interference' or that he 'employed improper methods' to terminate DCL's contractual relationship with its employees." (Frank Br. at 20). This statement is belied by the allegations of the FAVC and Pelkey Affidavit, which was submitted in support of the instant motion to specifically address Haddock's ongoing improper methods to interfere with DCL's contractual relationships with its employees. (*See generally* Pelkey Aff.).

Specifically, three employees told Pelkey, that on or about March 6, 2023, Haddock approached them and other DCL employees at the work site in his capacity as Project Manager for LMCO and told them they "need to find a new home," implying that DCL's employees needed to

work for a new employer other than DCL to stay on the IDIQ Contract. (Pelkey Aff., ¶ 25). When these issues are combined with the allegations raised in DCL's moving papers, there is more than enough evidence in the record to make a clear showing that DCL is likely to succeed on the merits of its claims that Defendants tortiously interfered with DCL's contracts and business expectancy.

### 2. **Breach of fiduciary duty and duty of loyalty.**

Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach of fiduciary duty resulted in damages. *Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020) (citing *Carstensen v. Chrisland Corp.*, 247 Va. 433, 442 S.E.2d 660, 666 (1994); *NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1016 (E.D. Va. 2018)). A fiduciary duty exists under Virginia law when special confidence has been imposed on an individual who is, as a result, legally obligated to act in the best interest of the party that imposes the special confidence. *Allen Realty Corp. v. Hobert*, 227 Va. 441, 318 S.E.2d 592, 595 (1985). Moreover, as it relates to the duty of loyalty, "[w]hile free competition in the marketplace is to be encouraged, it is also critically important that employees take seriously the duty of loyalty they owe their employers." *Nat'l Legal Research Grp., Inc. v. Lathan*, 42 F.3d 1386, 1386 1994 WL 667058, at *2 (4th Cir. 1994).

Here, it is indisputable that Missimer, as a shareholder, and Carpenter, as an office, owed a fiduciary duty and duty of loyalty to DCL. Additionally, as an employee of DCL, it cannot be disputed that Frank owed a duty to loyalty to DCL. For the same reasons as discussed above and in DCL's moving papers, Carpenter, Missimer and Frank breached these duties to DCL when they engaged in the competitive activities that serve as the basis of DCL's FAVC. Moreover, DCL has been damaged as explained above and in its moving papers. Frank claims that it was permissible

for him to make arrangements for other employment as long as no trade secrets are used. DCL does not dispute this position, but that is not what is what issue with regard to Frank. Frank was not at liberty to "work through this" with Carpenter and Missimer, in concert with Haddock, as it relates to the formation of BSS and Frank's intent to work for BSS doing the same exact work for the same exact client for which he renders services for DCL. This is the heart of his breach as well as Carpenter and Missimer's breaches of these "critically important" duties to DCL. *Id.*

Haddock challenges DCL's aiding and abetting Carpenter, Missimer, and Frank's breach of duties claim, but merely argues that there could be no breach because there was not trade secret involved. (Haddock Br. at 18-19). He also argues there is no cause of action for aiding and abetting the breach of these duties. (*Id.* at 19). However, courts in this District have explained that "[t]he confusion surrounding whether Virginia recognizes a cause of action for aiding and abetting a breach of fiduciary duty appears to stem from the Supreme Court of Virginia's decision in *Patteson v. Horsely*, 70 Va. 263 (Va. 1877)." *Keil v. Seth Corporation*, 2021 WL 5088242, *12 (E.D. Va. Nov. 2, 2021). The *Keil* court further explained that "[s]ince *Patteson*, the Supreme Court of Virginia has neither expressly recognized nor expressly rejected aiding and abetting a breach of fiduciary action as a separate cause of action" and that it has "[i]nstead . . . assumed the existence of the cause of action to evaluate whether a plaintiff had properly pled a claim." *Halifax Corp. v. Wachovia Bank*, 604 S.E.2d 403, 411-12 (Va. 2004); *Uplinger v. Alexandria Overlook Condo. Council of Co-Owners*, 2018 WL 3062247, at *4 (Va. 2018). Thus, Haddock has no legal basis to assert that aiding and abetting a breach is not viable and DCL, for the reason stated above, has sufficiently plead for a clear showing that it can succeed on the merits that Haddock knew about Carpenter, Missimer, and Frank's duties to DCL and worked with them to assist in their breaches.

### 3.  <u>Civil Conspiracy</u>.

According to Virginia common law, a civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744 (1985) (citing *Werth v. Fire Adjust. Bureau*, 160 Va. 845, 855, 171 S.E. 255 (1933)). The plaintiff must allege that the defendants combined together to effect a "preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy." *Bull v. Logetronics, Inc.*, 323 F. Supp. 115, 131 (E.D.Va. 1971) (citations omitted).

Here, Frank argues that "DCL does not allege a conspiracy with particularity, as is required." (Frank Br. at 24). Frank's contention is belied by the evidence of record because there are numerous emails between Defendants, including but not limited to Frank's February 24, 2023 email to Haddock wherein Frank stated in was "in a position to help" Carpenter and Missimer and the "blacksailsseccontracts@gmail.com" February 9, 2023 email introduced by Carpenter himself. (Ex. N; Pelkey Reply Aff., ¶ 17). Haddock states that he "does not have authority to fire and/or not extend an option year" and that he has "not exercised any influence over the fate of DCL's relationship with [LMCO]." (Haddock Aff., ¶¶ 50, 77). Haddock's statement is directly contradicted by the evidence of record, including Haddock's own February 9, 2023 voicemail, where Haddock unequivocally stated that DCL was being terminated because Carpenter and Missimer were threatening to quit. (Ex. B, ¶ 133). If Haddock truly had no such authority from LMCO, then a reasonable inference can be drawn that his statement to DCL that it was being terminated solely because of Carpenter and Missimer was made out of Haddock's own self-interest as it relates to his conspiracy with them. DCL believes that Haddock, in leaving this voicemail,

was trying to force DCL to capitulate to Carpenter and Missimer's demands that they be released from their restrictive covenants with either non-existent or extremely limited financial renumeration to DCL even though they admittedly desired for DCL to give up its subcontract with LMCO so that they could usurp it for BSS. Defendants' conspiracy is self-evident.

Accordingly, Defendants failed to rebut that DCL is likely to prevail on the merits of its claims. Defendants must be enjoined.

## II.    DEFENDANTS FAILED TO REBUT THAT THE REMAINDER OF THE TRO AND PRELIMINARY INJUNCTION FACTORS FAVOR DCL.

Defendants each vaguely challenge that DCL will not suffer irreparable harm in the absence of a TRO and preliminary injunction. The Fourth Circuit has held that there is "significant risk of harm to [an employer] if former high-level employees c[an] immediately proposition [the employer's] clients and solicit their employees." *Allegis Group, Inc. v. Jordan*, 951 F.3d 203, 212 (4th Cir. 2020). It is admitted, by way of Defendants' oppositions, that Carpenter, Missimer, and Frank are working for a direct competitor, PLEX. (Haddock Aff., ¶ 51). Defendants submitted not one scintilla of evidence in rebuttal, and in fact provided even more evidence against them, that Defendants have solicit DCL's customers, such as LMCO, and attempted to raid DCL's employees by disparaging DCL and that they continue to do so. (Ex. B ¶¶ 33, 186-187, 67-69, 73; Pelkey Aff., ¶¶ 16-42; Pelky Reply Aff, ¶ 17). The full extent of the loss caused by these actions is incalculable, and therefore irreparable. DCL will suffer irreparable harm in the event that the TRO and preliminary injunction are not entered.

Additionally, Defendants each dispute that there is no public interest in enjoining their misconduct and aver that the equities tip in their favor. Courts within the Fourth Circuit recognize that "[p]ublic interest favors the protection of confidential business information and the enforcement of valid contracts." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488

(E.D. Va. 2021) (citations omitted). Courts in this District have further held that "[t]here is no doubt that it is in the public interest to protect trade secrets." *API Tech. Servs., LLC v. Francis*, No. 4:13cvl42, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (international quotation marks and citation omitted). Defendants cannot and do not rebut the above case law and there is no reasonable basis for Defendants to claim that the equities do not tip in the favor of DCL because of some vague allegations related to these three individuals' importance to national security.

Finally, not a single Defendant disputed DCL's position regarding a bond requirement. As a result, DCL rests on its moving papers in this regard and requests that no, or a very minimal cash or check bond, be required. (Ex. B at ¶ 65; Exs. D, E). Under the circumstances, the entry of a TRO and preliminary injunction is warranted.

## III.  DEFENDANTS FUNDAMENTALLY MISCHARACTERIZE THE SCOPE OF THE RELIEF SOUGHT.

### A.  Defendants Do Not Establish that the Proposed Restrictions Are Unreasonable.

Defendants each generally argue that "TROs 'are not to be granted automatically,'" and that the Fourth Circuit has cautioned that such discretion should be 'sparingly exercised," with Carpenter citing *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). (Carpenter Br. at 5). However, Carpenter conveniently failed to quote the remainder of the court's explanation of considering TRO applications, where the court stated that, however, "[w]here serious issues are before the court, it is a sound idea to maintain the status quo *ante litem*." *Id.* (quoting *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 194-95 (4th Cir. 1977)). Moreover, other courts in the Fourth Circuit have found that TROs and preliminary injunctions are warranted when a "[c]ompany faces severe monetary damage to its business . . . and substantial litigation in alternative forums to attempt to minimize the severe damage." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991) (citing *Hanky v. City of Richmond*, 532 F. Supp. 1298

(E.D. Va. 1982)). DCL is in this exact situation because it is already experiencing severe monetary damage due to Defendants' concerted conduct against it and is at risk of substantial litigation in multiple forums to enforce the restrictive covenants at issue, including Missimer's attempt to bifurcate these proceedings between state and federal court and Carpenter's attempt to do the same by seeking dismissal in favor of arbitration. (ECF Nos. 26, 35, 36). The status quo must be preserved and DCL is entitled to an injunction especially because of these gamesmanship tactics.

Astoundingly, Missimer states that "i[f] the Court grants [DCL] the relief it requests, [he] will be prevented from working in the defense contracting space in any capacity, even as a janitor." (Missimer Aff., ¶ 30). Specifically, as it relates to the non-compete restriction at issue, in its Order to Show Cause filed on April 6, 2023, DCL seeks to enjoin Missimer, Carpenter and Frank from "providing any services to any client or customer that Carpenter, Missimer, and Frank maintained any contact with while in the employ of DCL for a period of two (2) years, measured from the date of the Order." (ECF No. 21). This restriction is narrowly tailored to protect DCL's legitimate business interests, especially given Defendants' misconduct to date, the full extent of which is presently unknown without the benefit of full and fair discovery. To the extent that the Court exercises its discretion to tailor the TRO restrictions further, the Court may do so.

**B.**   **Defendants Fail to Rebut that Expedited Discovery is Appropriate.**

Carpenter and Missimer both identically assert that the "rocket docket" is sufficient to propel discovery and Haddock specifically disputes the extent of the expedited discovery requested. (Carpenter Br. at 16; Missimer Br. at 19; Haddock at 26-28). DCL still does not know the extent to which Defendants are using DCL's trade secret and proprietary information and causing clients and employees to disassociate with DCL. For example, Carpenter states that he "viewed [the Business Plan] only on DCL's laptop" and that he "never exported or printed the

file" and "did not retain a copy of it after [his] DCL employment ended." (Carpenter Decl., ¶¶ 40-42). This statement shows the vital importance of the Court granting expedited discovery because DCL must take Carpenter's testimony under oath regarding these issues as he could have taken a photograph of the Business Plan, written it down by hand, or otherwise transmitted the information in the file in other ways that he neglects to mention in his Declaration. (Pelkey Reply Aff., ¶ 27).

Without the expedited discovery requested, Defendants will continue to engage in the same underhanded and gamesmanship tactics that they have engaged in to date by evading compliance with their discovery obligations and causing undue delay, which will further lead to the destruction or loss of admissible evidence. To the extent that the Court takes objection with the depth of expedited discovery requested, the Court is certainly within its discretion to modify DCL's requests in terms of notice requirements and the number of demands permitted to be served. The most important aspect is that the discovery be performed without any further delay and with real life consequences for Defendants should they try to evade the Court's order. Accordingly, DCL's requested preliminary relief is reasonable and expedited discovery should be ordered to commence immediately.

## **CONCLUSION**

For the reasons set forth in its moving Memorandum of Law and those set forth in detail herein, the Court should grant DCL's Motion for a TRO, Preliminary Injunction, and Expedited Discovery in its entirety and grant such other and further relief as the Court deems just and proper.

Dated: April 19, 2023           Respectfully submitted,

_____
Steven J. Weber, VSB No. 35573
Gregory R. Begg, *Pro Hac Vice*
Lauren Rayner Davis, *Pro Hac Vice*
PECKAR & ABRAMSON, P.C.
*Attorneys for Plaintiff, Dark Circuit Labs, Inc.*
2055 L Street, NW, Suite 750
Washington, DC 20036
Telephone: 202.293.8815
Facsimile: 202.293.7992
SWeber@pecklaw.com
GBegg@pecklaw.com
LDavis@pecklaw.com