UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| **DARK CIRCUIT LABS, INC.**,<br><br>Plaintiff,<br><br>vs.<br><br>**BLACK SAILS SECURITY LLC**,<br>**JOHN CARPENTER**, **ERIC**<br>**MISSIMER, MICHAEL FRANK,** and<br>**KEITH HADDOCK**,<br><br>Defendants. | Civil Action No.: 1:23-cv-00326-LMB-LRV |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS**
**BLACK SAILS SECURITY LLC AND JOHN CARPENTER'S MOTION TO DISMISS**

The Court should deny Defendants Black Sails Security LLC ("BSS") and John Carpenter's Motion to Dismiss, pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(1) and (6), the First Amended Verified Complaint ("FAC") filed by Plaintiff Dark Circuit Labs, Inc. ("DCL"). This Court does not lack subject matter jurisdiction over DCL's claims and DCL has sufficiently stated a claim under which relief can be granted for all claims in the FAC.

## COUNTERSTATEMENT OF FACTUAL AND PROCEDURAL BACKGROUND

DCL is comprised of highly skilled software engineers, reverse engineers, and vulnerability researchers who possess appropriate U.S. Government security clearances to serve as a subcontractor to large organizations, such as DCL's client Lockheed Martin Corporation ("LMCO"), to provide cyber security personnel, tools, and expertise in support of United States' national security missions. (FAC, ¶ 6). Carpenter was a Senior Computer Network Operations ("CNO") Developer and Vice President ("VP") of DCL. (FAC, ¶ 57). Defendant Eric Missimer ("Missimer") was DCL's Chief Technology Officer and custodian of DCL's trade secrets on

DCL's corporate network and is also a DCL shareholder. (FAC, ¶¶ 42, 44, 48-49). Defendant Michael Frank ("Frank") was a Senior CNO Developer for DCL. (FAC, ¶¶ 57-59). Missimer, Carpenter, and Frank all have security clearances and are bound by restrictive covenants designed to protect DCL's confidential and proprietary trade secret information. (FAC, ¶¶ 6, 42, 59, 61). Defendant Keith Haddock ("Haddock" and together with BSS, Carpenter, Missimer, and Frank, collectively, "Defendants") is a Project Manager for LMCO. (FAC, ¶ 33).

On March 10, 2023, DCL initiated the instant action by way of Verified Complaint. (ECF No. 1). DCL filed the FAC on March 23, 2023.[1] (*See* FAC, ECF No. 3). In its FAC, DCL alleges that as early as November 2022, if not sooner, Carpenter, Missimer, and Frank conspired with Haddock to utilize, without restraint, DCL's trade secrets to convert DCL's contracts to an entity, BSS, owned and controlled by Defendants in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*, in violation of restrictive covenants applicable to Missimer, Carpenter, and Frank as shareholders, officers, and/or employees of DCL, and in violation of federal and state statutory and common law. (FAC, ¶¶ 127-132, 137, 142-146, 158-176; FAC, Exs. A, B, C). DCL alleges that Carpenter, Missimer, Frank, and Haddock were all discussing with each other the internal workings of DCL's business operations, including but not limited to DCL's client and employee relationships and business strategies. (FAC, ¶¶ 47, 58, 69-72, 82, 85-87, 103-112, 121, 125-126, 129-132, 136, 141-142). Instead of using such information for the betterment of DCL, Carpenter, singularly and in concert with the other Defendants, used intimate insider knowledge

---

[1] BSS and Carpenter aver that DCL should not be permitted to further amend its complaint based on "futility." (Dfs Br. at 28). Further amendments would not be futile because subsequent to filing the FAC, new facts emerged regarding Defendants' misconduct including via their own admissions that they are working for a direct competitor performing the same work under the same contract, (ECF Nos. 40-1, ¶ 51; 41-1, ¶ 47; 43-1, ¶ 37), and from DCL's employees who were solicited by Defendants as described in the Affidavit of Ronald Pelkey and Reply Affidavit of Ronald Pelkey, both submitted in support of DCL's preliminary injunction motion. (ECF Nos. 20-1, 45-1).

of DCL's trade secrets to solicit DCL's largest client, LMCO, and employees for Defendants' benefit which is against the law. (FAC, ¶¶ 137, 145-146, 152, 154, 157).

Without the benefit of discovery, the allegations known to DCL to date related to elements of BSS and Carpenter's plan with the other Defendants consist of the following unlawful actions:

(a) While employed as an officer of the company, Carpenter, in concert with the other Defendants, formed a new corporation, BSS, to compete directly with DCL, (FAC, ¶¶ 14-15, 68, 80, 88-89);

(b) Carpenter and Missimer directly admitted to DCL on January 31, 2023 that they formed BSS and did so to compete with DCL, (FAC, ¶¶ 82-83);

(c) When there was no legitimate business need to do so, having never downloaded any company documents before, Carpenter downloaded DCL's business plan and strategies, which constitutes trades secrets, two times a mere two weeks prior to his incorporation of BSS, and wrongfully disclosed DCL's trade secrets to Haddock, (FAC, ¶¶ 36, 60-61, 70-75, 172, 176, 180-187); and

(d) Carpenter, along with the other Defendants, solicited and/or induced at least one other employee, and likely all DCL employees working under DCL's contract with LMCO, to separate from DCL to join BSS, by, among other things, telling them that they should join BSS because DCL will be terminated from its contract with LMCO, (FAC, ¶¶ 82, 84-87).

DCL alleges that it has suffered harm, including loss of work, loss of employees, loss of access to all electronic data including business records and proprietary tools, and a diversion of DCL's work to its direct competitor, PLEX, utilizing DCL's trade secret information. (FAC, ¶¶ 2, 41, 142).

On April 14, 2023, BSS and Carpenter filed the instant Motion to Dismiss. (ECF Nos. 35-36). For the foregoing reasons and those set forth more fully below, the Motion should be denied.

## LEGAL ARGUMENT

## I.    LEGAL STANDARD FOR DENYING A MOTION TO DISMISS.

### A.    This Court Has Subject Matter Jurisdiction Under Rule 12(b)(1).

BSS and Carpenter first assert that this Court lacks subject matter jurisdiction because of an arbitration provision in Carpenter's Confidentiality Non-Competition and Protectable Rights

Agreement ("Restrictive Covenants Agreement"). "As a general principle, the subject-matter jurisdiction of a district court is a question of law for the court, not the jury, to decide." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged. *Kerns*, 585 F.3d at 193. On the other hand, when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts. *Id.* When jurisdictional facts are inextricably intertwined with those central to the merits, however, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous. *Bell v. Hood*, 327 U.S. 678, 682 (1946).

**B.      DCL Stated Claims Sufficient to Survive Dismissal Under Rule 12(b)(6).**

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). The FRCP require that the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To meet the Rule 8 standard and "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nadendla v. Wake*, 24 F.4th 299, 304-05 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). To contain sufficient factual matter to make a claim plausible, the factual content must "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678. When doing so, courts "accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018).

## II.     THIS COURT HAS SUBJECT MATTER JURISDICTION OVER DCL'S MONETARY CLAIMS AGAINST BSS AND CARPENTER BECAUSE ENFORCEMENT OF THE ARBITRATION PROVISION WOULD BE INEQUITABLE UNDER THE CIRCUMSTANCES.

BSS and Carpenter aver that this Court lacks subject matter jurisdiction over DCL's monetary claims against Carpenter as a result of the arbitration clause in the Restrictive Covenants Agreement and that the arbitration provision should be extended to non-signatory BSS. (Dfs Br. at 5, 7). While the Fourth Circuit is cognizant of the United States Supreme Court's "healthy regard for the federal policy favoring arbitration," it is not without limits. *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 92 (4th Cir. 1996) (quoting *Moses H Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24 (1983)). The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added).

Here, there are grounds at equity for not enforcing the arbitration provision of the Restrictive Covenants Agreement. BSS and Carpenter first contend that "DCL agreed that it would not bring [monetary] claims in court: '***Neither Employee nor the Company will be able to sue in court in connection with monetary claims related to this agreement***,'" quoting only part of one relevant contractual provision. (Dfs Br. at 5) (emphasis in original). Instead of this singular cherry-picked sentence, there are two operative contractual provisions to examine: Sections 8 and 12. Pursuant to Section 8, DCL "shall be entitled to seek an injunction (temporary, preliminary and/or

permanent) to enforce th[e] Restrictive Covenants] Agreement" when alleging that Carpenter engaged in "any actual or threatened breach of any of the covenants contained in th[e] Restrictive Covenants] Agreement." (FAC, Ex. B at 6). Section 12 carves out from the arbitration clause any claims relating to seeking enforcement of the restrictive covenants. (FAC, Ex. B at 8). Section 12 expressly states that "[b]oth [Carpenter] and [DCL] give up any right to resolve a controversy through any other means, except for claims for injunctive relief relating to this Agreement and/or Employee's employment such as requests for . . . permanent injunctions which shall first be heard in the state and federal courts located in the State of Virginia." (FAC, Ex. B at 8). In Count 12 of the FAC, DCL seeks permanent injunctive relief. (FAC, ¶ 342-347). Because DCL has pled a claim for a permanent injunction, by the express terms of the Restrictive Covenants Agreement, the parties are presently in the mutually selected forum. (FAC, Ex. B at 8).

In making his motion, Carpenter is asking this Court to bifurcate DCL's claims against him in Counts 1 to 11 and 13 from its claim in Count 12 and then further bifurcate Carpenter from the claims against the other Defendants by having only his claims heard in arbitration. DCL's claims do not only involve proving what Carpenter did, they also involve proving what each of the other Defendants did in furtherance of their conspiracy to steal DCL's business for themselves. If Counts 1 to 11 and 13 against Carpenter are dismissed for lack of subject matter jurisdiction, the Court would still retain jurisdiction of DCL's claim against him in Count 12 for permanent injunctive relief. Entitlement to injunctive relief can only be shown through proving DCL's claims in Counts 1 to 11 and 13 which involve facts pertaining to not only Carpenter, but all Defendants. To prove its claims at arbitration, DCL would be required to issue third-party subpoenas on BSS, Missimer, Frank, and Haddock as their documents and testimony are directly relevant to DCL's claims against Carpenter.

6

As noted by the Fourth Circuit, a bifurcated matter presents opportunities for overlap in facts, duplication in effort, and conflicting results, all of which will result in inequitable circumstances for the parties. *Moses v. CashCall, Inc.*, 781 F.3d 63, 71 (4th Cir. 2015). The *Moses* court noted that bifurcation "could yield different results and subject parties to dichotomous obligations" and pose unnecessary "additional litigation costs inherent in being forced to litigate claims before two separate tribunals." *Id.* at 76. Thus, for purposes of judicial efficiency and to prevent inconsistent judgments, all claims against the conspiring Defendants should be decided in a single forum without unnecessary bifurcation which will only serve to cause undue delay and require unnecessary duplicative efforts of the arbitrator, Court, and parties. Furthermore, it is well established that a district court, in appropriate circumstances, may stay an action pending arbitration and that there is no requirement that "dismissal must follow referral to arbitration." *RoadTechs, Inc. v. MJ Highway Technology, Ltd.*, 79 F. Supp. 2d 637, 641 (E.D. Va. 2000). Dismissal would not be proper given the ample jurisprudence that a stay is an appropriate measure should the Court refer to arbitration, which incidentally, Carpenter is not even requesting.

Moreover, Carpenter and Missimer engaged in discussions with DCL, by and through their prior counsel, to resolve these claims and only now is Carpenter seeking to enforce the arbitration provision. The court's examination of the factual circumstances in *Maglula, LTD. v. Amazon.com, Inc.*, No. 1:19-cv-1570, 2020 WL 9536937, at *1 (E.D. Va. 2020) is instructive as to these issues. In *Maglula*, the court explained that while the plaintiff agreed to the agreement containing the arbitration clause, the plaintiff took the position that "th[e] suit does not fall within its scope, and its arbitration clause cannot control." *Id.* at *3. The court further found that the "[d]efendants did not conduct themselves as if the [arbitration clause] applied to [the] [p]laintiff's claims in the time lead-up to the litigation." *Id.* Indeed, the court determined that "[t]he effort to bind [the plaintiff] to the [agreement containing the arbitration clause] . . . came after [the defendant's] conduct steered

[the plaintiff] in a different direction." *Id.* As a result, the court found that the arbitration clause sought to be applied should not be enforced against the plaintiff. *See id.*

The same result should be reached here. Similar to the defendants' conduct in *Maglula*, Carpenter did not invoke the arbitration provision when he was notified by letter as far back as January 27, 2023 that he was in breach of his contractual, statutory, and common law obligations to DCL. (FAC, ¶¶ 75-78). Instead, Carpenter "steered [DCL] in a different direction," *see id.,* and at no point did Carpenter or his counsel ever invoke the arbitration provision once he was on notice of DCL's dispute with him. Thus, Carpenter "did not conduct [himself] as if the [arbitration clause] applied to [DCL]'s claims in the time lead[ing] up to the litigation." *See id.* (FAC, ¶¶ 133-135).

Accordingly, this Court should find that there exist multiple equitable grounds under the FAA to not enforce the arbitration provision for DCL's claims against Carpenter or BSS. Moreover, there is no jurisprudential ground for concluding that the Court lacks subject matter jurisdiction to stay this action pending arbitration and there certainly is no practical or logical reason to dismiss the action against Carpenter based on the arbitration clause. Therefore, BSS and Carpenter's argument to bifurcate this proceeding should be dismissed out of hand.

## III.  DCL SUFFICIENTLY STATES CLAIMS AGAINST BSS AND CARPENTER UPON WHICH RELIEF CAN BE GRANTED.

### A.  DCL Adequately Alleges that BSS and Carpenter Misappropriated Trade Secrets under Counts 1 and 2.

Contrary to BSS and Carpenter's misguided arguments, DCL states a claim that Defendants misappropriated DCL's trade secrets in violation of the DTSA, 18 U.S.C. §§ 1831-39, and the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336, *et seq*. Among other remedies, the DTSA provides injunctive and monetary relief for the misappropriation of trade secrets in civil actions. 18 U.S.C. § 1836 (b)(1). Under the DTSA, a "trade secret" is defined as:

All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing. 18 U.S.C. § 1839(3).

The DTSA protects against "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A).

The VUSTA's misappropriation elements are similar to that of the DTSA and require a plaintiff to prove: (1) the existence of a "trade secret"; and (2) the "misappropriation" of that trade secret by the defendant. *Trident Prods.& Servs., LLC v. Canadian Soiless Wholesale, Ltd*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012), *aff'd per curiam*, 505 F. App'x 242 (4th Cir. 2013). First, an alleged trade secret must "meet all the criteria listed in the statute: (1) independent economic value; (2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy." *Id.*; *see also* Va. Code § 59.1-336; *see Audio-Video Group, LLC v. Green*, No. 1:14-cv-169, 2014 WL 793535, at *4-5 (E.D. Va. Feb. 26, 2014) (explaining that the alleged misappropriation of customer information was likely to violate the VUSTA). Second, a plaintiff must plead that the defendant: (1) acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent); and (2) knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff. *Trident*, 859 F. Supp. 2d at 780.

Particularly relevant to this matter, in *Variable Annuity Life Ins. Co. v. Coreth*, the court held that the plaintiff demonstrated that its client information had independent economic value by virtue of its secrecy because a competitor armed with the plaintiff's confidential information, such as maturity dates, account balances, and the like, had the ability to target the plaintiff's most valuable clients, and that the reasonable efforts deployed to maintain the secrecy of the client information through several layers of servers and passwords, limited its availability to a need-to-

9

know basis, and further restricted its access by requiring advisors to execute confidentiality agreements. 535 F. Supp. 3d 488, 514 (E.D. Va. 2021). Moreover, "'[w]here [a] defendant did not utilize 'improper means to acquire a trade secret,' misappropriation can still exist if the defendant disclosed or used that secret." *API Tech. Servs., LLC v. Francis*, No. 4:13cvl42, 2013 WL 12131381, at \*2 (E.D. Va. Dec. 4, 2013) (quoting *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 417 (E.D. Va. 2004)).

Here, under the first element of a misappropriation claim, similar to *Coreth*, DCL alleges that the information concerning DCL's confidential and proprietary information is not generally known outside of DCL's business. (FAC, ¶¶ 215-217). Specifically, DCL alleges that it had and has valuable trade secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the U.S. Government, including but not limited to hypervisor development, reserve engineering, and CNO tool development. (FAC, ¶¶ 215, 234, 249, 257). DCL also specifically identifies myriad reasonable measures that it has taken to keep such information secret. (FAC, ¶¶ 219-220, 238, 260). Similar to the plaintiff in *Coreth*, DCL further alleges that officers and employees, like Carpenter, with access to DCL's information are required to comply with the aforementioned security measures and execute restrictive covenant agreements which include provisions that require such employees to maintain the confidentiality of DCL's proprietary information, including client lists and DCL's business plan and strategies. (FAC, ¶¶ 42, 52, 59, 61-62).

By way of the disclosures to DCL and the reasonable measures in place to protect DCL's trade secret information, substantial allegations exist in support of a claim of misappropriation of trade secrets based upon both BSS and Carpenter's use of DCL's trade secrets to solicit clients, such as LMCO, in an effort to induce them to move their business away from DCL. (FAC, ¶¶ 133, 136, 141, 221). One such example of Defendants' misappropriation occurred just prior to

Carpenter's formation of BSS. Based on DCL's internal investigation to date, which remains ongoing, on or about November 10, 2022, Carpenter accessed and downloaded DCL's business development plans and strategies ("Business Plan"), which includes but is not limited to DCL's list of prospective and existing customers. (FAC, ¶ 181). On or about November 15, 2022, after updates were made to the Business Plan by DCL's senior leadership, Carpenter downloaded this same document again. (FAC, ¶ 182). There was no business necessity for Carpenter to access and download the Business Plan on either November 10 or 15, 2023. (FAC, ¶ 183). There is no reason for any DCL employee to download the Business Plan as it is a working document with all edits being made live via a document hosting service. (FAC, ¶ 184).

In fact, DCL's file sharing program user logs reveal that while Carpenter frequently viewed or edited other documents on DCL's corporate networks, the Business Plan was the only document that he ever downloaded. (FAC, ¶ 185). Carpenter never uploaded the document with any changes, but instead simply downloaded it, on information and belief, to utilize DCL's trades secrets for Defendants' competitive venture, BSS, which was incorporated approximately two weeks after he downloaded the Business Plan for a second time. (FAC, ¶ 186). Defendants have already misappropriated DCL's customer list by way of soliciting Haddock of LMCO for a subcontract on the Task Order related to the IDIQ Contract. (FAC, ¶ 187).

BSS and Carpenter attempt to convince the Court that the information they stole with the other Defendants is not protectable under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(A)(i). DCL is not required, for purposes of pleading threatened or actual misappropriation under the DTSA, to identify a "secret sauce" type recipe, such as source code or a specific product, that BSS and Carpenter are incorrectly intimating is required in order for the DTSA to have teeth. *See Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853-54 (E.D. Va. 2018) (finding that the plaintiff "sufficiently ple[d] that it derived independent economic value from the

documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic investment—the disclosure of which could create an unfair competitive advantage.").

Without a doubt, DCL sufficiently pleads Defendants, singularly and in concert with one another, misappropriated its trade secrets under the "DTSA's *broad definition* of trade secrets." *Id.* at 853 (emphasis added); *see RLM Communications, Inc. v. Tuschen*, 831 F.3d 190, 202 n.4 (4th Cir. 2016) (finding that misappropriation existed when "the employer put forth evidence that the employee "accessed [the employer's] 'game plan' and other confidential documents from [the employer's] network with unusual frequency" just prior to a meeting with a competitor") (citation and internal quotation marks omitted) (alterations in original). For purposes of satisfying the FRCP 12(b)(6) pleading standard, a "reasonable inference" can be drawn that Carpenter was using and disclosing DCL's trade secrets for BSS based on his unusual course of conduct and timing in twice downloading DCL's Business Plan a mere two weeks before he incorporated BSS. (FAC, ¶¶ 181-185). It is indisputable that DCL's Business Plan constitutes trade secret information under the DTSA's broad definition because DCL "derive[s] independent economic value from the documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic investment—the disclosure of which could create an unfair competitive advantage." *Space Systems*, 306 F. Supp. 3d at 853-54. As a result, DCL's trade secrets misappropriation claims under federal and state law under Counts 1 and 2 of the FAC are sufficiently pled and should not be dismissed.

**B.    DCL States a Claim for Violation of the VUCITA in Count 3.**

BSS and Carpenter vaguely aver that DCL's allegations do not have any relation to the VUCITA. (Dfs Br. at 15). The VUCITA "applies to computer information transactions." Va. Code § 59.1-501.3. A computer information transaction is defined as "an agreement or the performance

of it to create, modify, transfer, or license computer information or informational rights in computer information." Va. Code § 59.1-501.2(11). Computer information transactions under the VUCITA can include the digital transfer of informational rights, which includes trade secrets. Va. Code § 59.1-501.2(38). Specifically, the VUCITA defines "[i]nformational rights" to include all rights in information created under laws governing "all rights in information created under laws governing . . . *trade secrets* . . . or any other law that gives a person, independently of contract, a right to control or preclude another person's use of or access to the information on the basis of the rights holder's interest in the information." *Id.* (emphasis added). It is in the Court's sole discretion to determine whether a party asserts a viable claim under the VUCITA. Va. Code § 59.1-501.17.

Here, DCL alleges that it "had and has valuable trade secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development." (FAC, ¶ 249). In seeking to dismiss this cause of action, BSS and Carpenter assert that the VUCITA "does not apply to a contract of employment of an individual." (Dfs Br. at 15). However, DCL alleges that Carpenter is bound by a confidentiality provision to keep DCL's trade secrets confidential – this non-disclosure obligation survives his employment, and thus is not contingent upon his employment. *See* Va. Code § 59.1-506.16(b) (describing eleven circumstances that survive termination of a contract under the VUCITA); Va. Code § 59.1-506.16(b)(2) ("[A]n obligation of confidentiality, nondisclosure, or noncompetition."); Va. Code § 59.1-506.16(b)(4) ("[A]n obligation to deliver, or dispose of information, materials, documentation, copies, records, or the like to the other party, an obligation to destroy copies"); Va. Code § 59.1-506.16(b)(10) ("[A]n obligation to provide an accounting and make any payment due under the accounting.").

DCL further alleges that, "[b]y and through the use of computer information transactions, Carpenter and Missimer and the other Defendants, singularly and in concert, purposefully or knowingly accessed, took, and destroyed Trade Secrets contained in data and/or databases and otherwise disseminated or utilized Trade Secrets belonging to DCL for their own benefit to the detriment of DCL." (FAC, ¶ 252). Thus, DCL has properly pled that it and Carpenter entered into the non-disclosure clause of the Restrictive Covenants Agreement, which is enforceable separate and apart from Carpenter's employment, and that such agreement constitutes "an agreement or the performance of it to create, modify, transfer, or license computer information or informational rights [such as DCL's trade secrets] in computer information," which was breached. *See* Va. Code § 59.1-501.2(11). These allegations are sufficient to survive a motion to dismiss that BSS and Carpenter violated DCL's informational rights under the VUCITA, in the very least via DCL's allegation regarding Carpenter's computer transaction in downloading DCL's Business Plan for Defendants' benefit. (FAC, ¶¶ 180-186). DCL's cause of action under the VUCITA should not be subject to pre-answer dismissal.

**C.    DCL States a Claim for Common Law Trade Secrets Misappropriation in Count 4.**

BSS and Carpenter argue that the VUTSA preempts DCL's common law misappropriation of trade secret claim. (Dfs Br. at 15). However, the VUTSA expressly states that it "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." *Babcock & Wilcox Co. v. Areva NP, Inc.,* 292 Va. 165, 205 n.51, 788 S.E.2d 237, 259 (2016). "The VUTSA preemption provision is 'intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret.'" *Trident Prod. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.,* 859 F. Supp. 2d 771, 782 (E.D. Va. 2012), *aff'd*, 505 F. App'x 242 (4th Cir. 2013) (quoting *Smithfield Ham & Products Co., Inc. v.*

*Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995)). It should be noted that the *Babcock* court did not hold that any statute was preempted, but instead merely quoted a prefatory note to the UTSA and quoted a section of the VUTSA. *See Babcock*, 292 Va. at 205.

Rather, whether claims are preempted by the VUTSA is a question of fact and law, and at this stage of the proceedings, Carpenter does not and cannot demonstrate how DCL's misappropriation claim conflicts with the VUTSA. *See Rogers Elec. Of Va., Ltd. v. Sims*, 93 Va. Cir. 484, 2015 WL 13589667, at \*2 (Va. Cir. Ct. Feb. 13, 2015); *Trident*, 859 F. Supp. 2d at 778 ("The determination of whether a trade secret exists is generally a question of fact to be determined 'from the greater weight of the evidence.'"). "The case law is clear that just about anything can constitute a trade secret under the right set of facts." *Id*. (quoting *MicroStrategy*, 331 F. Supp. 2d at 416). Unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss DCL's misappropriation under common law. *E.I. DuPont de Nemours and Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 451 (E.D. Va. 2009). "Courts hesitate to assign the label of 'VUTSA trade secret' to proprietary information at the pleadings stage for fear of depriving parties the opportunity to conduct fact-finding on the issue." *Anderson v. Fluor Intercontinental, Inc.,* No. 1:19-CV-0289, 2021 WL 837335, at \*17 (E.D. Va. Jan. 4, 2021).

In *AWP, Inc. v. Commonwealth Excavating, Inc.,* the court held that the defendant's preemption argument in support of a motion to dismiss was premature. No. 5:13CV031, 2013 WL 3830500, at \*7 (W.D. Va. July 24, 2013) (citing *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., Inc.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002) (concluding that "unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA.")). The court reasoned that "although [the plaintiff] ha[d] sufficiently alleged the existence of a trade secret, it ha[d] not yet proven its entitlement to relief under the VUTSA." *Id.; see also Bonumose Biochem, LLC v. Yi-*

*Heng Zhang*, No. 3:17-cv-33, 2018 WL 10069553, at *15 (W.D. Va. May 21, 2018) (denying a motion to dismiss a civil conspiracy claim "arguably [] premised solely on the misappropriation of confidential, proprietary information" because the determination of whether such information qualified as a trade secret presented a question of fact that the parties disputed).

While BSS and Carpenter may disagree and challenge the trade secret status of DCL's confidential and proprietary information, the motion to dismiss stage is not the proper time to make this argument. As in *AWP*, it is unknown whether DCL will be successful on all the elements of its VUTSA claim without the benefit of discovery. Therefore, dismissal of DCL's misappropriation of trade secrets claim under common law would be premature.

**D.    DCL States a Claim for Breach of Contract against Carpenter, Aiding and Abetting Breach of Contract against BSS and Carpenter, and Tortious Inference with Contractual Relations against BSS and Carpenter in Counts 5, 7, and 10.**

As it relates to its contractual claims, DCL alleges that, on November 3, 2021, Missimer entered into a DCL Shareholders Agreement ("Shareholders Agreement") for purposes of setting forth the shareholders' respective rights, duties, and obligations as owners of DCL, including but not limited to restrictive covenants and non-disclosure obligations by which Missimer agreed to abide. (FAC, ¶ 42; FAC, Ex. A). DCL further alleges that, as a Senior CNO Developer and VP of DCL, Carpenter entered into the Restrictive Covenants Agreement on December 20, 2021 as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit. (FAC, ¶ 59; FAC, Ex. B). Finally, DCL alleges that Frank executed an identical Restrictive Covenants Agreement to that of Carpenter on July 30, 2022. (FAC, ¶ 61; FAC, Ex. C). In seeking dismissal of DCL's various contractual claims, BSS and Carpenter assert that the restrictive covenants are unenforceable. (Dfs Br. at 17). They are mistaken.

There are two separate written agreements at issue and both must be examined as it relates to BSS and Carpenter's arguments for dismissal of DCL's contractually related claims because

DCL alleges that Carpenter not only breached his own contract but that both BSS and Carpenter aided and abetted Missimer and Frank's breaches of contract and tortiously interfered with Missimer and Frank's contracts. (FAC, ¶¶ 42, 59, 61). While Carpenter and Frank's respective Restrictive Covenants Agreements are governed under Virginia law, the Shareholders Agreement by which Missimer is bound for purposes of restrictive covenants is governed by Delaware law with Virginia courts selected as the venue for disputes. (*Compare* FAC Exs. B and C *with* Ex. A).

With regard to Carpenter and Frank's restrictive covenants, for a cognizable breach of contract claim under Virginia law, a plaintiff must plead that the: (1) defendant owes a legally enforceable obligation to the plaintiff; (2) defendant has breached that obligation; and (3) plaintiff has suffered damages as a result of the breach. *Design & Prod., Inc. v. Am. Exhibitions, Inc.,* 820 F. Supp. 2d 727, 736 (E.D. Va. 2011) (citing *Filak v. George,* 267 Va. 612, 619, 594 S.E.2d 610, 614 (Va. 2004)). As it relates to Missimer's restrictive covenants, the elements of a breach of contract claim are substantially similar under Delaware law to that of Virginia law. To plead a claim for breach of contract in Delaware, the plaintiff must allege that: (1) a contract existed between the parties; (2) the defendant breached his obligation imposed by the contract, and (3) the plaintiff suffered damages as a result of the defendant's breach. *VLIW Technology, LLC v. Hewlett–Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).

In this case, DCL has adequately pled its breach of contract claim against Carpenter, the aiding and abetting of breaches of Missimer and Frank's contracts by BSS and Carpenter, and tortious inference with Missimer and Frank's contracts by BSS and Carpenter. (FAC, ¶¶ 327-335). Under the first element, DCL has alleged that respective contracts exist between DCL and Carpenter, Missimer, and Frank. (FAC, ¶¶ 42, 59, 61; Exs. C, D, E). DCL alleges that Carpenter, Missimer, and Frank were provided with access to proprietary data, nonpublic information, trade secret, and confidential and proprietary information and in exchange Carpenter, Missimer, and

Frank agreed to maintain confidentiality and not misappropriate DCL's trade secrets and proprietary information and not solicit DCL's existing or prospective clients or employees. (FAC, ¶¶ 13, 62). *See also Davis Mem'l Goodwill Indus. v. Garada,* No. 17-CV-347, 2017 WL 11613374, at *3 (E.D. Va. Apr. 17, 2017) (finding that the defendant's mere execution of the contract was sufficient to meet the first element of a breach of contract claim). Thus, Carpenter, Missimer, and Frank's execution of their respective employment agreements, as evidenced by the three executed contracts annexed to the FAC, (Exs. C, D, E), shows that DCL adequately pled under the first element that Carpenter, Missimer, and Frank "owe[d] a legally enforceable obligation to" DCL with no further examination required by this Court at the pre-answer motion to dismiss stage when the allegations in the complaint must be viewed as true in favor of DCL as the non-moving party. *See Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 n.4 (4th Cir. 1993) ("In light of the standard of review, we traditionally have viewed even poorly drafted complaints in a light most favorable to the plaintiff.").

However, to the extent that BSS and Carpenter's arguments regarding reasonableness are considered as to whether DCL met the first element, this Court should find that the restrictive covenants are reasonable because they are not greater than necessary to protect DCL's legitimate business interests. In Virginia, restrictive covenants are examined with regard to the legitimate interests of the employer, the employee, and the public at large. *Gray*, 2010 WL 4646039, at *2. "Such legitimate business interests might include trade secrets, other confidential information, or . . . the good will the employer has acquired through dealings with his customers." *Id.* (internal quotation marks and citation omitted). A plaintiff must establish that the restraint (1) is no greater than necessary to protect a legitimate business interest, (2) is not unduly harsh or oppressive, and (3) is reasonable in light of public policy. *See Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 561 S.E.2d 694, 695 (Va. 2002).

In *Coreth*, the plaintiff, a life insurance company, pled alternative theories, as here, that the defendants, former financial advisors, misappropriated trade secrets and breached their contracts under federal and state law. 535 F. Supp. 3d at 493-94. The *Coreth* defendants maintained that the plaintiff's claims were "based solely on hearsay, couched in conclusory terms, pure speculation, and erroneous assertions of fact." *Id*. at 506. Unpersuaded by the defendants' arguments, the *Coreth* court held that the defendants were bound to an enforceable agreement where the plaintiff had agreed to grant the defendants access to its confidential and proprietary information and the use of company property in exchange for the defendants not to misappropriate, acquire, use, or disclose customer names, contact information, and account balances for any purposes other than in furtherance of their duties undertaken on behalf of the client. *Id*. at 505-08. The *Coreth* court concluded that the plaintiff adequately alleged that the defendants breached their restrictive covenants when it alleged that they "jotted down the names, addresses, telephone number and/or email addresses and, in some instances approximated account values, of clients" and caused clients to end or alter their relations because of their contact with the defendants. *Id*. at 505-08.

Likewise, Delaware courts "carefully review" noncompete and nonsolicit agreements to ensure that they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities." *Ainslie v. Cantor Fitzgerald, L.P.*, No. 9436-VCZ, 2023 WL 106924, at *8 (Del. Ch. Jan. 4, 2023) (quoting *FP UC Hldgs., LLC v. Hamilton*, No. 9436-VCZ, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020)). When employees have access to confidential information, such access provides employers with a legitimate business interest in a restrictive covenant and renders covenants not to compete more reasonable. *See Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 739 (4th Cir. 1993); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 553, 290 S.E.2d 882, 885 (1982) (finding covenant enforceable when an employee had access

to confidential information and such knowledge "qualified him to be a formidable competitor" to his previous employer).

As it relates to duration, Carpenter, Missimer, and Frank are prohibited for one year from their termination dates from competing with DCL with Carpenter and Frank being restrained for one year and Missimer for two years from solicitation of DCL's clients, candidates, and employees. (FAC, ¶¶ 53-54, 63-64). Courts in this District have found these temporal limitations to be reasonable under similar circumstances. *See Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 789 (E.D. Va. 2018) (holding that "a one-year duration for the non-solicitation and non-compete agreement is reasonable because plaintiff invests significant resources in its legal services clients and built relationships with many of them through [the] defendant's work on behalf of [the] plaintiff"); *Hair Club for Men, LLC v. Ehson*, No. 1:16-cv-236, 2016 WL 4577019, at *5-6 (E.D. Va. Aug. 31 2016) (finding that two years was reasonable). Indeed, the Supreme Court of Virginia has deemed reasonable even longer restricted periods. *See Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 389 S.E.2d 467, 470 (1990) (upholding a three year non-compete); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 290 S.E.2d 882, 885 (1982) (upholding that a three-year restriction and that the company had a legitimate business interest in preventing the use of "lists of customers, lists of suppliers, detailed knowledge of overhead factors, pricing policies, and bidding techniques" by an employee-competitor). Thus, the one- and two-year restrictions at issue in this case are reasonable in duration.

BSS and Carpenter also eagerly rush to point out that there is "no geographic scope" in the restrictive covenants in a wholly misguided attempt to destroy their enforceability. (Dfs Br. at 20). In making their argument, however, BSS and Carpenter critically omit that "[t]he considerations of function, geographic scope, and duration are not separate and distinct issues: a single consideration that is unreasonable may be reasonable as construed in light of the other two."

*Cantol, Inc. v. McDaniel*, No. 2:06CV86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006). Thus, as long as the function and duration are reasonably construed, the fact that there is no narrowed geographic limitation does not necessarily render a restrictive covenant unenforceable. *See Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011) (holding that "[a]lthough the lack of a geographical limitation favors defendant, it is outweighed by the nature of the businesses at issue, [the former employer]'s *legitimate interest in protecting itself from direct competition by a former employee in a niche market*, and the limitations within the Agreement, particularly the one-year duration of the non-compete and non-solicitation provisions. For these reasons, the non-compete provision is *not invalid*.") (emphasis added).

In this case, while the restrictions are not limited to a certain geographic area, DCL's operations are applicable to the entirety of the United States and beyond pursuant to its work under U.S. government contracts. (FAC, ¶¶ 1, 83, 215). The unpublished federal case from 2006 that BSS and Carpenter cite stating that "[t]he Supreme Court of Virginia has never upheld a restrictive covenant [without a defined geographic area]," (Dfs Br. at 21), is no longer applicable because as recently as 2012, the Supreme Court of Virginia has upheld non-competition and non-solicitation provisions that cover past clients with whom the employee had direct contact even in the absence of a geographical limit. *See Preferred Systems Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 394, 732 S.E.2d 676 (Va. 2012) (holding that "[t]he lack of a specific geographic limitation is not fatal to the covenant"). As the court found in *Cantol* and *Brainware*, there is no geographic restriction that could have been reasonably imposed to protect DCL's "legitimate interest in protecting itself from direct competition by a former employee[s, Carpenter, Missimer, and Frank,] in a niche market" of offensive cybersecurity contracting in support of the U.S. Government's national security missions. *Brainware*, 808 F. Supp. 2d at 827. (FAC, ¶¶ 1, 83, 215). Similar to the

*Brainware* court's finding, the restrictive covenants at issue should not be struck down for lack of a geographical limitation because they are reasonable in function and duration.

BSS and Carpenter further argue that because such restrictive covenants are "disfavored restraints on trade," the employer bears the burden of proof and any ambiguities in the contract will be construed in favor of the employee. (Dfs Br. at 17-18). However, they fail to acknowledge the Supreme Court of Virginia's holding in *Omniplex World Services Corp. v. U.S. Investigations Services, Inc.*, 270 Va. 246, 249, 618 S.E.2d 340 (2005), that "[e]ach non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Id.* The *Omniplex* Court continues that "[t]hese standards have been developed over the years to strike a balance between an employee's right to secure gainful employment and the employer's legitimate interest in protection from competition by a former employee based on the employee's ability to use information or other elements associated with the employee's former employment." *Id.* at 249.

Here, when evaluating each restrictive covenant at issue on its own merits, the Court should find that the provisions, although broad, are enforceable due to the unique circumstances at issue. Namely, DCL is a provider of highly specialized services for which there is a limited pool of government-cleared talent. (FAC ¶¶ 6, 10, 41). This fact makes DCL's employees its most valuable asset in which it invests tremendous efforts and resources to recruit, train, and retain. Put simply, DCL alleges that Defendants used their insider knowledge regarding DCL to try to steal DCL's most valuable asset by repeatedly threatening DCL's employees that they would no longer be employed by DCL because DCL was losing its LMCO subcontract. (FAC ¶ 145-146). Carpenter, Missimer, and Frank can still ply their trades as developers and engineers as long as they are not working with existing or prospective clients of DCL or working for competitors who contract with DCL's existing or prospective clients. There is likely not a more blatant need for

broad non-competition and non-solicitation provisions such as the ones at issue to be enforced when "balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Omniplex*, 618 S.E.2d at 249.

Under the second element of the breach of contract pleading standard, based on DCL's allegations related to Defendants' own disclosures to DCL's senior management and allegations regarding numerous emails, text messages, and a voicemail evidencing their intent and actions, there can be no reasonable dispute that DCL has sufficiently pled that Defendants misappropriated DCL's trade secrets and proprietary information in their efforts to solicit DCL's customers for purposes of a direct competitor, BSS, in direct breach of their contractual obligations to DCL. (FAC, ¶¶ 73-74, 79-81, 102-112, 133, 141, 169-171, 180-187). As it relates to the third element, DCL alleges that at present, its damages as a result of Defendants' conduct include but are not limited to: "(1) lost revenue to DCL under the IDIQ Contract and its reasonable expectation of an extension of that Contract; (2) loss of employees and expenses associated with recruiting and retaining employees with appropriate skills and security clearances; (3) irreparable harm to its business relationship and reputation with existing and prospective clients including LMCO and others; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated Trade Secrets; and (6) loss of employees and damages related to obtaining highly skilled and properly cleared employees and personnel to perform work on DCL contracts." (FAC, ¶ 41). As such, DCL has stated its breach of contract, aiding and abetting of breach of contract, and tortious interference with contractual relations claims sufficiently to survive dismissal.

**E.    DCL Has Stated a Claim that Carpenter Breached and Aided and Abetted Breaches of Fiduciary Duty and Duty of Loyalty in Counts 6 and 7.**

BSS and Carpenter contend that "DCL has not sufficiently alleged what interests were harmed or what actions Carpenter has taken that supposedly injured those interests" as it relates to

Carpenter's breach of fiduciary duty. (Dfs Br. at 23). Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach of fiduciary duty resulted in damages. *Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020) (citing *Carstensen v. Chrisland Corp.*, 247 Va. 433, 442 S.E.2d 660, 666 (1994)). A fiduciary duty exists when special confidence has been imposed on an individual who is, as a result, legally obligated to act in the best interest of the party that imposes the special confidence. *Allen Realty Corp. v. Hobert*, 227 Va. 441, 318 S.E.2d 592, 595 (1985). As it relates to the duty of loyalty, "[w]hile free competition in the marketplace is to be encouraged, it is also critically important that employees take seriously the duty of loyalty they owe their employers." *Nat'l Legal Research Grp., Inc. v. Lathan*, 42 F.3d 1386, 1386 1994 WL 667058, at *2 (4th Cir. 1994); *see Marsteller v. ECS Fed., Inc.*, No. 1:13-cv-593, 2013 WL 4781786, at *9 (E.D. Va. Sept. 5, 2013) ("[T]he Supreme Court of Virginia noted, 'liability for breach of fiduciary duty has been imposed when the employees or directors misappropriated trade secrets, misused confidential information and solicited an employer's clients or other employees prior to termination.") (quoting *Feddeman & Co v. Langan Associates*, 260 Va. 35, 42, 530 S.E.2d 668 (Va. 2000)).[2]

---

[2] Although BSS and Carpenter do not address the aiding and abetting a breach of fiduciary duty claim against them and thus concede that such claims are viable to survive dismissal, courts in this District have explained that "[t]he confusion surrounding whether Virginia recognizes a cause of action for aiding and abetting a breach of fiduciary duty appears to stem from the Supreme Court of Virginia's decision in *Patteson v. Horsely*, 70 Va. 263 (Va. 1877)." *Keil v. Seth Corporation*, No. 3:21cv153, 2021 WL 5088242, *12 (E.D. Va. Nov. 2, 2021). The *Keil* court explained that "[s]ince *Patteson*, the Supreme Court of Virginia has neither expressly recognized nor expressly rejected aiding and abetting a breach of fiduciary action as a separate cause of action" and that it has "[i]nstead . . . assumed the existence of the cause of action to evaluate whether a plaintiff had properly pled a claim." *Id.* (citing *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 604 S.E.2d 403, 411-12 (2004)); *see also AvalonBay Cmtys., Inc. v. Willden*, No. 1:08-cv-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009) (holding a defendant liable for aiding and abetting his brother's breach of fiduciary duty when he processed fraudulent invoices that harmed his brother's

Here, it is indisputable that Missimer, as a shareholder, and Carpenter, as an officer, owed a fiduciary duty and duty of loyalty to DCL. Additionally, as an employee of DCL, it cannot be disputed that Frank owed a duty to loyalty to DCL. In fact, BSS and Carpenter concede that "[a]n employee, including an employee at-will, owes a fiduciary duty of loyalty to his employer during his employment." (Dfs Br. at 23). Thus, the first element is met. As for the second element, for the same reasons as discussed above, Carpenter breached his duties to DCL when he engaged in the competitive activities that serve as the basis of DCL's FAC, including incorporating BSS for purposes of usurping the LMCO contract *during* his employment. (FAC, ¶¶ 14-15, 68, 80, 88-89).

BSS and Carpenter argue that "forming a company or making preliminary plans to compete is not actionable," citing *Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.*, 260 Va. 35, S.E.2d 668 (2000), in support of this proposition. (Dfs Br. at 23-24). However, *Feddeman* states no such thing, with the court in *Feddeman* instead finding that "[t]he evidence shows that these defendants did more than prepare to leave their employment and advise others of their plan." *Feddeman*, 260 Va. at 43-44, 530 S.E.2d at 673. DCL similarly alleges that Carpenter did far more than simply plan to leave his employment and inform others of his departure. Specifically, DCL alleges, and Carpenter and Missimer admitted during the internal investigation, that Carpenter solicited Missimer, Frank and at least one DCL employee to join BSS – this conduct is not the same as simply informing co-workers that you are intending to resign. (FAC, ¶¶ 82-83, 87). Thus, Carpenter's argument regarding his mere incorporation of BSS not being actionable is a red herring designed to distract from the avalanche of other allegations against him regarding his blatantly unlawful conduct.

---

employer). DCL has sufficiently pled facts to show that BSS and Carpenter, as an officer of DCL, knew of Missimer and Frank's duties to DCL and worked with them to assist in their breaches regardless of this knowledge. (FAC, ¶¶ 25-28, 47, 57-58, 69-72, 82, 85-87, 103-112, 121).

With regard to damages, there is no question that DCL has alleged that it has been damaged because of Carpenter's breach as DCL alleges that its relationship with LMCO has been damaged as a direct result of his and the other Defendants' conduct. (FAC, ¶¶ 38-39, 133-136, 210). Any arguments by BSS and Carpenter regarding the merits of this allegation is of no moment as it relates to a motion to dismiss. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) ("[I]mportantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim . . . ." (citation omitted)). Accordingly, DCL has stated claims for both breach of fiduciary duty against Carpenter and aiding and abetting Missimer and Carpenter's breaches of fiduciary duty by BSS and Carpenter for purposes of a FRCP 12(b)(6) motion to dismiss.

### F.    DCL States a Claim of Unfair Competition Against BSS and Carpenter in Count 8.

Virginia unfair competition law encompasses a variety of practices that cause an economic injury to a business, through a deceptive or wrongful business practice. *See Duggin v. Adams*, 234 Va. 221, 228, 360 S.E.2d 832, 837 (1987) (stating that "[s]harp dealing, overreaching, or unfair competition may also constitute improper methods" of engaging in commerce). As noted by BSS and Carpenter, the most popular example of common law unfair competition is trademark infringement. (Dfs Br. at 24). However, in addition to trademark infringement and other egregious business practices, Virginia courts have found that unfair trade practices include anti-competitive market practices, interference with business relationships, use of confidential information by former employees to solicit customers, theft of trade secrets, and breach of a restrictive covenant. *See Preferred Systems*, 284 Va. at 404, 732 S.E.2d at 688 (explaining that "improper methods or means [of commercial practice] generally involve . . . misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition"); *Peace v. Conway*, 246 Va. 278, 282, 435 S.E.2d 133, 135 (1993) (finding no "improper methods" of competition because

the employer "could have required his employees to execute covenants not to compete, which would "have prohibited [the former employees] from soliciting those customers upon termination of the employment relationship"). The types of "improper methods" listed above are grounded in notions of fair and unfair competition. DCL has alleged that each of the above unfair practices were perpetrated by Defendants in the FAC, (FAC, ¶¶ 300-310), and as such, it is premature to dismiss DCL's claim of unfair competition as to Carpenter and BSS.

**G.    DCL Has Stated a Claim that BSS and Carpenter Tortiously Inferred with a Prospective Economic Advantage and Contractual Relationship in Counts 9 and 10.**

For its claims of tortious interference with contract or prospective economic advantage to survive dismissal, DCL must plead (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit," (2) that Defendants had "knowledge of the relationship or expectancy," (3) "that it was reasonably certain that absent intentional misconduct, [DCL] would have continued in the relationship or realized the expectancy," and (4) "that [DCL] suffered damages from the interference." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir. 2021) (quoting *Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (applying Virginia law)). "Among the most egregious examples of improper conduct are those 'that are-illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules," including but not limited to misuse of confidential information and breach of a fiduciary relationship. *Commerce Funding Corp. v. Worldwide Sec. Services Corp.*, 249 F.3d 204, 214 (4th Cir. 2001) (citing *Maximus, Inc., v. Lockheed Info, Sys., Inc.*, 254 Va. 408, 493 S.E.2d 375 (1997)).

Here, DCL pleads the existence of its business relationship with LMCO and that its employees, including Carpenter, Missimer, and Frank, worked under that contract with Haddock. (FAC, ¶ 33, 67, 71). DCL further alleges that without Carpenter, Missmer, and Frank intentionally engaging in competitive activities against DCL while they were still employed, and in the case of

Missimer, while still an owner of the company, and without Haddock's use of DCL's confidential information conveyed to him by Carpenter and Missimer to strongarm DCL into handing over its LMCO subcontract to BSS, DCL's subcontract with LMCO would not be at risk and DCL's employees would not be scared about losing their jobs. (FAC, ¶¶ 82, 87,127-142, 144-146). Finally, there can be no reasonable dispute that DCL alleges that it has been damaged by Defendants' interference because it was forced to expend significant resources, including filing the instant lawsuit, to stop Defendants from any further interference. (FAC, ¶¶ 2, 41).

BSS and Carpenter incredulously assert that the "failure to identify a specific contact with which Defendants allegedly interfered is fatal to the claim of tortious interference." (Dfs Br. at 25). This statement is patently absurd as the FAC is replete with allegations regarding both its IDIQ Contract with LMCO, (FAC, ¶¶ 33, 37, 129, 151-152, 208-210), and the restrictive covenants to which Carpenter, Missimer, and Frank are bound, and even annexes the executed agreements to the FAC. (FAC, Exs. A, B, C). BSS and Carpenter further argue that the restrictive covenants at issue are unenforceable, but as explained in detail in Point III.D, *supra*, the restrictive covenant provisions are enforceable, which is fatal to BSS and Carpenter's specious argument.

BSS and Carpenter also contend that DCL has not alleged that they engaged in any intentional interference or that he used "improper means or methods" to terminate DCL's contractual relationship with LMCO or DCL's employees. (Dfs Br. at 26). This statement is belied by the allegations of the FAC which specifically address BSS and Carpenter's improper methods to interfere with DCL's contractual relationships with its employees and LMCO. (FAC, ¶¶ 82-83, 87). Specifically, DCL alleges that Carpenter solicited LMCO for DCL's contract and that at least one employee, in addition to Frank, was solicited for purposes of employing them with BSS. (*Id.*). When viewing these allegations in the most favorable light to DCL as the non-moving party, there are more than enough allegations to show that DCL sufficiently pled that BSS and Carpenter

tortiously interfered with DCL's contracts and business expectancy. Counts 9 and 10 should not be subject to dismissal.

**H.    DCL States a Claim of Civil Conspiracy Against Defendants in Count 11.**

According to Virginia common law, a civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744 (1985). To plead civil conspiracy, a plaintiff must allege the defendants combined together to effect a "preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy." *Bull v. Logetronics, Inc.*, 323 F. Supp. 115, 131 (E.D. Va. 1971) (citations omitted). (Dfs Br. at 27).

Here, BSS and Carpenter argue that DCL "does not allege a conspiracy with particularity." (Dfs Br. at 26). DCL has alleged particular facts sufficient to show that Defendants have acted singularly and in concert with one another, including allegations that Haddock and Missimer directly disclosed to DCL on January 25 and 26, 2023 that they were working with Carpenter to divert DCL's LMCO contract to BSS. (FAC, ¶ 67). These allegations alone would be enough for purposes of alleging conspiracy. However, yet another example of the conspiracy being pled with particularity is an email that DCL discovered subsequent to Frank's abrupt resignation on March 14, 2023. (FAC, ¶¶ 141, 157). While Frank was still an employee of DCL, he utilized his company email account (mike.frank@darkcircuitlabs.com) to communicate with Haddock via Haddock's LMCO email address via an email sent on February 24, 2023, stating that he "talk[s] to John & Eric pretty much daily about what's going" and "was in a position to help them," but that "BSS will not be setting sail anytime this year" (FAC, ¶ 141).

DCL alleges that Frank's email demonstrates Defendants were actively working together behind the scenes to unlawfully divert DCL's interests under the IDIQ Contract as well as shift

DCL employees to "PLEX," who on information and belief is a direct competitor of DCL, now that Defendants' plans to launch BSS had been revealed. (FAC, ¶ 142). While BSS and Carpenter dispute DCL's interpretation of this email, the email speaks for itself and regardless, such a dispute goes to the merits of DCL's claims and has no bearing on a motion to dismiss. *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts[ or] the merits of a claim . . . .").

Additionally, DCL further alleges conspiratorial conduct by Defendants by making allegations regarding Haddock's February 9, 2023 voicemail, where Haddock unequivocally stated that DCL was being terminated because Carpenter and Missimer were threatening to quit. (FAC, ¶ 133). A reasonable inference can be drawn from Haddock's voicemail that DCL was being terminated solely because of Carpenter and Missimer as it relates to their conspiracy with Haddock to unlawfully divert DCL's contract with LMCO to BSS. Defendants' conspiracy is self-evident on the face of the FAC and DCL pleads multiple particular factual allegations regarding their concerted conduct to survive a motion to dismiss on its civil conspiracy claim.

## CONCLUSION

For the foregoing reasons, DCL respectfully requests that the Court deny BSS and Carpenter's Motion to Dismiss in its entirety.

Dated: May 5, 2023

Respectfully submitted,

Steven J. Weber, VSB No. 35573
Lucas T. Daniels, VSB No. 91557
Gregory R. Begg, *Pro Hac Vice*
Lauren Rayner Davis, *Pro Hac Vice*
PECKAR & ABRAMSON, P.C.
*Attorneys for Plaintiff, Dark Circuit Labs, Inc.*
2055 L Street, NW, Suite 750
Washington, DC 20036
Telephone: 202.293.8815
Facsimile: 202.293.7992

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing pleading was filed electronically this 5th day of May 2023 using the CM/ECF system, which will send notification by electronic means to the following counsel of record:

Anne G. Bibeau, Esq.
**WOODS ROGERS VANDEVENTER BLACK PLC**
101 West Main Street, Suite 500
Norfolk, VA 23510
(757) 446-8517
anne.bibeau@wrvblaw.com
*Attorneys for Defendants Black Sails Security LLC and John Carpenter*

Broderick C. Dunn, Esq.
**COOK CRAIG & FRANCUZENKO, PLLC**
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
(703) 865-7480
bdunn@cookcraig.com
*Attorneys for Defendant Eric Missimer*

Roya Vasseghi, Esq.
**VASSEGHI BUDD PLLC**
9663-A Main Street Fairfax, VA 22203
(703) 215-9358
roya@vasseghibuddlaw.com
*Attorneys for Defendant Michael Frank*

Dawn Mertineit, Esq.
**SEYFARTH SHAW LLP**
Seaport East, Two Seaport Lane, Suite 1200
Boston, MA 02210
(617) 946-4917
dmertineit@seyfarth.com
*Attorneys for Defendant Keith Haddock*

Dated: May 5, 2023

_____
Steven J. Weber, VSB No. 35573