**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **DARK CIRCUIT LABS, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) **Civil Case No. 1:23-cv-00326-LMB-LRV** |
| | ) |
| **BLACK SAILS SECURITY, LLC.** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT**
**ERIC MISSIMER'S MOTION TO DISMISS THE AMENDED COMPLAINT**

NOW COMES the defendant, Eric Missimer ("Defendant" or "Dr. Missimer"), by and through his undersigned counsel, Broderick C. Dunn, Esq., Maria E. Stickrath, Esq., and the law firm of Cook Craig & Francuzenko, PLLC, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and moves this Court to dismiss the First Amended Verified Complaint (Dkt. No. 3) ("FAVC") filed against him by the plaintiff Dark Circuit Labs ("Plaintiff" or "DCL"). In support of Defendant's Memorandum in Opposition, Defendant states as follows:

**STATEMENT OF FACTS**

Dr. Missimer was an employee, shareholder, and member of the Board of Directors of DCL beginning in November of 2021. (FAVC ¶¶ 16-17). On November 3, 2021, Dr. Missimer and DCL entered into a Shareholders Agreement, which contains restrictive covenants. (FAVC, Ex. A). Dr. Missimer also served as DCL's Chief Technology Officer, Chief Financial Officer, and Treasurer of DCL. (FAVC ¶¶ 44, 48).

1

DCL alleges that in January of 2023, the President of DCL, Ronald Pelkey ("Pelkey") received a phone call from Keith Haddock ("Haddock"), a Project Manager for Lockheed Martin Corp. ("LMCO"), notifying Pelkey that another employee of DCL, John Carpenter ("Carpenter") had started his own company, Black Sails Security, LLC ("BSS"), and intended to compete with DCL. (FAVC ¶ 68). DCL is currently a contractor on the IDIQ contract with LMCO. (FAVC ¶ 33). DCL further alleges that Dr. Missimer confirmed this in a phone call he made to Pelkey and stated that he was involved in Carpenter's new venture and that he planned to quit DCL. (FAVC ¶¶ 70-71).

After these phone calls, DCL placed Dr. Missimer and Carpenter on administrative leave pending an internal investigation. (FAVC ¶ 77). DCL alleges that, as a part of their investigation, they interviewed another DCL employee, Michael Frank ("Frank"), who allegedly admitted that Carpenter and Dr. Missimer had offered Frank employment with Carpenter's newly formed company. (FAVC ¶ 85).

On February 9, 2023, Haddock allegedly called DCL's CEO, Chase Bertke ("Bertke") to inform him that if Dr. Missimer or Carpenter resigned from DCL, then DCL would be terminated from the IDIQ Contract. (FAVC ¶ 129). Carpenter and Dr. Missimer ultimately did not resign at that time (FAVC ¶¶ 134-135).  DCL also alleges that, during this conversation, Haddock mentioned a material term that had been proposed by DCL in ongoing settlement discussions between DCL, Carpenter, and Missimer. (FAVC ¶ 130). DCL then baldly alleges that "Defendants continued to communicate with Haddock or others at LMCO regarding confidential and proprietary information, DCL's internal business affairs, and solicitation of DCL employees to work for BSS or other entities on behalf of LMCO, all while they purported to be engaging in good

faith settlement negotiations with DCL." (FAVC ¶ 136). Dr. Missimer was ultimately terminated by DCL on March 6, 2023. (FAVC ¶ 156).

The crux of DCL's allegations against Dr. Missimer are that he failed to immediately return DCL's company property, and that he disconnected the company's VPN. (FAVC ¶ 167, 169). DCL acknowledges that Dr. Missimer has returned company property and states that "DCL intends to engage in forensic analysis of any and all company equipment;" admitting it has not actually examined any of the technology[1]. (FAVC ¶ 176-177). Despite having admitted that DCL has yet to perform any forensic analysis to confirm whether Dr. Missimer has accessed any company trade secrets, DCL makes the baseless allegation that "Missimer disconnected the VPN to engage in unauthorized access to DCL's company property" and that "Missimer granted Carpenter and BSS unauthorized access to DCL's company property while it was in his possession." (FAVC ¶¶ 178-179).

Finally, DCL alleges that, after January 25, 2023, LMCO changed DCL's payment terms from 14 days to 45 days and issued DCL a purchase order on March 6, 2023, for less than the usual amount of its purchase orders. (FAVC ¶¶ 193-94, 197-200). DCL alleges that it "anticipates that LMCO will not exercise its option [to extend the contract] under the IDIQ Contract by the deadline of August 3, 2023" and, without support, basses this on the actions of Defendants. (FAVC ¶ 202).

Based on the forgoing, DCL has pled thirteen counts, including:

1.  Misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, *et seq*., against all Defendants.

2.  Misappropriation of trade secrets under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336, *et seq*., against all Defendants.

---

[1] DCL's Objections and Responses to Dr. Missimer's First Set of Interrogatories indicate that DCL has taken no steps to engage in any forensic analysis. For example, in its response to Interrogatory No. 10, DCL stated "None at this time" when asked to describe whether it has conducted any forensic analyses on DCL's corporate servers in Missimer's possession. However, as of June 1, 2023, during a meet and confer call, DCL now claims that that they have hired an expert and have conducted a forensic analysis.

3. Violation of Virginia's Uniform Computer Information Transactions Act, Va. Code §§ 59.1-501.1, *et seq*., against all Defendants.

4. Misappropriation of trade secrets under Virginia common law, against all Defendants.

5. Breach of contract, against Carpenter, Dr. Missimer, and Frank.

6. Breach of fiduciary duty and duty of loyalty, against Carpenter, Dr. Missimer, and Frank.

7. Aiding and abetting a breach of contract and/or fiduciary duty and duty of loyalty, against all Defendants.

8. Common law unfair competition, against all Defendants.

9. Tortious interference with prospective economic advantage, against all Defendants.

10. Tortious interference with contractual relations, against all Defendants.

11. Civil conspiracy, against all Defendants.

12. Preliminary and permanent injunction, against all Defendants.

13. Accounting, against all Defendants.

(FAVC ¶¶ 211-352).  For the reasons outlined below, DCL has failed to state a claim upon which relief can be granted for any of its thirteen counts against Dr. Missimer.

## STANDARD OF REVIEW

"To survive a Motion to Dismiss, a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a Defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "When ruling on such a motion, a judge must accept as true all of the factual allegations contained

4

in the complaint." *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012) (internal quotation marks and citations omitted).

## **ARGUMENT**

### I.    **Plaintiff Has Not Pled Sufficient Facts to State a Claim for Misappropriation of Trade Secrets Under 18 U.S.C. § 1831, *et seq* or Va. Code § 59.1-336, *et seq.***

DCL's claims under the Defend Trade Secrets Act ("DTSA") and the Virginia Uniform Trade Secrets Act ("VUTSA") must fail because Plaintiff has failed to identify any trade secrets or plead any facts to support any allegation that Missimer misappropriated a trade secret. "[T]he applicable standards under the DTSA and ... the VUTSA are nearly identical." *OROS, Inc. v. Dajani*, No. 1:19-cv-351, 2019 WL 2361047, at *2 (E.D. Va. June 4, 2019). Misappropriation of trade secrets under either law requires that "(1) the information in question must constitute a trade secret, and (2) that trade secret must have been misappropriated." *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004).

Further, the definitions of "trade secrets" under the DTSA and VUTSA are also similar. The DTSA defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information," so long as the owner of the trade secret "has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Similarly, the VUTSA defines a "trade secret" as information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and where that information is

"subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code § 59.1-336.

The definitions of misappropriation are also similar under both the VUTSA and the DTSA, as each requires that the defendant either acquired the alleged trade secret through improper means or disclosed the trade secret without the owner's consent. *See* 18 U.S.C. § 1839(5); Va. Code § 59.1-336. Further, Plaintiff must prove that the "defendant knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff." *Space Systems/Loral, LLC v. Orbital ATK, Inc.,* 306 F. Supp. 3d 845, 855 (E.D. Va. 2018).

Nowhere in the FAVC does DCL identify a single, actionable trade secret. Under both the DTSA and the VUTSA, the Plaintiff must "identify, with particularity, each trade secret it claims was misappropriated." *MicroStrategy Inc. v. Business Objects, S.A.,* 331 F. Supp. 2d 396, 418 (E.D. Va. 2004); *see also Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*, No. 5:18-cv-00039, 2019 WL 1756293, at *4 (W.D. Va. Apr. 19, 2019). This requirement exists so that the factfinder can "distinguish that which is legitimately a trade secret from other information that is simply confidential but not a trade secret, or is publicly available information." *Keystone Transp. Sols., LLC,* No. 5:18-cv-00039, at *4. Moreover, it is not appropriate for a plaintiff to simply "produce lists of general information." *Id.*

The FAVC contains nothing more than "lists of general information," and makes no effort to connect this laundry list of "trade secrets" to Dr. Missimer. The FAVC makes the bald assertion that Missimer "disconnected the VPN to engage in unauthorized access to DCL's company property" and that he "granted Carpenter and BSS unauthorized access" to DCL property. (FAVC ¶¶ 178-179). However, DCL admits in its FAVC that it has made no effort to actually identify

6

whether a trade secret was somehow stolen, as DCL states that it "*intends* to engage in forensic analysis of any and all company equipment" allegedly held by Missimer. (FAVC at ¶ 177) (Emphasis added). DCL clearly does not possess facts to support its misappropriation claims, as it filed two different complaints before actually attempting to undergo any kind of investigation into any alleged misappropriation.

All DCL is left with is its vague, unsubstantiated assertion that "it cannot be reasonably disputed that Carpenter and Missimer separately and with the other Defendants stole, or otherwise utilized or removed without authorization and through improper means" DCL's trade secrets. (FAVC ¶ 240). Absent particular factual enhancement, DCL's allegation is not sufficient under either the DTSA or the VUSTA. Accordingly, Count I and Count II of the FAVC should be dismissed.

## II. The Virginia Uniform Computer Information Transactions Act is Not Applicable to the Case at Bar.

The Virginia Uniform Computer Information Transactions Act ("VUCITA") applies to computer information transactions, which are defined as "an agreement or the performance of it to create, modify, transfer, or license computer information or informational rights in computer information." Va. Code § 59.1-501.3; Va. Code § 59.1-501.2(11); *Pilar Services, Inc. v. NCI Information Systems, Inc.,* 569 F. Supp. 2d 563, 567 (E.D. Va. 2008). The purpose of this law is "to protect individuals involved in computer information transactions, such as agreements to create, transfer, modify, or lease computer information." *Smith v. Interactive Fin. Mktg. Grp., L.L.C.,* 79 Va. Cir. 158 (2009)). Specifically, Va. Code § 59.1-501.3(d)(5) exempts employment contracts from the statute's applicability.

There is no "computer information transaction" between Dr. Missimer and DCL alleged anywhere in the FAVC. To the extent DCL believes that the Dark Circuit Labs, Inc. Shareholders

Agreement (the "Shareholders Agreement") is covered under the Act, despite the Shareholders Agreement not involving a computer transaction, that argument fails as VUCITA explicitly exempts employment agreements. *See id.* The Shareholders Agreement clearly contains references to Missimer's employment with DCL, as the Agreement contains both a noncompete and a non-solicitation clause that each apply to "the time such Shareholder or *employee* of the Company…" (FAVC at ¶¶'s 53-54) (Emphasis added). As such, the VUCITA does not apply.

Furthermore, DCL's claim under the VUCITA is essentially a rephrasing of its state and federal misappropriation of trade secrets claims. The VUCITA specifically notes that it does not displace trade secret laws and, the Virginia Uniform Trade Secrets Act ("VUTSA"), clearly preempts other civil remedies for misappropriation of trade secrets. Va. Code § 59.1-501.16; Va. Code § 59.1341. DCL has failed to establish any applicability of the VUCITA to the present case, and even if it had, such a claim would be preempted by the VUTSA. Accordingly, DCL's Count III should be dismissed.

### III.    Plaintiff's Common Law Misappropriation of Trade Secrets Claim is Preempted by the Virginia Uniform Trade Secrets Act.

As with DCL's claims under Virginia Uniform Computer Information Transactions Act, any common law claim for misappropriation of a trade secret is preempted by the Virginia Uniform Trade Secrets Act ("VUTSA"). The Virginia Uniform Trade Secrets Act has a specific preemption section, stating "this chapter displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." Va. Code § 59.1-341. "The plain language of the preemption provision indicates that the law was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret." *Smithfield Ham and Products Co., Inc. v. Portion Pac, Inc.,* 905 F. Supp. 346, 349 (E.D. Va. 1995).

8

As explained in prior sections, DCL has failed to identify any trade secrets, let alone pled any facts to establish that Dr. Missimer has somehow misappropriated any trade secrets. Even if DCL had done so, any common law claim for misappropriation is clearly preempted by the VUTSA. Accordingly, Count IV should be dismissed.

### IV.    Dr. Missimer's Restrictive Covenants are Overly Broad and Unenforceable.

DCL's breach of contract claim against Dr. Missimer is predicated on Defendant's alleged breach of the Shareholders Agreement that DCL and Missimer executed on November 3, 2021. (Ex. A, ¶ 6).  The restrictive covenants to which DCL alleges Missimer is bound are contained in Article VI of the Shareholders Agreement in sections 6.3, 6.4, and 6.5.  (FAVC at ¶¶'s 52-54). Section 6.3 of the Shareholders Agreement states:

> 6.3  <u>Non-Compete</u>:  No Shareholder shall, during the time such Shareholder is a Shareholder or employee of the Company, and for a period of one (1) year following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, without the prior written consent of the Company, directly or indirectly, and whether as a principal, agent, officer, director, partner, employee, consultant, broker, dealer or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, or be engaged, have an interest in or take part in, or render services to any person, firm, corporation or other business organization (other than the Company) engaged in a business which is competitive with all or part of the business of the Company.

*Id.* at ¶ 53.  The non-compete clause in Section 6.3 of the Shareholders Agreement contains no geographic limitation and is essentially worldwide.  Nor does Section 6.3, or anywhere else in the Shareholders Agreement, detail what kind of business DCL engages in or what business and services would be competitive to DCL.  The FAVC describes DCL as being "comprised of highly skilled software engineers, reverse engineers, and vulnerability researchers who possess appropriate Government security clearance to serve as a subcontract to large organizations, such as Lockheed Martin, to provide cyber security personnel, tools, and expertise in support of the United States; National security missions." *Id.* at ¶ 6.  Thus, pursuant to Section 6.3 of the

Shareholders Agreement, Dr. Missimer would be precluded from working for, or in any industry related to, cyber security, government contracting, or national security.

Section 6.5 of the Shareholders Agreement states:

> 6.5    <u>Non-Solicitation</u>.  For so long as a Shareholder is a Shareholder or employee of the Company and for twenty four (24) months following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, such Shareholder shall not, without the written permission of the Company or any Affiliate, directly or indirectly (i) solicit, employ or retain, or have or cause any other person or entity to solicit, employee (sic) or retain, any other Shareholder or other person who is employed by the Company or (ii) solicit the business of or provide services or products to any client (or prospective client) of the Company at any time while such Shareholder was an employee or Shareholder of the Company.

*Id.* at ¶ 54.  Despite the fact that Article I of the Shareholders Agreement identifies and defines over twenty (20) separate terms, it does not define or identify the terms "client" or "prospective client."

Section 6.4 of the Shareholders Agreement states in part:

> 6.4    <u>Confidential Information</u>.  Each Shareholder agrees that he, she or it will utilize Confidential Information (as defined below) solely for the purpose of the business of the Company and will make no other use of Confidential Information.  In furtherance of the foregoing, no Shareholder shall directly or indirectly divulge, communicate, use to the detriment of the Company or for the benefit of any other person or entity or misuse in any way, any Confidential Information, including but not limited to, personal information, forms, know-how, client lists, technical data, business plans and industry analyses.  For the purposes of this Agreement, "<u>Confidential Information</u>" means information which is confidential and proprietary to the Company (including, but not limited to, trade secrets) and which derives (or may derive) economic value to the Company by not being generally known to others, or which the Company is otherwise under an agreement of confidentiality with an unaffiliated third party.

*Id.* at ¶ 52.

Paragraph 8.6 of the Shareholders Agreement states that it "shall be deemed to be a contract made under and shall be governed by and construed in accordance with the internal laws of the State of Delaware…" (FAVC Ex. A, Ex. 1, ¶ 8.6).  However, DCL's principal address is located

at 1900 Reston Metro Plaza, Floors 5-6, Reston, VA 20190 and, as Plaintiff concedes, "the employment and shareholder agreements at issue mandate (i) that Virginia law would apply and (ii) that all actions would be brought in the state or federal courts of Virginia." (*See* FAVC at ¶ 3; Ex. A, Ex. 1). While DCL is incorporated under the laws of Delaware, it does not conduct business there nor do any of the shareholders of DCL reside in Delaware. (Ex. A, ¶ 10). As such, the only connection that DCL has to Delaware is that Delaware was the state that Plaintiff chose to use to incorporate a business that is based in the Commonwealth of Virginia. (Ex. A, ¶¶'s 7-8, 10).

Under Virginia choice-of-law rules, "[i]f a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." *Settlement Funding, LLC v. Von Newmann-Lillie*, 645 S.E.2d 436, 438 (Va. 2007) (citation omitted). As such, Virginia gives choice-of-law clauses full effect except in "unusual circumstances." *PNC Bank, Nat'l Ass'n v. Dominion Energy Mgmt., Inc.,* No. 3:17cv311, 2018 WL 1768061, at *4 (E.D.Va. Apr. 12, 2018) (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999)).

In *Power Home Solar, LLC v. Sigora Solar, LLC*, a recent decision from the Western District of Virginia, the court found "no reasonable basis for a Michigan choice-of-law provision" in a dispute where the defendants lived and worked in Virginia, the plaintiff was a Delaware limited liability company with its principal place of business in North Carolina, and the plaintiff brought claims exclusively under federal and Virginia state law. *See Power Home Solar, LLC v. Sigora Solar, LLC*, No. 3:20cv00042, 2021 WL 3856459 at * 2 (W.D. Va. Aug.30, 2021).

Here, as in *Power Home Solar, LLC v. Sigora Solar, LLC*, there is no reasonable basis for a Delaware choice of law provision. Delaware is merely the forum in which Plaintiff's attorney chose to incorporate DCL. While Virginia courts would ordinarily give the Shareholders

Agreement's Delaware choice-of-law clause full effect, the present case presents an "unusual circumstance" where such application is not appropriate. DCL has no connection to Delaware. Dr. Missimer has never performed any work or had any association with Delaware. DCL's physical office and Defendants' worksite is located in Virginia. Finally, the Shareholders Agreement was not even drafted by someone barred in Delaware.

Therefore, applying Virginia law to the restrictive covenants contained in Dr. Missimer's Shareholders Agreement, the restrictive covenants are clearly unenforceable. Restrictive covenants are disfavored restraints on trade. *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 270 Va. 246, 249, 618 S.E.2d 340 (2005). Virginia law allows enforcement only if the restriction: 1) is narrowly drawn to protect the employer's legitimate business interest; 2) is not unduly burdensome on the employee's ability to earn a living; and 3) is not against public policy. *Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 493, 561 S.E.2d 694 (2002). In assessing the reasonableness of restrictions, courts focus "on the duration of the restraint, the geographic scope of the restraint, and the functional scope and extent of the activity being restricted," as well as "whether the restrictive covenant prohibits the employee from employment with a company that actually competes with the employer." *Lasership Inc. v. Watson*, 79 Va. Cir. 205 (Fairfax Co. 2009) (citations omitted). If a provision of a restrictive covenant, "considered in the context of the other language used in the contract, is capable of more than one reasonable construction, it is ambiguous, and [courts] will adopt that construction ***most favorable to the employee***." *Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 289, 414 S.E.2d 599, 601 (1992) (Emphasis added); *see also Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1521 (W.D. Va. 1995) ("The mere act of subjecting the employee to the uncertainty of an ambiguous provision offends public policy.") (Emphasis added).

12

The restrictive covenant here is clearly too overbroad to be enforceable. "The Supreme Court of Virginia has never upheld a restrictive covenant, which was ancillary to an employer-employee relationship, when the restrictive covenant could be applied to a geographic area in which the employee performed no function for the employer." *Contol, Inc. v. McDaniel,* 2006 WL 1213992 at *4 (E.D. Va. 2006); *see also TradeStaff & Co. v. Nogiec,* 77 Va. Cir. 77 (Va. Cir. 2008) ("non-compete agreements are enforceable when limited to the area formerly serviced by the former employee, or within a set mile radius of the area formerly serviced by the former employee."). The restriction is also overly broad in functional scope. Non-compete covenants that "restrict the former employee's performance of functions for his new employer [are upheld] only to the extent that the proscribed functions are the same functions as were performed for the former employer." *Lanmark Tech., Inc. v. Canales*, 454 F. Supp.2d 524, 528 (E.D. Va. 2006) (*quoting Cantol, Inc. v. McDaniel*, 2006 WL 1213992, at *4 (E.D. Va. 2006)).

The non-solicitation clause contained in Section 6.5 of the Shareholders Agreement is similarly unenforceable. Section 6.5 would prevent Dr. Missimer from soliciting or hiring a former DCL employee, client, or prospective client in any capacity for any type of business. As noted above, the Shareholders Agreement does not describe the terms "client" or "prospective client." Moreover, Dr. Missimer could not hire a former DCL employee to work somewhere completely unrelated to DCL, such as an ice cream parlor. DCL has no protectable business interest in preventing its former employees from working in noncompetitive roles. *See Strategic Enter. Sols., Inc. v. Ikuma*, 77 Va. Cir. 179 (Fairfax, 2008) (rejecting a similarly overbroad non-solicitation of employee's clause).

Even if the Court declines to apply Virginia law, the restrictive covenants would also be unenforceable under Delaware law. For a restrictive covenant to be enforceable under Delaware

law, it must (1) be "reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities." *See FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020). The reasonableness of the covenant's scope is measured in relation to the employer's legitimate interests: a greater scope must be supported by a greater interest. *See Id.* at *7 ("Given the vast geographic scope of the non-compete, [the former employer] must demonstrate it is protecting a particularly strong economic interest to persuade the Court that the non-compete is enforceable"). Moreover, Delaware courts do not mechanically enforce noncompetition or non-solicitation agreements. *Id.* at *6.

The Shareholders Agreement's restrictive covenants' lack of a defined, sufficiently tailored, geographic scope renders the covenants unenforceable under Delaware law. The scope of Dr. Missimer's agreement is such that Dr. Missimer would be prevented from performing cyber security work for any government of any country simply because DCL also provides cyber security services. Dr. Missimer would further be prevented from providing services of any kind to any undefined client of DCL pursuant to Section 6.5 of the Shareholders Agreement. And, even though Delaware courts occasionally allow blue penciling of overbroad noncompetes, unlike Virginia, it is unlikely even a Delaware court would blue pencil the restrictive covenants here. *See Kodiak Building Partners, LLC v. Adams*, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022) ("While in some circumstances, a court may use its discretion to blue pencil an overly broad non-compete to make its restrictions more reasonable, this court has also exercised its discretion in equity not to allow an employer to 'back away from an overly broad covenant by proposing to enforce it to a lesser extent than written.'") (citing *FP UC Hldgs.*, 2020 WL 1492783, at *8).

Either under Virginia law or Delaware law, the restrictive covenants contained in Dr. Missimer's Shareholders Agreement are overbroad and therefore unenforceable. Accordingly, Count V should be dismissed.

**V.    Plaintiff Has Not Pled Sufficient Facts to State a Claim that Dr. Missimer Breached Any Fiduciary Duties.**

In Virginia, to demonstrate a breach of a fiduciary duty, the plaintiff must show: (1) a fiduciary duty; (2) breach; and (3) damages resulting from the breach. *Adnet, Inc. v. Soni*, 66 F.4th 510, 515 (4th Cir. 2023). Generally, employees have the right to make arrangements to resign and make plans to compete with their employer without that conduct arising to a breach of fiduciary duty. *Feddeman & Co., C.P.A., P.C. v. Langan Associates, P.C.,* 260 Va. 35, 42 (2000).

DCL's breach of fiduciary duties claim is premised almost entirely on their deficient allegation that Dr. Missimer misappropriated trade secrets. As explained above, DCL has provided no facts to support that trade secrets existed, let alone that Dr. Missimer somehow misappropriated any trade secrets. To the extent that this count is also premised on the allegation that Dr. Missimer had planned to work for BSS, that argument also fails as Missimer had the right to arrange to make plans to resign from DCL. *See id.* Accordingly, Count VI should be dismissed.

**VI.    There is No Cause of Action for Aiding and Abetting a Breach of Contract and Plaintiff Has Failed to Plead Facts to Establish that Dr. Missimer Aided and Abetted a Breach of Fiduciary Duties or the Duty of Loyalty.**

As an initial matter, "[t]here is no cognizable action for aiding and abetting a breach of contract under Virginia law." *Power Home Solar, LLC v. Sigora Solar, LLC*, No. 3:20-CV-00042, 2021 WL 3856459, at *8 (W.D. Va. Aug. 30, 2021).

As to DCL's claims for aiding and abetting a breach of fiduciary duties, "[T]o establish a claim for aiding and abetting another party's breach of fiduciary duty, 'the third party must affirmatively aid the breach with the requisite *mens rea*, or culpable state of mind.' That is, the

15

plaintiff must show that the 'defendant: (1) knows about another's duty and breach; (2) participates in it or directs its commission; and (3) benefits from it.'" *Studco Building System U.S., LLC v. 1st Advantage Federal Credit Union,* 509 F. Supp. 3d 560, 571-572 (E.D. Va. 2020).

The only allegations here that Dr. Missimer somehow "aided and abetted" a breach of any duty other employees had to DCL is the conclusory allegation that "Missimer granted Carpenter and BSS unauthorized access to DCL's company property while it was in his possession." (FAVC ¶ 179). DCL provides no factual support for this allegation. Therefore, DCL has not pled any facts to show that a breach even happened, let alone that Dr. Missimer had the requisite *mens rea* to participate in such a breach. Accordingly, Count VII should be dismissed.

### VII.    Common Law Unfair Competition is Inapplicable Here.

Any claim for common law unfair competition is inapplicable to the present case. "Virginia law recognizes only a very limited cause of action for unfair competition." *Mid-Atlantic Telecom, Inc. v. Long Distance Services, Inc.,* 32 Va. Cir. 75 (Fairfax County 1993) (citing *Benjamin T. Crump Co. v. J.L. Lindsay, Inc.,* 130 Va. 144, 160, 107 S.E. 679, 686 (1921)). Common law unfair competition involves "deception, by means of which goods of one dealer are palmed off as those of another." *Monoflo Int'l, Inc. v. Sahm*, 726 F. Supp. 121, 127 (E.D. Va. 1989).

There is no allegation that Dr. Missimer sold any goods, nor any allegation that DCL was somehow deceived regarding the sale of any goods. This cause of action is clearly inapplicable to the instant case and Count VIII should be dismissed.

### VIII.    Plaintiff Has Not Pled Sufficient Facts to State a Claim for Tortious Interference with a Contract or a Prospective Economic Advantage.

"To successfully claim tortious interference with contractual relations, a party must prove each of the following elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3)

intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Masco Contractor Servs. E., Inc. v. Beals,* 279 F. Supp. 2d 699, 709 (E.D. Va. 2003). When a contract is terminable at will, the plaintiff must allege that the defendant employed improper methods to cause the interference. *Duggin v. Adams,* 234 Va. 221, 227 (1987).

DCL's tortious interference with a contract claim fails for multiple reasons. First, under Count X, DCL does not even identify a contract that Dr. Missimer allegedly interfered with. To the extent that DCL attempts to argue Dr. Missimer interfered with the Shareholders Agreement, Virginia law is clear that a "person cannot intentionally interfere with his own contract." *Fox v. Deese,* 234 Va. 412, 427 (1987).

To the extent DCL attempts to argue that Dr. Missimer interfered with Frank or Carpenter's employment agreements by somehow encouraging them to breach their restrictive covenants, those contracts were terminable at will, and thus, DCL would need to allege some improper method. *See Duggin,* 234 Va. at 227. However, as the Western District of Virginia has stated, "holding that the mere encouragement for someone else to breach a non-compete clause was an "improper method" sufficient to support a tortious interference claim would confound the Virginia Supreme Court's repeated attempts to "prevent 'turning every breach of contract into an actionable [tort] claim.'" *Zurich Am. Ins. Co. v. Turbyfill,* No. 7:10-CV-282, 2010 WL 4065527, at *4 (W.D. Va. Oct. 15, 2010) (quoting *Station #2, LLC, v. Lynch,* 280 Va. 166, 174 (2010)).  Thus, any argument DCL would have that Dr. Missimer somehow encouraged a breach of any restrictive covenants would fail.

Lastly, to the extent DCL argues that Dr. Missimer tortiously interfered with the contracts of "various other third-party customers or clients," DCL's lack of specificity regarding these

17

"contractual relationships" is fatal to their claim. (FAVC ¶ 327). As the Court in *Masco Contractor Services East, Inc. v. Beals,* 279 F. Supp. 2d 699, 709 (E.D. Va. 2003) stated:

> The purpose of laws against tortious interference is not to protect consumers or the operation of the marketplace generally. Rather, these causes of action provide a legal remedy where a particular party's *specific, existing* contract or business expectancy or opportunity has been interfered with in a tortious manner. Thus, the first element that a party claiming under either of these torts must prove is the existence of some specific contract or relationship. Failure to allege any specific, existing economic interest is fatal to the claim.

(Emphasis in the original). In the present case, DCL fails to identify an existing, specific contract Dr. Missimer allegedly interfered with. By DCL's own admissions, its contract with LMCO has an *option* to be extended, and that DCL only "*anticipates* that LMCO will not exercise its option under the IDIQ Contract by the deadline of August 3, 2023." (FAVC ¶ 202). As DCL has not pled any facts that any contract was actually interfered with, only that it "anticipates" interference, its tortious interference with a contract claim must fail.

DCL's tortious interference with a prospective economic advantage claim fails for much of the same reasons as its tortious interference with a contract claim fails. "To successfully claim tortious interference with prospective economic advantage, a party must (1) demonstrate the existence of a business relationship or expectancy, with a probability of future economic benefit; (2) prove knowledge of the relationship or expectancy; (3) show that it was reasonably certain that absent intentional misconduct, the claimant would have continued in the relationship or realized the expectancy; and (4) show that it suffered damages from the interference." *Masco,* 279 F. Supp. 2d at 709.

DCL has also failed to allege any specific business expectancy between it and LMCO existed. While DCL alleged that LMCO has an *option* to extend its contract with DCL and expressed some worry that LMCO will not do so by the August 3, 2023 deadline, "the expectancy of remaining in

business is too general to support a tortious interference claim." *Id.* at 711. Because DCL has not alleged any more than its concern that LMCO will not remain in business with them, the tortious interference with a business expectancy claim must also fail[2]. Accordingly, Count IX and Count X must be dismissed.

### IX.    Plaintiff Cannot State a Claim for Civil Conspiracy Because Plaintiff Has Failed to State a Claim for the Underlying Torts.

To state a claim for civil conspiracy, the plaintiff must allege that "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to plaintiff." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014). "[I]n Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." *Almy v. Grisham,* 237 Va. 68, 80 (2007). "The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use an unlawful means." *CaterCorp, Inc. v. Catering Concepts, Inc.,* 246 Va. 22, 28 (1993).

DCL's conspiracy count is incredibly vague, only stating that "Defendants committed overt acts in furtherance of an intentional, common scheme, as described in this Complaint." (FAVC ¶ 338). While it is not clear what underlying tort DCL is attempting to rely on, as explained throughout this brief, DCL has failed to state claims for misappropriation of trade secrets, breaches of fiduciary duties, or for tortious interference. DCL's allegation that Dr. Missimer conspired with the defendants to engage in some unidentified scheme is insufficient to sustain an action for conspiracy. Accordingly, Count XI should be dismissed.

---

[2] It is worth noting that if any party in the above-styled matter has damaged Plaintiff's contractual relationships, it is DCL.  Suing LMCO's employee, Haddock, and then coming after Dr. Missimer for the possibility that LMCO *might* not exercise the second option period under the IDIQ Contract belies logic.

**X.      Plaintiff is Not Likely to Succeed on the Merits of Any of Its Claims.**

"To obtain a preliminary injunction, a plaintiff must establish four elements: 1) that the plaintiff is likely to succeed on the merits; 2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities weighs in the plaintiff's favor; and 4) that a preliminary injunction is in the public's interest." *Scott v. Bierman*, 429 F. App'x 225, 228–29 (4th Cir. 2011). Similarly, "a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006).

This Court has already denied DCL's first attempt to obtain a Temporary Restraining Order and Preliminary Injunction. (Dkt. #52). Despite the passage of time and the beginning of discovery, DCL is still unable to show any greater likelihood of success on the merits of any of its claims against Dr. Missimer.  The aggregate of that failure and the paucity of the factual allegations contained in the FAVC are fatal Count XII.

**XI.      An Accounting is Not an Independent Cause of Action.**

DCL's cause of action for an accounting is improper. "A claim for an accounting is not an independent cause of action, but rather an equitable remedy." *Walsh v. Bank of Am., NA*, No. 111CV1168AJTJFA, 2012 WL 13020695, at *2 (E.D. Va. Feb. 15, 2012). Because an accounting is a remedy and is clearly not a cause of action, Count XIII is improperly pled and should be dismissed.

## <u>CONCLUSION</u>

DCL has failed to state a claim for any of its thirteen counts in the First Amended Verified Complaint. Further, as this is DCL's second attempt to plead its case, the Court should dismiss this case in its entirety, with prejudice.


Filed: June 5, 2023

                              Respectfully submitted,

                              ERIC MISSIMER

                              _/s/     Broderick C. Dunn_____
                              Broderick C. Dunn (VSB No. 74847)
                              Maria E. Stickrath (VSB No. 96191)
                              COOK CRAIG & FRANCUZENKO, PLLC
                              3050 Chain Bridge Road, Suite 200
                              Fairfax, VA 22030
                              Telephone: 703-865-7480
                              Facsimile: 703-434-3510
                              bdunn@cookcraig.com
                              mstickrath@cookcraig.com

21

## CERTIFICATE OF SERVICE

I hereby certify that, on this 5th day of June, 2023, I caused a true and accurate copy of the

foregoing to be served on counsel of record via the CM/ECF system to:

Gregory R. Begg, Esquire
Lauren Rayner Davis, Esquire
Lucas Taylor Daniels, Esquire
Steven Weber, Esquire
PECKAR & ABRAMASON, P.C.
2055 L Street, NW
Suite 750
Washington, DC 20036
Telephone: 202-293-8815
Facsimile: 202-293-7994
gbegg@pecklaw.com
ldavis@pecklaw.com
ldaniels@pecklaw.com
sweber@pecklaw.com
*Counsel for Plaintiff Dark Circuit Labs, Inc.*

Anne Graham Bibeau, Esquire
Pietro Sanitate, Esquire
WOODS ROGERS VADEVENTER BLACK PLC
101 W. Main Street, Suite 500
Suite 750
Norfolk, VA 23510
Telephone: 757-446-8600
abibeau@vanblk.com
psanitate@woodsrogers.com
*Counsel for Defendant Black Sails Security, LLC and John Carpenter*

Dawn Mertineit, Esquire
Renee Beth Appel, Esquire
SEYFARTH SHAW LLP
975 F Street NW
Washington, DC 20004-1454
Telephone: 202-828-5371
Facsimile: 202-828-5393
dmertineit@seyfarth.com
rappel@seyfarth.com
*Counsel for Defendant Keith Haddock*

Roya Vasseghi, Esquire
VASSEGHI BUDD LAW
9663-A Main Street
Fairfax, VA 22031
Telephone: 703-215-9358
Facsimile: 202-293-7994
roya@vasseghibuddlaw.com
*Counsel for Defendant Michael Frank*

*/s/    Broderick C. Dunn*