# **EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**DARK CIRCUIT LABS, INC.,**

            Plaintiffs,

    vs.

**BLACK SAILS SECURITY LLC, JOHN
CARPENTER, and ERIC MISSIMER**,

            Defendants.

Case No.:

## VERIFIED COMPLAINT

Plaintiff Dark Circuit Labs, Inc. (hereafter "DCL" or "Plaintiff"), by and through its attorneys, Peckar & Abramson, P.C., as and for its Complaint against Black Sails Security LLC (hereafter "BSS"), John Carpenter ("Carpenter"), and Eric Missimer ("Missimer") (hereafter collectively referred to as "Defendants"), hereby alleges the following:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over actions involving the Defend Trade Secrets Act.  *See* 18 U.S.C. § 1836(c) ("The district court of the United States shall have original jurisdiction of civil actions brought under this section").  Supplemental jurisdiction over the Virginia state law claims is conferred by 28 U.S.C. § 1367(a), as such claims are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.     This Court has personal jurisdiction over BSS because it is incorporated and headquartered in Alexandria, Virginia.  This Court has personal jurisdiction over Carpenter and Missimer because this action concerns the employment of Carpenter and Missimer at DCL, which is headquartered in Reston, Virginia, and the employment and shareholder agreements at issue

mandate (i) that Virginia law would apply and (ii) that all actions would be brought in the state or federal courts of Virginia.

3. Venue is proper, pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim, including the misappropriation of DCL's trade secrets, occurred within the jurisdiction of this judicial district.

## PARTIES

4. Plaintiff DCL is a domestic business corporation duly organized and existing under the laws of the State of Delaware, and maintaining a principal place of business at 1900 Reston Metro Plaza, Floors 5-6, Reston, Virginia 20190.

5. Upon information and belief, Defendant BSS is a corporation duly organized and existing under the laws of the Commonwealth of Virginia, and maintaining a principal place of business at 1610 Kenwood Avenue, Alexandria, Virginia, 22302.

6. Upon information and belief, Defendant Carpenter is an individual residing at 1610 Kenwood Avenue, Alexandria, Virginia, 22302.

7. Upon information and belief, Defendant Missimer is an individual residing at 237 West Street, Mansfield, Massachusetts 02048.

## SUMMARY OF THE ACTION

8. DCL is an offensive cyber security company that provides products and services to support the United States' operational missions and cyber arsenal, promoting a wider range of options for national security. DCL's engineers have expertise in hypervisor development, reverse engineering, and computer network operations ("CNO") tool development.

9. Carpenter was an employee of DCL from on or about December 15, 2021 until on or about March 6, 2023.

10.     Missimer was an employee of DCL from on or about November 3, 2021 until on or about March 6, 2023.

11.     Missimer has been a shareholder of DCL from November 3, 2021 until the present day.

12.     DCL, through a substantial investment of time resources, provided highly specialized offensive cybersecurity services marketed to the federal government of the United States, which gave it a decisive edge in the market.

13.     Carpenter and Missimer were leaders of this effort at DCL and were well compensated.

14.     In consideration for this compensation, Carpenter and Missimer executed confidentiality, non-compete, and non-solicitation agreements, promising that they would not steal the business DCL had developed and bring it to a competitor.

15.     At some point in 2022, while still employed by DCL, Carpenter decided he wanted to start a competing business.

16.     On or about December 2, 2022, Carpenter incorporated BSS in the Commonwealth of Virginia.

17.     Lockheed Martin Corp. ("LMCO") is a current client of DCL.

18.     On or about the evening of January 25, 2023, Pelkey received a phone call from Keith Haddock ("Haddock") who is the Project Manager for LMCO on the Task Order ("Task Order") order under the IDIQ Contract ("IDIQ Contract") for which DCL renders services to LMCO by and through its employees.

19.     During this phone conversation, Haddock informed Pelkey that he had a conversation with Carpenter about a company that he started, BSS, and confirmed that Carpenter intended to compete with DCL and solicited Haddock for a subcontract on the Task Order.

20.     On or about January 26, 2023 at or around 1:00 p.m. Eastern Standard Time ("EST"), Pelkey received a phone call from Missimer.

21.     During this phone conversation, Missimer informed Pelkey that he had been aware of Carpenter's competing enterprise, BSS, from "the beginning" which had already solicited DCL's existing client, LMCO, with the intention of diverting work from DCL's subcontract with LMCO to BSS.

22.     On or about January 31, 2023, Carpenter and Missimer admitted during an interview with Pelkey, Chase Bertke ("Bertke") Chief Executive Officer of DCL, and Lawrence Littleton ("Littleton"), Chief Financial Officer ("CFO") of DCL, that Carpenter and Missimer intended to terminate their employment with DCL to further pursue opportunities with the newly formed enterprise BSS and that at least one other current employees of DCL had been solicited to terminate their employment with DCL and work for BSS.

23.     Based on Carpenter and Missimer's disclosures, BSS was incorporated for the purpose of providing cyber security products and services marketed to the United States federal government, which is the exact type of services and products on which Carpenter and Missimer work at DCL.

24.     At present, DCL's losses as a result of Carpenter and Missimer's activities related to BSS include but are not limited to: (1) lost revenue to DCL under the IDIQ Contract; (2) irreparable harm to its business relationship and reputation with existing client LMCO; (3) irreparable harm to DCL's business relationships and reputation with existing and prospective

clients; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; and (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated confidential information and trade secrets.

### FACTS COMMON TO ALL COUNTS

25.     On or about November 3, 2021, Pelkey, Bertke, and Missimer entered into a Shareholders Agreement ("Shareholders Agreement"), a copy of which is annexed hereto as Exhibit "A" and incorporated by reference, for purposes of setting forth their respective rights, duties, and obligations as it relates to their positions as owners of DCL, including but not limited to restrictive covenants and non-disclosure obligations by which they agreed to abide.

26.     Pursuant to the Shareholders Agreement, Missimer acquired 325,000 shares of common stock of DCL with a par value of $0.0001 (the "Shares").

27.     From November 3, 2021 to December 15, 2022, in addition to his position as a shareholder of DCL and member of the Board of Directors of DCL, Missimer served as the CFO and Treasurer of DCL.

28.     From on or about November 3, 2021 to March 6, 2023, Missimer also served as DCL's Chief Technology Officer ("CTO").

29.     At all relevant times, Missimer's direct report was Bertke, the Chief Executive Officer ("CEO") of DCL.

30.     From on or about November 3, 2021 to March 6, 2023, Missimer had management authority over DCL's employees, including but not limited to Carpenter.

31.     As a founding member of DCL and member of DCL's senior leadership, Missimer acquired an intimate knowledge of DCL's market analysis, product development, pricing, and marketing strategies.

32.     On or about December 15, 2021, Carpenter executed an offer letter dated December 14, 2021 ("Offer Letter"), a copy of which is annexed hereto as Exhibit "B" and incorporated by reference, setting forth the terms and conditions of his employment as a Senior CNO Developer with DCL, including but not limited to a provision regarding his duty of loyalty to DCL.

33.     Paragraph 9 of the Offer Letter provides, in relevant part, that "[w]hile [Carpenter is] employed by [DCL], [he] will not engage in any other employment, consulting, or other business activity (whether full-time or part-time) that creates a conflict of interest with [DCL]."

34.     On or about December 20, 2021, Carpenter entered into a Confidentiality, Non-Competition and Protectable Interest Agreement ("Restrictive Covenants Agreement"), a copy of which is annexed hereto as Exhibit "C" and incorporated by reference, as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit as well as an inventions assignment clause.

35.     As a Vice President ("VP") of DCL and member of DCL's senior leadership, Carpenter acquired an intimate knowledge of DCL's market analysis, product development, pricing, and marketing strategies.

36.     During DCL's tenure working under the IDIQ Contract, LMCO nominated DCL as "Sub-Contractor of the Year" in 2022 and Haddock communicated his respect for DCL as a company, even proposing that LMCO may consider acquiring DCL in January 2023.

37.     For example, on or about July 13, 2022, Haddock sent an email to Bertke stating as follows: "You guys are class act and wonderful teammates. Looking forward to working with you all for a long time."

38.     As it relates to a potential acquisition of DCL, Haddock sent an email to Pelkey on or about January 5, 2023 stating as follows: "I have a business case in review and if that gets

approved, I could recommend a company purchase and then my leadership would evaluate the idea and move from there. Those usually take a few months to make a decision on."

39.     Throughout the course of working on the IDIQ Contract up until in or around February 2023, LMCO went out of its way to provide DCL with accelerated payments as it was aware that DCL is a start-up venture with potential cashflow issues for making payroll.

40.     Up until January 25, 2023, DCL was assured by Haddock throughout the course of working with LMCO that it was an integral part of LMCO's work on the Task Order and that LMCO intended to exercise its options under the recompete clauses in Task Order to keep DCL on contract through 2026.

## Missimer's Restrictive Covenants as a Shareholder

41.     The Shareholders Agreement, executed by Missimer on or around November 3, 2021, sets forth restrictive covenants by which Missimer agreed to be bound.

42.     Section 6.4 of the Shareholders Agreement provides as follows regarding confidentiality:

> 6.4     Confidential Information. Each Shareholder agrees that he, she or it will utilize Confidential Information (as defined below) solely for the purpose of the business of the Company and will make no other use of Confidential Information. In furtherance of the foregoing, no Shareholder shall directly or indirectly divulge, communicate, use to the detriment of the Company or for the benefit of any other person or entity or misuse in any way, any Confidential Information, including, but not limited to, personal information, forms, know-how, client lists, technical data, business plans and industry analyses. For the purposes of this Agreement, "Confidential Information" means that information which is confidential and proprietary to the Company (including, but not limited to, trade secrets) and which derives (or may derive) economic value to the Company by not being generally known to others, or which the Company is otherwise under an agreement of confidentiality with an unaffiliated third party. Each Shareholder agrees that he or it will maintain and preserve the confidentiality and secrecy of such Confidential Information. In the event that a Shareholder shall receive a request to disclose all or any part of the Confidential Information under the terms of a subpoena or order issued by a court of competent jurisdiction, such Shareholder agrees, to the extent legally permissible to (i) promptly notify the Company of the existence, terms and circumstances surrounding such a request, (ii) consult with the Company on the

advisability of taking legally available steps to resist or narrow such request, and (iii) if disclosure of such information is required, exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information and to reasonably cooperate with the Company in any such effort by the Company, at Company's sole cost and expense.

43. Section 6.3 of the Shareholders Agreement prohibits Missimer from engaging in competitive activity against DCL as follows:

6.3 Non-Compete[.] No Shareholder shall, during the time such Shareholder is a Shareholder or employee of the Company, and for a period of one (1) year following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, without the prior written consent of the Company, directly or indirectly, and whether as principal, agent, officer, director, partner, employee, consultant, broker, dealer or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, or be engaged, have an interest in or take part in, or render services to any person, firm, corporation or other business organization (other than the Company) engaged in a business which is competitive with all or part of the business of the Company.

44. Section 6.5 of the Shareholder Agreement prohibits Missimer from poaching or soliciting DCL's employees, diverting DCL's business to a competitor, and soliciting DCL's actual or potential customers, as follows:

6.5 Non-Solicitation. For so long as a Shareholder is a Shareholder or employee of the Company and for a period of twenty four (24) months following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, such Shareholder shall not, without the written permission of the Company or any Affiliate, directly or indirectly (i) solicit, employ or retain, or have or cause any other person or entity to solicit, employee or retain, any other Shareholder or other person who is employed by the Company or (ii) solicit the business of or provide services or products to any client (or prospective client) of the Company at any time while such Shareholder was an employee or Shareholder of the Company.

45. Section 6.6 of the Shareholders Agreement prohibits Missimer from disparaging DCL as follows:

6.6 Non-Disparagement. No Shareholder shall, directly or indirectly, individually or in concert with others, knowingly engage in any conduct or make any statement that is reasonably likely to have the effect of undermining or

8

disparaging the reputation of the Company or any Affiliate of the Company, or the good will of the Company or any Affiliate of the Company, products, or business opportunities, or that is reasonably likely to have the effect of undermining or disparaging the reputation of any officer, director or employee, past or present, of the Company or any of its Affiliates. This Section does not in any way restrict or impede any Shareholder from exercising protected rights, including rights under the National Labor Relations Act (NLRA) or the federal securities laws, including the Dodd-Frank Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency.

46.     In Section 8.9 of the Shareholders Agreement, Missimer consented to injunctive

relief and attorneys' fees in the event of a dispute regarding a breach of the restrictive covenants

therein:

8.9     <u>Specific Performance</u>. The parties hereto acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that money damages would not provide an adequate remedy.  It is accordingly agreed that each of the parties hereto shall be entitled to an injunction and other equitable remedies to prevent breaches or threatened breaches by the other parties hereto of this Agreement, and to enforce specifically the terms and provisions hereof or thereof in any court of the United States or any state thereof having jurisdiction, this being in addition to any other remedy to which the parties may be entitled at law or in equity.

## Carpenter's Restrictive Covenants as an Employee

47.     On or around December 20, 2021, Carpenter executed the Restrictive Covenants

Agreement as a condition of continued employment at DCL.

48.     Section 3 of the Restrictive Covenants Agreement provides as follows regarding

confidentiality:

3.     **Confidentiality and Use of Confidential Information and Trade Secrets.**

(a) **Confidential Information and Trade Secrets.** The Employee and the Company agree that for the purposes of this Agreement, and in addition to any meaning that it may have under the common law, the term "**Confidential Information**" shall mean information belonging to or possessed by the Company, whether or not reduced to writing (or in a form from which such information can be obtained, translated or derived into

reasonably usable form), that derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including without limitation, financial information, reports, and forecasts; improvements and other intellectual property owned by or relating to the Company; the buying practices of Clients or prospective Clients; the disclosures from or to Service Providers or prospective Service Providers; pricing offered to Clients or; pricing offered from Service Providers; the Company's production, advertising, marketing and growth strategies, methods and research; the prices/rates/terms at which the Company obtains or has obtained, or sells or has sold its products or services; the Company's sales, costs and sales methods; and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) that have been discussed or considered by the management of the Company; the Company's business systems and methodologies employed by the creation, delivery, maintenance and improvement of the Company's product and services. Confidential Information also includes the confidential information of others, such as Clients and Service Providers with which Employee or the Company has a business relationship. Confidential Information shall also include any information that Employee is required to keep confidential pursuant to any ethical obligation or state or federal law, rule or regulation. Notwithstanding the foregoing, Confidential Information does not include documents in the public domain unless due to breach of Employee's duties under the Agreement. Confidential Information, such as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, inventions, product drawings, designs and photographs, prototypes, methods, business systems, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known are referred to as "**Trade Secrets**".

(b)  **Use of Information During Employment.** While employed by the Company, Employee shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company. Employee shall adhere to all rules and policies of the Company relating to maintaining and safeguarding Confidential Information from public disclosure or use by an individual or business, including those that compete for Company Business.

(c)  **Information if no Longer Employed.** All documents, records, data, information and physical property, whether or not amounting to or containing Confidential Information or Trade Secrets, which are furnished

to Employee by the Company or are produced by Employee in connection with Employee's employment will be and remain the sole property of the Company. Employee is required to return to the Company all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Company. In the event Employee shall no longer be employed by the Company, Employee shall not use or otherwise distribute or disseminate Confidential Information or Trade Secrets on his/her/their behalf or that of a third person. Upon the end of the employment relationship between the Employee and the Company, Employee shall immediately gather and return to the Company all Confidential Information and Trade Secrets in his/her/their possession or control. At the Company's request, Employee shall delete all Confidential Information and Trade Secrets stored electronically which he/she/they maintains or has access to, including those residing in email accounts or on computers or portable electronic devices and shall remove from Employee's electronic storage, email or networking sites (such as LinkedIn) any Confidential Information or Trade Secrets by deleting such contacts from such websites and not re-engineering same. It is the express intent of the Parties that if no longer employed by the Company, the Employee shall not use or have access to Confidential Information or Trade Secrets relating to Clients, Prospective Clients, Service Providers, Prospective Service Providers, and Referral Sources including those for which Employee had a pre-existing relationship that existed prior to employment by Company (or its subsidiaries, affiliates or predecessors) it being expressly understood and agreed that the goodwill in such relationships has been transferred and sold to the Company.

49. Section 4 of the Restrictive Covenants Agreement prohibits Carpenter from diverting DCL's business to a competitor, and from soliciting DCL's actual or potential customers, as follows:

**4.**     <u>**No Diversion Of Client, Prospective Client, Service Provider, Prospective Service Providers, and Referral Source Relationships.**</u>

**(a)**   During the course of Employee's employment, Employee shall not, directly or indirectly: (i) solicit, accept an offer to do business with, service or divert any Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources and/or Company Business for Employee's personal benefit or that of a third-party or to the Company's detriment or (ii) consistent with Employee's duty of loyalty, work for another business which competes with the Company for Company Business including, without limitation, running, owning, managing, operating, controlling, being employed by, providing consulting services to, being a manager, officer, director or employee of, participating in, lending

Employee's name to, investing in, or being connected in any manner with the management, ownership, operation, or control of any business, venture or activity that performs competitive services with the Company.

**(b)** In recognition of the Company's interest in protecting its Goodwill interest in Clients, Prospective Clients, Service Providers, Prospective Service Providers and Referral Source relationships, Employee agrees that for a period of twelve (12) months after he/she is no longer employed, Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

50.    Section 5 of the Restrictive Covenants Agreement prohibits Carpenter from poaching or soliciting DCL's employees as follows:

**5.        Non-Solicitation of Company Employees.**

Employee recognizes the desire of the Company to preserve its Goodwill, its Confidential Information and Trade Secrets through the continued services of its employees. While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

51.     In Section 8 of the Restrictive Covenants Agreement, Carpenter consented to injunctive relief and attorneys' fees in the event of a dispute regarding a breach of the restrictive covenants therein:

> **8.      Remedies for Breach.**
>
> **(a)**      In the event of any actual or threatened breach of any of the covenants contained in this Agreement, the Company shall be entitled to seek an injunction (temporary, preliminary and/or permanent) to enforce this Agreement, without the requirement of posting a bond or other form of collateral, and may also pursue any other available remedies available to it in law and/or equity.
>
> **(b)**      Should the Company be a Prevailing Party in any litigation to enforce the terms of this Agreement, Employee shall be responsible for and pay the reasonable costs, fees and expenses of Company's attorneys associated with such litigation, including appeals. The Company shall be a "**Prevailing Party**" if it obtains temporary, preliminary and/or permanent injunctive relief, or is awarded monetary damages for such breach or threatened breach.

**Carpenter and Missimer's Breaches of Their
Restrictive Covenants and Fiduciary Duties to DCL**

52.     On or about January 25, 2023, Pelkey received a phone call from Haddock who is the Project Manager for LMCO on the Task Order under the IDIQ Contract for which DCL renders services by and through its employees.

53.     Haddock informed Pelkey that he had a conversation with Carpenter about a company that he started, BSS, and confirmed that Carpenter intended to compete with DCL and solicited Haddock for a subcontract on the Task Order.

54.     At the time of the conversation between Haddock and Carpenter, Carpenter was an employee of DCL.

55.     On or about January 26, 2023, Missimer called Pelkey and informed him that he has been aware of Carpenter's new company, BSS, since the beginning of December 2022.

56.     Missimer stated to Pelkey during this telephone conversation that Missimer and Carpenter solicited LMCO by way of communications with Haddock to obtain a subcontract on Task Order for BSS so that Missimer and Carpenter could continue working under the IDIQ Contract after quitting from DCL.

57.     Missimer had previously informed DCL that he was expecting a child and stated to Pelkey that he still intended to take a month of paid paternity leave beginning on January 30, 2023 and then would quit DCL on his return from leave and join BSS.

58.     On or about January 26, 2023, Haddock sent to electronic mail to Bertke, Carpenter, and Missimer stating as follows: "Can we all meet in person Friday (tomorrow) to discuss the DarkCircuit / BlackSails ConOp going forward and come to an early agreement?"

59.     DCL interpreted Haddock's electronic mail as a communication by LMCO that DCL's subcontract with LMCO on the Task Order under the IDIQ Contract was at risk of being diverted to BSS.

60.     Following the January 25 and 26, 2023 disclosures made by Haddock and Missimer, respectively, on January 27, 2023, DCL sent letters to Carpenter and Missimer informing them that DCL was opening an internal investigation as a result of the disclosures and putting them on notice of potential litigation ("Cease and Desist Letters").

61.     These Cease and Desist Letters described the disclosures made as of that date and set forth the restrictive covenants by which Carpenter and Missimer were bound.

62.     The Cease and Desist Letters further advised Carpenter and Missimer that they were being placed on administrative leave effective immediately pending an internal investigation by DCL with respect to their actions in assisting a competing enterprise, BSS.

63.    The Cease and Desist Letters further demanded the immediate return of any and all company property in Carpenter and Missimer's possession.

64.    On January 31, 2023, Pelkey sent a text message to current DCL employee, Michael Frank ("Frank"), informing him that DCL was conducting an internal investigation regarding Carpenter and Missimer's activities as it relates to BSS.

65.    Frank stated via text message to Pelkey that Carpenter had informed him of the formation of BSS and had stated that "they" would send him an offer letter so that Frank could join BSS.

66.    There was no mention of who "they" entails in the text message exchange, but Pelkey believed that Frank was referring to both Carpenter and Missimer.

67.    On February 1, 2023, Pelkey and Bertke interviewed Frank as part of DCL's internal investigation.

68.    Pelkey asked Frank if Carpenter and Missimer had approached Frank with an offer letter, to which Frank responded that both Carpenter and Missimer contacted him shortly before DCL's all hands staff meeting on January 27, 2023 to discuss joining BSS.

69.    Frank stated no official offer letter had been extended by BSS, but that Carpenter told Frank that he would protect him if Frank violated his employment agreement with DCL.

70.    DCL also learned during the internal investigation that at least one other current DCL employee in addition to Frank was solicited as well.

71.    As it relates to the formation of BSS, public records reveal that BSS was incorporated as a limited liability company with a sole managing member, Carpenter, in the Commonwealth of Virginia on December 2, 2022.

72.     At the time of BSS's incorporation, Missimer was a shareholder and officer of DCL and Carpenter was an employee of DCL.

73.     On December 15, 2022, DCL's Board of Directors, consisting of Pelkey, Bertke, Littleton, and Missimer, unanimously voted to remove Missimer as an officer effective immediately.

74.     At the time of December 15, 2022 vote, Pelkey and Bertke were unaware of Carpenter and Missimer's activities as it relates to BSS.

75.     The vote was proposed to remove Missimer as Treasurer because, among other issues, Pelkey and Bertke had determined there were significant problems with Missimer's management abilities as it relates to other DCL employees, specifically Carpenter, and the flow of information from Missimer to the Board of Directors.

76.     DCL invested significant time and resources trying to fix communication issues and functionality of the Board of Directors throughout 2022, including expending nearly $20,000 on an executive coach to help with communications and understanding of each other.

77.     The primary issue was that Carpenter was not effectively communicating on IDIQ-related matters to the Board of Directors as a Vice President ("VP") of DCL.

78.     At that time, Pelkey and Bertke believed that Carpenter's lack of communication on management and IDIQ-related issues as a VP was caused by issues related to Missimer's management of him.

79.     Specifically, Pelkey and Bertke believed that because Carpenter was communicating directly with Missimer, Carpenter thought that such communications were sufficient.

80. Pelkey and Bertke determined that Missimer was blocking communications to them as Board members, whether through Missimer's lack of skills discerning what was important to convey or that he may have been doing so intentionally.

81. As a result, the Board voted on whether to remove Missimer's ability to execute documents on behalf of DCL as an officer, which Missimer himself voted for in the affirmative at DCL's December 15, 2022 Board meeting.

82. Though Missimer was removed as an officer, he remained a member of the Board of Directors and is still presently a shareholder of DCL.

83. The intent was for the Board to revisit these issues in six months to determine whether Missimer should be reinstated as an officer if communication and management functionality improved.

84. On or about January 16, 2023, Pelkey and Bertke had a conversation with Carpenter about realignment of his duties given his communications issues.

85. After this conversation, Pelkey sent a text message to Missimer to discuss the outcome of the conversation with Carpenter.

86. Specifically, Pelkey asked if Missimer was available for a call to which Missimer responded he was "[a]t the gym[,] what's up?"

87. Pelkey responded to Missimer, "Nothing big, just wanted to back track with you on the Anthony thing and make sure we're all on the same page," to which Missimer responded "Oh so he just wanted to talk about Antony [*sic*]," followed up "Good" and "Man they are handling this poorly."

88. Pelkey believed that Missimer mistakenly thought Missimer was corresponding with Carpenter in the text message exchange.

89.     Shortly after sending the above three text messages, Missimer apparently realized his mistake that he was corresponding with Pelkey rather than Carpenter and deleted the message stating "Man they are handling this poorly" and then stated that he "[m]eant to say 'he'" and that it was supposed to be "you in the first message."

90.     Shortly after these text messages, that same day on or about January 16, 2023, Pelkey called Missimer to discuss business but also to discuss the text messages.

91.     During this conversation, Pelkey specifically confronted Missimer about the text messages, stating that Pelkey felt that Missimer thought he was communicating with Carpenter, and changed his messages once he realized his mistake.

92.     Missimer assured Pelkey that it was not the case and that his text messages were intended for Pelkey and Missimer stated that the wording of the text messages was a result of sending texts over his smart watch.

93.     Pelkey asked Missimer if he was happy working at DCL and stated that if Missimer had any issues he could discuss them with Pelkey.

94.     Missimer stated to Pelkey that he was happy working at DCL and that he had no issues to discuss.

95.     On or about January 18, 2023, Pelkey and Bertke were notified by DCL employee Frank that Carpenter approved his timesheet before he had the chance to appropriately add in all the correct hours.

96.     Carpenter was never given the authority by DCL to approve timesheets.

97.     Only an individual with managerial access has the ability to grant an employee authority to approve time sheets and the only individuals with such access at the time were Pelkey,

Bertke, and Missimer. Pelkey and Bertke confirmed to each other that they did not grant such access and thus the only individual who could have done so was Missimer.

98.     Pelkey and Bertke further learned that Carpenter was made a manager of the Task Order work group.

99.     In response to Frank's disclosure, Bertke conducted an investigation and downloaded several logs from TSheets, a timekeeping program used by DCL, which show Carpenter having the ability and taking action to approve employee time cards as well as his status as a manager in the program.

100.     Bertke further discovered that DCL had improperly invoiced the incorrect hours for Frank as a result of time sheets that Carpenter approved.

101.     Specifically, twenty (20) hours were incorrectly billed instead of the correct thirty-five and a half (35.5) hours resulting in additional administrative work and corrections by DCL's management team and unnecessary communications with DCL's client.

102.     In making this determination, Bertke reviewed several documents, including but not limited to: (1) a Weekly Labor Report showing the incorrect hours; (2) an Approval History Report showing Carpenter's unauthorized managerial access; (3) a System Log Report showing Carpenter approving Frank's time for the date and approving all employees' time on the Task Order; and (4) screenshots showing Carpenter as a manager of the Task Order work group.

103.     That same day, on or about January 18, 2023, Bertke discovered that Carpenter had unfollowed all of DCL's social media accounts, which led Bertke to conclude that Carpenter may be showing signs of being a disgruntled employee.

104.     In light of the disclosures made to Pelkey on January 25 and 26, 2023 and the subsequent ongoing internal investigation conducted by DCL, on information and belief, the

communication issues sought to be addressed by the Board of Directors throughout late 2022 actually stemmed from Carpenter and Missimer working together to build their own directly competitive enterprise by taking DCL's largest client, DCL's employees, and confidential information and trade secrets with them in the process.

### DCL's Efforts to Resolve the Matter Outside of Court

105.     In an attempt to salvage the business relationship between DCL and LMCO, DCL engaged with Missimer and Carpenter to negotiate their separation from DCL to preserve continuity of mission and reduce impact on the U.S. Government as LMCO's end customer.

106.     On or about January 31, 2023, Pelkey, Bertke, and Littleton interviewed Carpenter and Missimer as part of DCL's internal investigation regarding Carpenter and Missimer's activities as it relates to BSS.

107.     During his interview, Carpenter referred to Missimer as his "employee" as well as stating that Missimer was "potentially" his "employee."

108.     These statements show that Carpenter was directly employing, soliciting, and/or recruiting Missimer, a current shareholder and employee of DCL.

109.     On or about February 6, 2023, DCL, by and through its counsel, conveyed a settlement proposal to counsel for Defendants on a confidential basis.

110.     On or about February 7, 2023, counsel for the parties conferred regarding the proposed settlement terms.

111.     On or about February 9, 2023, Haddock, in his capacity as Project Manager for LMCO, called Bertke to inform him that if Missimer or Carpenter resigned from employment at DCL, DCL would be immediately terminated from the IDIQ Contract.

112. During this same phone call, Haddock also specifically mentioned a material term that had been proposed by DCL in settlement discussions that was conveyed to Defendants on a confidential basis.

113. Pelkey, Bertke, and Littleton were the only individuals at DCL who had knowledge of the proposed settlement terms and none of these individuals disclosed any of the proposed terms to Haddock.

114. The only other individuals who could have disclosed these terms to third parties, such as Haddock, were Carpenter and Missimer.

115. On or about February 9, 2023 at approximately 6:17 p.m. EST, Haddock left a voicemail for Bertke stating as follows:

> Hey Chase [Bertke], unfortunately, I got a call from Eric [Missimer] and John [Carpenter] again. They're going to quit tonight. Um, they say it's driven by the issues they're having with you, um, so tomorrow I got to draft a letter with Amber, um, if we can't get them to not quit tonight, um, we're going to draft, uh, a letter to Amber Bowen to you guys to start removing from contract you as an entity. Um, I intend to keep all the developers like we did with IC1, um, same conop where we give them opportunities to stay on contract, um, to any other company. Um, I have not sent that letter through Amber yet. That is going to happen the second they quit. They say they're tired and they want a quick resolution and they are going to quit tonight. So Saturday morning I got to send that letter.

116. DCL urged Carpenter and Missimer not to resign and neither individual responded to attempts by DCL to contact them.

117. Despite Haddock's voicemail, Carpenter and Missimer did not quit on February 9, 2023.

118. Based on Haddock's February 9, 2023 communications, Defendants continued to communicate with Haddock or others at LMCO regarding confidential and proprietary information, DCL's internal business affairs, and solicitation of DCL employees to work for BSS

or other entities on behalf of LMCO, all while they purported to be engaging in good faith settlement negotiations with DCL.

119.   On or about February 15, 2023, Missimer, by and through his counsel, sent a letter to DCL's counsel requesting inspection of DCL's books and records, including but not limited to DCL's balance sheets, cash flow statements, bank and credit card statements, customer invoices, and payroll records for 2022 and year to date in 2023.

120.   On or about February 17, 2023, DCL responded to Missimer's request by letter stating that it declined to provide the records requested as a result of Missimer's demonstrated intent to compete with DCL.

121.   DCL's February 17, 2023 letter further stated:

Furthermore, should your letter be insinuating that there are potential financial issues with DCL, such issues, should they exist, would have arisen when Missimer was the . . . CFO . . . and Treasurer of DCL from November 2021 to December 2022 until he was removed by unanimous vote and replaced by . . . Littleton as CFO. DCL is currently performing a third-party audit of its books and records as a result of Missimer's removal and his misconduct revealed during the ongoing internal investigation. Any potential issues identified by the audit of DCL's financial records, such as incorrect accounting, general errors, or misappropriation of company funds during this time period may implicate liability on the part of Missimer. Should the third-party audit identify any such issues during Missimer's time as CFO and Treasurer, DCL will have reason to believe that these actions or omissions were done intentionally or maliciously by Missimer in light of Missimer's demonstrated intent to compete with DCL.

122.   On or about February 27, 2023, DCL's counsel was notified via email that Carpenter had obtained new counsel who requested one week to review the case file and respond to DCL's settlement proposal.

123.   On or about March 2, 2023, one of DCL's employees, Paul Jalufka ("Jalufka"), informed Pelkey that he was approached in-person by another individual who is working on the

Task Order under the IDIQ Contract, "Joe C.," who asked him if he knew anything about DCL employees leaving the company.

124.    Jalufka stated to Pelkey that he told "Joe C." that he was unaware of anything like that occurring, at which point "Joe C." proceeded to avoid the subject and not provide any additional information to Jalufka about the issue.

125.    On information and belief, "Joe C." is a prospective employee of DCL.

126.    On or about March 2, 2023 Bertke received the latest purchase order from LMCO under the IDIQ Contract.

127.    The contract modification was for $75,416.15, a drastic departure from previous purchase order amounts of roughly $500,000.

128.    On or about March 3, 2023, DCL notified LMCO regarding the first year of funding being estimated to be depleted in approximately one month under the IDIQ Contract.

129.    Later that day, on or about March 3, 2023, Carpenter sent an email to Pelkey, Bertke, and Littleton noticing his intent to resign on April 3, 2023.

130.    On information and belief, Carpenter noticed his intent to resign from DCL with the knowledge LMCO intends not to issue any further work to DCL under the IDIQ Contract.

131.    On information and belief, Defendants and Haddock agreed to this course of action to ensure DCL would be phased out in order to divert DCL's business interests under the IDIQ Contract to BSS.

132.    In light of Carpenter and Missimer's continued breach of ongoing non-disclosure obligations, there could be no reasonable expectation by DCL that information provided for purposes of settlement would remain confidential and would not be used for leveraging a

competitive advantage to BSS and/or be disclosed to Haddock, LMCO, or other third parties such as "Joe C."

133.     On information and belief, Carpenter and Missimer's disclosures of confidential information related to settlement negotiations to Haddock, "Joe C.," and other third parties working under the IDIQ Contract, including but not limited to DCL's existing and prospective employees, has irreparably harmed DCL's reputation.

134.     On or about March 3, 2023, DCL concluded its internal investigation and determined that Carpenter and Missimer should be terminated for cause on or before March 7, 2023 as a result of DCL's finding that Carpenter and Missimer were in breach of their respective contractual, statutory, and common law obligations to DCL.

135.     On or about March 6, 2023, DCL terminated the employment of Carpenter and Missimer for cause.

136.     To date, Missimer has refused to return any of DCL's company property in his possession, including but not limited to DCL's servers which are housed in Missimer's basement and hold DCL's intellectual property, including several software products.

137.     On or about March 3, 2023, DCL discovered that Missimer had disconnected DCL's virtual private network ("VPN"), which is a secure tunnel between a device, such as a server, and the internet, thus cutting off DCL's access to its own servers.

138.     On information and belief, Missimer is in possession of (a) two (2) server blades, (b) two (2) server towers, (c) one (1) KVM switch, (d) one (1) network switch, (e) one (1) raspberry pi running pivpn, (f) one (1) router running openwrt, and (g) one Samsung Galaxy Fold cell phone.

139.     Given Missimer's position as DCL's CTO and system administrator, he should be aware of any and all equipment that was used in hosting, storing, transmitting data, or running on

the DCL network, and as a current DLC shareholder, DCL requires his assistance in identifying

any equipment that was associated with these purposes if same is not identified above

140. On information and belief, Missimer granted Carpenter and BSS unauthorized

access to DCL's company property in his possession.

**Defendants Irreparably Harmed DCL's Relationship with LMCO**

141. Carpenter and Missimer's activities related to BSS have irreparably harmed DCL's

business relationship with its client LMCO.

142. On or about October 28, 2021, DCL was awarded a subcontract by LMCO for the

Task Order under the IDIQ Contract.

143. The total purchase order value for DCL under the IDIQ Contract is $9,176,491.00

with annual option periods extending the contract through on or about August 3, 2026.

144. The first option period under the IDIQ Contract was exercised by LMCO before its

expiration date of August 3, 2022.

145. The deadline for the LMCO to exercise the second option period under the IDIQ

Contract is August 3, 2023.

146. DCL had been receiving "NET 14" accelerated payments since commencing work

on the IDIQ Contract, meaning that DCL had been receiving payment from LMCO for invoices

within fourteen (14) days after approval by LMCO.

147. Following Haddock's disclosure to Pelkey regarding BSS on or about January 25,

2023, LMCO immediately changed DCL's payment terms to the maximum time allowable under

the IDIQ Contract which is "NET 45," meaning that payments must be made within forty-five (45)

days of LMCO's approval of an invoice.

148. In so doing, LMCO ceased making accelerated payments to DCL under its prior

course of dealing in which it had been paying DCL under a "NET 14" payment term.

149.    This sudden change in payment terms caused float and payroll issues for DCL, requiring Pelkey, Bertke, and Littleton to raise $50,000.00 in personal loans to DCL to cover payroll for DCL's employees.

150.    Additionally, LMCO reduced its purchase order amount for DCL in its tenth contract modification sent to DCL on or about March 6, 2023.

151.    Specifically, prior to LMCO's March 6, 2023 contract modification, DCL had received approximately $500,000.00 per contract modification under the Task Order.

152.    LMCO communicated to DCL that approximately $500,000.00 was the highest purchase order possible under the terms of the IDIQ Contract that did not require an additional lengthy approval process by LMCO that would have delayed payment of DCL's invoices and impeded DCL's ability to make payroll.

153.    Larger purchase orders provide longer term stability for start-up ventures such as DCL.

154.    On or about March 6, 2023, DCL received its most recent purchase order from LMCO which was only $75,416.15.

155.    LMCO's extreme downward departure from its prior course of dealing in issuing nine previous purchase orders to DCL shows that LMCO has decided not to fund DCL's subcontract on a long-term basis.

156.    Based on LMCO's drastic change in course of dealing, DCL anticipates that LMCO will not exercise its option under the IDIQ Contract by the deadline of August 3, 2023.

157.    The only aspect of DCL's business relationship with LMCO that changed from the previous purchase orders to the $75,416.15 purchase order was the activities of Carpenter and

26

Missimer as it relates to BSS and their communications with Haddock beginning in or around December 2022.

158.    At present, DCL's losses as a result of Carpenter and Missimer's activities related to BSS include but are not limited to: (1) lost revenue to DCL under the IDIQ Contract; (2) irreparable harm to its business relationship and reputation with existing client LMCO; (3) irreparable harm to DCL's business relationships and reputation with existing and prospective clients; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; and (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated confidential information and trade secrets.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq*., against All Defendants)

159.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

160.    18 U.S.C. § 1839(3) defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if — (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

161.     18 U.S.C. § 1839(3) defines a "misappropriation" as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who — (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was — (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that - (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake."

162.     Defendants intentionally misappropriated and/or conspired to misappropriate trade secrets from DCL to their own economic benefit, knowing that the misappropriation would harm DCL.

163.     DCL had and has valuable trade secrets relating to its product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

164.     DCL's trade secrets constitute business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer lists.

165.     These trade secrets derive their independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

166.     DCL's competitors, such as BSS, could use DCL's trade secrets to procure an unfair competitive advantage over it, steal its customers, undercut its pricing and replicate its customer service methods.

167.     DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers in the basement of Missimer's house, DCL's co-founder and CTO, which is not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential" , "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; and (x) assuring compliance with all applicable cybersecurity regulations.

168.     By way of the disclosures to DCL, it cannot reasonably be disputed Carpenter and Missimer stole, or otherwise removed without authorization and through improper means, confidential and proprietary corporate documents from DCL, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*

169. These misappropriations occurred after May 1, 2016, the effective date of the DTSA.

170. Upon information and belief, Carpenter and Missimer were acting under BSS's direction when they misappropriated DCL's confidential information and/or BSS benefitted from the misappropriation.

171. DCL demands the return of its trade secrets, a preliminary and permanent injunction stopping further dissemination of the trade secrets and mandating destruction of the trade secrets in the hands of the misappropriating parties, as well as damages, including exemplary damages, attorneys' fees and costs because Defendants misappropriated DCL's trade secrets willfully and maliciously.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336, *et seq*., against All Defendants)

172. Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

173. Va. Code § 59.1-336 defines a "trade secret" as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process," that: (i) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (ii) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

174. Va. Code § 59.1-336 defines a "misappropriation" as (i) "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" or (ii) "[d]isclosure or use of a trade secret of another without express or

implied consent by a person who [(a)] [u]sed improper means to acquire knowledge of the trade secret; or [(b)] At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake..''

175.    Defendants intentionally misappropriated and/or conspired to misappropriate trade secrets from DCL to their own economic benefit, knowing that the misappropriation would harm DCL.

176.    DCL had and has valuable trade secrets relating to its product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

177.    DCL's trade secrets constitute business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, business data compilations, programs, diagrams, drawings, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer lists.

178.    These trade secrets derive their independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

179.    DCL's competitors, such as BSS, could use DCL's trade secrets to procure an unfair competitive advantage over it, steal its customers, undercut its pricing and replicate its customer service methods.

180. DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers in the basement of Missimer's house, DCL's co-founder and CTO, which is not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential" , "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; and (x) assuring compliance with all applicable cybersecurity regulations.

181. Through its forensic analysis, it cannot reasonably be disputed that Carpenter and Missimer stole, or otherwise removed without authorization and through improper means, confidential and proprietary corporate documents from DCL, in violation of the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq*.

182. Upon information and belief, Carpenter and Missimer were acting under BSS's direction when they misappropriated DCL's confidential information and/or BSS benefitted from the misappropriation.

183. DCL demands the return of its trade secrets, a preliminary and permanent injunction stopping further dissemination of the trade secrets and mandating destruction of the trade secrets in the hands of the misappropriating parties, as well as damages, including punitive damages,

attorneys' fees and costs because Defendants misappropriated DCL's trade secrets willfully and maliciously.

## AS AND FOR THE THIRD CAUSE OF ACTION
### (Violation of Virginia's Uniform Computer Information Transactions Act, Va. Code §§ 59.1-501.1, *et seq.*, against Carpenter and Missimer)

184.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

185.     DCL had and has valuable trade secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

186.     Carpenter and Missimer purposefully or knowingly took and destroyed trade secrets contained in data and/or databases belonging to DCL.

187.     As a result, DCL has been damaged and is entitled to compensatory and punitive damages, as well as reasonable attorneys' fees and costs of suit.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets under Virginia common law against All Defendants)

188.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

189.     Pursuant to well-established Virginia common law, to be protected as a "trade secret," courts require that: (1) The information is secret; (2) The economic value is derived from its secrecy; (3) The information is not readily ascertainable by proper means by competitors who could obtain economic value from its disclosure; and (4) The owner uses reasonable efforts to safeguard the information. *MicroStrategy Inc. v. Li*, 240 Va. 297, 601 S.E.2d 580 (Va. 2004); *see Dionne v. Se. Foam Converting & Packaging, Inc.*, 240 Va. 297, 397 S.E.2d 110 (Va. 1990).

190.     DCL had and has valuable trade secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

191.     DCL also had and has confidential and proprietary business information that does not rise to the level of a trade secret but is still protectable under Virginia common law.

192.     DCL's trade secrets and confidential/proprietary business information are not known outside of its business, have inherent value to DCL and its competitors, were developed through the expenditure of a substantial amount of resources and are not capable of being acquired or duplicated by others.

193.     DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers in the basement of Missimer's house, DCL's co-founder and CTO, which is not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential" , "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; and (x) assuring compliance with all applicable cybersecurity regulations.

194.     Carpenter and Missimer knew or had reason to know that the trade secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS.

195.     BSS acquired DCL's trade secrets from Missimer and Carpenter with knowledge that Missimer and Carpenter breached their various duties to DCL, including the duties of confidence and loyalty, to procure them.

196.     As a result of Defendants' misappropriation and/or use of DCL's trade secrets, DCL has been damaged.

197.     DCL is entitled to compensatory and punitive damages, injunctive relief and attorneys' fees and costs of suit on account of Defendants' Virginia common law misappropriation of trade secrets.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Breach of Contract against Carpenter and Missimer)

198.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

199.     DCL has fully performed its material obligations to Carpenter and Missimer under their employment agreements.

200.     Carpenter and Missimer, however, have breached their employment agreements by, *inter alia*, (i) failing to keep confidential DCL's trade secrets and/or confidential/proprietary business information, (ii) recruiting and/or soliciting employees from DCL to join BSS, (iii) inducing DCL's employees to leave DCL, (iv) soliciting, diverting and/or servicing DCL's actual or potential customers, (v) working for DCL's direct competitor, BSS, while still employed by DCL, (vi) misappropriating trade secrets, (vii) using trade secret and/or otherwise confidential/proprietary business information for the benefit of a person or entity other than DCL;

(viii) disclosing confidential and trade secret information to BSS, and (ix) failing to return to DCL all of its confidential and trade secret information.

201.    The harm to DCL resulting from Carpenter and Missimer's acts is irreparable, continuing, and not fully compensable by monetary damages.

202.    Carpenter and Missimer's unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

203.    DCL is also entitled to compensatory damages as well as contractual attorneys' fees and costs of suit.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty and Duty of Loyalty against Carpenter and Missimer)

204.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

205.    At all relevant times, Carpenter and Missimer owed a fiduciary duty and a duty of loyalty to DCL, which required them to use their best efforts on behalf of DCL, to act in DCL's best interests, and to refrain from activities that would damage DCL's interests.

206.    Carpenter and Missimer violated these duties when they, without notice, accepted employment and/or began working for BSS while still employed by DCL, in a manner calculated to divert business from and to interfere with the DCL's business relationships and operations.

207.    Additionally, as DCL employees, Carpenter and Missimer had a duty of loyalty, honesty and fidelity to maintain the confidentiality of DCL's trade secrets and confidential/proprietary business information.

208.    Carpenter and Missimer misappropriated and/or wrongfully disclosed and used for improper purposes such confidential information and trade secrets to compete with DCL.

209.     Carpenter and Missimer's actions constitute a scheme of self-dealing, where Carpenter and Missimer acted against the interests of DCL for their own economic advantage and that of BSS's, thereby disadvantaging DCL's economic and business interests.

210.     The harm to DCL resulting from Carpenter and Missimer's acts is irreparable, continuing, and not fully compensable by monetary damages.

211.     Carpenter and Missimer's unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

212.     Carpenter and Missimer have also proximately caused DCL to suffer compensatory damages in an amount to be proven at trial.

### AS AND FOR THE SEVENTH CAUSE OF ACTION
**(Aiding and Abetting a Breach of Contract and/or
Fiduciary Duty and Duty of Loyalty against BSS)**

213.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

214.     BSS was aware that Carpenter and Missimer had contractual obligations to DCL and owed duties of loyalty to DCL, yet encouraged and assisted them in committing breaches of same.

215.     BSS's assistance in this regard was knowing and substantial.

216.     The harm to DCL resulting from BSS's acts is irreparable, continuing, and not fully compensable by monetary damages.

217.     BSS's unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

218. BSS has also proximately caused DCL to suffer compensatory damages in an amount to be proven at trial.

### AS AND FOR THE EIGHTH CAUSE OF ACTION
**(Common Law Unfair Competition against Defendants)**

219. Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

220. Rather than build their own client base by investing the time and capital necessary to do so, Carpenter and Missimer conspired with BSS to misappropriate DCL's trade secrets, namely its confidential client lists and business information, then used same to unfairly compete against DCL.

221. Defendants have taken for themselves client relationships that DCL nurtured, developed and maintained since the founding of the company

222. Defendants have unfairly received the benefit of DCL's client relationships without any of the costs associated with developing those relationships, which costs were born solely by DCL.

223. Defendants' conduct constitutes common law unfair competition.

224. The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

225. Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

226. Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage against All Defendants)

227.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

228.    DCL has actual and prospective business relationships with numerous third-party customers or clients.

229.    DCL also had reasonable expectations of economic advantage with prospective business relationships in the form of potential customers or clients.

230.    These relationships and expectations constitute protectable interests.

231.    Defendants' unlawful, improper and deliberate acts have repeatedly interfered with DCL's actual and potential economic relationships.

232.    Defendants' acts of interference with DCL's business relationships were committed with malice and without adequate justification.

233.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

234.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

235.    Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE TENTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations against BSS)

236.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

237.   DCL had contractual relationships with Carpenter, Missimer, and various other third-party customers or clients.

238.   BSS, a non-party to these agreements, deliberately and intentionally interfered with these contractual relationships.

239.   BSS's acts of interference with DCL's contractual relationships were committed with malice and without adequate justification.

240.   The harm to DCL resulting from BSS's acts is irreparable, continuing, and not fully compensable by monetary damages.

241.   BSS's unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

242.   BSS has also caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE ELEVENTH CAUSE OF ACTION
### (Civil Conspiracy against All Defendants)

243.   Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

244.   Defendants committed overt acts in furtherance of an intentional, common scheme, as described in this Complaint.

245.   Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

246.   Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE TWELFTH CAUSE OF ACTION
### (Preliminary and Permanent Injunction against All Defendants)

247.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

248.    DCL has shown a likelihood of success on the merits.

249.    DCL has acted in good faith toward Defendants at all times, and has substantial business interests that must be protected.

250.    Defendants, by contrast, have acted in bad faith by deceptive and unlawful means in order to interfere and/or divert DCL's clients in furtherance of their own self-interests.

251.    The balance of equities lies decidedly in favor of DCL.

252.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

253.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

## AS AND FOR THE THIRTEENTH CAUSE OF ACTION
### (Accounting against All Defendants)

254.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

255.    A fiduciary relationship existed by and between Carpenter and Missimer, on the one hand, and DCL, on the other hand.

256.    Carpenter and Missimer breached their fiduciary duties owed to DCL by, *inter alia*, (i) failing to keep confidential DCL's trade secrets and/or confidential/proprietary business information, (ii) recruiting and/or soliciting employees from DCL to join BSS, (iii) inducing DCL's employees to leave DCL, (iv) soliciting, diverting and/or servicing DCL's actual or

potential customers, (v) working for DCL's direct competitor, BSS, while still employed by DCL, (vi) misappropriating trade secrets, (vii) using trade secret and/or otherwise confidential/proprietary business information for the benefit of a person or entity other than DCL; (viii) disclosing confidential and trade secret information to BSS, and (ix) failing to return to DCL all of its confidential and trade secret information.

257.    Defendants must account to DCL for all business obtained by Carpenter and Missimer using DCL's trade secrets and/or confidential/proprietary business information in violation of their employment agreements while engaging in unfair competition with DCL.

258.    DCL is entitled to a judgment against Defendants in an amount equal to the funds obtained by and through Carpenter and Missimer from all business they obtained using DCL's trade secrets and/or confidential/proprietary business information in violation of their employment agreements while engaging in unfair competition with DCL.

## **PRAYER FOR JUDGMENT**

**WHEREFORE**, DCL demands a preliminary and permanent injunction against Defendants further use or dissemination of DCL's trade secrets and/or confidential/proprietary business information and the deletion of same from any repositories to which they may have been copied.

**WHEREFORE**, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, Defendants shall not solicit or otherwise communicate with any client or customer that Carpenter and Missimer maintained any contact with while in the employ of DCL.

**WHEREFORE**, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, Defendants shall not provide any

services to any client or customer that Carpenter and Missimer maintained any contact with while in the employ of DCL.

**WHEREFORE**, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, measured from the date of the injunction order, Defendants shall not solicit, employ, or retain DCL's employees.

**WHEREFORE**, DCL demands immediate turnover for forensic analysis of all personal and business devices used by Carpenter and Missimer for work performed by DCL and access to Carpenter and Missimer's BSS email accounts and BSS's computer network.

**WHEREFORE**, DCL demands an accounting of all accounts relating to actual and potential customers and/or clients that Carpenter and Missimer solicited for BSS in violation of their employment agreements, and a return of all proceeds, compensation, commissions, alleged "wages," alleged "salary," consulting fees, incentive payments, profits, earnings, monies and/or other benefits that were unjustly obtained by Defendants through violation of Carpenter and Missimer's employment agreements and against BSS for aiding and abetting such breaches, plus all interest, costs, fees and expenses.

**WHEREFORE**, DCL demands judgment against Defendants for compensatory, consequential, liquidated, exemplary and punitive damages in an amount to be proven at trial, together with interest, attorneys' fees, costs and disbursements, and for such other and further relief as may be appropriate.

Dated: March 10, 2023                    Respectfully submitted,

Steven J. Weber, VSB No. 35573
Gregory R. Begg, *Pro Hac Vice* (pending)
Lauren Rayner Davis, *Pro Hac Vice* (pending)
Peckar & Abramson, P.C.
2055 L Street, NW
Suite 750
Washington, DC  20036
Telephone:  (202) 293-8815
Facsimile:  (202) 293-7994
SWeber@pecklaw.com
GBegg@pecklaw.com
LDavis@pecklaw.com

*Attorneys for Plaintiff Dark Circuit Labs, Inc.*

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury.

Dated: March 10, 2023                       Respectfully submitted,

                                            Steven J. Weber, VSB No. 35573
                                            Gregory R. Begg, *Pro Hac Vice* (pending)
                                            Lauren Rayner Davis, *Pro Hac Vice* (pending)
                                            Peckar & Abramson, P.C.
                                            2055 L Street, NW
                                            Suite 750
                                            Washington, DC  20036
                                            Telephone:  (202) 293-8815
                                            Facsimile:  (202) 293-7994
                                            SWeber@pecklaw.com
                                            GBegg@pecklaw.com
                                            LDavis@pecklaw.com

                                            *Attorneys for Plaintiff Dark Circuit Labs, Inc.*

## **VERIFICATION**

STATE OF VIRGINIA          )
                           ) ss.:
COUNTY OF VIRGINIA         )


      RONALD PELKEY, as the President of Dark Circuit Labs, Inc. in above-captioned case,

verify that I have reviewed and authorized the allegations made in this Verified Complaint. I

declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


RONALD PELKEY

Dated: March 10, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2023, I electronically filed the Verified Complaint with the Clerk of the Court using the ECF, who in turn sent notice to the following:

Anne G. Bibeau, Esq.
WOODS ROGERS VANDEVENTER BLACK PLC
101 West Main Street, Suite 500
Norfolk, VA 23510
anne.bibeau@wrvblaw.com
*Attorneys for Defendants Black Sails Security LLC and John Carpenter*

Broderick C. Dunn, Esq.
COOK CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
bdunn@cookcraig.com
*Attorneys for Defendant Eric Missimer*

Dated: March 10, 2023

_____
Steven J. Weber, VSB No. 35573

# EXHIBIT A

# DARK CIRCUIT LABS, INC.

## SHAREHOLDERS AGREEMENT

This SHAREHOLDERS AGREEMENT, dated as of *Nov 3rd*____, 2021, ("Effective Date"), by and among DARK CIRCUIT LABS, INC., with a principal address located at 1900 Reston Metro Plaza, Floors 5-6, Reston, VA 20190 and (the "Company") and each of the Shareholders listed on Schedule 1 attached hereto (each, a "Shareholder", and collectively, the "Shareholders").

## W I T N E S S E T H:

WHEREAS, as of the Effective Date, each of the Shareholders owns the number of shares of Common Stock, respectively, specified with respect to such individual on Schedule 1 attached hereto, and such shares, as of the Effective Date, represent the percentage ownership of all of the Capital Stock of the Company on a fully diluted basis as specified with respect to such individual on Schedule 1;

WHEREAS, the parties hereto desire to set forth their mutual agreements and understandings with respect to, among other things, certain of their respective rights, duties and obligations and certain transactions and arrangements in respect of the Company, the Capital Stock of the Company and related matters; and

WHEREAS, the parties hereto desire to ensure the continuity of the business of the Company and that all Shareholders remain actively engaged in the business of the Company.

NOW, THEREFORE, the parties hereto, intending legally to be bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Defined Terms and Interpretation.    (a) Each capitalized term found in this Agreement that is not specifically defined in this Section 1.1 shall have the definition ascribed to it in the particular Section of this Agreement where such term is found. As used in this Agreement, the following terms shall have the following meanings:

"Affiliate": of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Agreement": this Shareholders Agreement, together with all Schedules and Exhibits hereto, as the same may be amended, supplemented or modified in accordance with the terms hereof from time to time.

"Bankruptcy" shall mean, with respect to any Person, the occurrence of any of the following events: (a) the filing by such Person of a petition in bankruptcy or for relief under applicable bankruptcy laws; (b) the filing against such Person of any such petition (unless such

#4570734v5

petition is dismissed within ninety (90) days from the date of filing thereof); (c) entry against such Person of an order for relief under applicable bankruptcy laws; (d) written admission by such Person of its inability to pay its debts as they mature, or an assignment by such Person for the benefit of creditors; or (e) appointment of a trustee, conservator or receiver for the property or affairs of such Person.

"Buyout Event" shall mean the occurrence of an Involuntary Transfer or the removal of a Director For Cause (as defined in Section 2.5).

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company, any and all equivalent ownership interests in a Person (other than a corporation) and any and all rights, warrants or options to purchase any of the foregoing.

"Common Stock": shares of the Company's common stock, par value $0.0001.

"Company": Dark Circuit Labs, Inc., a Delaware corporation.

"Control": (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Effective Date": the date of this Agreement first written above.

"Founders" shall collectively mean Chase Bertke, Ronald Pelkey, Jr. and Eric Missimer, and each individually, a "Founder".

"Governmental Authority": any nation or government, any state or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or any other regulatory authority.

"Incompetence" means, with respect to any Director or Shareholder, that such person is unable to manage their affairs and that a guardian, trustee or other Person is appointed to manage the affairs of such Director or Shareholder.

"Involuntary Transfer" shall mean any Transfer, proceeding or action by or in which a Shareholder shall be deprived or divested of any right, title or interest in or to any of its shares of Capital Stock, including, without limitation, any seizure under levy of attachment or execution, any transfer in connection with Bankruptcy or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, any transfer to a state or to a public offers or agency pursuant to any statute pertaining to escheat or abandoned property, any transfer pursuant to a property settlement, judgment or final decree of a court incident to a divorce, dissolution of marriage or separation, or the involuntary dissolution of any Shareholder which is an entity.

"Nayara": shall mean Nayara One LLC, a Virginia limited liability company.

"Person": any individual, company, corporation, partnership, limited liability company, trust, division, Governmental Authority or other entity.

"Retire" and "Retirement" means a voluntary retirement from performing services for the Company as an employee or consultant or otherwise

"Requirement of Law": as to any Person, the articles or certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, statute, treaty, rule or regulation, order or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property, or to which such Person or any of its property is subject.

"Securities Act": The Securities Act of 1933, as amended.

"Shareholder": each of those shareholders of the Company listed on Schedule 1 attached hereto and each other Person that becomes a party to this Agreement from time to time pursuant to Section 3.1(b) hereof.

"Shareholders": collectively, all of the Shareholders of the Company.

"Transfer": with respect to any Capital Stock, (a) any sale, assignment or transfer of such Capital Stock or any right or interest therein; (b) any pledge or hypothecation of such Capital Stock or any interest therein; (c) any grant, sale or other transfer of securities convertible or exchangeable into or exercisable for or other options, warrants or rights to acquire such Capital Stock or any interest therein; and (d) any other direct or indirect transfer of such Capital Stock or any interest therein.

(b)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement unless otherwise specified.

(c)     The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

## ARTICLE II
## VOTING AGREEMENT, AND RELATED MATTERS

2.1     Number of Directors. The Board of Directors of the Company shall consist of not less than four individuals (each, a "Director"). For so long as Nayara is a shareholder of the Company, Nayara shall have the right to designate one (1) Director to the Board of Directors (the "Nayara Director"). The initial Nayara Director shall be Larry Littleton The remaining members of the Board of Directors shall consist of the three (3) Founders (the "Founding Directors").

2.2     Founders Designees to the Board of Directors. The Founders hereby agree to vote their Shares of Common Stock at any regular or special meeting of the Shareholders called for the purpose of filling positions on the Board of Directors of the Company, or in any written consent executed in lieu of such a meeting of Shareholders, and shall otherwise take all actions

3

necessary, to ensure the election of all of the Founders to Board of Directors, subject to the provisions of Sections 2.5 and 2.6 below.

2.3     Nayara Designee to the Board of Directors. At all times during which Nayara is a Shareholder, Nayara shall be permitted to designate one (1) member of the Board of Directors (the "Nayara Director"). In the event that the Nayara Director is removed in accordance with Section 2.5 below or is unable or unwilling to serve, then only Nayara shall have the right to appoint a replacement Nayara Director.

2.4     Director Votes. For all actions and decisions coming before the Board of Directors, each Founder serving as a director shall have ten (10) votes and any director who is not a Founder, including any director who replaces a Founder director, and the Nayara director, shall have one (1) vote (collectively, "Director Votes" and individually, a "Director Vote"). For any matter coming before the Board of Directors at a duly called meeting of the Board of Directors, the affirmative vote of a majority of the Director Votes shall be required to approve such matter; provided however, that at any time where less than all of the Founders are members of the Board of Directors, the affirmative vote of a majority of Director Votes to be cast by Founders then serving on Board will be required to approve any matter. The consent of all Directors shall be required for all action of the Board of Directors taken by written consent.

2.5     Removal of Directors. Directors holding a majority of the Director Votes may remove a Director from the Board of Directors (i) For Cause, as defined below or (ii) if such Director (or the party who has the right to designate such Director) no longer holds any shares of Capital Stock of the Company; provided that a Director shall be deemed to hold shares of Capital Stock transferred for estate planning purposes. For purposes of this Agreement "For Cause" shall mean, with respect to any Director, (i) such Director's dishonesty, incompetence, willful misconduct, gross negligence, or breach of fiduciary duty, (ii) any conviction of, or the entering of a plea of guilty or nolo contendere to, a crime that constitutes a felony, or any willful or material violation by such Director of any federal, state or foreign securities laws, (iii) any conviction of any other criminal act or act of material dishonesty, disloyalty or misconduct by such Director that has a material adverse effect on the property, operations, business or reputation of the Company or (iv) the material breach by such Director of any written covenant or agreement with the Company not to disclose any confidential information or not to compete or interfere with the Company.

2.6     Filing of Vacancies. In the event of (i) the death or Incompetence of a Founding Director, then the heir, guardian, trustee or other Person appointed to manage the affairs of such Founding Director shall have the right to appoint a replacement Director, provided that such replacement Director shall not have ten (10) Director Votes, but shall have one (1) Director Vote. In the event that any Founding Director is otherwise unwilling to serve as a Director, or is removed as a Director in accordance with Section 2.5 above, then the remaining Founders acting unanimously may appoint a replacement Director, provided that such replacement Director shall not have ten (10) Director Votes (as described below, but shall have one (1) Director Vote. A vacancy of Nayara Director shall be filled by the Nayara only.

4

## ARTICLE III

## SPECIAL PROVISIONS RELATING TO DILUTION, SERVICE PROVIDER SHARES AND PREEMPTIVE RIGHTS

3.1    Special Provisions Relating to Dilution and Service Provider Shares.

In the event that the Board of Directors elects to issue additional shares of Common Stock to employees, consultants and contractors of the Company in exchange for services to be provided to the Company (collectively, the "Service Providers" and such shares of Common Stock issued to Service Providers are hereafter referred to as "Service Provider Shares"), with respect to the issuance of the first [290,323] Service Provider Shares to Service Providers the number of shares of Common Stock of the Company issued to Nayara shall be appropriately adjusted, such that dilutive effect of the issuance of the first [290,323] Service Provider Shares to Service Providers shall be borne solely by the Founders on a pro rata basis (i.e. the percentage ownership of Nayara shall not be reduced as a result of such issuances of additional Common Stock until such time as [290,323] Service Provider Shares have been issued to Service Providers. After the issuance of such [290,323] Shares, the percentage ownership of the Shareholders with respect to the issuance of any additional shares of Common Stock shall be diluted appropriately and proportionately on a pro-rata basis.

3.2    Preemptive Rights.

(a)    If the Company proposes at any time to issue shares of Capital Stock (other than to Service Providers as contemplated in Section 3.1(b)), the Company shall provide written notice to Nayara (the "Section 3.2 Notice"), setting forth in reasonable detail the number of shares of Capital Stock to be issued, the per-share and aggregate consideration to be paid by each purchaser, and the other terms and conditions upon which such shares of Capital Stock are being sold. Nayara shall have the right, for a period of ten (10) business days after delivery of the Section 3.2 Notice to agree by written notice to the Company (an "Acceptance Notice") to purchase from the Company the number of shares of Capital Stock that would cause Nayara to own, after the issuance of the shares of Capital Stock set forth in the Section 3.2 Notice, the same percentage of all issued and outstanding shares of Capital Stock that the Nayara owned as of the time the Section 3.2 Notice was given. The shares of Capital Stock purchased under this Section 3.2 shall be the on the same terms and conditions for sale as are set forth in such Section 3.2 Notice. Nayara's election to purchase shares of Capital Stock hereunder shall be binding and irrevocable. The failure of Nayara to deliver an Acceptance Notice shall constitute a waiver of its rights under Section 3.2 with respect to the purchase of shares of Capital Stock offered at such time but shall not affect its rights with respect to any future issuances or sales of shares of Capital Stock.

(b)    At the closing of the sale or issuance of the shares of Capital Stock as set forth in the Section 3.2 Notice, the Company shall transfer to Nayara, and Nayara shall purchase, the number of shares of Capital Stock that Nayara is obligated to purchase, for the purchase price and on the terms and conditions provided for in Section 3.2.

5

## ARTICLE IV
## AGREEMENTS RELATING TO THE CAPITAL
## STOCK OF THE COMPANY AND OTHER MATTERS

Section 4.1    Transfers of Capital Stock.

(a)    No Shareholder other than Nayara shall, without the prior approval of the Board of Directors (which approval shall not be unreasonably withheld), directly or indirectly, Transfer any Capital Stock of the Company (or any interest therein or irrevocable proxy with respect thereto), now or hereafter at any time owned by such Shareholder. To the extent such Shareholder obtains such prior approval of the Board of Directors, such Transfer shall be subject to adherence with the terms and provisions of this Agreement, including, but not limited to the terms of this Article IV.

(b)    Any Transfer of Capital Stock of the Company by any Shareholder (or Transferee, as defined) shall not relieve the transferor of its obligations hereunder and, assuming such Transfer is done in compliance with the terms of this Agreement, shall only be valid if the Person to whom such Capital Stock is Transferred (a "Transferee") prior to the Transfer, agrees in writing in an agreement reasonably acceptable to the Company to be bound by the terms of this Agreement (if not already a party to this Agreement) immediately prior to such Transfer; provided, however, if a Transfer of Capital Stock involves the Transfer of all outstanding shares of Capital Stock by all of the Shareholders, then the Transferee need not be   party to this Agreement and this Agreement shall be automatically terminated upon consummation of such Transfer. Any such Transferee that agrees to be bound by the terms of this Agreement as provided in this paragraph (b) shall be deemed, upon execution and delivery of such agreement to be so bound, to be a Shareholder hereunder. Each such Transferee that agrees to be bound by the terms of this Agreement shall be entitled to all of the rights under this Agreement to which the transferor was entitled immediately prior to such Transfer. Any purported Transfer without obtaining the agreement by the Transferee to be bound by the terms of this Agreement reasonably acceptable to the Company (except in the case of the Transfer of all outstanding shares of Capital Stock) shall be deemed void and of no further effect and shall be governed by the provisions of paragraph (c) below.

(c)    In the event a Transfer of any Capital Stock of the Company has taken place or remains in place in violation of the provisions of this Article III or any other provision of this Agreement, such Transfer shall be void and of no effect, and no dividend of any kind whatsoever nor any distribution pursuant to liquidation or otherwise shall be paid by the Company to the Transferee in respect of such Capital Stock (all such dividends and distributions being deemed waived), and any voting rights of such Capital Stock on any matter whatsoever shall remain vested in the transferor. The Company shall not be required to record on its stock transfer ledger or its stock register or other records any Transfer made in violation of this Agreement.

6

4.2     Legends on Stock. Each certificate evidencing shares of Capital Stock of the Company held by any Shareholder or any Transferee of a Shareholder shall bear the following legend on the face thereof:

"THIS CERTIFICATE IS ISSUED SUBJECT TO THE PROVISIONS OF A SHAREHOLDERS AGREEMENT DATED AS OF _____, 2021 AND NEITHER THIS CERTIFICATE NOR THE SHARES REPRESENTED BY IT ARE ASSIGNABLE OR OTHERWISE TRANSFERABLE, EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SAID AGREEMENT, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, OR ANY OTHER STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAW OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE."

Any certificate issued at any time in exchange or substitution for any certificate bearing such legend (except a new certificate issued upon completion of a public distribution under a registration statement of the Capital Stock represented thereby) shall also bear such legend unless, in the opinion of counsel for the holder of such Capital Stock (which counsel shall be reasonably satisfactory to the Company), the Capital Stock represented thereby is not, at such time, required by law to bear such legend. The Company agrees that it will not Transfer on its books any certificate for its Capital Stock in violation of the provisions of this Agreement or any applicable laws.

4.3     Right of First Refusal.

(a)     If a Shareholder receives a bona fide third party offer to purchase all or part of his shares of Capital Stock (a "Third-Party Offer"), such Shareholder (a "Selling Shareholder") may sell such shares of Capital Stock subject to the provisions of this Section 4.3:

(i)     If a Selling Shareholder receives a Third-Party Offer, the Selling Shareholder must first offer to sell the shares of Capital Stock that are the subject of a Third-Party Offer (the "Offered Interest") to the other Shareholders (the "Non-Selling Shareholders"), as follows:

(1)     Such offer for sale (the "Offer") shall be in writing and addressed by the Selling Shareholder to the Non-Selling Shareholder(s) at their addresses listed in this Agreement (or to such other address that they shall designate in writing to the Company). Such Offer shall formally notify the Non-Selling Shareholder(s) of the material terms and conditions of the Third-Party Offer, including, but not limited to, the identity of the third party purchaser, the price to be paid for the Offered Interest to be acquired and the proposed closing

date. The Selling Shareholder shall represent and warrant in such Offer that the Third-Party Offer is a bona fide offer and that the Selling Shareholder is willing to sell the Offered Interest to the Non-Selling Shareholder(s) free and clear of all liens and encumbrances. If the sale involves more than fifty percent (50%) of the shares of Capital Stock in the Company, and if the Selling Shareholder intends to exercise the Drag Along Right set forth in Section 4.5, such Selling Shareholder shall affirmatively indicate in the Offer its intent to exercise the Drag Along Right and that the prospective purchaser has been notified of this intention and is ready willing and able to purchase such additional shares of Capital Stock.

(2)     The Non-Selling Shareholder(s) each shall have, for a period of thirty (30) days after receipt of the Offer (the "Expiration Date"), the right, but not the obligation, on a pro-rata basis or such other basis as agreed in writing in writing among the Non-Selling Shareholders, to acquire from the Selling Shareholder all and not less than all of the Offered Interest (the "Right of First Refusal") on the same terms and conditions set forth in the Offer. In order to exercise the Right of First Refusal, a Non-Selling Shareholder must provide written notice to the Selling Shareholder and the Company ("Exercise Notice") of his decision to exercise the Right of First Refusal prior to the Expiration Date. If a Non-Selling Shareholder does not exercise their Right of First Refusal to purchase their pro-rata portion of the Offered Interest, the other Non-Selling Shareholder(s) must either elect to purchase, on such basis as they may agree among themselves, that portion of the Offered Interest that the other Non-Selling Shareholder(s) did not elect to purchase or forego their own Right of First Refusal.

(3)     The closing of each sale and purchase pursuant to the exercise of the Right of First Refusal shall be held at the offices of the Company on the fifteenth (15th) Business Day following the date the Selling Shareholder receives the Exercise Notice from a Non-Selling Shareholder.

(ii)     If the Right of First Refusal has not been exercised on or prior to the Expiration Date, then the Selling Shareholder shall have the right, beginning five (5) Business Days thereafter and for a period of ninety (90) days after such Expiration Date, to sell to the Offered Interest to the bona fide third party purchaser that made the Third Party Offer on the same terms and conditions as set forth in the Offer. Any proposed Transfer on terms and conditions more favorable to the third party purchaser than those described in the Offer, as well as any proposed Transfer of shares of Capital Stock more than ninety (90) days after the Expiration Date, shall again be subject to compliance with the requirements of this Section 4.3.

4.4     Tag-Along Rights of Shareholders.

(a)     If, at any time, Selling Shareholder(s) holding fifty percent (50%) or more of the shares of Capital Stock deliver an Offer pursuant to Section 4.3, and the Non-Selling Shareholders wish to participate in such sale (the "Tag-Along Right"), and do not wish to exercise their Right of First Refusal, the Non-Selling Shareholders may notify the Selling Shareholders by written notice (the "Tag-Along Notice"), on or before the fifteenth (15th) day following the Expiration Date of the Right of First Refusal ("Tag-Along Period"), that such Non-Selling Shareholders desire to sell to the bona fide third party purchaser identified in the Offer all or part of their shares of Capital Stock in the Company ("Tag-Along Shareholder") on the same terms and conditions under which the Selling Shareholders' shares of Capital Stock are to be

8

purchased. The Tag-Along Notice shall specify the portion of the shares of Capital Stock that such Tag-Along Shareholder desires to sell. The offer of each Tag-along Shareholder set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-along Shareholder shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this Section 7.4. Each Tag-Along Shareholder shall have the right to sell in a sale subject to this Section 7.4 the shares of Capital Stock equal to the product obtained by multiplying (x) the shares of Capital Stock held by the Tag-Along Shareholder by (y) a fraction (A) the numerator of which is equal to shares of Capital Stock the Selling Shareholders proposes to sell or Transfer to the bona fide third-party purchaser and (B) denominator of which is equal to all of the shares of Capital Stock then owned by such Selling Shareholders.

(b)     The Selling Shareholders shall use their commercially reasonable efforts to include in the proposed sale to the bona fide third-party purchaser all of the shares of Capital Stock that the Tag-Along Shareholders have requested to have included pursuant to the applicable Tag-Along Notices, it being understood that the bona fide third-party purchaser shall not be required to purchase shares of Capital Stock in excess of the number set forth in the Offer. In the event the bona fide third-party purchaser elects to purchase less than all of the shares of Capital Stock sought to be sold by the Tag-Along Shareholders, the number of shares of Capital Stock to be sold to the third party purchaser by the Selling Shareholders and each Tag-Along Shareholder shall be reduced so that each such Shareholder is entitled to sell its pro-rata portion of the shares of Capital Stock the bona fide third-party purchaser elects to purchase (which in no event may be less than the number of shares of Capital Stock set forth in the Offer).

(c)     Each Shareholder who does not deliver a Tag-Along Notice in compliance with clause (a) above shall be deemed to have waived all of such Shareholder's rights to participate in such sale, and the Selling Shareholders shall (subject to the rights of any participating Tag-Along Shareholder) thereafter be free to sell to the bona fide third party purchaser its shares of Capital Stock at a price that is no greater than the price set forth in the Offer and on other same terms and conditions which are not materially more favorable to the Selling Shareholders than those set forth in the Offer, without any further obligation to the non-accepting Shareholders.

(d)     Each Tag-Along Shareholder shall take all actions as may be reasonably necessary to consummate the Tag-Along sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholders.

(e)     The Selling Shareholders shall have ninety (90) business days following the expiration of the Tag-Along Period in which to sell the shares of Capital Stock described in the Offer, on terms not more favorable to the Selling Shareholders than those set forth in the Offer (which such ninety (90) business day period may be extended for a reasonable time not to exceed one hundred twenty (120) business days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Shareholders have not completed such sale, the Selling Shareholders may not then effect a sale of shares of Capital Stock subject to this Section 7.4 without again fully complying with the provisions of this Section 4.4.

(f)     This Section 4.4 shall not apply to: (i) sales to any employee of the Company, except for any Founder who is an employee; or (ii) sales in a distribution to the public (whether pursuant to a registered public offering, Rule 144 or otherwise).

4.5     Drag-Along Rights.

(a)     In the event Selling Shareholder(s) holding more than fifty percent 50%) of the shares of Capital Stock in the Company desire, collectively, to Transfer all of their shares of Capital Stock, subject to the expiration of, or election not to exercise, the Non-Selling Shareholder(s)' Right of First Refusal, such Selling Shareholder(s) shall have the right to require the Non-Selling Shareholder(s) to sell (the "Drag-Along Right") to the bona fide third party purchaser identified in the Offer all of the Shares of Capital Stock owned by each Non-Selling Shareholder. Any shares of Capital Stock purchased pursuant to this Section 7.5 shall be paid for at the same price to be paid to the Selling Shareholder(s) for their shares of Capital Stock and upon the same terms and conditions under which the Selling Shareholder(s)' Shares of Capital Stock are to be purchased. The Selling Shareholder(s) may exercise the Drag Along right by affirmatively indicating they are exercising such Drag-Along Right in the Offer.

(b)     Each Non-Selling Shareholder shall take all actions as may be reasonably necessary to consummate the Drag-Along sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholders.

(c)     The Selling Shareholder(s) shall have ninety (90) Business Days following the date of the Offer in which to sell the Shares of Capital Stock described in the Offer, on terms not more favorable to the Selling Shareholder(s) than those set forth in the Offer (which such ninety (90) Business Day period may be extended for a reasonable time not to exceed one hundred twenty (120) Business Days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Shareholder(s) have not completed such sale, the Selling Shareholder(s) may not then effect a sale of shares of Capital Stock subject to this Section 7.5 without again fully complying with the provisions of this Section 4.5.

4.6     Buyout Events.

(a)     In the event a Buyout Event occurs with respect to a Founder (a "Terminated Shareholder"), the Company shall have the right, but not the obligation, to purchase all or any portion of the Terminated Shareholder's shares of Capital Stock (the "Buyout Right") in accordance with the terms of this Section 4.6.

(b)     The Company shall have the option, for a period of one hundred eighty (180) days following a Buyout Event (the "Buyout Period") to purchase all or any portion of the Terminated Shareholder's shares of Capital Stock. The right of the Non-Terminated Shareholder to purchase the Terminated Shareholder's shares of Capital Stock shall be exercisable by the delivery of a written notice (the "Buyout Exercise Notice") by the Company to the Terminated Shareholder, prior to the expiration of the Buyout Period, stating what amount of the Terminated Shareholder's shares of Capital Stock that the Company has elected to purchase. Such purchase

shall be completed in accordance with the closing procedures set forth in Section 4.7 herein. The Buyout Exercise Notice shall be binding on the Terminated Shareholder upon delivery by the Company.

  4.7  Terms for Purchase of Buyout Interest. The following terms of purchase shall apply to the purchase of a Terminated Shareholder's Shares of Capital Stock:

    (a)  Purchase Price. The purchase price for a Terminated Shareholder's shares of Capital Stock shall be the Fair Market Value of the Terminated Shareholder's shares of Capital Stock ("Purchase Price").

    (b)  Closing. The closing of the purchase of the Terminated Shareholder's Shares of Capital Stock pursuant to Section 4.6 hereof shall take place at the office of the Company on a date (the "Closing Date") and at a time designated by the Company. On the Closing Date, the Terminated Shareholder shall deliver the certificate(s) evidencing the Terminated Shareholder's shares of Capital Stock being sold along with a duly executed stock power and the Company shall deliver by certified or bank cashier's check or wire transfer to an account designated in writing by the Terminated Shareholder, an amount not less than twenty (20%) percent of the Purchase Price. The balance of the Purchase Price, with interest at a rate of five (5%) percent per annum shall be paid in five (5) equal installments each due to the Terminated Shareholder on the anniversary of the Closing Date and shall be evidenced by the delivery of a promissory note (a "Promissory Note") by the Company to the Terminated Shareholder. Notwithstanding the foregoing, the Company shall have the right, but not the obligation, to pay the entire Purchase Price on the Closing Date or the remaining balance of the Purchase Price to the Terminated Shareholder at any time without penalty.

    (c)  Spousal Consent. Simultaneously with the execution of this Agreement by the Shareholders, each Shareholder shall deliver to the Company, a fully executed Spousal Consent, in the form attached hereto as Exhibit B.

  4.8  Further Assurances. A Terminated Shareholder shall execute and deliver such additional documents and instruments and perform such additional acts as the Company may request to effectuate or carry out and perform all the terms, provisions and conditions of Sections 4.6 and 4.7 hereof and the transactions contemplated thereby, to effectively transfer, assign and deliver the Terminated Shareholder's Shares of Capital Stock to the Company.

  4.9  Remedies. It is specifically understood and agreed that any breach of the provisions of Sections 4.6, 4.7 or 4.8 hereof by a Terminated Shareholder will result in irreparable injury to the Company, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other remedies that the Company may have, the Company may enforce its respective rights by actions for specific performance in federal or state court in the Commonwealth of Virginia. In the event that the Company is required to enforce its rights under Sections 4.6, 4.7 or 4.8 hereof, the Terminated Shareholder shall reimburse the Company for all of the Company's costs and expenses, including attorneys' fees and

disbursements, incurred by the Company in enforcing the provisions of Section 4.6, 4.7 or 4.8 hereof.

4.10    Special Provisions Relating to Death, Incompetence, Retirement or Termination of Employment of any Founder. In the event of the death, Incompetence, Retirement, or termination of employment with the Company of a Founder for any reason other than Cause (as defined in Section 2.5), such Founder shall be permitted to maintain their shares of Capital Stock, or Transfer their shares of Capital Stock to such Founder's immediate family, or a trust or other entity Controlled by or for the benefit of such Founder and/or such Founder's immediate family. In the event of the death, Incompetence, Retirement or termination of employment with the Company of a Founder for any reason other than Cause, such Founder (in the case of termination of employment for any reason other than Cause), or such Founder's successor, heir, or guardian, as applicable, shall appoint a replacement Director to the Board of Directors as set forth in Section 2.6, and such replacement Director shall have one (1) Director Vote.

4.11    Transfers for Estate Planning Purposes. Notwithstanding the prohibition against Transfers set forth in this Article IV, a Founder may Transfer their shares of Capital Stock, for estate planning purposes to said Founder's immediate family, or a trust, corporation, limited liability company or partnership Controlled by or for the benefit of such Founder or such Founder's immediate family, without requiring compliance with Section 4.3. In addition, in the event of such a Transfer, the Shareholders shall not have the rights set forth in Section 4.4..

ARTICLE V
REPRESENTATIONS AND WARRANTIES

5.1    Representations and Warranties of the Shareholders. Each of the Shareholders severally represents and warrants to, the other Shareholders and the Company that:

(a)    Authority. Such Shareholder has all requisite power to enter into this Agreement and to be bound by the terms hereof. This Agreement has been duly executed and delivered by such Shareholder, has been effectively authorized by all necessary action on the part of such Shareholder and constitutes such Shareholder's legal, valid and binding obligation, enforceable against such Shareholder in accordance with its terms, except as enforceability may be subject to the application of general equitable principles and to bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally.

(b)    Agreements Not in Breach of Other Instruments. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of the terms hereof will not result in a breach of any of the terms or provisions of, or constitute a default under, or conflict with (x) any agreement, indenture or other instrument to which such Shareholder is a party or by which such Shareholder is bound, (y) any judgment, decree, order or award of any court, governmental body, Governmental Authority or arbitrator by which such Shareholder is bound or (z) any Requirement of Law applicable to such Shareholder.

12

(c)     Regulatory Approvals. There are no consents, approvals, authorizations or other requirements prescribed by any applicable Requirement of Law that must be obtained by such Shareholder or satisfied by such Shareholder in connection with its execution, delivery and performance of this Agreement.

(d)     No Legal Bar. There is no suit, action or proceeding pending or, to such Shareholder's knowledge, threatened against such Shareholder that questions the validity of this Agreement, any of the transactions contemplated hereby or any action which has been taken by such Shareholder in connection herewith or in connection with any of the transactions contemplated hereby or that seeks to enjoin the consummation thereof.

## ARTICLE VI
## ADDITIONAL COVENANTS AND AGREEMENTS

6.1     Books and Accounts. The Company shall keep, or shall cause to be kept, full, accurate and true books and accounts of the Company's business, in which each Company transaction shall be fully and accurately entered. The Board of Directors shall have the authority to designate and retain a firm of independent certified public accounts to assist in the maintenance and preparation of such books, records and reports as the Board of Directors deems desirable or as is required under any Requirement of Law.

6.2     Information Rights. The Company shall provide reasonable access or copies for review to each Shareholder of the following: (i) annual audited or reviewed financial statements, including a balance sheet as of the end of such fiscal year, and a statement of cash flows for such year within one hundred twenty (120) days of the close of each fiscal year of the Company, (ii) unaudited quarterly financial statements within thirty (30) days of the end of each fiscal quarter of the Company, and (iii) any other information reasonably requested by the Shareholder from time to time. Nayara shall have the right to visit and inspect the Company's properties, examine its books of account and records and discuss the Company's affairs, finances and accounts with the officers of the Company, at reasonable times and on reasonable advance notice to the Company.

6.3     Non-Compete: No Shareholder shall, during the time such Shareholder is a Shareholder or employee of the Company, and for a period of one (1) year following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, without the prior written consent of the Company, directly or indirectly, and whether as principal, agent, officer, director, partner, employee, consultant, broker, dealer or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, or be engaged, have an interest in or take part in, or render services to any person, firm, corporation or other business organization (other than the Company) engaged in a business which is competitive with all or part of the business of the Company.

6.4     Confidential Information. Each Shareholder agrees that he, she or it will utilize Confidential Information (as defined below) solely for the purpose of the business of the Company and will make no other use of Confidential Information. In furtherance of the foregoing, no Shareholder shall directly or indirectly divulge, communicate, use to the detriment

13

#4570734v5

of the Company or for the benefit of any other person or entity or misuse in any way, any Confidential Information, including, but not limited to, personal information, forms, know-how, client lists, technical data, business plans and industry analyses. For the purposes of this Agreement, "Confidential Information" means that information which is confidential and proprietary to the Company (including, but not limited to, trade secrets) and which derives (or may derive) economic value to the Company by not being generally known to others, or which the Company is otherwise under an agreement of confidentiality with an unaffiliated third party. Each Shareholder agrees that he or it will maintain and preserve the confidentiality and secrecy of such Confidential Information. In the event that a Shareholder shall receive a request to disclose all or any part of the Confidential Information under the terms of a subpoena or order issued by a court of competent jurisdiction, such Shareholder agrees, to the extent legally permissible to (i) promptly notify the Company of the existence, terms and circumstances surrounding such a request, (ii) consult with the Company on the advisability of taking legally available steps to resist or narrow such request, and (iii) if disclosure of such information is required, exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information and to reasonably cooperate with the Company in any such effort by the Company, at Company's sole cost and expense.

6.5    Non-Solicitation. For so long as a Shareholder is a Shareholder or employee of the Company and for a period of twenty four (24) months following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, such Shareholder shall not, without the written permission of the Company or any Affiliate, directly or indirectly (i) solicit, employ or retain, or have or cause any other person or entity to solicit, employee or retain, any other Shareholder or other person who is employed by the Company or (ii) solicit the business of or provide services or products to any client (or prospective client) of the Company at any time while such Shareholder was an employee or Shareholder of the Company.

6.6    Non-Disparagement. No Shareholder shall, directly or indirectly, individually or in concert with others, knowingly engage in any conduct or make any statement that is reasonably likely to have the effect of undermining or disparaging the reputation of the Company or any Affiliate of the Company, or the good will of the Company or any Affiliate of the Company, products, or business opportunities, or that is reasonably likely to have the effect of undermining or disparaging the reputation of any officer, director or employee, past or present, of the Company or any of its Affiliates. This Section does not in any way restrict or impede any Shareholder from exercising protected rights, including rights under the National Labor Relations Act (NLRA) or the federal securities laws, including the Dodd-Frank Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency.

6.7    Termination of Prior Shareholders' Agreements. Each of the Shareholders and the Company agree that all Shareholders' agreements among or between such parties or any of them in relation to the Company and/or its Capital Stock are hereby terminated and superseded and replaced by this Agreement.

## ARTICLE VII
## EFFECTIVE DATE; TERM; TERMINATION

7.1     Effective Date. This Agreement shall become effective on the Effective Date.

7.2     Term. The obligations of each party hereunder shall remain binding upon such party until such time as:

(a)     this Agreement has terminated pursuant to Section 7.3 hereof; or

(b)     such party has Transferred all of its Capital Stock in the Company in accordance with the terms of this Agreement and the by-laws of the Company and is in compliance with its obligations under this Agreement;

provided that Sections 6.3-6.6 shall survive any termination of this Agreement.

7.3     Termination. Except as otherwise expressly provided herein, this Agreement shall terminate and all rights and obligations hereunder shall cease, upon the first to occur of any of the following events:

(a)     the voluntary dissolution of the Company; or

(b)     the written agreement of each of the parties hereto to such termination; or

(c)     the effective date of an initial public offering of shares of the Company's Capital Stock.

## ARTICLE VIII
## MISCELLANEOUS

8.1     Entire Agreement.     This Agreement, together with the other agreements, instruments and documents expressly referred to herein, constitute the entire agreement of the parties with respect to the transactions contemplated hereby and supersede all prior agreements and understandings with respect thereto, whether written or oral.

8.2     No Waiver; Amendment; Modifications in Writing. No failure or delay by a party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to any party at law or in equity or otherwise. No waiver of or consent to any departure by a party from any provision of this Agreement shall be effective unless signed in writing by the parties entitled to the benefit thereof. No amendment, modification or termination of any provision of this Agreement shall be effective unless signed in writing by all parties. Any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure from the terms of any provision of this Agreement, shall be effective only in the specific instance and for the specific purpose for which made or given. Notwithstanding anything to the contrary contained in this Agreement, the

Board of Directors of the Company is hereby authorized to amend Schedule 1 to this Agreement to reflect any changes to Schedule 1 made in accordance with the terms of this Agreement including, (i) the addition or deletion of Shareholders, (ii) changes in the number and/or type of shares held by Shareholders, (iii) changes in percentage ownership and (iv) changes of address of a Shareholder made at the request of such Shareholder in writing.

8.3     Notices.  All notices, demands and requests which may be or is required to be given under this Agreement shall be in writing and , shall be deemed to have been duly given, (i) when sent by reputable overnight carrier, (ii) when received, if personally delivered, or (iii) when sent by United States registered or certified mail, return receipt requested, postage prepared. Any such notices shall be addressed as follows:

> If to the Company:     Dark Circuit Labs, Inc.
> 1900 Reston Metro Plaza
> Floors 5-6,
> Reston, VA 20190

> If to the Shareholder:  At the respective addresses set forth in Schedule 1.

Any party hereto may change the address or addresses to which notice is to be sent by giving written notice to the other parties in the manner provided for herein.

8.4     Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.

8.5     Binding Effect; Assignment.  The rights and obligations of the parties under this Agreement may not be assigned or otherwise transferred to any other Person, except (i) with the prior written consent of the other parties hereto and (ii) in connection with a Transfer of Capital Stock of the Company by a Shareholder made in compliance with all of the provisions of this Agreement.  Except as expressly provided in this Agreement, this Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors, permitted assigns, heirs and personal representatives. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and personal representatives.

8.6     Governing Law.  This Agreement shall be deemed to be a contract made under and shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference to the principles of conflict of laws.

8.7     Consent to Jurisdiction and Service of Process  Any suit, action or proceeding arising out of or relating to this Agreement may be instituted in any Federal court or any state court of the Commonwealth of Virginia situated in Fairfax County, and each party agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding

is improper or that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each party further irrevocably submits to the jurisdiction of such court in any such suit, action or proceeding. Any and all service of process and any other notice in any such suit, action or proceeding shall be effective against any party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage fully prepaid, mailed to such party as herein provided. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

8.8    Further Assurances. Each of the parties hereto shall execute and deliver such documents, instruments and agreements and take such further actions as may be reasonably required or desirable to carry out the provisions of this Agreement, and each of the parties hereto shall cooperate with each other in connection with the foregoing.

8.9    Specific Performance. The parties hereto acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that money damages would not provide an adequate remedy. It is accordingly agreed that each of the parties hereto shall be entitled to an injunction and other equitable remedies to prevent breaches or threatened breaches by the other parties hereto of this Agreement, and to enforce specifically the terms and provisions hereof or thereof in any court of the United States or any state thereof having jurisdiction, this being in addition to any other remedy to which the parties may be entitled at law or in equity.

8.10    Severability of Provisions. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

8.11    Headings. The Article and Section headings used or contained in this Agreement are for convenience of reference only and shall not affect the construction of this Agreement.

8.12    Costs and Expenses. The respective parties hereto shall pay all costs and expenses that each respectively incurs with respect to the negotiation, execution and delivery of this Agreement and the Related Documents.

8.13    Nature of Agreements. The covenants and agreements of the parties in this Agreement are several and not joint covenants and agreements, unless otherwise expressly specified herein.

8.14    Gender. Whenever the context so requires, any references to the singular pronoun shall include the plural and vice-versa, and references to the masculine gender shall include the feminine gender and vice-versa, and references to neuter gender shall include the masculine or feminine gender, whichever is applicable.

8.15    No Presumption From Drafting. This Agreement has been negotiated at arm's length between persons knowledgeable in the matters set forth within this Agreement.

17

#4570734v5

Accordingly, given that all parties have had the opportunity to draft, review, engage legal counsel, and/or edit the language of this Agreement, no presumption for or against any party arising out of the drafting all or any part of this Agreement will be applied in any action relating to, connected with or involving this Agreement.

[SIGNATURE PAGE TO FOLLOW IMMEDIATELY]

#4570734v5

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement or caused this Agreement to be duly executed by their respective officers or representatives thereunto duly authorized as of the day and year first written above.

DARK CIRCUIT LABS, INC., a Delaware corporation

By: _____

Name: Chase Bertke
Title: Chief Executive Officer

SHAREHOLDERS:

_____
Chase Bertke

_____
Eric Missimer

_____
Ronald Pelkey, Jr.

Nayara One, LLC, a _____
limited liability company

By: _____

Name: Larry Littleton
Title: Managing Director

<u>SCHEDULE 1</u>
<u>SHAREHOLDERS' OWNERSHIP OF CAPITAL STOCK</u>

| Name of Shareholder | No. of Shares of Common Stock Owned | Percentage Ownership of all of the Company's Outstanding Capital Stock |
|---|---|---|
| Chase Bertke | 325,000 | 32.5% |
| Ronald Pelkey, Jr. | 325,000 | 32.5% |
| Eric Missimer | 325,000 | 32.5% |
| Nayara One, LLC | 25,000 | 2.5% |
| Total | 1,000,000 | 100% |

20

# EXHIBIT B



**DARK CIRCUIT LABS**

December 14, 2021

Re: Offer of Employment

Dear John Carpenter,

Dark Circuit Labs, Inc. (the "Company") is pleased to extend the following offer of employment. This offer of at-will employment is conditioned on your satisfactory completion of certain requirements, as explained in this letter. Your employment is subject to the terms and conditions set forth in this letter, which override anything communicated to you, orally or in writing, during your interview or as part of any other communication about your employment with the Company. You will be subject to all applicable employment and other policies of the Company as provided by the Company.

1.  <u>Position.</u>   Your title will be Senior CNO Developer, reporting to Ronald Pelkey. This is a full-time exempt position. As an exempt employee, you are not subject to minimum wage and overtime requirements of federal, state, or local law. Your duties generally will be development of secure software written in C, Python, Assembly, and other languages to be run across platforms including Linux, Windows, Android, iOS, and MacOS. Demonstrate an understanding of operating system internals and be able to reverse engineer specific subsystems to perform duties required, including weaponization of vulnerabilities discovered. The Company reserves the right to make personnel decisions regarding your employment, including but not limited to changes regarding your job title, reporting relationship, duties, compensation, benefits, or Company policies or procedures.

2.  <u>Start Date, Location, and Hours.</u>   Subject to your satisfactory completion of certain requirements as explained in this letter, your employment will commence on December 20th, 2021 at client location. Your work hours may fluctuate from week to week as determined by client needs.

3.  <u>Compensation.</u>   The Company will pay you a starting salary at the rate of $210,000 per year, which will be paid in accordance with the Company's standard payroll policies and schedule subject to all withholdings and deductions as permitted and required by law. The Company reserves the right, in its sole discretion, to prospectively modify your base salary at any time for any reason to the extent permitted by applicable law. Subject to the Company's current annual performance review process, you may be eligible for an increase of your base compensation in the Company's sole discretion.

4.  <u>Bonus.</u>   You will be entitled to a one-time signing bonus in the amount of $10,000 (the "Signing Bonus"). The Signing bonus shall be paid to you on or before the 1-month anniversary of your starting date. Should you elect to terminate your employment prior to the 12-month anniversary date of your start date you will forfeit the Signing Bonus and the Company will automatically be released of any obligation to pay you the Signing Bonus.

You may be entitled to a discretionary bonus. Your discretionary bonus (if any) will be prorated for your first year of employment based on your start date. The Company has the sole and absolute discretion to decide whether to award you a discretionary bonus for any year, and if so, in what amount. The Company's determination regarding your discretionary bonus is final and binding. To earn a discretionary bonus for any year, you must be employed by the Company on the date the bonus is paid. All forms of compensation referred to in this offer letter are subject to withholding and payroll taxes and any other deductions required by applicable law.

5.     <u>Employee Benefits</u>.       As a full-time employee of the Company, you will be eligible to participate in benefit plans and programs in effect from time to time in accordance with and subject to the eligibility and other provisions of those plans and programs. Company benefits currently include paid time off (PTO) of up to fifteen (15) days per year, exclusive of Company designated holidays per calendar year, disability benefits, workers' compensation benefits, group medical insurance, group life insurance, dental and vision plans, and other fringe benefits. Further information will be provided to you so that you may choose the plans and benefits that are right for you. The Company reserves the right to modify or terminate Company benefits from time to time.

6.     <u>Equity Grant</u>.       Subject to the approval of the Company's Board of Directors and your execution of an equity grant agreement, you will be granted 2,500 shares of the Company's Common Stock (the "Grant"). The Grant will be subject to the terms and conditions of an equity grant agreement, which you will be required to sign. The Grant will vest in 25% increments over the next four (4) years of continuous service on each anniversary of your start date. If your employment is terminated prior to a scheduled vesting date you will forfeit all unvested shares under the Grant. You should consult with your own tax advisor concerning the tax risks associated with accepting the Grant.

7.     <u>Tax Advice</u>.       You are encouraged to obtain your own tax advice regarding your compensation from the Company. You agree that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you will not make any claim against the Company or its officers related to tax liabilities arising from your compensation.

8.     <u>At-Will Employment Relationship</u>.       Your employment is for no specific period of time. Your employment with the Company is "at will", meaning that either you or the Company may terminate your employment at any time, for any reason or no reason, with or without cause. You are free to terminate your employment at any time, so long as you provide thirty (30) calendar days' notice to the Company. Any contrary representations that may have been made to you are superseded by this offer letter. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and an authorized representative of the Company (other than you).

9.     <u>Duty of Loyalty</u>.       While you are employed by the Company, you will not engage in any other employment, consulting, or other business activity (whether full-time or part-time) that creates a conflict of interest with the Company.

#4632344v1

10. <u>Proprietary Information</u>.  The Company has a great deal of valuable proprietary information relating to its business, which, if disclosed to or used by a competitor, would cause the Company irreparable injury. The Company will disclose this information to you in reliance on your promise made herein not to misuse the information. At all times while employed by the Company and at all times thereafter you agree to treat all Company proprietary information in a secret and confidential manner and shall comply with all applicable procedures established by the Company with respect to maintaining the secrecy and confidentiality of such information. You further agree not to cause the transmission, removal, or transport of tangible embodiments of, or electronic files containing, the Company's proprietary information without prior written approval by an authorized representative of the Company, and to provide reasonable assistance as may be requested by the Company, in the effort to maintain the secrecy and confidentiality of such information. Your obligations in this regard will be more fully contained in the Non-Solicitation, Non-Competition and Protectable Rights Agreement accompanying this letter agreement, which shall supplement the terms of this letter agreement.

11. <u>Release of Information in Personnel Records</u>.  It is understood that the Company will take reasonably prudent measures to protect the confidentiality of your information which is contained in personnel records maintained by the Company, including, but not limited to, information set forth on your employment applications and other personal information concerning your compensation. However, by signing this letter, you acknowledge that from time to time there may be a reason for the Company to furnish to others such information. Accordingly, you hereby authorize the Company to release to others which information if, in the Company's judgment, there is a reasonable basis for doing so, or responding to a request for information or request for proposals from any government or any agency or department thereof.

12. <u>Contingencies</u>.  As required by law, your employment with the Company is contingent on verification of your right to work in the United States, as demonstrated by your completion of a Form I-9 upon hire and your submission of acceptable documentation (as noted on the Form I-9) verifying your identity and work authorization within three (3) days of starting employment. Your employment is further contingent on your execution of the Company's Confidentiality, Non-Solicitation, Non-Competition and Protectable Rights Agreement. This offer will be withdrawn if any of the above conditions are not satisfied.

13. <u>Severability</u>.  If any term of this letter is held to be invalid, void or unenforceable, the remainder of the terms herein will remain in full force and effect and will in no way be affected, and the parties will use their best efforts to find an alternative way to achieve the same result.

14. <u>Entire Agreement, Survival, Modifications, and Governing Law</u>.  This letter agreement constitutes the complete agreement between you and the Company regarding the matters described in this letter and supersedes any prior agreements, representations, or understandings (whether written, oral, or implied) between you and the Company. This letter agreement shall be effective when signed by you, and the provisions of this letter agreement shall not depend upon whether your employment is terminated by you or the Company, for any reason or for no reason, and the effectiveness of such provisions shall survive separation of employment. The terms of this letter agreement may not be amended or modified except by an express written agreement signed by both you and an authorized officer of the Company. The interpretation of this letter agreement and any dispute arising out of or relating to this letter agreement, your employment with the Company, or any other relationship between you and the Company will be governed by the law

of the State of Virginia, excluding laws relating to conflicts or choice of law that would require the application of the law of any other state.

All of us at the Company are excited about the prospect of you joining our team. If you are in agreement with and would like to accept this offer, please sign and date this letter agreement. This offer is open for you to accept until December 17th, 2021, at which time it will be deemed to be withdrawn. The originals will be stored in your personnel file and you will receive a fully executed copy for your records as well. If you have any questions, please call me at 703-994-1965 or contact me at ron@darkcircuitlabs.com.

We look forward to the opportunity of working with you.

Very truly yours,

Ronald Pelkey
President and Chief Operating Officer

Enclosures:
Exhibit A: Form I-9 and List of Acceptable Documents
Confidentiality, Non-Solicitation, Non-Competition and Protectable Rights Agreement

## **Acknowledgement and Acceptance of Employment Offer:**

I have read, had the opportunity to ask questions, and understand all the terms of the offer of employment set forth in this letter, and I accept employment with the Company and acknowledge and fully agree to the terms and conditions set forth in this offer letter.

As an exempt employee, I understand that my fixed weekly salary (excluding other additional payments) is intended to cover all hours worked each week, regardless of how many or few and including those weeks in which I work more than forty (40) hours.

**I further understand and agree that my employment is at-will and, with the exception of a subsequent written agreement signed by an authorized Company representative, no statements or communications, whether oral or written, will modify my at-will employment status.**

I also understand that this letter is the Company's complete offer or employment to me and this letter supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to my employment. I have not relied on any agreement or representations, express or implied, that are not set forth expressly in this letter.

Employee Signature

12/15/2021
Date

Employee Printed Name

# EXHIBIT C

# CONFIDENTIALITY NON-COMPETITION AND PROTECTABLE RIGHTS AGREEMENT

This Confidentiality and Protectable Interest Agreement (the "**Agreement**") is entered into this December 20th, 2021, between Dark Circuit Labs, Inc., a Delaware corporation (which together with its subsidiaries, affiliates, assigns and/or successors is "**the Company**" or the "**Company**") and John Carpenter (the "**Employee**"). The purpose of this Agreement is to set forth certain reasonable restrictions related to active and prospective clients and referral sources of The Company as well as the Company's Confidential Information and Trade Secrets. **This agreement contains a limited "non-compete."**

**WHEREAS**, the Company's business ("**Company Business**") is the development of cyber security products, software and services, or other lines of business that the Company enters (or has taken concrete steps to enter into in the near future) during the term of your association with the Company for third parties who utilize the Company's offerings ("**Clients**"), which Clients do business with, or seek to utilize the services of the Company and/or its employees.

**WHEREAS**, Company Business also includes the use of and interaction with referral sources of business from business and individuals who refer prospective or actual clients ("**Referral Sources**").

**WHEREAS**, the Company has expended substantial time, effort and financial resources on marketing, entertaining and servicing Clients, so as to develop and maintain those relationships, its brand, name and reputation in the marketplace. In doing so, the Company has generated and enjoys the expectation of continued patronage ("**Goodwill**") from those Clients with whom it has done business and from prospective Clients with whom it is actively working to obtain new business and those individuals which refer business to the Company ("**Referral Sources**") the loss of which will cause the Company irreparable harm. A "**Prospective Client**" or Referral Source shall mean one with whom the Company is or was working with to obtain new business at the relevant time period in question.

**WHEREAS**, the Company has expended substantial time, effort and financial resources on identifying and developing business relationships with, negotiating terms for product and software development with, and working with third-party service providers of components and software for the Company's products and services ("**Service Providers**"), so as to develop and maintain those relationships and to have its proprietary products and services created. In doing so, the Company has generated and enjoys the expectation of a continued working relationship with those Service Providers with whom it has done business and from prospective Service Providers with whom it is actively working to establish new business relationships ("**Goodwill**") the loss of which will cause the Company irreparable harm. A "**Prospective Service Provider**" shall mean one with whom the Company is or was working with to establish a business relationship at the relevant time period in question.

**WHEREAS**, the Company has expended substantial time, effort and financial resources in identifying, recruiting, hiring and retaining employees, the loss of whom will cause the Company irreparable harm.

WHEREAS, the Company has also acquired, maintains, and protects information that is not known publicly or readily available in the marketplace relating to Company Business including Clients, Service Providers and Referral Sources and which it regards as "**Confidential Information**," and/or as "**Trade Secrets**", as such terms are defined below, and Employee will have access to such Confidential Information and Trade Secrets of the Company in his or her or their role with the Employer.

Now, in view of these considerations and the mutual obligations contained in this Agreement, the Parties further agree as follows:

1.      **Consideration**. The Company may offer employment and/or receipt of an equity award or option to purchase equity to the Employee subject to the terms and conditions in an offer letter between the Company and Employee and other agreement governing the grant of equity or options to purchase equity. In the event of an inconsistency, the terms of this Agreement shall govern. Employee's employment shall be at all times at-will, subject to the notice provisions herein. Employee acknowledges that any offer of employment is conditioned upon Employee entering into this Agreement and shall constitute sufficient and valid consideration to Employee for purposes of Employee entering into this Agreement.

2.      **Faithful and Diligent Performance; No Conflicts of Interest.** Employee agrees to devote Employee's full business time and attention to the performance of duties for the Company and to perform Employee's duties for the Company faithfully and diligently, to act at all times while employed by the Company with undivided loyalty, and to refrain from engaging in any conduct while employed by the Company that involves a conflict of interest between employee's personal or financial interests and the Company's business interests, including obtain other employment or independent contractor work while employed by the Company unless Employee first fully discloses such conflict of interest to the Company and receives consent from the Company's Chief Executive Officer, President or Chief Operating Officer (the Company's "**Contact Persons**") to engage in such conduct.

3.      **Confidentiality and Use of Confidential Information and Trade Secrets.**

        (a)      **Confidential Information and Trade Secrets.** The Employee and the Company agree that for the purposes of this Agreement, and in addition to any meaning that it may have under the common law, the term "**Confidential Information**" shall mean information belonging to or possessed by the Company, whether or not reduced to writing (or in a form from which such information can be obtained, translated or derived into reasonably usable form), that derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including without limitation, financial information, reports, and forecasts; improvements and other intellectual property owned by or relating to the Company; the buying practices of Clients or prospective Clients; the disclosures from or to Service Providers or prospective Service Providers; pricing offered to Clients or; pricing offered from Service Providers; the Company's production, advertising, marketing and growth strategies, methods and research; the prices/rates/terms at which the Company obtains or has obtained, or sells or has sold its products or services; the Company's sales, costs and sales methods; and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) that have been discussed or considered by

the management of the Company; the Company's business systems and methodologies employed by the creation, delivery, maintenance and improvement of the Company's product and services. Confidential Information also includes the confidential information of others, such as Clients and Service Providers with which Employee or the Company has a business relationship. Confidential Information shall also include any information that Employee is required to keep confidential pursuant to any ethical obligation or state or federal law, rule or regulation. Notwithstanding the foregoing, Confidential Information does not include documents in the public domain unless due to breach of Employee's duties under the Agreement. Confidential Information, such as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, inventions, product drawings, designs and photographs, prototypes, methods, business systems, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known are referred to as "**Trade Secrets**".

(b)     **Use of Information During Employment.** While employed by the Company, Employee shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company. Employee shall adhere to all rules and policies of the Company relating to maintaining and safeguarding Confidential Information from public disclosure or use by an individual or business, including those that compete for Company Business.

(c)     **Information if no Longer Employed.** All documents, records, data, information and physical property, whether or not amounting to or containing Confidential Information or Trade Secrets, which are furnished to Employee by the Company or are produced by Employee in connection with Employee's employment will be and remain the sole property of the Company. Employee is required to return to the Company all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Company. In the event Employee shall no longer be employed by the Company, Employee shall not use or otherwise distribute or disseminate Confidential Information or Trade Secrets on his/her/their behalf or that of a third person. Upon the end of the employment relationship between the Employee and the Company, Employee shall immediately gather and return to the Company all Confidential Information and Trade Secrets in his/her/their possession or control. At the Company's request, Employee shall delete all Confidential Information and Trade Secrets stored electronically which he/she/they maintains or has access to, including those residing in email accounts or on computers or portable electronic devices and shall remove from Employee's electronic storage, email or networking sites (such as LinkedIn) any Confidential Information or Trade Secrets by deleting such contacts from such websites and not re-engineering same. It is the express intent of the Parties that if no longer employed by the Company, the Employee shall not use or have access to Confidential Information or Trade Secrets relating to Clients, Prospective Clients, Service Providers, Prospective Service Providers, and Referral Sources including those for which Employee had a pre-existing relationship that existed prior to employment by Company (or its subsidiaries, affiliates or predecessors) it being expressly understood and agreed that the goodwill in such relationships has been transferred and sold to the Company.

#4632509v1

3

**(d)** **Defend Trade Secret Act Notice.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a Trade Secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and is (i) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the Trade Secret to the attorney of the individual and use the Trade Secret information in the court proceeding, if the individual (iii) files any document containing the Trade Secret under seal; and (iv) does not disclose the Trade Secret, except pursuant to court order.

**4.** **No Diversion of Client, Prospective Client, Service Provider, Prospective Service Providers, and Referral Source Relationships.**

**(a)** During the course of Employee's employment, Employee shall not, directly or indirectly: (i) solicit, accept an offer to do business with, service or divert any Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources and/or Company Business for Employee's personal benefit or that of a third-party or to the Company's detriment or (ii) consistent with Employee's duty of loyalty, work for another business which competes with the Company for Company Business including, without limitation, running, owning, managing, operating, controlling, being employed by, providing consulting services to, being a manager, officer, director or employee of, participating in, lending Employee's name to, investing in, or being connected in any manner with the management, ownership, operation, or control of any business, venture or activity that performs competitive services with the Company.

**(b)** In recognition of the Company's interest in protecting its Goodwill interest in Clients, Prospective Clients, Service Providers, Prospective Service Providers and Referral Source relationships, Employee agrees that for a period of twelve (12) months after he/she is no longer employed, Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

**5.** **Non-Solicitation of Company Employees.** Employee recognizes the desire of the Company to preserve its Goodwill, its Confidential Information and Trade Secrets through the continued services of its employees. While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was

employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

**6.**    **Calculation of Time in Sections 4, 5 & 9.** In the event of a breach of the Employee's obligations in paragraphs 4, 5 or 9, the duration for which such breach is continuing shall be excluded from the period during which such obligations shall apply and such time period shall be extended thereby.

**7.**    **Representations & Acknowledgments.**

    **(a)**     **Representations.** Employee represents to the Company that:

        (i)     there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent, impair, restrict or make unlawful the execution of this Agreement or performance hereunder;

        (ii)     Employee does not possess any confidential information or trade secrets of a former employer or other thirty-party; and

        (iii)     in the course of employment with the Company, Employee will take no action to violate or infringe upon the intellectual property, confidentiality or ownership rights of any third-party.

    **(b)**     **Acknowledgements.** Employee acknowledges that:

        (i)     Employee shall fill a role for Company which will allow Employee to create, maintain and foster unique and extraordinary close and trusting relationships with Clients, Prospective Clients, Service Providers, Prospective Service Providers, and/or Referral Sources or is expected to utilize the Company's Confidential Information and Trade Secrets in performing the duties required by Employee's position;

        (ii)     Employee expressly waives any defense to the enforcement of paragraph 4 of this agreement that Employee had a pre-existing relationship with any Client, Service Provider or Referral Source;

        (iii)     Employee is not and will not be unduly burdened by the provisions and enforcement of this Agreement;

        (iv)     the covenants set forth in Sections 4 and 5 are reasonable in all respects (including geography, scope and duration) and necessary for the protection of the legitimate protectable interests of the Company, including its Goodwill and are not overreaching; and

        (v)     Employee has been given sufficient time to review and consider the terms of this Agreement and has been afforded the opportunity to consult with an attorney. By signing this Agreement, Employee has done so knowingly and voluntarily and without duress or coercion.

**8.** **Remedies for Breach.**

**(a)** In the event of any actual or threatened breach of any of the covenants contained in this Agreement, the Company shall be entitled to seek an injunction (temporary, preliminary and/or permanent) to enforce this Agreement, without the requirement of posting a bond or other form of collateral, and may also pursue any other available remedies available to it in law and/or equity.

**(b)** Should the Company be a Prevailing Party in any litigation to enforce the terms of this Agreement, Employee shall be responsible for and pay the reasonable costs, fees and expenses of Company's attorneys associated with such litigation, including appeals. The Company shall be a "**Prevailing Party**" if it obtains temporary, preliminary and/or permanent injunctive relief, or is awarded monetary damages for such breach or threatened breach.

**9.** **Ownership of Inventions**.

(a) **Inventions Retained and Licensed**. Employee has attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the date of this Agreement: (i) Employee made or created, and/or (ii) are owned solely or jointly by Employee or belonging to Employee jointly with others or in which Employee has an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively, "**Prior Inventions**"); or, if no such list is attached, Employee represents that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, Employee hereby forever waive any and all rights or claims of ownership to such Inventions. Employee understands that Employee listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of Employee's ownership of such Inventions.

(b) **Use or Incorporation of Inventions**. If in the course of Employee's employment or working with the Company, Employee uses or incorporates into any of the Company's products, services, processes or machines any Invention not covered by Section 9(d) of this Agreement in which Employee has an interest, Employee will promptly so inform the Company in writing. Whether or not Employee gives such notice, Employee hereby irrevocably grants to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c) **Inventions** "**Inventions**" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable including, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon, and to differentiate, for purposes of the disclosure in Exhibit A are personal to the Employee and do not involve the Company. "**Company Inventions**" means any

#4632509v1

6

and all Inventions that Employee may solely or jointly author, discover, develop, conceive, or reduce to practice during the Employee's employment or working with the Company on or related to Company matters within the scope of Employee's employment.

(d) **Assignment of Company Inventions**. Employee hereby assigns to the Company, or the Company's designee, and agrees to promptly make full written disclosure to the Company of and to hold in trust for the sole right and benefit of the Company, all of Employee's right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. Employee hereby waives and irrevocably quitclaims to the Company or the Company's designee any and all claims, of any nature whatsoever, that now have or may hereafter have for infringement of any and all Company Inventions. Employee further acknowledges that all Company Inventions that are made by Employee (solely or jointly with others) within the scope of and during the period of the Employee's employment or working with the Company are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by Employee's salary and benefits and any other consideration. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, Employee hereby waives and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If Employee has any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, Employee hereby unconditionally and irrevocably grants to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e) **Maintenance of Records**. Employee agrees to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Employee's employment or working with the Company. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. Employee agrees not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. Employee agrees to deliver all such records (including any copies thereof) to the Company at the time of termination of the employee's employment as provided for in this Agreement.

(f) **Intellectual Property Rights**. Employee agrees to assist the Company, or its designee in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments

which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Employee further agrees that Employee's obligation to execute or cause to be executed, when it is in Employee's power to do so, any such instrument or papers shall continue during and at all times after the end of the Employee's employment and until the expiration of the last such intellectual property right to expire in any country of the world. Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact, to act for and in Employee's behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by Employee's subsequent incapacity.

**10.** **[Limited Non-Compete Relating Solely to the Compliance with Option Grant.** In the event the Employee terminates Employee's employment with the Company, as a condition precedent for receiving the benefits of any grant of equity or option to purchase equity, Employee shall not, for a period of twelve (12) months after the end of employment work for a Company located within a twenty (20) mile radius of the Company's office address located at 1900 Reston Metro Plaza, Reston, VA 20150 that competes with the Company for Company Business.

**11.** **Limited Enforcement by The Company; Partial Invalidity.** The Company shall have the option and right to enforce any provision in this Agreement to a partial, lesser and/or more limited extent than this Agreement provides, upon written notice to Employee. If any provision of this Agreement is declared to be void, invalid, or illegal, the parties request that such provision be partially enforced and modified by the court to most closely reflect the intent of the parties, to the fullest extent permitted by law. If any provision of this Agreement is declared to be unreasonable or excessively broad by a court, the parties request, to the fullest extent permitted by law, that the court interpret such provision in such a manner so as to provide the greatest degree of protection for the Company.

**12.** **Governing Law and Consent to Jurisdiction.** This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Virginia without regard to principles involving the conflict of laws. Any dispute or controversy other than those involving the need for a temporary restraining order or a preliminary injunction arising out of or relating to this agreement and/or an Employee's employment that could otherwise be resolved by a court shall be resolved through arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association, in which neither class actions nor collective actions will be permitted. The Employer shall pay any such filing fee if necessary to ensure that the AAA hears these disputes. Judgment upon the award may be entered in any court having jurisdiction. Both you and The Company give up any right to resolve a controversy through any other means, except for claims for injunctive relief relating to this Agreement and/or Employee's employment such as requests for temporary restraining orders, and preliminary and/or permanent injunctions which shall first be heard in the state and federal courts located in the State of Virginia. Employee and the Company hereby consent to the jurisdiction and venue of such courts and irrevocably waive the necessity of

personal service of process and consent to service of process by overnight mail (UPS or FEDEX next day delivery).

***Neither Employee nor the Company will be able to sue in court in connection with monetary claims related to this agreement.*** This inability to sue in court includes, for example, claims based on federal statutes such as Title VII of the Civil Rights Act of 1964 and the Fair Labor Standards Act and claims based on statutes, common law causes of action and concerning compensation. If there is more than one such dispute between Employee and Company, all such disputes may be heard in a single arbitration proceeding. Disputes pertaining to different employees of Company will be heard in separate arbitration proceedings. Any arbitration shall be resolved under the Delaware Rapid Arbitration Act. Each party shall bear its own costs and fees in any legal dispute between them except in accordance with paragraph 8(b) of this Agreement or any statutory rights that Employee may have. Notwithstanding any language to the contrary in this agreement, the parties hereby agree that the award rendered by that arbitrator may be appealed pursuant to the AAA's Optional Appellate Arbitration Rules ("Appellate Rules"); that the award rendered by the arbitrator(s) shall, at a minimum, be a reasoned award; and that the award shall not be considered final until after the time for filing the notice of appeal pursuant to the Appellate Rules has expired. Appeals must be initiated within thirty (30) days of receipt of an Underlying Award, as defined by Rule A-3 of the Appellate Rules, by filing a Notice of Appeal with any AAA office. Following the appeal process the decision rendered by the appeal tribunal may be entered in any court having jurisdiction thereof.

### 13. __Miscellaneous.__

(a)    This Agreement may be only amended by written agreement of the parties hereto, and no person, other than the Parties shall have any rights under or interest in this Agreement or the subject matter hereof.

(b)    No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion. No waiver shall be effective unless set forth in writing and signed by the party granting such waiver.

(c)    Employee expressly acknowledges and agrees to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. This Agreement will inure to the benefit of the Company, its successors, and its assigns. Employee acknowledges and agrees that the Company may assign this Agreement to any of its subsidiaries, affiliates, or successors, at any time and without Employee's further approval or consent. Employee further acknowledges and agrees that the Company may be merged or consolidated with another entity, and that such entity shall automatically succeed to the rights, powers, and obligations that the Company has under this Agreement, without Employee's further approval or consent. Finally, Employee acknowledges and agrees that Employee's obligations under this Agreement are personal and that Employee may not assign this Agreement.

(d)     The headings or captions used in this Agreement are inserted only for the purpose of convenience and reference, and in no way define the scope or intent of any provision or part hereof.

(e)     The unnumbered paragraphs on page 1, and paragraphs 2 through 13 shall survive both the termination of this Agreement and the end of the employment relationship between the Employee and the Company.

(f)     The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. In the event of any such prohibition or unenforceability, a court of appropriate jurisdiction is authorized to partially enforce, amend and/or sever any such provision to the minimum extent necessary to make such provision neither prohibited nor unenforceable.

(g)     This Agreement, together with any other agreement referenced herein (such as any Offer Letter or Employment Agreement), constitutes the entire agreement between the Parties with respect to subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings and negotiations, both written and oral, between the Parties.

(h)     Employee understands that nothing in this Agreement is intended to restrict Employee's rights to discuss wages and working conditions with co-workers, if any, or in any way limit Employee's right to engage in concerted activity under the National Labor Relations Act, if any.

[SIGNATURE PAGE FOLLOWS]

BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND ALL OF ITS PROVISIONS AND THAT I AGREE TO BE FULLY BOUND BY THE SAME.

EMPLOYEE:

By: _____

Name: John M Carpenter

Address:

16 0 Kenwood Ave

Alexandria VA 22302

Email: jmc7dd@virginia.edu

DARK CIRCUIT LABS, INC.

By: _____

Name: Ronald Pelkey

Title: President and COO

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DARK CIRCUIT LABS, INC. | Black Sails Security LLC, John Carpenter, and Eric Missimer |
| **(b)** County of Residence of First Listed Plaintiff   Alexandria, County, VA <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   Alexandria, County, VA <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* <br> Peckar & Abramson, P.C., 2055 L Street, NW, Suite 750 <br> (202) 293-8815 | Attorneys *(If Known)* <br> Anne G. Bibeau, Esq., <br> Broderick C. Dunn, Esq. |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government Plaintiff
- [x] 3   Federal Question *(U.S. Government Not a Party)*
- [ ] 2   U.S. Government Defendant
- [ ] 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [x] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**TORTS**

*PERSONAL INJURY*
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

*PERSONAL INJURY*
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [x] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

*Habeas Corpus:*
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

*Other:*
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1836(c)

Brief description of cause:
Trade Secret Misappropriation, Breach of Contract, Supplemental VA state law claims.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 2023-03-10 | Steven J. Weber, Esq. |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

V.   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.