# **EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**DARK CIRCUIT LABS, INC.,**

Plaintiff,

vs.

**BLACK SAILS SECURITY LLC**, **JOHN CARPENTER**, **ERIC MISSIMER, MICHAEL FRANK,** and **KEITH HADDOCK**,

Defendants.

Case No.: 1:23-cv-00326

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Dark Circuit Labs, Inc. (hereafter "DCL" or "Plaintiff"), by and through its attorneys, Peckar & Abramson, P.C., as and for its First Amended Verified Complaint ("Complaint") against Black Sails Security LLC ("BSS"), Eric Missimer ("Missimer"), John Carpenter ("Carpenter"), Michel Frank ("Frank"), and Keith Haddock ("Haddock") (hereafter collectively referred to as "Defendants") hereby alleges the following:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over actions involving the Defend Trade Secrets Act ("DTSA"), *see* 18 U.S.C. § 1836(c) ("The district court of the United States shall have original jurisdiction of civil actions brought under this section"). This Court has subject matter jurisdiction over this action because this case involves misappropriation of DCL Trade Secrets, which are protected under the DTSA and which are products or service used in, or intended for use in, interstate or foreign commerce, in that its clients/customers and employees are located throughout the United States, its products or services are utilized throughout the United States and it obtains goods and services from vendors throughout the United States and beyond. Supplemental

jurisdiction over the Virginia state law claims is conferred by 28 U.S.C. § 1367(a), as such claims are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. This Court also has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a) because Plaintiff DCL is incorporated under the laws of the State of Delaware. Defendant BSS is incorporated under the laws of Virginia and has its principal place of business in Virginia, Defendants Carpenter, Frank, and Haddock are citizens of Virginia, and Defendant Missimer is a citizen of the Commonwealth of Massachusetts. The amount in controversy exceeds $7,000,000, far beyond the $75,000 threshold, not counting interest and costs of court. Therefore, because both diversity of the parties and the damages threshold is present, this Court has diversity jurisdiction.

3. This Court has personal jurisdiction over BSS because it is incorporated and headquartered in Alexandria, Virginia. This Court has personal jurisdiction over Carpenter, Missimer, and Frank because this action concerns the employment of Carpenter, Missimer, and Frank at DCL, which is headquartered in Reston, Virginia, and the employment and shareholder agreements at issue mandate (i) that Virginia law would apply and (ii) that all actions would be brought in the state or federal courts of Virginia. Additionally, Carpenter resides in Alexandria, Virginia, Missimer is as shareholder and Board Member of DCL which is headquartered in Reston, Virginia, and Frank resides in Herndon, Virginia. This Court has personal jurisdiction over Haddock because he resides in Winchester, Virginia which is within this judicial district and the events alleged with respect to Haddock and others occurred within this judicial district.

4. Venue is proper, pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim, including the misappropriation of DCL Trade Secrets, in violation

#4910599v1

of federal law and the statutory and common laws of the state of Virginia, occurred within the jurisdiction of this judicial district.

## **PLAINTIFF DCL**

5.      Plaintiff DCL is a domestic business corporation duly organized and existing under the laws of the State of Delaware and maintains a principal place of business at 1900 Reston Metro Plaza, Floors 5-6, Reston, Virginia 20190.

6.      DCL is comprised of highly skilled software engineers, reverse engineers, and vulnerability researchers who possess appropriate Government security clearances to serve as a subcontractor to large organizations, such as Lockheed Martin, to provide cyber security personnel, tools, and expertise in support of the United States' National security missions.

7.      The means, methods and products which DCL develops are inherently confidential, proprietary and constitute Trade Secrets because they contain unique and proprietary code which must, by its nature, be diversified and dissimilar to other software and products developed by others in the market.

8.      DCL's current government contracts include providing software development services in support of National security, intelligence, and law enforcement missions and any enterprises that provide substantially similar services under government contracts are considered as competitors of DCL.

9.      DCL's enterprise is incredibly niche, in that it requires deep knowledge of low level computer operating systems, programming languages, and advanced techniques to carry out the missions it is tasked with. This can include not just the inner-workings of operating systems, but also applied across multiple computer architectures, and programming languages needed to perform our tasks. The tasks can often vary in scope and require employees to have a wide breadth

#4910599v1

of knowledge and often deep specializations to accomplish. The skill set requires the ability to reverse engineer proprietary components to understand how they operate in order to fully develop capabilities. Because of this, most DCL employees either have or are pursuing advanced degrees within the field of computer science.

10.     DCL is permitted to hire only U.S. citizens who have been granted and maintain an appropriate clearance and pass additional background checks to staff positions on the contracts DCL has been awarded. Often, employees must work at locations that prevent them from carrying personal devices such as phones or other electronics on their person, which often deters potential candidates from applying as they would need to be local to the area and give up common conveniences.

11.     The talent required to fully staff these positions due to the requirements outlined above makes the "pool" of developers a small/shallow one where reputational damage can carry a large lasting impact on recruiting and business development.

12.     DCL, through a substantial investment of time and resources, has developed a highly specialized package of offensive cybersecurity tools, engineers and services, which give it a decisive edge in the market. Carpenter, Missimer and to some degree Frank were leaders of this effort at DCL.

13.     Carpenter, Missimer, and Frank were well compensated employees of DCL; Missimer is also a DCL shareholder. In consideration for their compensation, Carpenter, Missimer, and Frank executed confidentiality, non-compete, and non-solicitation agreements, promising that they would do precisely what they are doing now: stealing DCL Trade Secrets, employees and customers, singularly and in concert with the other Defendants.

#4910599v1

## DEFENDANTS AND SUMMARY OF THIS ACTION

14.     Defendant BSS is a corporation duly organized and existing under the laws of the Commonwealth of Virginia, and maintains a principal place of business at 1610 Kenwood Avenue, Alexandria, Virginia 22302.

15.     As described in more detail below, BSS was formed as part of the Defendants' plan to usurp DCL, its employees, customers and proprietary information in violation of the DTSA, in violation of contracts between DCL, Missimer, Carpenter, and Frank, and in violation of Virginia statutory and common law.

16.     Missimer has been a shareholder of DCL and Member of the Board of Directors from November 3, 2021 until the present day.

17.     Missimer was an employee of DCL from on or about November 3, 2021 until on or about March 6, 2023, when he was terminated due to his involvement in the activities alleged in this Complaint.

18.     From November 3, 2021 to December 15, 2022, Missimer served as Treasurer and Chief Financial Officer of DCL.

19.     From the commencement of his employment on November 3, 2021 until the termination of his employment by DCL on March 6, 2023, Missimer served as the Chief Technical Officer ("CTO") of DCL.

20.     In his capacity as CTO, Missimer served as the custodian of and had access to all electronic data for DCL including its business records, business plans and other confidential and proprietary data which constitute confidential and proprietary information protected by the employment agreements and shareholder agreement referenced herein as well as "trade secrets"

5

within the meaning of the DTSA and other applicable laws cited herein. Such information is referred to collectively herein as "Trade Secrets."

21.     When DCL confronted Missimer with the evidence giving rise to this Complaint, Missimer blocked DCL's access to its own data for a period of approximately two weeks and refused to return other DCL property. Only after the filing of the original Complaint in this action did Missimer return some, but not all, DCL Trade Secrets and other property or information.

22.     As described in more detail below, Missimer, singularly and in concert with the other Defendants has unlawfully deprived DCL of access to and has otherwise utilized DCL Trade Secrets in violation of his Shareholder Agreement with DCL, in violation of the DTSA and in violation of other statutory and common laws.

23.     As described in more detail below, Missimer has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment agreements, shareholder agreements and in violation of the DTSA and other statutory and common laws.

24.     As a DCL shareholder, Missimer is bound to covenants which prohibit the conduct he engaged in as alleged in this complaint. The restrictive covenants are set forth in more detail below.

25.     Carpenter was an employee of DCL from on or about December 15, 2021 until on or about March 3, 2023 when he submitted a notice of resignation, upon information and belief, in an effort to avoid accountability for his role in the conduct giving rise to this Complaint. For a period of time, Carpenter served as an Officer of DCL.

6

26.     As an employee of DCL, Carpenter is bound to duly executed restrictive covenants which prohibit the conduct alleged in this Complaint. The details of the applicable contractual restrictions are set forth in detail below.

27.     As described in more detail below, Carpenter, singularly and in concert with the other Defendants has unlawfully deprived DCL of access to and has otherwise utilized DCL Trade Secrets in violation of his employment agreement with DCL and in violation of the DTSA and other statutory and common laws.

28.     As described in more detail below, Carpenter has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment agreements, shareholder agreements, and in violation of the DTSA and other statutory and common laws.

29.     Frank was an employee of DCL from July 30, 2022 until his resignation on March 14, 2023 when he resigned, upon information and belief, in an effort to avoid accountability for his role in the conduct giving rise to this Complaint.

30.     As a DCL employee, Frank is bound to duly executed restrictive covenants which prohibit the conduct alleged in this Complaint. The details of the applicable contractual restrictions are set forth in detail below.

31.     Frank, singularly and in concert with the other Defendants, has unlawfully deprived DCL of access to and has otherwise utilized DCL confidential and proprietary information in violation of his employment agreement with DCL, and in violation of the DTSA and other statutory and common laws.

32.     Frank has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment

7

agreements, shareholder agreements, and in violation of the DTSA and other statutory and common laws.

33.    Lockheed Martin Corp. ("LMCO") is a current client of DCL. Haddock is the Project Manager for LMCO on the Task Order ("Task Order") under the IDIQ Contract ("IDIQ Contract") for which DCL renders services to LMCO by and through its employees.

34.    As described in more detail below, Haddock, singularly and in concert with the other Defendants has unlawfully deprived DCL of access to and has otherwise utilized DCL confidential and proprietary information in violation of the DTSA and in violation of other statutory and common laws.

35.    As described in more detail below, Haddock has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment agreements, shareholder agreements, and in violation of the DTSA and other statutory and common laws.

36.    As described in more detail below, Haddock, despite previously bestowing accolades upon DCL for the quality of its work for LMCO, has more recently used his influence to cause LMCO to diminish and eventually terminate its relationship with DCL and to otherwise cause harm to DCL for the benefit of Defendants.

37.    On or about December 2, 2022, Carpenter and the other Defendants incorporated BSS in the Commonwealth of Virginia for the purpose of diverting DCL Trade Secrets, customers and clients to Defendants for use to engage in illegal competition including to supplant DCL with BSS under the IDIQ Contract.

38.    DCL's performance for LMCO under the contract has met or exceeded the contractual requirements, so much so that: (a) in January, 2023, Defendant Haddock engaged in

discussions with DCL for LMCO to outright purchase DCL; (b) Haddock and/or LMCO nominated DCL as LMCO Subcontractor of the Year in 2022; (c) Haddock and/or LMCO accelerated contract payments to DCL; (d) Haddock and/or LMCO provided assurances and otherwise created the reasonable expectation that DCL would continue as a subcontractor through 2026 and beyond and that DCL's work volume would continue to increase; and (e) Haddock and/or LMCO otherwise promoted DCL.

39.     Within the past several months, Defendant Haddock has commenced a course of conduct, along with the other Defendants to cause LMCO to diminish and/or terminate its relationship with DCL, to usurp DCL, its employees, customers and its proprietary information through a conspiracy involving violations of the DTSA and in breach of contractual, statutory and common law obligations owed to DCL by Defendants.

40.     Toward the end of 2022, if not sooner, while still employed by DCL and thereafter, Carpenter, Missimer, and Frank, singularly and in concert with Haddock, conspired to create a competing business, to obtain employment or otherwise obtain work with competing businesses, to divert DCL existing and prospective customers, to divert DCL current employees, to utilize DCL Trade Secrets, to deprive DCL access to its own Trade Secrets in violation of the DTSA and in violation of contractual, common law and statutory obligations, thereby cause damage to DCL for the benefit of the Defendants.

41.     At present, DCL's damages as a result of Defendants' conduct include but are not limited to: (1) lost revenue to DCL under the IDIQ Contract and its reasonable expectation of an extension of that Contract; (2) loss of employees and expenses associated with recruiting and retaining employees with appropriate skills and security clearances; (3) irreparable harm to its business relationship and reputation with existing and prospective clients including LMCO and

#4910599v1

others; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated Trade Secrets; and (6) loss of employees and damages related to obtaining highly skilled and properly cleared employees and personnel to perform work on DCL contracts.

## RESTRICTIVE COVENANTS APPLICABLE
## TO MISSIMER AS A DCL SHAREHOLDER

42.     On or about November 3, 2021, Missimer entered into a DCL Shareholders Agreement ("Shareholders Agreement"), a copy of which is annexed hereto as Exhibit "A" and incorporated by reference, for purposes of setting forth their respective rights, duties, and obligations as it relates to their positions as owners of DCL, including but not limited to restrictive covenants and non-disclosure obligations by which they agreed to abide.

43.     Pursuant to the Shareholders Agreement, Missimer acquired 325,000 shares of common stock of DCL with a par value of $0.0001 (the "Shares").

44.     From November 3, 2021 to December 15, 2022, in addition to his position as a shareholder of DCL and member of the Board of Directors of DCL, Missimer served as the CFO and Treasurer of DCL.

45.     At all relevant times, Missimer's direct report was Chase Bertke ("Bertke"), the Chief Executive Officer ("CEO") of DCL.

46.     From on or about November 3, 2021 to March 6, 2023, Missimer had management authority over DCL's employees, including but not limited to Carpenter, Missimer, and Frank.

47.     As a founding member of DCL and member of DCL's senior leadership, Missimer acquired an intimate knowledge of DCL Trade Secrets including market analysis, product development, pricing, marketing strategies, employee recruitment and retention strategies.

10

48.     From on or about November 3, 2021 to March 6, 2023, Missimer also served as DCL's Chief Technology Officer ("CTO").

49.     In his capacity as CTO, Missimer served as the custodian of and had access to all electronic data for DCL including its business records, business plans and other confidential and proprietary data which constitute confidential and proprietary information protected by the employment agreements and shareholder agreement referenced herein as well as "trade secrets" within the meaning of the DTSA and other applicable laws cited herein.

50.     When DCL confronted Missimer with the evidence giving rise to this Complaint, Missimer blocked DCL's access to its own data for a period of approximately two weeks and refused to return other DCL property. Only after the filing of the original Complaint in this action did Missimer return some, but not all, DCL Trade Secrets and other property or information.

51.     The Shareholders Agreement, sets forth restrictive covenants by which Missimer agreed to be bound.

52.     Section 6.4 of the Shareholders Agreement provides as follows regarding confidentiality with respect to DCL information and which constitute Trade Secrets under the DTSA and other laws:

> **6.4     Confidential Information.** Each Shareholder agrees that he, she or it will utilize Confidential Information (as defined below) solely for the purpose of the business of the Company and will make no other use of Confidential Information. In furtherance of the foregoing, no Shareholder shall directly or indirectly divulge, communicate, use to the detriment of the Company or for the benefit of any other person or entity or misuse in any way, any Confidential Information, including, but not limited to, personal information, forms, know-how, client lists, technical data, business plans and industry analyses. For the purposes of this Agreement, "Confidential Information" means that information which is confidential and proprietary to the Company (including, but not limited to, trade secrets) and which derives (or may derive) economic value to the Company by not being generally known to others, or which the Company is otherwise under an agreement of confidentiality with an unaffiliated third party. Each Shareholder agrees that he or it will maintain and preserve the confidentiality and secrecy of such Confidential

11

Information. In the event that a Shareholder shall receive a request to disclose all or any part of the Confidential Information under the terms of a subpoena or order issued by a court of competent jurisdiction, such Shareholder agrees, to the extent legally permissible to (i) promptly notify the Company of the existence, terms and circumstances surrounding such a request, (ii) consult with the Company on the advisability of taking legally available steps to resist or narrow such request, and (iii) if disclosure of such information is required, exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information and to reasonably cooperate with the Company in any such effort by the Company, at Company's sole cost and expense.

53. Section 6.3 of the Shareholders Agreement prohibits Missimer from engaging in competitive activity against DCL as follows:

**6.3** **Non-Compete[.]** No Shareholder shall, during the time such Shareholder is a Shareholder or employee of the Company, and for a period of one (1) year following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, without the prior written consent of the Company, directly or indirectly, and whether as principal, agent, officer, director, partner, employee, consultant, broker, dealer or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, or be engaged, have an interest in or take part in, or render services to any person, firm, corporation or other business organization (other than the Company) engaged in a business which is competitive with all or part of the business of the Company.

54. Section 6.5 of the Shareholder Agreement prohibits Missimer from poaching or soliciting DCL's employees, diverting DCL's business to a competitor, and soliciting DCL's actual or potential customers, as follows:

**6.5** **Non-Solicitation.** For so long as a Shareholder is a Shareholder or employee of the Company and for a period of twenty four (24) months following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, such Shareholder shall not, without the written permission of the Company or any Affiliate, directly or indirectly (i) solicit, employ or retain, or have or cause any other person or entity to solicit, employee or retain, any other Shareholder or other person who is employed by the Company or (ii) solicit the business of or provide services or products to any client (or prospective client) of the Company at any time while such Shareholder was an employee or Shareholder of the Company.

#4910599v1

55.     Section 6.6 of the Shareholders Agreement prohibits Missimer from disparaging

DCL as follows:

**6.6    Non-Disparagement.** No Shareholder shall, directly or indirectly, individually or in concert with others, knowingly engage in any conduct or make any statement that is reasonably likely to have the effect of undermining or disparaging the reputation of the Company or any Affiliate of the Company, or the good will of the Company or any Affiliate of the Company, products, or business opportunities, or that is reasonably likely to have the effect of undermining or disparaging the reputation of any officer, director or employee, past or present, of the Company or any of its Affiliates. This Section does not in any way restrict or impede any Shareholder from exercising protected rights, including rights under the National Labor Relations Act (NLRA) or the federal securities laws, including the Dodd-Frank Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency.

56.     In Section 8.9 of the Shareholders Agreement, Missimer consented to injunctive

relief and attorneys' fees in the event of a dispute regarding a breach of the restrictive covenants

therein:

**8.9    Specific Performance.** The parties hereto acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that money damages would not provide an adequate remedy. It is accordingly agreed that each of the parties hereto shall be entitled to an injunction and other equitable remedies to prevent breaches or threatened breaches by the other parties hereto of this Agreement, and to enforce specifically the terms and provisions hereof or thereof in any court of the United States or any state thereof having jurisdiction, this being in addition to any other remedy to which the parties may be entitled at law or in equity.

### RESTRICTIVE COVENANTS APPLICABLE TO CARPENTER
### AND FRANK AS DCL OFFICERS AND/OR EMPLOYEES

57.     On or about December 15, 2021, Carpenter was hired by DCL as a Senior Computer

Network Operations ("CNO") Developer and became a Vice President ("VP") of DCL on or about

March 4, 2022.

13

#4910599v1

58.     As a VP and member of DCL's senior leadership, Carpenter acquired an intimate knowledge of DCL's market analysis, product development, pricing, and marketing strategies.

59.     On or about December 20, 2021, Carpenter entered into a Confidentiality, Non-Competition and Protectable Interest Agreement ("Restrictive Covenants Agreement"), a copy of which is annexed hereto as Exhibit "B" and incorporated by reference, as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit as well as an inventions assignment clause.

60.     On or about July 30, 2022, Frank was hired by DCL as a Senior CNO Developer.

61.     On or around July 30, 2022, Frank executed an identical Restrictive Covenants Agreement, a copy of which is annexed hereto as Exhibit "C" and incorporated by reference, as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit as well as an inventions assignment clause.

62.     Section 3 of the Restrictive Covenants Agreement provides as follows regarding confidentiality of DCL information defined in the employment agreements and which constitute Trade Secrets under the DTSA:

> **(a)     Confidential Information and Trade Secrets**. The Employee and the Company agree that for the purposes of this Agreement, and in addition to any meaning that it may have under the common law, the term "Confidential Information" shall mean information belonging to or possessed by the Company, whether or not reduced to writing (or in a form from which such information can be obtained, translated or derived into reasonably usable form), that derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including without limitation, financial information, reports, and forecasts; improvements and other intellectual property owned by or relating to the Company; the buying practices of Clients or prospective Clients; the disclosures from or to Service Providers or prospective Service Providers; pricing offered to Clients or; pricing offered from Service Providers; the Company's production, advertising, marketing and growth strategies, methods and research; the prices/rates/terms at which the Company obtains or has obtained, or sells or has sold its products or services; the Company's sales, costs and sales methods; and

14

business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) that have been discussed or considered by the management of the Company; the Company's business systems and methodologies employed by the creation, delivery, maintenance and improvement of the Company's product and services. Confidential Information also includes the confidential information of others, such as Clients and Service Providers with which Employee or the Company has a business relationship. Confidential Information shall also include any information that Employee is required to keep confidential pursuant to any ethical obligation or state or federal law, rule or regulation. Notwithstanding the foregoing, Confidential Information does not include documents in the public domain unless due to breach of Employee's duties under the Agreement. Confidential Information, such as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, inventions, product drawings, designs and photographs, prototypes, methods, business systems, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known are referred to as **"Trade Secrets"**.

**(b)** **Use of Information During Employment**. While employed by the Company, Employee shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company. Employee shall adhere to all rules and policies of the Company relating to maintaining and safeguarding Confidential Information from public disclosure or use by an individual or business, including those that compete for Company Business.

**(c)** **Information if no Longer Employed.** All documents, records, data, information and physical property, whether or not amounting to or containing Confidential Information or Trade Secrets, which are furnished to Employee by the Company or are produced by Employee in connection with Employee's employment will be and remain the sole property of the Company. Employee is required to return to the Company all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Company. In the event Employee shall no longer be employed by the Company, Employee shall not use or otherwise distribute or disseminate Confidential Information or Trade Secrets on his/her/their behalf or that of a third person. Upon the end of the employment relationship between the Employee and the Company, Employee shall immediately gather and return to the Company all Confidential Information and Trade Secrets in his/her/their possession or control. At the Company's request, Employee shall delete all Confidential Information and Trade Secrets stored electronically which he/she/they maintains or has access to, including those residing in email accounts

15

or on computers or portable electronic devices and shall remove from Employee's electronic storage, email or networking sites (such as LinkedIn) any Confidential Information or Trade Secrets by deleting such contacts from such websites and not re-engineering same. It is the express intent of the Parties that if no longer employed by the Company, the Employee shall not use or have access to Confidential Information or Trade Secrets relating to Clients, Prospective Clients, Service Providers, Prospective Service Providers, and Referral Sources including those for which Employee had a pre-existing relationship that existed prior to employment by Company (or its subsidiaries, affiliates or predecessors) it being expressly understood and agreed that the goodwill in such relationships has been transferred and sold to the Company.

**(d)** **Defend Trade Secret Act Notice.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a Trade Secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and is (i) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the Trade Secret to the attorney of the individual and use the Trade Secret information in the court proceeding, if the individual (iii) files any document containing the Trade Secret under seal; and (iv) does not disclose the Trade Secret, except pursuant to court order.

63. Section 4 of the Restrictive Covenants Agreements prohibit Carpenter and Frank from diverting DCL's business to a competitor, and from soliciting DCL's actual or potential customers, from soliciting DCL employees, all of which are designed, in part to protect DCL Trade Secrets as follows:

**4.** **No Diversion Of Client, Prospective Client, Service Provider, Prospective Service Providers, and Referral Source Relationships.**

(a) During the course of Employee's employment, Employee shall not, directly or indirectly: (i) solicit, accept an offer to do business with, service or divert any Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources and/or Company Business for Employee's personal benefit or that of a third-party or to the Company's detriment or (ii) consistent with Employee's duty of loyalty, work for another business which competes with the Company for Company Business including, without limitation, running, owning, managing, operating, controlling, being employed by, providing consulting services to, being a manager, officer, director or employee of, participating in, lending Employee's name to, investing in, or being connected in any manner with the management,

#4910599v1

ownership, operation, or control of any business, venture or activity that performs competitive services with the Company.

(b)    In recognition of the Company's interest in protecting its Goodwill interest in Clients, Prospective Clients, Service Providers, Prospective Service Providers and Referral Source relationships, Employee agrees that for a period of twelve (12) months after he/she is no longer employed, Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

64.    Section 5 of the Restrictive Covenants Agreement prohibits Carpenter and Frank

from poaching or soliciting DCL's employees as follows:

**5.    <u>Non-Solicitation of Company Employees.</u>**

Employee recognizes the desire of the Company to preserve its Goodwill, its Confidential Information and Trade Secrets through the continued services of its employees. While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

65.    In Section 8 of the Restrictive Covenants Agreement, Carpenter and Frank

consented to injunctive relief and attorneys' fees in the event of a dispute regarding a breach of

the restrictive covenants therein:

17

8. **Remedies for Breach.**

**(a)**     In the event of any actual or threatened breach of any of the covenants contained in this Agreement, the Company shall be entitled to seek an injunction (temporary, preliminary and/or permanent) to enforce this Agreement, without the requirement of posting a bond or other form of collateral, and may also pursue any other available remedies available to it in law and/or equity.

**(b)**     Should the Company be a Prevailing Party in any litigation to enforce the terms of this Agreement, Employee shall be responsible for and pay the reasonable costs, fees and expenses of Company's attorneys associated with such litigation, including appeals. The Company shall be a "Prevailing Party" if it obtains temporary, preliminary and/or permanent injunctive relief, or is awarded monetary damages for such breach or threatened breach.

## DEFENDANTS' CONCERTED EFFORT TO CONVERT DCL TRADE SECRETS, CLIENTS AND EMPLOYEES IN VIOLATION OF CONTRACTS, FEDERAL AND STATE LAW

### Carpenter, Missimer, and Frank's Breaches of Their Restrictive Covenants and Duties to DCL

66.     Ronald Pelkey ("Pelkey") is shareholder of DCL and serves as its President. Bertke is a shareholder and serves as the CEO of DCL. Lawrence Littleton ("Littleton") serves as Chief Financial Officer ("CFO") of DCL.

67.     On or about January 25, 2023, Pelkey received a phone call from Haddock who is the Project Manager for LMCO on the Task Order under the IDIQ Contract for which DCL renders services by and through its employees.

68.     Haddock informed Pelkey that he had a conversation with Carpenter about a company that he started, BSS, and confirmed that Carpenter intended to compete with DCL and solicited Haddock for a subcontract on the Task Order.

69.     At the time of the conversation between Haddock and Carpenter, Carpenter was an employee of DCL.

18

70. On or about January 26, 2023, Missimer called Pelkey and informed Pelkey that he has been aware of Carpenter's new company, BSS, from "the beginning."

71. Missimer stated to Pelkey during this telephone conversation that Missimer and Carpenter solicited LMCO by way of communications with Haddock to obtain a subcontract on Task Order for BSS so that Missimer and Carpenter could continue working under the IDIQ Contract after quitting from DCL.

72. Missimer had previously informed DCL that he was expecting a child and stated to Pelkey that he still intended to take a month of paid paternity leave beginning on January 30, 2023 and then would quit DCL on his return from leave and join BSS.

73. On or about January 26, 2023, Haddock sent to electronic mail to Bertke, Carpenter, and Missimer stating as follows: "Can we all meet in person Friday (tomorrow) to discuss the DarkCircuit / BlackSails ConOp going forward and come to an early agreement?"

74. DCL interpreted Haddock's electronic mail as a communication by LMCO that DCL's subcontract with LMCO on the Task Order under the IDIQ Contract was at risk of being diverted to BSS.

75. Following the January 25 and 26, 2023 disclosures made by Haddock and Missimer, respectively, on January 27, 2023, DCL sent letters to Carpenter and Missimer informing them that DCL was opening an internal investigation as a result of the disclosures and putting them on notice of potential litigation ("Cease and Desist Letters").

76. These Cease and Desist Letters described the disclosures made as of that date and set forth the restrictive covenants by which Carpenter and Missimer were bound.

#4910599v1

77.     The Cease and Desist Letters further advised Carpenter and Missimer that they were being placed on administrative leave effective immediately pending an internal investigation by DCL with respect to their actions in assisting a competing enterprise, BSS.

78.     The Cease and Desist Letters further demanded the immediate return of any and all company property in Carpenter and Missimer's possession.

79.     On January 31, 2023, Pelkey sent a text message to current DCL employee Frank, informing him that DCL was conducting an internal investigation regarding Carpenter and Missimer's activities as it relates to BSS.

80.     Frank stated via text message to Pelkey that Carpenter had informed him of the formation of BSS and had stated that "they" would send him an offer letter so that Frank could join BSS.

81.     There was no mention of who "they" entails in the text message exchange, but Pelkey believed that Frank was referring to both Carpenter and Missimer.

82.     On or about January 31, 2023, Carpenter and Missimer admitted during an interview with Pelkey, Bertke and Littleton, that Carpenter and Missimer intended to terminate their employment with DCL to further pursue opportunities with the newly formed enterprise BSS and that at least one other current employees of DCL had been solicited to terminate their employment with DCL and work for BSS.

83.     Based on Carpenter and Missimer's disclosures, it appears that BSS was incorporated by Carpenter and the other Defendants for the purpose of providing cyber security products and services marketed to the United States federal government, which is the exact type of services and products on which Carpenter and Missimer work at DCL in violation of the DTSA

#4910599v1

and in violation of contractual, common law and statutory obligations thereby causing damage to DCL for the benefit of the Defendants

84.     On February 1, 2023, Pelkey and Bertke interviewed Frank as part of DCL's internal investigation.

85.     Pelkey asked Frank if Carpenter and Missimer had approached Frank with an offer letter, to which Frank responded that both Carpenter and Missimer contacted him shortly before DCL's all hands staff meeting on January 27, 2023 to discuss joining BSS.

86.     Frank stated no official offer letter had been extended by BSS, but that Carpenter told Frank that he would protect him if Frank violated his employment agreement with DCL.

87.     DCL also learned during the internal investigation that at least one other current DCL employee in addition to Frank was solicited as well.

88.     As it relates to the formation of BSS, public records reveal that BSS was incorporated as a limited liability company with a sole managing member, Carpenter, in the Commonwealth of Virginia on December 2, 2022.

89.     At the time of BSS's incorporation, Missimer was a shareholder and officer of DCL and Carpenter was an employee of DCL.

90.     On December 15, 2022, DCL's Board of Directors, consisting of Pelkey, Bertke, Littleton, and Missimer, unanimously voted to remove Missimer as an officer effective immediately.

91.     At the time of the December 15, 2022 vote, Pelkey and Bertke were unaware of Carpenter and Missimer's activities as it relates to BSS.

92.     On information and belief, Defendants conspired to divert DCL's business interests for purposes of their competitive venture long before the formal incorporation of BSS.

#4910599v1

93.     For example, the vote was proposed to remove Missimer as Treasurer because, among other issues, Pelkey and Bertke had determined there were significant problems with Missimer's management abilities as it relates to other DCL employees, specifically Carpenter, and the flow of information from Missimer to the Board of Directors.

94.     DCL invested significant time and resources trying to fix communication issues and functionality of the Board of Directors throughout 2022, including expending nearly $20,000 on an executive coach to help with communications and understanding of each other.

95.     The primary issue was that Carpenter was not effectively communicating on IDIQ-related matters to the Board of Directors as a Vice President ("VP") of DCL.

96.     At that time, Pelkey and Bertke believed that Carpenter's lack of communication on management and IDIQ-related issues as a VP was caused by issues related to Missimer's management of him.

97.     Specifically, Pelkey and Bertke believed that because Carpenter was communicating directly with Missimer, Carpenter thought that such communications were sufficient.

98.     Pelkey and Bertke determined that Missimer was blocking communications to them as Board members, whether through Missimer's lack of skills discerning what was important to convey or that he may have been doing so intentionally.

99.     As a result, the Board voted on whether to remove Missimer's ability to execute documents on behalf of DCL as an officer, which Missimer himself voted for in the affirmative at DCL's December 15, 2022 Board meeting.

100.     Though Missimer was removed as an officer, he remained a member of the Board of Directors and is still presently a shareholder of DCL.

#4910599v1

101. The intent was for the Board to revisit these issues in six months to determine whether Missimer should be reinstated as an officer if communication and management functionality improved.

102. On or about January 16, 2023, Pelkey and Bertke had a conversation with Carpenter about realignment of his duties given his communications issues.

103. After this conversation, Pelkey sent a text message to Missimer to discuss the outcome of the conversation with Carpenter.

104. Specifically, Pelkey asked if Missimer was available for a call to which Missimer responded he was "[a]t the gym[,] what's up?"

105. Pelkey responded to Missimer, "Nothing big, just wanted to back track with you on the Anthony thing and make sure we're all on the same page," to which Missimer responded "Oh so he just wanted to talk about Antony [*sic*] [a DCL employee]," followed up "Good" and "Man they are handling this poorly."

106. Pelkey believed that Missimer mistakenly thought Missimer was corresponding with Carpenter in the text message exchange.

107. Shortly after sending the above three text messages, Missimer apparently realized his mistake that he was corresponding with Pelkey rather than Carpenter and deleted the message stating "Man they are handling this poorly" and then stated that he "[m]eant to say 'he'" and that it was supposed to be "you in the first message."

108. Shortly after these text messages, that same day on or about January 16, 2023, Pelkey called Missimer to discuss business but also to discuss the text messages.

23

109.     During this conversation, Pelkey specifically confronted Missimer about the text messages, stating that Pelkey felt that Missimer thought he was communicating with Carpenter, and changed his messages once he realized his mistake.

110.     Missimer assured Pelkey that it was not the case and that his text messages were intended for Pelkey and Missimer stated that the wording of the text messages was a result of sending texts over his smart watch.

111.     Pelkey asked Missimer if he was happy working at DCL and stated that if Missimer had any issues he could discuss them with Pelkey.

112.     Missimer stated to Pelkey that he was happy working at DCL and that he had no issues to discuss.

113.     On or about January 18, 2023, Pelkey and Bertke were notified by DCL employee Frank that Carpenter approved his timesheet before he had the chance to appropriately add in all the correct hours.

114.     Carpenter was never given the authority by DCL to approve timesheets.

115.     Only an individual with managerial access has the ability to grant an employee authority to approve time sheets and the only individuals with such access at the time were Pelkey, Bertke, and Missimer. Pelkey and Bertke confirmed to each other that they did not grant such access and thus the only individual who could have done so was Missimer.

116.     Pelkey and Bertke further learned that Carpenter was made a manager of the Task Order work group.

117.     In response to Frank's disclosure, Bertke conducted an investigation and downloaded several logs from TSheets, a timekeeping program used by DCL, which show

#4910599v1

Carpenter having the ability and taking action to approve employee time cards as well as his status as a manager in the program.

118. Bertke further discovered that DCL had improperly invoiced the incorrect hours for Frank as a result of time sheets that Carpenter approved.

119. Specifically, twenty (20) hours were incorrectly billed instead of the correct thirty-five and a half (35.5) hours resulting in additional administrative work and corrections by DCL's management team and unnecessary communications with DCL's client.

120. In making this determination, Bertke reviewed several documents, including but not limited to: (1) a Weekly Labor Report showing the incorrect hours; (2) an Approval History Report showing Carpenter's unauthorized managerial access; (3) a System Log Report showing Carpenter approving Frank's time for the date and approving all employees' time on the Task Order; and (4) screenshots showing Carpenter as a manager of the Task Order work group.

121. Missimer's improper action in granting Carpenter unauthorized managerial access further shows their conspiracy to engage in conduct to the detriment of DCL.

122. That same day, on or about January 18, 2023, Bertke discovered that Carpenter had unfollowed all of DCL's social media accounts, which led Bertke to conclude that Carpenter may be showing signs of being a disgruntled employee.

123. In light of the disclosures made to Pelkey on January 25 and 26, 2023 and the subsequent ongoing internal investigation conducted by DCL, on information and belief, the communication issues sought to be addressed by the Board of Directors throughout late 2022 actually stemmed from Carpenter and Missimer working together to build their own directly competitive enterprise by taking DCL's largest client, DCL's employees, and confidential information and Trade Secrets with them in the process.

124.     On or about January 31, 2023, Pelkey, Bertke, and Littleton interviewed Carpenter and Missimer as part of DCL's internal investigation regarding Carpenter and Missimer's activities as it relates to BSS.

125.     During his interview, Carpenter referred to Missimer as his "employee" as well as stating that Missimer was "potentially" his "employee."

126.     These statements show that Carpenter was directly employing, soliciting, and/or recruiting Missimer, a current shareholder and employee of DCL.

127.     On or about February 6, 2023, DCL, by and through its counsel, conveyed a settlement proposal to counsel for Defendants on a confidential basis.

128.     On or about February 7, 2023, counsel for the parties conferred regarding the proposed settlement terms.

129.     On or about February 9, 2023, Haddock, in his capacity as Project Manager for LMCO, called Bertke to inform him that if Missimer or Carpenter resigned from employment at DCL, DCL would be immediately terminated from the IDIQ Contract.

130.     During this same phone call, Haddock also specifically mentioned a material term that had been proposed by DCL in settlement discussions that was conveyed to Defendants on a confidential basis.

131.     Pelkey, Bertke, and Littleton were the only individuals at DCL who had knowledge of the proposed settlement terms and none of these individuals disclosed any of the proposed terms to Haddock.

132.     The only other individuals who could have disclosed these terms to third parties, such as Haddock, were Carpenter and Missimer, unless Carpenter and Missimer disclosed it to Frank (or others) who disclosed it to Haddock.

26

133.  On or about February 9, 2023 at approximately 6:17 p.m. EST, Haddock left a voicemail for Bertke stating as follows:

> Hey Chase [Bertke], unfortunately, I got a call from Eric [Missimer] and John [Carpenter] again. They're going to quit tonight. Um, they say it's driven by the issues they're having with you, um, so tomorrow I got to draft a letter with Amber, um, if we can't get them to not quit tonight, um, we're going to draft, uh, a letter to Amber Bowen to you guys to start removing from contract you as an entity. Um, I intend to keep all the developers like we did with IC1, um, same conop where we give them opportunities to stay on contract, um, to any other company. Um, I have not sent that letter through Amber yet. That is going to happen the second they quit. They say they're tired and they want a quick resolution and they are going to quit tonight. So Saturday morning I got to send that letter.

134.  DCL urged Carpenter and Missimer not to resign and neither individual responded to attempts by DCL to contact them.

135.  Despite Haddock's voicemail, Carpenter and Missimer did not quit on February 9, 2023.

136.  Based on Haddock's February 9, 2023 communications, Defendants continued to communicate with Haddock or others at LMCO regarding confidential and proprietary information, DCL's internal business affairs, and solicitation of DCL employees to work for BSS or other entities on behalf of LMCO, all while they purported to be engaging in good faith settlement negotiations with DCL.

137.  Partially in response to threats made by Haddock to terminate DCL unless DCL resolved its disputes with Missimer and Carpenter in a manner satisfactory to Haddock, to preserve continuity of mission and reduce impact on the U.S. Government as LMCO's end customer and to mitigate the harm caused by Defendants to the business relationship between DCL and LMCO, DCL engaged with Missimer and Carpenter to negotiate their separation from DCL on terms which would permit them to work for LMCO and others.

138.     On or about February 15, 2023, Missimer, by and through his counsel, sent a letter to DCL's counsel requesting inspection of DCL's books and records, including but not limited to DCL's balance sheets, cash flow statements, bank and credit card statements, customer invoices, and payroll records for 2022 and year to date in 2023.

139.     On or about February 17, 2023, DCL responded to Missimer's request by letter stating that it declined to provide the records requested as a result of Missimer's demonstrated intent to compete with DCL.

140.     DCL's February 17, 2023 letter further stated:

Furthermore, should your letter be insinuating that there are potential financial issues with DCL, such issues, should they exist, would have arisen when Missimer was the . . . CFO . . . and Treasurer of DCL from November 2021 to December 2022 until he was removed by unanimous vote and replaced by . . . Littleton as CFO. DCL is currently performing a third-party audit of its books and records as a result of Missimer's removal and his misconduct revealed during the ongoing internal investigation. Any potential issues identified by the audit of DCL's financial records, such as incorrect accounting, general errors, or misappropriation of company funds during this time period may implicate liability on the part of Missimer. Should the third-party audit identify any such issues during Missimer's time as CFO and Treasurer, DCL will have reason to believe that these actions or omissions were done intentionally or maliciously by Missimer in light of Missimer's demonstrated intent to compete with DCL.

141.     Subsequent to Frank's resignation, DCL discovered that while Frank was still an employee, he utilized his DCL email account (mike.frank@darkcircuitlabs.com), with the subject line "Frank Status" to communicate with Haddock at LMCO via an email sent on Friday, February 23, 2023 at 9:07 a.m. as follows:

I talk to John & Eric pretty much daily about what's going on with DCL. I figured out something was up sometime last year, and give that Eric and are I [sic] close, I was fortunate enough to be in a position to help them work through this. Anyways, it seems at this point that the writing is on the wall that we (current employees)(and possibly all) of us need to make a transition in the near future, and that BSS will not be setting sail anytime this year. Alternatively, I've known Stan Nolen from PLEX for a few years, and I think that his model of tool development aligns nicely with the work we do offsite, and it could be a good setup for me and possibly others.

#4910599v1

I know that may be more difficult to negotiate for obvious reasons. I would love to talk for you to talk to him, or just to hear what you think I should do in the next coming months (if anything at the moment). Regards, Mike.

142. Frank's February 23, 2023 email demonstrates Defendants were actively working behind the scenes during settlement discussions to unlawfully divert DCL's interests under the IDIQ Contract as well as shift DCL employees to "PLEX," who on information and belief is a direct competitor of DCL, now that Defendants' plans to launch BSS had been revealed.

143. On or about February 27, 2023, DCL's counsel was notified via email that Carpenter had obtained new counsel who requested one week to review the case file and respond to DCL's settlement proposal.

144. On information and belief, Defendants continued to disparage DCL to third parties and to solicit, recruit, and employ DCL employees throughout DCL's efforts to resolve this matter out of court.

145. For example, on or about March 2, 2023, one of DCL's employees, Paul Jalufka ("Jalufka"), informed Pelkey that he was approached in-person by another individual who is working under the IDIQ Contract, "Joe B.," who asked him if he knew anything about DCL employees leaving the company.

146. Jalufka stated to Pelkey that he told "Joe B." that he was unaware of anything like that occurring, at which point "Joe B." proceeded to avoid the subject and not provide any additional information to Jalufka about the issue.

147. On or about March 2, 2023 Bertke received the latest purchase order from LMCO under the IDIQ Contract.

148. The contract modification was for $75,416.15, a drastic departure from previous purchase order amounts of roughly $500,000.00.

#4910599v1

149.     On or about March 3, 2023, DCL notified LMCO regarding the first year of funding being estimated to be depleted in approximately one month under the IDIQ Contract.

150.     Later that day, on or about March 3, 2023, Carpenter sent an email to Pelkey, Bertke, and Littleton noticing his intent to resign on April 3, 2023.

151.     On information and belief, Carpenter and Frank, who on March 14, 2023 noticed his intent to resign from DCL on March 15, 2023, noticed their intent to resign with the knowledge LMCO intends not to issue any further work to DCL under the IDIQ Contract.

152.     On information and belief, Defendants and Haddock agreed to this course of action to ensure DCL would be phased out in order to divert DCL's business interests under the IDIQ Contract to Defendants.

153.     In light of Carpenter, Missimer, and Frank's continued breach of ongoing non-disclosure obligations, there could be no reasonable expectation by DCL that information provided for purposes of settlement would remain confidential and would not be used for leveraging a competitive advantage to BSS and/or be disclosed to Haddock, LMCO, or other third parties such as "Joe B."

154.     On information and belief, Carpenter, Missimer, and Frank's disclosures of confidential information related to settlement negotiations to Haddock, "Joe B.," and other third parties working under the IDIQ Contract, including but not limited to DCL's existing and prospective employees and other Trade Secrets has irreparably harmed DCL's reputation.

155.     On or about March 3, 2023, as part of DCL's ongoing internal investigation and determined that Carpenter and Missimer should be terminated for cause on or before March 7, 2023 as a result of DCL's finding that Carpenter and Missimer were in breach of their respective contractual, statutory, and common law obligations to DCL.

#4910599v1

156.     On or about March 6, 2023, DCL terminated the employment of Carpenter and Missimer for cause.

157.     Frank resigned from employment with DCL on March 14, 2023.

**Defendants' Failure to Return Company Property
and Further Misappropriation of DCL Trade Secrets**

158.     DCL demanded the return of any and all company property and Trade Secrets in Carpenter and Missimer's possession in its January 27, 2023 letter placing them on administrative leave pending the internal investigation.

159.     On information and belief, at the time of DCL's initial demand to return company property immediately, Missimer was in possession of (a) two (2) server blades, (b) two (2) server towers, (c) one (1) KVM switch, (d) one (1) network switch, (e) one (1) raspberry pi running pivpn, (f) one (1) router running openwrt, and (g) one Samsung Galaxy Fold cell phone.

160.     Missimer failed to immediately return any of DCL's company property and Trade Secrets in his possession, including but not limited to DCL's servers which are housed in Missimer's basement and hold DCL's intellectual property, including several software products.

161.     Missimer, being the CTO of DCL, oversaw standing up and configuring DCL's corporate network.

162.     The corporate servers in Missimer's possession and control hold all of DCL Trade Secrets including software repositories which contain DCL's software products developed since founding of the company and all other Company information.

163.     All software developed was developed on the internal network of DCL on DCL provided computers, and was not to be shared outside of DCL.

164.     These software products were developed to be sold by DCL through U.S. Government contracts.

31

165. Throughout February 2023, DCL, as well as by and through DCL's counsel to counsel for Missimer, continued to demand return of company property from Missimer.

166. On or about February 23, 2023, by and through his counsel, Missimer requested "greater specificity" as to the company property to be returned.

167. Notwithstanding Missimer's position as DCL's CTO and system administrator, which required that he be aware of any and all equipment that was used in hosting, storing, transmitting data, or running on the DCL network, and as a current DLC shareholder, on or about March 3, 2023, DCL communicated via its counsel to Missimer's counsel that was directed to immediately return to DCL (a) two (2) server blades, (b) two (2) server towers, (c) one (1) KVM switch, (d) one (1) network switch, (e) one (1) raspberry pi running pivpn, (f) one (1) router running openwrt, and (g) one Samsung Galaxy Fold cell phone, and that DCL required his assistance in identifying any further equipment that was associated with these purposes that was not identified.

168. Despite DCL providing the information requested, which DCL maintains was unnecessary given Misismer's knowledge and expertise, Missimer still failed to immediately return the company property in his possession.

169. On or about March 1, 2023, DCL discovered that Missimer had disconnected DCL's virtual private network ("VPN"), which is a secure tunnel between a device, such as a server, and the internet, thus cutting off DCL's access to its own servers.

170. On or about March 1, 2023, Pelkey sent an email to Missimer stating "the company VPN is down, am I correct in assuming that it is down because the network equipment is being shipped down to Virginia?"

171. DCL received no response from Missimer regarding Pelkey's March 1, 2023 email nor did DCL receive any company property following its discovery of the VPN's disconnection.

#4910599v1

172.     Despite repeated demands for the return of property by DCL and by and through DCL's counsel to Defendants' counsel, DCL's company property in Missimer's possession had still not been returned as of the date of the initial commencement of this action on or about March 10, 2023.

173.     As DCL did not have access to the servers used to store the code because Missimer improperly disconnected the VPN without DCL's authorization, DCL has been unable to sell or deliver its products to any clients or customers adding to a significant loss of revenue for DCL beyond the loss of revenue related to the IDIQ Contract.

174.     In addition to company products and source code, the DCL corporate network also holds sensitive DCL business documents that constitute confidential, proprietary, and Trade Secret information.

175.     These confidential and proprietary documents on DCL's corporate servers in Missimer's possession include but are not limited the following Trade Secrets such as customer lists, company contracts, bid proposals, labor rates, and legal documents (such as non-disclosure agreements and teaming agreements), all used for business governance and operations that give DCL a competitive advantage in the marketplace.

176.     On or about March 16, 2023, as a result of DCL's substantial efforts seeking the return of company property, including initiating the instant action, DCL received notification, by and through Missimer's counsel, that Missimer had shipped at least some of DCL's property back to the company.

177.     DCL intends to engage in forensic analysis of any and all company equipment that it has yet to receive from Missimer to determine whether Defendants transmitted, copied,

duplicated, deleted, or otherwise compromised the information and software stored in DCL's corporate networks.

178.    On information and belief, Missimer disconnected the VPN to engage in unauthorized access to DCL's company property.

179.    On information and belief, Missimer granted Carpenter and BSS unauthorized access to DCL's company property while it was in his possession.

180.    Based on DCL's internal forensic investigation to date, which remains ongoing, on or about November 10, 2022, Carpenter accessed and downloaded DCL's business development plans and strategies ("Business Plan") from DCL's corporate network, which includes but is not limited to DCL's prospective and existing customer lists.

181.    On or about November 15, 2022, after updates were made to the Business Plan by DLC senior leadership, Carpenter downloaded this same document again.

182.    There was no business necessity for Carpenter to access and download the Business Plan on or around November 10 and 15, 2023.

183.    There is no reason for any DCL employee to download the Business Plan as it is a working document with all edits being made live via a document hosting service within the DCL corporate network.

184.    In fact, DCL's corporate network user logs reveal that while Carpenter frequently viewed or edited other documents on DCL's corporate networks, the Business Plan was the only document that he ever downloaded.

185.    Carpenter never uploaded the document with any changes, but instead simply downloaded it, on information and belief, to utilize DCL's trades secrets for Defendants'

#4910599v1

competitive venture, BSS, which was incorporated approximately two weeks after he downloaded the Business Plan for a second time.

186.    Defendants have already misappropriated DCL's customer list by way of soliciting Haddock of LMCO for a subcontract on the Task Order related to the IDIQ Contract.

187.    Missimer, Carpenter, Frank and Haddock have been acting alone and/or in concert with each other and that knowledge and/or action by one is attributable to the other in all respects including the deprivation of DCL's access to DCL Trade Secret information and the use and dissemination thereof.

### **Damage Caused by Defendants' Conduct**

188.    Defendants' activities related to BSS have irreparably harmed DCL's business relationship with its client LMCO.

189.    On or about October 28, 2021, DCL was awarded a subcontract by LMCO for the Task Order under the IDIQ Contract.

190.    The total purchase order value for DCL under the IDIQ Contract is $9,176,491.00 with annual option periods extending the contract through on or about August 3, 2026.

191.    The first option period under the IDIQ Contract was exercised by LMCO before its expiration date of August 3, 2022.

192.    The deadline for the LMCO to exercise the second option period under the IDIQ Contract is August 3, 2023.

193.    DCL had been receiving "NET 14" accelerated payments since commencing work on the IDIQ Contract, meaning that DCL had been receiving payment from LMCO for invoices within fourteen (14) days after approval by LMCO.

194.    Following Haddock's disclosure to Pelkey regarding BSS on or about January 25, 2023, LMCO immediately changed DCL's payment terms to the maximum time allowable under the IDIQ Contract which is "NET 45," meaning that payments must be made within forty-five (45) days of LMCO's approval of an invoice.

195.    This sudden change in payment terms caused float and payroll issues for DCL, requiring Pelkey, Bertke, and Littleton to raise $50,000.00 in personal loans to DCL to cover payroll for DCL's employees.

196.    Additionally, LMCO reduced its purchase order amount for DCL in its tenth contract modification sent to DCL on or about March 6, 2023.

197.    Specifically, prior to LMCO's March 6, 2023 contract modification, DCL had received approximately $500,000.00 per contract modification under the Task Order.

198.    LMCO communicated to DCL that approximately $500,000.00 was the highest purchase order possible under the terms of the IDIQ Contract that did not require an additional lengthy approval process by LMCO that would have delayed payment of DCL's invoices and impeded DCL's ability to make payroll.

199.    Larger purchase orders provide longer term stability for start-up ventures such as DCL.

200.    On or about March 6, 2023, DCL received its most recent purchase order from LMCO which was only $75,416.15.

201.    LMCO's extreme downward departure from its prior course of dealing in issuing nine previous purchase orders to DCL shows that LMCO has decided not to fund DCL's subcontract on a long-term basis.

#4910599v1

202.    Based on LMCO's drastic change in course of dealing, DCL anticipates that LMCO will not exercise its option under the IDIQ Contract by the deadline of August 3, 2023.

203.    The only aspect of DCL's business relationship with LMCO that changed from the previous purchase orders to the $75,416.15 purchase order was the activities of Carpenter and Missimer as it relates to BSS and their communications with Haddock beginning in or around December 2022.

204.    DCL's performance for LMCO under the contract has met or exceeded the contractual requirements, so much so that: (a) in January, 2023, Defendant Haddock engaged in discussions with DCL in January, 2023 for LMCO to outright purchase DCL; (b) Haddock and/or LMCO nominated DCL as LMCO Subcontractor of the Year in 2022; (c) Haddock and/or LMCO accelerated contract payments to DCL; (d) Haddock and/or LMCO provided assurances and otherwise created the reasonable expectation that DCL would continue as a subcontractor through 2026 and beyond and that DCL's work volume would continue to increase; (e) Haddock and/or LMCO otherwise promoted DCL.

205.    For example, on or about July 13, 2022, Haddock sent an email to Bertke stating as follows: "You guys are class act and wonderful teammates. Looking forward to working with you all for a long time."

206.    As it relates to a potential acquisition of DCL, Haddock sent an email to Pelkey on or about January 5, 2023 stating as follows: "I have a business case in review and if that gets approved, I could recommend a company purchase and then my leadership would evaluate the idea and move from there. Those usually take a few months to make a decision on."

#4910599v1

207.    Throughout the course of working on the IDIQ Contract up until in or around February 2023, LMCO went out of its way to provide DCL with accelerated payments as it was aware that DCL is a start-up venture with potential cashflow issues for making payroll.

208.    Up until January 25, 2023, DCL was assured by Haddock throughout the course of working with LMCO that it was an integral part of LMCO's work on the Task Order and that LMCO intended to exercise its options under the recompete clauses in Task Order to keep DCL on contract through 2026.

209.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

210.    At present, DCL's losses as a result of Carpenter and Missimer's activities related to BSS include but are not limited to: (1) lost revenue to DCL under the IDIQ Contract; (2) irreparable harm to its business relationship and reputation with existing client LMCO; (3) irreparable harm to DCL's business relationships and reputation with existing and prospective clients; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated confidential information and Trade Secrets; and (6) loss of employees and damages related to obtaining highly skilled and properly cleared employees and personnel to perform work on DCL contracts.

## AS AND FOR THE FIRST CAUSE OF ACTION
**(Misappropriation of Trade Secrets under the Defend Trade Secrets Act ("DTSA"),
18 U.S.C. § 1831, *et seq*., against All Defendants)**

211.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

212.     18 U.S.C. § 1839(3) defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if — (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

213.     18 U.S.C. § 1839(3) defines a "misappropriation" as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who — (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was — (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to

39

know that - (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake."

214. Defendants intentionally misappropriated and/or conspired to misappropriate Trade Secrets from DCL to their own economic benefit, knowing that the misappropriation would harm DCL.

215. DCL had and has valuable Trade Secrets relating to its product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

216. DCL Trade Secrets constitute business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer lists.

217. These Trade Secrets derive their independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

218. DCL's competitors, such as BSS, could use DCL Trade Secrets to procure an unfair competitive advantage over it, steal its customers, undercut its pricing and replicate its customer service methods.

219. DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers in a secure location and providing custody and control to DCL's co-founder and CTO Missimer, which is not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential", "company confidential", and/or

40

"proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; (x) assuring compliance with all applicable cybersecurity regulations; and (xi) utilizing role-based access control to enforce least privilege required and only granting developers access to source code repositories for which they were authorized by DCL.

220. DCL has further taken reasonable measures to secure its software products, which Trade Secret information, by requiring all developers working on software products to utilize company laptops for development and to utilize the DCL GitLab which does not have connection to the internet. In order to view the repositories, an administrator must affirmatively grant access. The only administrators are the owners of DCL, which includes Missimer. DCL additionally requires all employees with access to DCL's network to take reasonable countermeasures to ensure access to the company network and subsequent source code repositories are protected. To do so, DCL employees were required to have a VPN certificate generated by Missimer, who was DCL's CTO, to gain access to the internal network. Furthermore, once inside the DCL corporate network employees were required to authenticate with their DCL accounts through the use of single-sign-on ("SSO") which validated the account permissions allowed.

#4910599v1

221.    By way of the disclosures to DCL and the reasonable measures in place to protect DCL's Trade Secret information, it cannot reasonably be disputed Carpenter and Missimer, in concert with Haddock, stole, or otherwise removed or used without authorization and through improper means, confidential and proprietary corporate documents from DCL, in violation of the DTSA, 18 U.S.C. § 1831, *et seq.*

222.    There exists a substantial likelihood of "inevitable disclosure" of DCL Trade Secrets if Missimer, Carpenter or Frank are allowed to work at a competitor company, in part because they cannot unlearn what he learned while working at DCL and if they are allowed to work with a competitor, their extensive knowledge would almost certainly filter into their work and result in disclosure of DCL Trade Secrets. *See Atlantic Diving Supply, Inc. v. Jay Basnight*, No. 2:22cv298, 2022 WL 5568083, at *12-13 (E.D. Va. Sept. 21, 2022) (citing *W.L. Gore & Assocs., Inc. v. Wu*, No. C. A. 263-N, 2006 WL 2692584, at *14 (Del. Ch. Sept. 15, 2006), *aff'd*, 918 A.2d 1171 (Del. 2007)).

223.    Based on Defendants' blatant conduct in disregard for their respective contractual, statutory and common law obligations, Missimer's refusal to return DCL's company property, Defendants' disclosure of DCL's Trade Secret and confidential information including disclosure of proposed settlement terms, and the highly sensitive nature of DCL's business operations, a court could not have "confidence that [Defendants] w[ould] refrain from using [DCL]'s Trade Secrets if [they were] allowed to work in areas where [they would] have to exercise the discretion and judgment to not use them." *Id.* at *12 (quoting *W.L. Gore*, 2006 WL 2692584, at *10, 14).

224.    Defendants have violated the DTSA and other obligations owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL

42

#4910599v1

employees away from DCL to join BSS or other employers (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter, (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

225.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

226.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

227.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to others.

228.    Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL.

229.    DCL demands the return of its Trade Secrets, a preliminary and permanent injunction stopping further dissemination or use of Trade Secrets and mandating destruction of the Trade Secrets in the hands of the misappropriating parties, as well as damages, including

#4910599v1

exemplary damages, attorneys' fees and costs because Defendants misappropriated DCL Trade Secrets willfully and maliciously.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets under the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code §§ 59.1-336, *et seq.*, against All Defendants)

230.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

231.    Va. Code § 59.1-336 defines a "trade secret" as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process," that: (i) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (ii) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

232.    Va. Code § 59.1-336 defines a "misappropriation" as (i) "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" or (ii) "[d]isclosure or use of a trade secret of another without express or implied consent by a person who [(a)] [u]sed improper means to acquire knowledge of the trade secret; or [(b)] At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake.."

233.    Defendants intentionally misappropriated and/or conspired to misappropriate Trade Secrets from DCL to their own economic benefit, knowing that the misappropriation would harm DCL.

234.    DCL had and has valuable Trade Secrets relating to its product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

235.    DCL Trade Secrets constitute business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, business data compilations, programs, diagrams, drawings, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer lists.

236.    These Trade Secrets derive their independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

237.    DCL's competitors, such as BSS, could use DCL Trade Secrets to procure an unfair competitive advantage over it, steal its customers, undercut its pricing and replicate its customer service methods.

238.    DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers and providing custody and control to Defendant Missimer, DCL's co-founder and CTO, which is not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential", "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v)

requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; (x) assuring compliance with all applicable cybersecurity regulations; and (xi) utilizing role-based access control to enforce least privilege required and only granting developers access to source code repositories for which they were authorized by DCL.

239.     DCL has further taken reasonable measures to secure its software products, which Trade Secret information, by requiring all developers working on software products to utilize company laptops for development and to utilize the DCL GitLab which does not have connection to the internet. In order to view the repositories, an administrator must affirmatively grant access. The only administrators are the owners of DCL, which includes Missimer. DCL additionally requires all employees with access to DCL's network to take reasonable countermeasures to ensure access to the company network and subsequent source code repositories are protected. To do so, DCL employees were required to have a VPN certificate generated by Missimer, who was DCL's CTO, to gain access to the internal network. Furthermore, once inside the DCL corporate network employees were required to authenticate with their DCL accounts through the use of SSO which validated the account permissions allowed.

240.     By way of the disclosures to DCL and the reasonable measures in place to protect DCL's Trade Secret information, it cannot reasonably be disputed that Carpenter and Missimer

#4910599v1

separately and with the other Defendants stole, or otherwise utilized or removed without authorization and through improper means, confidential and proprietary corporate documents from DCL, in violation of the VUTSA, Va. Code § 59.1-336, *et seq*.

241.    Defendants acted singularly and in concert to misappropriate DCL Trade Secrets for their own benefit to the detriment of DCL.

242.    Defendants have violated the VUTSA and other obligations owed to DCL by, *inter alia*, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter, (v) using Trade Secrets for the benefit of a person or entity other than DCL; (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

243.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants and others.

244.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

#4910599v1

245.     Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to others.

246.     Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL.

247.     DCL demands the return of its Trade Secrets, a preliminary and permanent injunction stopping further dissemination or use of Trade Secrets and mandating destruction of the Trade Secrets in the hands of the misappropriating parties, as well as damages, including punitive damages, attorneys' fees and costs because Defendants misappropriated DCL Trade Secrets willfully and maliciously.

## AS AND FOR THE THIRD CAUSE OF ACTION
### (Violation of Virginia's Uniform Computer Information Transactions Act ("VUCITA"), Va. Code §§ 59.1-501.1, *et seq.*, against All Defendants)

248.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

249.     DCL had and has valuable Trade Secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

250.     The VUCITA provides default rules and remedies to commercial transactions related to computer information transactions. Computer information transactions under VUCITA can include the digital transfer of informational rights, which include trade secrets.

251.     The VUCITA defines "[i]nformational rights" to include all rights in information created under laws governing "all rights in information created under laws governing patents,

copyrights, mask works, trade secrets, trademarks, publicity rights, or any other law that gives a person, independently of contract, a right to control or preclude another person's use of or access to the information on the basis of the rights holder's interest in the information." Va. Code § 59.1-501.2(38).

252.    By and through the use of computer information transactions, Carpenter and Missimer and the other Defendants, singularly and in concert, purposefully or knowingly accessed, took, and destroyed Trade Secrets contained in data and/or databases and otherwise disseminated or utilized Trade Secrets belonging to DCL for their own benefit to the detriment of DCL.

253.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

254.    As a result, DCL has been damaged and is entitled to compensatory and punitive damages, as well as reasonable attorneys' fees and costs of suit and other relief.

### AS AND FOR THE FOURTH CAUSE OF ACTION
**(Misappropriation of Trade Secrets under Virginia common law against All Defendants)**

255.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

256.    Pursuant to well-established Virginia common law, to be protected as a "trade secret," courts require that: (1) The information is secret; (2) The economic value is derived from its secrecy; (3) The information is not readily ascertainable by proper means by competitors who could obtain economic value from its disclosure; and (4) The owner uses reasonable efforts to safeguard the information. *MicroStrategy Inc. v. Li*, 240 Va. 297, 601 S.E.2d 580 (Va. 2004); *see Dionne v. Se. Foam Converting & Packaging, Inc.*, 240 Va. 297, 397 S.E.2d 110 (Va. 1990).

#4910599v1

257.     DCL had and has valuable Trade Secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

258.     DCL also had and has confidential and proprietary business information that does not rise to the level of a trade secret but is still protectable under Virginia common law.

259.     DCL Trade Secrets and confidential/proprietary business information are not known outside of its business, have inherent value to DCL and its competitors, were developed through the expenditure of a substantial amount of resources and are not capable of being acquired or duplicated by others.

260.     DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers in a secure location and placing them within the custody and control of Defendant Missimer, who is a DCL's co-founder andwas DCL's CTO, which are not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential", "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; (x) assuring

#4910599v1

compliance with all applicable cybersecurity regulations; and (xi) utilizing role-based access control to enforce least privilege required and only granting developers access to source code repositories for which they were authorized by DCL.

261. DCL has further taken reasonable measures to secure its software products, which Trade Secret information, by requiring all developers working on software products to utilize company laptops for development and to utilize the DCL GitLab which does not have connection to the internet. In order to view the repositories, an administrator must affirmatively grant access. The only administrators are the owners of DCL, which includes Missimer. DCL additionally requires all employees with access to DCL's network to take reasonable countermeasures to ensure access to the company network and subsequent source code repositories are protected. To do so, DCL employees were required to have a VPN certificate generated by Missimer, who was DCL's CTO, to gain access to the internal network. Furthermore, once inside the DCL corporate network employees were required to authenticate with their DCL accounts through the use of SSO which validated the account permissions allowed.

262. Defendants have violated the Virginia common law and other obligations owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue

to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

263. Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

264. Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

265. Defendants knew or had reason to know that the Ttrade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

266. Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL

267. As a result of Defendants' misappropriation, dissemination, destruction and/or use of DCL Trade Secrets, DCL has been damaged.

268. DCL is entitled to compensatory and punitive damages, injunctive relief and attorneys' fees and costs of suit on account of Defendants' Virginia common law misappropriation of Trade Secrets and other relief.

### AS AND FOR THE FIFTH CAUSE OF ACTION
**(Breach of Contract against Carpenter, Missimer, and Frank)**

269. Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

#4910599v1

270.     DCL has fully performed its material obligations to Carpenter, Missimer, and Frank under their employment agreements or shareholder agreement.

271.     Defendants have violated their contractual obligations owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

272.     Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

273.     Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

274.     Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

#4910599v1

275.     Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL

276.     Haddock singularly and in concert with the other Defendants solicited, enduced and participated in the breaches by Carpenter, Missimer, and Frank.

277.     The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

278.     Defendants unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

279.     DCL is also entitled to compensatory damages as well as contractual attorneys' fees and costs of suit, injunctive and other relief.

### AS AND FOR THE SIXTH CAUSE OF ACTION
**(Breach of Fiduciary Duty and Duty of Loyalty against Carpenter, Missimer, and Frank)**

280.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

281.     At all relevant times, Carpenter, Missimer, and Frank owed a fiduciary duty and a duty of loyalty to DCL, which required them to use their best efforts on behalf of DCL, to act in DCL's best interests, and to refrain from activities that would damage DCL's interests.

282.     Carpenter, Missimer, and Frank violated these duties when they, without notice, accepted employment and/or began working for BSS while still employed by DCL, in a manner calculated to divert business and employees from and to interfere with the DCL's business relationships and operations and committed the other acts alleged in this Complaint.

#4910599v1

283.    Additionally, as DCL employees, Carpenter, Missimer, and Frank had a duty of loyalty, honesty and fidelity to maintain the confidentiality of DCL Trade Secrets and confidential/proprietary business information.

284.    Carpenter, Missimer, and Frank misappropriated and/or wrongfully disclosed and used for improper purposes such confidential information and Trade Secrets to compete with DCL.

285.    Carpenter, Missimer, and Frank's actions constitute a scheme of self-dealing, where Carpenter, Missimer, and Frank acted against the interests of DCL for their own economic advantage and that of BSS's, thereby disadvantaging DCL's economic and business interests.

286.    Defendants have violated their fiduciary duties and duty of loyalty owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

287.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described

in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

288.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

289.    Haddock singularly and in concert with the other Defendants solicited, induced and participated in the breaches by Carpenter, Missimer, and Frank.

290.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

291.    Defendants' acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

292.    Defendants have also proximately caused DCL to suffer compensatory damages in an amount to be proven at trial.

### AS AND FOR THE SEVENTH CAUSE OF ACTION
**(Aiding and Abetting a Breach of Contract and/or
Fiduciary Duty and Duty of Loyalty against All Defendants)**

293.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

294.    All Defendants are have knowledge of the contractual, statutory and common law duties owed by Carpenter, Missimer, and Frank to DCL yet Defendants encouraged and assisted them in committing breaches of same.

295.    Defendants' assistance in this regard was knowing and substantial.

56

296.     The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

297.     Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

298.     Defendants have also proximately caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### (Common Law Unfair Competition against All Defendants)

299.     Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

300.     Rather than build their own client base by investing the time and capital necessary to do so, Defendants have conspired to misappropriate DCL's confidential client lists, other Trade Secrets, clients, employees and other business information, then used same to unfairly compete against DCL.

301.     Defendants have taken for themselves client relationships that DCL nurtured, developed and maintained since the founding of the company

302.     Defendants have unfairly received the benefit of DCL's client relationships without any of the costs associated with developing those relationships, which costs were born solely by DCL.

303.     Defendants have violated the common law prohibitions against unfair competition owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting,

#4910599v1

diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

304. Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

305. Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

306. Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

307. Haddock singularly and in concert with the other Defendants solicited, enduced and participated in the breaches by Carpenter, Missimer, and Frank.

308. Defendants' conduct constitutes common law unfair competition.

309. The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

310.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

311.    Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage against All Defendants)

312.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

313.    DCL has actual and prospective business relationships with numerous third-party customers or clients.

314.    DCL also had reasonable expectations of economic advantage with prospective business relationships in the form of potential customers or clients.

315.    These relationships and expectations constitute protectable interests.

316.    Defendants tortiously interfered with DCL's prospective economic advantage by, *inter alia*, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ

#4910599v1

Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

317.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

318.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

319.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

320.    Haddock singularly and in concert with the other Defendants solicited, induced and participated in the breaches by Carpenter, Missimer, and Frank.

321.    Defendants' unlawful, improper and deliberate acts have repeatedly interfered with DCL's actual and potential economic relationships.

322.    Defendants' acts of interference with DCL's business relationships were committed with malice and without adequate justification.

323.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

324.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

#4910599v1

325.    Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial and other relief.

### AS AND FOR THE TENTH CAUSE OF ACTION
**(Tortious Interference with Contractual Relations against All Defendants)**

326.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

327.    DCL had contractual relationships with Carpenter, Missimer, and various other third-party customers or clients.

328.    Defendants tortiously interfered with DCL's contractual relations by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

329.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

330.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described

61

in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

331.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

332.    Defendants, as non-parties to these agreements, deliberately and intentionally interfered with these contractual relationships.

333.    Defendants' acts of interference with DCL's contractual relationships were committed with malice and without adequate justification.

334.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

335.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

336.    BSS has also caused DCL to suffer compensatory damages in an amount to be proven at trial and other relief.

### AND FOR THE ELEVENTH CAUSE OF ACTION
**(Civil Conspiracy against All Defendants)**

337.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

338.    Defendants committed overt acts in furtherance of an intentional, common scheme, as described in this Complaint.

#4910599v1

339.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

340.    Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial and other relief.

## AS AND FOR THE TWELFTH CAUSE OF ACTION
### (Preliminary and Permanent Injunction against All Defendants)

341.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

342.    DCL has shown a likelihood of success on the merits.

343.    DCL has acted in good faith toward Defendants at all times, and has substantial business interests that must be protected.

344.    Defendants, by contrast, have acted in bad faith by deceptive and unlawful means in order to interfere and/or divert DCL's clients in furtherance of their own self-interests.

345.    The balance of equities lies decidedly in favor of DCL.

346.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

347.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

## AS AND FOR THE THIRTEENTH CAUSE OF ACTION
### (Accounting against All Defendants)

348.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

63

349. A fiduciary relationship existed by and between Carpenter, Missimer, and Frank, on the one hand, and DCL, on the other hand.

350. Carpenter, Missimer, and Frank breached their fiduciary duties owed to DCL by, *inter alia*, (i) failing to keep confidential DCL Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and/or soliciting employees from DCL to join BSS, (iii) inducing DCL's employees to leave DCL, (iv) soliciting, diverting and/or servicing DCL's actual or potential customers, (v) working for DCL's direct competitor, BSS, while still employed by DCL, (vi) misappropriating Trade Secrets, (vii) using Trade Secret and/or otherwise confidential/proprietary business information for the benefit of a person or entity other than DCL; (viii) disclosing confidential and Trade Secret information to BSS, and (ix) failing to return to DCL all of its confidential and Trade Secret information.

351. Defendants must account to DCL for all business obtained by Defendants through the wrongful acts alleged in this Complaint.

352. DCL is entitled to a judgment against Defendants in an amount equal to the funds obtained by and through Defendants for all business they obtained through the wrongful acts alleged herein.

## **PRAYER FOR JUDGMENT**

**WHEREFORE**, DCL demands a preliminary and permanent injunction against Defendants further use or dissemination of DCL Trade Secrets and/or confidential/proprietary business information and the deletion of same from any repositories to which they may have been copied.

**WHEREFORE**, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, Defendants shall not solicit or

#4910599v1

otherwise communicate with any client or customer that Carpenter, Missimer, and Frank maintained any contact with while in the employ of DCL.

WHEREFORE, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, Defendants shall not provide any services to any client or customer that Carpenter, Missimer, and Frank maintained any contact with while in the employ of DCL.

WHEREFORE, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, measured from the date of the injunction order, Defendants shall not solicit, employ, or retain DCL's employees.

WHEREFORE, DCL demands immediate turnover for forensic analysis of all DCL property in Defendants' possession as well as personal and business devices used by Carpenter, Missimer, and Frank for work performed by DCL and access to Carpenter and Missimer's BSS email accounts and BSS's computer network.

WHEREFORE, DCL demands an accounting of all accounts relating to actual and potential customers and/or clients that Defendants solicited for BSS in violation of their employment agreements, and a return of all proceeds, compensation, commissions, alleged "wages," alleged "salary," consulting fees, incentive payments, profits, earnings, monies and/or other benefits that were unjustly obtained by Defendants through violation of Carpenter, Missimer, and Frank's employment agreements and against BSS and Haddock for aiding and abetting such breaches, plus all interest, costs, fees and expenses.

WHEREFORE, DCL demands judgment against Defendants for compensatory, consequential, liquidated, exemplary and punitive damages in an amount to be proven at trial,

together with interest, attorneys' fees, costs and disbursements, and for such other and further relief

as may be appropriate.

Dated: March 23, 2023                              Respectfully submitted,

_____

Steven J. Weber, VSB No. 35573
Gregory R. Begg, *Pro Hac Vice* (pending)
Lauren Rayner Davis, *Pro Hac Vice* (pending)
Peckar & Abramson, P.C.
2055 L Street, NW
Suite 750
Washington, DC 20036
Telephone: (202) 293-8815
Facsimile: (202) 293-7994
SWeber@pecklaw.com
GBegg@pecklaw.com
LDavis@pecklaw.com
*Attorneys for Plaintiff Dark Circuit Labs, Inc.*

#4910599v1

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury.

Dated: March 23, 2023     Respectfully submitted,

Steven J. Weber, VSB No. 35573
Gregory R. Begg, *Pro Hac Vice* (pending)
Lauren Rayner Davis, *Pro Hac Vice* (pending)
Peckar & Abramson, P.C.
2055 L Street, NW
Suite 750
Washington, DC 20036
Telephone: (202) 293-8815
Facsimile: (202) 293-7994
SWeber@pecklaw.com
GBegg@pecklaw.com
LDavis@pecklaw.com
*Attorneys for Plaintiff Dark Circuit Labs, Inc.*

#4910599v1

## **VERIFICATION**

RONALD PELKEY, as the President of Dark Circuit Labs, Inc. in above-captioned case, I verify that I have reviewed and authorized the allegations made in this First Amended Verified Complaint. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
RONALD PELKEY

Dated: March 23, 2023

68

# EXHIBIT A

## DARK CIRCUIT LABS, INC.

### SHAREHOLDERS AGREEMENT

This SHAREHOLDERS AGREEMENT, dated as of _Nov 3rd_ , 2021, ("Effective Date"), by and among DARK CIRCUIT LABS, INC., with a principal address located at 1900 Reston Metro Plaza, Floors 5-6, Reston, VA 20190 and (the "Company") and each of the Shareholders listed on Schedule 1 attached hereto (each, a "Shareholder", and collectively, the "Shareholders").

### WITNESSETH:

WHEREAS, as of the Effective Date, each of the Shareholders owns the number of shares of Common Stock, respectively, specified with respect to such individual on Schedule 1 attached hereto, and such shares, as of the Effective Date, represent the percentage ownership of all of the Capital Stock of the Company on a fully diluted basis as specified with respect to such individual on Schedule 1;

WHEREAS, the parties hereto desire to set forth their mutual agreements and understandings with respect to, among other things, certain of their respective rights, duties and obligations and certain transactions and arrangements in respect of the Company, the Capital Stock of the Company and related matters; and

WHEREAS, the parties hereto desire to ensure the continuity of the business of the Company and that all Shareholders remain actively engaged in the business of the Company.

NOW, THEREFORE, the parties hereto, intending legally to be bound, hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1    Defined Terms and Interpretation.    (a) Each capitalized term found in this Agreement that is not specifically defined in this Section 1.1 shall have the definition ascribed to it in the particular Section of this Agreement where such term is found. As used in this Agreement, the following terms shall have the following meanings:

"Affiliate": of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Agreement": this Shareholders Agreement, together with all Schedules and Exhibits hereto, as the same may be amended, supplemented or modified in accordance with the terms hereof from time to time.

"Bankruptcy" shall mean, with respect to any Person, the occurrence of any of the following events: (a) the filing by such Person of a petition in bankruptcy or for relief under applicable bankruptcy laws; (b) the filing against such Person of any such petition (unless such

#4570734v5

petition is dismissed within ninety (90) days from the date of filing thereof); (c) entry against such Person of an order for relief under applicable bankruptcy laws; (d) written admission by such Person of its inability to pay its debts as they mature, or an assignment by such Person for the benefit of creditors; or (e) appointment of a trustee, conservator or receiver for the property or affairs of such Person.

"Buyout Event" shall mean the occurrence of an Involuntary Transfer or the removal of a Director For Cause (as defined in Section 2.5).

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company, any and all equivalent ownership interests in a Person (other than a corporation) and any and all rights, warrants or options to purchase any of the foregoing.

"Common Stock": shares of the Company's common stock, par value $0.0001.

"Company": Dark Circuit Labs, Inc., a Delaware corporation.

"Control": (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Effective Date": the date of this Agreement first written above.

"Founders" shall collectively mean Chase Bertke, Ronald Pelkey, Jr. and Eric Missimer, and each individually, a "Founder".

"Governmental Authority": any nation or government, any state or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government or any other regulatory authority.

"Incompetence" means, with respect to any Director or Shareholder, that such person is unable to manage their affairs and that a guardian, trustee or other Person is appointed to manage the affairs of such Director or Shareholder.

"Involuntary Transfer" shall mean any Transfer, proceeding or action by or in which a Shareholder shall be deprived or divested of any right, title or interest in or to any of its shares of Capital Stock, including, without limitation, any seizure under levy of attachment or execution, any transfer in connection with Bankruptcy or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, any transfer to a state or to a public offers or agency pursuant to any statute pertaining to escheat or abandoned property, any transfer pursuant to a property settlement, judgment or final decree of a court incident to a divorce, dissolution of marriage or separation, or the involuntary dissolution of any Shareholder which is an entity.

"Nayara": shall mean Nayara One LLC, a Virginia limited liability company.

2

"Person": any individual, company, corporation, partnership, limited liability company, trust, division, Governmental Authority or other entity.

"Retire" and "Retirement" means a voluntary retirement from performing services for the Company as an employee or consultant or otherwise

"Requirement of Law": as to any Person, the articles or certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, statute, treaty, rule or regulation, order or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property, or to which such Person or any of its property is subject.

"Securities Act": The Securities Act of 1933, as amended.

"Shareholder": each of those shareholders of the Company listed on Schedule 1 attached hereto and each other Person that becomes a party to this Agreement from time to time pursuant to Section 3.1(b) hereof.

"Shareholders": collectively, all of the Shareholders of the Company.

"Transfer": with respect to any Capital Stock, (a) any sale, assignment or transfer of such Capital Stock or any right or interest therein; (b) any pledge or hypothecation of such Capital Stock or any interest therein; (c) any grant, sale or other transfer of securities convertible or exchangeable into or exercisable for or other options, warrants or rights to acquire such Capital Stock or any interest therein; and (d) any other direct or indirect transfer of such Capital Stock or any interest therein.

(b)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement unless otherwise specified.

(c)    The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

## ARTICLE II
## VOTING AGREEMENT, AND RELATED MATTERS

2.1    Number of Directors. The Board of Directors of the Company shall consist of not less than four individuals (each, a "Director"). For so long as Nayara is a shareholder of the Company, Nayara shall have the right to designate one (1) Director to the Board of Directors (the "Nayara Director"). The initial Nayara Director shall be Larry Littleton The remaining members of the Board of Directors shall consist of the three (3) Founders (the "Founding Directors").

2.2    Founders Designees to the Board of Directors. The Founders hereby agree to vote their Shares of Common Stock at any regular or special meeting of the Shareholders called for the purpose of filling positions on the Board of Directors of the Company, or in any written consent executed in lieu of such a meeting of Shareholders, and shall otherwise take all actions

3

necessary, to ensure the election of all of the Founders to Board of Directors, subject to the provisions of Sections 2.5 and 2.6 below.

2.3     Nayara Designee to the Board of Directors. At all times during which Nayara is a Shareholder, Nayara shall be permitted to designate one (1) member of the Board of Directors (the "Nayara Director"). In the event that the Nayara Director is removed in accordance with Section 2.5 below or is unable or unwilling to serve, then only Nayara shall have the right to appoint a replacement Nayara Director.

2.4     Director Votes. For all actions and decisions coming before the Board of Directors, each Founder serving as a director shall have ten (10) votes and any director who is not a Founder, including any director who replaces a Founder director, and the Nayara director, shall have one (1) vote (collectively, "Director Votes" and individually, a "Director Vote"). For any matter coming before the Board of Directors at a duly called meeting of the Board of Directors, the affirmative vote of a majority of the Director Votes shall be required to approve such matter; provided however, that at any time where less than all of the Founders are members of the Board of Directors, the affirmative vote of a majority of Director Votes to be cast by Founders then serving on Board will be required to approve any matter. The consent of all Directors shall be required for all action of the Board of Directors taken by written consent.

2.5     Removal of Directors. Directors holding a majority of the Director Votes may remove a Director from the Board of Directors (i) For Cause, as defined below or (ii) if such Director (or the party who has the right to designate such Director) no longer holds any shares of Capital Stock of the Company; provided that a Director shall be deemed to hold shares of Capital Stock transferred for estate planning purposes. For purposes of this Agreement "For Cause" shall mean, with respect to any Director, (i) such Director's dishonesty, incompetence, willful misconduct, gross negligence, or breach of fiduciary duty, (ii) any conviction of, or the entering of a plea of guilty or nolo contendere to, a crime that constitutes a felony, or any willful or material violation by such Director of any federal, state or foreign securities laws, (iii) any conviction of any other criminal act or act of material dishonesty, disloyalty or misconduct by such Director that has a material adverse effect on the property, operations, business or reputation of the Company or (iv) the material breach by such Director of any written covenant or agreement with the Company not to disclose any confidential information or not to compete or interfere with the Company.

2.6     Filing of Vacancies. In the event of (i) the death or Incompetence of a Founding Director, then the heir, guardian, trustee or other Person appointed to manage the affairs of such Founding Director shall have the right to appoint a replacement Director, provided that such replacement Director shall not have ten (10) Director Votes, but shall have one (1) Director Vote. In the event that any Founding Director is otherwise unwilling to serve as a Director, or is removed as a Director in accordance with Section 2.5 above, then the remaining Founders acting unanimously may appoint a replacement Director, provided that such replacement Director shall not have ten (10) Director Votes (as described below, but shall have one (1) Director Vote. A vacancy of Nayara Director shall be filled by the Nayara only.

## ARTICLE III

## SPECIAL PROVISIONS RELATING TO DILUTION, SERVICE PROVIDER SHARES AND PREEMPTIVE RIGHTS

3.1     Special Provisions Relating to Dilution and Service Provider Shares.

In the event that the Board of Directors elects to issue additional shares of Common Stock to employees, consultants and contractors of the Company in exchange for services to be provided to the Company (collectively, the "Service Providers" and such shares of Common Stock issued to Service Providers are hereafter referred to as "Service Provider Shares"), with respect to the issuance of the first [290,323] Service Provider Shares to Service Providers the number of shares of Common Stock of the Company issued to Nayara shall be appropriately adjusted, such that dilutive effect of the issuance of the first [290,323] Service Provider Shares to Service Providers shall be borne solely by the Founders on a pro rata basis (i.e. the percentage ownership of Nayara shall not be reduced as a result of such issuances of additional Common Stock until such time as [290,323] Service Provider Shares have been issued to Service Providers. After the issuance of such [290,323] Shares, the percentage ownership of the Shareholders with respect to the issuance of any additional shares of Common Stock shall be diluted appropriately and proportionately on a pro-rata basis.

3.2     Preemptive Rights.

(a)     If the Company proposes at any time to issue shares of Capital Stock (other than to Service Providers as contemplated in Section 3.1(b)), the Company shall provide written notice to Nayara (the "Section 3.2 Notice"), setting forth in reasonable detail the number of shares of Capital Stock to be issued, the per-share and aggregate consideration to be paid by each purchaser, and the other terms and conditions upon which such shares of Capital Stock are being sold. Nayara shall have the right, for a period of ten (10) business days after delivery of the Section 3.2 Notice to agree by written notice to the Company (an "Acceptance Notice") to purchase from the Company the number of shares of Capital Stock that would cause Nayara to own, after the issuance of the shares of Capital Stock set forth in the Section 3.2 Notice, the same percentage of all issued and outstanding shares of Capital Stock that the Nayara owned as of the time the Section 3.2 Notice was given. The shares of Capital Stock purchased under this Section 3.2 shall be the on the same terms and conditions for sale as are set forth in such Section 3.2 Notice. Nayara's election to purchase shares of Capital Stock hereunder shall be binding and irrevocable. The failure of Nayara to deliver an Acceptance Notice shall constitute a waiver of its rights under Section 3.2 with respect to the purchase of shares of Capital Stock offered at such time but shall not affect its rights with respect to any future issuances or sales of shares of Capital Stock.

(b)     At the closing of the sale or issuance of the shares of Capital Stock as set forth in the Section 3.2 Notice, the Company shall transfer to Nayara, and Nayara shall purchase, the number of shares of Capital Stock that Nayara is obligated to purchase, for the purchase price and on the terms and conditions provided for in Section 3.2.

## ARTICLE IV
### AGREEMENTS RELATING TO THE CAPITAL
### STOCK OF THE COMPANY AND OTHER MATTERS

Section 4.1   Transfers of Capital Stock.

(a)   No Shareholder other than Nayara shall, without the prior approval of the Board of Directors (which approval shall not be unreasonably withheld), directly or indirectly, Transfer any Capital Stock of the Company (or any interest therein or irrevocable proxy with respect thereto), now or hereafter at any time owned by such Shareholder. To the extent such Shareholder obtains such prior approval of the Board of Directors, such Transfer shall be subject to adherence with the terms and provisions of this Agreement, including, but not limited to the terms of this Article IV.

(b)   Any Transfer of Capital Stock of the Company by any Shareholder (or Transferee, as defined) shall not relieve the transferor of its obligations hereunder and, assuming such Transfer is done in compliance with the terms of this Agreement, shall only be valid if the Person to whom such Capital Stock is Transferred (a "Transferee") prior to the Transfer, agrees in writing in an agreement reasonably acceptable to the Company to be bound by the terms of this Agreement (if not already a party to this Agreement) immediately prior to such Transfer; provided, however, if a Transfer of Capital Stock involves the Transfer of all outstanding shares of Capital Stock by all of the Shareholders, then the Transferee need not be party to this Agreement and this Agreement shall be automatically terminated upon consummation of such Transfer. Any such Transferee that agrees to be bound by the terms of this Agreement as provided in this paragraph (b) shall be deemed, upon execution and delivery of such agreement to be so bound, to be a Shareholder hereunder. Each such Transferee that agrees to be bound by the terms of this Agreement shall be entitled to all of the rights under this Agreement to which the transferor was entitled immediately prior to such Transfer. Any purported Transfer without obtaining the agreement by the Transferee to be bound by the terms of this Agreement reasonably acceptable to the Company (except in the case of the Transfer of all outstanding shares of Capital Stock) shall be deemed void and of no further effect and shall be governed by the provisions of paragraph (c) below.

(c)   In the event a Transfer of any Capital Stock of the Company has taken place or remains in place in violation of the provisions of this Article III or any other provision of this Agreement, such Transfer shall be void and of no effect, and no dividend of any kind whatsoever nor any distribution pursuant to liquidation or otherwise shall be paid by the Company to the Transferee in respect of such Capital Stock (all such dividends and distributions being deemed waived), and any voting rights of such Capital Stock on any matter whatsoever shall remain vested in the transferor. The Company shall not be required to record on its stock transfer ledger or its stock register or other records any Transfer made in violation of this Agreement.

6

4.2    Legends on Stock. Each certificate evidencing shares of Capital Stock of the Company held by any Shareholder or any Transferee of a Shareholder shall bear the following legend on the face thereof:

"THIS CERTIFICATE IS ISSUED SUBJECT TO THE PROVISIONS OF A SHAREHOLDERS AGREEMENT DATED AS OF _____, 2021 AND NEITHER THIS CERTIFICATE NOR THE SHARES REPRESENTED BY IT ARE ASSIGNABLE OR OTHERWISE TRANSFERABLE, EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SAID AGREEMENT, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, OR ANY OTHER STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS REGISTERED UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAW OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE."

Any certificate issued at any time in exchange or substitution for any certificate bearing such legend (except a new certificate issued upon completion of a public distribution under a registration statement of the Capital Stock represented thereby) shall also bear such legend unless, in the opinion of counsel for the holder of such Capital Stock (which counsel shall be reasonably satisfactory to the Company), the Capital Stock represented thereby is not, at such time, required by law to bear such legend. The Company agrees that it will not Transfer on its books any certificate for its Capital Stock in violation of the provisions of this Agreement or any applicable laws.

4.3    Right of First Refusal.

(a)    If a Shareholder  receives a bona fide third party offer to purchase all or part of his shares of Capital Stock (a "Third-Party Offer"), such  Shareholder (a "Selling Shareholder") may sell such shares of Capital Stock subject to the provisions of this Section 4.3:

(i)    If a Selling Shareholder receives a Third-Party Offer, the Selling Shareholder must first offer to sell the shares of Capital Stock that are the subject of a Third-Party Offer (the "Offered Interest") to the other Shareholders (the "Non-Selling Shareholders"), as follows:

(1)    Such offer for sale (the "Offer") shall be in writing and addressed by the Selling Shareholder to the Non-Selling Shareholder(s) at their addresses listed in this Agreement (or to such other address that they shall designate in writing to the Company). Such Offer shall formally notify the Non-Selling Shareholder(s) of the material terms and conditions of the Third-Party Offer, including, but not limited to, the identity of the third party purchaser, the price to be paid for the Offered Interest to be acquired and the proposed closing

date. The Selling Shareholder shall represent and warrant in such Offer that the Third-Party Offer is a bona fide offer and that the Selling Shareholder is willing to sell the Offered Interest to the Non-Selling Shareholder(s) free and clear of all liens and encumbrances. If the sale involves more than fifty percent (50%) of the shares of Capital Stock in the Company, and if the Selling Shareholder intends to exercise the Drag Along Right set forth in Section 4.5, such Selling Shareholder shall affirmatively indicate in the Offer its intent to exercise the Drag Along Right and that the prospective purchaser has been notified of this intention and is ready willing and able to purchase such additional shares of Capital Stock.

(2)     The Non-Selling Shareholder(s) each shall have, for a period of thirty (30) days after receipt of the Offer (the "Expiration Date"), the right, but not the obligation, on a pro-rata basis or such other basis as agreed in writing in writing among the Non-Selling Shareholders, to acquire from the Selling Shareholder all and not less than all of the Offered Interest (the "Right of First Refusal") on the same terms and conditions set forth in the Offer. In order to exercise the Right of First Refusal, a Non-Selling Shareholder must provide written notice to the Selling Shareholder and the Company ("Exercise Notice") of his decision to exercise the Right of First Refusal prior to the Expiration Date. If a Non-Selling Shareholder does not exercise their Right of First Refusal to purchase their pro-rata portion of the Offered Interest, the other Non-Selling Shareholder(s) must either elect to purchase, on such basis as they may agree among themselves, that portion of the Offered Interest that the other Non-Selling Shareholder(s) did not elect to purchase or forego their own Right of First Refusal.

(3)     The closing of each sale and purchase pursuant to the exercise of the Right of First Refusal shall be held at the offices of the Company on the fifteenth (15th) Business Day following the date the Selling Shareholder receives the Exercise Notice from a Non-Selling Shareholder.

(ii)     If the Right of First Refusal has not been exercised on or prior to the Expiration Date, then the Selling Shareholder shall have the right, beginning five (5) Business Days thereafter and for a period of ninety (90) days after such Expiration Date, to sell to the Offered Interest to the bona fide third party purchaser that made the Third Party Offer on the same terms and conditions as set forth in the Offer. Any proposed Transfer on terms and conditions more favorable to the third party purchaser than those described in the Offer, as well as any proposed Transfer of shares of Capital Stock more than ninety (90) days after the Expiration Date, shall again be subject to compliance with the requirements of this Section 4.3.

4.4     Tag-Along Rights of Shareholders.

(a)     If, at any time, Selling Shareholder(s) holding fifty percent (50%) or more of the shares of Capital Stock deliver an Offer pursuant to Section 4.3, and the Non-Selling Shareholders wish to participate in such sale (the "Tag-Along Right"), and do not wish to exercise their Right of First Refusal, the Non-Selling Shareholders may notify the Selling Shareholders by written notice (the "Tag-Along Notice"), on or before the fifteenth (15th) day following the Expiration Date of the Right of First Refusal ("Tag-Along Period"), that such Non-Selling Shareholders desire to sell to the bona fide third party purchaser identified in the Offer all or part of their shares of Capital Stock in the Company ("Tag-Along Shareholder") on the same terms and conditions under which the Selling Shareholders' shares of Capital Stock are to be

8

purchased. The Tag-Along Notice shall specify the portion of the shares of Capital Stock that such Tag-Along Shareholder desires to sell. The offer of each Tag-along Shareholder set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-along Shareholder shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this Section 7.4. Each Tag-Along Shareholder shall have the right to sell in a sale subject to this Section 7.4 the shares of Capital Stock equal to the product obtained by multiplying (x) the shares of Capital Stock held by the Tag-Along Shareholder by (y) a fraction (A) the numerator of which is equal to shares of Capital Stock the Selling Shareholders proposes to sell or Transfer to the bona fide third-party purchaser and (B) denominator of which is equal to all of the shares of Capital Stock then owned by such Selling Shareholders.

(b)     The Selling Shareholders shall use their commercially reasonable efforts to include in the proposed sale to the bona fide third-party purchaser all of the shares of Capital Stock that the Tag-Along Shareholders have requested to have included pursuant to the applicable Tag-Along Notices, it being understood that the bona fide third-party purchaser shall not be required to purchase shares of Capital Stock in excess of the number set forth in the Offer. In the event the bona fide third-party purchaser elects to purchase less than all of the shares of Capital Stock sought to be sold by the Tag-Along Shareholders, the number of shares of Capital Stock to be sold to the third party purchaser by the Selling Shareholders and each Tag-Along Shareholder shall be reduced so that each such Shareholder is entitled to sell its pro-rata portion of the shares of Capital Stock the bona fide third-party purchaser elects to purchase (which in no event may be less than the number of shares of Capital Stock set forth in the Offer).

(c)     Each Shareholder who does not deliver a Tag-Along Notice in compliance with clause (a) above shall be deemed to have waived all of such Shareholder's rights to participate in such sale, and the Selling Shareholders shall (subject to the rights of any participating Tag-Along Shareholder) thereafter be free to sell to the bona fide third party purchaser its shares of Capital Stock at a price that is no greater than the price set forth in the Offer and on other same terms and conditions which are not materially more favorable to the Selling Shareholders than those set forth in the Offer, without any further obligation to the non-accepting Shareholders.

(d)     Each Tag-Along Shareholder shall take all actions as may be reasonably necessary to consummate the Tag-Along sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholders.

(e)     The Selling Shareholders shall have ninety (90) business days following the expiration of the Tag-Along Period in which to sell the shares of Capital Stock described in the Offer, on terms not more favorable to the Selling Shareholders than those set forth in the Offer (which such ninety (90) business day period may be extended for a reasonable time not to exceed one hundred twenty (120) business days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Shareholders have not completed such sale, the Selling Shareholders may not then effect a sale of shares of Capital Stock subject to this Section 7.4 without again fully complying with the provisions of this Section 4.4.

(f)     This Section 4.4 shall not apply to: (i) sales to any employee of the Company, except for any Founder who is an employee; or (ii) sales in a distribution to the public (whether pursuant to a registered public offering, Rule 144 or otherwise).

4.5     Drag-Along Rights.

(a)     In the event Selling Shareholder(s) holding more than fifty percent 50%) of the shares of Capital Stock in the Company desire, collectively, to Transfer all of their shares of Capital Stock, subject to the expiration of, or election not to exercise, the Non-Selling Shareholder(s)' Right of First Refusal, such Selling Shareholder(s) shall have the right to require the Non-Selling Shareholder(s) to sell (the "Drag-Along Right") to the bona fide third party purchaser identified in the Offer all of the Shares of Capital Stock owned by each Non-Selling Shareholder. Any shares of Capital Stock purchased pursuant to this Section 7.5 shall be paid for at the same price to be paid to the Selling Shareholder(s) for their shares of Capital Stock and upon the same terms and conditions under which the Selling Shareholder(s)' Shares of Capital Stock are to be purchased. The Selling Shareholder(s) may exercise the Drag Along right by affirmatively indicating they are exercising such Drag-Along Right in the Offer.

(b)     Each Non-Selling Shareholder shall take all actions as may be reasonably necessary to consummate the Drag-Along sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholders.

(c)     The Selling Shareholder(s) shall have ninety (90) Business Days following the date of the Offer in which to sell the Shares of Capital Stock described in the Offer, on terms not more favorable to the Selling Shareholder(s) than those set forth in the Offer (which such ninety (90) Business Day period may be extended for a reasonable time not to exceed one hundred twenty (120) Business Days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Shareholder(s) have not completed such sale, the Selling Shareholder(s) may not then effect a sale of shares of Capital Stock subject to this Section 7.5 without again fully complying with the provisions of this Section 4.5.

4.6     Buyout Events.

(a)     In the event a Buyout Event occurs with respect to a Founder (a "Terminated Shareholder"), the Company shall have the right, but not the obligation, to purchase all or any portion of the Terminated Shareholder's shares of Capital Stock (the "Buyout Right") in accordance with the terms of this Section 4.6.

(b)     The Company shall have the option, for a period of one hundred eighty (180) days following a Buyout Event (the "Buyout Period") to purchase all or any portion of the Terminated Shareholder's shares of Capital Stock. The right of the Non-Terminated Shareholder to purchase the Terminated Shareholder's shares of Capital Stock shall be exercisable by the delivery of a written notice (the "Buyout Exercise Notice") by the Company to the Terminated Shareholder, prior to the expiration of the Buyout Period, stating what amount of the Terminated Shareholder's shares of Capital Stock that the Company has elected to purchase. Such purchase

10

shall be completed in accordance with the closing procedures set forth in Section 4.7 herein. The Buyout Exercise Notice shall be binding on the Terminated Shareholder upon delivery by the Company.

4.7     Terms for Purchase of Buyout Interest. The following terms of purchase shall apply to the purchase of a Terminated Shareholder's Shares of Capital Stock:

(a)     Purchase Price. The purchase price for a Terminated Shareholder's shares of Capital Stock shall be the Fair Market Value of the Terminated Shareholder's shares of Capital Stock ("Purchase Price").

(b)     Closing. The closing of the purchase of the Terminated Shareholder's Shares of Capital Stock pursuant to Section 4.6 hereof shall take place at the office of the Company on a date (the "Closing Date") and at a time designated by the Company. On the Closing Date, the Terminated Shareholder shall deliver the certificate(s) evidencing the Terminated Shareholder's shares of Capital Stock being sold along with a duly executed stock power and the Company shall deliver by certified or bank cashier's check or wire transfer to an account designated in writing by the Terminated Shareholder, an amount not less than twenty (20%) percent of the Purchase Price. The balance of the Purchase Price, with interest at a rate of five (5%) percent per annum shall be paid in five (5) equal installments each due to the Terminated Shareholder on the anniversary of the Closing Date and shall be evidenced by the delivery of a promissory note (a "Promissory Note") by the Company to the Terminated Shareholder. Notwithstanding the foregoing, the Company shall have the right, but not the obligation, to pay the entire Purchase Price on the Closing Date or the remaining balance of the Purchase Price to the Terminated Shareholder at any time without penalty.

(c)     Spousal Consent. Simultaneously with the execution of this Agreement by the Shareholders, each Shareholder shall deliver to the Company, a fully executed Spousal Consent, in the form attached hereto as Exhibit B.

4.8     Further Assurances. A Terminated Shareholder shall execute and deliver such additional documents and instruments and perform such additional acts as the Company may request to effectuate or carry out and perform all the terms, provisions and conditions of Sections 4.6 and 4.7 hereof and the transactions contemplated thereby, to effectively transfer, assign and deliver the Terminated Shareholder's Shares of Capital Stock to the Company.

4.9     Remedies. It is specifically understood and agreed that any breach of the provisions of Sections 4.6, 4.7 or 4.8 hereof by a Terminated Shareholder will result in irreparable injury to the Company, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other remedies that the Company may have, the Company may enforce its respective rights by actions for specific performance in federal or state court in the Commonwealth of Virginia. In the event that the Company is required to enforce its rights under Sections 4.6, 4.7 or 4.8 hereof, the Terminated Shareholder shall reimburse the Company for all of the Company's costs and expenses, including attorneys' fees and

disbursements, incurred by the Company in enforcing the provisions of Section 4.6, 4.7 or 4.8 hereof.

4.10    Special Provisions Relating to Death, Incompetence, Retirement or Termination of Employment of any Founder. In the event of the death, Incompetence, Retirement, or termination of employment with the Company of a Founder for any reason other than Cause (as defined in Section 2.5), such Founder shall be permitted to maintain their shares of Capital Stock, or Transfer their shares of Capital Stock to such Founder's immediate family, or a trust or other entity Controlled by or for the benefit of such Founder and/or such Founder's immediate family. In the event of the death, Incompetence, Retirement or termination of employment with the Company of a Founder for any reason other than Cause, such Founder (in the case of termination of employment for any reason other than Cause), or such Founder's successor, heir, or guardian, as applicable, shall appoint a replacement Director to the Board of Directors as set forth in Section 2.6, and such replacement Director shall have one (1) Director Vote.

4.11    Transfers for Estate Planning Purposes. Notwithstanding the prohibition against Transfers set forth in this Article IV, a Founder may Transfer their shares of Capital Stock, for estate planning purposes to said Founder's immediate family, or a trust, corporation, limited liability company or partnership Controlled by or for the benefit of such Founder or such Founder's immediate family, without requiring compliance with Section 4.3. In addition, in the event of such a Transfer, the Shareholders shall not have the rights set forth in Section 4.4..

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

5.1    Representations and Warranties of the Shareholders. Each of the Shareholders severally represents and warrants to, the other Shareholders and the Company that:

(a)    Authority. Such Shareholder has all requisite power to enter into this Agreement and to be bound by the terms hereof. This Agreement has been duly executed and delivered by such Shareholder, has been effectively authorized by all necessary action on the part of such Shareholder and constitutes such Shareholder's legal, valid and binding obligation, enforceable against such Shareholder in accordance with its terms, except as enforceability may be subject to the application of general equitable principles and to bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally.

(b)    Agreements Not in Breach of Other Instruments. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of the terms hereof will not result in a breach of any of the terms or provisions of, or constitute a default under, or conflict with (x) any agreement, indenture or other instrument to which such Shareholder is a party or by which such Shareholder is bound, (y) any judgment, decree, order or award of any court, governmental body, Governmental Authority or arbitrator by which such Shareholder is bound or (z) any Requirement of Law applicable to such Shareholder.

(c)     Regulatory Approvals. There are no consents, approvals, authorizations or other requirements prescribed by any applicable Requirement of Law that must be obtained by such Shareholder or satisfied by such Shareholder in connection with its execution, delivery and performance of this Agreement.

(d)     No Legal Bar. There is no suit, action or proceeding pending or, to such Shareholder's knowledge, threatened against such Shareholder that questions the validity of this Agreement, any of the transactions contemplated hereby or any action which has been taken by such Shareholder in connection herewith or in connection with any of the transactions contemplated hereby or that seeks to enjoin the consummation thereof.

## ARTICLE VI
## ADDITIONAL COVENANTS AND AGREEMENTS

6.1     Books and Accounts. The Company shall keep, or shall cause to be kept, full, accurate and true books and accounts of the Company's business, in which each Company transaction shall be fully and accurately entered. The Board of Directors shall have the authority to designate and retain a firm of independent certified public accounts to assist in the maintenance and preparation of such books, records and reports as the Board of Directors deems desirable or as is required under any Requirement of Law.

6.2     Information Rights. The Company shall provide reasonable access or copies for review to each Shareholder of the following: (i) annual audited or reviewed financial statements, including a balance sheet as of the end of such fiscal year, and a statement of cash flows for such year within one hundred twenty (120) days of the close of each fiscal year of the Company, (ii) unaudited quarterly financial statements within thirty (30) days of the end of each fiscal quarter of the Company, and (iii) any other information reasonably requested by the Shareholder from time to time. Nayara shall have the right to visit and inspect the Company's properties, examine its books of account and records and discuss the Company's affairs, finances and accounts with the officers of the Company, at reasonable times and on reasonable advance notice to the Company.

6.3     Non-Compete:  No Shareholder shall, during the time such Shareholder is a Shareholder or employee of the Company, and for a period of one (1) year following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, without the prior written consent of the Company, directly or indirectly, and whether as principal, agent, officer, director, partner, employee, consultant, broker, dealer or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, or be engaged, have an interest in or take part in, or render services to any person, firm, corporation or other business organization (other than the Company) engaged in a business which is competitive with all or part of the business of the Company.

6.4     Confidential Information. Each Shareholder agrees that he, she or it will utilize Confidential Information (as defined below) solely for the purpose of the business of the Company and will make no other use of Confidential Information. In furtherance of the foregoing, no Shareholder shall directly or indirectly divulge, communicate, use to the detriment

of the Company or for the benefit of any other person or entity or misuse in any way, any Confidential Information, including, but not limited to, personal information, forms, know-how, client lists, technical data, business plans and industry analyses. For the purposes of this Agreement, "Confidential Information" means that information which is confidential and proprietary to the Company (including, but not limited to, trade secrets) and which derives (or may derive) economic value to the Company by not being generally known to others, or which the Company is otherwise under an agreement of confidentiality with an unaffiliated third party. Each Shareholder agrees that he or it will maintain and preserve the confidentiality and secrecy of such Confidential Information. In the event that a Shareholder shall receive a request to disclose all or any part of the Confidential Information under the terms of a subpoena or order issued by a court of competent jurisdiction, such Shareholder agrees, to the extent legally permissible to (i) promptly notify the Company of the existence, terms and circumstances surrounding such a request, (ii) consult with the Company on the advisability of taking legally available steps to resist or narrow such request, and (iii) if disclosure of such information is required, exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information and to reasonably cooperate with the Company in any such effort by the Company, at Company's sole cost and expense.

6.5     Non-Solicitation. For so long as a Shareholder is a Shareholder or employee of the Company and for a period of twenty four (24) months following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, such Shareholder shall not, without the written permission of the Company or any Affiliate, directly or indirectly (i) solicit, employ or retain, or have or cause any other person or entity to solicit, employee or retain, any other Shareholder or other person who is employed by the Company or (ii) solicit the business of or provide services or products to any client (or prospective client) of the Company at any time while such Shareholder was an employee or Shareholder of the Company.

6.6     Non-Disparagement. No Shareholder shall, directly or indirectly, individually or in concert with others, knowingly engage in any conduct or make any statement that is reasonably likely to have the effect of undermining or disparaging the reputation of the Company or any Affiliate of the Company, or the good will of the Company or any Affiliate of the Company, products, or business opportunities, or that is reasonably likely to have the effect of undermining or disparaging the reputation of any officer, director or employee, past or present, of the Company or any of its Affiliates. This Section does not in any way restrict or impede any Shareholder from exercising protected rights, including rights under the National Labor Relations Act (NLRA) or the federal securities laws, including the Dodd-Frank Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency.

6.7     Termination of Prior Shareholders' Agreements.  Each of the Shareholders and the Company agree that all Shareholders' agreements among or between such parties or any of them in relation to the Company and/or its Capital Stock are hereby terminated and superseded and replaced by this Agreement.

## ARTICLE VII
### EFFECTIVE DATE; TERM; TERMINATION

7.1     Effective Date.  This Agreement shall become effective on the Effective Date.

7.2     Term.  The obligations of each party hereunder shall remain binding upon such party until such time as:

(a)     this Agreement has terminated pursuant to Section 7.3 hereof; or

(b)     such party has Transferred all of its Capital Stock in the Company in accordance with the terms of this Agreement and the by-laws of the Company and is in compliance with its obligations under this Agreement;

provided that Sections 6.3-6.6 shall survive any termination of this Agreement.

7.3     Termination.  Except as otherwise expressly provided herein, this Agreement shall terminate and all rights and obligations hereunder shall cease, upon the first to occur of any of the following events:

(a)     the voluntary dissolution of the Company; or

(b)     the written agreement of each of the parties hereto to such termination; or

(c)     the effective date of an initial public offering of shares of the Company's Capital Stock.

## ARTICLE VIII
### MISCELLANEOUS

8.1     Entire Agreement.   This Agreement, together with the other agreements, instruments and documents expressly referred to herein, constitute the entire agreement of the parties with respect to the transactions contemplated hereby and supersede all prior agreements and understandings with respect thereto, whether written or oral.

8.2     No Waiver; Amendment; Modifications in Writing.  No failure or delay by a party in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to any party at law or in equity or otherwise.  No waiver of or consent to any departure by a party from any provision of this Agreement shall be effective unless signed in writing by the parties entitled to the benefit thereof.  No amendment, modification or termination of any provision of this Agreement shall be effective unless signed in writing by all parties.  Any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure from the terms of any provision of this Agreement, shall be effective only in the specific instance and for the specific purpose for which made or given. Notwithstanding anything to the contrary contained in this Agreement, the

15

Board of Directors of the Company is hereby authorized to amend Schedule 1 to this Agreement to reflect any changes to Schedule 1 made in accordance with the terms of this Agreement including, (i) the addition or deletion of Shareholders, (ii) changes in the number and/or type of shares held by Shareholders, (iii) changes in percentage ownership and (iv) changes of address of a Shareholder made at the request of such Shareholder in writing.

8.3    Notices. All notices, demands and requests which may be or is required to be given under this Agreement shall be in writing and , shall be deemed to have been duly given, (i) when sent by reputable overnight carrier, (ii) when received, if personally delivered, or (iii) when sent by United States registered or certified mail, return receipt requested, postage prepared. Any such notices shall be addressed as follows:

If to the Company:    Dark Circuit Labs, Inc.
1900 Reston Metro Plaza
Floors 5-6,
Reston, VA 20190

If to the Shareholder:  At the respective addresses set forth in Schedule 1.

Any party hereto may change the address or addresses to which notice is to be sent by giving written notice to the other parties in the manner provided for herein.

8.4    Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.

8.5    Binding Effect; Assignment. The rights and obligations of the parties under this Agreement may not be assigned or otherwise transferred to any other Person, except (i) with the prior written consent of the other parties hereto and (ii) in connection with a Transfer of Capital Stock of the Company by a Shareholder made in compliance with all of the provisions of this Agreement. Except as expressly provided in this Agreement, this Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors, permitted assigns, heirs and personal representatives. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and personal representatives.

8.6    Governing Law. This Agreement shall be deemed to be a contract made under and shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference to the principles of conflict of laws.

8.7    Consent to Jurisdiction and Service of Process Any suit, action or proceeding arising out of or relating to this Agreement may be instituted in any Federal court or any state court of the Commonwealth of Virginia situated in Fairfax County, and each party agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding

is improper or that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each party further irrevocably submits to the jurisdiction of such court in any such suit, action or proceeding. Any and all service of process and any other notice in any such suit, action or proceeding shall be effective against any party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage fully prepaid, mailed to such party as herein provided. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

8.8    <u>Further Assurances</u>. Each of the parties hereto shall execute and deliver such documents, instruments and agreements and take such further actions as may be reasonably required or desirable to carry out the provisions of this Agreement, and each of the parties hereto shall cooperate with each other in connection with the foregoing.

8.9    <u>Specific Performance</u>. The parties hereto acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that money damages would not provide an adequate remedy. It is accordingly agreed that each of the parties hereto shall be entitled to an injunction and other equitable remedies to prevent breaches or threatened breaches by the other parties hereto of this Agreement, and to enforce specifically the terms and provisions hereof or thereof in any court of the United States or any state thereof having jurisdiction, this being in addition to any other remedy to which the parties may be entitled at law or in equity.

8.10    <u>Severability of Provisions</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

8.11    <u>Headings</u>. The Article and Section headings used or contained in this Agreement are for convenience of reference only and shall not affect the construction of this Agreement.

8.12    <u>Costs and Expenses</u>. The respective parties hereto shall pay all costs and expenses that each respectively incurs with respect to the negotiation, execution and delivery of this Agreement and the Related Documents.

8.13    <u>Nature of Agreements</u>. The covenants and agreements of the parties in this Agreement are several and not joint covenants and agreements, unless otherwise expressly specified herein.

8.14    <u>Gender</u>. Whenever the context so requires, any references to the singular pronoun shall include the plural and vice-versa, and references to the masculine gender shall include the feminine gender and vice-versa, and references to neuter gender shall include the masculine or feminine gender, whichever is applicable.

8.15    <u>No Presumption From Drafting</u>. This Agreement has been negotiated at arm's length between persons knowledgeable in the matters set forth within this Agreement.

#4570734v5

Accordingly, given that all parties have had the opportunity to draft, review, engage legal counsel, and/or edit the language of this Agreement, no presumption for or against any party arising out of the drafting all or any part of this Agreement will be applied in any action relating to, connected with or involving this Agreement.

[SIGNATURE PAGE TO FOLLOW IMMEDIATELY]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement or caused this Agreement to be duly executed by their respective officers or representatives thereunto duly authorized as of the day and year first written above.

DARK CIRCUIT LABS, INC., a Delaware corporation

By: _____
    Name: Chase Bertke
    Title: Chief Executive Officer

SHAREHOLDERS:

_____
Chase Bertke

_____
Eric Missimer

_____
Ronald Pelkey, Jr.

Nayara One, LLC, a _____
limited liability company

By: _____
    Name: Larry Littleton
    Title: Managing Director

19

#4570734v5

<u>SCHEDULE 1</u>
<u>SHAREHOLDERS' OWNERSHIP OF CAPITAL STOCK</u>

| Name of Shareholder | No. of Shares of Common Stock Owned | Percentage Ownership of all of the Company's Outstanding Capital Stock |
|---|---|---|
| Chase Bertke | 325,000 | 32.5% |
| Ronald Pelkey, Jr. | 325,000 | 32.5% |
| Eric Missimer | 325,000 | 32.5% |
| Nayara One, LLC | 25,000 | 2.5% |
| Total | 1,000,000 | 100% |

20

# EXHIBIT B

## CONFIDENTIALITY NON-COMPETITION AND PROTECTABLE RIGHTS AGREEMENT

This Confidentiality and Protectable Interest Agreement (the "**Agreement**") is entered into this December 20th, 2021, between Dark Circuit Labs, Inc., a Delaware corporation (which together with its subsidiaries, affiliates, assigns and/or successors is "**the Company**" or the "**Company**") and John Carpenter (the "**Employee**"). The purpose of this Agreement is to set forth certain reasonable restrictions related to active and prospective clients and referral sources of The Company as well as the Company's Confidential Information and Trade Secrets. **This agreement contains a limited "non-compete."**

**WHEREAS**, the Company's business ("**Company Business**") is the development of cyber security products, software and services, or other lines of business that the Company enters (or has taken concrete steps to enter into in the near future) during the term of your association with the Company for third parties who utilize the Company's offerings ("**Clients**"), which Clients do business with, or seek to utilize the services of the Company and/or its employees.

**WHEREAS**, Company Business also includes the use of and interaction with referral sources of business from business and individuals who refer prospective or actual clients ("**Referral Sources**").

**WHEREAS**, the Company has expended substantial time, effort and financial resources on marketing, entertaining and servicing Clients, so as to develop and maintain those relationships, its brand, name and reputation in the marketplace. In doing so, the Company has generated and enjoys the expectation of continued patronage ("**Goodwill**") from those Clients with whom it has done business and from prospective Clients with whom it is actively working to obtain new business and those individuals which refer business to the Company ("**Referral Sources**") the loss of which will cause the Company irreparable harm. A "**Prospective Client**" or Referral Source shall mean one with whom the Company is or was working with to obtain new business at the relevant time period in question.

**WHEREAS**, the Company has expended substantial time, effort and financial resources on identifying and developing business relationships with, negotiating terms for product and software development with, and working with third-party service providers of components and software for the Company's products and services ("**Service Providers**"), so as to develop and maintain those relationships and to have its proprietary products and services created. In doing so, the Company has generated and enjoys the expectation of a continued working relationship with those Service Providers with whom it has done business and from prospective Service Providers with whom it is actively working to establish new business relationships ("**Goodwill**") the loss of which will cause the Company irreparable harm. A "**Prospective Service Provider**" shall mean one with whom the Company is or was working with to establish a business relationship at the relevant time period in question.

**WHEREAS**, the Company has expended substantial time, effort and financial resources in identifying, recruiting, hiring and retaining employees, the loss of whom will cause the Company irreparable harm.

**WHEREAS**, the Company has also acquired, maintains, and protects information that is not known publicly or readily available in the marketplace relating to Company Business including Clients, Service Providers and Referral Sources and which it regards as "**Confidential Information**," and/or as "**Trade Secrets**", as such terms are defined below, and Employee will have access to such Confidential Information and Trade Secrets of the Company in his or her or their role with the Employer.

Now, in view of these considerations and the mutual obligations contained in this Agreement, the Parties further agree as follows:

1.      **Consideration**. The Company may offer employment and/or receipt of an equity award or option to purchase equity to the Employee subject to the terms and conditions in an offer letter between the Company and Employee and other agreement governing the grant of equity or options to purchase equity. In the event of an inconsistency, the terms of this Agreement shall govern. Employee's employment shall be at all times at-will, subject to the notice provisions herein. Employee acknowledges that any offer of employment is conditioned upon Employee entering into this Agreement and shall constitute sufficient and valid consideration to Employee for purposes of Employee entering into this Agreement.

2.      **Faithful and Diligent Performance; No Conflicts of Interest.** Employee agrees to devote Employee's full business time and attention to the performance of duties for the Company and to perform Employee's duties for the Company faithfully and diligently, to act at all times while employed by the Company with undivided loyalty, and to refrain from engaging in any conduct while employed by the Company that involves a conflict of interest between employee's personal or financial interests and the Company's business interests, including obtain other employment or independent contractor work while employed by the Company unless Employee first fully discloses such conflict of interest to the Company and receives consent from the Company's Chief Executive Officer, President or Chief Operating Officer (the Company's "**Contact Persons**") to engage in such conduct.

3.      **Confidentiality and Use of Confidential Information and Trade Secrets.**

(a)      **Confidential Information and Trade Secrets.** The Employee and the Company agree that for the purposes of this Agreement, and in addition to any meaning that it may have under the common law, the term "**Confidential Information**" shall mean information belonging to or possessed by the Company, whether or not reduced to writing (or in a form from which such information can be obtained, translated or derived into reasonably usable form), that derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including without limitation, financial information, reports, and forecasts; improvements and other intellectual property owned by or relating to the Company; the buying practices of Clients or prospective Clients; the disclosures from or to Service Providers or prospective Service Providers; pricing offered to Clients or; pricing offered from Service Providers; the Company's production, advertising, marketing and growth strategies, methods and research; the prices/rates/terms at which the Company obtains or has obtained, or sells or has sold its products or services; the Company's sales, costs and sales methods; and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) that have been discussed or considered by

the management of the Company; the Company's business systems and methodologies employed by the creation, delivery, maintenance and improvement of the Company's product and services. Confidential Information also includes the confidential information of others, such as Clients and Service Providers with which Employee or the Company has a business relationship. Confidential Information shall also include any information that Employee is required to keep confidential pursuant to any ethical obligation or state or federal law, rule or regulation. Notwithstanding the foregoing, Confidential Information does not include documents in the public domain unless due to breach of Employee's duties under the Agreement. Confidential Information, such as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, inventions, product drawings, designs and photographs, prototypes, methods, business systems, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known are referred to as "**Trade Secrets**".

      **(b)**   <u>**Use of Information During Employment.**</u> While employed by the Company, Employee shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company. Employee shall adhere to all rules and policies of the Company relating to maintaining and safeguarding Confidential Information from public disclosure or use by an individual or business, including those that compete for Company Business.

      **(c)**   <u>**Information if no Longer Employed.**</u> All documents, records, data, information and physical property, whether or not amounting to or containing Confidential Information or Trade Secrets, which are furnished to Employee by the Company or are produced by Employee in connection with Employee's employment will be and remain the sole property of the Company. Employee is required to return to the Company all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Company. In the event Employee shall no longer be employed by the Company, Employee shall not use or otherwise distribute or disseminate Confidential Information or Trade Secrets on his/her/their behalf or that of a third person. Upon the end of the employment relationship between the Employee and the Company, Employee shall immediately gather and return to the Company all Confidential Information and Trade Secrets in his/her/their possession or control. At the Company's request, Employee shall delete all Confidential Information and Trade Secrets stored electronically which he/she/they maintains or has access to, including those residing in email accounts or on computers or portable electronic devices and shall remove from Employee's electronic storage, email or networking sites (such as LinkedIn) any Confidential Information or Trade Secrets by deleting such contacts from such websites and not re-engineering same. It is the express intent of the Parties that if no longer employed by the Company, the Employee shall not use or have access to Confidential Information or Trade Secrets relating to Clients, Prospective Clients, Service Providers, Prospective Service Providers, and Referral Sources including those for which Employee had a pre-existing relationship that existed prior to employment by Company (or its subsidiaries, affiliates or predecessors) it being expressly understood and agreed that the goodwill in such relationships has been transferred and sold to the Company.

#4632509v1

3

**(d)    Defend Trade Secret Act Notice.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a Trade Secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and is (i) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the Trade Secret to the attorney of the individual and use the Trade Secret information in the court proceeding, if the individual (iii) files any document containing the Trade Secret under seal; and (iv) does not disclose the Trade Secret, except pursuant to court order.

## 4.    No Diversion of Client, Prospective Client, Service Provider, Prospective Service Providers, and Referral Source Relationships.

**(a)**    During the course of Employee's employment, Employee shall not, directly or indirectly: (i) solicit, accept an offer to do business with, service or divert any Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources and/or Company Business for Employee's personal benefit or that of a third-party or to the Company's detriment or (ii) consistent with Employee's duty of loyalty, work for another business which competes with the Company for Company Business including, without limitation, running, owning, managing, operating, controlling, being employed by, providing consulting services to, being a manager, officer, director or employee of, participating in, lending Employee's name to, investing in, or being connected in any manner with the management, ownership, operation, or control of any business, venture or activity that performs competitive services with the Company.

**(b)**    In recognition of the Company's interest in protecting its Goodwill interest in Clients, Prospective Clients, Service Providers, Prospective Service Providers and Referral Source relationships, Employee agrees that for a period of twelve (12) months after he/she is no longer employed, Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

## 5.    Non-Solicitation of Company Employees. Employee recognizes the desire of the Company to preserve its Goodwill, its Confidential Information and Trade Secrets through the continued services of its employees. While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was

employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

**6.**     **Calculation of Time in Sections 4, 5 & 9.** In the event of a breach of the Employee's obligations in paragraphs 4, 5 or 9, the duration for which such breach is continuing shall be excluded from the period during which such obligations shall apply and such time period shall be extended thereby.

**7.**     **Representations & Acknowledgments.**

    **(a)**     **Representations.** Employee represents to the Company that:

    (i)     there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent, impair, restrict or make unlawful the execution of this Agreement or performance hereunder;

    (ii)     Employee does not possess any confidential information or trade secrets of a former employer or other thirty-party; and

    (iii)     in the course of employment with the Company, Employee will take no action to violate or infringe upon the intellectual property, confidentiality or ownership rights of any third-party.

    **(b)**     **Acknowledgements.** Employee acknowledges that:

    (i)     Employee shall fill a role for Company which will allow Employee to create, maintain and foster unique and extraordinary close and trusting relationships with Clients, Prospective Clients, Service Providers, Prospective Service Providers, and/or Referral Sources or is expected to utilize the Company's Confidential Information and Trade Secrets in performing the duties required by Employee's position;

    (ii)     Employee expressly waives any defense to the enforcement of paragraph 4 of this agreement that Employee had a pre-existing relationship with any Client, Service Provider or Referral Source;

    (iii)     Employee is not and will not be unduly burdened by the provisions and enforcement of this Agreement;

    (iv)     the covenants set forth in Sections 4 and 5 are reasonable in all respects (including geography, scope and duration) and necessary for the protection of the legitimate protectable interests of the Company, including its Goodwill and are not overreaching; and

    (v)     Employee has been given sufficient time to review and consider the terms of this Agreement and has been afforded the opportunity to consult with an attorney. By signing this Agreement, Employee has done so knowingly and voluntarily and without duress or coercion.

#4632509v1

## 8. **Remedies for Breach**.

**(a)** In the event of any actual or threatened breach of any of the covenants contained in this Agreement, the Company shall be entitled to seek an injunction (temporary, preliminary and/or permanent) to enforce this Agreement, without the requirement of posting a bond or other form of collateral, and may also pursue any other available remedies available to it in law and/or equity.

**(b)** Should the Company be a Prevailing Party in any litigation to enforce the terms of this Agreement, Employee shall be responsible for and pay the reasonable costs, fees and expenses of Company's attorneys associated with such litigation, including appeals. The Company shall be a "**Prevailing Party**" if it obtains temporary, preliminary and/or permanent injunctive relief, or is awarded monetary damages for such breach or threatened breach.

## 9. **Ownership of Inventions**.

(a) **Inventions Retained and Licensed**. Employee has attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the date of this Agreement: (i) Employee made or created, and/or (ii) are owned solely or jointly by Employee or belonging to Employee jointly with others or in which Employee has an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively, "**Prior Inventions**"); or, if no such list is attached, Employee represents that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on Exhibit A, Employee hereby forever waive any and all rights or claims of ownership to such Inventions. Employee understands that Employee listing of any Inventions on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of Employee's ownership of such Inventions.

(b) **Use or Incorporation of Inventions**. If in the course of Employee's employment or working with the Company, Employee uses or incorporates into any of the Company's products, services, processes or machines any Invention not covered by Section 9(d) of this Agreement in which Employee has an interest, Employee will promptly so inform the Company in writing. Whether or not Employee gives such notice, Employee hereby irrevocably grants to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c) **Inventions** "**Inventions**" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable including, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon, and to differentiate, for purposes of the disclosure in Exhibit A are personal to the Employee and do not involve the Company. "**Company Inventions**" means any

and all Inventions that Employee may solely or jointly author, discover, develop, conceive, or reduce to practice during the Employee's employment or working with the Company on or related to Company matters within the scope of Employee's employment.

(d) **Assignment of Company Inventions**. Employee hereby assigns to the Company, or the Company's designee, and agrees to promptly make full written disclosure to the Company of and to hold in trust for the sole right and benefit of the Company, all of Employee's right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. Employee hereby waives and irrevocably quitclaims to the Company or the Company's designee any and all claims, of any nature whatsoever, that now have or may hereafter have for infringement of any and all Company Inventions. Employee further acknowledges that all Company Inventions that are made by Employee (solely or jointly with others) within the scope of and during the period of the Employee's employment or working with the Company are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by Employee's salary and benefits and any other consideration. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, Employee hereby waives and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If Employee has any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, Employee hereby unconditionally and irrevocably grants to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e) **Maintenance of Records**. Employee agrees to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Employee's employment or working with the Company. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. Employee agrees not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. Employee agrees to deliver all such records (including any copies thereof) to the Company at the time of termination of the employee's employment as provided for in this Agreement.

(f) **Intellectual Property Rights**. Employee agrees to assist the Company, or its designee in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments

which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Employee further agrees that Employee's obligation to execute or cause to be executed, when it is in Employee's power to do so, any such instrument or papers shall continue during and at all times after the end of the Employee's employment and until the expiration of the last such intellectual property right to expire in any country of the world. Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact, to act for and in Employee's behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by Employee's subsequent incapacity.

**10.      [Limited Non-Compete Relating Solely to the Compliance with Option Grant**.  In the event the Employee terminates Employee's employment with the Company, as a condition precedent for receiving the benefits of any grant of equity or option to purchase equity, Employee shall not, for a period of twelve (12) months after the end of employment work for a Company located within a twenty (20) mile radius of the Company's office address located at 1900 Reston Metro Plaza, Reston, VA 20150 that competes with the Company for Company Business.

**11.      Limited Enforcement by The Company; Partial Invalidity.** The Company shall have the option and right to enforce any provision in this Agreement to a partial, lesser and/or more limited extent than this Agreement provides, upon written notice to Employee. If any provision of this Agreement is declared to be void, invalid, or illegal, the parties request that such provision be partially enforced and modified by the court to most closely reflect the intent of the parties, to the fullest extent permitted by law. If any provision of this Agreement is declared to be unreasonable or excessively broad by a court, the parties request, to the fullest extent permitted by law, that the court interpret such provision in such a manner so as to provide the greatest degree of protection for the Company.

**12.      Governing Law and Consent to Jurisdiction.** This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Virginia without regard to principles involving the conflict of laws. Any dispute or controversy other than those involving the need for a temporary restraining order or a preliminary injunction arising out of or relating to this agreement and/or an Employee's employment that could otherwise be resolved by a court shall be resolved through arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association, in which neither class actions nor collective actions will be permitted. The Employer shall pay any such filing fee if necessary to ensure that the AAA hears these disputes. Judgment upon the award may be entered in any court having jurisdiction. Both you and The Company give up any right to resolve a controversy through any other means, except for claims for injunctive relief relating to this Agreement and/or Employee's employment such as requests for temporary restraining orders, and preliminary and/or permanent injunctions which shall first be heard in the state and federal courts located in the State of Virginia. Employee and the Company hereby consent to the jurisdiction and venue of such courts and irrevocably waive the necessity of

personal service of process and consent to service of process by overnight mail (UPS or FEDEX next day delivery).

***Neither Employee nor the Company will be able to sue in court in connection with monetary claims related to this agreement.*** This inability to sue in court includes, for example, claims based on federal statutes such as Title VII of the Civil Rights Act of 1964 and the Fair Labor Standards Act and claims based on statutes, common law causes of action and concerning compensation. If there is more than one such dispute between Employee and Company, all such disputes may be heard in a single arbitration proceeding. Disputes pertaining to different employees of Company will be heard in separate arbitration proceedings. Any arbitration shall be resolved under the Delaware Rapid Arbitration Act. Each party shall bear its own costs and fees in any legal dispute between them except in accordance with paragraph 8(b) of this Agreement or any statutory rights that Employee may have. Notwithstanding any language to the contrary in this agreement, the parties hereby agree that the award rendered by that arbitrator may be appealed pursuant to the AAA's Optional Appellate Arbitration Rules ("Appellate Rules"); that the award rendered by the arbitrator(s) shall, at a minimum, be a reasoned award; and that the award shall not be considered final until after the time for filing the notice of appeal pursuant to the Appellate Rules has expired. Appeals must be initiated within thirty (30) days of receipt of an Underlying Award, as defined by Rule A-3 of the Appellate Rules, by filing a Notice of Appeal with any AAA office. Following the appeal process the decision rendered by the appeal tribunal may be entered in any court having jurisdiction thereof.

### 13.   Miscellaneous.

**(a)**     This Agreement may be only amended by written agreement of the parties hereto, and no person, other than the Parties shall have any rights under or interest in this Agreement or the subject matter hereof.

**(b)**     No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion. No waiver shall be effective unless set forth in writing and signed by the party granting such waiver.

**(c)**     Employee expressly acknowledges and agrees to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. This Agreement will inure to the benefit of the Company, its successors, and its assigns. Employee acknowledges and agrees that the Company may assign this Agreement to any of its subsidiaries, affiliates, or successors, at any time and without Employee's further approval or consent. Employee further acknowledges and agrees that the Company may be merged or consolidated with another entity, and that such entity shall automatically succeed to the rights, powers, and obligations that the Company has under this Agreement, without Employee's further approval or consent. Finally, Employee acknowledges and agrees that Employee's obligations under this Agreement are personal and that Employee may not assign this Agreement.

(d)     The headings or captions used in this Agreement are inserted only for the purpose of convenience and reference, and in no way define the scope or intent of any provision or part hereof.

(e)     The unnumbered paragraphs on page 1, and paragraphs 2 through 13 shall survive both the termination of this Agreement and the end of the employment relationship between the Employee and the Company.

(f)     The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. In the event of any such prohibition or unenforceability, a court of appropriate jurisdiction is authorized to partially enforce, amend and/or sever any such provision to the minimum extent necessary to make such provision neither prohibited nor unenforceable.

(g)     This Agreement, together with any other agreement referenced herein (such as any Offer Letter or Employment Agreement), constitutes the entire agreement between the Parties with respect to subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings and negotiations, both written and oral, between the Parties.

(h)     Employee understands that nothing in this Agreement is intended to restrict Employee's rights to discuss wages and working conditions with co-workers, if any, or in any way limit Employee's right to engage in concerted activity under the National Labor Relations Act, if any.

[SIGNATURE PAGE FOLLOWS]

BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND
UNDERSTAND ALL OF ITS PROVISIONS AND THAT I AGREE TO BE FULLY BOUND
BY THE SAME.

EMPLOYEE:                                      DARK CIRCUIT LABS, INC.

By: _____                 By: _____
Name: John M Carpenter                         Name: Ronald Pelkey
                                               Title: President and COC

Address:
1610 Kenwood Ave
Alexandria VA 22302
Email: jmc7dd@vorginia.edu

#4632509v1

11

# EXHIBIT C

## CONFIDENTIALITY NON-COMPETITION AND PROTECTABLE RIGHTS AGREEMENT

This Confidentiality and Protectable Interest Agreement (the "**Agreement**") is entered into this July 30, 2022, between Dark Circuit Labs, Inc., a Delaware corporation (which together with its subsidiaries, affiliates, assigns and/or successors is "**the Company**" or the "**Company**") and Michael Frank (the "**Employee**"). The purpose of this Agreement is to set forth certain reasonable restrictions related to active and prospective clients and referral sources of The Company as well as the Company's Confidential Information and Trade Secrets. **This agreement contains a limited "non-compete."**

WHEREAS, the Company's business ("**Company Business**") is the development of cyber security products, software and services, or other lines of business that the Company enters (or has taken concrete steps to enter into in the near future) during the term of your association with the Company for third parties who utilize the Company's offerings ("**Clients**"), which Clients do business with, or seek to utilize the services of the Company and/or its employees.

WHEREAS, Company Business also includes the use of and interaction with referral sources of business from business and individuals who refer prospective or actual clients ("**Referral Sources**").

WHEREAS, the Company has expended substantial time, effort and financial resources on marketing, entertaining and servicing Clients, so as to develop and maintain those relationships, its brand, name and reputation in the marketplace. In doing so, the Company has generated and enjoys the expectation of continued patronage ("**Goodwill**") from those Clients with whom it has done business and from prospective Clients with whom it is actively working to obtain new business and those individuals which refer business to the Company ("**Referral Sources**") the loss of which will cause the Company irreparable harm. A "**Prospective Client**" or Referral Source shall mean one with whom the Company is or was working with to obtain new business at the relevant time period in question.

WHEREAS, the Company has expended substantial time, effort and financial resources on identifying and developing business relationships with, negotiating terms for product and software development with, and working with third-party service providers of components and software for the Company's products and services ("**Service Providers**"), so as to develop and maintain those relationships and to have its proprietary products and services created. In doing so, the Company has generated and enjoys the expectation of a continued working relationship with those Service Providers with whom it has done business and from prospective Service Providers with whom it is actively working to establish new business relationships ("**Goodwill**") the loss of which will cause the Company irreparable harm. A "**Prospective Service Provider**" shall mean one with whom the Company is or was working with to establish a business relationship at the relevant time period in question.

WHEREAS, the Company has expended substantial time, effort and financial resources in identifying, recruiting, hiring and retaining employees, the loss of whom will cause the Company irreparable harm.

**WHEREAS**, the Company has also acquired, maintains, and protects information that is not known publicly or readily available in the marketplace relating to Company Business including Clients, Service Providers and Referral Sources and which it regards as "**Confidential Information**," and/or as "**Trade Secrets**", as such terms are defined below, and Employee will have access to such Confidential Information and Trade Secrets of the Company in his or her or their role with the Employer.

Now, in view of these considerations and the mutual obligations contained in this Agreement, the Parties further agree as follows:

1.      **Consideration**. The Company may offer employment and/or receipt of an equity award or option to purchase equity to the Employee subject to the terms and conditions in an offer letter between the Company and Employee and other agreement governing the grant of equity or options to purchase equity. In the event of an inconsistency, the terms of this Agreement shall govern. Employee's employment shall be at all times at-will, subject to the notice provisions herein. Employee acknowledges that any offer of employment is conditioned upon Employee entering into this Agreement and shall constitute sufficient and valid consideration to Employee for purposes of Employee entering into this Agreement.

2.      **Faithful and Diligent Performance; No Conflicts of Interest.** Employee agrees to devote Employee's full business time and attention to the performance of duties for the Company and to perform Employee's duties for the Company faithfully and diligently, to act at all times while employed by the Company with undivided loyalty, and to refrain from engaging in any conduct while employed by the Company that involves a conflict of interest between employee's personal or financial interests and the Company's business interests, including obtain other employment or independent contractor work while employed by the Company unless Employee first fully discloses such conflict of interest to the Company and receives consent from the Company's Chief Executive Officer, President or Chief Operating Officer (the Company's "**Contact Persons**") to engage in such conduct.

3.      **Confidentiality and Use of Confidential Information and Trade Secrets.**

        (a)      **Confidential Information and Trade Secrets.** The Employee and the Company agree that for the purposes of this Agreement, and in addition to any meaning that it may have under the common law, the term "**Confidential Information**" shall mean information belonging to or possessed by the Company, whether or not reduced to writing (or in a form from which such information can be obtained, translated or derived into reasonably usable form), that derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including without limitation, financial information, reports, and forecasts; improvements and other intellectual property owned by or relating to the Company; the buying practices of Clients or prospective Clients; the disclosures from or to Service Providers or prospective Service Providers; pricing offered to Clients or; pricing offered from Service Providers; the Company's production, advertising, marketing and growth strategies, methods and research; the prices/rates/terms at which the Company obtains or has obtained, or sells or has sold its products or services; the Company's sales, costs and sales methods; and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) that have been discussed or considered by

the management of the Company; the Company's business systems and methodologies employed by the creation, delivery, maintenance and improvement of the Company's product and services. Confidential Information also includes the confidential information of others, such as Clients and Service Providers with which Employee or the Company has a business relationship. Confidential Information shall also include any information that Employee is required to keep confidential pursuant to any ethical obligation or state or federal law, rule or regulation. Notwithstanding the foregoing, Confidential Information does not include documents in the public domain unless due to breach of Employee's duties under the Agreement. Confidential Information, such as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, inventions, product drawings, designs and photographs, prototypes, methods, business systems, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known are referred to as "**Trade Secrets**".

(b) **Use of Information During Employment.** While employed by the Company, Employee shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company. Employee shall adhere to all rules and policies of the Company relating to maintaining and safeguarding Confidential Information from public disclosure or use by an individual or business, including those that compete for Company Business.

(c) **Information if no Longer Employed.** All documents, records, data, information and physical property, whether or not amounting to or containing Confidential Information or Trade Secrets, which are furnished to Employee by the Company or are produced by Employee in connection with Employee's employment will be and remain the sole property of the Company. Employee is required to return to the Company all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Company. In the event Employee shall no longer be employed by the Company, Employee shall not use or otherwise distribute or disseminate Confidential Information or Trade Secrets on his/her/their behalf or that of a third person. Upon the end of the employment relationship between the Employee and the Company, Employee shall immediately gather and return to the Company all Confidential Information and Trade Secrets in his/her/their possession or control. At the Company's request, Employee shall delete all Confidential Information and Trade Secrets stored electronically which he/she/they maintains or has access to, including those residing in email accounts or on computers or portable electronic devices and shall remove from Employee's electronic storage, email or networking sites (such as LinkedIn) any Confidential Information or Trade Secrets by deleting such contacts from such websites and not re-engineering same. It is the express intent of the Parties that if no longer employed by the Company, the Employee shall not use or have access to Confidential Information or Trade Secrets relating to Clients, Prospective Clients, Service Providers, Prospective Service Providers, and Referral Sources including those for which Employee had a pre-existing relationship that existed prior to employment by Company (or its subsidiaries, affiliates or predecessors) it being expressly understood and agreed that the goodwill in such relationships has been transferred and sold to the Company.

**(d)    Defend Trade Secret Act Notice.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a Trade Secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and is (i) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the Trade Secret to the attorney of the individual and use the Trade Secret information in the court proceeding, if the individual (iii) files any document containing the Trade Secret under seal; and (iv) does not disclose the Trade Secret, except pursuant to court order.

**4.    No Diversion of Client, Prospective Client, Service Provider, Prospective Service Providers, and Referral Source Relationships.**

**(a)**    During the course of Employee's employment, Employee shall not, directly or indirectly: (i) solicit, accept an offer to do business with, service or divert any Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources and/or Company Business for Employee's personal benefit or that of a third-party or to the Company's detriment or (ii) consistent with Employee's duty of loyalty, work for another business which competes with the Company for Company Business including, without limitation, running, owning, managing, operating, controlling, being employed by, providing consulting services to, being a manager, officer, director or employee of, participating in, lending Employee's name to, investing in, or being connected in any manner with the management, ownership, operation, or control of any business, venture or activity that performs competitive services with the Company.

**(b)**    In recognition of the Company's interest in protecting its Goodwill interest in Clients, Prospective Clients, Service Providers, Prospective Service Providers and Referral Source relationships, Employee agrees that for a period of twelve (12) months after he/she is no longer employed, Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

**5.    Non-Solicitation of Company Employees.** Employee recognizes the desire of the Company to preserve its Goodwill, its Confidential Information and Trade Secrets through the continued services of its employees. While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was

employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

**6.**    **Calculation of Time in Sections 4, 5 & 9.** In the event of a breach of the Employee's obligations in paragraphs 4, 5 or 9, the duration for which such breach is continuing shall be excluded from the period during which such obligations shall apply and such time period shall be extended thereby.

**7.**    **Representations & Acknowledgments.**

    **(a)**    **Representations.** Employee represents to the Company that:

        (i)    there are no restrictions, agreements or understandings whatsoever to which Employee is a party which would prevent, impair, restrict or make unlawful the execution of this Agreement or performance hereunder;

        (ii)    Employee does not possess any confidential information or trade secrets of a former employer or other thirty-party; and

        (iii)    in the course of employment with the Company, Employee will take no action to violate or infringe upon the intellectual property, confidentiality or ownership rights of any third-party.

    **(b)**    **Acknowledgements.** Employee acknowledges that:

        (i)    Employee shall fill a role for Company which will allow Employee to create, maintain and foster unique and extraordinary close and trusting relationships with Clients, Prospective Clients, Service Providers, Prospective Service Providers, and/or Referral Sources or is expected to utilize the Company's Confidential Information and Trade Secrets in performing the duties required by Employee's position;

        (ii)    Employee expressly waives any defense to the enforcement of paragraph 4 of this agreement that Employee had a pre-existing relationship with any Client, Service Provider or Referral Source;

        (iii)    Employee is not and will not be unduly burdened by the provisions and enforcement of this Agreement;

        (iv)    the covenants set forth in Sections 4 and 5 are reasonable in all respects (including geography, scope and duration) and necessary for the protection of the legitimate protectable interests of the Company, including its Goodwill and are not overreaching; and

        (v)    Employee has been given sufficient time to review and consider the terms of this Agreement and has been afforded the opportunity to consult with an attorney. By signing this Agreement, Employee has done so knowingly and voluntarily and without duress or coercion.

## 8. **Remedies for Breach**.

**(a)** In the event of any actual or threatened breach of any of the covenants contained in this Agreement, the Company shall be entitled to seek an injunction (temporary, preliminary and/or permanent) to enforce this Agreement, without the requirement of posting a bond or other form of collateral, and may also pursue any other available remedies available to it in law and/or equity.

**(b)** Should the Company be a Prevailing Party in any litigation to enforce the terms of this Agreement, Employee shall be responsible for and pay the reasonable costs, fees and expenses of Company's attorneys associated with such litigation, including appeals. The Company shall be a "**Prevailing Party**" if it obtains temporary, preliminary and/or permanent injunctive relief, or is awarded monetary damages for such breach or threatened breach.

## 9. **Ownership of Inventions**.

(a) **Inventions Retained and Licensed**. Employee has attached hereto, as <u>Exhibit A</u>, a complete list describing with particularity all Inventions (as defined below) that, as of the date of this Agreement: (i) Employee made or created, and/or (ii) are owned solely or jointly by Employee or belonging to Employee jointly with others or in which Employee has an interest, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or research and development, and which are not assigned to the Company hereunder (collectively, "**Prior Inventions**"); or, if no such list is attached, Employee represents that there are no such Inventions at the time of signing this Agreement, and to the extent such Inventions do exist and are not listed on <u>Exhibit A</u>, Employee hereby forever waive any and all rights or claims of ownership to such Inventions. Employee understands that Employee listing of any Inventions on <u>Exhibit A</u> does not constitute an acknowledgement by the Company of the existence or extent of such Inventions, nor of Employee's ownership of such Inventions.

(b) **Use or Incorporation of Inventions**. If in the course of Employee's employment or working with the Company, Employee uses or incorporates into any of the Company's products, services, processes or machines any Invention not covered by Section 9(d) of this Agreement in which Employee has an interest, Employee will promptly so inform the Company in writing. Whether or not Employee gives such notice, Employee hereby irrevocably grants to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

(c) **Inventions** "**Inventions**" means discoveries, developments, concepts, designs, ideas, know how, modifications, improvements, derivative works, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable including, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon, and to differentiate, for purposes of the disclosure in Exhibit A are personal to the Employee and do not involve the Company. "**Company Inventions**" means any

and all Inventions that Employee may solely or jointly author, discover, develop, conceive, or reduce to practice during the Employee's employment or working with the Company on or related to Company matters within the scope of Employee's employment.

(d) **Assignment of Company Inventions**. Employee hereby assigns to the Company, or the Company's designee, and agrees to promptly make full written disclosure to the Company of and to hold in trust for the sole right and benefit of the Company, all of Employee's right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. Employee hereby waives and irrevocably quitclaims to the Company or the Company's designee any and all claims, of any nature whatsoever, that now have or may hereafter have for infringement of any and all Company Inventions. Employee further acknowledges that all Company Inventions that are made by Employee (solely or jointly with others) within the scope of and during the period of the Employee's employment or working with the Company are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by Employee's salary and benefits and any other consideration. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, Employee hereby waives and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law. If Employee has any rights to the Company Inventions, other than Moral Rights, that cannot be assigned to the Company, Employee hereby unconditionally and irrevocably grants to the Company during the term of such rights, an exclusive, irrevocable, perpetual, worldwide, fully paid and royalty-free license, with rights to sublicense through multiple levels of sublicensees, to reproduce, distribute, display, perform, prepare derivative works of and otherwise modify, make, have made, sell, offer to sell, import, practice methods, processes and procedures and otherwise use and exploit, such Company Inventions.

(e) **Maintenance of Records**. Employee agrees to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Employee's employment or working with the Company. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. Employee agrees not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. Employee agrees to deliver all such records (including any copies thereof) to the Company at the time of termination of the employee's employment as provided for in this Agreement.

(f) **Intellectual Property Rights**. Employee agrees to assist the Company, or its designee in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, Moral Rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments

which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive and agree never to assert such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Employee further agrees that Employee's obligation to execute or cause to be executed, when it is in Employee's power to do so, any such instrument or papers shall continue during and at all times after the end of the Employee's employment and until the expiration of the last such intellectual property right to expire in any country of the world. Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-in-fact, to act for and in Employee's behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by Employee's subsequent incapacity.

10.     **[Limited Non-Compete Relating Solely to the Compliance with Option Grant**.  In the event the Employee terminates Employee's employment with the Company, as a condition precedent for receiving the benefits of any grant of equity or option to purchase equity, Employee shall not, for a period of twelve (12) months after the end of employment work for a Company located within a thirty (30) mile radius of the Company's office address located at 1900 Reston Metro Plaza, Suite 600, Reston VA, 20191, that competes with the Company for Company Business.]

11.     **Limited Enforcement by The Company; Partial Invalidity**. The Company shall have the option and right to enforce any provision in this Agreement to a partial, lesser and/or more limited extent than this Agreement provides, upon written notice to Employee. If any provision of this Agreement is declared to be void, invalid, or illegal, the parties request that such provision be partially enforced and modified by the court to most closely reflect the intent of the parties, to the fullest extent permitted by law. If any provision of this Agreement is declared to be unreasonable or excessively broad by a court, the parties request, to the fullest extent permitted by law, that the court interpret such provision in such a manner so as to provide the greatest degree of protection for the Company.

12.     **Governing Law and Consent to Jurisdiction**. This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Virginia without regard to principles involving the conflict of laws. Any dispute or controversy other than those involving the need for a temporary restraining order or a preliminary injunction arising out of or relating to this agreement and/or an Employee's employment that could otherwise be resolved by a court shall be resolved through arbitration in accordance with the Employment Arbitration Rules of the American Arbitration Association, in which neither class actions nor collective actions will be permitted. The Employer shall pay any such filing fee if necessary to ensure that the AAA hears these disputes. Judgment upon the award may be entered in any court having jurisdiction. Both you and The Company give up any right to resolve a controversy through any other means, except for claims for injunctive relief relating to this Agreement and/or Employee's employment such as requests for temporary restraining orders, and preliminary and/or permanent injunctions which shall first be heard in the state and federal courts located in the State of Virginia. Employee and the Company hereby consent to the jurisdiction and venue of such courts and irrevocably waive the necessity of

#4632509v1

8

personal service of process and consent to service of process by overnight mail (UPS or FEDEX next day delivery).

**Neither Employee nor the Company will be able to sue in court in connection with monetary claims related to this agreement.** This inability to sue in court includes, for example, claims based on federal statutes such as Title VII of the Civil Rights Act of 1964 and the Fair Labor Standards Act and claims based on statutes, common law causes of action and concerning compensation. If there is more than one such dispute between Employee and Company, all such disputes may be heard in a single arbitration proceeding. Disputes pertaining to different employees of Company will be heard in separate arbitration proceedings. Any arbitration shall be resolved under the Delaware Rapid Arbitration Act Each party shall bear its own costs and fees in any legal dispute between them except in accordance with paragraph 8(b) of this Agreement or any statutory rights that Employee may have. Notwithstanding any language to the contrary in this agreement, the parties hereby agree that the award rendered by that arbitrator may be appealed pursuant to the AAA's Optional Appellate Arbitration Rules ("Appellate Rules"); that the award rendered by the arbitrator(s) shall, at a minimum, be a reasoned award; and that the award shall not be considered final until after the time for filing the notice of appeal pursuant to the Appellate Rules has expired. Appeals must be initiated within thirty (30) days of receipt of an Underlying Award, as defined by Rule A-3 of the Appellate Rules, by filing a Notice of Appeal with any AAA office. Following the appeal process the decision rendered by the appeal tribunal may be entered in any court having jurisdiction thereof.

13. **Miscellaneous.**

(a) This Agreement may be only amended by written agreement of the parties hereto, and no person, other than the Parties shall have any rights under or interest in this Agreement or the subject matter hereof.

(b) No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion. No waiver shall be effective unless set forth in writing and signed by the party granting such waiver.

(c) Employee expressly acknowledges and agrees to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. This Agreement will inure to the benefit of the Company, its successors, and its assigns. Employee acknowledges and agrees that the Company may assign this Agreement to any of its subsidiaries, affiliates, or successors, at any time and without Employee's further approval or consent. Employee further acknowledges and agrees that the Company may be merged or consolidated with another entity, and that such entity shall automatically succeed to the rights, powers, and obligations that the Company has under this Agreement, without Employee's further approval or consent. Finally, Employee acknowledges and agrees that Employee's obligations under this Agreement are personal and that Employee may not assign this Agreement.

(d)     The headings or captions used in this Agreement are inserted only for the purpose of convenience and reference, and in no way define the scope or intent of any provision or part hereof.

(e)     The unnumbered paragraphs on page 1, and paragraphs 2 through 13 shall survive both the termination of this Agreement and the end of the employment relationship between the Employee and the Company.

(f)     The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. In the event of any such prohibition or unenforceability, a court of appropriate jurisdiction is authorized to partially enforce, amend and/or sever any such provision to the minimum extent necessary to make such provision neither prohibited nor unenforceable.

(g)     This Agreement, together with any other agreement referenced herein (such as any Offer Letter or Employment Agreement), constitutes the entire agreement between the Parties with respect to subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings and negotiations, both written and oral, between the Parties.

(h)     Employee understands that nothing in this Agreement is intended to restrict Employee's rights to discuss wages and working conditions with co-workers, if any, or in any way limit Employee's right to engage in concerted activity under the National Labor Relations Act, if any.

[SIGNATURE PAGE FOLLOWS]

#4632509v1

BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND ALL OF ITS PROVISIONS AND THAT I AGREE TO BE FULLY BOUND BY THE SAME.

EMPLOYEE:                                    DARK CIRCUIT LABS, INC.

By: *Michael Frank*                          By: _Ronald C Pelkey_
Name:                                        Name: Ronald Pelkey
                                             Title: President and Chief Operating Officer

Address:

904 Elden St

Herndon, VA 20170

Email:  m.afrank@yahoo.com