# **EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **DARK CIRCUIT LABS, INC.,**<br><br>                    Plaintiff,<br><br>     vs.<br><br>**BLACK SAILS SECURITY LLC**, **JOHN CARPENTER**, **ERIC MISSIMER, MICHAEL FRANK,** and **KEITH HADDOCK**,<br><br>                    Defendants. | Case No.: 1:23-cv-00326 |

<u>~~FIRST~~ SECOND</u> **AMENDED VERIFIED COMPLAINT**

Plaintiff Dark Circuit Labs, Inc. (hereafter "DCL" or "Plaintiff"), by and through its attorneys, Peckar & Abramson, P.C., as and for its ~~First~~Second Amended Verified Complaint ("Complaint") against Black Sails Security LLC ("BSS"), Eric Missimer ("Missimer"), John Carpenter ("Carpenter"), Michel Frank ("Frank"), and Keith Haddock ("Haddock") (hereafter collectively referred to as "Defendants") hereby alleges the following:

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over actions involving the Defend Trade Secrets Act ("DTSA"), *see* 18 U.S.C. § 1836(c) ("The district court of the United States shall have original jurisdiction of civil actions brought under this section"). This Court has subject matter jurisdiction over this action because this case involves misappropriation of DCL Trade Secrets, which are protected under the DTSA and which are products or service used in, or intended for use in, interstate or foreign commerce, in that its clients/customers and employees are located throughout the United States, its products or services are utilized throughout the United States and it obtains goods and services from vendors throughout the United States and beyond. Supplemental

jurisdiction over the Virginia state law claims is conferred by 28 U.S.C. § 1367(a), as such claims are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      This Court also has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a) because Plaintiff DCL is incorporated under the laws of the State of Delaware. Defendant BSS is incorporated under the laws of Virginia and has its principal place of business in Virginia, Defendants Carpenter, Frank, and Haddock are citizens of Virginia, and Defendant Missimer is a citizen of the Commonwealth of Massachusetts. The amount in controversy exceeds $7,000,000, far beyond the $75,000 threshold, not counting interest and costs of court. Therefore, because both diversity of the parties and the damages threshold is present, this Court has diversity jurisdiction.

3.      This Court has personal jurisdiction over BSS because it is incorporated and headquartered in Alexandria, Virginia. This Court has personal jurisdiction over Carpenter, Missimer, and Frank because this action concerns the employment of Carpenter, Missimer, and Frank at DCL, which is headquartered in Reston, Virginia, and the employment and shareholder agreements at issue mandate (i) that Virginia law would apply and (ii) that all actions would be brought in the state or federal courts of Virginia. Additionally, Carpenter resides in Alexandria, Virginia, Missimer is as shareholder and Board Member of DCL which is headquartered in Reston, Virginia, and Frank resides in Herndon, Virginia. This Court has personal jurisdiction over Haddock because he resides in Winchester, Virginia which is within this judicial district and the events alleged with respect to Haddock and others occurred within this judicial district.

4.      Venue is proper, pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim, including the misappropriation of DCL Trade Secrets, in violation

#4910599v1
#4972081v1

of federal law and the statutory and common laws of the state of Virginia, occurred within the jurisdiction of this judicial district.

## **PLAINTIFF DCL**

5.     Plaintiff DCL is a domestic business corporation duly organized and existing under the laws of the State of Delaware and maintains a principal place of business at 1900 Reston Metro Plaza, Floors 5-6, Reston, Virginia 20190.

6.     DCL is comprised of highly skilled software engineers, reverse engineers, and vulnerability researchers who possess appropriate Government security clearances to serve as a subcontractor to large organizations, such as Lockheed Martin, to provide cyber security personnel, tools, and expertise in support of the United States' National security missions.

7.     The means, methods and products which DCL develops are inherently confidential, proprietary and constitute Trade Secrets because they contain unique and proprietary code which must, by its nature, be diversified and dissimilar to other software and products developed by others in the market.

8.     DCL's current government contracts include providing software development services in support of National security, intelligence, and law enforcement missions and any enterprises that provide substantially similar services under government contracts are considered as competitors of DCL.

9.     DCL's enterprise is incredibly niche, in that it requires deep knowledge of low level computer operating systems, programming languages, and advanced techniques to carry out the missions it is tasked with. This can include not just the inner-workings of operating systems, but also applied across multiple computer architectures, and programming languages needed to perform our tasks. The tasks can often vary in scope and require employees to have a wide breadth

3

of knowledge and often deep specializations to accomplish. The skill set requires the ability to reverse engineer proprietary components to understand how they operate in order to fully develop capabilities. Because of this, most DCL employees either have or are pursuing advanced degrees within the field of computer science.

10.    DCL is permitted to hire only U.S. citizens who have been granted and maintain an appropriate clearance and pass additional background checks to staff positions on the contracts DCL has been awarded. Often, employees must work at locations that prevent them from carrying personal devices such as phones or other electronics on their person, which often deters potential candidates from applying as they would need to be local to the area and give up common conveniences.

11.    The talent required to fully staff these positions due to the requirements outlined above makes the "pool" of developers a small/shallow one where reputational damage can carry a large lasting impact on recruiting and business development.

12.    DCL, through a substantial investment of time and resources, has developed a highly specialized package of offensive cybersecurity tools, engineers and services, which give it a decisive edge in the market. Carpenter, Missimer and to some degree Frank were leaders of this effort at DCL.

13.    Carpenter, Missimer, and Frank were well compensated employees of DCL; Missimer is also a DCL shareholder. In consideration for their compensation, Carpenter, Missimer, and Frank executed confidentiality, non-compete, and non-solicitation agreements, promising that they would do precisely what they are doing now: stealing DCL Trade Secrets, employees and customers, singularly and in concert with the other Defendants.

**DEFENDANTS AND SUMMARY OF THIS ACTION**

4

14.     Defendant BSS is a corporation duly organized and existing under the laws of the Commonwealth of Virginia, and maintains a principal place of business at 1610 Kenwood Avenue, Alexandria, Virginia 22302.

15.     As described in more detail below, BSS was formed as part of the Defendants' plan to usurp DCL, its employees, customers and proprietary information in violation of the DTSA, in violation of contracts between DCL, Missimer, Carpenter, and Frank, and in violation of Virginia statutory and common law.

16.     Missimer has been a shareholder of DCL and Member of the Board of Directors from November 3, 2021 until the present day.

17.     Missimer was an employee of DCL from on or about November 3, 2021 until on or about March 6, 2023, when he was terminated due to his involvement in the activities alleged in this Complaint.

18.     From November 3, 2021 to December 15, 2022, Missimer served as Treasurer and Chief Financial Officer of DCL.

19.     From the commencement of his employment on November 3, 2021 until the termination of his employment by DCL on March 6, 2023, Missimer served as the Chief Technical Officer ("CTO") of DCL.

20.     In his capacity as CTO, Missimer served as the custodian of and had access to all electronic data for DCL including its business records, business plans and other confidential and proprietary data which constitute confidential and proprietary information protected by the employment agreements and shareholder agreement referenced herein as well as "trade secrets" within the meaning of the DTSA and other applicable laws cited herein. Such information is referred to collectively herein as "Trade Secrets."

#4910599v1
#4972081v1

21.     When DCL confronted Missimer with the evidence giving rise to this Complaint, Missimer blocked DCL's access to its own data for a period of approximately two weeks and refused to return other DCL property. Only after the filing of the original Complaint in this action did Missimer return some, but not all, DCL Trade Secrets and other property or information.

22.     As described in more detail below, Missimer, singularly and in concert with the other Defendants has unlawfully deprived DCL of access to and has otherwise utilized DCL Trade Secrets in violation of his Shareholder Agreement with DCL, in violation of the DTSA and in violation of other statutory and common laws.

23.     As described in more detail below, Missimer has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment agreements, shareholder agreements and in violation of the DTSA and other statutory and common laws.

24.     As a DCL shareholder, Missimer is bound to covenants which prohibit the conduct he engaged in as alleged in this complaint. The restrictive covenants are set forth in more detail below.

25.     Carpenter was an employee of DCL from on or about December 15, 2021 until on or about March 3, 2023 when he submitted a notice of resignation, upon information and belief, in an effort to avoid accountability for his role in the conduct giving rise to this Complaint. For a period of time, Carpenter served as an Officer of DCL.

26.     As an employee of DCL, Carpenter is bound to duly executed restrictive covenants which prohibit the conduct alleged in this Complaint. The details of the applicable contractual restrictions are set forth in detail below.

#4910599v1
#4972081v1

27.    As described in more detail below, Carpenter, singularly and in concert with the other Defendants has unlawfully deprived DCL of access to and has otherwise utilized DCL Trade Secrets in violation of his employment agreement with DCL and in violation of the DTSA and other statutory and common laws.

28.    As described in more detail below, Carpenter has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment agreements, shareholder agreements, and in violation of the DTSA and other statutory and common laws.

29.    Frank was an employee of DCL from July 30, 2022 until his resignation on March 14, 2023 when he resigned, upon information and belief, in an effort to avoid accountability for his role in the conduct giving rise to this Complaint.

30.    As a DCL employee, Frank is bound to duly executed restrictive covenants which prohibit the conduct alleged in this Complaint. The details of the applicable contractual restrictions are set forth in detail below.

31.    Frank, singularly and in concert with the other Defendants, has unlawfully deprived DCL of access to and has otherwise utilized DCL confidential and proprietary information in violation of his employment agreement with DCL, and in violation of the DTSA and other statutory and common laws.

32.    Frank has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment agreements, shareholder agreements, and in violation of the DTSA and other statutory and common laws.

#4910599v1
#4972081v1

33.     Lockheed Martin Corp. ("LMCO") is a current client of DCL. Haddock is the Project Manager for LMCO on the Task Order ("Task Order") under the IDIQ Contract ("IDIQ Contract") for which DCL renders services to LMCO by and through its employees.

34.     As described in more detail below, Haddock, singularly and in concert with the other Defendants has unlawfully deprived DCL of access to and has otherwise utilized DCL confidential and proprietary information in violation of the DTSA and in violation of other statutory and common laws.

35.     As described in more detail below, Haddock has in the past, and continues to act singularly and in concert with the other Defendants to further facilitate the actions of the Defendants in violation of their employment agreements, shareholder agreements, and in violation of the DTSA and other statutory and common laws.

36.     As described in more detail below, Haddock, despite previously bestowing accolades upon DCL for the quality of its work for LMCO, has more recently used his influence to cause LMCO to diminish and eventually terminate its relationship with DCL and to otherwise cause harm to DCL for the benefit of Defendants.

37.     On or about December 2, 2022, Carpenter and the other Defendants incorporated BSS in the Commonwealth of Virginia for the purpose of diverting DCL Trade Secrets, customers and clients to Defendants for use to engage in illegal competition including to supplant DCL with BSS under the IDIQ Contract.

38.     DCL's performance for LMCO under the contract has met or exceeded the contractual requirements, so much so that: (a) in January, 2023, Defendant Haddock engaged in discussions with DCL for LMCO to outright purchase DCL; (b) Haddock and/or LMCO nominated DCL as LMCO Subcontractor of the Year in 2022; (c) Haddock and/or LMCO

accelerated contract payments to DCL; (d) Haddock and/or LMCO provided assurances and otherwise created the reasonable expectation that DCL would continue as a subcontractor through 2026 and beyond and that DCL's work volume would continue to increase; and (e) Haddock and/or LMCO otherwise promoted DCL.

39.     Within the past several months, Defendant Haddock has commenced a course of conduct, along with the other Defendants to cause LMCO to diminish and/or terminate its relationship with DCL, to usurp DCL, its employees, customers and its proprietary information through a conspiracy involving violations of the DTSA and in breach of contractual, statutory and common law obligations owed to DCL by Defendants.

40.     Toward the end of 2022, if not sooner, while still employed by DCL and thereafter, Carpenter, Missimer, and Frank, singularly and in concert with Haddock, conspired to create a competing business, to obtain employment or otherwise obtain work with competing businesses, to divert DCL existing and prospective customers, to divert DCL current employees, to utilize DCL Trade Secrets, to deprive DCL access to its own Trade Secrets in violation of the DTSA and in violation of contractual, common law and statutory obligations, thereby cause damage to DCL for the benefit of the Defendants.

41.     At present, DCL's damages as a result of Defendants' conduct include but are not limited to: (1) lost revenue to DCL under the IDIQ Contract and its reasonable expectation of an extension of that Contract; (2) loss of employees and expenses associated with recruiting and retaining employees with appropriate skills and security clearances; (3) irreparable harm to its business relationship and reputation with existing and prospective clients including LMCO and others; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; (5) irreparable harm to DCL's ability to be competitive as a result of

#4910599v1
#4972081v1

misappropriated Trade Secrets; and (6) loss of employees and damages related to obtaining highly skilled and properly cleared employees and personnel to perform work on DCL contracts.

## RESTRICTIVE COVENANTS APPLICABLE
## TO MISSIMER AS A DCL SHAREHOLDER

42.     On or about November 3, 2021, Missimer entered into a DCL Shareholders Agreement ("Shareholders Agreement"), a copy of which is annexed hereto as Exhibit "A" and incorporated by reference, for purposes of setting forth their respective rights, duties, and obligations as it relates to their positions as owners of DCL, including but not limited to restrictive covenants and non-disclosure obligations by which they agreed to abide.

43.     Pursuant to the Shareholders Agreement, Missimer acquired 325,000 shares of common stock of DCL with a par value of $0.0001 (the "Shares").

44.     From November 3, 2021 to December 15, 2022, in addition to his position as a shareholder of DCL and member of the Board of Directors of DCL, Missimer served as the CFO and Treasurer of DCL.

45.     At all relevant times, Missimer's direct report was Chase Bertke ("Bertke"), the Chief Executive Officer ("CEO") of DCL.

46.     From on or about November 3, 2021 to March 6, 2023, Missimer had management authority over DCL's employees, including but not limited to Carpenter, Missimer, and Frank.

47.     As a founding member of DCL and member of DCL's senior leadership, Missimer acquired an intimate knowledge of DCL Trade Secrets including market analysis, product development, pricing, marketing strategies, employee recruitment and retention strategies.

48.     From on or about November 3, 2021 to March 6, 2023, Missimer also served as DCL's Chief Technology Officer ("CTO").

#4910599v1
#4972081v1

49.     In his capacity as CTO, Missimer served as the custodian of and had access to all electronic data for DCL including its business records, business plans and other confidential and proprietary data which constitute confidential and proprietary information protected by the employment agreements and shareholder agreement referenced herein as well as "trade secrets" within the meaning of the DTSA and other applicable laws cited herein.

50.     When DCL confronted Missimer with the evidence giving rise to this Complaint, Missimer blocked DCL's access to its own data for a period of approximately two weeks and refused to return other DCL property. Only after the filing of the original Complaint in this action did Missimer return some, but not all, DCL Trade Secrets and other property or information.

51.     The Shareholders Agreement, sets forth restrictive covenants by which Missimer agreed to be bound.

52.     Section 6.4 of the Shareholders Agreement provides as follows regarding confidentiality with respect to DCL information and which constitute Trade Secrets under the DTSA and other laws:

> **6.4     Confidential Information.** Each Shareholder agrees that he, she or it will utilize Confidential Information (as defined below) solely for the purpose of the business of the Company and will make no other use of Confidential Information. In furtherance of the foregoing, no Shareholder shall directly or indirectly divulge, communicate, use to the detriment of the Company or for the benefit of any other person or entity or misuse in any way, any Confidential Information, including, but not limited to, personal information, forms, know-how, client lists, technical data, business plans and industry analyses. For the purposes of this Agreement, "Confidential Information" means that information which is confidential and proprietary to the Company (including, but not limited to, trade secrets) and which derives (or may derive) economic value to the Company by not being generally known to others, or which the Company is otherwise under an agreement of confidentiality with an unaffiliated third party. Each Shareholder agrees that he or it will maintain and preserve the confidentiality and secrecy of such Confidential Information. In the event that a Shareholder shall receive a request to disclose all or any part of the Confidential Information under the terms of a subpoena or order issued by a court of competent jurisdiction, such Shareholder agrees, to the extent legally permissible to (i) promptly notify the Company of the existence, terms and

#4910599v1
#4972081v1

circumstances surrounding such a request, (ii) consult with the Company on the advisability of taking legally available steps to resist or narrow such request, and (iii) if disclosure of such information is required, exercise reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information and to reasonably cooperate with the Company in any such effort by the Company, at Company's sole cost and expense.

53.    Section 6.3 of the Shareholders Agreement prohibits Missimer from engaging in

competitive activity against DCL as follows:

**6.3    Non-Compete[.]** No Shareholder shall, during the time such Shareholder is a Shareholder or employee of the Company, and for a period of one (1) year following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, without the prior written consent of the Company, directly or indirectly, and whether as principal, agent, officer, director, partner, employee, consultant, broker, dealer or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on, or be engaged, have an interest in or take part in, or render services to any person, firm, corporation or other business organization (other than the Company) engaged in a business which is competitive with all or part of the business of the Company.

54.    Section 6.5 of the Shareholder Agreement prohibits Missimer from poaching or

soliciting DCL's employees, diverting DCL's business to a competitor, and soliciting DCL's

actual or potential customers, as follows:

**6.5    Non-Solicitation.** For so long as a Shareholder is a Shareholder or employee of the Company and for a period of twenty four (24) months following the later to occur of (i) the date such Shareholder is no longer a Shareholder of the Company and (ii) such Shareholder's employment with the Company is terminated, such Shareholder shall not, without the written permission of the Company or any Affiliate, directly or indirectly (i) solicit, employ or retain, or have or cause any other person or entity to solicit, employee or retain, any other Shareholder or other person who is employed by the Company or (ii) solicit the business of or provide services or products to any client (or prospective client) of the Company at any time while such Shareholder was an employee or Shareholder of the Company.

55.    Section 6.6 of the Shareholders Agreement prohibits Missimer from disparaging

DCL as follows:

**6.6    Non-Disparagement.** No Shareholder shall, directly or indirectly, individually or in concert with others, knowingly engage in any conduct or make


#4910599v1
#4972081v1

any statement that is reasonably likely to have the effect of undermining or disparaging the reputation of the Company or any Affiliate of the Company, or the good will of the Company or any Affiliate of the Company, products, or business opportunities, or that is reasonably likely to have the effect of undermining or disparaging the reputation of any officer, director or employee, past or present, of the Company or any of its Affiliates. This Section does not in any way restrict or impede any Shareholder from exercising protected rights, including rights under the National Labor Relations Act (NLRA) or the federal securities laws, including the Dodd-Frank Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency.

56.    In Section 8.9 of the Shareholders Agreement, Missimer consented to injunctive relief and attorneys' fees in the event of a dispute regarding a breach of the restrictive covenants therein:

**8.9    Specific Performance.** The parties hereto acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that money damages would not provide an adequate remedy. It is accordingly agreed that each of the parties hereto shall be entitled to an injunction and other equitable remedies to prevent breaches or threatened breaches by the other parties hereto of this Agreement, and to enforce specifically the terms and provisions hereof or thereof in any court of the United States or any state thereof having jurisdiction, this being in addition to any other remedy to which the parties may be entitled at law or in equity.

## RESTRICTIVE COVENANTS APPLICABLE TO CARPENTER AND FRANK AS DCL OFFICERS AND/OR EMPLOYEES

57.    On or about December 15, 2021, Carpenter was hired by DCL as a Senior Computer Network Operations ("CNO") Developer and became a Vice President ("VP") of DCL on or about March 4, 2022.

58.    As a VP and member of DCL's senior leadership, Carpenter acquired an intimate knowledge of DCL's market analysis, product development, pricing, and marketing strategies.

59.    On or about December 20, 2021, Carpenter entered into a Confidentiality, Non-Competition and Protectable Interest Agreement ("Restrictive Covenants Agreement"), a copy of

which is annexed hereto as Exhibit "B" and incorporated by reference, as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit as well as an inventions assignment clause.

60.     On or about July 30, 2022, Frank was hired by DCL as a Senior CNO Developer.

61.     On or around July 30, 2022, Frank executed an identical Restrictive Covenants Agreement, a copy of which is annexed hereto as Exhibit "C" and incorporated by reference, as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit as well as an inventions assignment clause.

62.     Section 3 of the Restrictive Covenants Agreement provides as follows regarding confidentiality of DCL information defined in the employment agreements and which constitute Trade Secrets under the DTSA:

> **(a)    Confidential Information and Trade Secrets**. The Employee and the Company agree that for the purposes of this Agreement, and in addition to any meaning that it may have under the common law, the term "Confidential Information" shall mean information belonging to or possessed by the Company, whether or not reduced to writing (or in a form from which such information can be obtained, translated or derived into reasonably usable form), that derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from the disclosure or use of such information, including without limitation, financial information, reports, and forecasts; improvements and other intellectual property owned by or relating to the Company; the buying practices of Clients or prospective Clients; the disclosures from or to Service Providers or prospective Service Providers; pricing offered to Clients or; pricing offered from Service Providers; the Company's production, advertising, marketing and growth strategies, methods and research; the prices/rates/terms at which the Company obtains or has obtained, or sells or has sold its products or services; the Company's sales, costs and sales methods; and business plans, prospects and opportunities (such as possible acquisitions or dispositions of businesses or facilities) that have been discussed or considered by the management of the Company; the Company's business systems and methodologies employed by the creation, delivery, maintenance and improvement of the Company's product and services. Confidential Information also includes the confidential information of others, such as Clients and Service Providers with which Employee or the Company has a business relationship. Confidential Information shall also include any information that Employee is required to keep

confidential pursuant to any ethical obligation or state or federal law, rule or regulation. Notwithstanding the foregoing, Confidential Information does not include documents in the public domain unless due to breach of Employee's duties under the Agreement. Confidential Information, such as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, inventions, product drawings, designs and photographs, prototypes, methods, business systems, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing for which reasonable measures are taken to protect the information from disclosure and which derive independent economic value from not being generally known are referred to as **"Trade Secrets"**.

**(b)**     **Use of Information During Employment**. While employed by the Company, Employee shall not use any Confidential Information or Trade Secrets other than on behalf of and in furthering the business and business interest of the Company. Employee shall adhere to all rules and policies of the Company relating to maintaining and safeguarding Confidential Information from public disclosure or use by an individual or business, including those that compete for Company Business.

**(c)**     **Information if no Longer Employed.** All documents, records, data, information and physical property, whether or not amounting to or containing Confidential Information or Trade Secrets, which are furnished to Employee by the Company or are produced by Employee in connection with Employee's employment will be and remain the sole property of the Company. Employee is required to return to the Company all such materials and property, including any material or medium from which any Confidential Information or Trade Secrets may be ascertained or derived, as and when requested by the Company. In the event Employee shall no longer be employed by the Company, Employee shall not use or otherwise distribute or disseminate Confidential Information or Trade Secrets on his/her/their behalf or that of a third person. Upon the end of the employment relationship between the Employee and the Company, Employee shall immediately gather and return to the Company all Confidential Information and Trade Secrets in his/her/their possession or control. At the Company's request, Employee shall delete all Confidential Information and Trade Secrets stored electronically which he/she/they maintains or has access to, including those residing in email accounts or on computers or portable electronic devices and shall remove from Employee's electronic storage, email or networking sites (such as LinkedIn) any Confidential Information or Trade Secrets by deleting such contacts from such websites and not re-engineering same. It is the express intent of the Parties that if no longer employed by the Company, the Employee shall not use or have access to Confidential Information or Trade Secrets relating to Clients, Prospective Clients, Service Providers, Prospective Service Providers, and Referral Sources including those for which Employee had a pre-existing relationship that existed prior to employment

#4910599v1
#4972081v1

by Company (or its subsidiaries, affiliates or predecessors) it being expressly understood and agreed that the goodwill in such relationships has been transferred and sold to the Company.

**(d)      Defend Trade Secret Act Notice.** An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a Trade Secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and is (i) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the Trade Secret to the attorney of the individual and use the Trade Secret information in the court proceeding, if the individual (iii) files any document containing the Trade Secret under seal; and (iv) does not disclose the Trade Secret, except pursuant to court order.

63.      Section 4 of the Restrictive Covenants Agreements prohibit Carpenter and Frank

from diverting DCL's business to a competitor, and from soliciting DCL's actual or potential

customers, from soliciting DCL employees, all of which are designed, in part to protect DCL Trade

Secrets as follows:

**4.      No Diversion Of Client, Prospective Client, Service Provider, Prospective Service Providers, and Referral Source Relationships.**

(a)      During the course of Employee's employment, Employee shall not, directly or indirectly: (i) solicit, accept an offer to do business with, service or divert any Clients, prospective Clients, Service Providers, prospective Service Providers, Referral Sources and/or Company Business for Employee's personal benefit or that of a third-party or to the Company's detriment or (ii) consistent with Employee's duty of loyalty, work for another business which competes with the Company for Company Business including, without limitation, running, owning, managing, operating, controlling, being employed by, providing consulting services to, being a manager, officer, director or employee of, participating in, lending Employee's name to, investing in, or being connected in any manner with the management, ownership, operation, or control of any business, venture or activity that performs competitive services with the Company.

(b)      In recognition of the Company's interest in protecting its Goodwill interest in Clients, Prospective Clients, Service Providers, Prospective Service Providers and Referral Source relationships, Employee agrees that for a period of twelve (12) months after he/she is no longer employed, Employee shall not directly or indirectly, on behalf of himself/herself/themselves or a third party: solicit business

#4910599v1
#4972081v1

of the same type or related to the Company Business from; accept an offer to do business of the same type or related to the Company Business with or referral from; provide services of the same type or related to the Company Business to; or induce the termination, non-renewal of, or reduction of business done or referred of any person or entity who, at the time Employee's employment with the Company ended was a Client, Prospective Client, Service Provider, Prospective Service Provider, or Referral Source of the Company within the last twenty-four (24) month period prior to termination of Employee's employment with the Company.

64.    Section 5 of the Restrictive Covenants Agreement prohibits Carpenter and Frank

from poaching or soliciting DCL's employees as follows:

**5.    <u>Non-Solicitation of Company Employees.</u>**

Employee recognizes the desire of the Company to preserve its Goodwill, its Confidential Information and Trade Secrets through the continued services of its employees. While employed by the Company and for a period of twelve (12) months thereafter, Employee shall not (directly or indirectly or on behalf of himself/herself or a third party) solicit, assist or induce any then-current (a) employee; (b) independent contractor; or (c) consultant of the Company, to terminate or reduce his, her, their or its relationship with the Company or to become an employee, consultant or independent contractor with an entity other than the Company. Furthermore, Employee shall not (directly or indirectly on behalf of himself/herself or a third-party) hire as an employee, or engage as independent contractor or consultant, any former employee, consultant or independent contractor of the Company who was employed or engaged by the Company at any time during the twelve (12) month period prior to such hiring or engagement.

65.    In Section 8 of the Restrictive Covenants Agreement, Carpenter and Frank

consented to injunctive relief and attorneys' fees in the event of a dispute regarding a breach of

the restrictive covenants therein:

#4910599v1
#4972081v1

**8.      Remedies for Breach.**

**(a)**      In the event of any actual or threatened breach of any of the covenants contained in this Agreement, the Company shall be entitled to seek an injunction (temporary, preliminary and/or permanent) to enforce this Agreement, without the requirement of posting a bond or other form of collateral, and may also pursue any other available remedies available to it in law and/or equity.

**(b)**      Should the Company be a Prevailing Party in any litigation to enforce the terms of this Agreement, Employee shall be responsible for and pay the reasonable costs, fees and expenses of Company's attorneys associated with such litigation, including appeals. The Company shall be a "Prevailing Party" if it obtains temporary, preliminary and/or permanent injunctive relief, or is awarded monetary damages for such breach or threatened breach.

## DEFENDANTS' CONCERTED EFFORT TO CONVERT DCL TRADE SECRETS, CLIENTS AND EMPLOYEES IN VIOLATION OF CONTRACTS, FEDERAL AND STATE LAW

### Carpenter, Missimer, and Frank's Breaches of Their Restrictive Covenants and Duties to DCL

66.      Ronald Pelkey ("Pelkey") is shareholder of DCL and serves as its President. Bertke is a shareholder and serves as the CEO of DCL. Lawrence Littleton ("Littleton") serves as Chief Financial Officer ("CFO") of DCL.

67.      On or about January 25, 2023, Pelkey received a phone call from Haddock who is the Project Manager for LMCO on the Task Order under the IDIQ Contract for which DCL renders services by and through its employees.

68.      Haddock informed Pelkey that he had a conversation with Carpenter about a company that he started, BSS, and confirmed that Carpenter intended to compete with DCL and solicited Haddock for a subcontract on the Task Order.

69.      At the time of the conversation between Haddock and Carpenter, Carpenter was an employee of DCL.

#4910599v1
#4972081v1

70.    On or about January 26, 2023, Missimer called Pelkey and informed Pelkey that he has been aware of Carpenter's new company, BSS, from "the beginning."

71.    Missimer stated to Pelkey during this telephone conversation that Missimer and Carpenter solicited LMCO by way of communications with Haddock to obtain a subcontract on Task Order for BSS so that Missimer and Carpenter could continue working under the IDIQ Contract after quitting from DCL.

72.    Missimer had previously informed DCL that he was expecting a child and stated to Pelkey that he still intended to take a month of paid paternity leave beginning on January 30, 2023 and then would quit DCL on his return from leave and join BSS.

73.    On or about January 26, 2023, Haddock sent to electronic mail to Bertke, Carpenter, and Missimer stating as follows: "Can we all meet in person Friday (tomorrow) to discuss the DarkCircuit / BlackSails ConOp going forward and come to an early agreement?"

74.    DCL interpreted Haddock's electronic mail as a communication by LMCO that DCL's subcontract with LMCO on the Task Order under the IDIQ Contract was at risk of being diverted to BSS.

75.    Following the January 25 and 26, 2023 disclosures made by Haddock and Missimer, respectively, on January 27, 2023, DCL sent letters to Carpenter and Missimer informing them that DCL was opening an internal investigation as a result of the disclosures and putting them on notice of potential litigation ("Cease and Desist Letters").

76.    These Cease and Desist Letters described the disclosures made as of that date and set forth the restrictive covenants by which Carpenter and Missimer were bound.

#4910599v1
#4972081v1

77.    The Cease and Desist Letters further advised Carpenter and Missimer that they were being placed on administrative leave effective immediately pending an internal investigation by DCL with respect to their actions in assisting a competing enterprise, BSS.

78.    The Cease and Desist Letters further demanded the immediate return of any and all company property in Carpenter and Missimer's possession.

79.    On January 31, 2023, Pelkey sent a text message to current DCL employee Frank, informing him that DCL was conducting an internal investigation regarding Carpenter and Missimer's activities as it relates to BSS.

80.    Frank stated via text message to Pelkey that Carpenter had informed him of the formation of BSS and had stated that "they" would send him an offer letter so that Frank could join BSS.

81.    There was no mention of who "they" entails in the text message exchange, but Pelkey believed that Frank was referring to both Carpenter and Missimer.

82.    On or about January 31, 2023, Carpenter and Missimer admitted during an interview with Pelkey, Bertke and Littleton, that Carpenter and Missimer intended to terminate their employment with DCL to further pursue opportunities with the newly formed enterprise BSS and that at least one other current employees of DCL had been solicited to terminate their employment with DCL and work for BSS.

83.    Based on Carpenter and Missimer's disclosures, it appears that BSS was incorporated by Carpenter and the other Defendants for the purpose of providing cyber security products and services marketed to the United States federal government, which is the exact type of services and products on which Carpenter and Missimer work at DCL in violation of the DTSA

#4910599v1
#4972081v1

and in violation of contractual, common law and statutory obligations thereby causing damage to DCL for the benefit of the Defendants

84.    On February 1, 2023, Pelkey and Bertke interviewed Frank as part of DCL's internal investigation.

85.    Pelkey asked Frank if Carpenter and Missimer had approached Frank with an offer letter, to which Frank responded that both Carpenter and Missimer contacted him shortly before DCL's all hands staff meeting on January 27, 2023 to discuss joining BSS.

86.    Frank stated no official offer letter had been extended by BSS, but that Carpenter told Frank that he would protect him if Frank violated his employment agreement with DCL.

87.    DCL also learned during the internal investigation that at least one other current DCL employee in addition to Frank was solicited as well.

88.    As it relates to the formation of BSS, public records reveal that BSS was incorporated as a limited liability company with a sole managing member, Carpenter, in the Commonwealth of Virginia on December 2, 2022.

89.    At the time of BSS's incorporation, Missimer was a shareholder and officer of DCL and Carpenter was an employee of DCL.

90.    On December 15, 2022, DCL's Board of Directors, consisting of Pelkey, Bertke, Littleton, and Missimer, unanimously voted to remove Missimer as an officer effective immediately.

91.    At the time of the December 15, 2022 vote, Pelkey and Bertke were unaware of Carpenter and Missimer's activities as it relates to BSS.

92.    On information and belief, Defendants conspired to divert DCL's business interests for purposes of their competitive venture long before the formal incorporation of BSS.

#4910599v1
#4972081v1

93.     For example, the vote was proposed to remove Missimer as Treasurer because, among other issues, Pelkey and Bertke had determined there were significant problems with Missimer's management abilities as it relates to other DCL employees, specifically Carpenter, and the flow of information from Missimer to the Board of Directors.

94.     DCL invested significant time and resources trying to fix communication issues and functionality of the Board of Directors throughout 2022, including expending nearly $20,000 on an executive coach to help with communications and understanding of each other.

95.     The primary issue was that Carpenter was not effectively communicating on IDIQ-related matters to the Board of Directors as a Vice President ("VP") of DCL.

96.     At that time, Pelkey and Bertke believed that Carpenter's lack of communication on management and IDIQ-related issues as a VP was caused by issues related to Missimer's management of him.

97.     Specifically, Pelkey and Bertke believed that because Carpenter was communicating directly with Missimer, Carpenter thought that such communications were sufficient.

98.     Pelkey and Bertke determined that Missimer was blocking communications to them as Board members, whether through Missimer's lack of skills discerning what was important to convey or that he may have been doing so intentionally.

99.     As a result, the Board voted on whether to remove Missimer's ability to execute documents on behalf of DCL as an officer, which Missimer himself voted for in the affirmative at DCL's December 15, 2022 Board meeting.

100.    Though Missimer was removed as an officer, he remained a member of the Board of Directors and is still presently a shareholder of DCL.

#4910599v1
#4972081v1

101.    The intent was for the Board to revisit these issues in six months to determine whether Missimer should be reinstated as an officer if communication and management functionality improved.

102.    On or about January 16, 2023, Pelkey and Bertke had a conversation with Carpenter about realignment of his duties given his communications issues.

103.    After this conversation, Pelkey sent a text message to Missimer to discuss the outcome of the conversation with Carpenter.

104.    Specifically, Pelkey asked if Missimer was available for a call to which Missimer responded he was "[a]t the gym[,] what's up?"

105.    Pelkey responded to Missimer, "Nothing big, just wanted to back track with you on the Anthony thing and make sure we're all on the same page," to which Missimer responded "Oh so he just wanted to talk about Antony [*sic*] [a DCL employee]," followed up "Good" and "Man they are handling this poorly."

106.    Pelkey believed that Missimer mistakenly thought Missimer was corresponding with Carpenter in the text message exchange.

107.    Shortly after sending the above three text messages, Missimer apparently realized his mistake that he was corresponding with Pelkey rather than Carpenter and deleted the message stating "Man they are handling this poorly" and then stated that he "[m]eant to say 'he'" and that it was supposed to be "you in the first message."

108.    Shortly after these text messages, that same day on or about January 16, 2023, Pelkey called Missimer to discuss business but also to discuss the text messages.

109.    During this conversation, Pelkey specifically confronted Missimer about the text messages, stating that Pelkey felt that Missimer thought he was communicating with Carpenter, and changed his messages once he realized his mistake.

110.    Missimer assured Pelkey that it was not the case and that his text messages were intended for Pelkey and Missimer stated that the wording of the text messages was a result of sending texts over his smart watch.

111.    Pelkey asked Missimer if he was happy working at DCL and stated that if Missimer had any issues he could discuss them with Pelkey.

112.    Missimer stated to Pelkey that he was happy working at DCL and that he had no issues to discuss.

113.    On or about January 18, 2023, Pelkey and Bertke were notified by DCL employee Frank that Carpenter approved his timesheet before he had the chance to appropriately add in all the correct hours.

114.    Carpenter was never given the authority by DCL to approve timesheets.

115.    Only an individual with managerial access has the ability to grant an employee authority to approve time sheets and the only individuals with such access at the time were Pelkey, Bertke, and Missimer. Pelkey and Bertke confirmed to each other that they did not grant such access and thus the only individual who could have done so was Missimer.

116.    Pelkey and Bertke further learned that Carpenter was made a manager of the Task Order work group.

117.    In response to Frank's disclosure, Bertke conducted an investigation and downloaded several logs from TSheets, a timekeeping program used by DCL, which show

#4910599v1
#4972081v1

Carpenter having the ability and taking action to approve employee time cards as well as his status as a manager in the program.

118.    Bertke further discovered that DCL had improperly invoiced the incorrect hours for Frank as a result of time sheets that Carpenter approved.

119.    Specifically, twenty (20) hours were incorrectly billed instead of the correct thirty-five and a half (35.5) hours resulting in additional administrative work and corrections by DCL's management team and unnecessary communications with DCL's client.

120.    In making this determination, Bertke reviewed several documents, including but not limited to: (1) a Weekly Labor Report showing the incorrect hours; (2) an Approval History Report showing Carpenter's unauthorized managerial access; (3) a System Log Report showing Carpenter approving Frank's time for the date and approving all employees' time on the Task Order; and (4) screenshots showing Carpenter as a manager of the Task Order work group.

121.    Missimer's improper action in granting Carpenter unauthorized managerial access further shows their conspiracy to engage in conduct to the detriment of DCL.

122.    That same day, on or about January 18, 2023, Bertke discovered that Carpenter had unfollowed all of DCL's social media accounts, which led Bertke to conclude that Carpenter may be showing signs of being a disgruntled employee.

123.    In light of the disclosures made to Pelkey on January 25 and 26, 2023 and the subsequent ongoing internal investigation conducted by DCL, on information and belief, the communication issues sought to be addressed by the Board of Directors throughout late 2022 actually stemmed from Carpenter and Missimer working together to build their own directly competitive enterprise by taking DCL's largest client, DCL's employees, and confidential information and Trade Secrets with them in the process.

#4910599v1
#4972081v1

124.    On or about January 31, 2023, Pelkey, Bertke, and Littleton interviewed Carpenter and Missimer as part of DCL's internal investigation regarding Carpenter and Missimer's activities as it relates to BSS.

125.    During his interview, Carpenter referred to Missimer as his "employee" as well as stating that Missimer was "potentially" his "employee."

126.    These statements show that Carpenter was directly employing, soliciting, and/or recruiting Missimer, a current shareholder and employee of DCL.

127.    On or about February 6, 2023, DCL, by and through its counsel, conveyed a settlement proposal to counsel for Defendants on a confidential basis.

128.    On or about February 7, 2023, counsel for the parties conferred regarding the proposed settlement terms.

129.    On or about February 9, 2023, Haddock, in his capacity as Project Manager for LMCO, called Bertke to inform him that if Missimer or Carpenter resigned from employment at DCL, DCL would be immediately terminated from the IDIQ Contract.

130.    During this same phone call, Haddock also specifically mentioned a material term that had been proposed by DCL in settlement discussions that was conveyed to Defendants on a confidential basis.

131.    Pelkey, Bertke, and Littleton were the only individuals at DCL who had knowledge of the proposed settlement terms and none of these individuals disclosed any of the proposed terms to Haddock.

132.    The only other individuals who could have disclosed these terms to third parties, such as Haddock, were Carpenter and Missimer, unless Carpenter and Missimer disclosed it to Frank (or others) who disclosed it to Haddock.

#4910599v1
#4972081v1

133.    On or about February 9, 2023 at approximately 6:17 p.m. EST, Haddock left a voicemail for Bertke stating as follows:

> Hey Chase [Bertke], unfortunately, I got a call from Eric [Missimer] and John [Carpenter] again. They're going to quit tonight. Um, they say it's driven by the issues they're having with you, um, so tomorrow I got to draft a letter with Amber, um, if we can't get them to not quit tonight, um, we're going to draft, uh, a letter to Amber Bowen to you guys to start removing from contract you as an entity. Um, I intend to keep all the developers like we did with IC1, um, same conop where we give them opportunities to stay on contract, um, to any other company. Um, I have not sent that letter through Amber yet. That is going to happen the second they quit. They say they're tired and they want a quick resolution and they are going to quit tonight. So Saturday morning I got to send that letter.

134.    DCL urged Carpenter and Missimer not to resign and neither individual responded to attempts by DCL to contact them.

135.    Despite Haddock's voicemail, Carpenter and Missimer did not quit on February 9, 2023.

136.    Based on Haddock's February 9, 2023 communications, Defendants continued to communicate with Haddock or others at LMCO regarding confidential and proprietary information, DCL's internal business affairs, and solicitation of DCL employees to work for BSS or other entities on behalf of LMCO, all while they purported to be engaging in good faith settlement negotiations with DCL.

137.    Partially in response to threats made by Haddock to terminate DCL unless DCL resolved its disputes with Missimer and Carpenter in a manner satisfactory to Haddock, to preserve continuity of mission and reduce impact on the U.S. Government as LMCO's end customer and to mitigate the harm caused by Defendants to the business relationship between DCL and LMCO, DCL engaged with Missimer and Carpenter to negotiate their separation from DCL on terms which would permit them to work for LMCO and others.

#4910599v1
#4972081v1

138.    On or about February 15, 2023, Missimer, by and through his counsel, sent a letter to DCL's counsel requesting inspection of DCL's books and records, including but not limited to DCL's balance sheets, cash flow statements, bank and credit card statements, customer invoices, and payroll records for 2022 and year to date in 2023.

139.    On or about February 17, 2023, DCL responded to Missimer's request by letter stating that it declined to provide the records requested as a result of Missimer's demonstrated intent to compete with DCL.

140.    DCL's February 17, 2023 letter further stated:

Furthermore, should your letter be insinuating that there are potential financial issues with DCL, such issues, should they exist, would have arisen when Missimer was the . . . CFO . . . and Treasurer of DCL from November 2021 to December 2022 until he was removed by unanimous vote and replaced by . . . Littleton as CFO. DCL is currently performing a third-party audit of its books and records as a result of Missimer's removal and his misconduct revealed during the ongoing internal investigation. Any potential issues identified by the audit of DCL's financial records, such as incorrect accounting, general errors, or misappropriation of company funds during this time period may implicate liability on the part of Missimer. Should the third-party audit identify any such issues during Missimer's time as CFO and Treasurer, DCL will have reason to believe that these actions or omissions were done intentionally or maliciously by Missimer in light of Missimer's demonstrated intent to compete with DCL.

141.    Subsequent to Frank's resignation, DCL discovered that while Frank was still an employee, he utilized his DCL email account (mike.frank@darkcircuitlabs.com), with the subject line "Frank Status" to communicate with Haddock at LMCO via an email sent on Friday, February 24, 2023 at 9:07 a.m. as follows:

I talk to John & Eric pretty much daily about what's going on with DCL. I figured out something was up sometime last year, and give that Eric and are I [*sic*] close, I was fortunate enough to be in a position to help them work through this. Anyways, it seems at this point that the writing is on the wall that we (current employees)(and possibly all) of us need to make a transition in the near future, and that BSS will not be setting sail anytime this year. Alternatively, I've known Stan Nolen from PLEX for a few years, and I think that his model of tool development aligns nicely with the work we do offsite, and it could be a good setup for me and possibly others.

#4910599v1
#4972081v1

I know that may be more difficult to negotiate for obvious reasons. I would love to talk for you to talk to him, or just to hear what you think I should do in the next coming months (if anything at the moment). Regards, Mike.

142.   Frank's February 243, 2023 email demonstrates Defendants were actively working behind the scenes during settlement discussions to unlawfully divert DCL's interests under the IDIQ Contract as well as shift DCL employees to "PLEX," who on information and belief is a direct competitor of DCL, now that Defendants' plans to launch BSS had been revealed.

143.   On or about February 27, 2023, DCL's counsel was notified via email that Carpenter had obtained new counsel who requested one week to review the case file and respond to DCL's settlement proposal.

144.   On information and belief, Defendants continued to disparage DCL to third parties and to solicit, recruit, and employ DCL employees throughout DCL's efforts to resolve this matter out of court.

145.   For example, on or about March 2, 2023, one of DCL's employees, Paul Jalufka ("Jalufka"), informed Pelkey that he was approached in-person by another individual who is working under the IDIQ Contract, "Joe B.," who asked him if he knew anything about DCL employees leaving the company.

146.   Jalufka stated to Pelkey that he told "Joe B." that he was unaware of anything like that occurring, at which point "Joe B." proceeded to avoid the subject and not provide any additional information to Jalufka about the issue.

147.   On or about March 2, 2023 Bertke received the latest purchase order from LMCO under the IDIQ Contract.

148.   The contract modification was for $75,416.15, a drastic departure from previous purchase order amounts of roughly $500,000.00.

#4910599v1
#4972081v1

149.   On or about March 3, 2023, DCL notified LMCO regarding the first year of funding being estimated to be depleted in approximately one month under the IDIQ Contract.

150.   Later that day, on or about March 3, 2023, Carpenter sent an email to Pelkey, Bertke, and Littleton noticing his intent to resign on April 3, 2023.

151.   On information and belief, Carpenter and Frank, who on March 14, 2023 noticed his intent to resign from DCL on March 15, 2023, noticed their intent to resign with the knowledge LMCO intends not to issue any further work to DCL under the IDIQ Contract.

152.   On information and belief, Defendants and Haddock agreed to this course of action to ensure DCL would be phased out in order to divert DCL's business interests under the IDIQ Contract to Defendants.

153.   In light of Carpenter, Missimer, and Frank's continued breach of ongoing non-disclosure obligations, there could be no reasonable expectation by DCL that information provided for purposes of settlement would remain confidential and would not be used for leveraging a competitive advantage to BSS and/or be disclosed to Haddock, LMCO, or other third parties such as "Joe B."

154.   On information and belief, Carpenter, Missimer, and Frank's disclosures of confidential information related to settlement negotiations to Haddock, "Joe B.," and other third parties working under the IDIQ Contract, including but not limited to DCL's existing and prospective employees and other Trade Secrets has irreparably harmed DCL's reputation.

155.   On or about March 3, 2023, as part of DCL's ongoing internal investigation and determined that Carpenter and Missimer should be terminated for cause on or before March 7, 2023 as a result of DCL's finding that Carpenter and Missimer were in breach of their respective contractual, statutory, and common law obligations to DCL.

#4910599v1
#4972081v1

156.     On or about March 6, 2023, DCL terminated the employment of Carpenter and Missimer for cause.

157.     Frank resigned from employment with DCL on March 14, 2023.

**Defendants' Failure to Return Company Property
and Further Misappropriation of DCL Trade Secrets**

158.     DCL demanded the return of any and all company property and Trade Secrets in Carpenter and Missimer's possession in its January 27, 2023 letter placing them on administrative leave pending the internal investigation.

159.     On information and belief, at the time of DCL's initial demand to return company property immediately, Missimer was in possession of (a) two (2) server blades, (b) two (2) server towers, (c) one (1) KVM switch, (d) one (1) network switch, (e) one (1) raspberry pi running pivpn, (f) one (1) router running openwrt, and (g) one Samsung Galaxy Fold cell phone.

160.     Missimer failed to immediately return any of DCL's company property and Trade Secrets in his possession, including but not limited to DCL's servers which are housed in Missimer's basement and hold DCL's intellectual property, including several software products.

161.     Missimer, being the CTO of DCL, oversaw standing up and configuring DCL's corporate network.

162.     The corporate servers in Missimer's possession and control hold all of DCL Trade Secrets including software repositories which contain DCL's software products developed since founding of the company and all other Company information.

163.     All software developed was developed on the internal network of DCL on DCL provided computers, and was not to be shared outside of DCL.

164.     These software products were developed to be sold by DCL through U.S. Government contracts.

31

165.    Throughout February 2023, DCL, as well as by and through DCL's counsel to counsel for Missimer, continued to demand return of company property from Missimer.

166.    On or about February 23, 2023, by and through his counsel, Missimer requested "greater specificity" as to the company property to be returned.

167.    Notwithstanding Missimer's position as DCL's CTO and system administrator, which required that he be aware of any and all equipment that was used in hosting, storing, transmitting data, or running on the DCL network, and as a current DLC shareholder, on or about March 3, 2023, DCL communicated via its counsel to Missimer's counsel that was directed to immediately return to DCL (a) two (2) server blades, (b) two (2) server towers, (c) one (1) KVM switch, (d) one (1) network switch, (e) one (1) raspberry pi running pivpn, (f) one (1) router running openwrt, and (g) one Samsung Galaxy Fold cell phone, and that DCL required his assistance in identifying any further equipment that was associated with these purposes that was not identified.

168.    Despite DCL providing the information requested, which DCL maintains was unnecessary given Missiismer's knowledge and expertise, Missimer still failed to immediately return the company property in his possession.

169.    On or about March 1, 2023, DCL discovered that Missimer had disconnected DCL's virtual private network ("VPN"), which is a secure tunnel between a device, such as a server, and the internet, thus cutting off DCL's access to its own servers.

170.    On or about March 1, 2023, Pelkey sent an email to Missimer stating "the company VPN is down, am I correct in assuming that it is down because the network equipment is being shipped down to Virginia?"

171.    DCL received no response from Missimer regarding Pelkey's March 1, 2023 email nor did DCL receive any company property following its discovery of the VPN's disconnection.

#4910599v1
#4972081v1

172.    Despite repeated demands for the return of property by DCL and by and through DCL's counsel to Defendants' counsel, DCL's company property in Missimer's possession had still not been returned as of the date of the initial commencement of this action on or about March 10, 2023.

173.    As DCL did not have access to the servers used to store the code because Missimer improperly disconnected the VPN without DCL's authorization, DCL has been unable to sell or deliver its products to any clients or customers adding to a significant loss of revenue for DCL beyond the loss of revenue related to the IDIQ Contract.

174.    In addition to company products and source code, the DCL corporate network also holds sensitive DCL business documents that constitute confidential, proprietary, and Trade Secret information.

175.    These confidential and proprietary documents on DCL's corporate servers in Missimer's possession include but are not limited the following Trade Secrets such as customer lists, company contracts, bid proposals, labor rates, and legal documents (such as non-disclosure agreements and teaming agreements), all used for business governance and operations that give DCL a competitive advantage in the marketplace.

176.    On or about March 16, 2023, as a result of DCL's substantial efforts seeking the return of company property, including initiating the instant action, DCL received notification, by and through Missimer's counsel, that Missimer had shipped at least some of DCL's property back to the company.

177.    DCL intends to engage in forensic analysis of any and all company equipment that it has yet to receive from Missimer to determine whether Defendants transmitted, copied,

duplicated, deleted, or otherwise compromised the information and software stored in DCL's corporate networks.

178.    On information and belief, Missimer disconnected the VPN to engage in unauthorized access to DCL's company property.

179.    On information and belief, Missimer granted Carpenter and BSS unauthorized access to DCL's company property while it was in his possession.

180.    Based on DCL's internal forensic investigation to date, which remains ongoing, on or about November 10, 2022, Carpenter accessed and downloaded DCL's business development plans and strategies ("Business Plan") from DCL's corporate network, which includes but is not limited to DCL's prospective and existing customer lists.

181.    On or about November 15, 2022, after updates were made to the Business Plan by DLC senior leadership, Carpenter downloaded this same document again.

182.    There was no business necessity for Carpenter to access and download the Business Plan on or around November 10 and 15, 2023.

183.    There is no reason for any DCL employee to download the Business Plan as it is a working document with all edits being made live via a document hosting service within the DCL corporate network.

184.    In fact, DCL's corporate network user logs reveal that while Carpenter frequently viewed or edited other documents on DCL's corporate networks, the Business Plan was the only document that he ever downloaded.

185.    Carpenter never uploaded the document with any changes, but instead simply downloaded it, on information and belief, to utilize DCL's trades secrets for Defendants'

competitive venture, BSS, which was incorporated approximately two weeks after he downloaded the Business Plan for a second time.

186.    In the government contracting sphere, which is fiercely competitive, hourly rates and breakdowns of those rates into general and administrative, direct labor, and overhead costs are proprietary and trade secret information.

187.    Individual employee salaries are not disclosed during any part of the bidding process, which further shows that such information is considered as confidential and proprietary, especially in this highly competitive industry where knowledge of a competitor's employees' salaries and/or hourly rates provides an opportunity to undercut that competitor's bid for government subcontracting work.

185.    DCL's Business Plan constitutes trade secret information under the broad definition of trade secrets under both the DTSA and VUTSA.

186.188.    Defendants have already misappropriated DCL's customer list and other Trade Secret information such as DCL's proprietary rates utilized to by way of soliciting, induce or conspire with Haddock of LMCO for a subcontract on the Task Order related to the IDIQ Contract and/or to replace DCL. Upon information and belief Carpenter leveraged this information to start the onboarding process for BSS under the Task Order using knowledge of DCL's proprietary rates giving BSS an unfair business advantage. When the plan was discovered by DCL, Defendants switched plans temporarily and obtained employment, with the assistance of Haddock and/or LMCO, at PLEX (a direct DCL competitor) performing identical work, or nearly so, as subcontractor employees to LMCO. Defendant's knowledge and possession of DCL Trade Secret information was used to secure that employment, with the assistance of Haddock, which violates the restrictive covenants and statutory and common law alleged in this pleading.

35

189.    Missimer, Carpenter, Frank and Haddock have been acting alone and/or in concert with each other and that knowledge and/or action by one is attributable to the other in all respects including the deprivation of DCL's access to DCL Trade Secret information and the use and dissemination thereof.

**Facts Discovered Since ~~T~~the Filing ~~O~~of ~~T~~the First Amended Complaint ~~A~~and Facts Supporting Plaintiff's Spoliation Claim.**

190.    Defendants destroyed DCL information and took great pains to cover their tracks and destroy evidence that they knew could be used against them in litigation. In addition to the facts alleged above, the following information has been obtained subsequent to the filling of the First Amended Complaint in the process of ongoing discovery and forensic examination of electronically stored data.

~~187.~~191.    Missimer's DCL email account shows that he searched for the term "Carpenter" on December 2, 2022 and then again searched for emails he could have sent to Carpenter's personal email address "jmc7d@virginia.edu" on December 5, 2022. The terms "Mike Frank" and "Shareholders Agreement" were searched on December 3, 2022.

~~188.~~192.    On December 6, 2022, and then again on December 7, 2022, Missimer used his privileged administrative access to perform an email restoration for the time period of November 12, 2022 to December 6, 2022.

193.    An email restoration is performed when an administrative account user wants to restore all deleted emails of a specific user email account; however, such a restoration will not restore emails that have been permanently deleted (meaning emails deleted from the "Trash" folder), it will only restore emails that have been deleted and are still in the email account's "Trash" folder within 55 days

#4910599v1
#4972081v1

189.194.    The use of the email restoration function, which, to date, it appears was never used by Missimer prior to these occurrences, allows for a reasonable inference that from November 12, 2022 to December 6, 2022, Carpenter, Missimer, and Frank were using their DCL email accounts to communicate with each other and/or Haddock or other third parties regarding starting their competitive venture, BSS.

195.    BSS was formed on December 2, 2022. Based on Missimer's search terms on December 2 and 3, 2022 of the other Defendants' names, searches for emails to and from Missimer's DCL email address and Defendants' personal email addresses, and the agreement containing Missimer's restrictive covenants, it is DCL's position that Missimer purposefully and knowingly permanently deleted all emails evidencing his conspiracy with the other Defendants and then performed the email restorations on December 6 and 7, 2022 to determine whether he had been successful in destroying such evidence.

196.    Missimer, as an owner of DCL, could perform the email restoration function on any DCL email account because of his administrative access to DCL's email accounts. No other DCL employee besides Missimer, Ronald Pelkey, and Chase Bertke were supposed to have administrative access during this time.

197.    In this regard, eEven more troubling than the destruction of evidence itself, is that although the above-described email restoration was performed on Missimer's administrator account, the IP address associated with these actions originates from Alexandria, Virginia, the very same city which is listed as BSS' business address and which is Carpenter's residence. This finding further supports that Missimer had granted Carpenter unauthorized access to Missimer's administrative accounts or performed these actions in conjunction with Carpenter.

#4910599v1
#4972081v1

198.    A reasonable inference can be drawn that Carpenter was using Missimer's account on behalf of, and with the approval of, the other Defendants to engage in the destruction of evidence, which further shows Defendants' conspiracy to harm DCL.

199.    ~~Conversely~~Alternatively, a reasonable inference can be drawn that Missimer was physically located at Carpenter's residence~~address~~ and that they were together when they performed the email restoration.

200.    ~~-~~The search term for "Mike Frank" ~~from~~ in Missimer's DCL email account also allows for the inference that Frank was implicated in Missimer and/or Carpenter's actions as of early December, which aligns exactly with Frank's own statement in his February 24, 2023 email to Haddock that he had been in a position to help them early on in their formation of BSS. Moreover, Missimer also destroyed evidence when he wiped his DCL mobile phone on December 10, 2022 without authorization from DCL.

201.    ~~As part of this litigation,~~ DCL demanded that Carpenter, Missimer, and Frank ~~all defendants, including Missimer~~ return all DCL devices. An Android smartphone utilized by Missimer for DCL business was ~~provided~~returned to DCL and delivered ~~to~~for a computer forensic expert to examine. M~~i~~issimer did not provide the passcode of the mobile phone to DCL. Shockingly, Missimer's~~-~~ passcode for the device was merely "1234" which the forensic examiner was quickly able to "crack." The examination revealed that the SIM cards had been removed, which is necessary for an appropriate examination and recovery of DCL information and other information relevant to this case. ~~–~~DCL ~~had requested~~demanded that all DCL property and information be returned ~~to Missimer~~, however, ~~he~~Missimer has yet to return the SIM cards.

202.    Further, the forensic examination revealed that Missimer twice performed a "wipe" or factory reset of his DCL issued Android smartphone, once on September 24, 2022 (when the

38

phone was issued to him) and again on December 10, 2022 at 7:35:04 p.m. Little to no information can now be recovered from the device. However, there is evidence that the device was used to access cloud storage products and communication products which could have been utilized to improperly store or disseminate DCL information and which may have been used by Defendants to covertly communicate in furtherance of Defendants' conspiracy.

203.    Ongoing forensic examination of the company's Google account reveals that on November 9, 2022, Carpenter accessed one or more documents from DCL's servers using his Apple iPhone XSR smartphone, which contradicts his sworn statement provided in this litigation: "At the beginning of my DCL employment, DCL issued me a DCL laptop for use in accessing DCL's computer servers and data. I never accessed DCL's computer servers or data any other way." (Carpenter 4/14/23 Declaration in Opposition to TRO, paragraph 33).

204.    In Carpenter's "personal" DCL drive he had two copies DCL's Weekly Labor Report for the Task Order for the week of December 5, 2022. These reports not only show DLC's weekly invoices since the start of the relevant contract, but also breakdown DCL's rates by employee and include a separate breakout for DCL's "fee".  Such information is highly confidential and would be devastating to the company if other competitive sub-contractors were able to know this information.

205.    Carpenter uploaded and viewed this information twice in his personal drive, first on December 12, 2022 a second time on January 8, 2023 both after he founded BSS on December 2, 2022. Upon information and belief, prior to December 12, 2022, Carpenter had never used his DCL personal drive to view or store DCL Weekly Labor Reports. January 8, 2023 was a Sunday and occurred while Carpenter was on vacation from DCL. Additionally, no hours were recorded

#4910599v1
#4972081v1

in DCL's time keeping system by Carpenter on this date. Upon information and belief, the January 8, 2023 date is falls within the timeline when Carpenter was onboarding with Lockheed Martin.

206.    Upon information and belief, the Weekly Labor Report only appears in hisCarpenter's personal drive twice, with the second occurrence being an exact copy of the first. That Carpenter was accessing a Weekly Labor Report on January 8, 2023 provides further evidence that drive was not part of regular, legitimate, business use, but rather was used to divert DCL work to BSS or another entity. Such reports and information, to the extent they were known to LMCO, are subject to a non-disclosure agreement and/or was information that Haddock should not have utilized as part of Defendant's conspiracy to divert DCL work and employees. Knowledge and use of Weekly Labor Report billing rates would be highly significant with respect to Defendant's efforts to compete on price and to divert DCL work to BSS or other competitors.

190.207.    During DCL's interview of Carpenter and Missimer on January 30, 2023, Carpenter stated that he had submitted bid paperwork on behalf of BSS to LMCO was waiting for approval. When DCL was waiting for its approval, DCL had already submitted pricing information to LMCO, thus allowing for the reasonable inference that BSS would have done the same and that Carpenter used DCL's rates from its Weekly Labor Reports and/or Business Plan as a reference to undercut DCL's competitive advantage, which is exactly what DCL was diligently trying to protect against by having it shareholders and employees execute confidentiality and restrictive covenant agreements.

208.    Carpenter, Missimer, and Frank had a duty to preserve DCL's Trade Secrets and/or confidential/proprietary business information and other information relevant to this case.

209.    Missimer, Carpenter, Frank and Haddock have been acting alone and/or in concert with each other and that knowledge and/or action by one is attributable to the other in all respects

40

including the deprivation of DCL's access to DCL Trade Secret information and the use and dissemination thereof.

210. As detailed above, Defendants misappropriated DCL's customer list and other Trade Secret information utilized to solicit, induce, or conspire with Haddock of LMCO for a subcontract on the Task Order related to the IDIQ Contract and/or to replace DCL. Defendants utilized DCL Trade Secret information to obtain employment at a direct competitor of DCL – known as PLEX – performing identical work, or nearly so, as subcontractor employees to LMCO. Defendant's knowledge and possession of DCL Trade Secret information was used to secure that employment-which violates the restrictive covenants and statutory and common law alleged in this pleading.

211. Defendants' unlawful conduct has caused DCL to make several unsuccessful demands for Defendants to return all DCL devices and access to relevant documents, including electronically stored information ("ESI").

212. Carpenter, Missimer, and Frank knew that DCL emails and devices, as well as their own personal devices, may be relevant to the anticipated litigation. And therefore, Defendants were obligated to suspend routine document retention/destruction policy and implement a "litigation hold" to ensure the preservation of relevant documents and ESI.

213. Instead, in or about December 2022, Defendants began altering and destroying DCL information and took great pains to cover their tracks.

214. Defendants' alteration and destruction of documents and/or devices was intentional, willful, deliberate, and in bad faith for the purpose of depriving DCL of relevant evidence.

#4910599v1
#4972081v1

215.    In order to preserve potential evidence relevant to this case, particularly in light of Defendant's conduct with respect to unauthorized access and deletion to DCL information and Missimer's unauthorized physical retention of the server following a demand for its return by DCL, DCL was compelled to refrain from utilizing the existing server and instead, to rebuild its network, at significant cost to DCL, so that appropriate forensic examination may proceed.

216.    A reasonable factfinder can conclude that the altered and/or destroyed evidence would have supported the claims of DCL in this litigation.

217.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court.

191.218.    DCL demands judgment against Defendants for an award of costs and fees incurred in DCL's efforts to discern the scope, magnitude, and direction of the spoliation of evidence, attorney's fees, and for such other and further relief as may be appropriate.

**Damage Caused by Defendants' Conduct**

192.219.    Defendants' activities related to BSS have irreparably harmed DCL's business relationship with its client LMCO.

193.220.    On or about October 28, 2021, DCL was awarded a subcontract by LMCO for the Task Order under the IDIQ Contract.

194.221.    The total purchase order value for DCL under the IDIQ Contract is $9,176,491.00 with annual option periods extending the contract through on or about August 3, 2026.

195.222.    The first option period under the IDIQ Contract was exercised by LMCO before its expiration date of August 3, 2022.

#4910599v1
#4972081v1

196.223.    The deadline for the LMCO to exercise the second option period under the IDIQ Contract is August 3, 2023.

197.224.    DCL had been receiving "NET 14" accelerated payments since commencing work on the IDIQ Contract, meaning that DCL had been receiving payment from LMCO for invoices within fourteen (14) days after approval by LMCO.

198.225.    Following Haddock's disclosure to Pelkey regarding BSS on or about January 25, 2023, LMCO immediately changed DCL's payment terms to the maximum time allowable under the IDIQ Contract which is "NET 45," meaning that payments must be made within forty-five (45) days of LMCO's approval of an invoice.

199.226.    This sudden change in payment terms caused float and payroll issues for DCL, requiring Pelkey, Bertke, and Littleton to raise $50,000.00 in personal loans to DCL to cover payroll for DCL's employees.

200.227.    Additionally, LMCO reduced its purchase order amount for DCL in its tenth contract modification sent to DCL on or about March 6, 2023.

201.228.    Specifically, prior to LMCO's March 6, 2023 contract modification, DCL had received approximately $500,000.00 per contract modification under the Task Order.

202.229.    LMCO communicated to DCL that approximately $500,000.00 was the highest purchase order possible under the terms of the IDIQ Contract that did not require an additional lengthy approval process by LMCO that would have delayed payment of DCL's invoices and impeded DCL's ability to make payroll.

203.230.    Larger purchase orders provide longer term stability for start-up ventures such as DCL.

204.231.    On or about March 6, 2023, DCL received its most recent purchase order from LMCO which was only $75,416.15.

205.232.    LMCO's extreme downward departure from its prior course of dealing in issuing nine previous purchase orders to DCL shows that LMCO has decided not to fund DCL's subcontract on a long-term basis.

206.233.    Based on LMCO's drastic change in course of dealing, DCL anticipates that LMCO will not exercise its option under the IDIQ Contract by the deadline of August 3, 2023.

207.234.    The only aspect of DCL's business relationship with LMCO that changed from the previous purchase orders to the $75,416.15 purchase order was the activities of Carpenter and Missimer as it relates to BSS and their communications with Haddock beginning in or around December 2022.

208.235.    DCL's performance for LMCO under the contract has met or exceeded the contractual requirements, so much so that: (a) in January, 2023, Defendant Haddock engaged in discussions with DCL in January, 2023 for LMCO to outright purchase DCL; (b) Haddock and/or LMCO nominated DCL as LMCO Subcontractor of the Year in 2022; (c) Haddock and/or LMCO accelerated contract payments to DCL; (d) Haddock and/or LMCO provided assurances and otherwise created the reasonable expectation that DCL would continue as a subcontractor through 2026 and beyond and that DCL's work volume would continue to increase; (e) Haddock and/or LMCO otherwise promoted DCL.

209.236.    For example, on or about July 13, 2022, Haddock sent an email to Bertke stating as follows: "You guys are class act and wonderful teammates. Looking forward to working with you all for a long time."

210.237.    As it relates to a potential acquisition of DCL, Haddock sent an email to Pelkey on or about January 5, 2023 stating as follows: "I have a business case in review and if that gets approved, I could recommend a company purchase and then my leadership would evaluate the idea and move from there. Those usually take a few months to make a decision on."

211.238.    Throughout the course of working on the IDIQ Contract up until in or around February 2023, LMCO went out of its way to provide DCL with accelerated payments as it was aware that DCL is a start-up venture with potential cashflow issues for making payroll.

212.239.    Up until January 25, 2023, DCL was assured by Haddock throughout the course of working with LMCO that it was an integral part of LMCO's work on the Task Order and that LMCO intended to exercise its options under the recompete clauses in Task Order to keep DCL on contract through 2026.

213.240.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

214.241.    At present, DCL's losses as a result of Carpenter and Missimer's activities related to BSS include but are not limited to: (1) lost revenue to DCL under the IDIQ Contract; (2) irreparable harm to its business relationship and reputation with existing client LMCO; (3) irreparable harm to DCL's business relationships and reputation with existing and prospective clients; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated confidential information and Trade Secrets; and (6) loss of employees and

damages related to obtaining highly skilled and properly cleared employees and personnel to perform work on DCL contracts.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq*., against All Defendants)

~~215.~~242.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

~~216.~~243.    18 U.S.C. § 1839(3) defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if — (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

~~217.~~244.    18 U.S.C. § 1839(3) defines a "misappropriation" as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who — (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was — (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of

#4910599v1
#4972081v1

the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that - (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake."

218.245.     Defendants     intentionally     misappropriated     and/or     conspired     to misappropriate Trade Secrets from DCL to their own economic benefit, knowing that the misappropriation would harm DCL.

219.246.     DCL had and has valuable Trade Secrets relating to its product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

220.247.     DCL Trade Secrets constitute business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer lists.

221.248.     These Trade Secrets derive their independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

222.249.     DCL's competitors, such as BSS, could use DCL Trade Secrets to procure an unfair competitive advantage over it, steal its customers, undercut its pricing and replicate its customer service methods.

#4910599v1
#4972081v1

223.250.      DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers in a secure location and providing custody and control to DCL's co-founder and CTO Missimer, which is not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential", "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; (x) assuring compliance with all applicable cybersecurity regulations; and (xi) utilizing role-based access control to enforce least privilege required and only granting developers access to source code repositories for which they were authorized by DCL.

224.251.      DCL has further taken reasonable measures to secure its software products, which Trade Secret information, by requiring all developers working on software products to utilize company laptops for development and to utilize the DCL GitLab which does not have connection to the internet. In order to view the repositories, an administrator must affirmatively grant access. The only administrators are the owners of DCL, which includes Missimer. DCL additionally requires all employees with access to DCL's network to take reasonable countermeasures to ensure access to the company network and subsequent source code repositories

48

are protected. To do so, DCL employees were required to have a VPN certificate generated by Missimer, who was DCL's CTO, to gain access to the internal network. Furthermore, once inside the DCL corporate network employees were required to authenticate with their DCL accounts through the use of single-sign-on ("SSO") which validated the account permissions allowed.

225.252.    By way of the disclosures to DCL and the reasonable measures in place to protect DCL's Trade Secret information, it cannot reasonably be disputed Carpenter and Missimer, in concert with Haddock, stole, or otherwise removed or used without authorization and through improper means, confidential and proprietary corporate documents from DCL, in violation of the DTSA, 18 U.S.C. § 1831, *et seq*.

226.253.    There exists a substantial likelihood of "inevitable disclosure" of DCL Trade Secrets if Missimer, Carpenter or Frank are allowed to work at a competitor company, in part because they cannot unlearn what he learned while working at DCL and if they are allowed to work with a competitor, their extensive knowledge would almost certainly filter into their work and result in disclosure of DCL Trade Secrets. *See Atlantic Diving Supply, Inc. v. Jay Basnight*, No. 2:22cv298, 2022 WL 5568083, at *12-13 (E.D. Va. Sept. 21, 2022) (citing *W.L. Gore & Assocs., Inc. v. Wu*, No. C. A. 263-N, 2006 WL 2692584, at *14 (Del. Ch. Sept. 15, 2006), *aff'd*, 918 A.2d 1171 (Del. 2007)).

227.254.    Based on Defendants' blatant conduct in disregard for their respective contractual, statutory and common law obligations, Missimer's refusal to return DCL's company property, Defendants' disclosure of DCL's Trade Secret and confidential information including disclosure of proposed settlement terms, and the highly sensitive nature of DCL's business operations, a court could not have "confidence that [Defendants] w[ould] refrain from using [DCL]'s Trade Secrets if [they were] allowed to work in areas where [they would] have to exercise

#4910599v1
#4972081v1

the discretion and judgment to not use them." *Id.* at *12 (quoting *W.L. Gore*, 2006 WL 2692584, at *10, 14).

228.255.    Defendants have violated the DTSA and other obligations owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter, (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

229.256.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

230.257.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

231.258.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to others.

#4910599v1
#4972081v1

232.259.       Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL.

233.260.       DCL demands the return of its Trade Secrets, a preliminary and permanent injunction stopping further dissemination or use of Trade Secrets and mandating destruction of the Trade Secrets in the hands of the misappropriating parties, as well as damages, including exemplary damages, attorneys' fees and costs because Defendants misappropriated DCL Trade Secrets willfully and maliciously.

<u>**AS AND FOR THE SECOND CAUSE OF ACTION**</u>
**(Misappropriation of Trade Secrets under the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code §§ 59.1-336, *et seq*., against All Defendants)**

234.261.       Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

235.262.       Va. Code § 59.1-336 defines a "trade secret" as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process," that: (i) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (ii) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

236.263.       Va. Code § 59.1-336 defines a "misappropriation" as (i) "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" or (ii) "[d]isclosure or use of a trade secret of another without express or implied consent by a person who [(a)] [u]sed improper means to acquire knowledge of the trade secret; or [(b)] At the time of disclosure or use, knew or had reason to know that his

knowledge of the trade secret was (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake..."

237.264.    Defendants intentionally misappropriated and/or conspired to misappropriate Trade Secrets from DCL to their own economic benefit, knowing that the misappropriation would harm DCL.

238.265.    DCL had and has valuable Trade Secrets relating to its product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

239.266.    DCL Trade Secrets constitute business and financial information, both tangible and intangible, relating to its company operations and including, but is not limited to, business data compilations, programs, diagrams, drawings, plans, compilations, formulas, designs, methods, techniques, processes, procedures and customer lists.

240.267.    These Trade Secrets derive their independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use.

241.268.    DCL's competitors, such as BSS, could use DCL Trade Secrets to procure an unfair competitive advantage over it, steal its customers, undercut its pricing and replicate its customer service methods.

242.269.    DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers and providing custody and control to

Defendant Missimer, DCL's co-founder and CTO, which is not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential", "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; (x) assuring compliance with all applicable cybersecurity regulations; and (xi) utilizing role-based access control to enforce least privilege required and only granting developers access to source code repositories for which they were authorized by DCL.

243.270.    DCL has further taken reasonable measures to secure its software products, which Trade Secret information, by requiring all developers working on software products to utilize company laptops for development and to utilize the DCL GitLab which does not have connection to the internet. In order to view the repositories, an administrator must affirmatively grant access. The only administrators are the owners of DCL, which includes Missimer. DCL additionally requires all employees with access to DCL's network to take reasonable countermeasures to ensure access to the company network and subsequent source code repositories are protected. To do so, DCL employees were required to have a VPN certificate generated by Missimer, who was DCL's CTO, to gain access to the internal network. Furthermore, once inside

#4910599v1
#4972081v1

the DCL corporate network employees were required to authenticate with their DCL accounts through the use of SSO which validated the account permissions allowed.

244.271.    By way of the disclosures to DCL and the reasonable measures in place to protect DCL's Trade Secret information, it cannot reasonably be disputed that Carpenter and Missimer separately and with the other Defendants stole, or otherwise utilized or removed without authorization and through improper means, confidential and proprietary corporate documents from DCL, in violation of the VUTSA, Va. Code § 59.1-336, *et seq*.

245.272.    Defendants acted singularly and in concert to misappropriate DCL Trade Secrets for their own benefit to the detriment of DCL.

246.273.    Defendants have violated the VUTSA and other obligations owed to DCL by, *inter alia*, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter, (v) using Trade Secrets for the benefit of a person or entity other than DCL; (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

247.274.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants and others.

248.275.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

249.276.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to others.

250.277.    Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL.

251.278.    DCL demands the return of its Trade Secrets, a preliminary and permanent injunction stopping further dissemination or use of Trade Secrets and mandating destruction of the Trade Secrets in the hands of the misappropriating parties, as well as damages, including punitive damages, attorneys' fees and costs because Defendants misappropriated DCL Trade Secrets willfully and maliciously.

**AS AND FOR THE THIRD CAUSE OF ACTION**
**(Violation of Virginia's Uniform Computer Information Transactions Act ("VUCITA"),**
**Va. Code §§ 59.1-501.1,** *et seq.***, against All Defendants)**

252.279.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

253.280.    DCL had and has valuable Trade Secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

254.281.    The VUCITA provides default rules and remedies to commercial transactions related to computer information transactions. Computer information transactions under VUCITA can include the digital transfer of informational rights, which include trade secrets.

255.282.    The VUCITA defines "[i]nformational rights" to include all rights in information created under laws governing "all rights in information created under laws governing patents, copyrights, mask works, trade secrets, trademarks, publicity rights, or any other law that gives a person, independently of contract, a right to control or preclude another person's use of or access to the information on the basis of the rights holder's interest in the information." Va. Code § 59.1-501.2(38).

256.283.    By and through the use of computer information transactions, Carpenter and Missimer and the other Defendants, singularly and in concert, purposefully or knowingly accessed, took, and destroyed Trade Secrets contained in data and/or databases and otherwise disseminated or utilized Trade Secrets belonging to DCL for their own benefit to the detriment of DCL.

257.284.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

258.285.    As a result, DCL has been damaged and is entitled to compensatory and punitive damages, as well as reasonable attorneys' fees and costs of suit and other relief.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets under Virginia common law against All Defendants)

259.286.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

#4910599v1
#4972081v1

260.287.    Pursuant to well-established Virginia common law, to be protected as a "trade secret," courts require that: (1) The information is secret; (2) The economic value is derived from its secrecy; (3) The information is not readily ascertainable by proper means by competitors who could obtain economic value from its disclosure; and (4) The owner uses reasonable efforts to safeguard the information. *MicroStrategy Inc. v. Li*, 240 Va. 297, 601 S.E.2d 580 (Va. 2004); *see Dionne v. Se. Foam Converting & Packaging, Inc.*, 240 Va. 297, 397 S.E.2d 110 (Va. 1990).

261.288.    DCL had and has valuable Trade Secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development.

262.289.    DCL also had and has confidential and proprietary business information that does not rise to the level of a trade secret but is still protectable under Virginia common law.

263.290.    DCL Trade Secrets and confidential/proprietary business information are not known outside of its business, have inherent value to DCL and its competitors, were developed through the expenditure of a substantial amount of resources and are not capable of being acquired or duplicated by others.

264.291.    DCL has taken reasonable measures to keep such information secret by, among other things, (i) securing DCL's physical servers in a secure location and placing them within the custody and control of Defendant Missimer, who is a DCL's co-founder and was DCL's CTO, which are not generally accessible to the public; (ii) having employees sign non-disclosure and mutual confidentiality agreements; (iii) requiring that DCL leadership mark outgoing information as "confidential", "company confidential", and/or "proprietary" before sending it externally; (iv) password-protecting all employees' laptops; (v) requiring full disk encryption of

all employee's laptops; (vi) utilizing a corporate VPN with per employee certificates to access the network; (vii) requiring the use of a sophisticated local password management application, Keepass, to encrypt all employees' corporate passwords; (viii) requiring Keepass randomly generated confidential passwords to access DCL's work-related network applications, which also must be accessed through the DCL network; (ix) requiring non-disclosure and mutual confidentiality agreements with all vendors, insurance carriers, subcontractors, co-brokers and other third-parties; (x) assuring compliance with all applicable cybersecurity regulations; and (xi) utilizing role-based access control to enforce least privilege required and only granting developers access to source code repositories for which they were authorized by DCL.

265.292.    DCL has further taken reasonable measures to secure its software products, which Trade Secret information, by requiring all developers working on software products to utilize company laptops for development and to utilize the DCL GitLab which does not have connection to the internet. In order to view the repositories, an administrator must affirmatively grant access. The only administrators are the owners of DCL, which includes Missimer. DCL additionally requires all employees with access to DCL's network to take reasonable countermeasures to ensure access to the company network and subsequent source code repositories are protected. To do so, DCL employees were required to have a VPN certificate generated by Missimer, who was DCL's CTO, to gain access to the internal network. Furthermore, once inside the DCL corporate network employees were required to authenticate with their DCL accounts through the use of SSO which validated the account permissions allowed.

266.293.    Defendants have violated the Virginia common law and other obligations owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting

#4910599v1
#4972081v1

and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

267.294.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

268.295.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

269.296.    Defendants knew or had reason to know that the Ttrade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

270.297.    Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL

271.298.    As a result of Defendants' misappropriation, dissemination, destruction and/or use of DCL Trade Secrets, DCL has been damaged.

#4910599v1
#4972081v1

272.299.    DCL is entitled to compensatory and punitive damages, injunctive relief and attorneys' fees and costs of suit on account of Defendants' Virginia common law misappropriation of Trade Secrets and other relief.

### AS AND FOR THE FIFTH CAUSE OF ACTION
**(Breach of Contract against Carpenter, Missimer, and Frank)**

273.300.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

274.301.    DCL has fully performed its material obligations to Carpenter, Missimer, and Frank under their employment agreements or shareholder agreement.

275.302.    Defendants have violated their contractual obligations owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

276.303.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

#4910599v1
#4972081v1

277.304.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

278.305.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

279.306.    Defendants acquired, utilized and/or disseminated DCL Trade Secrets with knowledge that Missimer, Carpenter and Frank breached their various duties to DCL

280.307.    Haddock singularly and in concert with the other Defendants solicited, induced and participated in the breaches by Carpenter, Missimer, and Frank.

281.308.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

282.309.    Defendants unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

283.310.    DCL is also entitled to compensatory damages as well as contractual attorneys' fees and costs of suit, injunctive and other relief.

## AS AND FOR THE SIXTH CAUSE OF ACTION
**(Breach of Fiduciary Duty and Duty of Loyalty against Carpenter, Missimer, and Frank)**

284.311.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

#4910599v1
#4972081v1

285.312.     At all relevant times, Carpenter, Missimer, and Frank owed a fiduciary duty and a duty of loyalty to DCL, which required them to use their best efforts on behalf of DCL, to act in DCL's best interests, and to refrain from activities that would damage DCL's interests.

286.313.     Carpenter, Missimer, and Frank violated these duties when they, without notice, accepted employment and/or began working for BSS while still employed by DCL, in a manner calculated to divert business and employees from and to interfere with the DCL's business relationships and operations and committed the other acts alleged in this Complaint.

287.314.     Additionally, as DCL employees, Carpenter, Missimer, and Frank had a duty of loyalty, honesty and fidelity to maintain the confidentiality of DCL Trade Secrets and confidential/proprietary business information.

288.315.     Carpenter, Missimer, and Frank misappropriated and/or wrongfully disclosed and used for improper purposes such confidential information and Trade Secrets to compete with DCL.

289.316.     Carpenter, Missimer, and Frank's actions constitute a scheme of self-dealing, where Carpenter, Missimer, and Frank acted against the interests of DCL for their own economic advantage and that of BSS's, thereby disadvantaging DCL's economic and business interests.

290.317.     Defendants have violated their fiduciary duties and duty of loyalty owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets

#4910599v1
#4972081v1

for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts. Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

291.318.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

292.319.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

293.320.    Haddock singularly and in concert with the other Defendants solicited, induced and participated in the breaches by Carpenter, Missimer, and Frank.

294.321.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

295.322.    Defendants' acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

296.323.    Defendants have also proximately caused DCL to suffer compensatory damages in an amount to be proven at trial.

#4910599v1
#4972081v1

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### (Aiding and Abetting a Breach of Contract and/or
### Fiduciary Duty and Duty of Loyalty against All Defendants)

~~297.~~324.        Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

~~298.~~325.        All Defendants are have knowledge of the contractual, statutory and common law duties owed by Carpenter, Missimer, and Frank to DCL yet Defendants encouraged and assisted them in committing breaches of same.

~~299.~~326.        Defendants' assistance in this regard was knowing and substantial.

~~300.~~327.        The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

~~301.~~328.        Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

~~302.~~329.        Defendants have also proximately caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### (Common Law Unfair Competition against All Defendants)

~~303.~~330.        Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

~~304.~~331.        Rather than build their own client base by investing the time and capital necessary to do so, Defendants have conspired to misappropriate DCL's confidential client lists,

#4910599v1
#4972081v1

other Trade Secrets, clients, employees and other business information, then used same to unfairly compete against DCL.

305.332.    Defendants have taken for themselves client relationships that DCL nurtured, developed and maintained since the founding of the company

306.333.    Defendants have unfairly received the benefit of DCL's client relationships without any of the costs associated with developing those relationships, which costs were born solely by DCL.

307.334.    Defendants have violated the common law prohibitions against unfair competition owed to DCL by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

308.335.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

309.336.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and

circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

310.337.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

311.338.    Haddock singularly and in concert with the other Defendants solicited, induced and participated in the breaches by Carpenter, Missimer, and Frank.

312.339.    Defendants' conduct constitutes common law unfair competition.

313.340.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

314.341.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

315.342.    Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage against All Defendants)

316.343.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

317.344.    DCL has actual and prospective business relationships with numerous third-party customers or clients.

318.345.    DCL also had reasonable expectations of economic advantage with prospective business relationships in the form of potential customers or clients.

#4910599v1
#4972081v1

319.346.    These relationships and expectations constitute protectable interests.

320.347.    Defendants tortiously interfered with DCL's prospective economic advantage by, *inter alia*, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

321.348.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

322.349.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

323.350.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

#4910599v1
#4972081v1

324.351.    Haddock singularly and in concert with the other Defendants solicited, induced and participated in the breaches by Carpenter, Missimer, and Frank.

325.352.    Defendants' unlawful, improper and deliberate acts have repeatedly interfered with DCL's actual and potential economic relationships.

326.353.    Defendants' acts of interference with DCL's business relationships were committed with malice and without adequate justification.

327.354.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

328.355.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

329.356.    Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial and other relief.

### AS AND FOR THE TENTH CAUSE OF ACTION
**(Tortious Interference with Contractual Relations against All Defendants)**

330.357.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

331.358.    DCL had contractual relationships with Carpenter, Missimer, and various other third-party customers or clients.

332.359.    Defendants tortiously interfered with DCL's contractual relations by, inter alia, (i) wrongfully possessing, disseminating, misappropriating, utilizing or destroying Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and soliciting DCL employees away from DCL to join BSS or other employers, (iii) soliciting, diverting and/or

#4910599v1
#4972081v1

servicing DCL's actual or prospective customers, (iv) working for DCL's direct competitor, BSS and others, while still employed by DCL, and thereafter (v) using Trade Secrets for the benefit of a person or entity other than DCL, (vii) disclosing Trade Secrets to BSS, Haddock and others, (vii) failing to return to DCL all of its confidential and Trade Secret information, (viii) causing LMCO to threaten to terminate or actually terminate DCL, (ix) inducing DCL to continue to employ Carpenter, Missimer, and Frank until Defendants could complete their plan to misappropriate DCL Trade Secrets, and (x) Defendants utilizing Trade Secrets to accomplish these aforementioned acts.

333.360.    Defendants acted singular and in concert in the misappropriation of DCL Trade Secrets and other wrongful acts alleged herein for the benefit of Defendants.

334.361.    Defendants have disclosed DCL Trade Secrets and have communicated with other existing and prospective customers and employees regarding the facts and circumstances described in this Complaint, with the intent to disparage DCL, to cause other persons or entities to cease doing business with DCL and to otherwise cause harm to DCL.

335.362.    Defendants knew or had reason to know that the Trade Secrets and confidential/proprietary business information were meant to be kept confidential, yet still misappropriated and disclosed same to a directly competitive enterprise, BSS and others.

336.363.    Defendants, as non-parties to these agreements, deliberately and intentionally interfered with these contractual relationships.

337.364.    Defendants' acts of interference with DCL's contractual relationships were committed with malice and without adequate justification.

338.365.    The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

339.366.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

340.367.    BSS has also caused DCL to suffer compensatory damages in an amount to be proven at trial and other relief.

### AND FOR THE ELEVENTH CAUSE OF ACTION
#### (Civil Conspiracy against All Defendants)

341.368.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

342.369.    Defendants committed overt acts in furtherance of an intentional, common scheme, as described in this Complaint.

343.370.    Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction and other relief.

344.371.    Defendants have also caused DCL to suffer compensatory damages in an amount to be proven at trial and other relief.

### AS AND FOR THE TWELFTH CAUSE OF ACTION
#### (Preliminary and Permanent Injunction against All Defendants)

345.372.    Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

346.373.    DCL has shown a likelihood of success on the merits.

#4910599v1
#4972081v1

347.374.　　　DCL has acted in good faith toward Defendants at all times, and has substantial business interests that must be protected.

348.375.　　　Defendants, by contrast, have acted in bad faith by deceptive and unlawful means in order to interfere and/or divert DCL's clients in furtherance of their own self-interests.

349.376.　　　The balance of equities lies decidedly in favor of DCL.

350.377.　　　The harm to DCL resulting from Defendants' acts is irreparable, continuing, and not fully compensable by monetary damages.

351.378.　　　Defendants' unlawful acts have damaged DCL and will continue to cause damage and irreparable injury to DCL unless enjoined by this Court; therefore, DCL is entitled to a preliminary and permanent injunction.

**AS AND FOR THE THIRTEENTH CAUSE OF ACTION**
**(Accounting against All Defendants)**

352.379.　　　Plaintiff repeats, reiterates and realleges each and every allegation contained in the foregoing paragraphs of this Complaint with the same force an effect as though alleged herein.

353.380.　　　A fiduciary relationship existed by and between Carpenter, Missimer, and Frank, on the one hand, and DCL, on the other hand.

354.381.　　　Carpenter, Missimer, and Frank breached their fiduciary duties owed to DCL by, *inter alia*, (i) failing to keep confidential DCL Trade Secrets and/or confidential/proprietary business information, (ii) recruiting and/or soliciting employees from DCL to join BSS, (iii) inducing DCL's employees to leave DCL, (iv) soliciting, diverting and/or servicing DCL's actual or potential customers, (v) working for DCL's direct competitor, BSS, while still employed by DCL, (vi) misappropriating Trade Secrets, (vii) using Trade Secret and/or otherwise confidential/proprietary business information for the benefit of a person or entity other

71

than DCL; (viii) disclosing confidential and Trade Secret information to BSS, and (ix) failing to return to DCL all of its confidential and Trade Secret information.

355.382.    Defendants must account to DCL for all business obtained by Defendants through the wrongful acts alleged in this Complaint.

356.383.    DCL is entitled to a judgment against Defendants in an amount equal to the funds obtained by and through Defendants for all business they obtained through the wrongful acts alleged herein.

## **PRAYER FOR JUDGMENT**

**WHEREFORE**, DCL demands a preliminary and permanent injunction against Defendants further use or dissemination of DCL Trade Secrets and/or confidential/proprietary business information and the deletion of same from any repositories to which they may have been copied.

**WHEREFORE**, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, Defendants shall not solicit or otherwise communicate with any client or customer that Carpenter, Missimer, and Frank maintained any contact with while in the employ of DCL.

**WHEREFORE**, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, Defendants shall not provide any services to any client or customer that Carpenter, Missimer, and Frank maintained any contact with while in the employ of DCL.

**WHEREFORE**, DCL demands a preliminary and permanent injunction that, for a period of two (2) years measured from the date of the injunction order, measured from the date of the injunction order, Defendants shall not solicit, employ, or retain DCL's employees.

#4910599v1
#4972081v1

**WHEREFORE**, DCL demands immediate turnover for forensic analysis of all DCL property in Defendants' possession as well as personal and business devices used by Carpenter, Missimer, and Frank for work performed by DCL and access to Carpenter and Missimer's BSS email accounts and BSS's computer network.

**WHEREFORE**, DCL demands an accounting of all accounts relating to actual and potential customers and/or clients that Defendants solicited for BSS in violation of their employment agreements, and a return of all proceeds, compensation, commissions, alleged "wages," alleged "salary," consulting fees, incentive payments, profits, earnings, monies and/or other benefits that were unjustly obtained by Defendants through violation of Carpenter, Missimer, and Frank's employment agreements and against BSS and Haddock for aiding and abetting such breaches, plus all interest, costs, fees and expenses.

**WHEREFORE**, DCL demands judgment against Defendants for compensatory, consequential, liquidated, exemplary and punitive damages in an amount to be proven at trial, together with interest, attorneys' fees, costs and disbursements, and for such other and further relief as may be appropriate.

Dated: March 23, 2023                              Respectfully submitted,

_____

Steven J. Weber, VSB No. 35573
Gregory R. Begg, *Pro Hac Vice* (pending)
Lauren Rayner Davis, *Pro Hac Vice* (pending)
Peckar & Abramson, P.C.
2055 L Street, NW
Suite 750
Washington, DC 20036
Telephone: (202) 293-8815
Facsimile: (202) 293-7994
SWeber@pecklaw.com
GBegg@pecklaw.com
LDavis@pecklaw.com
*Attorneys for Plaintiff Dark Circuit Labs, Inc.*

#4910599v1
#4972081v1

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff respectfully demands a trial by jury.

Dated: March 23, 2023                    Respectfully submitted,

_____
Steven J. Weber, VSB No. 35573
Gregory R. Begg, *Pro Hac Vice* (pending)
Lauren Rayner Davis, *Pro Hac Vice* (pending)
Peckar & Abramson, P.C.
2055 L Street, NW
Suite 750
Washington, DC 20036
Telephone: (202) 293-8815
Facsimile: (202) 293-7994
SWeber@pecklaw.com
GBegg@pecklaw.com
LDavis@pecklaw.com
*Attorneys for Plaintiff Dark Circuit Labs, Inc.*

#4910599v1
#4972081v1

## <u>VERIFICATION</u>

RONALD PELKEY, as the President of Dark Circuit Labs, Inc. in above-captioned case, verify that I have reviewed and authorized the allegations made in this First Amended Verified Complaint. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
RONALD PELKEY

Dated: March 23, 2023

#4910599v1
#4972081v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I electronically filed this First Amended Verified Complaint with the Clerk of the Court using ECF and served a copy of this First Amended Verified Complaint via electronic mail and Federal Express upon counsel for Defendants Black Sails Security LLC, John Carpenter, and Eric Missimer as follows:

Anne G. Bibeau, Esq.
**WOODS ROGERS VANDEVENTER BLACK PLC**
101 West Main Street, Suite 500
Norfolk, VA 23510
anne.bibeau@wrvblaw.com
*Attorneys for Defendants Black Sails Security LLC and John Carpenter*

Broderick C. Dunn, Esq.
**COOK CRAIG & FRANCUZENKO, PLLC**
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
bdunn@cookcraig.com
*Attorneys for Defendant Eric Missimer*

I further certify that, on this date, a copy of this First Amended Verified Complaint was served via ECF, Regular and Certified Mail (R.R.R.), and Capital Process Servers upon Defendants Michael Frank and Keith Haddock as follows:

Michael Frank
904 Elden Street
Herndon, VA 20170

Keith Haddock
328 Union View Lane
Winchester, VA 22603

Dated: March 23, 2023

_____
Steven J. Weber, VSB No. 35573


#4910599v1
#4972081v1