UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| **DARK CIRCUIT LABS, INC.**,<br><br>            Plaintiff,<br><br>    vs.<br><br>**BLACK SAILS SECURITY LLC**,<br>**JOHN CARPENTER**, **ERIC**<br>**MISSIMER, MICHAEL FRANK,** and<br>**KEITH HADDOCK**,<br><br>            Defendants. | Civil Action No.: 1:23-cv-00326-LMB-LRV |

**PLAINTIFF DARK CIRCUIT LABS, INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT KEITH HADDOCK'S MOTION TO DISMISS**

The Court should deny Defendant Keith Haddock's ("Haddock") Motion to Dismiss, pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), the First Amended Verified Complaint ("FAC") filed by Plaintiff Dark Circuit Labs, Inc. ("DCL") because DCL has sufficiently stated a claim under which relief can be granted for all claims in the FAC.

**COUNTERSTATEMENT OF FACTUAL AND PROCEDURAL BACKGROUND**

DCL is comprised of highly skilled software engineers, reverse engineers, and vulnerability researchers who possess appropriate U.S. Government security clearances to serve as a subcontractor to large organizations, such as DCL's client Lockheed Martin Corporation ("LMCO"), to provide cyber security personnel, tools, and expertise in support of United States' national security missions. (FAC, ¶ 6). Haddock is a Project Manager for LMCO. (FAC, ¶ 33). Defendant Eric Missimer ("Missimer") was DCL's Chief Technology Officer and custodian of DCL's trade secrets on DCL's corporate network and is also a DCL shareholder. (FAC, ¶¶ 42, 44, 48-49). Defendant John Carpenter was a Senior Computer Network Operations ("CNO")

1

Developer and Vice President ("VP") of DCL. (FAC, ¶ 57). Defendant Michael Frank ("Frank" and together with BSS, Carpenter, Missimer, and Haddock, collectively, "Defendants") was a Senior CNO Developer for DCL. (FAC, ¶¶ 57-59). Missimer, Carpenter, and Frank all have security clearances and are bound by restrictive covenants designed to protect DCL's confidential and proprietary trade secret information. (FAC, ¶¶ 6, 42, 59, 61).

On March 10, 2023, DCL initiated the instant action by way of Verified Complaint. (ECF No. 1). DCL filed the FAC on March 23, 2023.[1] (*See* FAC, ECF No. 3). In its FAC, DCL alleges that as early as November 2022, if not sooner, Carpenter, Missimer, and Frank conspired with Haddock to utilize, without restraint, DCL's trade secrets to convert DCL's contracts to an entity, BSS, owned and controlled by Defendants in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*, in violation of restrictive covenants applicable to Missimer, Carpenter, and Frank as shareholders, officers, and/or employees of DCL, and in violation of federal and state statutory and common law. (FAC, ¶¶ 127-132, 137, 142-146, 158-176; FAC, Exs. A, B, C). DCL alleges that Carpenter, Missimer, Frank, and Haddock were all discussing with each other the internal workings of DCL's business operations, including but not limited to DCL's client and employee relationships and business strategies. (FAC, ¶¶ 47, 58, 69-72, 82, 85-87, 103-112, 121, 125-126, 129-132, 136, 141-142). Instead of using such information for the betterment of DCL, Haddock, singularly and in concert with the other Defendants, used intimate insider knowledge of

---

[1] Subsequent to filing the FAC, new facts emerged regarding Defendants' misconduct including via their own admissions that they are working for a direct competitor performing the same work under the same contract, (ECF Nos. 40-1, ¶ 51; 41-1, ¶ 47; 43-1, ¶ 37), and from DCL's employees who were solicited by Defendants as described in the Affidavit of Ronald Pelkey ("Pelky Aff.") and Reply Affidavit of Ronald Pelkey ("Pelkey Reply Aff."), both submitted in support of DCL's preliminary injunction motion and annexed to the Declaration of Steven J. Weber, Esq. ("Weber Decl.") to oppose the instant motion. (*See* Weber Decl., Exs. A, B). Even without the benefit of discovery, following the denial of the TRO, further wrongdoing by Defendants was uncovered by DCL's third-party forensic investigation and on June 16, 2023, DCL moved to amend its complaint to add new factual allegations related to Defendants' spoliation of evidence. (ECF No. 77).

DCL's trade secrets to onboard BSS who solicited DCL's largest client, LMCO, and employees for Defendants' benefit, which is against the law. (FAC, ¶¶ 137, 145-146, 152, 154, 157).

DCL's performance for LMCO under the IDIQ Contract has met or exceeded the contractual requirements, so much so that: (a) as recently as January 2023, Haddock engaged in discussions with DCL for LMCO to outright purchase DCL; (b) Haddock and/or LMCO nominated DCL as LMCO Subcontractor of the Year in 2022; (c) Haddock and/or LMCO accelerated contract payments to DCL; (d) Haddock and/or LMCO provided assurances and otherwise created the reasonable expectation that DCL would continue as a subcontractor through 2026 and beyond and that DCL's work volume would continue to increase; and (e) Haddock and/or LMCO otherwise promoted DCL. (FAC, ¶¶ 38, 204). For example, on or about July 13, 2022, just three months before Carpenter downloaded DCL's Business Plan and began to compete with DCL with the other Defendants by forming BSS, Haddock sent an email to DCL's senior leadership stating as follows: "You guys are class act and wonderful teammates. Looking forward to working with you all for a long time." (FAC, ¶¶ 180-185, 205). Indeed, even up until January 2023, DCL was assured by Haddock throughout the course of working with LMCO that it was an integral part of LMCO's work on the Task Order and that LMCO intended to exercise its options under the recompete clauses in Task Order to keep DCL on contract through 2026. (FAC, ¶ 208). As late as January 5, 2023, Haddock was still pursuing DCL for LMCO to acquire it. (FAC, ¶ 206).

However, after DCL was not receptive to Haddock's acquisition attempts, Haddock commenced a course of conduct, along with the other Defendants to cause LMCO to diminish and/or terminate its relationship with DCL, to usurp DCL's contract with LMCO, and raid its employees, customers, and proprietary information through a conspiracy involving violations of the DTSA and in breach of contractual, statutory and common law obligations owed to DCL by Defendants. (FAC, ¶ 39). A mere twenty days after Haddock had offered to acquire DCL for the

second time, he admitted to DCL on January 25, 2023 that BSS was formed to compete with DCL and take over its work on the IDIQ Contract. (FAC, ¶¶ 82-83). Without the benefit of discovery and through costly and time intensive efforts, DCL has uncovered the following elements of Haddock's plan with the other Defendants which consists of the following unlawful actions:

(1) Haddock assisted Carpenter, Missimer, and Frank with forming BSS for the admitted purpose of engaging in work in direct competition with DCL, with the specific intent to acquire work from LMCO of the kind already being performed by DCL, indeed, it was their intention to replace DCL as a contractor to LMCO utilizing all of DCL's confidential and proprietary trade secret information and DCL's employees to execute that work. (FAC, ¶¶ 14-15, 68, 80, 88-89).

(2) Haddock used his knowledge of and access to DCL's trade secrets by and through Carpenter, Missimer, and Frank to solicit, induce, and interfere with DCL's relationship with LMCO and DCL's employees for the sole purpose of inducing them to quit DCL and join BSS by telling them that DCL was in hardship (which hardship was either false or caused by Defendants) and offering them refuge elsewhere which would have the effect of disabling DCL and enabling Defendants to compete/divert work to BSS, themselves, or other entities. (FAC, ¶¶ 82, 84-87).

(3) Missimer and Carpenter, during to the course of their employment, either had access to or wrongfully gained access to all of DCL's trade secrets information including but not limited to, employee salaries, financial records, identity of existing and prospective customers, contract and pricing terms with existing customers, staffing plans for existing and prospective customers, and communications with LMCO and others which they communicated to Haddock who then exploited it for his own use rather than for legitimate use for DCL's business. At one point, Haddock stated that DCL's model would allow LMCO to increase its profit from 6% to 10% based on the fact that an identical company like DCL was a subsidiary to LMCO. (Ex. B, Pelkey Reply Aff., ¶¶ 61). Haddock had ample motivation to seek DCL's proprietary information and did so in concert with the other Defendants. (FAC, ¶¶ 36, 60-61, 70-75, 172, 176, 180-187).

(4) The evening of February 9, 2023, Haddock left DCL a voicemail that Carpenter and Missimer were quitting and DCL would be terminated the following day and when viewed in conjunction with the settlement negotiations at that time, there is no other conclusion but that Carpenter and Missimer were in constant communication with Haddock and each other at this time regarding DCL's confidential and proprietary information, which DCL alleges that such conduct evidences their conspiracy against DCL and wrongful use of DCL's trade secrets. (FAC, ¶¶ 129-137).

DCL alleges that it has suffered both ascertainable damages and irreparable harm harm, including loss of work, loss of employees, loss of access to all electronic data including business records and

proprietary tools, and a diversion of DCL's work to its direct competitor, PLEX, all utilizing DCL's trade secret information. (FAC, ¶¶ 2, 41, 142).

On June 5, 2023, Haddock filed the instant Motion to Dismiss.[2] (ECF No. 70). For the foregoing reasons and those set forth more fully below, the Motion should be denied.

## LEGAL ARGUMENT

## I. LEGAL STANDARD FOR DENYING A MOTION TO DISMISS.

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). The FRCP require that the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To meet the Rule 8 standard and "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nadendla v. Wake*, 24 F.4th 299, 304-05 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). To contain sufficient factual matter to make a claim plausible, the factual content must "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When doing so, courts "accept the factual allegations of the complaint as

---

[2] Haddock seeks dismissal of DCL's claims against him with prejudice. (Df Br. at 1, 24). However, while the Court should deny Haddock's motion in its entirety, should the Court entertain Haddock's request, any claims subject to Rule 12(b)(6) dismissal should be dismissed without prejudice with the opportunity for DCL to refile claims against Haddock should new facts emerge. *See North Carolina v. McGuirt*, 114 F. App'x 555, 559 (4th Cir. 2005) (explaining that "dismissal with prejudice is an extreme sanction that must be examined carefully" because "[d]ismissing a claim with prejudice for failure to comply with [pleading standards] tends to undermine one of the policies of the Federal Rules of Civil Procedure: facilitating a decision on the merits rather than on pleading technicalities.") (citing *Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978)).

true and construe them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018).

Additionally, in considering a motion to dismiss under Rule 12(b)(6), courts may consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Bala v. Commonwealth of Virginia Dept. of Conservation and Rec.*, 532 F. App'x 332, 344 (4th Cir. 2013); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *see also Stover v. College of William and Mary in Virginia*, ___ F. Supp. 3d ___, No. 4:21cv150, 2022 WL 10585341, at *6 n.1 (E.D. Va. Oct. 18, 2022) (considering a report that was not attached to the complaint in making a 12(b)(6) determination even where the defendants disputed the facts in the report). Accordingly, as the FAC was verified by Pelkey just as his two affidavits were verified on behalf of DCL, the contents therein should be considered and treated as verified allegations underlying the basis of the FAC for purposes of Haddock's instant motion.

## II.    DCL SUFFICIENTLY STATES CLAIMS AGAINST HADDOCK UPON WHICH RELIEF CAN BE GRANTED.

### A.    DCL Adequately Alleges that Haddock Misappropriated Trade Secrets under Counts 1 and 2.

Contrary to Haddock's misguided arguments, DCL states a claim that Defendants misappropriated DCL's trade secrets in violation of the DTSA, 18 U.S.C. §§ 1831-39, and the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336, *et seq*. Among other remedies, the DTSA provides injunctive and monetary relief for the misappropriation of trade secrets in civil actions. 18 U.S.C. § 1836 (b)(1). Under the DTSA, a "trade secret" is defined as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing. 18 U.S.C. § 1839(3).

The DTSA protects against "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A).

The VUSTA's misappropriation elements are similar to that of the DTSA and require a plaintiff to prove: (1) the existence of a "trade secret"; and (2) the "misappropriation" of that trade secret by the defendant. *Trident Prods.& Servs., LLC v. Canadian Soiless Wholesale, Ltd*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012), *aff'd per curiam*, 505 F. App'x 242 (4th Cir. 2013). First, an alleged trade secret must "meet all the criteria listed in the statute: (1) independent economic value; (2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy." *Id.*; *see also* Va. Code § 59.1-336; *see Audio-Video Group, LLC v. Green*, No. 1:14-cv-169, 2014 WL 793535, at *4-5 (E.D. Va. Feb. 26, 2014) (explaining that the alleged misappropriation of customer information was likely to violate the VUSTA). Second, a plaintiff must plead that the defendant: (1) acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent); and (2) knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff. *Trident*, 859 F. Supp. 2d at 780.

Particularly relevant to this matter, in *Variable Annuity Life Ins. Co. v. Coreth*, the court held that the plaintiff demonstrated that its client information had independent economic value by virtue of its secrecy because a competitor armed with the plaintiff's confidential information, such as maturity dates, account balances, and the like, had the ability to target the plaintiff's most valuable clients, and that the reasonable efforts deployed to maintain the secrecy of the client information through several layers of servers and passwords, limited its availability to a need-to-know basis, and further restricted its access by requiring advisors to execute confidentiality agreements. 535 F. Supp. 3d 488, 514 (E.D. Va. 2021). Moreover, "'[w]here [a] defendant did not

utilize 'improper means to acquire a trade secret,' misappropriation can still exist if the defendant disclosed or used that secret." *API Tech. Servs., LLC v. Francis*, No. 4:13cvl42, 2013 WL 12131381, at *2 (E.D. Va. Dec. 4, 2013) (quoting *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 417 (E.D. Va. 2004)).

Here, under the first element of a misappropriation claim, similar to *Coreth*, DCL alleges that the information concerning DCL's confidential and proprietary information is not generally known outside of DCL's business. (FAC, ¶¶ 215-217). Specifically, DCL alleges that it had and has valuable trade secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the U.S. Government, including but not limited to hypervisor development, reserve engineering, and CNO tool development. (FAC, ¶¶ 215, 234, 249, 257). DCL also specifically identifies myriad reasonable measures that it has taken to keep such information secret. (FAC, ¶¶ 219-220, 238, 260). Similar to the plaintiff in *Coreth*, DCL further alleges that officers and employees, like Frank, with access to DCL's information are required to comply with the aforementioned security measures and execute restrictive covenant agreements which include provisions that require such employees to maintain the confidentiality of DCL's proprietary information, including client lists and DCL's business plan and strategies. (FAC, ¶¶ 42, 52, 59, 61-62).

By way of the disclosures to DCL and the reasonable measures in place to protect DCL's trade secret information, substantial allegations exist in support of a claim of misappropriation of trade secrets based upon both Haddock's use of DCL's trade secrets in an effort to replace DCL with BSS on the IDIQ Contract. (FAC, ¶¶ 133, 136, 141, 221). In the government contracting sphere, which is fiercely competitive, hourly rates and breakdowns of those rates into general and administrative, direct labor, and overhead costs are proprietary and trade secret information. Indeed, individual employee salaries are not disclosed during any part of the bidding process, and

further shows that such information is considered as confidential and proprietary, especially in this highly competitive industry where knowledge of a competitor's employees' salaries and/or hourly rates provides an opportunity to undercut that competitor's bid for government subcontracting work. Missimer and Carpenter had knowledge of and access to this trade secret information as it relates to the IDIQ Contract, which is the contract they and the other Defendants threatened to steal from DCL until DCL was forced to file the instant action to stop them. (FAC, ¶¶ 33, 47, 58, 67-74, 176).

Missimer and Carpenter misappropriated this trade secret information when they used and threatened to use their knowledge of DCL's hourly rates and breakdowns of those rates into general and administrative, direct labor, and overhead costs to inform their decisions to start their own competitive enterprise, BSS, and solicit DCL's largest client, LMCO, by way of Haddock and lure employees like Frank and others to their new enterprises using their insider knowledge of these employees' rates. (FAC, ¶¶ 47, 58, 180-185). There is no possible reasonable measure of secrecy that could have been imposed by DCL to protect the information related to general and administrative, direct labor, and overhead costs from Missimer and Carpenter because Missimer was a shareholder, director, and officer, and Carpenter was an officer of DCL. (FAC, ¶¶ 42-51, 57-58, 221-222, 238-239, 260-261). Missimer and Carpenter were required to have access to this information in order to run the company in their various fiduciary capacities, whereby Missimer held a unique position of trust among the owners of the company as a DCL shareholder/co-founder and Treasurer. (FAC, ¶¶ 42-51, 57-58, 221-222). Missimer and Carpenter misappropriated this trade secret information through their conspiracy with Haddock and the other Defendants to steal the IDIQ Contract from DCL for BSS specifically by using their knowledge of DCL's pricing to do so. (FAC, ¶¶ 47, 58, 62, 218, 237).

Haddock attempts to convince the Court that the information he stole with the other Defendants is not protectable under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(A)(i). DCL is not required, for purposes of pleading threatened or actual misappropriation under the DTSA, to identify a "secret sauce" type recipe, such as source code or a specific product, that Haddock is incorrectly intimating is required in order for the DTSA to have teeth. *See Space Systems/Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853-54 (E.D. Va. 2018) (finding that the plaintiff "sufficiently ple[d] that it derived independent economic value from the documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic investment—the disclosure of which could create an unfair competitive advantage.").

Without a doubt, DCL sufficiently pleads Defendants, singularly and in concert with one another, misappropriated its trade secrets under the "DTSA's *broad definition* of trade secrets." *Id.* at 853 (emphasis added); *see RLM Communications, Inc. v. Tuschen*, 831 F.3d 190, 202 n.4 (4th Cir. 2016) (finding that misappropriation existed when "the employer put forth evidence that the employee "accessed [the employer's] 'game plan' and other confidential documents from [the employer's] network with unusual frequency" just prior to a meeting with a competitor") (citation and internal quotation marks omitted) (alterations in original). For purposes of satisfying the FRCP 12(b)(6) pleading standard, a "reasonable inference" can be drawn that Carpenter and Missimer were using and disclosing DCL's trade secrets for BSS based on Carpenter's unusual course of conduct and timing in twice downloading DCL's Business Plan a mere two weeks before he incorporated BSS. (FAC, ¶¶ 181-185). It is indisputable that DCL's Business Plan constitutes trade secret information under the DTSA's broad definition because DCL "derive[s] independent economic value from the documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic

investment—the disclosure of which could create an unfair competitive advantage." *Space Systems*, 306 F. Supp. 3d at 853-54. It is also indisputable that DCL alleges that Carpenter and Missimer communicated DCL's trade secrets to Haddock who in turn used such protected information against DCL to try to force DCL to give up the IDIQ Contract for the benefit of a competitive entity. (FAC, ¶¶ 67-68, 129-137). As a result, DCL's trade secrets misappropriation claims under federal and state law in Counts 1 and 2 of the FAC are sufficiently pled and should not be dismissed.

**B.**     **DCL States a Claim for Violation of the VUCITA in Count 3.**

Haddock vaguely contends that DCL's allegations do not have any relation to the VUCITA. (Df Br. at 12). Haddock's arguments are identical to that of BSS, Carpenter, and Missimer, and as such DCL adopts its arguments related to this cause of action as set forth in its oppositions to BSS, Carpenter, and Missimer's motions to dismiss. DCL's cause of action under the VUCITA should not be subject to pre-answer dismissal.

**C.**     **DCL States a Claim for Common Law Trade Secrets Misappropriation in Count 4.**

Haddock argues that the VUTSA preempts DCL's common law misappropriation of trade secret claim. (Df Br. at 10-11). DCL adopts its arguments related to this cause of action as set forth in its oppositions to BSS, Carpenter, and Missimer's motions to dismiss. In sum, dismissal of DCL's misappropriation of trade secrets claim under common law would be premature.

**D.**     **DCL States a Claim for Aiding and Abetting Breach of Contract against Haddock, and Tortious Inference with Contractual Relations against Haddock in Counts 5, 7, and 10.**

As it relates to its contractual claims, DCL alleges that, on November 3, 2021, Missimer entered into a DCL Shareholders Agreement ("Shareholders Agreement") for purposes of setting forth the shareholders' respective rights, duties, and obligations as owners of DCL, including but not limited to restrictive covenants and non-disclosure obligations by which Missimer agreed to

abide. (FAC, ¶ 42; FAC, Ex. A). DCL further alleges that, as a Senior CNO Developer and VP of DCL, Carpenter entered into the Restrictive Covenants Agreement on December 20, 2021 as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit. (FAC, ¶ 59; FAC, Ex. B). Finally, DCL alleges that Frank executed an identical Restrictive Covenants Agreement to that of Carpenter on July 30, 2022. (FAC, ¶ 61; FAC, Ex. C). In seeking dismissal of DCL's various contractual claims, Haddock asserts that the restrictive covenants are unenforceable. (Df Br. at 17). He is mistaken.

There are two separate written agreements at issue and both must be examined as it relates to Frank's arguments for dismissal of DCL's contractually related claims because DCL alleges that Frank not only breached his own contract but that Frank aided and abetted Carpenter and Missimer's breaches of contract and tortiously interfered with Carpenter and Missimer's contracts. (FAC, ¶¶ 42, 59, 61). While Carpenter and Frank's respective Restrictive Covenants Agreements are governed under Virginia law, the Shareholders Agreement by which Missimer is bound for purposes of restrictive covenants is governed by Delaware law with Virginia courts selected as the venue for disputes. (*Compare* FAC Exs. B and C *with* Ex. A).

With regard to Carpenter and Frank's restrictive covenants, for a cognizable breach of contract claim under Virginia law, a plaintiff must plead that the: (1) defendant owes a legally enforceable obligation to the plaintiff; (2) defendant has breached that obligation; and (3) plaintiff has suffered damages as a result of the breach. *Design & Prod., Inc. v. Am. Exhibitions, Inc.,* 820 F. Supp. 2d 727, 736 (E.D. Va. 2011) (citing *Filak v. George,* 267 Va. 612, 619, 594 S.E.2d 610, 614 (Va. 2004)). As it relates to Missimer's restrictive covenants, the elements of a breach of contract claim are substantially similar under Delaware law to that of Virginia law. To plead a claim for breach of contract in Delaware, the plaintiff must allege that: (1) a contract existed between the parties; (2) the defendant breached his obligation imposed by the contract, and (3) the

plaintiff suffered damages as a result of the defendant's breach. *VLIW Technology, LLC v. Hewlett–Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).

As a threshold issue, Haddock adopts Missimer's argument that Virginia law, as opposed to Delaware law, should apply to the Shareholders Agreement. (Df Br. at 21 n.15). DCL is incorporated in Delaware and adheres to filing and reporting requirements of the state as a Delaware corporation. (FAC, ¶¶ 2, 5). The Shareholders Agreement, which Missimer executed, also designates Delaware law as governing law, further evidencing the corporation's ties to the state. (FAC, Ex. B). As much as he would like to evade this fact, Missimer is not a rank-and-file employee. Missimer is a DCL shareholder, (FAC, ¶¶ 3, 13), and as an owner and co-founder of the company, he expressly agreed to be governed by Delaware law when he agreed and helped to incorporate DCL in that state. *Run Them Sweet, LLC, v. CPA Global Limited*, 224 F. Supp. 3d 462, 466 (2016) ("[N]o word or clause in a contract will be treated meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract."); *Settlement Funding, LLC v. Von Neumann-Lillie*, 274 Va. 76, 645 S.E.2d 436 (2007) (holding that a Virginia trial court erred in refusing to apply Utah law in construction of loan agreement when the contract clearly indicated its application). Accordingly, DCL submits that the parties to the Shareholders Agreement mutually selected Delaware law to govern disputes and as such Delaware law should be applied.

However, regardless of whether Delaware or Virginia law applies, DCL has adequately pled tortious inference with Carpenter, Missimer, and Frank's contracts by Haddock. (FAC, ¶¶ 327-335). Under the first element, DCL has alleged that respective contracts exist between DCL and Carpenter, Missimer, and Frank. (FAC, ¶¶ 42, 59, 61). DCL alleges that Carpenter, Missimer, and Frank were provided with access to proprietary data, nonpublic information, trade secret, and confidential and proprietary information and in exchange Carpenter, Missimer, and Frank agreed

to maintain confidentiality and not misappropriate DCL's trade secrets and proprietary information and not solicit DCL's existing or prospective clients or employees. (FAC, ¶¶ 13, 62). *See also Davis Mem'l Goodwill Indus. v. Garada*, No. 17-CV-347, 2017 WL 11613374, at *3 (E.D. Va. Apr. 17, 2017) (finding that the defendant's mere execution of the contract was sufficient to meet the first element of a breach of contract claim). Thus, Carpenter, Missimer, and Frank's execution of their respective employment agreements, as evidenced by the three executed contracts annexed to the FAC, (FAC, Exs. A, B, C), shows that DCL adequately pled under the first element that Carpenter, Missimer, and Frank "owe[d] a legally enforceable obligation to" DCL with no further examination required by this Court at the pre-answer motion to dismiss stage when the allegations in the complaint must be viewed as true in favor of DCL as the non-moving party. *See Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 n.4 (4th Cir. 1993) ("In light of the standard of review, we traditionally have viewed even poorly drafted complaints in a light most favorable to the plaintiff.").

To the extent that Haddock's arguments regarding reasonableness are considered as to whether DCL met the first element, this Court should find that the restrictive covenants are reasonable because they are not greater than necessary to protect DCL's legitimate business interests. In Virginia, restrictive covenants are examined with regard to the legitimate interests of the employer, the employee, and the public at large. *Gray*, 2010 WL 4646039, at *2. "Such legitimate business interests might include trade secrets, other confidential information, or . . . the good will the employer has acquired through dealings with his customers." *Id.* (internal quotation marks and citation omitted). A plaintiff must establish that the restraint (1) is no greater than necessary to protect a legitimate business interest, (2) is not unduly harsh or oppressive, and (3) is reasonable in light of public policy. *See Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 561 S.E.2d 694, 695 (Va. 2002).

In *Coreth*, the plaintiff, a life insurance company, pled alternative theories, as here, that the defendants, former financial advisors, misappropriated trade secrets and breached their contracts under federal and state law. 535 F. Supp. 3d at 493-94. The *Coreth* defendants maintained that the plaintiff's claims were "based solely on hearsay, couched in conclusory terms, pure speculation, and erroneous assertions of fact." *Id.* at 506. Unpersuaded by the defendants' arguments, the *Coreth* court held that the defendants were bound to an enforceable agreement where the plaintiff had agreed to grant the defendants access to its confidential and proprietary information and the use of company property in exchange for the defendants not to misappropriate, acquire, use, or disclose customer names, contact information, and account balances for any purposes other than in furtherance of their duties undertaken on behalf of the client. *Id.* at 505-08. The *Coreth* court concluded that the plaintiff adequately alleged that the defendants breached their restrictive covenants when it alleged that they "jotted down the names, addresses, telephone number and/or email addresses and, in some instances approximated account values, of clients" and caused clients to end or alter their relations because of their contact with the defendants. *Id.* at 505-08.

Likewise, Delaware courts "carefully review" noncompete and nonsolicit agreements to ensure that they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities." *Ainslie v. Cantor Fitzgerald, L.P.*, No. 9436-VCZ, 2023 WL 106924, at *8 (Del. Ch. Jan. 4, 2023) (quoting *FP UC Hldgs., LLC v. Hamilton*, No. 9436-VCZ, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020)). When employees have access to confidential information, such access provides employers with a legitimate business interest in a restrictive covenant and renders covenants not to compete more reasonable. *See Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 739 (4th Cir. 1993); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 553, 290 S.E.2d 882, 885 (1982) (finding covenant enforceable when an employee had access

to confidential information and such knowledge "qualified him to be a formidable competitor" to his previous employer).

As it relates to duration, Carpenter, Missimer, and Frank are prohibited for one year from their termination dates from competing with DCL with Carpenter and Frank being restrained for one year and Missimer for two years from solicitation of DCL's clients, candidates, and employees. (FAC, ¶¶ 53-54, 63-64). Courts in this District have found these temporal limitations to be reasonable under similar circumstances. *See Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 789 (E.D. Va. 2018) (holding that "a one-year duration for the non-solicitation and non-compete agreement is reasonable because plaintiff invests significant resources in its legal services clients and built relationships with many of them through [the] defendant's work on behalf of [the] plaintiff"); *Hair Club for Men, LLC v. Ehson*, No. 1:16-cv-236, 2016 WL 4577019, at *5-6 (E.D. Va. Aug. 31, 2016) (finding that two years was reasonable). Indeed, the Supreme Court of Virginia has deemed reasonable even longer restricted periods. *See Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 374, 389 S.E.2d 467, 470 (1990) (upholding a three year non-compete); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 290 S.E.2d 882, 885 (1982) (upholding that a three-year restriction and that the company had a legitimate business interest in preventing the use of "lists of customers, lists of suppliers, detailed knowledge of overhead factors, pricing policies, and bidding techniques" by an employee-competitor). Thus, the one- and two-year restrictions at issue in this case are reasonable in duration.

Haddock also asserts that the restrictive covenants are "overly broad due to a lack of geographic scope" in a wholly misguided attempt to destroy their enforceability. (Df Br. at 20). In making this argument, however, Haddock critically omits that "[t]he considerations of function, geographic scope, and duration are not separate and distinct issues: a single consideration that is unreasonable may be reasonable as construed in light of the other two." *Cantol, Inc. v. McDaniel*,

No. 2:06CV86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006). Thus, as long as the function and duration are reasonably construed, the fact that there is no narrowed geographic limitation does not necessarily render a restrictive covenant unenforceable. *See Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011) (holding that "[a]lthough the lack of a geographical limitation favors defendant, it is outweighed by the nature of the businesses at issue, [the former employer]'s *legitimate interest in protecting itself from direct competition by a former employee in a niche market*, and the limitations within the Agreement, particularly the one-year duration of the non-compete and non-solicitation provisions. For these reasons, the non-compete provision is *not invalid*.") (emphasis added).

In this case, while the restrictions are not limited to a certain geographic area, DCL's operations are applicable to the entirety of the United States and beyond pursuant to its work under U.S. government contracts. (FAC, ¶¶ 1, 83, 215). Moreover, as recently as 2012, the Supreme Court of Virginia upheld non-competition and non-solicitation provisions that cover past clients with whom the employee had direct contact even in the absence of a geographical limit. *See Preferred Systems Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 394, 732 S.E.2d 676 (Va. 2012) (holding that "[t]he lack of a specific geographic limitation is not fatal to the covenant"). As the court found in *Cantol* and *Brainware*, there is no geographic restriction that could have been reasonably imposed to protect DCL's "legitimate interest in protecting itself from direct competition by a former employee[s, Carpenter, Missimer, and Frank,] in a niche market" of offensive cybersecurity contracting in support of the U.S. Government's national security missions. *Brainware*, 808 F. Supp. 2d at 827. (FAC, ¶¶ 1, 83, 215). Similar to the *Brainware* court's finding, the restrictive covenants should not be struck down for lack of a geographical limitation because they are reasonable in function and duration.

17

Although Haddock cites *Omniplex World Services Corp. v. U.S. Investigations Services, Inc.*, 270 Va. 246, 249, 618 S.E.2d 340 (2005), Haddock fails to acknowledge the Supreme Court of Virginia's standard set forth in that case where the Court explained "[e]ach non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Id.* The *Omniplex* Court continues that "[t]hese standards have been developed over the years to strike a balance between an employee's right to secure gainful employment and the employer's legitimate interest in protection from competition by a former employee based on the employee's ability to use information or other elements associated with the employee's former employment." *Id.* at 249.

Here, when evaluating each restrictive covenant at issue on its own merits, this Court should find that the provisions, although broad, are enforceable due to the unique circumstances at issue. Namely, DCL is a provider of highly specialized services for which there is a limited pool of government-cleared talent. (FAC ¶¶ 6, 10, 41). This fact makes DCL's employees its most valuable asset in which it invests tremendous efforts and resources to recruit, train, and retain. Put simply, DCL alleges that Defendants used their insider knowledge regarding DCL to try to steal DCL's most valuable asset by repeatedly threatening DCL's employees that they would no longer be employed by DCL because DCL was losing its LMCO subcontract. (FAC ¶ 145-146). There is likely not a more blatant need for broad non-competition and non-solicitation provisions such as the ones at issue here to be enforced when "*balancing the provisions of the contract with the circumstances of the businesses and employees involved*." *Omniplex*, 618 S.E.2d at 249 (emphasis added).

Under the second element of the breach of contract pleading standard, based on DCL's allegations related to Defendants' own disclosures to DCL's senior management and allegations regarding numerous emails, text messages, and a voicemail evidencing their intent and actions,

there can be no reasonable dispute that DCL has sufficiently pled that Defendants misappropriated DCL's trade secrets and proprietary information in their efforts to solicit DCL's customers for purposes of a direct competitor, BSS, in direct breach of their contractual obligations to DCL. (FAC, ¶¶ 73-74, 79-81, 102-112, 133, 141, 169-171, 180-187). As it relates to the third element, DCL alleges that its damages as a result of Defendants' conduct include but are not limited to: "(1) lost revenue to DCL under the IDIQ Contract and its reasonable expectation of an extension of that Contract; (2) loss of employees and expenses associated with recruiting and retaining employees with appropriate skills and security clearances; (3) irreparable harm to its business relationship and reputation with existing and prospective clients including LMCO and others; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated Trade Secrets; and (6) loss of employees and damages related to obtaining highly skilled and properly cleared employees and personnel to perform work on DCL contracts." (FAC, ¶ 41).

As it specifically relates to Count 7, Haddock submits that there is no independent cause of action for aiding and abetting breach of contract under either Virginia or Delaware law and that DCL's cause of action should be dismissed on this basis. (Df Br. at 13). However, the aiding and abetting cause of action in the FAC specifically states: "Aiding and Abetting a Breach of Contract *and/or* Fiduciary Duty and Duty of Loyalty against All Defendants." (FAC, pg. 56) (emphasis added). Clearly, DCL pleads that Carpenter, Missimer, and Frank all have various duties to DCL which either arise contractually or out of common law principles and that all Defendants, including Haddock, assisted Carpenter, Missimer, and Frank with their breaches. In the cases cited by Haddock in support of his contention, the parties had alleged aiding and abetting breach of contract as its own singular cause of action, which DCL did not do here.

As such, DCL has stated its breach of contract, aiding and abetting of breach of contract, and tortious interference with contractual relations claims sufficiently to survive dismissal.

**E.**     **DCL Has Stated a Claim that Haddock Aided and Abetted Breaches of Fiduciary Duty and Duty of Loyalty in Counts 6 and 7.**

Haddock contends that DCL's breach, and aiding and abetting breaches, of fiduciary duty and duty of loyalty claims should be dismissed because they are based on DCL's "allegations Missimer, Carpenter, and Frank misappropriated trade secrets and solicited [LMCO]." (Df Br. at 13). Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach of fiduciary duty resulted in damages. *Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020) (citing *Carstensen v. Chrisland Corp.*, 247 Va. 433, 442 S.E.2d 660, 666 (1994)). A fiduciary duty exists when special confidence has been imposed on an individual who is, as a result, legally obligated to act in the best interest of the party that imposes the special confidence. *Allen Realty Corp. v. Hobert*, 227 Va. 441, 318 S.E.2d 592, 595 (1985). As it relates to the duty of loyalty, "[w]hile free competition in the marketplace is to be encouraged, it is also critically important that employees take seriously the duty of loyalty they owe their employers." *Nat'l Legal Research Grp., Inc. v. Lathan*, 42 F.3d 1386, 1386 1994 WL 667058, at *2 (4th Cir. 1994); *see Marsteller v. ECS Fed., Inc.*, No. 1:13-cv-593, 2013 WL 4781786, at *9 (E.D. Va. Sept. 5, 2013) ("[T]he Supreme Court of Virginia noted, 'liability for breach of fiduciary duty has been imposed when the employees or directors misappropriated trade secrets, misused confidential information and solicited an employer's clients or other employees prior to termination.") (quoting *Feddeman & Co v. Langan Associates*, 260 Va. 35, 42, 530 S.E.2d 668 (Va. 2000)).

Haddock first challenges DCL's aiding and abetting breach of fiduciary duty and duty of loyalty cause of action by arguing that there is no cause of action for aiding and abetting the breach of these duties. (Df Br. at 13-14). However, courts in this District have explained that "[t]he confusion surrounding whether Virginia recognizes a cause of action for aiding and abetting a breach of fiduciary duty appears to stem from the Supreme Court of Virginia's decision in *Patteson v. Horsely*, 70 Va. 263 (Va. 1877)." *Keil v. Seth Corporation*, No. 3:21cv153, 2021 WL 5088242, *12 (E.D. Va. Nov. 2, 2021). The *Keil* court explained that "[s]ince *Patteson*, the Supreme Court of Virginia has neither expressly recognized nor expressly rejected aiding and abetting a breach of fiduciary action as a separate cause of action" and that it has "[i]nstead . . . assumed the existence of the cause of action to evaluate whether a plaintiff had properly pled a claim." *Id.* (citing *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 604 S.E.2d 403, 411-12 (2004)); *see also AvalonBay Cmtys., Inc. v. Willden*, No. 1:08-cv-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009) (holding a defendant liable for aiding and abetting his brother's breach of fiduciary duty when he processed fraudulent invoices that harmed his brother's employer); *Sherry Wilson and Co., Inc. v. Generals Court, L.C.*, No. 21696, 2002 WL 32136374, at *1 (Va. Cir. Ct. Sept. 27, 2002) ("[O]ne who assists another to breach his fiduciary duty . . . may be held *jointly and severally liable* for the losses sustained as a result of such breach") (emphasis added). Thus, Haddock has no legal basis to assert that aiding and abetting a breach of fiduciary duty is not viable in Virginia.

To establish a claim for aiding and abetting another party's breach of fiduciary duty, "the third party must affirmatively aid the breach with the requisite mens rea, or culpable state of mind." *Studco Bldg. Sys. United States, LLC v. 1st Advantage Fed. Credit Union*, 509 F. Supp. 3d 560, 571 (E.D. Va. 2020) (quoting *AvalonBay Communities, Inc. v. Willden*, No. 1:08-CV-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009), *aff'd*, 392 F. App'x. 209 (4th Cir. 2010)). That is, the plaintiff must show that the "defendant: (1) knows about another's duty and breach; (2)

participates in it or directs its commission; and (3) benefits from it." *All. Tech. Grp., LLC v. Achieve I, LLC*, No. 3:12CV701-HEH, 2013 WL 143500, at *5 (E.D. Va. Jan. 11, 2013); *see also Avalon Bay*, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009) ("Virginia law allows a third party to be liable for another party's breach of fiduciary duty when that third party knowingly participated in the breach.").

Here, it is indisputable that Missimer, as a shareholder, and Carpenter, as an officer, owed a fiduciary duty and duty of loyalty to DCL. Additionally, as an employee of DCL, it cannot be disputed that Frank owed a duty to loyalty to DCL. In fact, Haddock does not dispute and therefore concedes that "[a]n employee, including an employee at-will, owes a fiduciary duty of loyalty to his employer during his employment." *Williams v. Dominion Tech. Partners, LLC*, 576 S.E.2d 752, 757 (Va. 2003). Carpenter, Missimer, and Frank breached their duties to DCL when they engaged in the competitive activities that serve as the basis of DCL's FAC, including assisting each other with launching BSS for purposes of usurping the LMCO contract *during* their employment. (FAC, ¶¶ 14-15, 68, 80, 88-89). DCL has sufficiently pled facts to show that Haddock knew or had reason to know that Missimer was a shareholder, director, officer, and employee of DCL, Carpenter was an officer of DCL, and Frank was an employee of DCL, knew of Missimer, Carpenter, and Frank's duties to DCL, and specifically knew that Carpenter and Missimer were breaching their duties when Haddock disclosed the activities of BSS to DCL on January 25, 2023. (FAC, ¶¶ 25-28, 47, 57-58, 69-72, 82, 85-87, 103-112, 121). Moreover, DCL alleges that the next day, on "January 26, 2023, Haddock sent [an email] to Bertke, Carpenter, and Missimer stating as follows: "Can we all meet in person Friday (tomorrow) to discuss the DarkCircuit / BlackSails ConOp going forward and come to an early agreement?" (FAC, ¶ 73). Haddock's email is direct evidence that he knew that such duties existed and that Carpenter and Missimer were in breach because an "agreement" would be needed to resolve their unlawful

conduct. Haddock also knew that Frank had a duty to DCL and yet assisted Frank in breaching his duties while he was still an employee by assisting Frank to work for a direct competitor, PLEX. FAC, ¶ 141-143). Haddock appears to argue that because DCL does not allege that Haddock responded to Frank's February 24, 2023 email regarding PLEX means that the aiding and abetting claim as to Frank should be dismissed. (Df Br. at 2, 23). However, DCL cannot allege what it does not know and discovery in this case has barely commenced. To date, Defendants have refused to produce any relevant documents, including emails between Defendants that DCL has requested. DCL believes that Haddock did respond to Frank and that such email(s) will be revealed in discovery and that there will be testimony as to how Haddock assisted Frank in his breach with respect to PLEX. Thus, the first element is met.

As for the second element, DCL has alleged more than ample facts to show that Haddock participated and directed in the commission of the breaches of such duties. DCL specifically alleges that Haddock had "knowledge of the contractual, statutory and common law duties owed by Carpenter, Missimer, and Frank to DCL yet [Haddock] encouraged and assisted them in committing breaches of same." (FAC, ¶ 294). Specifically, DCL alleges that Haddock's voicemail that DCL was being terminated by LMCO simply because Carpenter and Missimer were threatening to quit as a result of DCL not capitulating to their demands is direct evidence that Haddock was assisting Missimer and Carpenter in their efforts to compete with DCL. (FAC, ¶ 129-137). Thus, there can be no reasonable dispute that DCL has alleged that Haddock directly participated in or commissioned the breaches by Carpenter, Missimer, and Frank.

With regard to the third element, DCL has sufficiently alleged that Haddock benefited from the breach. DCL alleges that Haddock stated that DCL's model would allow LMCO to increase its profit from 6% to 10% based on the fact that an identical company like DCL was a subsidiary to LMCO. (FAC, ¶ 61). It is not unreasonable to believe that Haddock is subject to performance-

based bonus compensation. If he had been able to successful acquire DCL, he would have personally benefited from such acquisition because of the significant profits that LMCO would have been able to realize as a result of same. Thus, once DCL did not immediately jump at Haddock's offer for the company to be acquired by LMCO, Haddock decided to change course and throw all of his weight behind the illicit activities of Carpenter and Missimer to start up BSS in order for LMCO to acquire that company instead once they had stolen DCL's contract and employees. The entirety of Haddock's financial interest in BSS is not yet known, or any benefit that he would have received from LMCO as a result of eventually acquiring BSS had Defendants been successful in their plans. It would be premature and unjust for the aiding and abetting breaches of fiduciary duties claim to be dismissed prior to discovery on these issues.

With regard to damages, there is no question that DCL has alleged that it has been damaged because of Haddock's aiding and abetting the breaches of Carpenter, Missimer, and Frank as DCL alleges that its relationship with LMCO has been irreparably damaged as a direct result of his and the other Defendants' conduct. (FAC, ¶¶ 38-39, 133-136, 210). Any arguments by Haddock regarding the merits of this allegation is of no moment as it relates to a motion to dismiss. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) ("[I]mportantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim . . . ." (citation omitted)). Accordingly, DCL has stated claims against Haddock for aiding and abetting Carpenter, Missimer, and Frank's breaches of fiduciary duty and duty of loyalty for purposes of a FRCP 12(b)(6) motion to dismiss.

**F.    DCL States a Claim of Unfair Competition Against Haddock in Count 8.**

Virginia unfair competition law encompasses a variety of practices that cause an economic injury to a business through a deceptive or wrongful business practice. *See Duggin v. Adams*, 234 Va. 221, 228, 360 S.E.2d 832, 837 (1987) (stating that "[s]harp dealing, overreaching, or unfair

competition may also constitute improper methods" of engaging in commerce). As noted by Haddock, the most popular example of common law unfair competition is trademark infringement. (Df Br. at 14-15). However, in addition to trademark infringement and other egregious business practices, Virginia courts have found that unfair trade practices include anti-competitive market practices, interference with business relationships, use of confidential information by former employees to solicit customers, theft of trade secrets, and breach of a restrictive covenant. *See Preferred Systems*, 284 Va. at 404, 732 S.E.2d at 688 (explaining that "improper methods or means [of commercial practice] generally involve . . . misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition"). The types of "improper methods" listed above are grounded in notions of fair and unfair competition. DCL has alleged that each of the above unfair practices were perpetrated by Defendants in the FAC, (FAC, ¶¶ 300-310), and as such, it is premature to dismiss DCL's claim of unfair competition as to Haddock.

## G.   DCL Has Stated a Claim that Haddock Tortiously Inferred with a Prospective Economic Advantage and Contractual Relationship in Counts 9 and 10.

For its claims of tortious interference with contract or prospective economic advantage to survive dismissal, DCL must plead (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit," (2) that Defendants had "knowledge of the relationship or expectancy," (3) "that it was reasonably certain that absent intentional misconduct, [DCL] would have continued in the relationship or realized the expectancy," and (4) "that [DCL] suffered damages from the interference." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir. 2021) (quoting *Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (applying Virginia law)). "Among the most egregious examples of improper conduct are those 'that are-illegal or independently tortious, such as violations of statutes,

regulations, or recognized common-law rules," including but not limited to misuse of confidential information and breach of a fiduciary relationship. *Commerce Funding Corp. v. Worldwide Sec. Services Corp.*, 249 F.3d 204, 214 (4th Cir. 2001) (citing *Maximus, Inc., v. Lockheed Info, Sys., Inc.*, 254 Va. 408, 493 S.E.2d 375 (1997)).

Here, DCL pleads the existence of its business relationship with LMCO and that its employees with fiduciary relationships, including Carpenter, Missimer, and Frank, worked under its LMCO contract with Haddock. (FAC, ¶ 33, 67, 71). DCL further alleges that without Carpenter, Missmer, and Frank intentionally engaging in competitive activities against DCL while they were still employed, and in the case of Missimer, while still an owner of the company, and without Haddock's use of DCL's confidential information conveyed to him by Carpenter and Missimer to strong-arm DCL into handing over its LMCO subcontract to BSS, DCL's subcontract with LMCO would not be at risk and DCL's employees would not be scared about losing their jobs. (FAC, ¶¶ 82, 87,127-142, 144-146). Finally, there can be no reasonable dispute that DCL alleges that it has been damaged by Defendants' interference because it was forced to expend significant resources, including filing the instant lawsuit, to stop Defendants from any further interference. (FAC, ¶¶ 2, 41).

Haddock asserts that these claims will fail because "a defendant cannot interfere with an invalid agreement." (Df Br. at 20). However, as explained in detail above, the restrictive covenant provisions are enforceable, which is fatal to Haddock's specious argument. Haddock further contends that "DCL has not alleged that Haddock engaged in any 'intentional interference' or that he 'employed improper methods' to terminate DCL's contractual relationship with its employees." (Df Br. at 21). This statement is belied by the allegations of the FAC and Pelkey Affidavit, which was submitted in support of DCL's motion for a temporary restraining order and preliminary injunction to specifically address Haddock's ongoing improper methods to interfere with DCL's

contractual relationships with its employees which was discovered after the filing of the FAC. (*See* Weber Decl., Exs. A, B). Specifically, three employees told Pelkey, that on or about March 6, 2023, Haddock approached them and other DCL employees at the work site in his capacity as Project Manager for LMCO and told them they "need to find a new home," implying that DCL's employees needed to work for a new employer other than DCL to stay on the IDIQ Contract. (Weber Decl., Ex. A, ¶ 25). When viewing these allegations in the most favorable light to DCL as the non-moving party, there are more than enough allegations to show that DCL sufficiently pled that Haddock tortiously interfered with DCL's contracts and business expectancy. Counts 9 and 10 should not be subject to dismissal.

**H.    DCL States a Claim of Civil Conspiracy Against Defendants in Count 11.**

According to Virginia common law, a civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744 (1985). To plead civil conspiracy, a plaintiff must allege the defendants combined together to effect a "preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy." *Bull v. Logetronics, Inc.*, 323 F. Supp. 115, 131 (E.D. Va. 1971) (citations omitted).

Here, Haddock argues that DCL's conspiracy cause of action is not pled with particularity. (Df Br. at 22-23). DCL's conspiracy claim incorporates all prior paragraphs of the FAC by reference and thus they are part of DCL's conspiracy claim. (FAC, ¶ 337). DCL has alleged particular facts sufficient to show that Defendants have acted singularly and in concert with one another, including allegations that Haddock and Missimer directly disclosed to DCL on January 25 and 26, 2023 that they were working with Carpenter to divert DCL's LMCO contract to BSS. (FAC, ¶ 67). DCL further alleges that Carpenter referred to Missimer as his employee (i.e., an

employee of BSS) on January 30, 2023 when both individuals were still employed by DCL, and that Haddock repeatedly made phone calls to DCL trying to force DCL to let BSS steal its contract. (FAC, ¶¶67-69, 82, 124-126, 129-137). These allegations alone would be enough for purposes of alleging conspiracy.

However, yet another example of the conspiracy being pled with particularity is an email that DCL discovered subsequent to Frank's abrupt resignation on March 14, 2023. (FAC, ¶¶ 141, 157). While Frank was still an employee of DCL, he utilized his company email account (mike.frank@darkcircuitlabs.com) to communicate with Haddock via Haddock's LMCO email address via an email sent on February 24, 2023, stating that he "talk[s] to John & Eric pretty much daily about what's going" and "was in a position to help them," but that "BSS will not be setting sail anytime this year." (FAC, ¶ 141). DCL expressly alleges that Frank's email demonstrates Defendants were actively working together behind the scenes to unlawfully divert DCL's interests under the IDIQ Contract as well as shift DCL employees to PLEX, DCL's direct competitor, once DCL made it clear that it would not allow its business to be stolen. (FAC, ¶ 142). While Haddock disputes DCL's interpretation of this email, the email speaks for itself and regardless, such a dispute goes to the merits of DCL's claims and has no bearing on a motion to dismiss. *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts[ or] the merits of a claim . . . .").

Additionally, DCL further alleges conspiratorial conduct by Defendants by making allegations regarding Haddock's February 9, 2023 voicemail, where Haddock unequivocally stated that DCL was being terminated because Carpenter and Missimer were threatening to quit. (FAC, ¶ 133). A reasonable inference can be drawn from Haddock's voicemail that DCL was being terminated solely because of Carpenter and Missimer as it relates to their conspiracy with Haddock to unlawfully divert DCL's contract with LMCO to BSS. Defendants' conspiracy is self-evident

on the face of the FAC and DCL pleads multiple particular factual allegations regarding their concerted conduct to survive a motion to dismiss on its civil conspiracy claim.

**I.    Without the Benefit of Discovery, It is Premature for Haddock to Argue that DCL is Not Entitled to Permanent Injunctive Relief.**

It is premature for Haddock to argue that DCL's claim for a permanent injunction should be dismissed. (Df Br. at 23). Haddock intimates that nothing has changed since DCL moved for its temporary restraining order and preliminary injunction, but as explained above, DCL has moved to amend its complaint to add new factual allegations and causes of action related to Defendants' destruction of evidence. (ECF No. 77). Without the benefit of full and fair discovery, Haddock has no legal basis to argue that DCL's claim for permanent injunctive relief should be subject to dismissal. *See Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (holding that "because we are at the motion to dismiss stage, we see no need to dismiss this request for relief when the underlying . . . facts have not been fully developed."). Dismissal of DCL's permanent injunction cause of action would be improper at this time.

**J.    DCL's Claim for an Accounting in Count 13 Is Properly Asserted.**

Haddock seeks dismissal of DCL's demand for an accounting because an accounting is an equitable remedy. (Df Br. at 23). "Under Virginia law, an accounting is a form of equitable relief which is available upon order of a court in equity providing for an accounting of funds among those with a partnership or other *fiduciary relation* inter se.'" *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 623 (E.D. Va. 2010) (emphasis added) (citations omitted); *see also* Va. Code § 8.01–31 ("An accounting in equity may be had against any fiduciary or by one joint tenant, tenant in common, or coparcener for receiving more than comes to his just share or proportion, or against the personal representative of any such party.") (emphasis added). Just as DCL is able to plead a cause of action for injunctive relief, which is an

equitable remedy, so to can DCL allege a cause of action for an accounting. Additionally, DCL alleges that "[a] fiduciary relationship existed by and between Carpenter, Missimer, and Frank, on the one hand, and DCL, on the other hand." (FAC, ¶ 349). DCL further alleges throughout the FAC that Carpenter, Missimer, and Frank were competing with DCL, and were in agreement o assist each other with doing so, while still serving as fiduciaries. (FAC, ¶¶ 22-32, 34-36, 89, 141-142). DCL alleges that Haddock aided and abetted the breaches of Carpenter, Missimer, and Frank's fiduciary duties in his conspiracy with them to start BSS. (FAC, ¶¶ 39-40, 73, 129-135, 294; *see* Exs. A, B). By and through Haddock's conspiratorial conduct to assist with their breaches, Haddock, just like the other Defendants, "must account to DCL for all business obtained by Defendants through the wrongful acts alleged in [DCL's] Complaint." (FAC, ¶ 351). Haddock cannot be bifurcated from DCL's claim of accounting because his conduct is intertwined with the others and to allow him to reap benefits from their unlawful conduct would be unjust. Thus, DCL has sufficiently pled facts to survive a motion to dismiss on its claim for an accounting, which will be raised at the proper time upon full and fair discovery in this case.

## CONCLUSION

For the foregoing reasons, DCL respectfully requests that the Court deny Haddock's Motion to Dismiss in its entirety.

Dated: June 19, 2023                    Respectfully submitted,

Steven J. Weber, VSB No. 35573
Lucas T. Daniels, VSB No. 91557
Gregory R. Begg, *Pro Hac Vice*
Lauren Rayner Davis, *Pro Hac Vice*
PECKAR & ABRAMSON, P.C.
*Attorneys for Plaintiff, Dark Circuit Labs, Inc.*
2055 L Street, NW, Suite 750
Washington, DC 20036
Telephone: 202.293.8815

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused a true and accurate copy of the foregoing

Opposition to Defendant Keith Haddock's Motion to Dismiss and Declaration of Steven J. Weber,

Esq. and Exhibits thereto to be served on Defendants' counsel via the CM/ECF system as follows:

Broderick C. Dunn, VSB 74847
Maria Estelle Stickrath, VSB 96191
COOK CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
(703) 865-7480
bdunn@cookcraig.com
mstickrath@cookcraig.com
*Attorneys for Defendant Eric Missimer*

Anne G. Bibeau, VSB 41488
Pietro Sanitate, VSB 89538
WOODS ROGERS VANDEVENTER BLACK PLC
101 West Main Street, Suite 500
Norfolk, VA 23510
(757) 446-8517
anne.bibeau@wrvblaw.com
psanitate@wrvblaw.com
*Attorneys for Defendants Black Sails Security LLC and John Carpenter*

Roya Vasseghi, VSB 85122
VASSEGHI BUDD PLLC
9663-A Main Street Fairfax, VA 22203
(703) 215-9358
roya@vasseghibuddlaw.com
*Attorneys for Defendant Michael Frank*

Renee B. Appel, VSB 87721
Dawn Mertineit, *Pro Hac Vice*
SEYFARTH SHAW LLP
975 F. Street NW
Washington, DC 20004
(617) 946-4917
rappel@seyfarth.com
dmertineit@seyfarth.com
*Attorneys for Defendant Keith Haddock*

Dated:  June 19, 2023                    */s/ Steven J. Weber*
                                           STEVEN J. WEBER