# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **DARK CIRCUIT LABS, INC.**, <br><br> Plaintiffs, <br><br> vs. <br><br> **BLACK SAILS SECURITY LLC**, **JOHN CARPENTER**, **ERIC MISSIMER, MICHAEL FRANK,** and **KEITH HADDOCK**, <br><br> Defendants. | Civil Action No.: 1:23-cv-00326-TSE-LRV |

**AFFIDAVIT OF RONALD PELKEY IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY
<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65</u>**

**RONALD PELKEY**, being duly sworn, deposes and says:

1.   During all relevant time periods herein, I have held the title of President and Chief Operating Officer of Plaintiff Dark Circuit Labs, Inc. ("Plaintiff" or "DCL") in the above captioned action and as such, I am fully familiar with the facts relevant hereto.

2.   I respectfully submit this Affidavit in support of DCL's Motion for a Temporary Restraining Order ("TRO"), Preliminary Injunction, and Expedited Discovery pursuant to Federal Rule of Civil Procedure ("FRCP") 65, brought on by Order to Show Cause, against Defendants Black Sails Security LLC, ("BSS"), John Carpenter ("Carpenter"), Eric Missimer ("Missimer"), Michael Frank ("Frank"), and Keith Haddock ("Haddock") (collectively herein referred to as "Defendants") pending a determination of the relief requested in DCL's First Amended Verified Complaint ("FAVC").

#4918716v1

3. As alleged more fully in the FAVC, toward the end of 2022, if not sooner, while still employed by DCL and thereafter, Carpenter, Missimer, and Frank, singularly and in concert with Haddock, created a competing business, BSS, to obtain employment or otherwise obtain work with competing businesses, to divert DCL's existing and prospective customers and employees, to utilize DCL's trade secrets, and to deprive DCL access to its own trade secrets, all in violation of contractual, common law and statutory obligations, thereby causing damage to DCL for the benefit of Defendants. (Ex. B, ¶ 40).

4. Haddock is the Project Manager for Lockheed Martin Corporation ("LMCO") on the Task Order ("Task Order") under the IDIQ Contract ("IDIQ Contract") for which DCL renders services to LMCO by and through its employees.

5. Within the past several months, Haddock has commenced a course of conduct, along with the other Defendants to cause LMCO, a current client of DCL, to diminish and/or terminate its relationship with DCL and to usurp DCL of its employees, customers, and proprietary information through a conspiracy involving violations of the Defend Trade Secrets Act ("DTSA") and in breach of contractual, statutory, and common law obligations owed to DCL by Defendants. (Ex. B, ¶ 39).

6. This Affidavit is specifically submitted to supplement the FAVC to provide details related to Haddock's more recent use of DCL's trade secrets to, singularly and in concert with the other Defendants, induce DCL's employees to breach their restrictive covenant agreements with DCL.

7. To date, Haddock has approached the majority of DCL's employees working under the IDIQ Contract and made statements to induce them to terminate their employment relationships

2

#4918716v1

with DCL and either work for DCL's direct competitors under the IDIQ Contract or to start their own competitive business ventures in order to continuing working on the IDIQ Contract.

8. I personally discussed Haddock's statements with three current DCL employees.

9. While the details of these discussions are described herein, these three individuals are the only ones that have discussed these issues with DCL thus far and, based on their disclosures, DCL believes its other employees under the IDIQ Contract have been negatively impacted by Haddock's statements for the benefit of Defendants.

10. By way of background as to how I came to have these discussions with the three DCL employees, on or about March 10, 2023, DCL filed its initial Verified Complaint in this action. (Ex. A).[1]

11. On this same date, DCL convened a voluntary company "all hands" meeting open to all DCL employees.

12. The purpose of the voluntary all hands meeting was to answer any questions employees may have about Missimer and Carpenter's terminations for cause from DCL, which occurred on March 6, 2023, and the subsequent lawsuit that was filed against them and their competitive enterprise, BSS. (Ex. B, ¶ 156; *see* Ex. A).[2]

13. DCL is comprised of highly skilled software engineers, reverse engineers, and vulnerability researchers who possess appropriate Government security clearances to serve as a subcontractor to large organizations, such as Lockheed Martin Corporation ("LMCO"), to provide

---

[1] Unless otherwise noted, the factual statements referenced herein refer to the factual statements and the Exhibits annexed to the Declaration of Steven J. Weber, Esq. ("Weber Declaration" or "Weber Decl.") submitted in support of DCL's motion.

[2] DCL's March 10, 2023 Verified Complaint named only BSS, Carpenter, and Missimer as Defendants. (Ex. A). Frank and Haddock were not added as Defendants until DCL filed its FAVC on March 23, 2023. (Ex. B).

3

#4918716v1

cyber security personnel, tools, and expertise in support of the United States' National security missions. (Ex. B, ¶ 6).

14. The importance of DCL's ability to retain its highly skilled and Government cleared employees cannot be overstated because there is a limited pool of talent from which DCL can hire that is further limited by contractual requirements that such employees maintain high level security clearances.

15. Carpenter, Missimer, and Frank were security-cleared highly skilled DCL employees working on the Task Order under the IDIQ Contract who were subject to restrictive covenant agreements with DCL. (*See* Ex. B, ¶¶ 42, 59, 61; Exs. C, D, E).

16. DCL employee Paul Jalufka ("Jalufka") was in attendance for the March 10, 2023 all hands meeting.

17. Jalufka is a security-cleared highly skilled DCL employee working on the Task Order under the IDIQ Contract who is subject to an identical restrictive covenant agreement to that of Carpenter and Frank. (*See* Ex. B, ¶¶ 59, 61; Exs. D, E).

18. During the all hands meeting, Jalufka informed DCL's senior management, including Chase Bertke ("Bertke"), DCL's Chief Executive Officer ("CEO"), Lawrence Littleton ("Littleton"), DCL's Chief Financial Officer ("CFO"), and myself (collectively, "Senior Management"), that on or around March 8, 2023, Haddock, in his capacity as Project Manager for LMCO, approached Jalufka and fellow DCL employee Delfino Liban ("Liban") at the work site and stated that DCL was being removed from the IDIQ Contract and that DCL's funding would not be renewed for any successive option years after this option year's expiration date on August 3, 2023.

4

19. Liban is also a security-cleared highly skilled DCL employee working on the Task Order under the IDIQ Contract who is subject to an identical restrictive covenant agreement to that of Carpenter and Frank. (*See* Ex. B, ¶¶ 59, 61; Exs. D, E).

20. Jalufka further informed DCL's Senior Management that Haddock stated he wanted to keep all DCL developers on the IDIQ Contract, and that any developer who wanted to stay on would be introduced to DCL's competitors by and through Haddock in order to do so.

21. Jalufka also stated that he was aware that Haddock had approached all other DCL employees at the work site, in addition to himself and Liban, with this same information.

22. Despite Haddock's statements inducing DCL's employees to separate from employment and work for competitive enterprises based on his assertion that DCL was terminated from the IDIQ Contract, DCL had not received any formal notice of termination of its subcontract with LMCO.

23. On or about March 11, 2023 at or around 9:30 a.m., I spoke with Liban to follow up on the information regarding Haddock's statements provided by Jalufka at the voluntary all hands meeting.

24. During my conversation with Liban, Liban stated that in or around early February 2023, Haddock, in his capacity as Project Manager for LMCO, approached Liban stating that Haddock wanted to make Liban aware of "disagreements" within DCL.

25. Liban further stated that after DCL terminated Carpenter and Missimer on March 6, 2023, Haddock approached him and other DCL employees at the work site in his capacity as Project Manager for LMCO and told them they "need to find a new home," implying that DCL's employees needed to work for a new employer other than DCL to stay on the IDIQ Contract.

5

26. Liban stated that he interpreted Haddock's statement to mean that DCL was going to be removed from the IDIQ Contract, likely through DCL's remaining options not being exercised by LMCO.

27. Liban stated that Haddock further told Liban that he had several options, including finding new employment through another company already working on the IDIQ Contract or starting his own company and staying on the contract that way, and that Haddock advised he would "support" Liban in either instance.

28. Liban further expressed his disappointment that he learned of DCL's dispute with Carpenter and Missimer as it relates to their activities with BSS through Haddock and other rumors by third parties at the work site that DCL was attempting to negotiate Carpenter and Missimer's separations and that this information was not conveyed by DCL's Senior Management to Liban directly.

29. I informed Liban that DCL had not received any official notification from LMCO that DCL was being removed from the IDIQ Contract, but given Haddock's actions and statements to date, DCL was under the impression that it was being terminated and that DCL would continue to attempt to confirm its status regarding same with LMCO.

30. I further advised Liban that the reason DCL's senior management had not discussed these issues with DCL employees up until the March 10, 2023 all hands meeting was because DCL had been keeping all efforts to resolve this matter outside of court on a need-to-know basis per DCL's understanding that settlement negotiations were to remain confidential.

31. I expressed to Liban that it was a serious issue that he had heard rumors through other third parties, including Haddock, that were not party to negotiations or that such negotiations

6

were even occurring in the first place, especially as none of the information from the negotiations was shared outside of DCL's Senior Management.

32. I further stated to Liban that, based on Liban's disclosures, the only way third parties could have become aware of settlement negotiations was by and through Carpenter and/or Missimer, who in turn apparently communicated such information to Haddock and/or other third parties.

33. Approximately one week after my discussions with Jalufka and Liban, on March 17, 2023, during DCL's ongoing investigation into Defendants' misconduct and following an abrupt resignation by Frank on March 14, 2023, DCL discovered that Frank sent an email to Haddock using his DCL email address on February 24, 2023. (Exs. N, P; Ex. B ¶ 29).

34. Given Jalufka's knowledge that Haddock had spoken with DCL employees working under the IDIQ Contract at the work site on or around March 8, 2023, at the time of Frank's abrupt resignation a mere six days later, DCL believed that Frank had resigned because he was under the impression that he needed to find a new place to work based on Haddock's statements.

35. However, in his February 24, 2023 email, Frank admitted that he was communicating with Carpenter and Missimer "pretty much daily" and that Frank had known about and been involved with Carpenter and Missimer's plans related to BSS since "sometime last year" and that Frank was "fortunate enough to be in a position to help them." (Ex. N).

36. On or about March 23, 2023, DCL filed its FAVC, adding Frank and Haddock as new Defendants as a result of the newly discovered evidence regarding their unlawful conduct against DCL related to their ongoing conspiracy with BSS, Carpenter, and Missimer. (Ex. B).

7

#4918716v1

37. On or about March 30, 2023 at or around 9:00 a.m., DCL employee David Eisen ("Eisen") requested to speak with me regarding the status of his continued employment with DCL.

38. Eisen is also a security-cleared highly skilled DCL employee working on the Task Order under the IDIQ Contract who is subject to an identical restrictive covenant agreement to that of Carpenter and Frank. (*See* Ex. B, ¶¶ 59, 61; Exs. D, E).

39. During my conversation with Eisen, Eisen confirmed that Haddock had pulled Eisen and the other DCL developers aside at the work site and told them that they all needed to find new employment with competitors of DCL to stay on the IDIQ Contract, and express frustration at the current situation.

40. Defendants' continued solicitation of DCL's highly skilled employees has caused confusion and frustration, including but not limited to Jalufka, Liban, and Eisen, which may cause their departures from DCL, whether imminently or sometime in the future.

41. The loss of these highly skilled employees or others as a result of Defendants' conduct would cause even further damage to DCL than it has already incurred.

42. It is now abundantly apparent that, despite DCL's best efforts to resolve this matter out of court, court intervention is required as Defendants continue to cause harm to DCL to the present day by disparaging DCL, including but not limited to Defendants' efforts and specifically Haddock's statements to induce other highly skilled employees to depart from DCL throughout March 2023.

43. In light of the foregoing, DCL seeks to immediately enjoin Defendants from breaching, and/or aiding and abetting the breach of, their restrictive covenant agreements and misappropriating DCL's trade secrets in violation of federal and state law, and imposing such

8

#4918716v1

additional relief as may be appropriate until the Court has ruled on DCL's request for a preliminary injunction, as more fully outlined in DCL's Order to Show Cause.

44. DCL will continue to suffer extraordinary irreparable harm if Defendants are not immediately restrained and the expedited discovery in Plaintiff's Order to Show Cause is not ordered.

45. No prior application for the relief requested herein has been made to this Court or any other court of competent jurisdiction.

46. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 6, 2023

_____
RONALD PELKEY

#4918716v1