UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **DARK CIRCUIT LABS, INC.**,<br><br>Plaintiff,<br><br>vs.<br><br>**BLACK SAILS SECURITY LLC**,<br>**JOHN CARPENTER**, **ERIC**<br>**MISSIMER, MICHAEL FRANK,** and<br>**KEITH HADDOCK**,<br><br>Defendants. | Civil Action No.: 1:23-cv-00326-LMB-LRV |

**PLAINTIFF DARK CIRCUIT LABS, INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT ERIC MISSIMER'S MOTION TO DISMISS**

The Court should deny Defendant Eric Missimer's ("Missimer") Motion to Dismiss, pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), the First Amended Verified Complaint ("FAC") filed by Plaintiff Dark Circuit Labs, Inc. ("DCL") because DCL has sufficiently stated a claim under which relief can be granted for all claims in the FAC.

**COUNTERSTATEMENT OF FACTUAL AND PROCEDURAL BACKGROUND**

DCL is comprised of highly skilled software engineers, reverse engineers, and vulnerability researchers who possess appropriate U.S. Government security clearances to serve as a subcontractor to large organizations, such as DCL's client Lockheed Martin Corporation ("LMCO"), to provide cyber security personnel, tools, and expertise in support of United States' national security missions. (FAC, ¶ 6). Missimer was DCL's Chief Technology Officer and custodian of DCL's trade secrets on DCL's corporate network and is also a DCL shareholder. (FAC, ¶¶ 42, 44, 48-49). Defendant John Carpenter was a Senior Computer Network Operations ("CNO") Developer and Vice President ("VP") of DCL. (FAC, ¶ 57). Defendant Michael Frank

("Frank") was a Senior CNO Developer for DCL. (FAC, ¶¶ 57-59). Missimer, Carpenter, and Frank all have security clearances and are bound by restrictive covenants designed to protect DCL's confidential and proprietary trade secret information. (FAC, ¶¶ 6, 42, 59, 61). Defendant Keith Haddock ("Haddock" and together with BSS, Carpenter, Missimer, and Frank, collectively, "Defendants") is a Project Manager for LMCO. (FAC, ¶ 33).

On March 10, 2023, DCL initiated the instant action by way of Verified Complaint. (ECF No. 1). DCL filed the FAC on March 23, 2023.[1] (*See* FAC, ECF No. 3). In its FAC, DCL alleges that as early as November 2022, if not sooner, Carpenter, Missimer, and Frank conspired with Haddock to utilize, without restraint, DCL's trade secrets to convert DCL's contracts to an entity, BSS, owned and controlled by Defendants in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*, in violation of restrictive covenants applicable to Missimer, Carpenter, and Frank as shareholders, officers, and/or employees of DCL, and in violation of federal and state statutory and common law. (FAC, ¶¶ 127-132, 137, 142-146, 158-176; FAC, Exs. A, B, C). DCL alleges that Carpenter, Missimer, Frank, and Haddock were all discussing with each other the internal workings of DCL's business operations, including but not limited to DCL's client and employee relationships and business strategies. (FAC, ¶¶ 47, 58, 69-72, 82, 85-87, 103-112, 121, 125-126, 129-132, 136, 141-142). Instead of using such information for the betterment of DCL, Frank, singularly and in concert with the other Defendants, used intimate insider knowledge of

---

[1] Subsequent to filing the FAC, new facts emerged regarding Defendants' misconduct including via their own admissions that they are working for a direct competitor performing the same work under the same contract, (ECF Nos. 40-1, ¶ 51; 41-1, ¶ 47; 43-1, ¶ 37), and from DCL's employees who were solicited by Defendants as described in the Affidavit of Ronald Pelkey ("Pelky Aff.") and Reply Affidavit of Ronald Pelkey ("Pelkey Reply Aff."), both submitted in support of DCL's preliminary injunction motion and annexed to the Declaration of Steven J. Weber, Esq. ("Weber Decl.") to oppose the instant motion. (*See* Weber Decl., Exs. A, B). Even without the benefit of discovery, following the denial of the TRO, further wrongdoing by Defendants was uncovered by DCL's third-party forensic investigation and on June 16, 2023, DCL moved to amend its complaint to add new factual allegations related to Defendants' spoliation of evidence. (ECF No. 77).

DCL's trade secrets to join BSS who solicited DCL's largest client, LMCO, and employees for Defendants' benefit which is against the law. (FAC, ¶¶ 137, 145-146, 152, 154, 157).

Without the benefit of discovery, the allegations known to DCL to date related to elements of Missimer's plan with the other Defendants consist of the following unlawful actions:

(1) Forming BSS for the admitted purpose of engaging in work in direct competition with DCL, with the specific intent to acquire work from LMCO of the kind already being performed by DCL, indeed, it was their intention to replace DCL as a contractor to LMCO utilizing all of DCL's confidential and proprietary trade secret information and DCL's employees to execute that work. (FAC, ¶¶ 14-15, 68, 80, 82-83, 88-89).

(2) Used their knowledge of and access to DCL's trade secrets to solicit, induce, and interfere with DCL's relationship with LMCO and DCL's employees for the sole purpose of inducing them to quit DCL and join BSS by telling them that DCL was in hardship (which hardship was either false or caused by Defendants) and offering them refuge elsewhere which would have the effect of disabling DCL and enabling Defendants to compete/divert work to BSS, themselves, or other entities. (FAC, ¶¶ 82, 84-87).

(3) Missimer and Carpenter, during to the course of their employment, either had access to or wrongfully gained access to all of DCL's trade secrets information including but not limited to, employee salaries, financial records, identity of existing and prospective customers, contract and pricing terms with existing customers, staffing plans for existing and prospective customers, and communications with LMCO and others which they then exploited for their own use rather than for legitimate use for DCL's business; such access was exploited by Defendants for the purpose of diverting DCL's LMCO contract and employees to BSS or other third party entities or persons other than DCL. (FAC, ¶¶ 36, 60-61, 70-75, 172, 176, 180-187).

(4) Electronic data recovered to date shows that in and around the end of 2022 and beginning of 2023, either on their own or at the direction of the others, Defendants repeatedly viewed, accessed transferred and deleted data DCL's data with highly unusual frequency and when there was no legitimate DCL business purpose for doing so. (FAC, ¶¶ 20, 49, 180-187).

DCL alleges that it has suffered both ascertainable and irreparable harm, including loss of work, loss of employees, loss of access to all electronic data including business records and proprietary tools, and a diversion of DCL's work to its direct competitor, PLEX, all utilizing DCL's trade secret information. (FAC, ¶¶ 2, 41, 142).

On June 5, 2023, Missimer filed the instant Motion to Dismiss. (ECF No. 68). For the foregoing reasons and those set forth more fully below, the Motion should be denied.

## **LEGAL ARGUMENT**

## I.    **LEGAL STANDARD FOR DENYING A MOTION TO DISMISS.**

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). The FRCP require that the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). This pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To meet the Rule 8 standard and "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nadendla v. Wake*, 24 F.4th 299, 304-05 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). To contain sufficient factual matter to make a claim plausible, the factual content must "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When doing so, courts "accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018).[2]

Additionally, in considering a motion to dismiss under Rule 12(b)(6), courts may consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Bala v. Commonwealth of Virginia Dept. of*

---

[2] It should be noted that Missimer seeks dismissal of DCL's claims against him with prejudice. (Df Br. at 21). However, while the Court should deny Missimer's motion in its entirety, should the Court entertain Missimer's request, any claims subject to Rule 12(b)(6) dismissal should be dismissed without prejudice with the opportunity for DCL to refile claims against Missimer should new facts emerge. *See North Carolina v. McGuirt*, 114 F. App'x 555, 559 (4th Cir. 2005) (explaining that "dismissal with prejudice is an extreme sanction that must be examined carefully" because "[d]ismissing a claim with prejudice for failure to comply with [pleading standards] tends to undermine one of the policies of the Federal Rules of Civil Procedure: facilitating a decision on the merits rather than on pleading technicalities.") (citing *Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978)).

*Conservation and Rec.*, 532 F. App'x 332, 344 (4th Cir. 2013); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); *see also Stover v. College of William and Mary in Virginia*, ___ F. Supp. 3d ___, No. 4:21cv150, 2022 WL 10585341, at *6 n.1 (E.D. Va. Oct. 18, 2022) (considering a report that was not attached to the complaint in making a 12(b)(6) determination even where the defendants disputed the facts in the report). Accordingly, as the FAC was verified by Pelkey just as his two affidavits were verified, they should be considered and treated as allegations underlying the basis of the FAC for purposes of Missimer's instant motion.

## II.    DCL SUFFICIENTLY STATES CLAIMS AGAINST MISSIMER UPON WHICH RELIEF CAN BE GRANTED.

### A.    DCL Adequately Alleges that Missimer Misappropriated Trade Secrets under Counts 1 and 2.

Contrary to Missimer's misguided arguments, DCL states a claim that Defendants misappropriated DCL's trade secrets in violation of the DTSA, 18 U.S.C. §§ 1831-39, and the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336, *et seq*. Among other remedies, the DTSA provides injunctive and monetary relief for the misappropriation of trade secrets in civil actions. 18 U.S.C. § 1836 (b)(1). Under the DTSA, a "trade secret" is defined as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing. 18 U.S.C. § 1839(3).

The DTSA protects against "actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A).

The VUSTA's misappropriation elements are similar to that of the DTSA and require a plaintiff to prove: (1) the existence of a "trade secret"; and (2) the "misappropriation" of that trade secret by the defendant. *Trident Prods.& Servs., LLC v. Canadian Soiless Wholesale, Ltd*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012), *aff'd per curiam*, 505 F. App'x 242 (4th Cir. 2013). First, an alleged trade secret must "meet all the criteria listed in the statute: (1) independent economic value;

(2) not known or readily ascertainable by proper means; and (3) subject to reasonable efforts to maintain secrecy." *Id.*; *see also* Va. Code § 59.1-336; *see Audio-Video Group, LLC v. Green*, No. 1:14-cv-169, 2014 WL 793535, at *4-5 (E.D. Va. Feb. 26, 2014) (explaining that the alleged misappropriation of customer information was likely to violate the VUSTA). Second, a plaintiff must plead that the defendant: (1) acquired, disclosed, or used a trade secret developed by the plaintiff through improper means (namely, without express or implied consent); and (2) knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff. *Trident*, 859 F. Supp. 2d at 780.

Particularly relevant to this matter, in *Variable Annuity Life Ins. Co. v. Coreth*, the court held that the plaintiff demonstrated that its client information had independent economic value by virtue of its secrecy because a competitor armed with the plaintiff's confidential information, such as maturity dates, account balances, and the like, had the ability to target the plaintiff's most valuable clients, and that the reasonable efforts deployed to maintain the secrecy of the client information through several layers of servers and passwords, limited its availability to a need-to-know basis, and further restricted its access by requiring advisors to execute confidentiality agreements. 535 F. Supp. 3d 488, 514 (E.D. Va. 2021). Moreover, "'[w]here [a] defendant did not utilize 'improper means to acquire a trade secret,' misappropriation can still exist if the defendant disclosed or used that secret." *API Tech. Servs., LLC v. Francis*, No. 4:13cvl42, 2013 WL 12131381, at *2 (E.D. Va. Dec. 4, 2013) (quoting *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 417 (E.D. Va. 2004)).

Here, under the first element of a misappropriation claim, similar to *Coreth*, DCL alleges that the information concerning DCL's confidential and proprietary information is not generally known outside of DCL's business. (FAC, ¶¶ 215-217). Specifically, DCL alleges that it had and

has valuable trade secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the U.S. Government, including but not limited to hypervisor development, reserve engineering, and CNO tool development. (FAC, ¶¶ 215, 234, 249, 257). DCL also specifically identifies myriad reasonable measures that it has taken to keep such information secret. (FAC, ¶¶ 219-220, 238, 260). Similar to the plaintiff in *Coreth*, DCL further alleges that officers and employees, like Missimer, with access to DCL's information are required to comply with the aforementioned security measures and execute restrictive covenant agreements which include provisions that require such employees to maintain the confidentiality of DCL's proprietary information, including client lists and DCL's business plan and strategies. (FAC, ¶¶ 42, 52, 59, 61-62).

By way of the disclosures to DCL and the reasonable measures in place to protect DCL's trade secret information, substantial allegations exist in support of a claim of misappropriation of trade secrets based upon both Missimer's use of DCL's trade secrets to solicit clients, such as LMCO, in an effort to induce them to move their business away from DCL. (FAC, ¶¶ 133, 136, 141, 221). In the government contracting sphere, which is fiercely competitive, hourly rates and breakdowns of those rates into general and administrative, direct labor, and overhead costs are proprietary and trade secret information. Indeed, individual employee salaries are not disclosed during any part of the bidding process, which is just one of the many reasons Missimer's claims against DCL related to such issues are frivolous, and further shows that such information is considered as confidential and proprietary, especially in this highly competitive industry where knowing a competitor's employees' salaries and/or hourly rates provides an opportunity to undercut that competitor's bid for government subcontracting work.

Missimer and Carpenter had knowledge of and access to this trade secret information as it relates to the IDIQ Contract, which is the contract they and the other Defendants threatened to

steal from DCL until DCL was forced to file the instant action to stop them. (FAC, ¶¶ 33, 47, 58, 67-74, 176). Missimer and Carpenter knew DCL's rates and had access to the breakdowns thereof. Missimer and Carpenter misappropriated this trade secret information when they used and threatened to use their knowledge of DCL's hourly rates and breakdowns of those rates into general and administrative, direct labor, and overhead costs to inform their decisions to start their own competitive enterprise, BSS, and solicit DCL's largest client, LMCO, by way of Haddock and lure employees like Frank and others to their new enterprises using their insider knowledge of these employees' rates. (FAC, ¶¶ 47, 58, 180-185).

There is no possible reasonable measure of secrecy that could have been imposed by DCL to protect the information related to general and administrative, direct labor, and overhead costs from Missimer and Carpenter because Missimer was a shareholder, director, and officer, and Carpenter was an officer of DCL. (FAC, ¶¶ 42-51, 57-58, 221-222, 238-239, 260-261). Missimer and Carpenter were required to have access to this information in order to run the company in their various fiduciary capacities, whereby Missimer held a unique position of trust among the owners of the company as a DCL shareholder/co-founder and Treasurer. (FAC, ¶¶ 42-51, 57-58, 221-222). Missimer misappropriated this trade secret information through his conspiracy with Carpenter and the other Defendants as an employee of BSS. Indeed, DCL alleges that while both individuals were still employed by DCL and Missimer was still a Director and shareholder of DCL, Carpenter referred to Missimer as his employee (i.e., an employee of BSS). (FAC, ¶¶ 47, 58, 62, 218, 237).

Missimer attempts to convince the Court that the information he stole with the other Defendants is not protectable under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(A)(i). DCL is not required, for purposes of pleading threatened or actual misappropriation under the DTSA, to identify a "secret sauce" type recipe, such as source code or a specific product, that Missimer is incorrectly intimating is required in order for the DTSA to have teeth. *See Space Systems/Loral,*

*LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 853-54 (E.D. Va. 2018) (finding that the plaintiff "sufficiently ple[d] that it derived independent economic value from the documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic investment—the disclosure of which could create an unfair competitive advantage."). Without a doubt, DCL sufficiently pleads Defendants, singularly and in concert with one another, misappropriated its trade secrets under the "DTSA's *broad definition* of trade secrets." *Id.* at 853 (emphasis added); *see RLM Communications, Inc. v. Tuschen*, 831 F.3d 190, 202 n.4 (4th Cir. 2016) (finding that misappropriation existed when "the employer put forth evidence that the employee "accessed [the employer's] 'game plan' and other confidential documents from [the employer's] network with unusual frequency" just prior to a meeting with a competitor") (citation and internal quotation marks omitted) (alterations in original).

For purposes of satisfying the FRCP 12(b)(6) pleading standard, a "reasonable inference" can be drawn that Carpenter and Missimer were using and disclosing DCL's trade secrets for BSS based on Carpenter's unusual course of conduct and timing in twice downloading DCL's Business Plan a mere two weeks before he incorporated BSS. (FAC, ¶¶ 181-185). It is indisputable that DCL's Business Plan constitutes trade secret information under the broad definition of trade secrets under the DTSA and VUTSA because DCL "derive[s] independent economic value from the documents being kept secret because they contained financial data, business plans, and procurement strategies, and were created after considerable economic investment—the disclosure of which could create an unfair competitive advantage." *Space Systems*, 306 F. Supp. 3d at 853-54. As a result, DCL's trade secrets misappropriation claims under federal and state law in Counts 1 and 2 of the FAC are sufficiently pled and should not be dismissed.

9

**B.**     **DCL States a Claim for Violation of the VUCITA in Count 3.**

Missimer vaguely contends that DCL's allegations do not have any relation to the VUCITA. (Df Br. at 7-8). The VUCITA "applies to computer information transactions." Va. Code § 59.1-501.3. A computer information transaction is defined as "an agreement or the performance of it to create, modify, transfer, or license computer information or informational rights in computer information." Va. Code § 59.1-501.2(11). Computer information transactions under the VUCITA can include the digital transfer of informational rights, which includes trade secrets. Va. Code § 59.1-501.2(38). Specifically, the VUCITA defines "[i]nformational rights" to include all rights in information created under laws governing "all rights in information created under laws governing . . . *trade secrets* . . . or any other law that gives a person, independently of contract, a right to control or preclude another person's use of or access to the information on the basis of the rights holder's interest in the information." *Id.* (emphasis added). It is in the Court's sole discretion to determine whether a party asserts a viable claim under the VUCITA. Va. Code § 59.1-501.17.

Here, DCL alleges that it "had and has valuable trade secrets relating to their product and service offerings in interstate and/or foreign commerce, namely its provision of cyber security products and services marketed to the United States federal government including but not limited to hypervisor development, reverse engineering, and CNO tool development." (FAC, ¶ 249). In seeking to dismiss this cause of action, Missimer asserts that the "VUCITA explicitly exempts employment agreements." (Df Br. at 8). However, DCL alleges that Missimer is bound by a confidentiality provision to keep DCL's trade secrets confidential – this non-disclosure obligation survives his employment, and thus is not contingent upon his employment. *See* Va. Code § 59.1-506.16(b) (describing eleven circumstances that survive termination of a contract under the VUCITA); Va. Code § 59.1-506.16(b)(2) ("[A]n obligation of confidentiality, nondisclosure, or noncompetition."); Va. Code § 59.1-506.16(b)(4) ("[A]n obligation to deliver, or dispose of

information, materials, documentation, copies, records, or the like to the other party, an obligation to destroy copies"); Va. Code § 59.1-506.16(b)(10) ("[A]n obligation to provide an accounting and make any payment due under the accounting.").

DCL further alleges that, "[b]y and through the use of computer information transactions, Carpenter and Missimer and the other Defendants, singularly and in concert, purposefully or knowingly accessed, took, and destroyed Trade Secrets contained in data and/or databases and otherwise disseminated or utilized Trade Secrets belonging to DCL for their own benefit to the detriment of DCL." (FAC, ¶ 252). Thus, DCL has properly pled that it and Missimer entered into the non-disclosure clause of the Shareholders Agreement, which is enforceable separate and apart from Missimer's employment, and that such agreement constitutes "an agreement or the performance of it to create, modify, transfer, or license computer information or informational rights [such as DCL's trade secrets] in computer information," which was breached. *See* Va. Code § 59.1-501.2(11). These allegations are sufficient to survive a motion to dismiss that Missimer violated DCL's informational rights under the VUCITA, in the very least via DCL's allegation regarding Carpenter's computer transaction in downloading DCL's Business Plan for Defendants' benefit and Frank's admission in his email to Haddock that he had been involved with Carpenter and Missimer's activities for BSS early in the process of the competing venture's formation. (FAC, ¶¶ 141, 180-186). DCL's VUCITA claim should not be subject to pre-answer dismissal.

## C.    DCL States a Claim for Common Law Trade Secrets Misappropriation in Count 4.

Missimer argues that the VUTSA preempts DCL's common law misappropriation of trade secret claim. (Df Br. at 8-9). However, the VUTSA expressly states that it "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." *Babcock & Wilcox Co. v. Areva NP, Inc.,* 292 Va. 165, 205 n.51, 788 S.E.2d 237, 259 (2016). "The VUTSA preemption provision is 'intended to prevent

inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret.'" *Trident Prod. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 782 (E.D. Va. 2012), *aff'd*, 505 F. App'x 242 (4th Cir. 2013) (quoting *Smithfield Ham & Products Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995)). It should be noted that the *Babcock* court did not hold that any statute was preempted, but instead merely quoted a prefatory note to the UTSA and quoted a section of the VUTSA. *See Babcock*, 292 Va. at 205.

Rather, whether claims are preempted by the VUTSA is a question of fact and law, and at this stage of the proceedings, Carpenter does not and cannot demonstrate how DCL's misappropriation claim conflicts with the VUTSA. *See Rogers Elec. Of Va., Ltd. v. Sims*, 93 Va. Cir. 484, 2015 WL 13589667, at *2 (Va. Cir. Ct. Feb. 13, 2015); *Trident*, 859 F. Supp. 2d at 778 ("The determination of whether a trade secret exists is generally a question of fact to be determined 'from the greater weight of the evidence.'"). "The case law is clear that just about anything can constitute a trade secret under the right set of facts." *Id*. (quoting *MicroStrategy*, 331 F. Supp. 2d at 416). Unless it can be clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss DCL's misappropriation under common law. *E.I. DuPont de Nemours and Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 451 (E.D. Va. 2009). "Courts hesitate to assign the label of 'VUTSA trade secret' to proprietary information at the pleadings stage for fear of depriving parties the opportunity to conduct fact-finding on the issue." *Anderson v. Fluor Intercontinental, Inc.,* No. 1:19-CV-0289, 2021 WL 837335, at *17 (E.D. Va. Jan. 4, 2021).

In *AWP, Inc. v. Commonwealth Excavating, Inc.,* the court held that the defendant's preemption argument in support of a motion to dismiss was premature. No. 5:13CV031, 2013 WL 3830500, at *7 (W.D. Va. July 24, 2013) (citing *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., Inc.*, 191 F. Supp. 2d 652, 659 (E.D. Va. 2002) (concluding that "unless it can be

clearly discerned that the information in question constitutes a trade secret, the Court cannot dismiss alternative theories of relief as preempted by the VUTSA.")). The court reasoned that "although [the plaintiff] ha[d] sufficiently alleged the existence of a trade secret, it ha[d] not yet proven its entitlement to relief under the VUTSA." *Id.; see also Bonumose Biochem, LLC v. Yi-Heng Zhang*, No. 3:17-cv-33, 2018 WL 10069553, at *15 (W.D. Va. May 21, 2018) (denying a motion to dismiss a civil conspiracy claim "arguably [] premised solely on the misappropriation of confidential, proprietary information" because the determination of whether such information qualified as a trade secret presented a question of fact that the parties disputed).

While Missimer may disagree and challenge the trade secret status of DCL's confidential and proprietary information, the motion to dismiss stage is not the proper time to make this argument. As in *AWP*, it is unknown whether DCL will be successful on all the elements of its VUTSA claim without the benefit of discovery. Therefore, dismissal of DCL's misappropriation of trade secrets claim under common law would be premature.

**D.      DCL States a Claim for Breach of Contract against Missimer, Aiding and Abetting Breach of Contract against Missimer, and Tortious Inference with Contractual Relations against Missimer in Counts 5, 7, and 10.**

As it relates to its contractual claims, DCL alleges that, on November 3, 2021, Missimer entered into a DCL Shareholders Agreement ("Shareholders Agreement") for purposes of setting forth the shareholders' respective rights, duties, and obligations as owners of DCL, including but not limited to restrictive covenants and non-disclosure obligations by which Missimer agreed to abide. (FAC, ¶ 42; FAC, Ex. A). DCL further alleges that, as a Senior CNO Developer and VP of DCL, Carpenter entered into the Restrictive Covenants Agreement on December 20, 2021 as it relates to his employment with DCL, including but not limited to covenants not to compete or solicit. (FAC, ¶ 59; FAC, Ex. B). Finally, DCL alleges that Frank executed an identical Restrictive Covenants Agreement to that of Carpenter on July 30, 2022. (FAC, ¶ 61; FAC, Ex. C). In seeking

dismissal of DCL's various contractual claims, Missimer asserts that the restrictive covenants are unenforceable. (Df Br. at 9). He is mistaken.

There are two separate written agreements at issue and both must be examined as it relates to Missimer's arguments for dismissal of DCL's contractually related claims because DCL alleges that Missimer not only breached his own contract but that Missimer aided and abetted Carpenter and Frank's breaches of contract and tortiously interfered with Carpenter and Frank's contracts. (FAC, ¶¶ 42, 59, 61). While Carpenter and Frank's respective Restrictive Covenants Agreements are governed under Virginia law, the Shareholders Agreement by which Missimer is bound for purposes of restrictive covenants is governed by Delaware law with Virginia courts selected as the venue for disputes. (*Compare* FAC Exs. B and C *with* Ex. A).

With regard to Carpenter and Frank's restrictive covenants, for a cognizable breach of contract claim under Virginia law, a plaintiff must plead that the: (1) defendant owes a legally enforceable obligation to the plaintiff; (2) defendant has breached that obligation; and (3) plaintiff has suffered damages as a result of the breach. *Design & Prod., Inc. v. Am. Exhibitions, Inc.,* 820 F. Supp. 2d 727, 736 (E.D. Va. 2011) (citing *Filak v. George,* 267 Va. 612, 619, 594 S.E.2d 610, 614 (Va. 2004)). As it relates to Missimer's restrictive covenants, the elements of a breach of contract claim are substantially similar under Delaware law to that of Virginia law. To plead a claim for breach of contract in Delaware, the plaintiff must allege that: (1) a contract existed between the parties; (2) the defendant breached his obligation imposed by the contract, and (3) the plaintiff suffered damages as a result of the defendant's breach. *VLIW Technology, LLC v. Hewlett–Packard, Co.*, 840 A.2d 606, 612 (Del. 2003).

As a threshold argument, Missimer asserts that Virginia law, as opposed to Delaware law, should apply to the Shareholders Agreement. (Df Br. at 10-11). DCL is incorporated in Delaware and adheres to filing and reporting requirements of the state as a Delaware corporation. (FAC,

¶¶ 2, 5). The Shareholders Agreement, which Missimer executed, also designates Delaware law as governing law, further evidencing the corporation's ties to the state. (FAC, Ex. B). As much as he would like to evade this fact, Missimer is not a rank-and-file employee. Missimer is a DCL shareholder, (FAC, ¶¶ 3, 13), and as an owner and co-founder of the company, he expressly agreed to be governed by Delaware law when he agreed and helped to incorporate DCL in that state. *Run Them Sweet, LLC, v. CPA Global Limited*, 224 F. Supp. 3d 462, 466 (2016) ("[N]o word or clause in a contract will be treated meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract."); *Settlement Funding, LLC v. Von Neumann-Lillie*, 274 Va. 76, 645 S.E.2d 436 (2007) (holding that a Virginia trial court erred in refusing to apply Utah law in construction of loan agreement when the contract clearly indicated its application). Accordingly, DCL submits that the parties to the Shareholders Agreement mutually selected Delaware law to govern disputes and as such Delaware law should be applied.

However, regardless of whether Delaware or Virginia law applies, DCL has adequately pled its breach of contract claim against Missimer, the aiding and abetting of breaches of Carpenter and Frank's contracts by Missimer, and tortious inference with Carpenter and Frank's contracts by Missimer. (FAC, ¶¶ 327-335). Under the first element, DCL has alleged that respective contracts exist between DCL and Carpenter, Missimer, and Frank. (FAC, ¶¶ 42, 59, 61). DCL alleges that Carpenter, Missimer, and Frank were provided with access to proprietary data, nonpublic information, trade secret, and confidential and proprietary information and in exchange Carpenter, Missimer, and Frank agreed to maintain confidentiality and not misappropriate DCL's trade secrets and proprietary information and not solicit DCL's existing or prospective clients or employees. (FAC, ¶¶ 13, 62). *See also Davis Mem'l Goodwill Indus. v. Garada,* No. 17-CV-347, 2017 WL 11613374, at *3 (E.D. Va. Apr. 17, 2017) (finding that the defendant's mere execution of the contract was sufficient to meet the first element of a breach of contract claim). Thus, Carpenter,

Missimer, and Frank's execution of their respective employment agreements, as evidenced by the three executed contracts annexed to the FAC, (FAC, Exs. A, B, C), shows that DCL adequately pled under the first element that Carpenter, Missimer, and Frank "owe[d] a legally enforceable obligation to" DCL with no further examination required by this Court at the pre-answer motion to dismiss stage when the allegations in the complaint must be viewed as true in favor of DCL as the non-moving party. *See Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 n.4 (4th Cir. 1993) ("In light of the standard of review, we traditionally have viewed even poorly drafted complaints in a light most favorable to the plaintiff.").

To the extent that Missimer's arguments regarding reasonableness are considered as to whether DCL met the first element, this Court should find that the restrictive covenants are reasonable because they are not greater than necessary to protect DCL's legitimate business interests. In Virginia, restrictive covenants are examined with regard to the legitimate interests of the employer, the employee, and the public at large. *Gray*, 2010 WL 4646039, at *2. "Such legitimate business interests might include trade secrets, other confidential information, or . . . the good will the employer has acquired through dealings with his customers." *Id.* A plaintiff must establish that the restraint (1) is no greater than necessary to protect a legitimate business interest, (2) is not unduly harsh or oppressive, and (3) is reasonable in light of public policy. *See Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 561 S.E.2d 694, 695 (Va. 2002).

In *Coreth*, the plaintiff, a life insurance company, pled alternative theories, as here, that the defendants, former financial advisors, misappropriated trade secrets and breached their contracts under federal and state law. 535 F. Supp. 3d at 493-94. The *Coreth* defendants maintained that the plaintiff's claims were "based solely on hearsay, couched in conclusory terms, pure speculation, and erroneous assertions of fact." *Id.* at 506. Unpersuaded by the defendants' arguments, the *Coreth* court held that the defendants were bound to an enforceable agreement where the plaintiff

had agreed to grant the defendants access to its confidential and proprietary information and the use of company property in exchange for the defendants not to misappropriate, acquire, use, or disclose customer names, contact information, and account balances for any purposes other than in furtherance of their duties undertaken on behalf of the client. *Id*. at 505-08. The *Coreth* court concluded that the plaintiff adequately alleged that the defendants breached their restrictive covenants when it alleged that they "jotted down the names, addresses, telephone number and/or email addresses and, in some instances approximated account values, of clients" and caused clients to end or alter their relations because of their contact with the defendants. *Id*. at 505-08.

Likewise, Delaware courts "carefully review" noncompete and nonsolicit agreements to ensure that they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities." *Ainslie v. Cantor Fitzgerald, L.P.*, No. 9436-VCZ, 2023 WL 106924, at *8 (Del. Ch. Jan. 4, 2023) (quoting *FP UC Hldgs., LLC v. Hamilton*, No. 9436-VCZ, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020)). When employees have access to confidential information, such access provides employers with a legitimate business interest in a restrictive covenant and renders covenants not to compete more reasonable. *See Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 739 (4th Cir. 1993); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 553, 290 S.E.2d 882, 885 (1982) (finding covenant enforceable when an employee had access to confidential information and such knowledge "qualified him to be a formidable competitor" to his previous employer).

As it relates to duration, Carpenter, Missimer, and Frank are prohibited for one year from their termination dates from competing with DCL with Carpenter and Frank being restrained for one year and Missimer for two years from solicitation of DCL's clients, candidates, and employees. (FAC, ¶¶ 53-54, 63-64). Courts in this District have found these temporal limitations

to be reasonable under similar circumstances. *See Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 789 (E.D. Va. 2018) (holding that "a one-year duration for the non-solicitation and non-compete agreement is reasonable because plaintiff invests significant resources in its legal services clients and built relationships with many of them through [the] defendant's work on behalf of [the] plaintiff"); *Hair Club for Men, LLC v. Ehson*, No. 1:16-cv-236, 2016 WL 4577019, at *5-6 (E.D. Va. Aug. 31, 2016) (finding that two years was reasonable). Indeed, the Supreme Court of Virginia has deemed reasonable even longer restricted periods. *See Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 374, 389 S.E.2d 467, 470 (1990) (upholding a three year non-compete); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 290 S.E.2d 882, 885 (1982) (upholding that a three-year restriction and that the company had a legitimate business interest in preventing the use of "lists of customers, lists of suppliers, detailed knowledge of overhead factors, pricing policies, and bidding techniques" by an employee-competitor). Thus, the one- and two-year restrictions at issue in this case are reasonable in duration.

Missimer also eagerly rushes to point out that there is "no geographic limitation" in the restrictive covenants in a wholly misguided attempt to destroy their enforceability. (Df Br. at 9, 13-14). In making this argument, however, Missimer critically omits that "[t]he considerations of function, geographic scope, and duration are not separate and distinct issues: a single consideration that is unreasonable may be reasonable as construed in light of the other two." *Cantol, Inc. v. McDaniel*, No. 2:06CV86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006). Thus, as long as the function and duration are reasonably construed, the fact that there is no narrowed geographic limitation does not necessarily render a restrictive covenant unenforceable. *See Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011) (holding that "[a]lthough the lack of a geographical limitation favors defendant, it is outweighed by the nature of the businesses at issue, [the former employer]'s *legitimate interest in protecting itself from direct competition by a former*

*employee in a niche market*, and the limitations within the Agreement, particularly the one-year duration of the non-compete and non-solicitation provisions. For these reasons, the non-compete provision is *not invalid*.") (emphasis added).

In this case, while the restrictions are not limited to a certain geographic area, DCL's operations are applicable to the entirety of the United States and beyond pursuant to its work under U.S. government contracts. (FAC, ¶¶ 1, 83, 215). Missimer bizarrely argues that "DCL has no protectable business interest in preventing its former employees from working in noncompetitive roles" and, with much hyperbole, states that Missimer would be restricted from working even in an "ice cream parlor" in "any country." (Df Br. at 13). DCL would not and does not allege that it seeks to prevent its former employees, such as Missimer, from serving ice cream halfway across the world. Missimer seeks to work, and in fact has admitted that he is already working, on the same exact contract (i.e., IDIQ Contract) for the same exact client (i.e., LMCO) for whom he was working when he was an employee of DCL. It does not matter whether Missimer is working in Virginia or, to use Missimer's extreme example which was made for purposes of misleading or distracting the Court, any other country in the world, as long as he is seeking to work under the exact same LMCO contract for a director competitor of DCL, which is precisely what he is doing. If Missimer was seeking to work in another state or country on a contract that was not the IDIQ Contract and not for direct a competitor of DCL then these parties would not be before this Court.

Moreover, as recently as 2012, the Supreme Court of Virginia upheld non-competition and non-solicitation provisions that cover past clients with whom the employee had direct contact even in the absence of a geographical limit. *See Preferred Systems Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 394, 732 S.E.2d 676 (Va. 2012) (holding that "[t]he lack of a specific geographic limitation is not fatal to the covenant"). As the court found in *Cantol* and *Brainware*, there is no geographic restriction that could have been reasonably imposed to protect DCL's

"legitimate interest in protecting itself from direct competition by a former employee[s, Carpenter, Missimer, and Frank,] in a niche market" of offensive cybersecurity contracting in support of the U.S. Government's national security missions. *Brainware*, 808 F. Supp. 2d at 827. (FAC, ¶¶ 1, 83, 215). Similar to the *Brainware* court's finding, the restrictive covenants should not be struck down for lack of a geographical limitation because they are reasonable in function and duration.

Missimer further argues that because restrictive covenants are "disfavored restraints on trade," the employer bears the burden of proof and any ambiguities in the contract will be construed in favor of the employee. (Df Br. at 12). However, Missimer fails to acknowledge the Supreme Court of Virginia's holding in *Omniplex World Services Corp. v. U.S. Investigations Services, Inc.*, 270 Va. 246, 249, 618 S.E.2d 340 (2005), where the Court explained "[e]ach non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Id.* The *Omniplex* Court continues that "[t]hese standards have been developed over the years to strike a balance between an employee's right to secure gainful employment and the employer's legitimate interest in protection from competition by a former employee based on the employee's ability to use information or other elements associated with the employee's former employment." *Id.* at 249.

Here, when evaluating each restrictive covenant at issue on its own merits, this Court should find that the provisions, although broad, are enforceable due to the unique circumstances at issue. Namely, DCL is a provider of highly specialized services for which there is a limited pool of government-cleared talent. (FAC ¶¶ 6, 10, 41). This fact makes DCL's employees its most valuable asset in which it invests tremendous efforts and resources to recruit, train, and retain. Put simply, DCL alleges that Defendants used their insider knowledge regarding DCL to try to steal DCL's most valuable asset by repeatedly threatening DCL's employees that they would no longer be employed by DCL because DCL was losing its LMCO subcontract. (FAC ¶ 145-146).

Carpenter, Missimer, and Frank can still ply their trades as developers and engineers as long as they are not working for DCL's competitors, such as BSS or PLEX, who contract with DCL's existing or prospective clients for the duration of the restricted period. There is likely not a more blatant need for broad non-competition and non-solicitation provisions such as the ones at issue here to be enforced when "*balancing the provisions of the contract with the circumstances of the businesses and employees involved.*" *Omniplex*, 618 S.E.2d at 249 (emphasis added).

Under the second element of the breach of contract pleading standard, based on DCL's allegations related to Defendants' own disclosures to DCL's senior management and allegations regarding numerous emails, text messages, and a voicemail evidencing their intent and actions, there can be no reasonable dispute that DCL has sufficiently pled that Defendants misappropriated DCL's trade secrets and proprietary information in their efforts to solicit DCL's customers for purposes of a direct competitor, BSS, in direct breach of their contractual obligations to DCL. (FAC, ¶¶ 73-74, 79-81, 102-112, 133, 141, 169-171, 180-187). As it relates to the third element, DCL alleges that at present, its damages as a result of Defendants' conduct include but are not limited to: "(1) lost revenue to DCL under the IDIQ Contract and its reasonable expectation of an extension of that Contract; (2) loss of employees and expenses associated with recruiting and retaining employees with appropriate skills and security clearances; (3) irreparable harm to its business relationship and reputation with existing and prospective clients including LMCO and others; (4) irreparable harm to its business relationships and reputation with existing and prospective DCL employees; (5) irreparable harm to DCL's ability to be competitive as a result of misappropriated Trade Secrets; and (6) loss of employees and damages related to obtaining highly skilled and properly cleared employees and personnel to perform work on DCL contracts." (FAC, ¶ 41). As such, DCL has stated its breach of contract, aiding and abetting of breach of contract, and tortious interference with contractual relations claims sufficiently to survive dismissal.

**E.**    **DCL Has Stated a Claim that Missimer Breached and Aided and Abetted Breaches of Fiduciary Duty and Duty of Loyalty in Counts 6 and 7.**

Missimer contends that DCL's breach, and aiding and abetting breaches, of fiduciary duty and duty of loyalty claims should be dismissed because they are "premised almost entirely on [DCL's] . . . allegation that . . . Missimer misappropriated trade secrets" and that "Missimer had planned to work for BSS." (Df Br. at 15). Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach of fiduciary duty resulted in damages. *Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020) (citing *Carstensen v. Chrisland Corp.*, 247 Va. 433, 442 S.E.2d 660, 666 (1994)). A fiduciary duty exists when special confidence has been imposed on an individual who is, as a result, legally obligated to act in the best interest of the party that imposes the special confidence. *Allen Realty Corp. v. Hobert*, 227 Va. 441, 318 S.E.2d 592, 595 (1985). As it relates to the duty of loyalty, "[w]hile free competition in the marketplace is to be encouraged, it is also critically important that employees take seriously the duty of loyalty they owe their employers." *Nat'l Legal Research Grp., Inc. v. Lathan*, 42 F.3d 1386, 1386 1994 WL 667058, at *2 (4th Cir. 1994); *see Marsteller v. ECS Fed., Inc*., No. 1:13-cv-593, 2013 WL 4781786, at *9 (E.D. Va. Sept. 5, 2013) ("[T]he Supreme Court of Virginia noted, 'liability for breach of fiduciary duty has been imposed when the employees or directors misappropriated trade secrets, misused confidential information and solicited an employer's clients or other employees prior to termination.") (quoting *Feddeman & Co v. Langan Associates*, 260 Va. 35, 42, 530 S.E.2d 668 (Va. 2000)).

Missimer challenges DCL's aiding and abetting breach of fiduciary duty and duty of loyalty cause of action, arguing that there is no cause of action for aiding and abetting the breach of these duties. (Df Br. at 15-16). However, courts in this District have explained that "[t]he

confusion surrounding whether Virginia recognizes a cause of action for aiding and abetting a breach of fiduciary duty appears to stem from the Supreme Court of Virginia's decision in *Patteson v. Horsely*, 70 Va. 263 (Va. 1877)." *Keil v. Seth Corporation*, No. 3:21cv153, 2021 WL 5088242, *12 (E.D. Va. Nov. 2, 2021). The *Keil* court explained that "[s]ince *Patteson*, the Supreme Court of Virginia has neither expressly recognized nor expressly rejected aiding and abetting a breach of fiduciary action as a separate cause of action" and that it has "[i]nstead . . . assumed the existence of the cause of action to evaluate whether a plaintiff had properly pled a claim." *Id.* (citing *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 604 S.E.2d 403, 411-12 (2004)); *see also AvalonBay Cmtys., Inc. v. Willden*, No. 1:08-cv-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009) (holding a defendant liable for aiding and abetting his brother's breach of fiduciary duty when he processed fraudulent invoices that harmed his brother's employer).

Here, it is indisputable that Missimer, as a shareholder, and Carpenter, as an officer, owed a fiduciary duty and duty of loyalty to DCL. Additionally, as an employee of DCL, it cannot be disputed that Frank owed a duty to loyalty to DCL. In fact, Missimer does not dispute that "[a]n employee, including an employee at-will, owes a fiduciary duty of loyalty to his employer during his employment." *Williams v. Dominion Tech. Partners, LLC*, 576 S.E.2d 752, 757 (Va. 2003). Thus, the first element is met. As for the second element, for the same reasons as discussed above, Missimer breached his duties to DCL when he engaged in the competitive activities that serve as the basis of DCL's FAC, including assisting Carpenter and Frank with launching BSS for purposes of usurping the LMCO contract *during* his employment. (FAC, ¶¶ 14-15, 68, 80, 88-89). DCL has sufficiently pled facts to show that Missimer, a shareholder, director, officer, and employee of DCL who knew that Carpenter was an officer of DCL and that Frank was an employee of DCL, knew of Carpenter and Frank's duties to DCL, and worked with them to assist in their breaches of duties regardless of this knowledge. (FAC, ¶¶ 25-28, 47, 57-58, 69-72, 82, 85-87, 103-112, 121).

Missimer further argues that he "had the right to arrange to make plans to resign from DCL," citing *Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.*, 260 Va. 35, S.E.2d 668 (2000), in support of this proposition. (Df Br. at 15). However, *Feddeman* states no such thing, with the court in *Feddeman* instead finding that "[t]he evidence shows that these defendants *did more* than prepare to leave their employment and advise others of their plan." 260 Va. at 43-44, 530 S.E.2d at 673 (emphasis added). DCL similarly alleges that Missimer did far more than simply plan to leave his employment and inform others of his departure. Thus, Missimer's argument regarding "mak[ing] plans to resign" not being actionable is a red herring.

With regard to damages, there is no question that DCL has alleged that it has been damaged because of Missimer's breach as DCL alleges that its relationship with LMCO has been damaged as a direct result of his and the other Defendants' conduct. (FAC, ¶¶ 38-39, 133-136, 210). Any arguments by Missimer regarding the merits of this allegation is of no moment as it relates to a motion to dismiss. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) ("[I]mportantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim . . . ." (citation omitted)). Accordingly, DCL has stated claims for both breach of the duty of loyalty against Missimer and aiding and abetting Carpenter and Frank's breaches of fiduciary duty by Missimer for purposes of a FRCP 12(b)(6) motion to dismiss.

**F.**    **DCL States a Claim of Unfair Competition Against Missimer in Count 8.**

Virginia unfair competition law encompasses a variety of practices that cause an economic injury to a business, through a deceptive or wrongful business practice. *See Duggin v. Adams*, 234 Va. 221, 228, 360 S.E.2d 832, 837 (1987) (stating that "[s]harp dealing, overreaching, or unfair competition may also constitute improper methods" of engaging in commerce). As noted by Missimer, the most popular example of common law unfair competition is trademark infringement as it relates to the "palming off" of goods. (Df Br. at 16). However, in addition to trademark

24

infringement and other egregious business practices, Virginia courts have found that unfair trade practices include anti-competitive market practices, interference with business relationships, use of confidential information by former employees to solicit customers, theft of trade secrets, and breach of a restrictive covenant. *See Preferred Systems*, 284 Va. at 404, 732 S.E.2d at 688 (explaining that "improper methods or means [of commercial practice] generally involve . . . misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching, or unfair competition"); *Peace v. Conway*, 246 Va. 278, 282, 435 S.E.2d 133, 135 (1993) (finding no "improper methods" of competition because the employer "could have required his employees to execute covenants not to compete, which would "have prohibited [the former employees] from soliciting those customers upon termination of the employment relationship"). The types of "improper methods" listed above are grounded in notions of fair and unfair competition. DCL has alleged that each of the above unfair practices were perpetrated by Defendants in the FAC, (FAC, ¶¶ 300-310), and as such, it is premature to dismiss DCL's claim of unfair competition.

**G.    DCL Has Stated a Claim that Missimer Tortiously Inferred with a Prospective Economic Advantage and Contractual Relationship in Counts 9 and 10.**

For its claims of tortious interference with contract or prospective economic advantage to survive dismissal, DCL must plead (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit," (2) that Defendants had "knowledge of the relationship or expectancy," (3) "that it was reasonably certain that absent intentional misconduct, [DCL] would have continued in the relationship or realized the expectancy," and (4) "that [DCL] suffered damages from the interference." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir. 2021) (quoting *Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (applying Virginia law)). "Among the most egregious examples of

improper conduct are those 'that are-illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules," including but not limited to misuse of confidential information and breach of a fiduciary relationship. *Commerce Funding Corp. v. Worldwide Sec. Services Corp.*, 249 F.3d 204, 214 (4th Cir. 2001) (citing *Maximus, Inc., v. Lockheed Info, Sys., Inc.*, 254 Va. 408, 493 S.E.2d 375 (1997)).

Here, DCL pleads the existence of its business relationship with LMCO and that its employees, including Carpenter, Missimer, and Frank, worked under its LMCO contract with Haddock. (FAC, ¶ 33, 67, 71). DCL further alleges that without Carpenter, Missmer, and Frank intentionally engaging in competitive activities against DCL while they were still employed, and in the case of Missimer, while still an owner of the company, and without Haddock's use of DCL's confidential information conveyed to him by Carpenter and Missimer to strong-arm DCL into handing over its LMCO subcontract to BSS, DCL's subcontract with LMCO would not be at risk and DCL's employees would not be scared about losing their jobs. (FAC, ¶¶ 82, 87,127-142, 144-146). Finally, there can be no reasonable dispute that DCL alleges that it has been damaged by Defendants' interference because it was forced to expend significant resources, including filing the instant lawsuit, to stop Defendants from any further interference. (FAC, ¶¶ 2, 41).

Missimer asserts that DCL does not "identify a contract that . . .  Missimer allegedly interfered with." (Df Br. at 17). This statement is patently absurd as the FAC is replete with allegations regarding both its IDIQ Contract with LMCO, (FAC, ¶¶ 33, 37, 129, 151-152, 208-210), and the restrictive covenants to which Carpenter, Missimer, and Frank are bound, and even annexes the executed agreements to the FAC. (FAC, Exs. A, B, C). Missimer clearly interfered with these contracts and that is exactly what DCL alleges. Missimer further argues that the restrictive covenants at issue are unenforceable, but as explained in detail in Point II.D, *supra*, the restrictive covenant provisions are enforceable, which is fatal to Missimer's specious argument.

Missimer also contends that DCL has not alleged that they engaged in any intentional interference or that he used "improper methods" to terminate DCL's contractual relationship with LMCO or DCL's employees. (Df Br. at 17). This statement is belied by the FAC which specifically address Missimer's improper methods to interfere with DCL's contractual relationships with its employees and LMCO. (FAC, ¶¶ 36, 60-61, 70-75, 82-83, 87, 172, 176, 180-187).

Specifically, DCL alleges that Carpenter and Missimer solicited LMCO for DCL's IDIQ Contract for BSS using DCL's trade secrets from his knowledge of DCL's Business Plan, which includes but is not limited to DCL's list of prospective and existing customers, detailed breakdowns of bidding strategies and pricing information, staffing forecasts for existing and prospective contracts, and assessments of DCL's ability to win a bid. (FAC, ¶¶ 36, 60-61, 70-75, 172, 176, 180-187). At least one employee, in addition to Frank, was solicited for purposes of employing them with BSS using Missimer's knowledge of DCL's proprietary employee salaries. (FAC, ¶¶ 82-83, 87; *see* Weber Decl., Exs. A, B). When viewing these allegations in the most favorable light to DCL as the non-moving party, there are more than enough allegations to show that DCL sufficiently pled that Missimer tortiously interfered with DCL's contracts and business expectancy. Counts 9 and 10 should not be subject to dismissal.

## H.    DCL States a Claim of Civil Conspiracy Against Defendants in Count 11.

According to Virginia common law, a civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744 (1985). To plead civil conspiracy, a plaintiff must allege the defendants combined together to effect a "preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy." *Bull v. Logetronics, Inc.*, 323 F. Supp. 115, 131 (E.D. Va. 1971) (citations omitted).

27

Here, Missimer argues that DCL's conspiracy cause of action is "vague" and inaccurately states that DCL is only relying on a singular allegation to support its conspiracy claim. (Df Br. at 19). DCL's conspiracy claim incorporates all prior paragraphs of the FAC by reference and thus they are part of DCL's conspiracy claim. (FAC, ¶ 337). DCL has alleged particular facts sufficient to show that Defendants have acted singularly and in concert with one another, including allegations that Haddock and Missimer directly disclosed to DCL on January 25 and 26, 2023 that they were working with Carpenter to divert DCL's LMCO contract to BSS. (FAC, ¶ 67). DCL further alleges that Carpenter referred to Missimer as his employee (i.e., an employee of BSS) on January 30, 2023 when both individuals were still employed by DCL, and that Haddock repeatedly made phone calls to DCL trying to force DCL to let BSS steal its contract. (FAC, ¶ 67-69, 82, 124-126, 129-137). These allegations alone would be enough for purposes of alleging conspiracy.

However, yet another example of the conspiracy being pled with particularity is an email that DCL discovered subsequent to Frank's abrupt resignation on March 14, 2023. (FAC, ¶¶ 141, 157). While Frank was still an employee of DCL, he utilized his DCL email account to communicate with Haddock via Haddock's LMCO email address via an email sent on February 24, 2023, stating that he "talk[s] to John & Eric pretty much daily about what's going" and "was in a position to help them," but that "BSS will not be setting sail anytime this year" (FAC, ¶ 141). DCL expressly alleges that Frank's email demonstrates Defendants were actively working together behind the scenes to unlawfully divert DCL's interests under the IDIQ Contract as well as shift DCL employees to PLEX, DCL's direct competitor, once DCL made it clear that it would not allow its business to be stolen. (FAC, ¶ 142). While Missimer disputes DCL's interpretation of this email, the email speaks for itself and regardless, such a dispute goes to the merits of DCL's claims and has no bearing on a motion to dismiss. *See Republican Party of N.C. v. Martin*, 980

F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts[ or] the merits of a claim . . . .").

Additionally, DCL further alleges conspiratorial conduct by Defendants by making allegations regarding Haddock's February 9, 2023 voicemail, where Haddock unequivocally stated that DCL was being terminated because Carpenter and Missimer were threatening to quit. (FAC, ¶ 133). A reasonable inference can be drawn from Haddock's voicemail that DCL was being terminated solely because of Carpenter and Missimer as it relates to their conspiracy with Haddock to unlawfully divert DCL's contract with LMCO to BSS. Defendants' conspiracy is self-evident on the face of the FAC and DCL pleads multiple particular factual allegations regarding their concerted conduct to survive a motion to dismiss on its civil conspiracy claim.

I.    **Without the Benefit of Discovery, It is Premature for Missimer to Argue that DCL is Not Entitled to Permanent Injunctive Relief.**

It is premature for Missimer to argue that DCL's claim for a permanent injunction should be dismissed. Missimer intimates that nothing has changed since DCL moved for its temporary restraining order and preliminary injunction, but as explained above, DCL has moved to amend its complaint to add new factual allegations and causes of action related to Defendants' destruction of evidence. Without the benefit of full and fair discovery, Missimer has no legal basis to argue that DCL's claim for permanent injunctive relief should be subject to dismissal. *See Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (holding that "because we are at the motion to dismiss stage, we see no need to dismiss this request for relief when the underlying . . . facts have not been fully developed."). Dismissal of DCL's permanent injunction cause of action would be improper.

J.    **Missimer's Claim for an Accounting in Count 13 Should Survive Because Missimer Was a Fiduciary to DCL.**

Missimer seeks dismissal of DCL's demand for an accounting "[b]ecause an accounting is a remedy and is clearly not a cause of action." (Df Br. at 20). "Under Virginia law, an accounting

is a form of equitable relief which is available upon order of a court in equity providing for an accounting of funds among those with a partnership or other *fiduciary relation* inter se.'" *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 623 (E.D. Va. 2010) (emphasis added) (citations omitted); *see also* Va. Code § 8.01–31 ("An accounting in equity may be had against *any fiduciary* or by one joint tenant, tenant in common, or coparcener for receiving more than comes to his just share or proportion, or against the personal representative of any such party.") (emphasis added). Just as DCL is able to plead a cause of action for injunctive relief, which is an equitable remedy, so to can DCL allege a cause of action for an accounting. Additionally, DCL has sufficiently alleged that Missimer was a fiduciary of DCL in his capacity as a DCL shareholder, director, and officer of DCL when he was competing with DCL while still serving as a fiduciary. Thus, DCL has sufficiently pled facts to survive a motion to dismiss on its claim for an accounting, which will be raised at the proper time after full and fair discovery in this case.

## CONCLUSION

For the foregoing reasons, DCL respectfully requests that the Court deny Missimer's Motion to Dismiss in its entirety.

Dated: June 19, 2023

Respectfully submitted,

Steven J. Weber, VSB No. 35573
Lucas T. Daniels, VSB No. 91557
Gregory R. Begg, *Pro Hac Vice*
Lauren Rayner Davis, *Pro Hac Vice*
PECKAR & ABRAMSON, P.C.
*Attorneys for Plaintiff, Dark Circuit Labs, Inc.*
2055 L Street, NW, Suite 750
Washington, DC 20036
Telephone: 202.293.8815

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused a true and accurate copy of the foregoing Opposition to Defendant Eric Missimer's Motion to Dismiss and Declaration of Steven J. Weber, Esq. and Exhibits thereto to be served on Defendants' counsel via the CM/ECF system as follows:

Broderick C. Dunn, VSB 74847
Maria Estelle Stickrath, VSB 96191
COOK CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
(703) 865-7480
bdunn@cookcraig.com
mstickrath@cookcraig.com
*Attorneys for Defendant Eric Missimer*

Anne G. Bibeau, VSB 41488
Pietro Sanitate, VSB 89538
WOODS ROGERS VANDEVENTER BLACK PLC
101 West Main Street, Suite 500
Norfolk, VA 23510
(757) 446-8517
anne.bibeau@wrvblaw.com
psanitate@wrvblaw.com
*Attorneys for Defendants Black Sails Security LLC and John Carpenter*

Roya Vasseghi, VSB 85122
VASSEGHI BUDD PLLC
9663-A Main Street Fairfax, VA 22203
(703) 215-9358
roya@vasseghibuddlaw.com
*Attorneys for Defendant Michael Frank*

Renee B. Appel, VSB 87721
Dawn Mertineit, *Pro Hac Vice*
SEYFARTH SHAW LLP
975 F. Street NW
Washington, DC 20004
(617) 946-4917
rappel@seyfarth.com
dmertineit@seyfarth.com
*Attorneys for Defendant Keith Haddock*

Dated:  June 19, 2023                    */s/ Steven J. Weber*
                                          STEVEN J. WEBER