# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **DARK CIRCUIT LABS, INC.**, <br><br> Plaintiff, <br><br> vs. <br><br> **BLACK SAILS SECURITY LLC**, **JOHN CARPENTER**, **ERIC MISSIMER**, **MICHAEL FRANK,** and **KEITH HADDOCK**, <br><br> Defendants. | Civil Action No.: 1:23-cv-00326-LMB-LRV |

**REPLY AFFIDAVIT OF RONALD PELKEY IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65**

**RONALD PELKEY**, being duly sworn, deposes and says:

1. During all relevant time periods herein, I have held the title of President and Chief Operating Officer of Plaintiff Dark Circuit Labs, Inc. ("Plaintiff" or "DCL") in the above captioned action and as such, I am fully familiar with the facts relevant hereto.

2. I respectfully submit this Reply Affidavit in further support of DCL's Motion for a Temporary Restraining Order ("TRO"), Preliminary Injunction, and Expedited Discovery pursuant to Federal Rule of Civil Procedure ("FRCP") 65, brought on by Order to Show Cause, against Defendants Black Sails Security LLC, ("BSS"), John Carpenter ("Carpenter"), Eric Missimer ("Missimer"), Michael Frank ("Frank"), and Keith Haddock ("Haddock") (collectively

herein referred to as "Defendants") pending a determination of the relief requested in DCL's First Amended Verified Complaint ("FAVC").[1]

3.　　I have reviewed three Affidavits and one Declaration submitted by Defendants in opposition to DCL's instant motion for emergency and preliminary relief. (*See* ECF Nos. 40-1, 41-1, 42-1, 43-1).

4.　　As more fully detailed herein, Defendants contradict themselves and the evidence of record throughout their submitted Affidavits and Declaration. As a result, this Affidavit serves to rebut Defendants' assertions with even further documentary evidence than has already been submitted by DCL.

## I.　　**DEFENDANTS' ADMISSIONS AND CONTRADICTORY POSITIONS.**

### A.　　**Defendants BSS and Carpenter's Declaration.**

5.　　Carpenter states, "In late 2022, I talked with Haddock about how BSS could apply for a subcontract with LMCO to perform offensive cyber security tools and development." (Carpenter Decl., ¶ 11).

6.　　However, Haddock states that, "In late January 2023, . . . Carpenter called me to inform me for the first time that he was planning to start a new company, [BSS], to serve as another subcontractor for Lockheed Martin [Corporation ("LMCO")]," DCL's largest client. (Haddock Aff., ¶ 23).

7.　　These contradictory statements show that either Carpenter or Haddock (or both) submitted a false statement to the Court as to what occurred and when. More importantly, however,

---

[1]　Unless otherwise noted, the factual statements referenced herein refer to the factual statements and the Exhibits annexed to the Declaration of Steven J. Weber, Esq. ("Weber Declaration" or "Weber Decl.") and Affidavit of Ronald Pelkey ("Pelkey Affidavit" or "Pelkey Aff."), both submitted in support of DCL's motion. (ECF Nos. 20-1, 20-2).

#4926015v3

both Haddock and Carpenter admit that such a conversation occurred wherein a current Vice President of DCL, Carpenter, who had access to DCL's proprietary and confidential trade secret information, solicited Haddock of LMCO to divert DCL's subcontract to BSS. Carpenter and Haddock concede this fact by their statements, regardless of their contradictory nature.

8.      Carpenter states that he was authorized to approve timesheets. (Carpenter Decl., ¶ 11). Neither I nor Chase Bertke ("Bertke"), the Chief Executive Officer ("CEO") of DCL, granted Carpenter authority. The only other individual with administrative rights to grant such authorization was Missimer, further demonstrating their colluding conduct.

9.      Carpenter states that when DCL commenced its internal investigation on January 27, 2023, "it was unclear whether I was to continue working." (Carpenter Decl., ¶ 15). This statement is false because the letter clearly and unambiguously explained that Carpenter's "access to time sheets shall remain active during [his] administrative suspension to preserve continuity of services for the mission" and that he would be compensated "pursuant to [his] existing agreements with DCL and the terms of that contract" for services rendered thereunder. (Ex. F at 2).

10.     Carpenter states that he was "scheduled to work the following day" and it was only "[a]fter Haddock contacted DCL to demand that it allow me to continue working, DCL relented and informed me that I was to continue work." (Carpenter Decl., ¶ 16). This statement is false because the letter clearly and unambiguously states that Carpenter was permitted to continue working solely on the IDIQ Task Order to support mission continuity during the pendency of the investigation. (Ex. F). However, because he was administratively suspended during the investigation due to the disclosures about his competitive activities, he would not be attending business planning meetings or otherwise conducting any company business other than what was required by LMCO for the mission and would not have access to company property for this same

#4926015v3

reason. If it were any other line of business, Carpenter (and Missimer) would have likely been immediately terminated upon the January 25 and 26, 2023 disclosures. DCL's commitment to preserving the continuity of the mission is demonstrated by its approach to this unique situation in its January 27, 2023 letter to Carpenter and its efforts to resolve this matter out of court thereafter.

11.     As it relates to DCL's resolution efforts, Carpenter states that DCL proposed "an unreasonable amount of money, far in excess of the anticipated revenue the subcontract would generate." (Carpenter Decl., ¶ 17). DCL was judicious about excluding any subjective statements regarding settlement discussions in its filings for this action for purposes of maintaining confidentiality.

12.     However, now that Carpenter has opened the door and subjectively stated that DCL's demand was "unreasonable," it is important to note that damages calculations were conducted based on the IDIQ Contract to show how DCL reached the figures that it proposed for purposes of settlement. The proposed figures would not have come close to exceeding the revenue the contract would generate, but DCL was willing to negotiate to keep this matter out of court to preserve its relationship with LMCO and to ensure mission continuity. In fact, Carpenter produced a counteroffer in response to those figures.

13.     DCL believed a compromise could be reached by splitting the difference but, during the pendency of settlement discussions, Carpenter retained new counsel who shortly thereafter conveyed a polar opposite position that Carpenter was dissolving BSS and planned instead to work for one of DCL's competitors. This position left DCL with no other course of action but to pursue Carpenter to enforce the restrictive covenants to which he is bound, which is exactly what DCL has done by filing the instant action. It should be noted that there is no indication that Carpenter

4

has or will not simply incorporate a new competitive enterprise in its stead to evade a court order given his prior conduct.

14.     Carpenter also makes several assertions related to solicitation of Frank for purposes of BSS. Specifically, Carpenter states that "Frank approached me and asked if he could work for BSS." (Carpenter Decl., ¶¶ 18, 32). Carpenter's statement is at odds with contemporaneous text messages between myself and Frank around the time Frank was interviewed as part of the internal investigation, as detailed in the FAVC. (Ex. M). Either Carpenter or Frank is making a false statement about who approached whom, but in any event, even if taking both contradictory statements as true, both statements show that Carpenter had formed BSS and was soliciting and/or intending to employ DCL's employees, in direct violation of his restrictive covenants.

15.     Carpenter states that "my plan for BSS to acquire DCL's LMCO subcontract was dependent on reaching a deal with DCL." (Carpenter Decl., ¶ 18). This statement is an admission under oath that Carpenter was trying to steal DCL's contract. This statement explicitly shows intent regarding Carpenter's unlawful competitive activities with DCL. The fact that DCL was willing to discuss settlement when Carpenter's misconduct came to light should not be used against DCL.

16.     Carpenter states that he "discussed the settlement negotiations with Missimer, whom DCL had included in its settlement proposal." (Carpenter Decl., ¶ 19). This statement is an admission that Missimer and Carpenter were continuing to conspire against DCL, despite taking the position during negotiations that they had nothing to do with one another and refusing to settle by way of a single settlement agreement, instead taking the position that each of their agreements must be negotiated separately. As Carpenter has now admitted that he was conferring with Missimer during negotiations regarding the proposed terms, it completely undercuts their position

#4926015v3

that one had no idea what the other was doing and shows their total lack of credibility and gamesmanship.

17. Carpenter states that he "told Haddock on or about February 9, 2023, that [he] planned to quit my DCL employment." (Carpenter Decl., ¶ 20). This date is an important date because it was only approximately one week into negotiations which were being conducted via the parties' respective counsel. It is also the same date that I had a phone call with Missimer about trying to keep negotiations moving forward. Additionally, the evening of February 9, 2023, Haddock admits that he left DCL a voicemail that Carpenter and Missimer were quitting and DCL would be terminated the following day. (Haddock Aff., ¶ 33). When viewed in conjunction with each other, there is no other conclusion to reach but that Carpenter and Missimer were in constant communication with Haddock and each other at this time regarding DCL's confidential and proprietary information, further evidencing their conspiracy against DCL.

18. Carpenter also attaches to his Declaration an email, dated February 9, 2023, the same date as referenced above, from Haddock to Carpenter, a then-current employee and Vice President of DCL. However, Haddock's email was not sent to Carpenter's DCL email address. It was instead sent to an email address "blacksailseccontracts@gmail.com," which DCL interprets as an email address that was created for BSS to secure contracts. For Haddock to have sent this email to Carpenter's Gmail address, Carpenter would have needed to provide it to Haddock in some manner prior to that date. Even if there were no other evidence that Carpenter was soliciting LMCO to divert DCL's business to BSS, this email alone shows that Defendants must be enjoined. The February 9, 2023 email further shows the necessity for expedited discovery as DCL should be entitled to full and fair review of all other emails that Defendants sent to or from the

"blacksailsseccontracts@gmail.com" address or any other email accounts that were created for purposes of competing with DCL in order to investigate the full extent of Defendants' wrongdoing.

19.     As it relates to the contents of the February 9, 2023 email, Carpenter appears to take the position that Haddock's statements regarding DCL exonerate him from breaching his restrictive covenant agreements or that perhaps DCL's relationship with LMCO was tarnished prior to Defendants' activities related to BSS. DCL's FAVC details accolades that Haddock had bestowed upon DCL up until the end of 2022, including discussions regarding purchasing DCL, which is the same exact time that BSS was incorporated. (Ex. B, ¶¶ 36-39).

20.     Disturbingly, and in keeping with DCL's allegations in the FAVC regarding Defendants' conspiracy against DCL, the February 9, 2023 emails shows that Haddock sent confidential performance information to Carpenter, not as a DCL employee, but in Carpenter's capacity as an owner of BSS, a direct competitor. DCL had never received any negative progress updates or poor performance reviews from Haddock or any others at LMCO. The February 9, 2023 email is clear and unequivocal documentary evidence that BSS, Carpenter, and Haddock were working together to withhold information that caused damage to DCL by trying to remove DCL from its subcontract to steal DCL's business plans and all of its employees.

21.     Moreover, similar to Carpenter and Frank pointing fingers at each other in terms of who approached whom, Carpenter and Haddock appear to disagree regarding when Haddock became aware of BSS. Carpenter states that after the February 9, 2023 email from Haddock, he "began the application process for BSS to become an LMCO subcontractor." (Carpenter Decl., ¶¶ 22-23). However, this statement is directly contradicted by a statement made by Carpenter on January 30, 2023 during his interview as part of DCL's internal investigation, which was ten days

prior to the February 9, 2023 email, that Carpenter expected to be approved by LMCO as a subcontractor "any day now."

22.     I have personal knowledge regarding the subcontractor approval process with LMCO and understand that it typically takes two or more weeks for LMCO to approve a subcontractor. As a result, based on Carpenter's recorded January 30, 2023 statement, he must have started engaging with Haddock at least two weeks or more prior to the date of the interview, which is consistent with Carpenter's statement that, "In late 2022, I talked with Haddock about how BSS could apply for a subcontract with LMCO to perform offensive cyber security tools and development." (Carpenter Decl., ¶ 14).

23.     This timeline shows that Haddock's statement in Paragraph 23 of his Affidavit that he did not learn of BSS until "late January 2023" lacks credibility, or that Carpenter was being untruthful when he made his statement in Paragraph 14 of his Declaration. In any event, even if all such contradictory statements are taken as true, they would still show that Carpenter had formed BSS intending to compete with DCL in violation of his contractual, statutory, and common law duties and that Haddock assisted him in his efforts to do so.

24.     Carpenter states that he "did not resign" after I requested him not to do so. (Carpenter Decl., ¶ 21). As alleged in the FAVC, it is true that I requested that both Carpenter and Missimer not resign on February 9, 2023 and neither individual responded to my attempts to contact them. (Ex. B, ¶ 134). However, DCL was forced to take that approach, because during negotiations, Carpenter and Missimer were using DCL's desire to maintain continuity on the customer mission as a hostage by threatening to quit if DCL did not cave to their demands. Haddock also used DCL's confidential information conveyed to him by Carpenter and Missimer

to further strongarm DCL into handing over its contract to BSS. (Haddock Aff., ¶ 28). All of these actions show Defendants' conspiracy.

25.     Carpenter admits that he, Missimer, and Haddock discussed BSS and that he started plans to compete with DCL. (Carpenter Decl., ¶ 28). Carpenter further admits that it was not until he was fired and a lawsuit was filed did he decide to abandon his plans and decide to go work for a direct competitor under the same program at LMCO. (Carpenter Decl., ¶ 28-29).

26.     Carpenter admits that he downloaded DCL's Business Plan, as DCL alleges in the FAVC. (Carpenter Decl., ¶ 33). There is no record of customer meetings on the dates that Carpenter downloaded the Business Plan and out of all of the documents that Carpenter viewed or accessed through this same document sharing program, the Business Plan was the only document he ever downloaded. (Ex. R). Carpenter downloaded it twice, a mere two weeks before he incorporated BSS. (Ex. R). A reasonable inference can be drawn that Carpenter was misappropriating DCL's trade secrets for purposes of BSS from this course of unusual conduct and timing.

27.     Carpenter states that he had "identified" a "prospective customer" and that was the reason he downloaded the Business Plan. (Carpenter Decl., ¶ 39). I personally attended these meetings and Carpenter never recommended any customer to DCL and then downloaded the file (twice) to take the notes DCL's senior management had discussed to use for the benefit of BSS.

28.     Carpenter states that he "viewed [the Business Plan] only on DCL's laptop" and that he "never exported or printed the file" and "did not retain a copy of it after [his] DCL employment ended." (Carpenter Decl., ¶¶ 40-42). This statement shows the vital importance of the Court granting expedited discovery because DCL must take Carpenter's testimony under oath regarding these issues as he could have taken a photograph of the Business Plan, written it down

by hand, or otherwise transmitted the information in the file in other ways that he does not mention in his Declaration.

29. Finally, Carpenter admits that he is violating his restrictive covenant agreement by presently working for PLEX, a direct competitor of DCL. (Carpenter Decl., ¶ 47).

**B. <u>Defendant Missimer's Affidavit</u>.**

30. Missimer states that "DCL has no ties to the state of Delaware." (Missimer Aff., ¶ 10). This statement is false because DCL is incorporated in Delaware and adheres to filing and reporting requirements of the state as a Delaware corporation. The Shareholders Agreement, which Missimer executed, also designates Delaware law as governing law, further evidencing the corporation's ties to the state. (Ex. C).

31. Missimer also makes several statements regarding his undue delay in returning DCL's company property and apparently seeks to blame his delay on requesting a list of property on DCL. (Missimer Aff., ¶¶ 21-22). First, despite being demanded to return company property on January 27, 2023, Missimer did not respond to DCL's demands for its property's return and his counsel did not request a list until three weeks later. Given Missimer's position as DCL's Chief Technology Officer and system administrator, as alleged in the FAVC, DCL's position was that he should have been aware of any and all equipment that was used in hosting, storing, transmitting data, or running on the DCL network, and as a current employee and DLC shareholder and that DCL expected his assistance in identifying any equipment that was associated with these purposes. (Ex. B, ¶ 22).

32. Missimer claims that when he was terminated he "was in transit to Virginia" and that this made it "impossible for [him] to get the requested equipment back to DCL." (Missimer Aff., ¶¶ 23-24, 26-27). These statements show that Missimer admits that he had not returned

company property as late as March 6, 2023, his termination date, and that he does not deny that he disconnected the VPN, thus depriving DCL of its corporate network. Missimer could have and should have returned DCL's company property immediately upon DCL's demand on January 27, 2023 when he was placed on administrative leave, but he failed to do so. He continued to fail to do so all the way until March 16, 2023, six days after DCL filed the instant action, which shows that if DCL had not taken action to recover its property by filing in court, that it may never have had its property returned.

33.     Finally, astoundingly, Missimer states that "i[f] the Court grants [DCL] the relief it requests, [he] will be prevented from working in the defense contracting space in any capacity, even as a janitor." (Missimer Aff., ¶ 30). This statement is false. DCL is not requesting that the Court order that Missimer cannot work as a janitor; this is a ludicrous statement and shows that Missimer did not review the relief DCL requested. Specifically, as it relates to the non-compete restriction, in its Order to Show Cause filed on April 6, 2023, DCL seeks to enjoin Missimer from "providing any services to any client or customer that Carpenter, Missimer, and Frank maintained any contact with while in the employ of DCL for a period of two (2) years, measured from the date of the Order." (ECF No. 21). This restriction is narrowly tailored to protect DCL's legitimate business interests, especially given Defendants' misconduct to date, the full extent of which is presently unknown without the benefit of full and fair discovery.

34.     Missimer states that he filed a state court action, which DCL has since removed to this Court, and even attaches a copy of his state court complaint to his Affidavit. DCL filed an Answer with Affirmative Defenses on April 18, 2023 under Docket No. 1:23-cv-00476-LMV-LRV, denying Missimer's claims in their entirety. DCL has also since moved to consolidate these actions under this action's docket number. (ECF No. 26).

35.     Rather than assert his claims as counterclaims in this action, and he clearly thinks they are related to the issues in this case given that he attached his state court complaint to his Affidavit, Missimer filed in state court for the sole purpose of creating delay, which caused DCL to expend unnecessary time and resources to try to bring all claims into the same forum, all right at the critical time when DCL was preparing for the TRO hearing and this filing.

36.     Regarding Missimer's purported whistleblower claims against DCL, Missimer did not make a report to Bertke, myself, or any other employee with managerial authority at DCL, regarding any alleged disclosures related to fraud on the government. Regarding any alleged financial improprieties, such issues, should they exist, which DCL denies, based on Missimer's allegations regarding the timing of his alleged disclosures, which DCL denies occurred, could have only arisen when Missimer was the CFO and Treasurer of DCL from November 2021 to December 2022 until he was removed by unanimous vote and replaced as CFO. DCL is performing a third-party audit of its books and records as a result of Missimer's removal and his misconduct revealed during the internal investigation that resulted in Missimer and Carpenter's March 6, 2023 terminations for cause. Any potential issues identified by the audit of DCL's financial records, such as incorrect accounting, general errors, or misappropriation of company funds during this time period may implicate liability on the part of Missimer. Should the third-party audit identify any incorrect accounting, general errors, or misappropriation of company funds during Missimer's tenure as CFO and Treasurer, DCL will have reason to believe that these actions or omissions were done intentionally or maliciously by Missimer in light of Missimer's demonstrated intent to compete with DCL.

37.     Bertke and I regularly send memoranda for the record ("MFR") via DCL's company email to contemporaneously document events regarding company business.

#4926015v3

38.     As it relates to claims by Missimer regarding retaliatory termination, DCL made the decision to terminate Missimer for his unlawful activities on Saturday, March 4, 2023, a decision which was documented via MFR that same day. Shortly thereafter, on Monday, March 6, 2023, DCL made the decision to terminate Carpenter, a decision which was also documented via MFR that same day. (A true and correct copy of emails, dated March 4, 2023 and March 6, 2023, is attached hereto as Exhibit S).[2]

39.     The terminations of both Missimer and Carpenter were implemented on Monday, March 6, 2023. Missimer's demand letter was trasmitted to Missimer's counsel via email on March 6, 2023 and DCL's counsel was in a meeting with me, Bertke, and Littleton at the time of its receipt and did not see Missimer's counsel email until after DCL had already implemented the terminations of Missimer and Carpenter at approximately 5:50 p.m. DCL was in process of implementing both Missimer and Carpenter's terminations, including preparing termination letters for cause based on DCL's findings regarding Missimer and Carpenter's misconduct to that date, well before Missimer's counsel transmitted his demand letter to DCL's counsel via email.

40.     With regard to purported retaliation related to housing benefits, at a Board meeting held by DCL on or about December 15, 2022, Missimer voted for the ceasation of his own housing benefits. The vote to cease providing housing benefits was proposed at this meeting because Bertke was commuting to the government customer's site from Maryland to Virginia resulting in two to three hours each day depending on traffic patterns and he requested to be provided with the same housing benefits provided to Missimer whose primary residence was in the Commowealth of Massachusetts. Missimer opposed Bertke's proposal and instead it was determined that if not all

---

[2] For purposes of continuity and ease of reference, new exhibits annexed to this Affidavit continue from Exhibits A through R, which were annexed to the Declaration of Steven J. Weber, Esq. submitted in support of DCL's Motion.

shareholders could receive the same housing benefits that no shareholder should receive them. As a result, the Board unanimously voted to discontinue providing housing benefits to shareholders, which included Missimer.

41.     Regarding any purported retaliation related to paternity leave, DCL does not have a formal paternity leave policy and paid paternity leave is not required under either Virginia or Delaware law. Missimer disclosed to DCL that he was expecting a child at which time the Board, which includes Missimer, discussed adopting a paid paternity leave policy at a Board meeting on December 1, 2022. While such a policy was discussed, it was never formally adopted by the Board and thus is not an enforceable policy of DCL. As a result, any allegation of retaliation by Missimer related to paternity leave is meritless. Notwithstanding no formal paternity leave policy being adopted by DCL, the Board approved Missimer's request of one month of paid paternity leave. However, without DCL's knowledge, during this same time period, Missimer had been and was engaging in competitive activities with Carpenter throughout December 2022 and January 2023. On January 26, 2023, Missimer informed Pelkey that he would be joining Carpenter's newly formed company, BSS, and that he still intended to take paid paternity leave and then quit upon his return and join BSS.

42.     Bertke and I regularly send memorandums for the record ("MFR") via DCL's company email to contemporaneously document events regarding company business.

43.     On January 26, 2023 at 1:35 p.m., I sent an MFR to Bertke and Littleton regarding my conversation with Missimer:

> On or about 1pm of January 26th Eric Missimer gave me a call and informed me that he has been aware of John Carpenter's new company, Black Sails Security LLC, since the beginning of December 2022. Eric stated that he and John solicited Keith Haddock, Lockheed Martin's project manager of the . . . task order and client of DCL, to obtain a sub contract on [the IDIQ Contract] for Black Sails Security so that Eric and John could continue working on the contract. Eric stated that he

intended to take a month of paid leave and then quit on his return and Join John Carpenter's company.

(A true and correct copy of my MFR, dated January 26, 2023, is attached hereto as Exhibit T).

44.     Following Missimer's disclosure to me, on January 27, 2023, Missimer was placed on adminsitrative leave pending an internal investigaiton. Missimer did not engage in any protected activity that would give rise to a retaliation claim when he engaged in this misconduct in concert with Carpenter or made this disclosure to me.

## C.     **Defendant Frank's Affidavit.**

45.     Frank provides testimony that Carpenter and Missimer were conspiring "to start a competing company," BSS. (Frank Aff., ¶ 23). Frank's statement undercuts Carpenter and Missimer's repeated positions (following their initial disclosures after they changed tact) that they were not working together on starting BSS.

46.     Frank further states that, "In the middle of February 2023, I knew that the relationship between DCL, Missimer, Carpenter and LMCO were at a low point." (Frank Aff., ¶ 29). Frank was an employee of DCL, but not in senior management, and thus was never privy to DCL's management information. The only way that Frank could have learned of such information was through the other Defendants, such as Carpenter, Missimer, and/or Haddock, in violation of the confidences of settlement exchanges that were taking place during this time and in violation of Carpenter and Missimer's covenants not to disparage DCL. DCL has asserted in its FAVC and in DCL's moving papers for the instant Motion that it was Carpenter, Missimer, and/or Haddock who worked together to disparage and induce employees to leave their employment with DCL. For Frank, their efforts succeeded because Frank abruptly resigned on March 14, 2023. (Ex. J).

47.     Moreover, Frank states that, "[o]n February 23, I reached out to Haddock via email to try to understand and gain an understanding of what I should do given my situation," and

explains that his "statement on February 23rd of helping Carpenter and Missimer 'work through this' was merely to convey that I was a good friend, teammate and wished nothing but the best for all of us." (Frank Aff., ¶¶ 30, 31, 33).

48.     By his statements, Frank appears to assert that his email to Haddock was sent for innocuous purposes. However, DCL's internal investigation revealed that Frank deleted his email to Haddock prior to his abrupt resignation. Frank took affirmative steps to backtrack and delete an email from his "Sent" folder which is an out of the ordinary action. I am unaware of other emails that Frank sent were deleted by Frank which shows that he intended to destroy the email he sent to Haddock to prevent DCL from discovering it. (A true and correct copy of a screen shot of the Frank's February 24, 2023 email to Haddock in the "Trash" folder is attached hereto as Exhibit U).

49.     Moreover, Frank was never authorized by DCL as an employee to "work through this" with BSS, Carpenter, and Missimer, and/or Haddock. It was DCL's understanding that all settlement discussions regarding BSS were confidential. Frank was interviewed as part of DCL's internal investigation which commenced immediately upon Haddock and Missimer's January 25 and 26, 2023 disclosures related to BSS. Frank's interview could have and should have been the extent of Frank's involvement in this case. However, Frank's February 24, 2023 email to Haddock shows, by his own words, that he was assisting Carpenter and Missimer with their plans related to BSS beginning sometime in 2022. (Exs. N, S). Additionally, I do not understand why Frank would state to Haddock that BSS would not be "setting sail anytime this year" if he did not have plans to go work for BSS, whether in the past, at that time, or in the future.

#4926015v3

50. Finally, similar to Carpenter, Frank admits that he is violating his restrictive covenant agreement by presently working for PLEX, a direct competitor of DCL. (Frank Aff., ¶ 37).

**D.** **Defendant Haddock's Affidavit.**

51. Haddock states that Carpenter contacted him in "December 2022 . . . to tell [him] that [Carpenter] was experiencing 'bait and switch' issues with DCL." (Haddock Aff., ¶ 22). I am not sure how this could be possible given that Carpenter himself states that he was sitting at the exact same desk performing the exact same duties as he was for his previous company in his own Declaration. Carpenter also makes no mention of such a conversation in his Declaration. Haddock further states that "Missimer specifically told [Haddock] that DCL was telling [Missimer] that he needed to go work on another program." (*Id.*). No one in senior management at DCL ever spoke with Missimer and told him that he needed to work on any other program.

52. Haddock states that "in or around January 23, 2023," I called Haddock to tell him that "Carpenter and . . . Missimer were planning to leave DCL and start a new company, BSS" and that "[b]ecause of their plans, . . . [DCL] needed to let both of them go." (Haddock Aff., ¶ 24). This is false for several reasons. First, it was Haddock who called me, not the other way around. Second, Haddock called me to discuss these issues in the evening of January 25, 2023, not January 23, 2023. Third, DCL had no knowledge that Missimer was involved with BSS at the time of Haddock's January 25, 2023 phone call to me. During a monthly meeting scheduled before the previously described call with Haddock that same day, I advised Haddock, along with Bertke during this meeting, that due to Carpenter starting a competing company, DCL would have to terminate his employment. However, Missimer was not mentioned because DCL was not yet aware that he was involved. It was on this monthly meeting call that Keith then asked DCL for a favor to

#4926015v3

see if DCL could find a way to keep Carpenter on the IDIQ Task Order, to which Bertke and I replied that we would speak with Carpenter and try to work something out.

53.     On January 26, 2023 at 9:46 a.m., I sent the following MFR to Bertke and Lawrence Littleton ("Littleton"), DCL's Chief Financial Officer:

> On or about the evening of January 25th I received a phone call from Keith Haddock who is the project manager for Lockheed Martin on the . . . task order on the . . . IDIQ [Contract], whom is a current client of DCL. Keith informed me that he had a conversation with John Carpenter about a company that he started, Black Sails Security LLC, and confirmed that John intended to compete with Dark Circuit Labs and solicited Keith for a subcontract on the [IDIQ] task order. At the time of this writing and the time of the conversation between Keith Haddock and John Carpenter, John is an employee of Dark Circuit Labs.

(A true and correct copy of my MFR, dated January 26, 2023, is attached hereto as Exhibit V).

54.     Haddock's version of events in his April 17, 2023 Affidavit does not comport with my contemporaneous documentation of this event mere hours after the conversation occurred. (*Compare* Ex. T with Haddock Aff., ¶¶ 24-25).

55.     Haddock states that DCL was issuing "persistent threats" to Carpenter and Missimer. (Haddock Aff., ¶ 32). This is false, whether it is Haddock who is making the false statement or it was Carpenter and Missimer who made such false statements to Haddock. At no time did DCL ever threaten Missimer or Carpenter throughout negotiations and acted in good faith trying to resolve the separation by and through counsel.

56.     Haddock mentions "threats" for a second time. (Haddock Aff., ¶ 40). However, these threats are never specifically described and DCL is unaware of and denies any such threats.

57.     Haddock states that he "never informed the [r]emaining DCL [e]mployees that [he] could introduce them to DCL competitors." (Haddock Aff., ¶ 42). This statement directly contravenes the statements personally made to me by three different current DCL employees. (*See* Pelkey Aff., ECF No. 20-1). Beyond introductions to competitors, Haddock even said he would

help DCL's employees start their own companies if needed, which is strikingly similar to how it appears the idea for BSS emerged. These contradictory statements further show the need for expedited discovery in order for DCL to determine the full extent of Haddock's wrongdoing and harm to DCL.

58.     Haddock states that "Carpenter, Frank, and Missimer have each since joined another subcontractor, PLEX, and remain employed on the [p]rogram." (Haddock Aff., ¶ 51). This statement shows that that Carpenter, Frank, and Missimer are all in violation of their contractual, statutory, and common law obligations to DCL.

59.     Haddock states that he has not experienced a situation like this "during his nearly 20 years working at [LMCO]." (Haddock Aff., ¶ 52). It is my understanding that Haddock has only been a Program Manager for approximately five and a half years and before that he was a testing engineer.

60.     Haddock states that he did not "learn[] confidential proposed settlement terms from the other [D]efendants" and that it was me who disclosed a "proposed monetary term" and that Haddock merely "repeated it back" to me. (Haddock Aff., ¶ 66). I did not state anything about a financial figure on the call, and moreover, DCL did not allege in its FAVC that Haddock mentioned a financial figure, but merely a "material term." (Ex. B, ¶ 130). The fact that Haddock characterizes it as a "monetary figure" shows that he is acutely aware of the information that he learned from Carpenter and/or Missimer. This is yet another reason that DCL requires expedited discovery because emails and phone records will be able to shed light on when, how often, and on what basis these individuals were conspiring and misappropriating DCL's confidential information during this time.

61.     Haddock states that "[t]here is no financial incentive or other motivation for me to receive, use, or disclose DCL's confidential or trade secret information." (Haddock Aff., ¶ 71). This statement is directly contradicted by Haddock's prior conduct because Haddock made repeated comments and remarks about not only purchasing DCL but copying its company model to use for LMCO's benefit. At one point, Haddock stated that such a model would allow LMCO to increase its profit from 6% to 10% based on the fact that an identical company like DCL was a subsidiary to LMCO. Haddock had ample motivation to seek DCL's proprietary information and did so in concert with the other Defendants.

62.     Haddock states that "[a]t no time" did he "disparage[] DCL." (Haddock Aff., ¶ 76). However, DCL employees stated to me directly that Haddock mentioned "issues with leadership" several times which is a statement that obviously sowed discord among DCL's employees with whom I spoke as detailed in my Affidavit submitted with DCL's moving papers in support of the instant motion. (*See* Pelkey Aff., ECF No. 20-1).

63.     Haddock states that he "does not have authority to fire and/or not extend an option year" and that he has "not exercised any influence over the fate of DCL's relationship with [LMCO]." (Haddock Aff., ¶¶ 50, 77). Haddock's statement is directly contradicted by the evidence of record, including Haddock's own February 9, 2023 voicemail, where Haddock unequivocally stated that DCL was being terminated because Carpenter and Missimer were threatening to quit. (Ex. B, ¶ 133). If Haddock truly had no such authority from LMCO, then a reasonable inference can be drawn that his statement to DCL that it was being terminated solely because of Carpenter and Missimer was made out of Haddock's own self-interest as it relates to his conspiracy with them. DCL believes that Haddock, in leaving this voicemail, was trying to force DCL to capitulate to Carpenter and Missimer's demands that they be released from their

restrictive covenants with either non-existent or extremely limited financial renumeration to DCL even though they admittedly desired for DCL to give up its subcontract with LMCO so that they could usurp it for BSS.

II.  **DEFENDANTS SHOULD BE ENJOINED.**

64.  In light of the foregoing, DCL seeks to immediately enjoin Defendants from breaching, and/or aiding and abetting the breach of, their restrictive covenant agreements and misappropriating DCL's trade secrets in violation of federal and state law, and imposing such additional relief as may be appropriate until the Court has ruled on DCL's request for a preliminary injunction, as more fully outlined in DCL's Order to Show Cause.

65.  DCL will continue to suffer extraordinary irreparable harm if Defendants are not immediately restrained and the expedited discovery in DCL's Order to Show Cause is not ordered.

66.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 19, 2023

RONALD PELKEY

#4926015v2